Lee D. Winston
lwinston@winstoncooks.com
State of Alabama Bar No.:6407O72L
Roderick T. Cooks
rcooks@winstoncooks.com
State of Alabama Bar No.: 5819O78R
Winston Cooks, LLC
420 20th Street North
Suite#2200
Birmingham, AL 35203
Telephone:      (205) 502-0970
Facsimile:      (205) 278-5876

Attorneys for the Plaintiff and the Proposed Classes

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK L. MOBLEY for and on behalf of himself and other persons similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> WORKDAY, INC. <br><br> Defendant. | Case No. 4:23-cv-00770-YGR <br><br> **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> Date:        October 10, 2023 <br> Time:        2:00 p.m. <br> Courtroom    1, 4th Floor <br> Judge:        Hon. Yvonne Gonzalez Rogers <br><br> Complaint Filed:  February 21, 2023 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

RESPONSE IN OPPOSITION TO MOTION TO DISMISS ............................................ 1

I.    INTRODUCTION ...................................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................................... 4

    A.  Mobley's Qualifications ................................................................................. 4

    B.  Workday's Business ....................................................................................... 4

    C.  Mobley's Allegations .................................................................................... 4

    D.  Workday's Investor Representations .............................................................. 5

    E.  Facts Related to Workday's Applicant Recruitment and ............................... 5

III.  LEGAL STANDARD ................................................................................................ 9

IV.   ARGUMENT ........................................................................................................... 10

V.    WORKDAY IS AN ENTITY SUBJECT TO LIABILITY UNDER TITLE VII,
    THE ADEA AND THE ADA .................................................................................. 12

    A.  Workday is an employment agency under Title VII, the ADEA, and the ADA. ........ 12

    B.  Workday Is Not Selling Classified Ads ....................................................... 14

    C.  Workday's power to control access to employment opportunities means that it
    is a covered entity under Title VII, the ADEA, and the ADA. .................................. 15

VI.   PLAINTIFF'S INTENTIONAL DISCRIMINATION CLAIMS ARE
    SUFFICIENTLY PLED ............................................................................................ 19

VII.  PLAINTIFF'S DISPARATE IMPACT CLAIMS ARE PROPERLY BEFORE
    THIS COURT AND SHOULD NOT BE DISMISSED AT THIS STAGE ...................... 19

    A.  Disparate impact claims are applicable to employment agencies. ............... 19

    B.  A Motion to Dismiss is Not the Proper Way to Dispose of Plaintiff's Disparate
    Impact Class Allegations. ...................................................................................... 23

    C.  Leave to Amend ........................................................................................... 25

CERTIFICATE OF SERVICE ........................................................................................ 26

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Pacific Maritime Ass'n*,
    336 F.3d 924 (9th Cir. 2003) ........................................ 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................ 9

*Ass'n of Mex.–Am. Educators v. State of California*,
    231 F.3d 572 (9th Cir.2000) (en banc) ......................... 15, 18, 22

*Astiana v. Ben & Jerry's Homemade, Inc., No. C 10-4387 PJH*,
    2011 WL 2111796 (N.D. Cal. May 26, 2011) ...................... 23

*Austin v. University of Oregon*,
    925 F.3d 1135 (9th Cir. 2019) ................................... 9

*Bass v. Dollar Tree Stores, Inc.*,
    2007 WL 2462150 *3 (N.D. Cal. 2007) ........................... 23-24

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
    2006 WL 3422198 (N.D. Cal. 2006) ............................... 24

*Bell Atlantic Corporation v. Twombly*,
    550 U.S. 544 (2007) ............................................ 9

*Brock v. Cathedral Bluffs Shale Oil Co.*,
    796 F.2d 533 (D.C. Cir.1986) ................................... 21

*Brothers v. First Leasing*,
    724 F.2d 789 (9th Cir. 1984) ................................... 11

*Brush v. San Francisco*,
    315 F. Supp. 577 (N.D. Cal. 1970) ........................... 10, 14

*Canatella v. Reverse Mortg. Sols. Inc., No. 13-CV-05937-YGR*,
    2014 WL 7205146 (N.D. Cal. Dec. 17, 2014) ...................... 9

*Cannon v. University of Chicago*,
    559 F.2d 1063–76 (7th Cir.1976) .............................. 13-14

*Cohen v. City of Culver City*,
    754 F.3d 690 (9th Cir. 2014) ................................... 11

*Cole v. Asurion Corp.*,
    2008 WL 5423859 (C.D. Cal. Dec. 30, 2008) ..................... 24

*Debro v. Contra Costa Community College District, et al.*,
    2021 WL 5585592 (N.D. Cal. 2021) .............................. 10

*DeJaynes v. Powell*,
   2022 WL 2657194 (N.D.Ill., 2022) ................................................................. 10

*Domingo v. New England Fish Co.*,
   727 F.2d 1429 (9th Cir.) ................................................................. 13

*E.E.O.C. v. Wal-Mart Stores, Inc.*,
   156 F.3d 989, fn. (9th Cir. 1998) ................................................................. 21

*Eldredge v. Carpenters 46*,
   833 F.2d 1334 (9th Cir. 1987) ................................................................. 22

*Fed. Exp. Corp. v. Holowecki*,
   552 U.S. 389, 128 S. Ct. 1147, 170 L. Ed. 2d 10 (2008) ................................. 21

*Gamble v. Kaiser Foundation Health Plan, Inc.*,
   348 F.Supp.3d 1003 (N.D. Ca. 2018) ................................................................. 19

*Garibaldi v. Bank of America Corp.*,
   2014 WL 172284 (N.D.Cal. 2014) ................................................................. 23

*Gilbert v. City of Richmond*,
   417 F.2d 426 (9th Cir. 1969) ................................................................. 25

*Gomez v. Alexian Brothers Hospital*,
   698 F.2d 1019 (9th Cir. 1983) ................................................................. 17, 18

*In re Jamster Mktg. Litig.*,
   2009 WL 1456632 (S.D. Cal. 2009) ................................................................. 24

*In re NVIDIA GPU Litig.*,
   2009 WL 4020104 (N.D. Cal. 2009) ................................................................. 24

*In re Wal-Mart Stores, Inc. Wage and Hour Litigation*,
   505 F.Supp.2d 609 (2007) ................................................................. 23

*International Broth. of Teamsters v. U.S.*,
   431 U.S. 324, fn. 14 (1977) ................................................................. 19

*Kemether v. Pa. Interscholastic Athletic Ass'n*,
   15 F. Supp. 2d 740 (E.D. Pa. 1998) ................................................................. 15

*Levitt v. Yelp! Inc.*,
   765 F.3d 1123 (9th Cir. 2014) ................................................................. 9

*Lutcher v. Musicians Union Local 47*,
   633 F.2d 880 (9th Cir. 1980) ................................................................. 16, 18

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) ................................................................. 9

Response in Opposition to Defendant's Motion to Dismiss

*MGIC Indem. Corp. v. Weisman,*
 803 F.2d 500 (9th Cir. 1986) ............................................................ 6

*Moreno v. Baca,*
 2000 WL 33356835 (C.D. Cal. 2000) ............................................... 24

*Moyo v. Gomez,*
 40 F.3d 982 (9th Cir. 1994) ............................................................... 11

*Newman v. Google LLC, No. 20-CV-04011-VC,*
 2023 WL 5282407 (N.D. Cal. Aug. 17, 2023) ................................... 25

*Northwest Forest Resource Council v. Glickman,*
 82 F.3d 825 (9th Cir. 1996) ............................................................... 20

*Paige v. State of Cal.,*
 102 F.3d 1035 (9th Cir. 1996) .......................................................... 3, 19

*Rabin v. PricewaterhouseCoopers LLP,*
 236 F.Supp.3d 1126 (N.D. Cal. 2017) ......................................... 11, 22-23

*Radentz v. Am. Ass'n of Physician Specialists, Inc.,*
 No. 2014 WL 12601014 (C.D.Cal. Nov. 10, 2014) ........................... 15

*Raytheon Co. v. Hernandez,*
 540 U.S. 44 (2003) ............................................................................ 23

*Rejoice! Coffee Co., LLC. v. Hartford Fin. Servs. Grp., Inc.,*
 No. 20-CV-06789-EMC, 2021 WL 5879118 (N.D. Cal. Dec. 9, 2021) ........................ 6, 9

*Rodriguez v. Airborne Express,*
 265 F.3d 890–97 (9th Cir. 2001) ....................................................... 19

*Scaglione v. Chappaqua Cent. Sch. Dist.,*
 209 F.Supp.2d 311 (S.D.N.Y.2002) ............................................... 14, 15

*Shein v. Canon U.S.A., Inc.,*
 2009 WL 3109721 (C.D. Cal. 2009) ................................................. 24

*Sheppard v. David Evans & Assoc.,*
 694 F.3d 1045 (9th Cir. 2012) ........................................................... 9

*Sibley Mem'l Hosp. v. Wilson,*
 488 F.2d 1338 (D.C. Cir. 1973) ................................................ 15, 16, 17, 18

*Sliger v. Prospect Mortg., LLC,*
 789 F.Supp.2d 1212 (E.D. Cal. 2011) ......................................... 23, 25

*Smith v. City of Jackson,*
 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) ................... 11

iv

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506, 510 (2002) ........................................................................ 9, 10, 19

*Tcherepnin v. Knight,*
    389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) ...................................... 11

*Velez v. Roche,*
    335 F.Supp.2d 1022 (N.D. Ca. 2004) ............................................................ 18

*Wilborn v. S. Union State Cmty. Coll.,*
    720 F. Supp. 2d 1274 (M.D. Ala. 2010) ........................................................ 13

**Statutes**

42 U.S.C. § 2000e ................................................................................ 11, 12, 14, 20

42 U.S.C. § 12111 ....................................................................................................... 12

**Other**

7AA Charles Alan Wright, Arthur R. Miller & Mary K. Kane, FEDERAL PRACTICE AND
PROCEDURE CIVIL § 1785.3 (3d 2005) ................................................................ 24

29 C.F.R. § 1607 .......................................................................................... 20, 21

*Ethical and social risks of harm from Language Models*, Weideinger et al............................. 13

Fed. R. Evid. 201 ........................................................................................... 6

*Lori Andrews & Hannah Bucher, Automating Discrimination:  AI Hiring Practices and Gender
Inequality,* 44:1 Cardozo Law Review, 145 (2022-2023) ........................................ 1

EEOC Compl. Man., Vol. II, § 631.4(b)................................................................ 21

Response in Opposition to Defendant's Motion to Dismiss

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

**Comes now**, Plaintiff Derek Mobley (hereinafter "Plaintiff" or "Mobley", by and through undersigned counsel, and respectfully responds to the Defendant's Motion to Dismiss as follows:

## I. INTRODUCTION

Technological advancement in the use and development of "Artificial Intelligence" ("AI") and Machine Learning ("ML") is fast outstripping human ability to comprehend and regulate it.[1] Because of these advances and the fact that AI now permeates almost every aspect of business and commerce, the Consumer Financial Protection Bureau, the United States Justice Department's Civil Rights Division, the Equal Employment Opportunity Commission and the Federal Trade Commission on April 25, 2023, issued a "Joint Statement on Enforcement Efforts Against Discrimination and Bias in Automated Systems" pledging to engage in a renewed, coordinated effort to enforce potential legal violations involving AI programs.[2]    The joint statement notes that the output of automated systems may be skewed by datasets that "incorporate historical bias," "[are] unrepresentative or imbalanced," or "contain other types of errors."   Id. It also cautions that unlawful discrimination may result when automated systems correlate data with protected classes.   Id.   Second, the statement describes certain automated systems as "black boxes" and warns that this lack of transparency can make it difficult for

---

[1] Amazon recently came under fire because its engineers unwittingly created an algorithm that rejected women applicants who used the term "women" in their application materials. The algorithm rejected potentially qualified women before they even reached the interview stage, but other candidates who were not even qualified made it through the hiring process.  The reason for this hiring bias was the fact that the AI had learned to replicate the biases of the data used to create it.  Lori Andrews & Hannah Bucher, *Automating Discrimination:  AI Hiring Practices and Gender Inequality,* 44:1 Cardozo Law Review, 145 (2022-2023).

[2] https://www.eeoc.gov/joint-statement-enforcement-efforts-against-discrimination-and-bias-automated-systems.

people to know whether the system is fair.  Id.  Third, the statement recognizes that developers of automated systems often do not fully understand the contexts in which their systems are being used, so the systems may be developed under flawed assumptions about users and their practices. Important here is the joint statement's proclamation that, "[e]xisting legal authorities apply to the use of automated systems and innovative new technologies just as they apply to other practices."  Id.

Against this backdrop, Mobley's lawsuit challenges Workday, Inc.'s (hereinafter "Workday" or "Defendant") discriminatory use of AI screening tools when evaluating and selecting applicants for employment opportunities.  Workday principally argues, *inter alia*, that it is not an employer or an employment agency and only markets and sells business software to clients who are then responsible for its subsequent use; thus, making the anti-discrimination statutes inapplicable to it.  However, Plaintiff's factual allegations and controlling authority do not permit Workday to throw a rock and hide its hand.  In short, Workday's practices, as alleged in Mobley's complaint, meet the definition of an employment agency under existing federal anti-discrimination laws.

Further, even if it is held that Workday is not an employment agency, Ninth Circuit authority still holds it liable for discrimination under Title VII, because it interfered on invidious grounds with Mobley's ability to form third-party employment relationships.  Under what is called the indirect employer theory, a defendant [Workday] need not be the plaintiff's direct employer to be subject to Title VII's reach so long as it exercised a degree of control over access to employment opportunities with third parties.  Here, Mobley's Complaint amply shows that Workday interfered with his attempts to obtain employment with third parties 80-100 times.  By its own admission, Workday deploys its discriminatory job screening algorithms and

machine learning processes to determine the employment of tens of thousands of Americans.[3] Thus, Workday is amenable to suit under either theory of liability.

Workday's collateral attacks on Mobley's complaint are equally unavailing. First, claiming that he never raised a disparate treatment theory in his charge of discrimination goes against the time worn instruction that "employment discrimination charges are to be construed with the utmost liberality."" *Paige v. State of Cal.,* 102 F.3d 1035, 1041-42 (9th Cir. 1996). Mobley's EEOC charge clearly states, "[u]pon information and belief, the Charging Party and other African-Americans have been discriminated against **because** of their race (African-American), in violation of the Civil Rights Act of 1964, as amended." This could apply equally to his disparate treatment or disparate impact claims. Second, Mobley was not required to plead a *prima facie* case of discrimination in his complaint. It has long been recognized that the *McDonnell Douglas* framework is an evidentiary standard and as long a plaintiff's allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests a motion to dismiss is due to be denied. Third, Title VII specifically authorizes disparate impact cases against employment agencies. See Fourth, Congress's interest in rooting out discrimination of any kind requires that the anti-discrimination statutes be interpreted broadly to facilitate that aim. Consequently, the Supreme Court has readily expanded the reach of anti-discrimination statutes to eliminate loopholes and capture all forms of invidious discrimination. Finally, Workday wants Mobley to answer what he cannot as an applicant, which is what "screening tools" it uses to unlawfully discriminate. What he has done is to allege that Workday's process and practices have denied him 80-t100 employment opportunities because of his race, age, and disability, and that he is not alone. Where there is

---

[3] See, Ex. 1 at pgs.1&5.

this much smoke, applicable authority dictates that Mobley should be allowed to investigate its source.

## II.    STATEMENT OF FACTS

### A.    Mobley's Qualifications

Mobley is an African-American male graduate of Morehouse College, an Historically Black College or University.  ECF#1 at p. 10, ¶¶19-20.  He obtained a bachelor's degree in finance from Morehouse College, and an associate degree in network systems administration, from ITT Technical Institute.  Id.  He is over the age of forty (40) and suffers from anxiety and depression.  Id.  Since 2018, Mobley has applied for at least 80-100 positions that use Workday, Inc. as a screening tool for talent acquisition and/or hiring. Id.  He has been denied employment each time.  Id.

### B.    Workday's Business

Workday primarily sells to medium-sized and large, global organizations that span numerous industry categories, including professional and business services, financial services, healthcare, education, government, technology, media, retail, and hospitality.  Ex. 1 at pgs. 1-7. Firms purchase a subscription for Workday's services and as part of their subscription, customers are provided support services to include professional consulting to enable them to use Workday applications.  Id.  Workday acknowledges that the development of AI and ML poses present ethical issues in the area of human rights and employment that could expose it to legal liability.  Ex. 1 at pg. 24.

### C.    Mobley's Allegations

Mobley alleges that Workday's AI and ML job screening tools discriminate on the bases of race, age, and disability with respect to selections.  ECF#1 at p. 10, ¶¶21-29. He also alleges

that these policies and procedures have been continuously utilized by Workday since at least 2018, and that their implementation and use has personally harmed Mobley and the putative class members he seeks to represent. Id. Additionally, he alleges that the selection tools marketed by Workday to its customers allows these customers to manipulate and configure them in a discriminatory manner to recruit, hire, and onboard employees. Id. Workday's processes interpret an applicant's qualifications and recommend whether the applicant should be accepted or rejected. Id. Applicants who are not members of these protected groups and who are similarly situated to Mobley, have not been subjected to such discriminatory treatment. ECF#1 at p. 4.

### D.    Workday's Investor Representations

In its 10k filings Workday states regarding its customers,

> "Our business depends on our ability to satisfy our customers and end users, both with respect to our application offerings and the **professional services** that are performed to help them use features and functions that address their business needs. High customer satisfaction requires that our customers undergo a successful implementation and be properly trained on our applications to effectively implement and increase their level of adoption of such applications. (emphasis added).

> \*\*\*

> Implementation of our applications may be technically complicated because they are designed to enable complex and varied business processes across large organizations, integrate data from a broad and complex range of workflows and systems, and may involve deployment in a variety of environments. Incorrect or improper implementation or use of our applications could result in customer and user dissatisfaction and harm our business and operating results. In order for our customers to successfully implement our applications, **they need access to highly skilled and trained service professionals. Professional services may be performed by our own staff, by a third party, or by a combination of the two.** (emphasis added).[4]

---

[4] Ex. 1 Excerpt from Workday 10k January 31, 2022.

Response in Opposition to Defendant's Motion to Dismiss

### E.    Facts Related to Workday's Applicant Recruitment and Selection

Workday's securities filing and web site materials tout the efficiency of their "AI" and "ML" tools for applicant recruitment and selection decisions-functions traditionally performed by employment agencies.[5]   Workday's approach to AI is unique. "Workday thinks about and implements AI and ML differently than any other enterprise software company in the world."[6] Based on a foundation of AI and ML, Workday provides:

#### Human Capital Management: Solutions for the Office of the CHRO

> In the changing world of human resources ("HR"), Workday helps organizations identify and respond to rapidly changing conditions, whether they stem from shifting talent needs or a renewed focus on belonging and diversity. Workday's suite of HCM applications allows organizations to manage the entire employee lifecycle – **from recruitment to retirement** – enabling HR teams to hire, onboard, pay, develop and reskill, and provide meaningful employee experiences that are personalized and helpful, based on listening to the diverse needs of today's workforce. For example, our skills technology, built on an AI and ML foundation, helps organizations make the important shift to a skills-first approach, helping them prepare today for the jobs of tomorrow. (emphasis added).[7]

Workday charges are based on a subscription model that reflects an on-going relationship with their client employers, to wit it states "[a]dditionally, we offer extensive customer training opportunities and a professional services ecosystem of experienced Workday consultants and

---

[5] "A court may take judicial notice of "matters of public record" without converting a motion to dismiss into a motion for summary judgment. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). But a court may not take judicial notice of a fact that is "subject to reasonable dispute." Fed. R. Evid. 201(b) *Rejoice! Coffee Co., LLC. v. Hartford Fin. Servs. Grp., Inc.*, No. 20-CV-06789-EMC, 2021 WL 5879118, at *11 (N.D. Cal. Dec. 9, 2021)

[6]Ex. 2- https://blog.workday.com/en-us/2023/how-ai-and-ml-are-powering-future-work.html
[7] Ex. 3-Work Day 10k For Fiscal Year Ending January 31, 2023, pg. 2
https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=117287473&type=PDF&symbol=WDAY&companyName=Workday+Inc.&formType=10-K&dateFiled=2023-02-27&CK=1327811

Response in Opposition to Defendant's Motion to Dismiss

system integrators to help customers not only achieve a timely adoption of Workday but continue to get value out of our applications over the life of their subscription."[8]  Workday's AI and ML recruits applicants and then refines the candidate pools:

"**Referrals**

Workday Recruiting enables the entire organization to participate in the talent acquisition process using referrals and recommendations.  Through the referral leaderboard, you can encourage employees to generate more referrals by allocating points to the referral activity.

"**Endorsements**"

Refine candidates' pools with endorsements.  As candidates indentify[sic] contacts within your organization, Workday automatically seeks their endorsement."[9]

Workday's AI is deployed to recruit and hire younger workers.  For example, in the federal sector:

"**Workday Government Cloud for the CHCO**"

Federal agencies need solutions that can help them attract and develop the next generation of talent. This video explores how Workday Government Cloud can **help agencies find the right candidates**, expedite onboarding, improve workforce engagement, and more."[10]

---

[8] Id. at pg. 5

[9] Ex. 4-Workday Recruiting- https://www.workday.com/content/dam/web/en-us/documents/datasheets/datasheet-workday-recruiting.pdf

[10]Ex. 5- https://forms.workday.com/en-us/other/workday-government-cloud-overview/form.html?step=step1_default (emphasis added).

Response in Opposition to Defendant's Motion to Dismiss



The slide deck reflects that Workday can "Attract & retain workers" whereas the spoken script acknowledges that Workday's AI is used to "…attract and retain younger workers."[11]

Ultimately Workday's AI and ML makes the applicant recommendations:

"With recruiting, engagement, and Workday Skills Cloud unified with Workday Human Capital Management (HCM), we've got you covered every step of the way.
Our skills intelligence foundation helps you build diverse teams by expanding candidate pools with equitable, AI- and ML-driven job recommendations."[12]

Using their "AI" and "ML" to make job recommendations (equitable or otherwise) or control access to jobs makes Workday an employment agency.

---

[11] Id video.  At the time Mobley's EEOC charge he was 47 years old. ECF. 17-1, pg. 6.
[12] Ex. 6- https://www.workday.com/en-us/products/talent-management/talent-acquisition.html.

Response in Opposition to Defendant's Motion to Dismiss

1

## III.    LEGAL STANDARD

2

This case is pending on a Motion to Dismiss, not the Defendant's Motion for Summary

3

Judgment.  These are not claims for fraud which are subject to Fed.R.Civ.P. 9's heightened

4

pleading standard.  Instead, "[t]o overcome a Rule 12(b)(6) motion to dismiss after the Supreme

5

Court's decisions in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) and *Bell Atlantic Corporation v.*

6

*Twombly,* 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must ...

7

suggest that the claim has at least a plausible chance of success.' " *Levitt v. Yelp! Inc.,* 765 F.3d

8

1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and

9

construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St.*

10

*Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008)." *Rejoice! Coffee Co., LLC.*

11

*v. Hartford Fin. Servs. Grp., Inc.,* No. 20-CV-06789-EMC, 2021 WL 5879118, at *3 (N.D. Cal.

12

Dec. 9, 2021); See also *Canatella v. Reverse Mortg. Sols. Inc.,* No. 13-CV-05937-YGR, 2014

13

WL 7205146, at *6 (N.D. Cal. Dec. 17, 2014) (cleaned up) ("Thus, "for a complaint to survive a

14

motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that

15

content, must be plausibly suggestive of a claim entitling the plaintiff to relief.")

16

The Supreme Court's decisions in *Iqbal* and *Twombly* did not alter the holding in

17

*Swierkiewicz* that discrimination plaintiffs are not required to allege a prima facie case to state a

18

valid claim. See *Twombly,* 550 U.S. at 569 n.14; see also *Austin v. University of Oregon,* 925

19

F.3d at 1135, 1136-37 (9th Cir 2019) (applying *Swierkiewicz* to Title IX claims and rejecting the

20

argument that Iqbal abrogated *Swierkiewicz*); *Sheppard v. David Evans & Assoc.,* 694 F.3d

21

1045, 1050 n.2 (9th Cir. 2012) (ADEA plaintiff is "not required to plead a prima facie case of

22

discrimination" (emphasis in original) (citing *Swierkiewicz,* 534 U.S. at 508-11)).

23

24

25

26

27

28

Response in Opposition to Defendant's Motion to Dismiss

Nevertheless, Workday's grounds for dismissal include the failure to recite the prima facie case elements. Defendant Workday, Inc.'s Motion to Dismiss and Memorandum of Point and Authorities in Support pgs. 13-14. Workday's Motion To Dismiss is populated with and relies on cases that weighed evidence whether at summary judgement, class certification, preliminary injunction (*Brush v. San Francisco,* 315 F. Supp. 577 (N.D. Cal. 1970) aff'd d. 469 F.2d 89 (9th Cir. 1972) or even trial. See *DeJaynes v. Powell,* 2022 WL 2657194, at *1 (N.D.Ill., 2022)("One of the several standing orders on this Court's website admonishes attorneys that summary judgment cases are not particularly helpful on a motion to dismiss.").[13]

## IV.  ARGUMENT

Workday's introductory statement that the Plaintiff complaint is devoid of any plausible allegations that it is an employment agency is just plain wrong. Plaintiff's complaint does what it is supposed to do under Rule 8, which is to put the Defendant on notice of what the Plaintiff is claiming. Further, the Supreme Court has squarely rejected a heightened pleading standard for discrimination cases at the motion to dismiss stage. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002); *Debro v. Contra Costa Community College District, et al.,* 2021 WL 5585592, *3 (N.D. Cal. 2021). Mobley's complaint outlines how Workday's processes and practices denied him 80-100 employment opportunities because of his race, age, and disability. He also alleges that individuals outside of his protected status are not treated in this fashion. Under *Swierkiwicz* and its progeny these allegations are sufficient.

Regarding Mobley's allegations challenging Workday's employment practices, Congress states, "It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because

---

[13] See Ex. 7-Table of Non-Motion to Dismiss Cases.

of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(b).  The Supreme Court and courts in the Ninth Circuit have made clear that because of the nation's overriding policy to stamp out discrimination, anti-discrimination statutes are to be construed broadly to facilitate the eradication of discrimination on any basis.  *Smith v. City of Jackson,* 544 U.S. 228, 240, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) (interpreting the ADEA to permit disparate impact claims in addition to disparate treatment claims); *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)(when a statute is remedial in nature, its text is to be construed "broadly to effectuate its purposes."); *Moyo v. Gomez,* 40 F.3d 982 (9th Cir. 1994) ("it has been long established that Title VII, as remedial legislation, is construed broadly."); *Brothers v. First Leasing,* 724 F.2d 789, 794 (9th Cir. 1984) ("[t]o conclude that discrimination in consumer leasing transactions is exempt from the ECOA simply because Congress did not add express language covering consumer leases when it amended the [Equal Credit Opportunity Act] for entirely unrelated reasons would be inconsistent with the broad purpose of the statute and the liberal construction we must give it."); *Cohen v. City of Culver City,* 754 F.3d 690, 695 (9th Cir. 2014) (courts must construe the language of the ADA broadly to effectively implement its remedial purpose); *Rabin v. PricewaterhouseCoopers LLP,* 236 F.Supp.3d 1126, 1128 (N.D. Cal. 2017) (the disparate impact theory is available to job applicants alleging violations of the ADEA).  Thus, to accomplish this goal remedial statutes like Title VII, the ADEA, and the ADA, that are designed to eliminate discrimination and protect applicants and employees, must be interpreted in a manner that would close any loopholes crafty defendants would use to escape liability for their unlawful acts.  Therefore, the

Response in Opposition to Defendant's Motion to Dismiss

catch-all phrase "otherwise to discriminate" operates to address Workday's alleged unlawful practices and processes here.

## V.    WORKDAY IS AN ENTITY SUBJECT TO LIABILITY UNDER TITLE VII, THE ADEA, AND THE ADA.

### A.    Workday is an employment agency under Title VII, the ADEA, and the ADA.

Workday's MTD's quotes the statutory definition of an employment agency:

> "Employment agency" is defined in both Title VII and the ADA as: Any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person. 42 U.S.C. § 2000e(c); 42 U.S.C. § 12111(7) ("The term[] . . . 'employment agency' . . . shall have the same meaning given such terms in section 2000e of this title.").[14]

According to Workday, "Our skills intelligence foundation helps you build diverse teams by expanding candidate pools with equitable, AI- and ML-driven job recommendations." That concession puts Workday comfortably within statutory definition of an employment agency, especially when their customers are paying regular subscription fees for AI recruitment and recommendations. Title VII (and the other anti-discrimination statutes) do not provide tech immunity for employee recruitment and selection accomplished through Workday's proprietary AI and ML.

Workday acknowledges that their AI refines candidate pools as, "As candidates indentify[sic] contacts within your organization, Workday automatically seeks their endorsement."[15]  To the extent an organization's past hiring practices have been discriminatory sifting out resumes and seeking out recommendations from the current workforce is a marker for discriminatory employment practice.  See *Domingo v. New England Fish Co.,* 727 F.2d

---

[14] ECF# 17, pg. 14.
[15] Ex. 4-Workday Recruiting.

1429, 1433 (9th Cir.), *modified,* 742 F.2d 520 (9th Cir. 1984) "In addition, Nefco gave preference in hiring to relatives of company employees and business associates. This pervasive nepotism policy did help both whites and nonwhites obtain employment, but whites controlled the best jobs, and in those jobs the nepotism favored whites." Scholars recognize that AI is not ready to be deployed for employee recruitment. See *Ethical and social risks of harm from Language Models,* Weideinger et al,    https://arxiv.org/abs/2112.04359  pg. 12 discussing training data required to reduce bias may not yet exist "…For example, a language technology that analyses CVs for recruitment, or to give career advice, may be less likely to recommend historically discriminated groups to recruiters, or more likely to recommend lower paying careers to marginalized groups."

Crossing the employment agency threshold and more, "Workday was an early adopter of large language models (LLMs) the technology that has enabled Generative AI and we use them in production today.  We have started adopting Generative AI, and we use them in production today.   We have started adopting Generative AI at Workday to solve a host of additional customer challenges.  A canonical case for LLMs is content creation, and we can how drafting performance reviews, job descriptions, and host of other documents will be transformed by this approach."[16]

As Judge Thompson from the Middle District of Alabama observed in *Wilborn v. S. Union State Cmty. Coll.,* 720 F. Supp. 2d 1274, 1291 (M.D. Ala. 2010) "Almost thirty-five years ago, the Seventh Circuit Court of Appeals observed that, "Litigation concerning the meaning of the term employment agency is rather sparse."   *Cannon v. University of Chicago,* 559 F.2d 1063, 1075–76 (7th Cir.1976). And the term has rarely been the subject of

---

[16] Ex. 2-How AI and ML Are Powering the Future of Work.

Response in Opposition to Defendant's Motion to Dismiss

meaningful dispute in the intervening years. *See Scaglione v. Chappaqua Cent. Sch. Dist.,* 209 F.Supp.2d 311, 316 (S.D.N.Y.2002) (McMahon, J.) ("There are very few cases invoking 42 U.S.C. § 2000e–2(b) ... and the few that do almost invariably involve an entity that is indisputably an 'employment agency.' ")."

**B.    Workday Is Not Selling Classified Ads**

Workday relies on *Brush v. San Francisco Newspaper Printing Co.*, 315 F. Supp. 577, 578 (N.D. Cal. 1970*), aff'd,* 469 F.2d 89 (9th Cir. 1972) in support of their argument that Workday is not an employment agency.[17]  In *Brush*, the newspaper publisher accepted gender based classified job advertisements printed in the San Francisco Chronicle, the daily San Francisco Examiner, and the Sunday Chronicle-Examiner.   However, the publisher had no control over employee selection and did not make any applicant recommendations.[18]  Here, Workday's AI/ML recruits applicants and makes employment recommendations. The cases are not comparable.

Defendant interprets subsequent decisions since *Brush* as requiring a defendant "actively assist" in procuring employment opportunities or employees to be an employment agency. Workday actively controls the employment selection process.  As described in their promotional video, when necessary, Workday's AI and ML focuses on recruiting and hiring younger employees.[19]  At the time of Mobley's EEOC charge he was 47 years old and not within the age range for training data designed for that opportunity.

---

[17] Workday MTD, ECF#17, pg.15.

[18] *Brush* was decided on an application for a preliminary injunction which resulted in a change that the newspaper would make a gender-neutral column available for employment ads.

[19] Ex. 5- https://forms.workday.com/en-us/other/workday-government-cloud-overview/form.html?step=step1_default video at approximately 29 seconds.

1
2

    **C.    Workday's power to control access to employment opportunities means that it is a covered entity under Title VII, the ADEA,  and the ADA.**

3

    Even if this court were to hold that Workday is not an employment agency, which it

4

should not, under an additional line of authority, "Title VII prohibits a defendant's interference

5

with an individual's employment opportunities with another employer. . .' Thus, a Title VII

6

defendant need not be the plaintiff's employer to interfere impermissibly with plaintiff's

7

employment opportunities.'" *Radentz v. Am. Ass'n of Physician Specialists, Inc.,* No., 2014 WL

8

12601014, at \*4 (C.D.Cal. Nov. 10, 2014) (quoting *Scaglione v. Chappaqua Cent. School Dist.,*

9

209 F. Supp. 2d 311, 316 (S.D.N.Y. 2002) (describing the rule adopted by *Sibley Mem'l Hosp.*

10

*v. Wilson,* 488 F.2d 1338, 1342 (D.C. Cir. 1973), and *Kemether v. Pa. Interscholastic Athletic*

11

*Ass'n,* 15 F. Supp. 2d 740, 762 (E.D. Pa. 1998))).   The Ninth Circuit has wholeheartedly

12

adopted the *Sibley* rule of indirect-employer liability.  See, *Anderson v. Pacific Maritime Ass'n,*

13

336 F.3d 924 (9th Cir. 2003); *Ass'n of Mex.–Am. Educators v. State of California,* 231 F.3d 572,

14

581 (9th Cir.2000) (en banc) (quoting *Sibley Mem'l Hosp. v. Wilson,* 488 F.2d 1338, 1341

15

(D.C.Cir.1973)).

16
17

    In *Sibley Memorial Hospital v. Wilson,* the D.C. Circuit Court found a hospital liable for

18

discrimination under Title VII for failing to refer a nurse for an employment opportunity with a

19

patient.  *Sibley Mem'l Hosp. v. Wilson,* 488 F.2d 1338, 1342 (D.C. Cir. 1973).  The plaintiff was

20

not an employee of the hospital but worked for an employment registry service which sent him

21

to assist patients at the hospital.  Id. at 1339-42.  The plaintiff alleged that because of his sex,

22

the hospital only assigned him male patients while female nurses could care for both male and

23

female patients.  Id. The plaintiff sued the hospital under Title VII, and the hospital argued that

24

because no employer-employee relationship existed, no liability existed under Title VII.  Id.

25

The district court for the District of Columbia entered summary judgment for the plaintiff

26
27
28

Response in Opposition to Defendant's Motion to Dismiss

finding that the hospital violated Title VII.  The D.C. Circuit reversed and remanded the case but in doing so held that Title VII enforcement does not explicitly depend upon the existence of a direct employer-employee relationship.  Id. at 1342-43.  The circuit court stated that the hospital exposed itself to Title VII liability because of the degree of control it exerted over the access to the employment opportunities.  Id.  The court also noted that indirect employer liability under Title VII can occur when labor unions or employment agencies interfere with the direct employment relationship.  Id.  In a string of cases beginning with *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir. 1980), the Ninth Circuit agreed with *Sibley* and subsequently expanded its reach.

In *Lutcher v. Musicians Union Local 47*, the Ninth Circuit applied Sibley's rationale and held that Title VII applies even when no direct employment relationship exists.  Joe Lutcher, a professional musician, and a member of the Musicians Union Local 47, converted to the Seventh Day Adventist Church.  Because his religion forbade it, Lutcher refused to pay dues to the Union.  Lutcher eventually came to serve as a business and personnel manager of the Watts Community Symphony Orchestra, who used Union musicians.  The Union's president wrote the conductor of the Symphony asking that Lutcher not perform with Union musicians.  His refusal to pay union dues barred him from performing with Union musicians which limited his opportunities to perform with the Symphony.  He sued the union under Title VII for religious discrimination.

The district court for the Central District of California granted summary judgment in favor of the Union.  The Ninth Circuit reversed, holding that the Union had violated Title VII by forcing Lutcher to pay dues when it conflicted with his religion.  The Union's actions limited Lutcher's employment opportunities because he could not perform jobs that involved Union

musicians.    The court found that the Union's interference with the direct employment relationship between the Symphony and Lutcher made it liable under Title VII.

Next, the Ninth Circuit applied *Sibley* in *Gomez v. Alexian Brothers Hospital,* 698 F.2d 1019, 1021 (9th Cir. 1983).    *Gomez* practiced medicine as an employee of the American Emergency Services Professional Corporation Medical Group ("AES").    *Gomez* submitted a contract proposal to the defendant hospital on behalf of AES.    The proposal involved operation of the hospital's emergency room, with *Gomez* serving as the director.    The hospital rejected the proposal.    *Gomez* brought a Title VII claim against the hospital because he believed that the hospital had denied AES's proposal for discriminatory reasons.    The district court for the Northern District of California granted summary judgment to the hospital.

The court held that Title VII did not apply because AES was an independent contractor and *Gomez* was an employee of AES, rather than the hospital.    The Ninth Circuit reversed, holding that the hospital was an indirect employer of *Gomez* because of its ability to interfere with the terms and conditions of *Gomez's* employment.    Further, the court found, "[t]he fact that plaintiff continues as an employee of AES does not mean the employment relationship between AES and plaintiff has not been interfered with. The conditions of plaintiff's employment are different than they would have been had he not been discriminated against. . ."    *Gomez,* 698 F.2d at 1021.

Similarly, in *Ass`n of Mexican-Am. Educators v. California,* 231 F.3d 572, 580-82(9th Cir. 2000) ("AMAE"), the Ninth Circuit found the state of California liable under Title VII because, even though it was not the plaintiffs' direct employer, it had influenced the employment policies and practices of local school districts.    Important here is the fact that AMAE was a class action. The AMAE plaintiffs challenged California's use of a skills test as a

Response in Opposition to Defendant's Motion to Dismiss

prerequisite to employment in the State's public schools.   The plaintiffs brought Title VII claims because the test allegedly had a disparate impact on minorities.

Relying on *Sibley*, *Lutcher*, and *Gomez*, the *AMAE* court found the state of California liable because it had interfered with the plaintiffs' relationship with future employers because its test dictated whom the employers could hire.   Further, the court stated that because California had participated in and influenced the employment practices and policies of the local school districts it was covered by Title VII. The court's conclusion rested on the degree of control the state exerted over who would be referred to the local districts.

Each of these decisions takes an expansive view of the indirect employer theory, as created by *Sibley*.  See *Velez v. Roche,* 335 F.Supp.2d 1022 (N.D. Ca. 2004) (extending indirect employer theory of liability to a hostile environment claim where the VA was the direct employer, and the Air Force was the indirect employer).  Moreover, the common thread that runs through all of them is that an entity is liable under Title VII where (1) the entity-controlled access to the employment opportunity with the direct employer, and (2) it interfered with the direct employment relationship between the employee and the direct employer.

Here, Mobley clearly alleges that Workday exerts singular control over who advances to employment relationships with third-party employers.

Response in Opposition to Defendant's Motion to Dismiss

## VI.    PLAINTIFF'S    INTENTIONAL    DISCRIMINATION    CLAIMS    ARE SUFFICIENTLY PLED.

Workday's claim that Mobley failed to exhaust his administrative remedies under Title VII and the ADEA is deeply flawed because it ignores the 9th Circuit instruction that "employment discrimination charges are to be construed with the utmost liberality."" *Paige v. State of Cal.,* 102 F.3d 1035, 1041-42 (9th Cir. 1996); *Gamble v. Kaiser Foundation Health Plan, Inc.,* 348 F.Supp.3d 1003, 1018 (N.D. Ca. 2018) (plaintiffs need not state specifically that the claim is brought on behalf of a class in their administrative charge).   Paragraph 7 of Mobley's charge alleges he was discriminated against because of his race, African-American, this means disparate treatment.   See *International Broth. of Teamsters v. U.S.,* 431 U.S. 324, 334-35, fn. 14 (1977) (claims of disparate treatment involve employer's alleged treatment of some people less favorably than others because of their race).   The ADEA allegations in his charge are similarly positioned because they fall "within the scope of the administrative investigation which can reasonably be expected to grow out of the charge of discrimination." *Gamble,* at 1014.   (quoting *Rodriguez v. Airborne Express,* 265 F.3d 890, 896–97 (9th Cir. 2001).

As stated above, under *Swierkiewicz* Mobley's allegations of intentional discrimination put the Defendant on notice as to what he is claiming and how he was injured.   Nothing more is required under Rule 8.

## VII.    PLAINTIFF'S DISPARATE IMPACT CLAIMS ARE PROPERLY BEFORE THIS COURT AND SHOULD NOT BE DISMISSED AT THIS STAGE.

### A.    Disparate impact claims are applicable to employment agencies.

When interpreting a statute, the court must "look to its plain language construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress.

Response in Opposition to Defendant's Motion to Dismiss

1  Then, if the language of the statute is unclear, . . . look to its legislative history.  *Northwest*

2  *Forest Resource Council v. Glickman,* 82 F.3d 825, 830-31 (9th Cir. 1996).  There's no need to

3  examine the legislative history of Title VII to determine whether the disparate impact theory

4  applies to employment agencies, because it is plainly stated in the text.  Workday does not even

5  address the statute's disparate impact provisions and instead presents a confusing argument

6  regarding the effect and motivation of disparate impact claims.  See, ECF#17 at pgs. 17-18.

7  Workday's legal contortions cannot absolve it from liability.  The statute clearly dictates that

8  employment agencies fall within its ambit, without any limiting language.  This is not a

9  question of first impression.

10      42 U.S.C. § 2000e-2(k)(1)(A) (Title VII)  that "An unlawful employment practice based

11  on disparate impact is established under this subchapter only if-(i) a complaining party

12  demonstrates that a **respondent** uses a particular employment practice that causes a disparate

13  impact on the basis of race, color, religion, sex, or national origin and the respondent fails to

14  demonstrate that the challenged practice is job related for the position in question and consistent

15  with business necessity. . . "  Title VII defines a respondent as:  "(n) The term "respondent"

16  means an employer, **employment agency**, labor organization, joint labor-management

17  committee controlling apprenticeship or other training or retraining program, including an on-

18  the-job training program, or Federal entity subject to section 2000e–16 of this title."  42 U.S.C.

19  § 2000e(n).  Moreover, regarding whether employment agencies and employment services are

20  subject to disparate impact claims, 29 C.F.R. § 1607.10, in relevant part states,

> "A. Where selection procedures are devised by agency. **An employment agency, including private employment agencies . . . which agrees to a request by an employer or labor organization to device and utilize a selection procedure should follow the standards in these guidelines for determining adverse impact. If adverse impact exists, the agency should comply with these guidelines.**.."

*Fed. Exp. Corp. v. Holowecki,* 552 U.S. 389, 395, 128 S. Ct. 1147, 1154, 170 L. Ed. 2d 10 (2008) ("[t]he agency has statutory authority to issue regulations, see § 628; . . . .") (citation omitted); *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 539 (D.C. Cir.1986) (publication in the Code of Federal Regulations indicates a substantive rule enforceable by third parties in federal court).  Further, both the EEOC and DOJ have issued guidance indicating that employment agencies can be held liable for disparate impact. Section 631.4(b) of the EEOC Compliance Manual provides that an employment agency, like an employer, may be held liable for disparate impact.[20]  The manual states "[t]he adverse impact theory is also applicable to evaluate policies and practices of employment agencies."   EEOC Compl. Man., Vol. II, § 631.4(b); See also Policy Guidance: What constitutes an employment agency under Title VII, how should charges against employment agencies be investigated, and what remedies can be obtained for employment agency violations of the Act? (1991).[21]  The EEOC, DOJ, DOL and the Civil Service Commission have jointly adopted the Uniform Guidelines on Employee Selection Procedures ("Guidelines") to help "employers, labor organizations, employment agencies, and licensing and certification boards" comply with federal employment law.  29 C.F.R. § 1607.1(A) & (B) (2023). The Guidelines assume that employment agencies can be held liable for disparate impact. Again, § 1607.10 specifically provides that "any employment agency . . . should follow the standards in these guidelines for determining adverse impact." 29 C.F.R. § 1607.10. Accordingly, employment agencies (like Workday) are expected to comply with the Guidelines to eliminate any disparate impact.

---

[20] *E.E.O.C. v. Wal-Mart Stores, Inc.,* 156 F.3d 989, fn. 1 (9th Cir. 1998) ("The EEOC Guidelines "constitute '[t]he administrative interpretation of [Title VII] by the enforcing agency,' and consequently they are entitled to great deference.'")(citations omitted).

[21] https://www.eeoc.gov/laws/guidance/policy-guidance-what-constitutes-employment-agency-under-title-vii-how-should-charges#_ftn8.

Response in Opposition to Defendant's Motion to Dismiss

In EEOC Decision No. 71-762 (1973), the Commission considered whether the use of an unsubstantiated pre-referral test which disproportionately excluded Black applicants violated Title VII. The respondent, **an employment agency**, relied upon an applicant's performance in a pre-referral test to determine whether to refer the applicant to a particular position. However, because white applicants significantly outperformed Black applicants in all but two test categories, white applicants were more likely to be referred to the most appealing jobs. The Commission held that the employment agency's practice violated Title VII and found the agency liable under a disparate impact theory.

In *Eldredge v. Carpenters 46,* 833 F.2d 1334 (9th Cir. 1987) the Ninth Circuit considered whether an apprenticeship program which disproportionately excluded women violated Title VII. The apprenticeship program required applicants to, among other things, obtain employment with a union contractor. Applicants could satisfy this requirement by finding an employer who would hire them and request the applicant by name. This so called "hunting license" system resulted in a substantial and statistically significant disparity between male and women applicants. The plaintiff class alleged that the defendant apprenticeship committee violated Title VII by utilizing a facially neutral standard that had a disparate impact. The court held that although the apprenticeship committee was not "in the same position as an employment agency," the committee violated Title VII by utilizing procedures that had a disparate impact. Id. at 1337 (emphasis added); See also, *Ass`n of Mexican-Am. Educators v. California,* 231 F.3d 572, 581-82 (9th Cir. 2000) (state of California held liable where its test dictated who the employers could hire).  The inescapable conclusion here is that the disparate impact theory of liability applies to employment agencies. Therefore, applicants, such as Mobley, can maintain a disparate impact claim against Workday.  *Rabin v. PricewaterhouseCoopers LLP,* 236

F.Supp.3d 1126 (N.D. Ca. 2017) (disparate impact theory of liability applies to job applicants under Title VII and the ADEA); *Raytheon Co. v. Hernandez,* 540 U.S. 44, 53 (2003) (ADA recognizes disparate impact discrimination "defining "discriminate" to include. . . "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability").[22]

### B.    A Motion to Dismiss is Not the Proper Way to Dispose of Plaintiff's Disparate Impact Class Allegations.

Here, to avoid class discovery, Workday suggest that this court adopt a pleading standard that would require detailed proof of Mobley's disparate impact claims, and not just the factual allegations, which is a standard no Plaintiff could ever hope to meet without some discovery.  Federal courts in California, including the Northern District, have not adopted the pleading standard asserted by the Defendants.  Indeed, numerous California District Courts have held that, "the granting of motions to dismiss class allegations before discovery has commenced is rare." *In re Wal-Mart Stores, Inc. Wage and Hour Litigation*, 505 F.Supp.2d 609, 615 (2007) ("[D]ismissal of class allegations at the pleading stage should be done rarely and that the better course is to deny such a motion because 'the shape and form of a class action evolves only through the process of discovery.' "); *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387 PJH, 2011 WL 2111796, at *14–15 (N.D. Cal. May 26, 2011); *Garibaldi v. Bank of America Corp.*, 2014 WL 172284, *8 (N.D.Cal. 2014); *Sliger v. Prospect Mortg., LLC*, 789 F.Supp.2d 1212, 1217-1219 (E.D. Cal. 2011); *Bass v. Dollar Tree Stores, Inc.*, 2007 WL 2462150 *3 (N.D. Cal. 2007)("Defendant's arguments regarding the propriety of the class allegations are premature. Accordingly, the Court denies Defendant's motion to strike or dismiss the class

---

[22] https://www.eeoc.gov/laws/guidance/americans-disabilities-act-and-use-software-algorithms-and-artificial-intelligence.

Response in Opposition to Defendant's Motion to Dismiss

allegations at this procedural stage"); *Moreno v. Baca*, 2000 WL 33356835, \*2 (C.D. Cal. 2000) (holding that defendants' motion to strike class allegations was premature because no motion for class certification had been filed); *In re NVIDIA GPU Litig.*, 2009 WL 4020104, \*13 (N.D. Cal. 2009) ("A determination of the ascertainability and manageability of the putative class in light of the class allegations is best addressed at the class certification stage of the litigation"); *Shein v. Canon U.S.A., Inc.*, 2009 WL 3109721, \*10 (C.D. Cal. 2009) ("The Court finds that these matters are more properly decided on a motion for class certification, after the parties have had an opportunity to conduct class discovery and develop a record"); *In re Jamster Mktg. Litig.*, 2009 WL 1456632, \*7 (S.D. Cal. 2009) ("Even though the arguments of [the defendant] may ultimately prove persuasive, the court declines to address issues of class certification at the present time. Piece-meal resolution of issues related to the prerequisites for maintaining a class action do not serve the best interests of the court or parties"); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 2006 WL 3422198, \*3 (N.D. Cal. 2006) (finding that a motion to strike class allegations from a complaint "is an improper attempt to argue against class certification before the motion for class certification has been made and while discovery regarding class certification is not yet complete"); *Cole v. Asurion Corp.*, 2008 WL 5423859, \*14 (C.D. Cal. Dec. 30, 2008) ("Undoubtedly, addressing these arguments at a later date will require additional time and expense on the part of the defendants. But the Court is reluctant to preemptively deny Plaintiff at least the opportunity to present a motion for class certification"); see also, 7AA Charles Alan Wright, Arthur R. Miller & Mary K. Kane, FEDERAL PRACTICE AND PROCEDURE CIVIL § 1785.3 (3d 2005) (noting that the practice employed in the overwhelming majority of class actions is to resolve class certification only after an appropriate period of discovery).

Response in Opposition to Defendant's Motion to Dismiss

Thus, this Court should not grant Workday's motion based on arguments that would limit or defeat class certification under Rule 23, because any such analysis is more properly done on a motion for class certification. *Gilbert v. City of Richmond,* 417 F.2d 426, 432 (9th Cir. 1969)("compliance with Rule 23 is not to be tested by a motion to dismiss for failure to state a claim."); *Sliger v. Prospect Mortg., LLC,* 789 F.Supp.2d 1212, 1217-1219 (E.D. Cal. 2011)(denying 12(b)(6) motion to dismiss putative class members' claims based on complaint's "overly broad" definition of the class because "the procedure urged by the defendant threatens a determination on the merits" that was inappropriate prior to class certification).

## C.    Leave to Amend

Finally, if for any reason this Court grants the Defendant's motion, Mobley requests an opportunity to cure any deficiencies in his complaint. See *Newman v. Google LLC,* No. 20-CV-04011-VC, 2023 WL 5282407, at *1 (N.D. Cal. Aug. 17, 2023) ("The plaintiffs have had six opportunities to adequately plead their claims.")

**Dated:  September 13, 2023**

Respectfully submitted,

/s/Roderick T. Cooks
Roderick T. Cooks *(admitted pro hac vice)*
Lee Winston *(admitted pro hac vice)*
Attorney for the Plaintiff and the Proposed Classes

**OF COUNSEL**:
Lee D. Winston
lwinston@winstoncooks.com
State of Alabama Bar No.:6407O72L
Roderick T. Cooks
rcooks@winstoncooks.com
Winston Cooks, LLC
420 20th Street North
Suite#2200
Birmingham, AL 35203
Telephone:    (205) 502-0970
Facsimile:    (205) 278-5876

Response in Opposition to Defendant's Motion to Dismiss

**LOCAL COUNSEL:**
Jay Greene
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108
Phone 415-905-0215
greeneattorney@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing document on all persons listed below via the Court's ECF filing system:

Julie A. Totten
Kayla Delgado Grundy
Orrick
405 Howard Street
San Francisco, CA 94105
jatotten@orrick.com
kgrundy@orrick.com

Done this the **13th** day of September 2023.

s/Roderick T. Cooks
Of Counsel

Response in Opposition to Defendant's Motion to Dismiss