**Volume 1**

**Pages 1 - 36**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

DEREK MOBLEY, for and on        )
behalf of himself and other     )
persons similarly situated,     )
                                )
            Plaintiffs,          )
                                )
  VS.                           )    **NO. 23-CV-770**
                                )
WORKDAY, INC.,                  )
                                )
            Defendant.          )
_____)

San Francisco, California
Tuesday, January 9, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    WINSTON COOKS, LLC
                    351 24th Street North
                    Box 122
                    Birmingham, Alabama  35203
            BY:  **RODERICK TWAIN COOKS, ATTORNEY AT LAW**

For Defendant:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
            BY:  **ERIN M. CONNELL, ATTORNEY AT LAW**

REPORTED BY:  Jennifer Coulthard, CSR No. 14457, CRR, RMR, CRC
              Official U.S. District Court Stenographer

<u>**Tuesday - January 9, 2024**</u>                              <u>**10:27 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**--oOo--**

    **THE CLERK:**  Calling civil case 23-770, Mobley versus Workday, Inc.

    Can you please step forward, state your appearances for the record?  Thank you.

    **MR. COOKS:**  Roderick Cooks for the plaintiff, Derek Mobley.

    **THE COURT:**  Good morning.

    **MR. COOKS:**  Good morning, Judge.

    **MS. CONNELL:**  Good morning, Your Honor; Erin Connell at Orrick Herrington & Sutcliffe on behalf of Defendant Workday.

    **THE COURT:**  Good morning.

    Did all the parties get the Court's questions?

    **MR. COOKS:**  Yes, Judge.

    **MS. CONNELL:**  Yes, Your Honor.

    **MR. COOKS:**  Yes.

    **THE COURT:**  Great.  So let's just run through the questions.  I have one or two more, but let's just run through the questions in order, and then I promise you'll have the opportunity to tell me whatever else you want to tell me at the end of the proceeding.  So I'll read the questions to make sure we're on the same page as to what we're talking about.

**PROCEEDINGS**

So the first question is:  Imagine a company hires an outside consulting firm to screen resumés received from local college students to recommend candidates to be interviewed on campus.  Unbeknownst to the company, the outside consulting firm intentionally discriminates by checking the students' social media and eliminating students of color from a list of recommended interviewees.  Would the college students have a Title VII claim for intentional discrimination against the consulting firm on the basis that the consulting firm is an indirect employer and/or an employment agency?

This is really a question for the defense, so let me just give the defense the first opportunity at that.

**MS. CONNELL:**  Sure.  Thank you, Your Honor.

Under the circumstances articulated in hypothetical 1, the students of color who were eliminated from consideration may have a viable claim against the consulting firm as an employment agency if a Court were to determine that by evaluating the resumés and eliminating the students of color that the consulting firm was significantly engaged in the activity of procuring employees for the employer as part of its professional business activity.

But the consulting firm would not fall within the narrow definition of indirect employer, as that has been developed through the case law, as courts have taken great care to keep that judicial expansion of statutory liability -- since

this concept is not in Title VII or its regulations -- limited

to situations where the third-party entity has a, quote,

peculiar level of control -- that's the phrase that's

consistently used in the case law -- over the working

conditions at issue.  So -- and there's two things that the

Ninth Circuit requires.  There has to be discriminatory

interference and that peculiar level of control.  And in this

hypothetical it doesn't appear that the consulting firm has

that level of control over the employment of the students who

are hired, or control of the ultimate decision who was hired.

       **THE COURT:**  Let me just pause on the employment agency

issue.

       **MS. CONNELL:**  Uh-huh.

       **THE COURT:**  So in the hypothetical, the outside

consulting firm is not going out and getting the resumés.

They're just coming into the company and the company is handing

them over and then the outside consulting firm isn't

prohibiting anybody from being hired, it's just making a list

of recommendations.  But, in your view, that wouldn't preclude

it from being an employment agency.  Am I understanding you

correctly?

       **MS. CONNELL:**  With that additional -- those additional

details, I think that tips the scale away from being an

employment agency.  It -- you know, it's what's unclear in the

facts of the hypothetical.

**PROCEEDINGS**

If, for example, it's unclear if the resumés are, for example, directed at a certain job, if the consulting firm is engaged in conduct of, you know, saying, "Okay, these resumés should go to this job" and it's really more active in that regard, I think it would tip the scales more towards finding that it is an employment agency.

I think it's also relevant that in the hypothetical it stated that the employment agency is excluding students of colors resumés altogether.  So if the employer never saw those resumés, you know, I think that, too, would be -- would be a fact that was in favor of finding it to be engaged as an employment agency.  But, I mean, importantly, these are materially different than the facts that are alleged in our case.

**THE COURT:**  I understand that.

**MS. CONNELL:**  Yeah.

**THE COURT:**  I'm just trying to understand the contours of what the defense position is, in terms of what counts as an employment agency.

So I hear you saying that if the resumés are going to a company and the outside consulting firm is just saying: We're not going to recommend anyone who's of color, but we'll just --

You know, of course a company has access to the resumés of the students of color; it's just they will never be

**PROCEEDINGS**

on the recommended list.  In your view, that would make them

not an employment agency potentially?

      **MS. CONNELL:**  Potentially.  There is case law that

says that simply screening resumés is not sufficient, that --

let's see.  Bear with me.  We cite it in our papers.

*Whitsitt v. Hedy Homes Staffing Services*, 2015 WL 5560119.

It's from the Eastern District of California, September 21st,

2015.  Says that simply screening resumés in that regard is not

proactive, engaged in the active procurement of employees.

      But, again, this is materially different than our

scenario because the facts as alleged in our case, Workday is

not doing any of this type of activity.  It's the employers.

As plaintiff alleges in his complaint, the employers are using

Workday's software to screen resumés.  Those are plaintiffs'

allegations.  So the actor is the employer, not Workday, and

that's the material distinction.

      **THE COURT:**  I understand.  But just staying on this

point about an entity that screens resumés is not an employment

agency.

      So are you saying that the students wouldn't be able

to sue the outside consulting firm that refused to recommend

any of the resumés?  They would screen out all of the resumés

from the recommended list if somebody is of color.  They can't

sue the outside consulting firm, but they also can't sue the

company either because the company has no idea that this is

**PROCEEDINGS**

happening and has no reason to think that this otherwise reputable outside consulting firm is doing this horrible thing. So is that really what Title VII provides?

  **MS. CONNELL:** I think the students of color could sue the employer under an agency principle. And from the facts of the hypothetical, it sounds like the employer has outsourced to the consulting company entirely its obligation to screen the resumés and make hiring decisions.

  So if that's the case and the employee -- if the students of color could -- under agency principles would have a claim against the employer. But, again, that's not -- that's materially different than the facts in our case.

  **THE COURT:** And it's also not pled here --

  **MS. CONNELL:** Correct.

  **THE COURT:** -- the agency theory.

  Okay. Let me just give the plaintiff an opportunity to comment on that conversation.

  **MR. COOKS:** Well, Judge, first, the employer can't delegate their responsibility under Title VII to a third-party and just say, you know, that's your -- that's what we hired you to do; we have no responsibility if you go out and, you know, discriminate against students of color. That's City of *Los Angeles v. Manhart*, Supreme Court case.

  **THE COURT:** Is that in your brief?

  **MR. COOKS:** No, Your Honor. It's not in the brief.

**THE COURT:**  Can you give us the cite?

**MR. COOKS:**  Yes.

I'm sorry.  *Los Angeles Department of Water and Power v. Manhart*, 435 U.S. 702, footnote -- it's in footnote 33.

And as far as it being an employment agency, if it's screening resumés, you know, receive --

**THE COURT:**  Wait.  I'm sorry.  Before you move on from that, I remember looking at that line of cases and thinking that that line of cases is mostly in the agency -- an agency theory.

**MR. COOKS:**  Yes, yes.

**THE COURT:**  But I haven't seen agency theory pled in the complaint, unless I'm missing it.

**MR. COOKS:**  That is correct, Your Honor, there is not agency theory pled in the complaint.  But, in responding to their motion, you know, and in preparing for this argument, you know, we found cases that support that it's an employment agency and an indirect employer.

Now, as far as employment agency, they're procuring employees --

**THE COURT:**  I'm sorry.  That's really three different theories, right?  One is, they're an employment agency; second one is, they're an indirect employer --

**MR. COOKS:**  Yes.

    **THE COURT:** -- the third one is they are an agent of the employer, but only the first one is pled.

    **MR. COOKS:** Is pled.

    **THE COURT:** Okay.

    **MR. COOKS:** Yes, Your Honor.  That's right.

    But the thing is, Your Honor, I think is what it boils down to is who has control of access to the opportunity, right?  So whether it's an employment agency or indirect employer or an agent -- the agent -- either one of those controls access to the employee -- to the job opportunity for the employee, right?  So who should shoulder that liability?  It should be either the agent, indirect employee or the employment agency -- right? -- because remember what the case law says.  The case law says we're supposed to -- a judge is supposed to interpret Title VII broadly and make it, you know, all encompassing as long as it doesn't run afoul of, you know, principles of law and fairness, right?

    So I think the cases indicate -- *Sibley*, the *Sibley* case -- this is in our papers -- the *Sibley* case, *Gomez*, *Association of Mexican-American Educators* and the *Lutcher* case all indicate that.

    And even a case *Morgan* -- it's not in our papers, but I'll read the cite -- *Morgan v. Safeway Stores*, 884 F.2d 1211.  This is a Ninth Circuit case that -- these cases take an expansive view of who can be responsible for -- or who could be

liable for -- under Title VII for controlling opportunities to get to an employer.

If there's an intermediary like we're saying in our case that Workday -- where the -- you know, they say it's a software company, we say it's an employment agency.  We don't plead agency on anything in our papers, that's true, but they controlled the access or Mr. Mobley's access to 80 to 100 jobs.  So if he can't get past Workday, he doesn't get the job.  It's just that simple.

**THE COURT:**  Thank you.  I think I understand the argument.

I do think that brings me to the second question that I had in the list, which was, imagine a company enters job applicants into a spreadsheet then uses the spreadsheet to sort by birthday, just hires the youngest people.  Is the software vendor, you know, Microsoft -- if they use Microsoft Excel -- is Microsoft now an indirect employer, an employment agency or an agent because somebody used their software to do this?

**MR. COOKS:**  Judge, it's not pled -- well, it's not -- well, it's sort of pled that way in our -- in all candor.  It's sort of pled that way in our initial complaint.  But, from what we've learned subsequent to filing the complaint is that Workday is not like you go into Office Depot and buy a software program and you, you know, download it on your computer and use it.  Workday is much more involved than that.  It's a

subscription service.  They provide consultants to employers.
They provide, you know, ongoing technical expertise, technical
help.  So it's not just like that.

        But if -- even if you looked at it as just, hey, they
went into Office Depot and bought a, you know, software
program, this is my thinking or this is what I think:  If
Workday is in the position to provide the -- or the
manufacturer is in the position to put guardrails on this
tool -- right?  Just like if -- you know, in a products
liability -- in a products liability case if, you know, you got
a bandsaw or something that has some kind of guard on it --
right? -- if it's foreseeable that the guard can be removed and
cause an injury, well, it's on the manufacturer to make the saw
safe or safe for foreseeable injuries, right?

        So in the case of Workday or a vendor, if Workday
doesn't put the guardrails on the product that it's producing
and it's foreseeable that it can be used in a discriminatory
fashion, well, who should the liability fall on?  Should it be
on the one that has the opportunity to put guardrails in place,
to make sure that this can't be misused this way or put
warnings on the product to make sure it can't be used this way
or to contract or have some kind of contract with the end-user
and say, "Okay.  Well, if this happens, you're going to
indemnify me," or something like that, but it --

        And so what we're saying is, at least with reference

**PROCEEDINGS**

to that hypothetical, it's kind of like a strict liability "lite" would be my response, like Workday is in the best position to prevent the harm that the hypothetical describes.

THE COURT:  So you are not contending that Workday actually has its own screening functions?  It wasn't clear to me whether, in the complaint or in the papers responding to the motion, whether plaintiffs are alleging that Workday has screening criteria, that it uses AI or machine-learning screening criteria to screen out applications.  Do you have or is it plaintiffs' allegation that that is the case?

MR. COOKS:  That's what we're alleging.  It's not clear in our complaint -- in all candor, I'll admit to that -- but in our opposition, we go to great lengths to try to show, based on things we were able to learn, you know, since the filing of the case and then preparing to respond to the motion to dismiss that Workday does this machine training, machine learning.  They input information or train these algorithms or these computer -- these computer algorithms to, you know, market to companies for what their particular need is.  That's what we've learned.  And I think we've, you know, put that in the fact section of our opposition.

THE COURT:  Let me give the defense an opportunity to respond.

MS. CONNELL:  Thank you, Your Honor.

First of all, with regard to the additional facts, I

**PROCEEDINGS**

mean, we've made clear in our papers it's not appropriate for the judge to take -- the Court to take judicial notice of those facts; they're marketing materials from Workday's website, which also I don't agree with the characterizations.

If you do -- if you look at what's --

**THE COURT:**  I don't intend to --

**MS. CONNELL:**  Yeah, okay.

**THE COURT:**  -- take judicial notice of it --

**MS. CONNELL:**  Okay.

**THE COURT:**  -- for the purposes of the motion to dismiss, but I do think that they -- it's relevant as to plaintiffs' representation as to how they can potentially amend the complaint and whether the Court should grant leave to amend.

**MS. CONNELL:**  Sure.  Understood, Your Honor.

But if you look at the 10-K -- which I think the Court can take judicial notice of -- what it makes clear is that these services that they're referring to refer to implementation of the software from a technical perspective. That's what the references are there.

Workday certainly is not -- you know, Workday, the company, is not screening resumés and making recommendations. That's not what it does as a business.  It is far more like the hypothetical No. 2 where it is selling software to its customers and then the customers configure it to meet their

business needs, and that's what plaintiff pleads in the
complaint, specifically at paragraphs 8, 14 and 21.

The plaintiffs are saying that it's the customers who
take Workday's software and they configure it to meet their
business needs and that that's where the discrimination, if you
will, comes in.  Again, Workday doesn't agree with those
allegations -- those are plaintiff's allegations -- but, again,
it's the company that's the actor.

And the definition of "employment agency" in Title VII
and the ADA and the ADEA is clear.  It doesn't cover products
liability-type scenarios.  It covers -- it says, "Any person
regularly undertaking to procure employees for an employer."
That -- I mean, it's an employment discrimination statute, and
so its reach is not boundless.

And the -- and the doctrine, the judicial doctrine of
indirect employer is very limited.  If you look at the
scenarios, the very cases that plaintiffs cite in their papers,
they're very fact specific, and they're unusual.  They're
peculiar situations.  A nurse working in a hospital; that's the
*Sibley* case -- right? -- and so you can -- you read the case
and it makes sense that the hospital is, in fact, the nurse's
joint -- it's essentially a joint employer standard.

Similarly, another case that he cited, the State of
California and local school districts are essentially joint
employers for public school teachers because of just the level

of control that they assert, but it's not -- it's not a
software company that sells software to a vendor.  I mean,
that's just -- it's so far afield that there's no facts that
plaintiffs could plead consistent with Rule 11 that would even
come close to meeting that definition, so I do think that in
this scenario, the facts of hypothetical 2 are far more similar
to our facts here than the facts in hypothetical No. 1.

   **THE COURT:**  I don't want to get too far down the road
on what --

   **MS. CONNELL:**  Yeah.

   **THE COURT:**  -- on what a potential complaint could
look like and what the next round of this might look like, but
that's helpful.  Thank you for the information.

   I do want to move to question No. 3, which is that
Workday argues Title VII doesn't recognize disparate impact
liability for employment agencies based on textual differences
between section 2000e-2(a), which is the employer liability
provision, and 2(b), which is the employment agency liability
provision.

   I understand Workday's argument that the indirect
employer theory is very limited and is only applicable in these
peculiar situations of control, but if we had an indirect
employer or an agency theory, would either of those take it out
of the 2(b) provision and put us under 2(a), in Workday's view?

   **MS. CONNELL:**  Yes, Your Honor.  I mean, the courts

hold just that, including *Sibley v. Memorial Hospital*.  I won't repeat my arguments as to why that doesn't apply, but in situations where it does apply, because the indirect employer essentially is the joint employer, the liability is under the employer liability section of Title VII.

      **THE COURT:**  And the same is true under agency theory, the Manford (phon) case --

      **MR. COOKS:**  Mano (phon).

      **THE COURT:**  -- am I getting that right?

      **MS. CONNELL:**  Yes, Your Honor.  If there were a scenario where the employer had hired a third-party company that was acting as its agent, it would be under the employer liability section.

      **THE COURT:**  And then with -- and then my -- I don't think I necessarily need to hear from the plaintiff on that, unless you have more you want to say on that.

      **MR. COOKS:**  Well, Judge, that's -- the *Association of Mexican-American Educators* case that's in our papers, that was a disparate impact class -- right? -- dealt with an indirect employer theory.  And it wasn't a -- wasn't a joint employer theory.  It was the State of California was controlling access to who could become teachers.  So this is not new.  This is not anything that's, you know -- other than, you know, they're saying it's the software.

      And there's another thing, too.  We say they're an

employment agency; they say they're a software vendor.  That's a disputed fact, so I don't think that can be decided on a motion to dismiss.  That's all.

      **THE COURT:**  Okay.  I understand the argument.  I do think there needs to be allegations that aren't in the complaint before the Court can really adopt that approach, but I understand plaintiff's argument on that.

      **MR. COOKS:**  Yes.

      **THE COURT:**  Then just to continue down this road about this statutory interpretation point, the employer liability provision has two subsections with the first addressing intentional discrimination and the second addressing disparate impact and then the employment agency liability provision has kind of a similar parallel structure with the two clauses, the first mirroring intentional discrimination, the second mirroring the disparate impact prong.

      What's Workday's view as to why there's that parallelism, and is the second clause of the employment agency liability provision unnecessary if it's actually true that only intentional discrimination is prohibited for employment agencies?

      **MS. CONNELL:**  Respectfully, Your Honor, while the second clause of the employment agency provision -- liability provision contains some of the same language as the second subsection of the employer liability provision, it doesn't

mirror it.  And, importantly, it doesn't authorize a disparate impact claim because it doesn't include the important phrase "Or otherwise adversely affect employment," which is the key language that the Supreme Court repeatedly has recognized gives rise to a disparate impact claim.

It's not surplusage, though, because it prohibits a different type of intentional discrimination.  It prohibits classifying or referring employees -- or applicants in this scenario -- because of their protected status.

So it's a type of discrimination that we usually refer to now as discriminatory steering or channeling, and it refers to intentionally driving employees or steering or channeling them, for example, women or minorities, to lower paying jobs, to less desirable jobs.

The EEOC has published guidance on this.  It's from 1983 entitled "CM-618, Segregating, Limiting and Classifying Employees."  The cite is EEOC-CVG-1984-2.  It's from October 1st of 1983 and it states that "Classifying employees or applicants entails grouping or categorizing individuals or jobs so that certain jobs are recognized as generally held by females or minorities while other jobs are reserved for white males."

And it goes on to say that "Discriminatory classification of employees or applicants includes assigning women and minorities to menial, dirty, confining, less

**PROCEEDINGS**

desirable, less prestigious, nonsupervisory or lower-paying jobs, and then it gives examples.

So this kind of discriminatory steering is different than discriminatorily refusing to refer, which is what the first clause prohibits, and that was the type of bad acts that was in hypothetical 1.

But going back to the language that gives rise to a disparate impact claim, as we explain in our papers, the Supreme Court in *Smith v. City of Jackson* --

**THE COURT:** I don't mean to cut you off.

**MS. CONNELL:** You get it.

**THE COURT:** I have been through the case law --

**MS. CONNELL:** Okay.

**THE COURT:** -- and that provision. I just had that additional question about that language --

**MS. CONNELL:** Okay.

**THE COURT:** -- which I appreciate it, and I think your answer makes sense to me.

**MS. CONNELL:** Okay.

**THE COURT:** I'm up to hearing more from the plaintiff on that.

**MR. COOKS:** Yes, Judge.

I don't think Congress meant to give -- to give employment agencies a pass that it didn't give direct employers -- right? -- so basing the broad -- Title VII is

supposed to be interpreted under the broadest sense possible is my understanding of the cases and the reason being is to stamp out insidious discrimination, right?

So I don't think the language of the statute is limiting in what -- limiting in the way that my opponent is framing it. I think it is -- it's not surplusage. It's clearly referencing "any other" or "otherwise discriminates." So I don't -- I don't see how that's limiting it to a disparate treatment theory rather than a disparate impact, because that's a hole that you could -- you know, that's a big hole that you could drive a truck through if you can't have a disparate impact case against an employment agency.

And there's a *Pegues* -- there's a case that's not in our papers, *Pegues v. Mississippi State Employment Services* -- it's 699 F.2d 760 -- and that case went to trial, but the theory is a disparate impact for referrals, right?

And it was an employment agency -- State of Mississippi was an employment agency and the whole case hinged on this plaintiff could not get to a referral for a job through the Mississippi employment agency. And the Fifth Circuit allowed a disparate impact theory to go forward all the way to trial. She lost at trial, but they didn't cut her legs off at the outset.

THE COURT: Yeah. I understand from the plaintiffs' briefing that there's been a lot of case law that -- including

in the Ninth Circuit -- that has allowed these types of claims to go forward, but it hasn't really discussed the argument that the defense has raised.

It is odd to me, though, that the case law that the defense is citing is from 15 years ago; and yet, nobody has noticed that this is an issue?  This would be the first court to address that issue?  That's surprising to me, I have to say, but I also -- I also haven't seen a case that has discussed it substantively.

**MR. COOKS:**  Judge, that could be because it's assumed, you know, that it applies, so . . .

**THE COURT:**  Either way, it's our job to look at whether that section is right.

So let me move to question five.

Let me say before I read question five that I know that the defense questions the ability of one person to bring a suit like this based on one person's experience.

I do think this is a little different because it's one person who has applied to 80 to 100 jobs.  Because of the particularities of how the case is set up, it's like having 80 to 100 people who have applied to one job; it's just the reverse of that.  But, in a situation where we're looking at the reverse of that, it becomes all the more important that we understand what it is that this one person says his qualifications are, what kinds of jobs he's applying to, what

kind of luck he's had in other situations where Workday wasn't

involved getting work.  And so it seems to me that if

plaintiffs are going to hang their hat on this one person, then

we need to know more about him and what jobs he's applied to.

But I'm open to hearing more from the plaintiffs on that.

　　　　MR. COOKS:  Well, Judge, you know, Rule 8(a) is

still -- you know, it still governs pleadings, you know, as far

as complaints.  I know *Twombly* and *Iqbal*, you know, require,

you know, not probability but plausibility.

　　　　You know, our facts are sparse as far as, you know,

what jobs he applied for and things like that, but I think, you

know, with his qualifications as the hypothetical, you know, as

the question, you know, references, and reading the complaint

as a whole, I think the inference is, is that -- or the

inference that can be drawn is that, you know, here's a

qualified individual based on his academic credentials and he's

applied for 80 to 100 jobs -- that's equaled zero.  He hasn't

gotten one.  And in each and every instance he's gone through

Workday.  And that's -- I think that puts us not with

probability but plausibility, like is it plausible that his

race played a factor?  Is it plausible that his age played a

factor?  Is it plausible that his disability of depression --

disabilities of depression and anxiety played a factor?  I

think that's enough to get us over that plausibility into where

they can frame an answer to our complaint.

**PROCEEDINGS**

Now, what we have to remember is that it's not based on whether we'd be successful. It's just whether they can frame an answer and then we can get to discovery and then they can get him in a deposition and say, well, okay, we've got -- you know, we have these jobs that you applied for, were you qualified for this? What were your qualifications? Just like an individual disparate treatment case where, you know, you get a plaintiff in a deposition and you ask those questions. So I think our complaint, as it stands, it's sparse, but I think it's sufficient.

**THE COURT:** Anything further from the defense on that topic?

**MS. CONNELL:** I think you know our position, Your Honor. We think it doesn't even come close. I mean, there's ample case law cited in our papers. I can give you additional examples if you would like, but he needs to say some facts about his qualifications and some facts about the requirements for this job that lay a plausible foundation that he was qualified. He doesn't even try. There's just nothing in there.

And he needs -- to your point of the 80 to 100 jobs, if that's what we're going to be litigating over is the 80 to 100 jobs and they're going to go after discovery for 80 to 100 jobs, he needs to do that for all 80 to 100 jobs. I mean, he has said nothing about the jobs.

The complaint at paragraph 20 simply says "He applied for at least 80 to 100 positions upon information and belief they used Workday Inc. as a screening tool and he was denied employment," and that's it.  I mean, we don't have -- we don't know what companies these were with, what industries they were in.  There's just nothing there that gives rise to a plausible claim for discrimination, disparate treatment or disparate impact.

THE COURT:  I don't think I need additional case law on it --

MS. CONNELL:  Okay.

THE COURT:  -- but I appreciate the plaintiff's position too.

But that does bring me to the last question I have on my questions list, which is that Workday contends that another pleading failure is that Mobley doesn't state in his disparate impact claims a causal connection between the screening software and the disparate outcomes that occurred.

Causation under the case law may be inferred based on substantial disparity in the outcomes, but one question I have -- and maybe it's a little premature for this question but since I have you here, I want to ask it -- is statistical evidence -- let me ask Workday first about this -- is statistical evidence really the only way to allege a disparity sufficiently substantial to infer causation, or are there other

ways to allege that?  I mean, it is a question for both parties really.

        **MS. CONNELL:**  So yes, Your Honor.  Thank you.

        We spent a lot of time researching this question, and we -- candidly, we found no case where the Court, at the pleadings stage, inferred causation based on pleading allegations about the disparity, whether it's statistical or otherwise.

        What the cases say is that you have to plead facts that give rise to a plausible inference of causation.  And the phrase that the case law uses is a "plausible theory of causation."  And it does not need to be statistical evidence at the pleadings stage.

        The cases give a host of examples of different types of theories of causation, but it has to be some facts that lead the Court to be able to plausibly conclude that the identified practice -- and we disagree that they've identified a practice here -- and the disparity that's pled -- and we disagree that they pled a disparity here -- but there's some link.  And there's no magic formula that you have to plead.

        One case that I think is really instructive here, it's out of the Western District of Washington, but it is cited favorably in numerous Northern District of California decisions, and that is the *Moussouris v. Microsoft* case.  It's 2016 WL 4472930 from the Western District of Washington, March

7th, 2016.  It's cited by *Arnold v. Sessions* and *Liu v. Uber Technologies* favorably -- both of which are cited in our papers -- and there the allegation was that Microsoft's performance review system caused a disparate impact on women. And in the initial motion to dismiss, the Court dismissed with leave to amend, finding that under *Iqbal* and *Twombly*, the plaintiff needs to plead some facts.

The Court explained:  "In order for the Court to plausibly infer that plaintiff can demonstrate disparate impact liability, plaintiffs must allege something more than the conclusory assertion that the facially neutral policy they oppose in fact causes the disparate impact they challenged.

"Without requiring such a non-conclusory factual allegation, a disparate impact plaintiff could survive the pleadings stage by alleging a facially neutral policy and a disparate impact and asserting the former causes the latter. The conclusion would contravene the Supreme Court's recent jurisprudence regarding pleadings standards, which requires scrutiny for plausibility."

Now, on the second round the plaintiffs pled a whole -- a lot more facts.  And in the second motion or on the second motion to dismiss, the Court did find that the additional facts nudged it over the line from probable to plausible.

And the cite for the second order is 2016 WL 6037978

from the Western District of Washington, October 14th, 2016.

I think the other two cases that really walk through what types of facts need to be pled -- nicely -- both are cited in our papers. One is *Liu v. Uber Technologies* and the other is *Alhayoti*, again cited in our papers, *Alhayoti v. Blinken*, from the Northern District of California. It's a recent case from last July.

But, again, there's no magic formula -- it doesn't need to be statistics -- but there needs to be something about causation. "Some plausible theory of causation" is the phrase that the case law uses.

**THE COURT:** Thank you. Let me hear from the plaintiff on this.

**MR. COOKS:** Judge, I agree with part of what my opponent says, that there is not really any case law that talks about that you have to have, you know, statistical disparities on the front end to, you know, plead a disparate impact claim; the rest of it not so much.

This is the thing: You can't draft an evidentiary standard at this stage of this litigation. You can't say --

You know, the reason we put all the extraneous materials that we asked the Court to take judicial notice of is because it's like we're at summary judgment, so we have to marshal materials to try to, you know, defeat their motion to dismiss.

**PROCEEDINGS**

As she says, all you have to do is allege enough facts for a plausible inference of disparate impact.

Okay.  Here 80 to 100 applications, all rejections, right?

The allegation is that the algorithm, which, you know, we say in the front part -- in the beginning of our complaint we mention the algorithm and things, but not in the counts, you know, or in the factual section specifically for Mr. Mobley, but we do talk about the algorithm in the beginning of our complaint.

So you have to read complaints holistically.  You don't just, you know, pick what's good for you and discard what's bad for you.  You're supposed to or at least the Court is supposed to read it holistically, right?

So reading the complaint holistically and applying the standard -- not an evidentiary standard but a motion-to-dismiss standard -- we think that we've pled a plausible claim of disparate impact for Mr. Mobley based on him not getting -- you know, 80 to 100 applications, not getting a callback, not getting anything.  We allege that the reason or the discriminatory practice is the algorithms that Workday, you know, sells or employers use or Workday has control over.  And the causation comes from that.  So I think that's all we had to plead.

THE COURT:  Thank you.  I have one more question that

PROCEEDINGS

wasn't on my list that I want to ask you all about, and then I'll give you your opportunity to say whatever else you wanted to say to me.

The last question is on the topic of exhaustion of administrative remedies. So one of the questions I had is -- I looked at the charge that Mobley filed with the EEOC and, you know, the standard is whether plaintiff's claim would have fallen within the scope of an EEOC investigation that can reasonably be expected to grow out of the charge of discrimination. And the Courts look to kind of a "Who, what, when, where, why" type analysis to say, you know, if the EEOC were to investigate disparate impact in this situation, would they also be investigating the same facts that would concern intentional discrimination?

And this is really a question for Workday. Why is it that this wouldn't involve investigation of the same facts?

It does seem to me that a lot of the investigation would focus on why it was -- if it is a screening algorithm -- part of this is we don't know what the alleged practice is, honestly. But assuming it's a screening algorithm, if the investigation focuses on why the algorithm was adopted -- you know? -- is it related to job performance, is there a good business reason for requiring personality tests, is there a high-level of disparity that the Workday companies know about that results from these types of personality tests or other

**PROCEEDINGS**

screening algorithms and do they -- what did they say about
that?  Did they say "That's great, we want to have younger
people," or did they say it's -- you know, it's fine, it's
something we have to live with because of this other important
business justification?  All of that seems like it would be the
same investigation.

    And I know that you've cited case law like the
*Brown v. Puget Sound* case, but in those cases I can understand
why normal cases or, I mean, in the garden-variety case
disparate impact and potential for discrimination would be
based on different facts.

    And I do think that the *Brown* case is a good example
of that where someone applied once, was rejected under a policy
that was being challenged for disparate impact reasons and then
applies a second time and said the second time was intentional
discrimination.  Those two investigations are not going to be
based on the same facts or circumstances.

    And so I understand why the Ninth Circuit came out the
way it did in *Brown*, but I don't understand why the
investigation would be different in this case.

    **MS. CONNELL:**  Your Honor, I think in this case -- I
mean, the same -- the facts are different, but the same
concepts and analysis that were applied in *Brown* would apply
here because when you're dealing with a disparate impact case
or claim -- excuse me -- you're not looking into the intent of

the actor here, Workday.  You're looking at the effects of the practice.

So the investigation would focus on, you know, if you narrow it down to the application of the practice, was there a disparate outcome, you know?  You're not looking at, like:  Why was Workday doing this?  You're not looking at why -- the "why" doesn't matter at the prima facia.  So all that matters is practice; it was applied neutrally to everybody and it resulted in a disparate impact.  You're not investigating intent, which is the key distinction in a prima facia case between the two types of claims.

And then the focus turns on the business justification:  Is it job related, is it consistent with business necessity, and has the plaintiff identified an equally effective practice that doesn't have the discriminatory outcome?

And so, like, those considerations and those questions are totally different than:  Did Workday act with the intent to discriminate against the applicants of the employers who used its software.  I mean, it's just -- it's a different analysis and it's just -- I do think that if you were investigating and focusing on the effects, not the "why," you're not going to be investigating the "why."  It would be a -- it's a different inquiry.

THE COURT:  I understand that.

Would the plaintiff like to respond?

**MR. COOKS:**  Yes, Your Honor.

In paragraph 7 of our -- of what they filed with the Court to take judicial notice of, it's document 17-1, page 7 of 9, paragraph 7.  This is what Mr. Mobley says, "Upon information and belief, the Charging Party and other African-Americans have been discriminated against because of their race (African-American) in violation of Civil Rights Act of 1964, as amended."

"Because of" means this is the reason.  I mean, this is -- "because of" means intentional.

**THE COURT:**  I have a question about that.  I saw that in your briefs, but why can't just "because of" also refer to disparate impact discrimination?

In the statute, which is section 2000e-2(a)(2), which is the disparate impact provision, it uses the word "because of."

**MR. COOKS:**  Well, it can be both because they use it in the disparate treatment section too.  They said because of race -- because of race there's a disparate impact.

So what we're talking about is what could be reasonably expected to grow out of the allegations in the EEOC charge, right?  We're not -- we're not talking about legal standards.  We're not -- the EEOC investigators aren't lawyers, most of them.  They're taking your allegations and it's

certainly plausible that an EEOC investigator, looking at

paragraph 7, would say, okay, this means disparate treatment or

disparate impact or both.  So it's not exclusionary is what I'm

saying.

And then, too, you know, on the front of this charge,

on the first page, he checks the -- you know, he checks all the

boxes, so that could be intent.  That could be a -- you know,

if he checks all the boxes, he checks race, disability and age,

so I think a reasonable investigator could say, well, what is

he talking about as -- what are his facts for race, okay?

He says disparate impact in a large part of his

charge, but then he also says in paragraph 7 that he was

discriminated against because of his race, so I think you -- I

think you can have both.  I don't think it's exclusionary.  I

don't think it -- a proven investigation or an investigation by

an investigator could go either way.  So I don't think, you

know, he had to set out, "Well, this is the theory of disparate

treatment under Title VII investigator, this is what you're

supposed to look for."

People go and file charges on their own all the time,

so, I mean, yeah.  So I don't think it's meant to operate in

such a confined and narrow way as my opponent is describing.

**THE COURT:**  What's the defense response to that, that

this is -- you know, this is a layperson's language and it's

used by layperson investigators.  It's broad enough to

encompass both disparate impact.  Most of the facts are about disparate impact, but some of the sentences are broad enough to encompass both types of liability, and that's enough to satisfy the exhaustion when the Ninth Circuit says that the Courts do interpret the charge broadly.

MS. CONNELL:  Respectfully, I disagree with the characterization that plaintiffs' counsel has given.  If you read the charging parties' averments, they are very detailed.  They cite to the disparate impact sections of the statute.  They allege disparate impact.  They talk about tests and they talk about the standards for disparate impact.

There's nothing in here that indicates that what they're alleging is intentional discrimination.

And on the check-the-box part of the form, I mean, that's what you would check if you were alleging disparate impact.  There's no box for disparate impact or disparate treatment.  That's what the narrative portion is for.  And you read the narrative portion and it's -- he's alleging disparate impact.  He's not alleging intentional discrimination.

THE COURT:  I understand that argument too.

Thank you.  I think that exhausts -- I know that was a lot of questions on my part.  That exhausts my questions.  Let me give you each an opportunity to address anything else that we didn't cover that you think I ought to know.  I'll start with the plaintiff.

**MR. COOKS:**  Judge, we just think that the complaint is sufficient to -- under *Twombly* and *Iqbal* and *Swierkiewicz* that we're alleging plausible allegations of disparate treatment and disparate impact.

You cannot draft these summary judgment and evidentiary standards or trial evidentiary standards on complaints at this stage.

I know that our complaint may have been a little light on some facts, but I think the facts that we allege were enough that we should survive at least the pleadings stage in order to get to some discovery to try to either prove or they can disprove Mr. Mobley's allegations.

**THE COURT:**  Oh.  Anything more from the defense?

**MS. CONNELL:**  Yes.  Just briefly, Your Honor.  And we obviously disagree that he's pled enough.  And while we did not move to strike the class claims, we're focusing on what he had -- the insufficiency of the allegations with regard to the substance of the claims.

You know, it is not lost on us that if this goes forward, he is seeking to bring this on behalf of a nationwide class.  That's incredibly broad.  And so I don't think that he's come even close on his individual claims to proceed with the causes of action that he's brought, and so I do think that it is particularly important in a case like this to hold them to the *Iqbal Twombly* standards for that reason as well.

**PROCEEDINGS**

**THE COURT:**  Thank you both.

**MR. COOKS:**  Thank you, Judge.

**THE COURT:**  I appreciate it.

**MR. COOKS:**  Thank you.

**THE COURT:**  If you would -- I know that I put in my order a request that you all provide the citations that you read today into the record to the courtroom deputy so that we can give it to the court reporter, and my law clerks will look into the cases you've cited.  Thank you very much.

**MS. CONNELL:**  Thank you, Your Honor.

**MR. COOKS:**  Can you give us a couple of days, Judge? We're going to be traveling, so maybe Friday?

**THE COURT:**  That's fine.  You can both have until Friday --

**MS. CONNELL:**  Okay.

**THE COURT:**  -- to turn that in.

**MR. COOKS:**  Thank you.

**MS. CONNELL:**  Thank you, Your Honor.

**MR. COOKS:**  Thank you, Judge.

**THE CLERK:**  Okay.  Court's in recess.

(Concluded at 11:18 a.m.)

--oOo--

<u>**CERTIFICATE OF REPORTER**</u>

      I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


JENNIFER L. COULTHARD, RMR, CRR        <u>January 23, 2024</u>
Official Court Reporter                        DATE
CA CSR#14457