1    Lee D. Winston
     lwinston@winstoncooks.com
2    State of Alabama Bar No.:6407O72L
     Roderick T. Cooks
3    rcooks@winstoncooks.com
     State of Alabama Bar No.:  5819O78R
4    Winston Cooks, LLC
     420 20th Street North
5    Suite#2200
     Birmingham, AL 35203
6    Telephone:     (205) 482-5174
     Facsimile:     (205) 278-5876
7
     Attorneys for the Plaintiff and the Proposed Classes
8

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11

12   DEREK L. MOBLEY for and on behalf        )   Case No. 4:23-cv-00770-RFL
     of himself and other persons             )
13   similarly situated,                      )   **PLAINTIFF'S RESPONSE IN**
                                              )   **OPPOSITION TO DEFENDANT'S**
14              Plaintiff,                     )   **MOTION TO DISMISS PLAINTIFF'S**
                                              )   **FIRST AMENDED COMPLAINT**
15                                             )
                                              )   Date:        May 7, 2024
16   v.                                        )   Time:        10:00 a.m.
                                              )   Courtroom    15, 18th Floor
17   WORKDAY, INC.                             )   Judge:       Hon. Rita F. Lin
                                              )   First Amended Complaint Filed:
18              Defendant.                     )   February 20, 2024
19   _____ )

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

    A. Mobley's Qualifications and Applications ......................................................... 4

    B. Algorithmic Decision-Making Tools ............................................................... 5

    C. Workday Acts as an Employment Agency ...................................................... 6

    D. Workday is an Agent ................................................................................... 7

    E. Workday is an Indirect Employer .................................................................. 7

LEGAL STANDARD ............................................................................................... 8

ARGUMENT ........................................................................................................... 9

    I.  PLAINTIFF PLAUSIBLY ALLEGES THAT WORKDAY IS AN ENTITY SUBJECT
        TO LIABILITY UNDER TITLE VII, THE ADA, AND THE ADEA. ........................... 9

        A. Workday Acts as Employment Agency to Whom Employers Delegate Hiring
           Decisions. ................................................................................................ 9

        B. Workday Is Not Selling Classified Ads and Just Screening Applications ................ 13

        C. "my.workday.com" is an Agent ................................................................... 14

        D. Workday is an Indirect Employer ................................................................. 17

    II. PLAINTIFF'S OTHER DISCRIMINATION CLAIMS ARE VIABLE ......................... 19

    A. Plaintiff Claims of Intentional Discrimination Satisfy Rule 8(a)(2). ..................... 19

    B. Plaintiff has alleged facts giving rise to a plausible inference that Workday's
       challenged policy caused a disparate impact. ..................................................... 21

    C. Plaintiff's FEHA Claim Should go Forward .................................................... 24

    D. Disparate impact claims are applicable to employment agencies. ......................... 25

    E. Punitive Damages are Available .................................................................. 25

i

1

CONCLUSION ................................................................................................ 25

CERTIFICATE OF SERVICE ......................................................................... 26

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................. 8

4

*Ass'n of Mex.–Am. Educators v. State of California,*
231 F.3d 572 (9th Cir.2000) ................................................................... 18

5

6

*Austin v. University of Oregon,*
925 F.3d at 1135 (9th Cir 2019) ............................................................ 8

7

8

*Babrocky v. Jewel Food Co.,*
773 F.2d 857 (7th Cir. 1985) ................................................................. 21

9

*Bell Atlantic Corporation v. Twombly,*
550 U.S. 544 (2007) ................................................................................. 8

10

11

*Bolden-Hardge v. Office of California State Controller,*
63 F.4th 1215 (9th Cir. 2023) ........................................................... 8, 22

12

*Brush v. San Francisco Newspaper Printing Co.,*
315 F. Supp. 577 (N.D. Cal. 1970) .................................................. 3, 14

13

14

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.,*
213 F.3d 474 (9th Cir. 2000) ................................................................. 15

15

*Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.,*
37 F.3d 12 (1st Cir. 1994) ..................................................................... 16

16

17

*Clarendon Nat'l Ins. Co. v. Ins. Co. of the West,*
442 F. Supp. 2d 914 (E.D. Cal. 2006) .................................................. 15

18

19

*Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Solutions, LLC,*
369 F. Supp. 3d 362 (D. Conn. 2019) ...................................... 11, 12, 24

20

*Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Solutions, LLC,*
478 F.Supp.3d 259 (D.Conn. 2020) ...................................................... 13

21

22

*DeVito v. Chicago Park Dist.,*
83 F.3d 878 (7th Cir. 1996) ................................................................... 16

23

24

*EEOC v. Marquez Bros. Int'l, Inc.,*
2017 WL 4123915 (E.D. Cal. Sept. 18, 2017) ................................. 2, 20

25

*EEOC v. O & G Spring and Wire Forms Specialty Co.,*
38 F.3d 872 (7th Cir.1994) .................................................................... 21

26

27

*Ferdik v. Bonzelet,*
963 F.2d 1258 (9th Cir. 1992) ........................................................... 2, 9

28

*Gamble v. Kaiser Found. Health Plan, Inc.,*
    348 F. Supp. 3d 1003 (N.D. Cal. 2018) ..................................... 22

*Gomez v. Alexian Brothers Hospital,*
    698 F.2d 1019 (9th Cir. 1983) ............................................... 18

*Hall v. Hamilton Family Ctr.,*
    2014 WL 1410555 (N.D. Cal. Apr. 11, 2014) ......................... 24

*Hung Ping Wang v. Hoffman,*
    694 F.2d 1146–50 (9th Cir. 1982) ......................................... 22

*Huskey v. State Farm Fire & Casualty Co.,*
    2023 WL 5848164 (N.D.Ill. 2023) ................................... 3, 23, 24

*International Broth. of Teamsters v. U.S.,*
    431 U.S. 324 (1977) ........................................................... 2, 20

*Kolstad v. American Dental Ass'n,*
    527 U.S. 526 (1999) ............................................................. 21

*Lee v. Hertz Corp.,*
    330 F.R.D. 557 (N.D. Cal. 2019) ....................................... 8, 21

*Levitt v. Yelp! Inc.,*
    765 F.3d 1123 (9th Cir. 2014) ................................................. 8

*Louis v. Saferent Solutions, LLC,*
    2023 WL 4766192 (D. Mass. 2023) ........................................ 12

*Loyd v. Phillips Bros., Inc.,*
    25 F.3d 518 (7th Cir. 1994) .................................................. 21

*Lutcher v. Musicians Union Local 47,*
    633 F.2d 880 (9th Cir. 1980) ................................................ 18

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*
    519 F.3d 1025 (9th Cir. 2008) ................................................. 8

*NAACP, Inc. v. Town of East Haven,*
    70 F.3d 219 (2d Cir.1995) .................................................... 20

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n,*
    294 F. Supp. 3d 940 (N.D. Cal. 2018) ................................... 22

*Nat'l Fair Hous. Alliance v. Deutsche Bank Nat'l Tr.,*
    2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) ......................... 22

*Patsy Freeman v. Suddle Enterprises, Inc.,*
    179 F. Supp. 2d 1351 (M.D. Ala. 2001) ................................. 15

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

*Raines v. U.S. Healthworks Med. Grp.*,
   15 Cal. 5th 268, 534 P.3d 40 (2023) ................................................ 16

*Raines v. U.S. Healthworks Medical Grp.*,
   28 F.4th 968 (9th Cir. 2022) ........................................................... 16

*Rookard v. Mexicoach*,
   680 F.2d 1257 (9th Cir. 1982) ......................................................... 15

*Sheppard v. David Evans & Assoc.*,
   694 F.3d 1045 (9th Cir. 2012) ........................................................... 8

*Sibley Mem'l Hosp. v. Wilson*,
   488 F.2d 1338 (D.C. Cir. 1973) ............................................. 17, 18, 19

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011) ........................................................................ 13

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002) ....................................................... 8, 9, 20, 21

*United States ex rel. Vatan v. QTC Med. Servs., Inc.*,
   721 F. App'x 662 (9th Cir. 2018) ..................................................... 4

*Velez v. Roche*,
   335 F.Supp.2d 1022 (N.D. Ca. 2004) ............................................. 19

*Whitsitt v. Hedy Holmes Staffing Servs.*,
   2015 WL 5560199 (E.D.Cal. Sept. 21, 2015) ............................ 13, 14

*Williams v. City of Montgomery*,
   742 F.2d 586 (11th Cir. 1984) ......................................................... 16

**Statutes**

42 U.S.C. § 1981 ................................................................................. 3

42 U.S.C. § 2000e ............................................................................. 25

Cal. Gov't. Code § 12926 ................................................................. 26

Cal. Gov't. Code § 12940 ............................................................. 3, 24

**Other**

29 C.F.R. § 1607.10 .......................................................................... 25

Fed. R. Civ. P. 8 ....................................................... 3, 4, 19, 20, 23

Fed. R. Civ. P. 9 ................................................................................. 8

Fed. R. Civ. P. 12 ............................................................................. 14

Weideinger, Laura, et al, *Ethical and social risks of harm from Language Models*,
arXiv:2112.04359 [cs.CL] (2021)....................................................... 5

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1

2

**RESPONSE IN OPPOSITION TO MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

3

**INTRODUCTION**

4

5

6

7

8

9

10

11

12

At the January 9, 2024, hearing on Defendant's Motion to Dismiss Plaintiff's original Complaint, Mobley candidly admitted that the document was factually sparse regarding his qualifications for the jobs for which he applied and the outcomes of those applications. Additionally, the Court pointed out that while Mobley argued Workday, in addition to being an employment agency, was an agent of its client-employers and/or an indirect employer, these alternative theories of liability were not pled in his original Complaint. Mobley's FAC cures every defect identified by the Court at the January 9th hearing and in its order granting Workday's Motion to Dismiss Plaintiff's original Complaint.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Mobley's FAC clearly sets forth his qualifications, provides a sampling of the positions he was denied, identifies the employers who denied him and how Workday was responsible for the decision. It also provides a factual predicate for the alternative theories of liability argued at the January 9th hearing by describing how Workday's algorithmic decision-making tools discriminate, how it screens applicants for client-employers, sources candidates for its client-employers for current or future job openings, the depth of its relationships with client-employers that subscribe to its applicant screening platform, how it provides professional consulting services to its client-employers as part of their paid subscription services, how its client-employers delegate decision-making authority and selection decisions to Workday via its "AI", "ML", assessments, tests and pymetrics, and how Workday has the singular ability to limit the employment opportunities of applicants like Mobley. Plaintiff alleges that these policies and practices cause significant and unlawful discriminatory effects based on race, age, and disability.

27

28

1

Instead of meeting the FAC's allegations head-on, Workday deflects and asks this Court to examine Mobley's new complaint through the lens of the first, which is improper because the new complaint is the only operative complaint before it. *Ferdik v. Bonzelet,* 963 F.2d 1258, 1262 (9th Cir. 1992) ("[A]fter amendment the original pleading no longer performs any function and is treated thereafter as non-existent[.]" Why does Workday want to focus this Court's attention on the past? Because Plaintiff's FAC clearly satisfies *Iqbal's* and *Twombly's* plausibility standard and shows that Mobley and the classes he seeks to represent are entitled to relief.

Mobley's allegations directly challenge his blanket denial of employment by the Workday applicant screening platform.  Incredibly, he is 0 for 100+.  This alone should give the Court pause, as the Supreme Court has repeatedly countenanced that in the discrimination context the "inexorable zero," in and of itself supports an inference of discrimination. See I*nternational Broth. of Teamsters v. U.S.,* 431 U.S. 324, 342 n. 23(1977) ("In any event, fine tuning of statistics could not have obscured the glaring absence of minority line drivers.... the company's inability to rebut the inference of discrimination came not from a misuse of statistics, but from the inexorable zero."); *EEOC v. Marquez Bros. Int'l, Inc.,* 2017 WL 4123915, at *7 (E.D. Cal. Sept. 18, 2017) ("Existence of the 'inexorable zero' in Title VII cases raises the judicial eyebrow.").  Workday is aware of the discriminatory effects of its applicant screening tools and could easily implement guardrails to prevent unlawful discrimination but has failed to do so. Not only does Workday continue to market its products and services in the same way despite knowing their discriminatory effect, but also astonishingly assert that they function free of bias.  Accordingly, Plaintiff has also pled plausible allegations of intentional and adverse impact discrimination based on race, age, and disability.

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

In moving to dismiss Workday contends that Plaintiff has not pled any facts that could transform it from a "software provider" to an employment agency, indirect employer, or agent of its customers.  Workday also wants to hold Mobley's feet to fire for not knowing exactly what data mining, data analytics, machine learning, and algorithms it uses to produce the discriminatory outcomes as alleged in the FAC.  However, its arguments flout Rule 8's bedrock principle that a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  See, Fed. R. Civ. P. 8(a)(2).  For Mobley to have the knowledge Workday deems sufficient to state a claim for relief, he would need access to its programmers, data trainers, software creators, etc.  See *Huskey v. State Farm Fire & Casualty Co.,* 2023 WL 5848164, *9 (N.D.Ill. 2023) ("[A]llegations describing how machine-learning algorithms-especially antifraud algorithms-are prone to bias, the inference that State Farm's use of algorithmic decision-making tools has resulted in longer wait times and greater scrutiny for Black policy holders is plausible. No more is necessary.  Plaintiffs have adequately alleged a disparate impact claim. . .").  Such granular details are properly addressed during discovery.

Plaintiff has plausibly alleged that Workday's marketing and deployment of automated decision-making products that source, procure, and reject job applicants on behalf of its client-employers adversely effects African-Americans, applicants over the age of 40, and the disabled, and that Workday, having full knowledge of the discriminatory effects of its products, has not taken any steps to eliminate or reduce them.  These allegations unequivocally state claims for disparate treatment in violation of Title VII, the ADEA, and 42 U.S.C. § 1981, disparate impact in violation of Title VII, the ADEA, and the ADA, and aiding and abetting race, disability, and age discrimination in violation of Cal. Gov. Code § 12940(I).  Workday's motion should be denied in its entirety.

3

# BACKGROUND

### A.    Mobley's Qualifications and Applications

Mobley is an African-American male, over the age of 40 [D.O.B. 1974] who suffers from anxiety and depression.  FAC¶19.  Mobley graduated from Morehouse College in 1995 with a bachelor's degree in finance and is also an honors graduate of ITT Technical Institute.  FAC¶¶20-24.  Over his career Mobley has worked in various financial, IT help-desk, and customer service-oriented jobs.  FAC¶¶25-26.  He possesses extensive knowledge in multiple critical roles within the Enterprise server, banking, finance, and insurance industries.  FAC¶27.

Since 2017, Mobley has applied for over 100 positions with employers that exclusively use Workday as a screening platform for talent acquisition and/or hiring.  FAC¶49-55.   The emails by which Mobley communicated with these employers all say myworkday.com.  FAC¶53.  Mobley's applications have been denied every time.  *Id* at 49.  Many of the positions for which Mobley submitted applications required him to take a Workday branded assessment and/or personality test.  FAC¶56.  Upon information and belief, these assessments and personality tests are unlawful disability inquiries and/or medical examinations that are designed to identify mental health disorders or cognitive impairments and had no bearing on whether Mobley would be a successful employee.[1]  FAC¶¶56-60.

Mobley never received an interview for most of the jobs for which he submitted applications, and in numerous instances he was informed of his rejection within hours of submitting his application.  FAC¶¶61-87.  For example, on January 29, 2022, he applied for a job at 12:55 a.m. and received a rejection email less than an hour later, at 1:50 a.m.  FAC¶¶84-85.  A

---

[1]There is nothing inherently wrong with stating "upon information and belief"  at the pleading stage as Rule 8(a) permits pleading "on information and belief." See U*nited States ex rel. Vatan v. QTC Med. Servs., Inc.,* 721 F. App'x 662, 664 (9th Cir. 2018).

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

reasonable inference can be drawn that an automated algorithmic screening tool evaluated Mobley's application.

### B.    Algorithmic Decision-Making Tools

In May of 2023, Workday recruiting processed 22% of all U.S. job openings which equated to about 2.2 million U.S. job requisitions for that month.  FAC at pg. 2.  Workday is able to process this massive number of applications by using automated screening tools powered by "artificial intelligence" and "machine learning" algorithms.  FAC¶98-99.  These algorithms are trained to use "data mining" and "data analytics" to detect years of experience, schools attended, former employers, and other markers to assist in making hiring decisions.   FAC¶29-30.  Algorithms, however, often have discriminatory effects, because, even where demographic data such as race, age, and disability are not included as inputs the algorithm can "learn" to use omitted demographic features by combining other inputs that are correlated with race (or other protected classifications), like zip code, college attended, and membership in certain groups.  FAC¶34.  Additionally, if the data mined is based on the intentional prejudices or biases of prior trainers or a lack of diversity in the data set, data mining will learn from the discriminatory examples to which it has been exposed.  FAC¶35.

Academics also warn that wholesale reliance on machine-learning algorithms (i.e. software screening systems) can perpetuate discrimination because of "limited diversity in the workforce responsible for creating models for training leads to bias in data mining which in turn leads to discriminatory and biased selection decisions."  FAC¶¶42-44, 47-48.  Further, leading scholars "recognize that AI is not ready to be deployed for employee recruitment."  See Weideinger, Laura, et al, *Ethical and social risks of harm from Language Models*, arXiv:2112.04359 [cs.CL] at 11-12 (2021) ("…For example, a language technology that analyses

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

CVs for recruitment, or to give career advice, may be less likely to recommend historically discriminated groups to recruiters, or more likely to recommend lower paying careers to marginalized groups.").

### C.    Workday Acts as an Employment Agency

Firms purchase a subscription for Workday's services and are provided support services, including professional consulting, to enable them to delegate their human resource hiring function to Workday. FAC¶90-91.  Submission of application via Workday's platform is the only way to gain employment opportunities with these employers.  FAC¶92.  Workday's subscription-based service reflects an on-going relationship with their client-employers and includes significant engagement in the process of hiring employees.  FAC¶93.  Workday boasts that it can "reduce time to hire by automatically dispositioning or moving candidates forward in the recruiting process." FAC¶94.  Via what it terms as "Talent Management", Workday **sources** candidates and then uses algorithmic decision-making tools to recommend job opportunities.  FAC¶95.

Workday's relationships with its client-employers are not one-off transactions but ongoing business arrangements where employers delegate their hiring function Workday who in turn uses its algorithmic decision-making tools to screen out applicants who are African-American, disabled, and/or over the age of 40.  FAC¶.  Vis-a-`vis pymetrics Workday's Assessment Connector uses neuroscience data and AI to help client-employers make their hiring and internal mobility decisions more predictive, and allegedly free of bias; however, these algorithms are only trained on incumbent employees at a company, allowing the pymetrics Workday Assessment Connector to build a homogenous workforce not representative of the applicant pool.  FAC¶¶101-102.  Workday also encourages and uses the recommendations of incumbent employees for hiring decisions.  FAC¶103.  This facially neutral employment practice

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

has a differential effect upon African-Americans, the disabled, and workers over the 40, because any lack of work force diversity allows for incumbent employees to consciously or unconsciously refer or recommend few, if any members of these protected classes.   FAC¶¶103-104.

### D.   Workday is an Agent

In the same way, Workday's use of its "AI", "ML", assessments, tests, and pymetrics to make job recommendations (algorithmic decision-making tools) or control access to jobs (equitable or otherwise), make it an agent for its client-employers.   FAC¶107.   After being directed to the Workday job screening platform, Workday decides which applicants to screen out from gaining employment.   FAC¶¶108-110.   According to Workday's Marketing Materials, its "skills intelligence foundation helps you [the employer] build diverse teams by expanding candidate pools with equitable, AI- and ML-driven job recommendations."   FAC¶111.   The authority to dispose of candidates "en masse" through the use of algorithmic decision-making tools delegates to Workday the responsibility to oversee the applicant hiring process.   FAC¶112. Because Workday is contracted to provide these services and they are an applicant's only means of obtaining employment, Workday is an agent for its client-employers.   FAC¶¶113-114.

### E.   Workday is an Indirect Employer

Workday possesses the ability to limit the employment opportunities of Mobley and the putative Class Members because it directly interferes with any direct employment relationship between them and prospective employers.     FAC¶115.   Workday's client-employers contract with it to provide these services via their algorithmic screening tools.   FAC¶116.   Workday is an indirect employer by virtue of its ability to discriminatorily interfere and exert peculiar control over the prospective employee's relationship with the direct employer.   FAC¶117.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **LEGAL STANDARD**

This case is pending on a Motion to Dismiss, not the Defendant's Motion for Summary Judgment.  These are not claims for fraud which are subject to Fed.R.Civ.P. 9's heightened pleading standard.  Instead, "[t]o overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must ... suggest that the claim has at least a plausible chance of success.' " *Levitt v. Yelp! Inc.,* 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008).

The Supreme Court's decisions in *Iqbal* and *Twombly* did not alter the holding in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002) that discrimination plaintiffs are not required to allege a prima facie case to state a valid claim. See *Twombly,* 550 U.S. at 569 n.14; see also *Austin v. University of Oregon,* 925 F.3d at 1135, 1136-37 (9th Cir 2019) (applying *Swierkiewicz* to Title IX claims and rejecting the argument that *Iqbal* abrogated *Swierkiewicz*); *Sheppard v. David Evans & Assoc.,* 694 F.3d 1045, 1050 n.2 (9th Cir. 2012) (ADEA plaintiff is "not required to plead a prima facie case of discrimination" (emphasis in original) (citing *Swierkiewicz,* 534 U.S. at 508-11)).  Likewise, pleading a viable disparate impact discrimination claim at this stage is not meant to be an onerous task.  All a plaintiff needs to allege is that a particular practice caused a disparate impact on a protected class. *Lee v. Hertz Corp.,* 330 F.R.D. 557, 561 (N.D. Cal. 2019).  Notably, statistics are not required at the pleadings stage for a case to proceed.  See, e.g., *Bolden-Hardge v. Office of California State Controller,* 63 F.4th 1215 (9th

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

Cir. 2023) (holding "as matter of first impression, Title VII plaintiff is not required to support

disparate impact claim with statistics").

## ARGUMENT

### I.     PLAINTIFF PLAUSIBLY ALLEGES THAT WORKDAY IS AN ENTITY SUBJECT TO LIABILITY UNDER TITLE VII, THE ADA, AND THE ADEA.

If Workday were asking the Court to dismiss Plaintiff's original complaint, the arguments

it now advances for immunity from liability under Title VII, the ADA, and the ADEA might make

sense.  Plaintiff's original complaint, however, is not under consideration.  *Ferdik v. Bonzelet,*

963 F.2d 1258, 1262 (9th Cir. 1992).  For it to prevail now, Workday must show that the well-

pleaded factual allegations in Plaintiff's FAC do not support an inference that it is an entity subject

to liability under Title VII, the ADA, or the ADEA.  It has failed to do so.  Also, Mobley is not

required to conclusively "establish" what Workday is any of these entities at the pleading stage.

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508-11 (2002).   He only needed to allege enough

non-conclusory factual content plausibly suggestive of a claim entitling him to relief, which he

has done.

### A.     Workday Acts as Employment Agency to Whom Employers Delegate Hiring Decisions.

Workday markets and provides subscription based human resources decision-making

services to client-employers who use it as such.  FAC¶90.  Workday also provides support

services to its client-employers, to include professional consulting, that enables them to delegate

their human resource hiring function wholly to the Workday platform.  FAC¶¶90-91.  Workday's

fundamental purpose is to "source" candidates and then use its algorithmic decision-making tools

to determine whether a candidate should be "dispositioned" or allowed to move forward in the

hiring process.  FAC¶¶92-95.  In HR speak, sourcing candidates is defined as follows:

1
2
3
4
5

"Candidate sourcing is a component of the talent acquisition process that involves finding the right people for a company's open roles.  This proactive recruitment method includes identifying potential candidates, engaging with them, and building relationships. The goal of candidate sourcing is to develop a pipeline of potential candidates to be considered for current and future job openings.  Candidate sourcing differs from reactive recruiting methods, which rely on waiting for potential candidates to apply for open positions on job postings rather than proactively seeking out and engaging with them."[2]

6
7
8
9
10
11
12
13
14
15

Workday's algorithmic decision-making tools also build homogenous workforces because they are only trained to replicate the incumbent workforce which, as is seen in tech jobs, is often not representative of the available talent pool.  FAC¶¶47-48, 100-102.  Workday also encourages and seeks recommendations from incumbent employees for hiring decisions, which allows for conscious or unconscious bias to effect employment decisions. FAC¶103.  Employers who, as alleged, have completely delegated their human resources decision-making operation to Workday have no reason to deviate from its recommendations.   Thus, Workday cannot claim that it encourages its client-employers to exercise independent judgment in making employment decisions.

16
17
18
19
20
21
22
23
24
25

Workday's sourcing of candidates for open roles within a company is a textbook example of procurement of employees for an employer.  Likewise, posting job opportunities on job sites such as LinkedIn, Indeed, Monster, or Careerbuilders, is procuring employment opportunities for potential employees.  Especially, where, as here, the applicant is directed to apply for the position via Workday's application platform, which is the only way to be considered for employment.  Workday is an employment agency under Title VII, the ADA, and the ADEA.  Even if this Court were to believe Workday's bare and unsubstantiated assertions that it is only a "software vendor", it is not shielded from liability.  Two Fair Housing Act cases make clear that "software vendors"

26
27
28

[2] https://www.upwork.com/resources/candidate-sourcing-strategies

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

are not allowed to discriminate themselves or to "sell a product to a customer which would unwittingly cause [it] . . . to violate federal [anti-discrimination laws] . . ." *Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Solutions, LLC,* 369 F. Supp. 3d 362, 372 (D. Conn. 2019).

In *Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Solutions, LLC,* 369 F. Supp. 3d 362 (D. Conn. 2019), the defendant, CoreLogic used its software to conduct tenant screening for apartment complexes managed by other entities and sold consumer reports generated from its databases. Id. at 367. CoreLogic offered two screening products [CrimCHECK and CrimSAFE]. Id. CrimCHECK gave the housing providers copies of criminal records for them to interpret on their own, while CrimSAFE used an "algorithm" to interpret an applicant's criminal history and provided housing providers with a decision on whether the applicant qualified for housing. Id. CoreLogic's algorithm was marketed as an "automated tool" that could process and interpret criminal records and notify leasing staff when criminal records were found that did not meet the housing provider's criteria for renting. Id. CoreLogic also generated a rejection letter for the housing provider to send to the prospective tenant when a disqualifying record was found. Id. Based on these facts, the court found CoreLogic directly and vicariously liable for violating the Fair Housing Act's prohibition against discriminatory housing practices. Id. at 372. CoreLogic effectively controlled the decision to approve or reject a rental application. Id. at 373.

CoreLogic was found liable because it held itself out as a company with the knowledge and ingenuity to screen housing applicants by interpreting criminal records and in doing so it "had a duty to not sell a product to a customer which would unwittingly cause its customer to violate federal housing law and regulations." Id. at 372. The court further held:

> "Defendant would be liable if it sold a product designed to allow its customer to circumvent the fair housing laws intentionally. Allowing a screening company to facilitate discrimination by disqualifying qualified applicants on an impermissible

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

basis or by allowing a customer to set impermissible qualification standards with impunity would subvert the purpose of the FHA."  Id. at 372.

The Court also shot down CoreLogic's argument that the Fair Housing Act only applied to housing providers, blocking it from shifting liability to its client-employers.  *Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Solutions, LLC,* 369 F. Supp. 3d 362, 372-75 (D. Conn. 2019).

The other "software vendor" discrimination case on all fours with Mobley is *Louis v. Saferent Solutions, LLC,* 2023 WL 4766192 (D,Mass. 2023)(July 26, 2023).  In *Louis*, SafeRent provided algorithm based tenant screening services.  Id. at *2.  SafeREnt designed, marketed, and sold "a variety of tenant screening services to landlords, real estate agents, brokerages, and property managers nationwide and in Massachusetts." Id. at *2.  SafeRent advertised its services as "self-service tenant screening solutions," intended to help "identify top quality applicants." Id. SafeRent's algorithm calculated the risk of leasing a property to tenants.  Id.  Once a tenant was assigned a rental score, SafeRent's algorithm issued an "accept/decline conditional decision' to housing providers based on the applicant's risk score.  Id.  The Plaintiffs alleged that SafeRent's tenant screening services resulted in discriminatory housing practice based on race.  Id. at *8.  Like the defendant in CoreLogic, SafeRent argued that the FHA did not apply to it because it did not make the hiring decision.  Id. *8.  Plaintiffs alleged that housing providers relied on SafeRent's tenant scores in deciding to accept or deny rental applications.  Id. at 9.  Drawing heavily on the court's reasoning in CoreLogic, the *Louis* court held that because SafeRent's algorithm determined who qualified to occupy a rental unit and that practice allegedly resulted in a disparate impact on protected groups, SafeRent was liable under the FHA.  Id. at *9.  Each of these cases broadly interpreted the FHA's reach in concluding that the "software vendors" were directly and vicariously liable for their alleged discriminatory tenant screening practices.  Thus, as with the FHA in *CoreLogic* and *Louis*, to accomplish their remedial goals statutes like Title VII, the ADEA,

12

and the ADA, must be interpreted in a manner that would close any loopholes crafty defendants would use to escape liability for their unlawful acts.  Workday then is liable for the discriminatory acts committed by its algorithmic decision-making tools.

Further, discriminatory acts may have several proximate causes, and the possibility that one decision may be overridden by another decisionmaker does not "automatically render the link to the [subordinate's] bias 'remote' or 'purely contingent,'" even if the decisionmaker conducts a separate investigation or exercises their own judgment. *Staub v. Proctor Hosp.,* 562 U.S. 411, 419 (2011); see also *Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Solutions, LLC,* 478 F.Supp.3d 259, at 288 (D.Conn. 2020) (holding that even if a screening company's applicant rejection "may be overridden by its client [that] does not eliminate its responsibility—discrimination may have multiple causes and parties other than final decisionmakers may be liable"). "[I]t is axiomatic under tort law that the decisionmaker's exercise of judgment does not prevent the earlier agent's action from being the proximate cause of the harm." *Staub,* 562 U.S. at 419.  Workday acts hand-in-glove with its client-employers to discriminate against the Plaintiff and the classes he seeks to represent.  Therefore, Workday should not be allowed to escape liability by pointing the decision-making finger at its client-employers and shielding itself.

**B.     Workday Is Not Selling Classified Ads and Just Screening Applications**

Workday reliance on *Brush v. San Francisco Newspaper Printing Co.*, 315 F. Supp. 577, 578 (N.D. Cal. 1970*), aff'd*, 469 F.2d 89 (9th Cir. 1972) and *Whitsitt v. Hedy Holmes Staffing Servs.,* 2015 WL 5560199, at *3 (E.D.Cal. Sept. 21, 2015) aff'd 671 F.App'x 1004 (9th Cir. 2016) in support of their argument that Workday is not an employment agency is misplaced. In *Brush*, the newspaper publisher accepted gender based classified job advertisements printed in the San Francisco Chronicle, the daily San Francisco Examiner, and the Sunday Chronicle-Examiner.

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

However, the publisher had no control over employee selection and did not make any applicant recommendations.[3]  Here, the allegation is that Workday's AI/ML sources candidates and makes employment decisions and recommendations.  *Whitsitt* also misses the mark because Mobley's allegations describe activities far and above perfunctorily screening applications.  The cases are not comparable.

### C.     "my.workday.com" is an Agent

In this litigation Workday identifies as a mere software vendor and argues it is a misguided notion to suggest that they are an agent of their client-employers.    Workday's AI/ML sources candidates, culls applicants, makes employment recommendations, and rejects applicants on behalf of their customers. FAC ¶¶111-112.  Employers that engage Workday for hiring require applicants to use myworkday.com to access job opportunities.  FAC¶49.  Workday is a decision maker in the process.

Mobley's First Amended Complaint pleads that Workday is subject to Title VII as an agent. FAC ¶¶107-114.   Whether the alleged agency liability flows from a respondent superior theory or from being an independent agent is not ripe for an MTD determination.  Nevertheless, Workday continually conflates the heightened evidentiary standard of summary judgment with the applicable Rule 12(b)(6) motion to dismiss standard of review by arguing that Plaintiff lacks sufficient evidence to maintain certain claims.  All without the benefit of any discovery and by ignoring the facts as pleaded.

Workday champions its AI and ML decision-making capabilities as reason to hire their company: "Our skills intelligence foundation helps you build diverse teams by expanding

---

[3] *Brush* was decided on an application for a preliminary injunction which resulted in a change that the newspaper would make a gender-neutral column available for employment ads.

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1   candidate pools with equitable, AI-and ML-driven job recommendations" and dispositions

2   candidates "en masse". FAC ¶¶111-112. Mobley was personally affected by these algorithmic

3   decision-making tools as his applications were disposed of multiple times by myworkday.com.

4   Mobley's alleged injuries are not remote or speculative. The employment rejections are all

5   traceable to my workday.com. FAC ¶¶49-87.

6          Whether Workday's sourcing of candidates and selection decisions establish agency are

7   factual questions that cannot be resolved in consideration of a Motion to Dismiss. *C.A.R. Transp.*

8   *Brokerage Co., Inc. v. Darden Rests., Inc.,* 213 F.3d 474, 479-80 (9th Cir. 2000) ("[U]nless only

9   one conclusion may be drawn, existence of an agency and the extent of an agent's authority is a

10  question of fact..."); *Rookard v. Mexicoach,* 680 F.2d 1257, 1261 (9th Cir. 1982)("agency" is a

11  question of fact for the jury'); *Clarendon Nat'l Ins. Co. v. Ins. Co. of the West,* 442 F. Supp. 2d

12  914, 936 (E.D. Cal. 2006) ("The existence and scope of an agency is generally a question of

13  fact...unless the essential facts are undisputed and subject to only one inference...."); see also

14  *Patsy Freeman v. Suddle Enterprises, Inc.,* 179 F. Supp. 2d 1351, 1354 (M.D. Ala.

15  2001)("Agency questions are fact intensive determinations, thereby precluding summary

16  judgment in all but the weakest of cases.").

17         To shake the agent mantle Workday also misinterprets the EEOC's guidance on AI as

18  giving immunity to "software vendors". However, a closer examination of the cited regulations

19  shows that software vendors can be agents when the employer has given them authority to act in

20  their behalf. Granted the Agency offered guidance to employers that depending on how the AI is

21  used they may also be liable; "software vendors" are not exempted as possible agents. In relevant

22  part the EEOC regulations provide: "In addition, employers may be held responsible for the

23  actions of their agents, which may include entities such as software vendors, if the employer has

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

given them authority to act on the behalf.[11]" https://www.eeoc.gov/laws/guidance/select-issues-assessing-adverse-impact-software-algorithms-and-artificial

The 9th Circuit requested the California Supreme Court answer the following question: "Does California's Fair Employment and Housing Act, which defines 'employer' to include 'any person acting as an agent of an employer,' Cal. Gov't Code § 12926(d), permit a business entity acting as an agent of an employer to be held directly liable for employment discrimination?" Raines v. U.S. Healthworks Medical Grp., 28 F.4th 968, 969 (9th Cir. 2022).  Noting that similarity between Title VII and the California Fair and Employment and Housing Act, the California Supreme Court concluded that as long the corporate agent itself employed 5 persons liability potentially attached.  Summarizing the same cases relied on by Workday in their Motion to Dismiss concerning agent liability *DeVito v. Chicago Park Dist.,* 83 F.3d 878, 881 (7th Cir. 1996) , *Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.,* 37 F.3d 12, 17 (1st Cir. 1994), and *Williams v. City of Montgomery,* 742 F.2d 586, 589 (11th Cir. 1984)(where a trial was held),  the California Supreme Court concludes:

> "These federal cases hold that under federal civil rights law, aggrieved employees may sue, not only their employer, but also the institutional agents of their employer if those agents engage in an industry affecting commerce and are responsible for the civil rights violation at issue. The latter condition, that the agent be responsible for the violation, is analyzed in different ways, but the federal courts have generally focused on whether the agent exercised an administrative function traditionally exercised by the employer." *Raines v. U.S. Healthworks Med. Grp.,* 15 Cal. 5th 268, 287, 534 P.3d 40, 51 (2023).

Acting far beyond an innocuous software seller, Workday's AI and ML exert an extraordinary degree of control over access to their customers' employment opportunities. Indeed, Microsoft Excel does not hire employees, Workday does through sourcing, reviewing, recommending and rejection of applicants.  Workday's assumption of these traditional HR functions (for subscription fees) raise factual agency questions. For example, Mobley submitted

1    an employment application for Unum at 12:55 a.m. to the "my.workday.com" platform, he

2    received a rejection by 1:50 a.m.  FAC ¶84-85.  It is inconceivable that anything other than an

3    automated decision-making tool made the decision not to advance Mobley's application.  The

4    First Amended Complaint contains numerous examples with the common theme of being required

5    to travel through Workday's AI and ML processes to obtain employment.  Workday has created

6    a unique business model executed by their AI/ML and financed by subscription fees which

7    assumes responsibilities over the application and selection process for their customers who

8    engage them for that purpose.  Workday is the gatekeeper for employment opportunities.

9

10          **D.       Workday is an Indirect Employer**

11          In *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1342 (D.C. Cir. 1973) the D.C.

12   Circuit Court found a hospital liable for discrimination under Title VII for failing to refer a nurse

13   for an employment opportunity with a patient.   The plaintiff was not an employee of the hospital

14   but worked for an employment registry service which sent him to assist patients at the hospital.

15   Id. at 1339-42.  The plaintiff alleged that because of his sex, the hospital only assigned him male

16   patients while female nurses could care for both male and female patients.  Id. The plaintiff sued

17   the hospital under Title VII, and the hospital argued that because no employer-employee

18   relationship existed, no liability existed under Title VII.  Id.   The district court for the District of

19   Columbia entered summary judgment for the plaintiff finding that the hospital violated Title VII.

20   The D.C. Circuit reversed and remanded the case but in doing so held that Title VII enforcement

21   does not explicitly depend upon the existence of a direct employer-employee relationship.  Id. at

22   1342-43.  The circuit court stated that the hospital exposed itself to Title VII liability because of

23   the degree of control it exerted over the access to the employment opportunities.  Id.  The court

24   also noted that indirect employer liability under Title VII can occur when labor unions or

25

26

27

28

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1   employment agencies interfere with the direct employment relationship. Id. Even if this court

2   were to hold that Workday is not an employment agency or an agent, which it should not, a string

3   of Ninth Circuit cases beginning with *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883

4   (9th Cir. 1980), agreed with and expanded *Sibley* reach.

5          In *Lutcher v. Musicians Union Local 47*, the Ninth Circuit applied *Sibley's* rationale and

6   held that Title VII applies even when no direct employment relationship exists. Similarly, in

7   *Gomez v. Alexian Brothers Hospital,* 698 F.2d 1019, 1021 (9th Cir. 1983), the court held that a

8   hospital was an indirect employer of the plaintiff because of its singular ability to interfere with

9   the terms and conditions of his employment. The court also found, "[t]he fact that plaintiff

10  continues as an employee of AES does not mean the employment relationship between AES and

11  plaintiff has not been interfered with. The conditions of plaintiff's employment are different than

12  they would have been had he not been discriminated against. . ." *Gomez,* 698 F.2d at 1021.

13         In *Ass'n of Mexican-Am. Educators v. California,* 231 F.3d 572, 580-82(9th Cir. 2000)

14  ("AMAE"), the court found the state of California liable under Title VII because, even though it

15  was not the plaintiffs' direct employer, it had influenced the employment policies and practices

16  of local school districts. Important here is that AMAE was a class action. Relying on *Sibley*,

17  *Lutcher*, and *Gomez*, the *AMAE* court found the state of California liable because it had interfered

18  with the plaintiffs' relationship with future employers because its test dictated whom the

19  employers could hire. Moreover, the court stated that because California had participated in and

20  influenced the employment practices and policies of the local school districts it was covered by

21  Title VII. The court's conclusion rested on the degree of control the state exerted over who would

22  be referred to the local districts.

23

24

25

26

27

28

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Each of these decisions takes an expansive view of the indirect employer theory created by *Sibley*.  See *Velez v. Roche,* 335 F.Supp.2d 1022 (N.D. Ca. 2004) (extending indirect employer theory of liability to a hostile environment claim where the VA was the direct employer, and the Air Force was the indirect employer).  Moreover, the common thread that runs through all of them is that an entity is liable under Title VII where (1) the entity-controlled access to the employment opportunity with the direct employer, and (2) it interfered with the direct employment relationship between the employee and the direct employer.  Here, Mobley clearly alleges that Workday and its algorithmic decision-making tools exert singular control over who advances to employment relationships with employers.  FAC¶¶38-39, 51-55, 84-85,115-117.

## II.  **PLAINTIFF'S OTHER DISCRIMINATION CLAIMS ARE VIABLE**

### A.  **Plaintiff Claims of Intentional Discrimination Satisfy Rule 8(a)(2).**

In attacking the sufficiency of Mobley's allegations of intentional discrimination, Workday wants this Court to forget what this case is about.  Namely, whether Workday and its algorithmic decision-making tools discriminate against applicants because of race, disability and age.  As the FAC makes clear, these tools learn to discriminate on their own or can perpetuate current discrimination based on their training.  FAC¶¶28-30, 33-40, 45-46.  It also alleges that these algorithms don't need the applicant's demographic information to discriminate because they can figure out omitted demographic features by combining other inputs that are correlated with a protected characteristic.  FAC¶34.  Whether Workday's algorithms act the same or some other way is for discovery.  What is known, and what Workday seems to ignore, is that there are serious concerns as to whether AI or ML tools can ever be made bias free.  Bloomberg, the EU, the federal government, and numerous academics are not optimistic that they can.  Workday's argument that Mobley did not adequately plead his qualifications for the roles for which he was rejected is

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

simply incorrect. Mobley set out his academic achievements, prior job history, and his areas of experience. FAC¶¶20-27. He then offered a sampling of the 100+ jobs he was rejected for, identifying them by title and company. FAC¶¶61-88. When read together Mobley's allegations clearly show that he only applied for applied for jobs within his educational and experiential job histories for which he says he met the qualifications. Compare FAC¶¶20-27 to 61-88. Workday's contention implies that for Mobley to adequately allege that he was qualified for the jobs he needed to attach job descriptions to his FAC, explain his qualifications bullet point by bullet point, and then provide information he could not possibly possess, such as who received the position and what were their qualifications relative to his. Who is he supposed to get this information from? The robot who forwarded him a rejection email less than one hour after he applied for a job? FAC¶84-85. Fortunately, Rule 8 does not require such to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511-13 (2002).

Finally, Workday argues that Mobley fails to allege any fact suggestive of causation. However, 0 for 100+ indicates causation. Put simply, unrefuted allegations that an applicant with Mobley's qualifications and experience cannot get one job after submitting 100+ applications by itself supports an inference of discrimination. See *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (stating that a "company's inability to rebut the inference of discrimination came not from a misuse of statistics but from 'the inexorable zero' "); *EEOC v. Marquez Bros. Int'l, Inc.,* 2017 WL 4123915, at *7 (E.D. Cal. Sept. 18, 2017) ("Existence of the 'inexorable zero' in Title VII cases raises the judicial eyebrow."), see also *NAACP, Inc. v. Town of East Haven,* 70 F.3d 219, 225 (2d Cir.1995) (vacating denial of preliminary injunction enjoining defendant from hiring any town employees in light of failure to ever hire a full-time black employee, which, by itself, supports an inference of discrimination);

*EEOC v. O & G Spring and Wire Forms Specialty Co.,* 38 F.3d 872, 878 (7th Cir.1994) (finding of intentional discrimination was supported by statistical showing that defendant failed to hire any African–Americans); *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 524 n. 4 (7th Cir. 1994) (where promotional procedure maintained the inexorable zero it is strong evidence of intent to bring about that result); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 867 n. 7 (7th Cir. 1985) (holding reliance on statistical evidence of inexorable zero was sufficient to establish prima facie case, notwithstanding plaintiff's failure to reference appropriate work-pool). Furthermore, Mobley alleges that in catering to its customers unlawful demands, Workday consciously ignored the fact that its algorithmic decision-making tools lack sufficient guardrails to prevent discrimination. FAC¶¶38-39, 45-46. Workday's actions were intentional and in reckless disregard of the applicable anti-discrimination laws. See *Kolstad v. American Dental Ass'n,* 527 U.S. 526 (1999). Causation is present here.

### B. Plaintiff has alleged facts giving rise to a plausible inference that Workday's challenged policy caused a disparate impact.

Workday correctly sets forth what Mobley must prove at summary judgment or trial to establish a prima facie disparate-impact claim under Title VII. However, here at the pleading stage the plaintiff need not plead a prima facie case. See *Austin v. Univ. of Or.,* 925 F.3d 1133, 1136-37 (9th Cir. 2019); *Lee v. Hertz Corp.,* 330 F.R.D. 557, 561 (N.D. Cal. 2019). Again, in the specific context of discrimination cases, a plaintiff does not have to plead a prima facie case to advance to discovery. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002). That is because the prima facie case is an evidentiary standard, not a pleading standard. Id. at 510. Moreover, "the precise requirements of a prima facie case can vary depending on the context," and "[b]efore discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case." Id. at 512; Notably, statistics

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

are also not required at the pleadings stage for a case to proceed.  See, e.g., *Bolden-Hardge v. Office of California State Controller,* 63 F.4th 1215 (9th Cir. 2023) (holding "as matter of first impression, Title VII plaintiff is not required to support disparate impact claim with statistics"); *Hung Ping Wang v. Hoffman,* 694 F.2d 1146, 1149–50 (9th Cir. 1982) (concluding that a promotion system's subjectivity, with facial indicia of disparate impact, was enough to allow case to proceed); *Gamble v. Kaiser Found. Health Plan, Inc., 3*48 F. Supp. 3d 1003, 1023 (N.D. Cal. 2018) (finding adequate the plaintiffs' allegations of an arbitrary and subjective promotion policy). Mobley has gone the extra mile and alleged more than enough facts that give rise to an inference of disparate impact .

**Disparity.**  Mobley provided a sampling of the 100+ jobs he applied for, his qualifications for them, and the results of those applications, a zero-success rate.  FAC¶¶19-27,28-48, 49, 51-88. Mobley's allegations align with the FAC's explanation of how algorithmic discrimination operates and how it permeates Workday's operations and processes.  Id.  Questions about whether Mobley got better results using different jobs platform go to the weight of the evidence and should not be dispositive of the determination whether he has adequately pled discrimination at the procedural stage.   *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n,* 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018) ("defendant's contentions regarding whether the Plaintiffs' methodology is flawed are best reserved for resolution at summary judgment. The Court finds the specific contentions about alleged deficiencies in methodology go to the weight of the evidence and are not dispositive of the determination whether Plaintiffs have adequately pled discrimination at this procedural stage."); *Nat'l Fair Hous. Alliance v. Deutsche Bank Nat'l Tr.,* 2019 WL 5963633, at *14 (N.D. Ill. Nov. 13, 2019) ("It is not Plaintiff's burden at the pleading stage to explain potential

1    non-discriminatory reasons for Defendant's conduct.").  Requiring anything else from Mobley

2    places a burden on him at the pleading stage that is not required by Rule 8.

3            ***Employment Practice.***    Mobley has also sufficiently identified a specific policy:

4    Workday's decision to market, sell, and employ algorithmic decision-making tools, instead of

5    human judgment, to decide who gets a job.  FAC¶¶38-39, 45, 84-85, 97-102, 111-113.  The FAC

6    is replete with allegations, sourced to published materials, that illustrate how algorithmic

7    discrimination impacts protected groups.  FAC¶¶28-48.  Specifically, how data mining and biased

8    algorithms have discriminatory effects, even where demographic data is not included as an input.

9    FAC¶¶33-34.  The FAC also alleges in detail how Workday's algorithmic decision-making tools

10   incorporate this information to make job decisions.  FAC ¶¶38-39.    Additionally, Mobley

11   challenges Workday's use of assessments and/or personality tests, which flow directly to his

12   disability claim.   FAC¶¶56-60.  He explicitly describes how these tools are unlawful "disability

13   inquiries" and/or "medical examinations" used to decide who gets a job.  Id.  The tie that binds

14   all these allegations together is that the decisions are all made using Workday's algorithmic

15   decision-making tools.  *Huskey v. State Farm Fire & Casualty Co.,* 2023 WL 5848164, *8

16   (N.D.Ill. 2023) (September 11, 2023) ("Plaintiffs point to a specific policy:  State Farm's decision

17   to automate claims-processing.  Plaintiffs need not pin down the policy with greater precision at

18   this stage.").

19           ***Causation.***    Mobley plausibly alleges a connection between Workday's algorithmic

20   decision-making tools and disparities in hiring.  FAC¶¶28-48. He describes in detail how machine

21   learning algorithms are prone to bias and can learn to discriminate against members of protected

22   groups even without being provided specific demographic information.  Id.  Mobley, an African-

23   American over the age of 40 who suffers from depression and anxiety, demonstrates causation by

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

alleging that he has been denied 100+ jobs by the Workday job platform.  The inference to be gathered here is that Workday's algorithmic decision-making tools discriminate on the basis race, disability, and age.  "No more is necessary", at this stage of the litigation.  *Huskey,* at *9. Workday's nitpicking Mobley's every allegation misses this point, and for that reason their arguments supporting dismissal should be disregarded.

### C.    Plaintiff's FEHA Claim Should go Forward

Workday's premature prediction that this Court will dismiss Mobley's federal claims and decline to exercise jurisdiction over his aiding and abetting discrimination claim fatally ignore facts suggestive of an opposite outcome.   "Under the FEHA, those who aid or abet another in any discriminatory practice are jointly and severally liable. Cal. Gov't Code § 12940(i) (making it an unlawful employment practice for "any person to aid, abet, incite, compel or coerce the doing of any acts forbidden" by the FEHA). To plead aiding and abetting liability under the FEHA, Plaintiffs must specifically allege that each Defendant knew the other's conduct amounted to discrimination and gave substantial assistance to that discrimination. See *Hall v. Hamilton Family Ctr.,* 2014 WL 1410555, at *4 (N.D. Cal. Apr. 11, 2014) (noting that FEHA does not define "aiding or abetting" and that courts have adopted the common law definition).  Mobley alleges that Workday caters to the biases of its client-customers and offers recommendations reflective of the same.  FAC¶¶38-39.  He also alleges that Workday's algorithmic decision-making tools automatically observe when a client disfavors candidates who are members of a protected class and decreases the rate at which those candidates are recommended for jobs.  Id.  Workday has consciously chosen to not include guardrails to prevent its algorithmic decision-making tools from discriminating against members of protected classes, thereby aiding and abetting its client-customers' bias.  See *CoreLogic,* at 372.

24

**D.      Disparate impact claims are applicable to employment agencies.**

42 U.S.C. § 2000e-2(k)(1)(A) (Title VII) states  that "An unlawful employment practice based on disparate impact is established under this subchapter only if-(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . " Title VII defines a respondent as:  "(n) The term "respondent" means an employer, employment agency, labor organization, joint labor-management committee controlling apprenticeship or other training or retraining program, including an on-the-job training program, or Federal entity subject to section 2000e–16 of this title."   42 U.S.C. § 2000e(n).  Thus, the disparate impact theory applies to employment agencies.[4]

**E.      Punitive Damages are Available**

Workday's MTD, in footnote 2, alternatively requests that Mobley's request for punitive damages be stricken.   Doc. 50 MTD, pg. 12 note 2.[5]  This issue is not before the Court.

<u>**CONCLUSION**</u>

Based on the foregoing, the Defendant's Motion is due to be denied in its entirety and the matter allowed to proceed on the merits.

---

[4] See, 29 C.F.R. § 1607.10; see also EEOC Compl. Man., Vol. II, § 631.4(b); See also Policy Guidance: What constitutes an employment agency under Title VII, how should charges against employment agencies be investigated, and what remedies can be obtained for employment agency violations of the Act? (1991); EEOC Decision No. 71-762 (1973).

[5] A footnote is not the place to make new substantive arguments. See *In re Katz Interactive Call Processing Pat. Litig.,* No. 07-ML-01816-B RGK, 2009 WL 8636055, at *1 (C.D. Cal. Oct. 26, 2009).  This is a motion to dismiss not a motion to strike punitive damages.

Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint

1    **Dated: April 2, 2024**

2                                             Respectfully submitted,

3                                             /s/Roderick T. Cooks
4                                             Roderick T. Cooks *(admitted pro hac vice)*
                                              Lee Winston *(admitted pro hac vice)*
5                                             Attorney for the Plaintiff and the Proposed
                                              Classes
6    **OF COUNSEL:**

7    Lee D. Winston
     lwinston@winstoncooks.com
8    State of Alabama Bar No.:6407O72L
     Roderick T. Cooks
9    rcooks@winstoncooks.com
     Winston Cooks, LLC
10   420 20ᵗʰ Street North
     Suite#2200
11   Birmingham, AL 35203
     Telephone:     (205) 502-0970
12   Facsimile:     (205) 278-5876

13   **LOCAL COUNSEL:**
     Jay Greene
14   Greene Estate, Probate, and Elder Law Firm
     447 Sutter Street, Suite 435
15   San Francisco, CA 94108
     Phone 415-905-0215
16   greeneattorney@gmail.com

17
                        **CERTIFICATE OF SERVICE**
18
          I HEREBY CERTIFY that on April 2nd, 2024, I electronically filed the foregoing
19   document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document
     is being served this day on all counsel of record identified on the below Service List in the
20   manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF
     or in some other authorized manner for those counsel or parties who are not authorized to
21   receive electronic Notices of Electronic Filing:

22        JULIE A. TOTTEN
          ERIN M. CONNELL
23        KAYLA D. GRUNDY
          ALEXANDRIA R. ELLIOTT
24        JUSTIN M. WASHINGTON

25        Attorneys for Defendant WORKDAY, INC.

26
                                             s/Roderick T. Cooks
27                                           Of Counsel

28
                                        26