1
2
3
4
5
6
7

KARLA GILBRIDE, SBN 264118 (CA)
JENNIFER S. GOLDSTEIN, SBN 147791 (CA)
DARA S. SMITH, SBN 1027046 (DC)
STEVEN WINKELMAN, SBN 1048481 (DC)
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Office of General Counsel
131 M Street N.E., 5th Floor
Washington, D.C. 20507
Telephone (202) 921-2564
steven.winkelman@eeoc.gov

*Attorneys for EEOC as Amicus Curiae*

8
9
10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK L. MOBLEY, for and on behalf of himself and other persons similarly situated,<br><br>       Plaintiff,<br><br>   vs.<br><br>WORKDAY, INC.,<br><br>      Defendant. | Case No. 3:23-cv-00770-RFL<br><br>**BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date:        May 7, 2024<br>Time:       10:00 a.m.<br>Judge:     Hon. Rita F. Lin<br>Courtroom:  15, 18th Floor<br><br>First Amended Complaint: February 20, 2024 |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF CONTENTS

2    I.      STATEMENT OF INTEREST ................................................................................. 1

3    II.     INTRODUCTION .................................................................................................. 1

4    III.    BACKGROUND .................................................................................................... 2

5    IV.     ARGUMENT ......................................................................................................... 3

6            A.     Mobley has plausibly alleged that Workday is an employment agency. ......................... 4

7            B.     Mobley has plausibly alleged that Workday is an indirect employer. .......................... 10

8            C.     Mobley has plausibly alleged that Workday is an agent of employers ........................ 12

9    V.      CONCLUSION .................................................................................................... 14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

# TABLE OF AUTHORITIES

**Page(s)**

3

**Cases**

4

*Alexander v. Gardner-Denver Co.*,
   415 U.S. 36 (1974) ............................................................................................................ 1

5

6

*Anderson v. Pac. Mar. Ass'n*,
   336 F.3d 924 (9th Cir. 2003) .......................................................................................... 10

7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................................... 3, 4

8

9

*Ass'n of Mexican-Am. Educators v. State of Cal.*,
   231 F.3d 572 (9th Cir. 2000) (en banc) ....................................................................... 1, 11

10

11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................................... 3, 4

12

13

*Brush v. San Francisco Newspaper Printing Co.*,
   315 F. Supp. 577 (N.D. Cal. 1970), *aff'd*, 469 F.2d 89 (9th Cir. 1972) ...................... 4, 5

14

*Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*,
   37 F.3d 12 (1st Cir. 1994) ........................................................................................... 12, 13

15

16

*DeVito v. Chicago Park Dist.*,
   83 F.3d 878 (7th Cir. 1996) ......................................................................................... 12, 13

17

18

*Dumas v. Town of Mount Vernon*,
   436 F. Supp. 866 (S.D. Ala. 1977), *aff'd in part, rev'd in part*, 612 F.2d 974 (5th Cir.
   1980) ................................................................................................................................ 6, 8

19

20

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc) ......................................................................... 9

21

*Garity v. APWU Nat'l Lab. Org.*,
   828 F.3d 848 (9th Cir. 2016) ........................................................................................... 2

22

23

*Gomez v. Alexian Bros. Hosp. of San Jose*,
   698 F.2d 1019 (9th Cir. 1983) ........................................................................................ 10

24

25

*Greenfield v. Field Enters., Inc.*,
   No. 71-cv-2075, 1972 WL 155 (N.D. Ill. Feb. 1, 1972) ................................................. 4

26

*Hill v. Miss. State Emp. Serv.*,
   918 F.2d 1233 (5th Cir. 1990) ...................................................................................... 5-6

27

28

*Kaplowitz v. Univ. of Chi.*,
   387 F. Supp. 42 (N.D. Ill. 1974) ..................................................................................... 4

*Kemether v. Pa. Interscholastic Athletic Ass'n, Inc.*,
   15 F. Supp. 2d 740 (E.D. Pa. 1998) ........................................................................ 6

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ................................................................................... 8

*Radentz v. Am. Ass'n of Physician Specialists, Inc.*,
   No. 13-cv-01486, 2014 WL 12601014 (C.D. Cal. Nov. 10, 2014) ......................... 5

*Raines v. U.S. Healthworks Med. Grp.*,
   534 P.3d 40 (Cal. 2023) ......................................................................................... 13

*Riesgo v. Heidelberg Harris, Inc.*,
   36 F. Supp. 2d 53 (D.N.H. 1997) ............................................................................ 6

*Scaglione v. Chappaqua Cent. Sch. Dist.*,
   209 F. Supp. 2d 311 (S.D.N.Y. 2002) ..................................................................... 6

*Sciarra v. DaMar Staffing Sols. of Indianapolis, Inc.*,
   No. 1:07-cv-1580, 2009 WL 10719817 (S.D. Ind. Aug. 21, 2009) ........................ 6

*Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.*,
   595 F.2d 711 (D.C. Cir. 1978) .............................................................................. 11

*Sibley Mem'l Hosp. v. Wilson*,
   488 F.2d 1338 (D.C. Cir. 1973) ....................................................................... 10, 12

*Spirt v. Tchrs. Ins. & Annuity Ass'n*,
   691 F.2d 1054 (2d Cir. 1982), *vacated on other grounds*, 463 U.S. 1223 (1983), *reinstated
   and modified on other grounds*, 735 F.2d 23 (2d Cir. 1984) ........................... 12-13

*Stewart v. Am. Ass'n of Physician Specialists, Inc.*,
   No. 5:13-cv-01670, 2015 WL 7722349 (C.D. Cal. Nov. 30, 2015) ........................ 5

*United States v. Gonzales*,
   520 U.S. 1 (1997) .................................................................................................... 5

*Vanguard Just. Soc. Inc. v. Hughes*,
   471 F. Supp. 670 (D. Md. 1979) ........................................................................... 11

*Whitsitt v. Hedy Holmes Staffing Servs.*,
   No. 2:13-cv-00117, 2015 WL 5560119 (E.D. Cal. Sept. 21, 2015), *aff'd*, 671 F. App'x
   1004 (9th Cir. 2016) ................................................................................................ 7

*Wilborn v. S. Union State Cmty. Coll.*,
   720 F. Supp. 2d 1274 (M.D. Ala. 2010) .................................................................. 4

*Williams v. City of Montgomery*,
   742 F.2d 586 (11th Cir. 1984) ......................................................................... 12, 13

*Wilson v. Timec Servs. Co., Inc.*,
   No. 2:23-cv-00172, 2023 WL 3436900 (E.D. Cal. May 12, 2023) ................................. 11

**Statutes**

29 U.S.C. § 621 .................................................................................................................... 1

29 U.S.C. § 623 .......................................................................................................... 4, 5, 10

29 U.S.C. § 630 ............................................................................................................ 4, 12

42 U.S.C. § 12101 ............................................................................................................... 1

42 U.S.C. § 12111 ...................................................................................................... 4, 10, 12

42 U.S.C. § 12112 .......................................................................................................... 4, 10

42 U.S.C. § 2000e ................................................................................................. 1, 4, 8, 12

42 U.S.C. § 2000e-2 ..................................................................................................... 4, 5, 10

47 U.S.C. § 230 .................................................................................................................... 9

**Rules**

Fed. R. Civ. P. 8 .................................................................................................................. 3

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ............................................................................. 8

EEOC Compliance Manual § 2-III (Aug. 2009) ..................................................... 10, 11, 13

EEOC, *CM-631: Employment Agencies* (Feb. 15, 1990) ............................................. 5, 6, 8

EEOC, *Policy Guidance: What constitutes an employment agency under Title VII, how
   should charges against employment agencies be investigated, and what remedies can be
   obtained for employment agency violations of the Act?*, No. N-917-002. (Sept. 20, 1991) ............. 5

EEOC, *Policy Statement on control by third parties over the employment relationship
   between an individual and his/her direct employer* (May 20, 1987) ............................... 12

EEOC, *Select Issues: Assessing Adverse Impact in Software, Algorithms, and Artificial
   Intelligence Used in Employment Selection Procedures Under Title VII of the Civil Rights
   Act of 1964* (May 18, 2023) ...................................................................................... 13-14

EEOC, *The Americans with Disabilities Act and the Use of Software, Algorithms, and
   Artificial Intelligence to Assess Job Applicants and Employees* (May 12, 2022) .......... 14

Pauline T. Kim & Matthew T. Bodie, *Artificial Intelligence and the Challenges of Workplace
   Discrimination and Privacy*, 35 ABA J. Lab. & Emp. L. 289, 297 (2021) ...................... 9

BRIEF OF EEOC AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF
           iv
           Case No. 3:23-cv-00770-RFL

Pauline T. Kim, *Manipulating Opportunity*, 106 Va. L. Rev. 867 (2020) ..................................... 7, 12

Rev. Rul. 85-187, 1985-2 C.B. 338, 1985 WL 291469 (1985) ............................................................ 9

Susan C. Morse, *Do Tax Compliance Robots Follow the Law?*, 16 Ohio St. Tech. L.J. 278
    (2020)................................................................................................................................................ 9

*Webster's New International Dictionary* (2d ed. 1959).......................................................................... 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      STATEMENT OF INTEREST

Congress charged the Equal Employment Opportunity Commission (EEOC) with administering and enforcing federal statutes that prohibit employment discrimination, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Title VII), the Americans with Disabilities Act, *id.* §§ 12101 *et seq.* (ADA), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (ADEA). The operative allegations in this case implicate whether these statutes cover entities that purportedly screen and refer applicants and make automated hiring decisions on behalf of employers using algorithmic tools. The EEOC has issued several guidance documents addressing what types of entities are covered by—and thus subject to—these statutes. Because the EEOC has a significant interest in whether and how these longstanding theories of coverage apply to the novel circumstances presented in this case, the agency offers its views. The EEOC takes no position on the accuracy of the allegations in this case, including whether they correctly characterize the nature, ownership, or creatorship of the relevant algorithmic tools.

## II.      INTRODUCTION

Federal employment discrimination laws share the same animating goal: "to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of [protected traits]." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974). To achieve this goal, Congress ensured that prohibitions on employment discrimination extended beyond direct employers to a range of institutions, entities, and persons that might influence or control access to employment, including employment agencies, labor organizations, and training programs. *See Ass'n of Mexican-Am. Educators v. State of Cal.*, 231 F.3d 572, 580-81 (9th Cir. 2000) (en banc). Congress recognized that if these types of entities were permitted to engage in discrimination where direct employers were not, the promise of equal employment opportunity would be hollow.

Here, Derek Mobley's First Amended Complaint (FAC) [ECF 47] alleges that Workday, Inc. provided employers with algorithmic applicant screening tools that discriminated against him (and others similarly situated) based on race, disability, and age. Although the EEOC takes no position on the accuracy of Mobley's assertions, the FAC alleges that Workday's algorithmic tools dictated whether applicants were referred to—and thus considered by—employers; Workday systems made

1   automated decisions on behalf of employers to reject certain candidates; and the Workday platform

2   was the exclusive point of entry for many job opportunities. Accepting the allegations in the FAC as

3   true, as the court must at the pleading stage, Workday is a type of intermediary that Congress meant

4   federal anti-discrimination laws to cover.

5          More precisely, Mobley has alleged facts sufficient to support a reasonable inference that

6   Workday is subject to Title VII, the ADA, and the ADEA under the statutory text and three

7   longstanding legal theories. *First*, Mobley has plausibly alleged that Workday operates as an

8   employment agency because it purportedly engages to a significant degree in screening and referral

9   activities that have long been associated with traditional employment agencies. *Second*, Mobley has

10  plausibly alleged that Workday is an indirect employer because it purportedly exercises significant

11  control over his and other applicants' access to employment opportunities with Workday's

12  employer-clients. *Third*, and finally, Mobley has plausibly alleged that Workday is an agent of

13  employers because employers have purportedly delegated authority to Workday to make at least

14  some hiring decisions.

15         For these reasons, Mobley has adequately pleaded that Workday is a covered entity under

16  Title VII, the ADA, and the ADEA. Accordingly, Workday's Motion to Dismiss [ECF 50] should be

17  denied to the extent it seeks dismissal on these grounds. The EEOC takes no position on any other

18  issues.

19  **III.    BACKGROUND**[1]

20         Workday offers human resource management services to employers across multiple

21  industries. FAC p.2. Key among those services, the FAC states that Workday provides employers

22  with automated "applicant screening systems" that incorporate "algorithmic decision-making tools."

23  FAC ¶ 28. These tools analyze and interpret resumes and applications and then "determine whether

24  an employer should accept or reject an application for employment." FAC ¶¶ 8, 28-29. Although an

25  employer may supply the desired qualifications for a given job, the FAC states that Workday's

---

[1] We draw these facts from Mobley's FAC and present them in the light most favorable to him, as
required at the pleading stage. *See Garity v. APWU Nat'l Lab. Org.*, 828 F.3d 848, 854 (9th Cir.
2016). Again, the EEOC takes no position on the accuracy of the FAC's factual allegations,
including the descriptions about what services Workday allegedly provides.

screening tools determine which job candidates possess those qualifications. FAC ¶ 38 ("Workday determines which candidates to recommend based on the demonstrated interests of its client-employers in certain types of candidates…."); FAC ¶ 8 ("Workday … utilizes screening tools, to include Workday branded assessments and/or tests, to [] process and interpret an applicant's qualifications and recommend whether the applicant should be accepted or rejected.").

Mobley is an African-American man, is over the age of forty, and has anxiety and depression. FAC ¶ 19. Beginning in 2017, Mobley applied for more than one hundred positions with employers that "exclusively use Workday, Inc. as a screening platform for talent acquisition and/or hiring," and every application was rejected. FAC ¶¶ 49, 88. The application process generally proceeded as follows: Mobley would first respond to an online job ad "on a third-party website such as LinkedIn, Indeed, Monster, or Careerbuilders," by clicking on a link, which would "direct[] him to the Workday platform on the employer's website." FAC ¶¶ 51-52. The Workday platform would then prompt Mobley to create an account and either upload a resume or enter his information manually. FAC ¶¶ 54-55. The FAC also states that some positions "required [Mobley] to take a Workday branded assessment and/or personality test." FAC ¶ 56. After that, Mobley would receive an email notification that he had been rejected for the position. FAC ¶¶ 61-88. Notably, some of these rejections came within hours of Mobley submitting his application, FAC ¶¶ 68-69, 76-77, and one came in just fifty-five minutes, FAC ¶¶ 84-85.

In June 2021, Mobley filed a charge of discrimination with the EEOC, which he later amended. FAC ¶ 6. After receiving a right-to-sue letter, Mobley filed this action. FAC ¶ 6. As relevant here, his operative complaint asserts claims under Title VII, the ADA, and the ADEA. FAC ¶¶ 130-58.

## IV.    ARGUMENT

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Given this liberal pleading standard, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the facts alleged in the

1   complaint allow for "the reasonable inference that the defendant is liable for the misconduct

2   alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Importantly, "a well-pleaded complaint may proceed

3   even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is

4   very remote and unlikely." *Twombly*, 550 U.S. at 556 (citation and quotation marks omitted).

5       Here, Mobley has met this lenient standard with respect to all three theories of coverage

6   alleged in the FAC.

7       **A.    Mobley has plausibly alleged that Workday is an employment agency.**

8       Title VII, the ADA, and the ADEA all prohibit discrimination by employment agencies.

9   42 U.S.C. §§ 2000e-2(b), 12111(2), 12112(a); 29 U.S.C. § 623(b). All three statutes also define the

10  term "employment agency" to include "any person regularly undertaking with or without

11  compensation to procure employees for an employer." 42 U.S.C. §§ 2000e(c), 12111(7); 29 U.S.C.

12  § 630(c).[2]

13      Courts have generally construed the term to "include only those engaged to a significant

14  degree" in such procurement activities "as their profession or business." *Brush v. San Francisco*

15  *Newspaper Printing Co.*, 315 F. Supp. 577, 580 (N.D. Cal. 1970), *aff'd*, 469 F.2d 89 (9th Cir. 1972).

16  This inquiry often focuses on the degree to which an entity engages in "the *activities* of an

17  employment agency in the traditional and generally accepted sense of that term." *Greenfield v. Field*

18  *Enters., Inc.*, No. 71-cv-2075, 1972 WL 155, at *4 (N.D. Ill. Feb. 1, 1972) (emphasis added). The

19  statutory definition thus sweeps broadly and encompasses any person or type of entity that actively

20  performs or assists in traditional employee- or job-procurement functions. *See, e.g.*, *Wilborn v. S.*

21  *Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1291-92 (M.D. Ala. 2010) (truck driver vocational

22  program was employment agency where it "actively assist[ed] participants in the job search process"

23  by helping them submit job applications, inviting recruiters to program, and facilitating job

24  interviews); *Kaplowitz v. Univ. of Chi.*, 387 F. Supp. 42, 46 (N.D. Ill. 1974) (law school was an

25  employment agency where its placement office was "the primary source through which employers

26

27  _____

    [2] Unlike the ADEA, Title VII and the ADA also define "employment agency" as including "any
    person regularly undertaking with or without compensation … to procure for employees
28  opportunities to work for an employer." 42 U.S.C. §§ 2000e(c), 12111(7).

hire[d] … law students and recent graduates" and a senior administrator estimated that he spent "25% of his time on placement-related activities"); *see also United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning….").[3]

Screening and referral activities are among those classically associated with employment agencies.[4] In enacting Title VII, Congress expressly contemplated referral activities, making it unlawful for an employment agency to "fail or refuse to *refer*" an individual for employment based on a protected trait. 42 U.S.C. § 2000e-2(b) (emphasis added); *see also* 29 U.S.C. § 623(b) (same with respect to age). The EEOC has further described "referral activities" as the "primary function of employment agencies." EEOC, *CM-631: Employment Agencies*, § 631.4(d) (Feb. 15, 1990);[5] *see also* EEOC, *Policy Guidance: What constitutes an employment agency under Title VII, how should charges against employment agencies be investigated, and what remedies can be obtained for employment agency violations of the Act?*, No. N-917-002, § II.E. (Sept. 20, 1991)[6] (directing investigators to gather information about employment agencies' "screening and referral practices").

Although screening and referral activities go by various names and come in different forms, they typically involve three hallmark tasks: (i) evaluating candidates' skills and qualifications, including by reviewing their resumes or other application materials; (ii) making judgments about which candidates are qualified or suitable for a given job opening; and (iii) referring or recommending those candidates to an employer for further consideration. *See Hill v. Miss. State*

---

[3] By contrast, courts have held that merely publishing information about employment opportunities is not enough to make an entity an employment agency. *See, e.g.*, *Brush*, 315 F. Supp. at 580-81 (newspaper was not employment agency where it merely published help wanted ads); *Stewart v. Am. Ass'n of Physician Specialists, Inc.*, No. 5:13-cv-01670, 2015 WL 7722349, at *5 (C.D. Cal. Nov. 30, 2015) (nonprofit physicians' organization not employment agency where it "simply has a page on its website which allows potential employers to list job opportunities"); *Radentz v. Am. Ass'n of Physician Specialists, Inc.*, No. 13-cv-01486, 2014 WL 12601014, at *3-5 (C.D. Cal. Nov. 10, 2014) (similar).

[4] To be clear, we do not suggest that an entity *must* engage in screening and referral activities to qualify as an employment agency. Determining whether an entity is an employment agency is a fact-intensive inquiry, which considers the degree to which the entity engaged in employee- or job-procurement activities. Because those activities can (and do) manifest in different ways, and an employment agency's level of involvement in those activities may vary, there is no single archetype of an employment agency.

[5] Available at https://www.eeoc.gov/laws/guidance/cm-631-employment-agencies.

[6] Available at https://www.eeoc.gov/laws/guidance/policy-guidance-what-constitutes-employment-agency-under-title-vii-how-should-charges.

*Emp. Serv.*, 918 F.2d 1233, 1234-35 & n.1 (5th Cir. 1990) (state commission was employment agency where it "match[ed] applicants to jobs" by determining which applicants were "most qualified" and then referring those applicants to local employers); *Scaglione v. Chappaqua Cent. Sch. Dist.*, 209 F. Supp. 2d 311, 312-13, 315-18 (S.D.N.Y. 2002) (county personnel office was employment agency where it reviewed candidates and generated "preferred eligible list" from which municipalities could hire); *Kemether v. Pa. Interscholastic Athletic Ass'n, Inc.*, 15 F. Supp. 2d 740, 764 (E.D. Pa. 1998) (athletic association potentially liable as employment agency where its agents "perform[ed] the actual 'matchmaking' task of procuring officials for schools").[7]

Importantly, an employment agency's role in evaluating candidates may include administering pre-referral tests. *See Dumas v. Town of Mount Vernon*, 436 F. Supp. 866, 871 (S.D. Ala. 1977) (employment agency "tested the plaintiff" and "certified the plaintiff for consideration for the position which she sought," among other things), *aff'd in part, rev'd in part*, 612 F.2d 974 (5th Cir. 1980); *Dixon v. CMS of the State of Ill.*, No. 14-cv-4986, 2016 WL 4158926, at *2 (N.D. Ill. Aug. 5, 2016) (employment agency "administer[ed] the examinations plaintiff took in an effort to obtain employment with the [state]"); *see also* EEOC, *CM-631: Employment Agencies*, § 631.4(h)(2) (discussing employment agencies that "administer[] prereferral tests as the basis for making referrals").

Accepting the FAC's allegations as true, as required at the pleading stage, Mobley has plausibly alleged that Workday's algorithmic tools perform precisely the same screening and referral functions as traditional employment agencies—albeit by more sophisticated means. Like traditional employment agencies, Workday's screening tools allegedly review a candidate's application or resume to identify relevant skills and qualifications. FAC ¶ 29 (alleging that algorithmic tools "quickly analyze large number of applications automatically"). Like traditional employment agencies, Workday's system then purportedly makes a judgment about whether a candidate is

---

[7] *See also Riesgo v. Heidelberg Harris, Inc.*, 36 F. Supp. 2d 53, 54 (D.N.H. 1997) (discussing employment agency that "recruit[ed], screen[ed], and refer[red] temporary employees to client companies"); *Sciarra v. DaMar Staffing Sols. of Indianapolis, Inc.*, No. 1:07-cv-1580, 2009 WL 10719817, at *1 (S.D. Ind. Aug. 21, 2009) (discussing employment agency that "screen[ed] and refer[red] job candidates to client/employers seeking to fill positions").

qualified or suitable for a particular job opening. FAC ¶ 38 (alleging that "Workday determines which candidates to recommend based on the demonstrated interests of its client-employer in certain types of candidates"). Like traditional employment agencies, Workday's screening tools allegedly then either reject the candidate or refer them to an employer for further consideration. FAC ¶ 94 ("Workday's website states that it can 'reduce time to hire by automatically dispositioning or moving candidates forward in the recruiting process.'"); FAC ¶ 99 ("Workday embeds artificial intelligence ('AI') and machine learning ('ML') into its algorithmic decision-making tools, enabling these applications to make hiring decisions."). And the alleged "Workday branded cognitive assessment or personality tests" candidates take are akin to traditional pre-referral tests. FAC ¶ 8.

   In short, because Mobley has plausibly alleged that Workday actively is engaged to a significant degree in the services of traditional employment agencies, he has sufficiently pleaded that Workday is an employment agency. *See* Pauline T. Kim, *Manipulating Opportunity*, 106 Va. L. Rev. 867, 915 (2020) ("[j]ob-matching platforms perform the exact same functions [as traditional employment agencies], except that they leverage more data and use sophisticated computer algorithms to aid the matching process," and thus, "should easily meet the definition of an employment agency").

   In urging a contrary result, Workday first argues that it does not engage in employee-procurement activities because *screening* employees is not equivalent to *procuring* employees, and Workday does not "actively recruit or solicit applications." [ECF 50 at 10-11.] Neither point is persuasive. As the authorities canvassed above demonstrate, courts have long recognized screening and referral services as traditional functions of employment agencies. Workday fails to engage with that body of caselaw, and the single unpublished district court decision on which it relies is readily distinguishable.[8]

   Furthermore, while some employment agencies may recruit candidates, or "source" them as

---

[8] Workday relies on *Whitsitt v. Hedy Holmes Staffing Servs.*, No. 2:13-cv-00117, 2015 WL 5560119 (E.D. Cal. Sept. 21, 2015), *aff'd*, 671 F. App'x 1004 (9th Cir. 2016). That case, however, involved a pro se plaintiff who merely alleged that a company "screened" his applications, but evidently provided no further details. *Id.* at *3. *Whitsitt* thus stands for the unremarkable proposition that conclusory allegations are insufficient.

Mobley puts it, neither the statutory text nor the caselaw *requires* that an entity engage in candidate recruitment to be an employment agency. As the EEOC has explained, an employment agency "need not actively solicit the prospective employees or job applicants; it is enough if applicants come to them." EEOC, *CM-631: Employment Agencies*, § 631.1(b)(4). That is because the statutory phrase "to procure employees" does not necessitate active solicitation or recruitment. To "procure" means "[t]o obtain (something), esp. by special effort or means," or "[t]o achieve or bring about (a result)." Procure, *Black's Law Dictionary* (11th ed. 2019); *see also Kentucky v. Biden*, 23 F.4th 585, 604 (6th Cir. 2022) ("'[P]rocure' means '[t]o bring into possession; to acquire; gain; get; to obtain by any means, as by purchase or loan.'" (first alteration added) (quoting *Webster's New International Dictionary* 1974 (2d ed. 1959))). Moreover, while Title VII, the ADA and the ADEA all prohibit employment agencies and other covered entities from discriminating against "individual[s]," the statutes' definitional provisions speak more narrowly of employment agencies procuring, or bringing about the acquisition of, "employees" or individuals that ultimately will be "employed by an employer." 42 U.S.C. § 2000e(f). Screening and referral activities (i.e., determining whether particular candidates are qualified or suitable) achieve or bring about the acquisition of employees and thus satisfy the statutory definition. While other common employment-agency functions like recruitment may also meet the statutory definition as there is no archetypal employment agency, *see supra* n.4, recruitment is neither the sole nor a requisite employee-procuring activity and is not essential to statutory coverage.

Along the same lines, an employment agency's screening and referral activities may take place after an individual has already applied for a particular position with a particular employer. In *Dumas*, for example, the plaintiff applied to a county personnel board for an assistant town clerk position. 436 F. Supp. at 869. After the plaintiff applied, the personnel board administered an exam, conducted an interview, and then referred the plaintiff to the town for further consideration by placing her on "a list from which the position of assistant town clerk was to be filled." *Id.* Although the relevant screening and referral activities occurred post-application, the district court determined that the personnel board was "clearly an 'employment agency' as envisioned by [Title VII]." *Id.* at 871.

Workday next argues that merely providing employers with algorithmic tools that allow *them* to screen candidates does not make Workday an employment agency. [ECF 50 at 12-13.] After all, Workday observes, if an individual uses a Microsoft Excel spreadsheet to calculate their taxes, that does not make Microsoft a tax preparer. [ECF 50 at 13.] Whatever intuitive appeal that analogy might have collapses under scrutiny. Mobley alleges that, unlike Microsoft in that hypothetical, Workday's screening system itself actively makes automated decisions to reject or advance job candidates. *See* Pauline T. Kim & Matthew T. Bodie, *Artificial Intelligence and the Challenges of Workplace Discrimination and Privacy*, 35 ABA J. Lab. & Emp. L. 289, 297 (2021) ("If a tech platform actively intervenes to suggest or promote certain candidates or opportunities, or to facilitate certain matches, … it should be treated as an 'employment agency' under Title VII."). Excel does not make comparable decisions, actively or otherwise, about one's taxes.[9]

Additionally, Mobley alleges that Workday's algorithmic tools themselves cause or contribute to the challenged discrimination, independent of the criteria used by individual employers. As the Ninth Circuit has held in other contexts, online platforms cannot avoid liability when their own design elements cause or contribute to unlawful discrimination. *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (en banc) (online platform not entitled to immunity under Communications Decency Act, 47 U.S.C. § 230, where it designed website in manner that "contributes materially" to alleged violations of Fair Housing Act). Although Workday does not invoke immunity under Section 230, the Ninth Circuit's reasoning In *Roommates.com* applies with similar force to Workday's argument here.

Finally, Workday suggests that an adverse ruling would have significant ramifications because thousands of employers use its platform. [ECF 50 at 11.] As an initial matter, Workday cites

---

[9] Analogously, the Internal Revenue Service has stated that "[a] firm that furnishes a computerized tax return preparation service to tax practitioners is an income tax return preparer *when the program used goes beyond mere mechanical assistance.*" Rev. Rul. 85-187, 1985-2 C.B. 338, 1985 WL 291469, at *1 (1985) (emphasis added); *see also* Susan C. Morse, *Do Tax Compliance Robots Follow the Law?*, 16 Ohio St. Tech. L.J. 278, 283 n.13 (2020) (acknowledging that "[t]here is a debate as to whether tax compliance robots should be treated as tax preparers," but noting that "a Revenue Ruling suggests that tax compliance robots could be tax preparers in some cases"). So even if one were to entertain an analogy between applicant-screening software and tax-preparation software, it would not help Workday at the pleading stage because its algorithmic tools (as Mobley characterizes them) go beyond "mere mechanical assistance."

1    no authority for the novel proposition that an entity can be too big to qualify as an employment

2    agency. In any event, that appeal to consequence has no bearing on whether Workday satisfies the

3    statutory definition as a conceptual matter. If, as Mobley alleges, Workday actively performs

4    traditional employee-procurement tasks, then the statutory definition compels a finding that

5    Workday is an employment agency. That remains true whether Workday performs those tasks for

6    one employer or thousands of employers. More to the point, if Workday's algorithmic tools in fact

7    make hiring decisions (and on the scale Mobley suggests), it would be all the more important to

8    ensure that Workday complies with federal anti-discrimination law.

9        **B.    Mobley has plausibly alleged that Workday is an indirect employer.**

10       Title VII and the ADEA make it unlawful for "an employer" to discriminate against "any

11   individual," 42 U.S.C. § 2000e-2(a), 29 U.S.C. § 623(a), and the ADA similarly makes it unlawful

12   for "an employer" to discriminate against "a qualified individual" with a disability, 42 U.S.C.

13   §§ 12111(2), 12112(a). Even when an entity is not a plaintiff's employer, it may still be liable as an

14   "indirect employer," a theory of liability also known as "third-party interference." *See* EEOC

15   Compliance Manual § 2-III(B)(3)(a) (Aug. 2009).[10] The leading case on this theory is *Sibley*

16   *Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973). There, the D.C. Circuit held that

17   entities "who are neither actual nor potential direct employers of particular complainants," may

18   nonetheless be held liable under Title VII when they "control access to such employment and …

19   deny such access by reference to invidious criteria." *Id.* at 1342. Applying that holding, the court

20   concluded that a hospital could be liable to a male nurse, whom it did not employ, for blocking his

21   access to female patients who wished to employ him. *Id.* at 1339-40, 1342-44.

22       Simply put, "*Sibley* and its progeny extended Title VII coverage to indirect employers when

23   those employers discriminated against and interfered with the employees' relationship with their

24   employers." *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 931 (9th Cir. 2003). The Ninth Circuit has

25   long recognized this doctrine. *See Gomez v. Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019, 1021

26   (9th Cir. 1983) ("We agree with the District of Columbia Circuit that it would contravene Congress's

27

28   _____
     [10] Available at https://www.eeoc.gov/laws/guidance/section-2-threshold-issues.

intent in Title VII to permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service." (cleaned up)).[11]

Here again, accepting Mobley's allegations as true, Workday exercised sufficient control over his and other applicants' access to employment opportunities to qualify as an indirect employer. Like the hospital in *Sibley Memorial*, Workday purportedly acts as a gatekeeper between applicants and prospective employers. Mobley alleges that "a prospective employee can only advance in the hiring process if they get past the Workday platform[']s screening algorithms." FAC ¶ 98. Mobley further alleges that the employers to which he applied "exclusively use Workday, Inc. as a screening platform for talent acquisition and/or hiring," FAC ¶ 49, which meant that "[t]he Workday platform is the only way to gain employment with these employers," FAC ¶ 92. According to Mobley's allegations, Workday's algorithmic tools (and the underlying artificial intelligence powering them to provide the alleged screening and referral services) dictate whether applicants are referred to—and thus considered by—these employers. *Cf. Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.*, 595 F.2d 711, 722 (D.C. Cir. 1978) ("The considerations articulated in *Sibley Hospital* apply with equal force to discriminatorily-motivated propagation of adverse references."). To the extent Workday offers assessments and tests, those would likewise give the platform significant control over whether an applicant advances in the hiring process. *See Ass'n of Mexican-Am. Educators v. State of Cal.*, 231 F.3d 572, 582 (9th Cir. 2000) (en banc) (although State of California did not employ teachers, "by requiring, formulating, and administering" a skills test as a condition of employment, the state "'interfered' to a degree sufficient to bring it within the reach of Title VII"); *Vanguard Just. Soc. Inc. v. Hughes*, 471 F. Supp. 670, 696 (D. Md. 1979) (defendant was potentially liable under *Sibley Memorial* doctrine where it "exercised substantial authority and discretion in the area of testing of applicants for entry level positions"). Accordingly, Mobley has sufficiently alleged that Workday is

---

[11] Although *Anderson* and *Gomez* were Title VII cases, the indirect employer theory applies in other contexts as well. *See* EEOC Compliance Manual § 2-III(B)(3)(a)(I) (discussing third-party interference claims under Title VII, ADA, and ADEA); *see also, e.g.*, *Wilson v. Timec Servs. Co., Inc.*, No. 2:23-cv-00172, 2023 WL 3436900, at *4 (E.D. Cal. May 12, 2023) ("[P]laintiffs have sufficiently pled that defendant … was their indirect employer under Title VII, … and the ADA.").

1    an indirect employer. *See also* Kim, *supra*, at 917-19.

2         In resisting this conclusion, Workday argues that it does not exert "control over its

3    customers," who "are not required to use Workday tools and are free to stop using them at any time."

4    [ECF 50 at 14.] This response misses the point. The hospital in *Sibley Memorial* was an indirect

5    employer even though it too did not control its patients, who were not required to use that hospital

6    and were free to seek care elsewhere. As that outcome illustrates, the relevant inquiry is not whether

7    the defendant controls the plaintiff's prospective employer, but whether the defendant can control or

8    interfere with the plaintiff's *access* to that employer. In many cases, the defendant's ability to

9    interfere—or the "circumstances peculiarly affording it the capability of discriminatorily

10   interfering," *Sibley Mem'l*, 488 F.2d at 1341—may arise from its own voluntary business

11   relationship with the prospective employer.

12        Workday also argues that it "has no control over any premises, no power over day-to-day

13   operations, no right to supervise, and no ability to force a customer to make decisions in the hiring

14   process or otherwise." [ECF 50 at 14.] But nothing in *Sibley Memorial* or its progeny suggests that

15   an indirect employer's ability to interfere must manifest itself in these ways. To the contrary, as the

16   EEOC has explained, "[t]he nature of the control exercised by the third party will always be a

17   product of each specific factual situation," and it is therefore "difficult to provide a general rule that

18   will fit every case." EEOC, *Policy Statement on control by third parties over the employment*

19   *relationship between an individual and his/her direct employer* (May 20, 1987).[12]

20        **C.    Mobley has plausibly alleged that Workday is an agent of employers.**

21        Under Title VII, the ADA, and the ADEA, the term "employer" includes "any agent of" an

22   employer. 42 U.S.C. §§ 2000e(b), 12111(5)(A); 29 U.S.C. § 630(b). Relying on this clause, several

23   circuits have reasoned that an employer's agent may be held independently liable for discrimination

24   under some circumstances. *See DeVito v. Chicago Park Dist.*, 83 F.3d 878, 882 (7th Cir. 1996);

25   *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 17 (1st

26   Cir. 1994); *Williams v. City of Montgomery*, 742 F.2d 586, 588-89 (11th Cir. 1984); *Spirt v. Tchrs.*

27   _____

28   [12] Available at https://www.eeoc.gov/laws/guidance/policy-statement-control-third-parties-over-employment-relationship-between.

1    *Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir. 1982), *vacated on other grounds*, 463 U.S. 1223

2    (1983), *reinstated and modified on other grounds*, 735 F.2d 23 (2d Cir. 1984); *see also Raines v.*

3    *U.S. Healthworks Med. Grp.*, 534 P.3d 40, 51 (Cal. 2023) ("These cases establish that an employer's

4    agent can, under certain circumstances, appropriately bear direct liability under the federal

5    antidiscrimination laws."); EEOC Compliance Manual § 2-III(B)(2)(b) ("An entity that is an agent

6    of a covered entity is liable for the discriminatory actions it takes on behalf of the covered entity.").

7         Importantly, as Workday itself acknowledges [ECF 50 at 15], an employer's agent may be

8    independently liable when the employer has delegated to the agent "functions [that] are traditionally

9    exercised by an employer." *Williams*, 742 F.2d at 589; *see also id.* ("Where the employer has

10   delegated control of some of the employer's traditional rights, such as hiring or firing, to a third

11   party, the third party has been found to be an 'employer' by virtue of the agency relationship."

12   (citation omitted)); *DeVito*, 83 F.3d at 881 (employer's agent potentially liable where agent

13   "adjudicate[d] employment disputes on behalf of the [employer]"); *Carparts*, 37 F.3d at 17-18

14   (agent of employer potentially liable where it "act[ed] on behalf of the entity in the matter of

15   providing and administering employee health benefits").[13]

16        Accepting Mobley's allegations as true, Workday meets this requirement. Specifically,

17   Mobley alleges facts suggesting that employers delegate control of significant aspects of their hiring

18   processes to Workday. Again, according to Mobley, Workday's screening system itself allegedly can

19   either refer candidates for further consideration or instead reject them, in which case Workday would

20   have the final say over the decision not to hire those rejected candidates. The EEOC's own technical

21   assistance states that a software vendor acts as an employer's agent "if the employer has given [the

22   vendor] significant authority to act on the employer's behalf," which "may include situations where

23   an employer relies on the results of a selection procedure that the agent administers on its behalf."

24   EEOC, *Select Issues: Assessing Adverse Impact in Software, Algorithms, and Artificial Intelligence*

25   *Used in Employment Selection Procedures Under Title VII of the Civil Rights Act of 1964* (May 18,

---

[13] Workday suggests that the "ultimate question" is whether holding an employer's agent liable is
"consistent with notions of due process." [ECF 50 at 15.] None of the decisions Workday cites on
this front—nor any of the decisions cited here—uses the term "due process," let alone holds that it is
the "ultimate question" in determining whether an agent can be liable for its own discrimination.

1   2023);[14] *see also* EEOC, *The Americans with Disabilities Act and the Use of Software, Algorithms,*

2   *and Artificial Intelligence to Assess Job Applicants and Employees* (May 12, 2022)[15] (employer's

3   agents "may include entities such as software vendors, if the employer has given them authority to

4   act on the employer's behalf").

5         Here, according to Mobley, Workday's employer-clients rely on the results of its algorithmic

6   screening tools to make at least some initial decisions to reject candidates. Accordingly, Mobley has

7   sufficiently alleged that Workday is an agent of employers.

8   **V.       CONCLUSION**

9         For the foregoing reasons, under the allegations set forth in the FAC, Mobley has sufficiently

10  pleaded that Workday is subject to Title VII, the ADA, and the ADEA as an employment agency,

11  indirect employer, or agent of employers. Accordingly, Workday's motion should be denied to the

12  extent it seeks dismissal on these grounds.

13

14  Dated: April 9, 2024

15                    KARLA GILBRIDE
                      General Counsel

16                    JENNIFER S. GOLDSTEIN
17                    Associate General Counsel

18                    DARA S. SMITH
                      Assistant General Counsel

19                    BY:   */s/  Steven Winkelman*
20                    STEVEN WINKELMAN
                      Attorney
21                    U.S. EQUAL EMPLOYMENT
                      OPPORTUNITY COMMISSION
22                    Office of General Counsel
                      131 M Street N.E., 5th Floor
23                    Washington, D.C. 20507
                      Telephone (202) 921-2564
24                    steven.winkelman@eeoc.gov

25            *Attorneys for EEOC as Amicus Curiae*

26  _____

27  [14] Available at https://www.eeoc.gov/laws/guidance/select-issues-assessing-adverse-impact-software-algorithms-and-artificial.

28  [15] Available at https://www.eeoc.gov/laws/guidance/americans-disabilities-act-and-use-software-algorithms-and-artificial-intelligence.

1

**CERTIFICATE OF SERVICE**

2          I certify that on April 9, 2024, I electronically submitted the foregoing Brief of the Equal

3   Employment Opportunity Commission as Amicus Curiae, along with the Notice of Motion of the

4   Equal Employment Opportunity Commission for Leave to File Accompanying Brief as Amicus

5   Curiae, and [Proposed] Order, with the Clerk of Courts using the CM/ECF system which will

6   automatically send email notification of such filing to the attorneys of record.

7

DATED: April 9, 2024                           BY:   */s/  Steven Winkelman*
8                                                      STEVEN WINKELMAN
                                                       Attorney
9                                                      U.S. EQUAL EMPLOYMENT
                                                       OPPORTUNITY COMMISSION
10                                                     Office of General Counsel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28