1   JULIE A. TOTTEN (STATE BAR NO. 166470)
    jatotten@orrick.com
2   ERIN M. CONNELL (STATE BAR NO. 223355)
    econnell@orrick.com
3   KAYLA D. GRUNDY (STATE BAR NO. 300513)
    kgrundy@orrick.com
4   ALEXANDRIA R. ELLIOTT (STATE BAR NO. 320293)
    aelliott@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
6   405 Howard Street
    San Francisco, CA  94105-2669
7   Telephone:    (415) 773-5700
    Facsimile:    (415) 773-5759
8

9   Attorneys for Defendant
    WORKDAY, INC.
10
                       UNITED STATES DISTRICT COURT
11
                     NORTHERN DISTRICT OF CALIFORNIA
12

13
    DEREK L. MOBLEY, for and on behalf of        Case No. 3:23-cv-00770-RFL
14  himself and other persons similarly situated;
                                                 **DEFENDANT WORKDAY, INC.'S**
15                 Plaintiff,                     **REPLY IN SUPPORT OF ITS MOTION**
                                                 **TO DISMISS AMENDED COMPLAINT**
16         v.
                                                 Date:        May 7, 2024
17  WORKDAY, INC.                                Time:        10:00 a.m.
                                                 Courtroom:   15, 18th Floor
18                 Defendant.                    Judge:       Hon. Rita F. Lin

19                                               Amended Complaint:  February 20, 2024

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................ 1

II.     PLAINTIFF FAILS TO ALLEGE THAT WORKDAY IS AN ENTITY THAT
        CAN BE SUBJECT TO LIABILITY UNDER TITLE VII, THE ADEA, OR THE
        ADA ............................................................................................................... 2

        A.      Workday Is Not An Employment Agency ............................................... 2

        B.      Workday Is Not Plaintiff's Indirect Employer ...................................... 5

        C.      Workday Cannot Be Held Liable As An Agent For Providing Software .............. 6

III.    PLAINTIFF FAILS TO STATE A CLAIM AGAINST WORKDAY ............................. 8

        A.      Plaintiff Fails To State A Claim For Intentional Discrimination ........................... 8

        B.      Plaintiff's Disparate Impact Claims Fail ................................................ 11

        C.      Plaintiff's FEHA Claim Fails ................................................................. 13

IV.     CONCLUSION .............................................................................................. 14

1

2

**TABLE OF AUTHORITIES**

3

**Page(s)**

4

**Cases**

5

*Ali v. ServiceNow, Inc.*,
    2019 WL 11542365, at *4 (N.D. Cal. Sept. 23, 2019), aff'd, 797 F. App'x 322
    (9th Cir. 2020)...................................................................................................................10

*Anderson v. Pacific Maritime Ass'n*,
    336 F.3d 924 (9th Cir. 2003).......................................................................................... 5, 6

*Ass'n of Mexican-Am. Educators v. California*,
    231 F.3d 572 (9th Cir. 2000)........................................................................................... 5, 6

*Birkbeck v. Marvel Lighting Corp.*,
    30 F.3d 507 (4th Cir. 1994)................................................................................................ 7

*Brush v. San Francisco Newspaper Printing Co.*,
    315 F. Supp. 577 (N.D. Cal. 1970), *aff'd*, 469 F.2d 89 (9th Cir. 1972)................................... 3

*Carparts Distrib. Ctr., Inc. v. Auto Wholesaler's Ass'n of New England, Inc.*,
    37 F.3d 12 (1st Cir. 1994) .................................................................................................. 7

*Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Solutions, LLC*,
    369 F. Supp. 3d 362 (D. Conn. 2019) ................................................................................ 4

*DeVito v. Chicago Park Dist.*,
    83 F.3d 878 (7th Cir. 1996)................................................................................................ 7

*EEOC v. Marquez Bros. Int'l, Inc.*,
    2017 WL 4123915 (E.D. Cal. Sept. 18, 2017) ................................................................. 10

*Gomez v. Alexixan Brothers Hospital*,
    698 F.2d 1019 (9th Cir. 1983)............................................................................................ 5

*Huskey v. State Farm Fire & Casualty Co.*
    2023 WL 5848164 (N.D. Ill 2023)................................................................................... 12

*Intl. Broth. of Teamsters v. U.S.*,
    431 U.S. 324 (1977) ......................................................................................................... 10

*Lee v. Hertz Corp.*,
    330 F.R.D. 557 (N.D. Cal. 2019) ..................................................................................... 11

*Louis v. Saferent Solutions, LLC*,
    2023 WL 4766192 (D. Mass. 2023).................................................................................. 4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Lutcher v. Musicians Union Local 47*,
    633 F.2d 880 (9th Cir. 1980).................................................................................... 6

*Nat'l Fair Hous. All. V. Fed. Nat'l Mortg. Assn'n*,
    294 F. Supp. 3d 940 (N.D. Cal 2018) ............................................................... 11, 13

*Ortiz v. Georgia P.*,
    973 F. Supp. 2d 1162 (E.D. Cal. 2013)................................................................... 14

*Raines v. U.S. Healthworks Med. Grp.*,
    15 Cal. 5th 268 (2023) ............................................................................................. 7

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ................................................................................................. 8

*Sibley Memorial Hospital v. Wilson*,
    488 F.2d 1338 (D.C. Cir. 1973) ........................................................................... 5, 6

*Smith v. BP Lubricants USA Inc.*,
    64 Cal. App. 5th 138 (2021)................................................................................... 14

*Velez v. Roche*,
    335 F. Supp. 2d 1022 (N.D. Cal. June 30, 2004) ..................................................... 5

*Vernon v. State*,
    116 Cal. App. 4th 114 (Cal. Ct. App. 2004) .......................................................... 14

*Williams v. City of Montgomery*,
    742 F.2d 586 (11th Cir. 1984)................................................................................... 7

*Wynn v. Natl. Broad. Co., Inc.*
    234 F. Supp. 2d 1067 (C.D. Cal. 2002), dismissed, No. CV00-11248-
    SVW(RZX), 2002 WL 31681865 (C.D. Cal. Mar. 6, 2002)................................... 14

**Statutes**

28 U.S.C. § 1367(c) .......................................................................................................... 13

29 U.S.C. § 623 .................................................................................................................. 2

29 U.S.C § 630(c) ............................................................................................................... 2

42 U.S.C. § 2000e-2 ......................................................................................................... 13

42 U.S.C. § 2000e(c) .......................................................................................................... 2

42 U.S.C. § 12111 .............................................................................................................. 2

42 U.S.C. § 12111(7) ......................................................................................................... 2

1

**Other Authorities**

2

*Select Issues: Assessing Adverse Impact in Software, Algorithms, and Artificial
    Intelligence Used in Employment Selection Procedures Under Title VII of the
    Civil Rights Act of 1964*, U.S. E.E.O.C. (May 18, 2023), available at
    https://www.eeoc.gov/laws/guidance/select-issues-assessing-adverse-impact-
    software-algorithms-and-artificial.................................................................................*passim*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT WORKDAY, INC.'S REPLY ISO MOTION TO DISMISS AMENDED COMPLAINT - CASE NO.
3:23-CV-00770-RFL

1  **I.**      <u>**INTRODUCTION**</u>

2         Plaintiff has now had two opportunities to plead plausible facts supporting a basis to sue

3  Workday under antidiscrimination laws. Not only does he fail to do so in his First Amended

4  Complaint ("FAC"), but his Opposition to Workday's Motion to Dismiss confirms the only way

5  he can avoid dismissal is to stretch both his own allegations and the law past their breaking point.

6         Beyond rhetoric, Plaintiff points to no allegations plausibly suggesting that Workday

7  "procures employees" as required for Workday to be an "employment agency"—he does not

8  allege that Workday recruits or solicits applications, nor that it decides the criteria for selection

9  among candidates. Instead, to support the notion that the mere provision of algorithmic screening

10  tools transforms a company into an employment agency, he relies on legal authority from an

11  entirely different statutory framework that simply does not apply in the employment context. As

12  for his indirect employer and agency theories, common sense rebukes the notion that Workday

13  meets these incredibly exacting standards for all of the "10,000" customers that allegedly use

14  Workday software in connection with millions of different jobs across various industries.

15  Plaintiff's allegations make it no more plausible that Workday exercises the extraordinary amount

16  of control necessary, because plainly it cannot and does not do so. For each of these reasons, and

17  as described in greater detail below, Plaintiff has not and cannot allege that Workday is an entity

18  covered by Title VII, the ADA, or the ADEA. *Infra* § I.

19         Plaintiff's substantive defense of his claims fares no better. His own description of his

20  intentional discrimination theory is based on *facially neutral* software—it is not an intentional

21  discrimination claim at all—and Plaintiff otherwise raises no inference that Workday's *motive* in

22  offering its screening tools is discriminatory. His disparate impact claims fail because he points to

23  no disparity, fails to identify the specific practice he is challenging, and fails to plead facts

24  supporting the notion that any practice causes a disparate impact. Lastly, Plaintiff's state-law

25  aiding-and-abetting theory under FEHA cannot meet the applicable standard because he again

26  offers no plausible allegations of Workday's *intent* to discriminate against anyone—let alone

27  him—on a protected ground. *Infra* § II.  The Court should dismiss the First Amended Complaint

28  with prejudice.

1
2

**II.    PLAINTIFF FAILS TO ALLEGE THAT WORKDAY IS AN ENTITY THAT CAN BE SUBJECT TO LIABILITY UNDER TITLE VII, THE ADEA, OR THE ADA**.

3        Plaintiff's federal discrimination claims fail because he fails to plausibly allege that

4   Workday is liable as (A) an employment agency; (B) an indirect employer; or (C) an agent under

5   Title VII, the ADEA, or the ADA. 42 U.S.C. §§ 12111; 2000e-2; 29 U.S.C. § 623.

6        **A.    Workday Is Not An Employment Agency**.

7        Workday's Motion explained that Plaintiff has not sufficiently pled that Workday is an

8   "employment agency" that "regularly undertak[es] to procure employees for an employer." 42

9   U.S.C. § 2000e(c); 42 U.S.C. § 12111(7); 29 U.S.C § 630(c). Mot. 4-7. In opposition, Plaintiff

10  largely fails to engage with the statutory text or to directly address the central inquiry whether

11  Workday is "involved in procuring applications or only in helping companies organize the

12  applications they receive independently." Mot. 5 (citing ECF No. 45 at 10). He points to no

13  factual allegations plausibly establishing that Workday actively procures applicants. And, his

14  legal argument that merely providing a software screening tool makes a company an

15  "employment agency" is entirely unsupported by applicable caselaw.

16        ***Plaintiff does not allege that Workday recruits or solicits applications.*** Plaintiff points to

17  no allegations showing that Workday "recruit[ed] or solicit[ed] applications … for any positions

18  at any employers, let alone the positions to which Plaintiff applied." Mot. 5. Nor does he point to

19  allegations "that Workday controls, requires, or otherwise dictates the inputs, criteria, and

20  ultimate functionality of the configurable software tools it offers customers." Mot. 6. Instead he

21  contorts his own allegations—and sometimes contradicts them entirely—in a vain attempt to

22  insinuate that Workday solicits prospective employees like the temp agencies and headhunters

23  Congress surely had in mind when it defined "employment agency."

24        Plaintiff first claims to have alleged that Workday's "fundamental purpose is to 'source'

25  candidates and then use its algorithmic decision-making tools to determine whether a candidate

26  should be … allowed to move forward in the hiring process."  Opp. 9 (citing FAC ¶¶ 92-95). The

27  cited paragraphs say nothing of the sort—one says simply that "Workday's systems source

28  candidates" but does not elaborate or explain what this allegation means, FAC ¶ 95. Perhaps

- 2 -

recognizing the void, Plaintiff block-quotes copy from *another company's* website, never cited in the First Amended Complaint, defining "sourcing" as "identifying potential candidates, engaging with them, and building relationships." Mot. 9-10 (internal citation omitted). To be clear: Plaintiff has never alleged that *Workday* did any of those things with respect to any job to which Plaintiff alleges he applied. Doing so would violate Rule 11.

Plaintiff next asserts that "Workday's sourcing of candidates for open roles within a company is a textbook example of procurement of employees for an employer." Opp. 10. Again, Plaintiff points to no allegations about what Workday actually *does* in this apparently "textbook" capacity. But it would not matter, because Plaintiff does not allege that he was a candidate recommended from "within a company" for a role at that company—Plaintiff has to allege that Workday was an employment agency in connection with a job to which *he* applied.

Emptier still is Plaintiff's contention that "posting job opportunities on job sites such as LinkedIn, Indeed, Monster, or Careerbuilders, is procuring employment opportunities for potential employees." Opp. 10. Even if this virtually boundless understanding of the term "employment agency" were correct, the First Amended Complaint does not allege that Workday posts job opportunities to websites. It alleges the opposite: That job postings were posted "by a prospective employer" on a "third-party website." FAC ¶ 51. Plaintiff then claims he clicked a link that took him to "the Workday platform *on the employer's website*" to complete an application. FAC ¶ 52 (emphasis added). None of these allegations implicate Workday in candidate sourcing, especially to a "significant degree." *Brush v. San Francisco Newspaper Printing Co.*, 315 F. Supp. 577, 580 (N.D. Cal. 1970), *aff'd*, 469 F.2d 89 (9th Cir. 1972).

Lastly, Plaintiff falls back on generalities—such as saying that "Workday provides support services … to include professional consulting," Opp. 9, or alluding to "[e]mployers who, as alleged, have completely delegated their human resources decision-making operation to Workday," Opp. 10. The problem with these vague contentions, as Workday's Motion explains (at 7), is that they say virtually nothing about what Workday actually does. Plaintiff cannot evade his pleading obligation by relabeling the act of providing software and related technical support as "professional consulting" or a "human resources decision-making operation." He must allege

- 3 -

1    plausible facts showing that Workday *actively procures employees*. He cannot do so.

2            ***Mere provision of algorithmic screening tools does not make a company an***

3    ***"employment agency."*** Plaintiff cites no case under Title VII, the ADA, or the ADEA that has

4    ever held that merely providing a software screening tool makes a company an "employment

5    agency." Instead, he analogizes to two cases under the Fair Housing Act ("FHA"). These cases

6    merely prove that Plaintiff is wrong. Unlike the statutes at issue in this case, the FHA does not

7    limit liability to covered entities at all. Congress made a different choice when it cabined the

8    coverage of other federal antidiscrimination statutes, and that choice must be given effect.

9            Plaintiff first relies upon *Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Solutions,*

10   *LLC*, which held that a provider of a "criminal tenant screening product" could be liable for

11   discrimination under the FHA. 369 F. Supp. 3d 362 (D. Conn. 2019). But the court had no need to

12   ask whether the defendant was an "employment agency" because that concept does not exist

13   under the FHA. As the court explained, the FHA "focuses on prohibited acts," thus "'bann[ing]

14   an outcome while not saying who the actor is.'" *Id.* (internal citation omitted). Into that statutory

15   void, the U.S. Department of Housing and Urban Development inserted regulations that "create

16   liability for a person's 'own conduct that results in a discriminatory housing practice' and 'a

17   discriminatory housing practice by the person's agent or employee.'" *Id.* at 372 (citing 24 C.F.R.

18   § 100.7(a)(1)(i), (b)). The court found the defendant potentially subject to liability under both

19   theories—for its own conduct as a "person" or for the conduct of its customers. Neither theory is

20   at issue here.

21           The same is true for Plaintiff's other case, *Louis v. Saferent Solutions, LLC*, 2023 WL

22   4766192 (D. Mass. 2023). There, the court rejected defendant Saferent's arguments that it was

23   not subject to the FHA because the FHA is not limited to certain people or entities. *Id.* But again,

24   unlike the FHA, the statutes at issue in this case cabin coverage to particular types of entities.

25   Cases that have no occasion to apply the definitions of those entities are irrelevant here. So too is

26   Plaintiff's argument that "discriminatory acts may have several proximate causes, and the

27   possibility that one decision may be overridden by another decisionmaker does not automatically"

28   foreclose liability. Opp. 13. This is a distraction. Whether Workday is an employment agent turns

- 4 -

1  on whether it procures employees for employers, not whether it is a "proximate cause" of who an

2  employer decides to hire. Plaintiff has now failed twice to meet the applicable standard.

3         **B.        Workday Is Not Plaintiff's Indirect Employer.**

4         Plaintiff also fails to defend the extraordinary suggestion that Workday is an "indirect

5  employer" as to all of the alleged millions of hires across its 10,000 customers. Mot. 7-8.

6         Plaintiff argues that a defendant is an indirect employer if it "(1) … controlled access to

7  the employment opportunity … and (2) interfered with the direct employment relationship." Opp.

8  19. But he misunderstands both the degree and nature of control necessary under the case law. As

9  the court explained in *Anderson v. Pacific Maritime Ass'n*, which Plaintiff does not address,

10  indirect employer liability requires "some *peculiar control* over the employee's relationship with

11  the direct employer." 336 F.3d 924, 932 (9th Cir. 2003). And in the indirect employer context,

12  having "control" does not mean merely being placed in a position to influence an employment

13  decision. It means possessing *power* over the employment relationship in a way that surpasses or

14  displaces that of the direct employer. *See Ass'n of Mexican-Am. Educators v. California*, 231 F.3d

15  572 (9th Cir. 2000) (en banc).

16         Each case the parties cite involves this type of control. *See* Mot. 7-8; Opp. 18-19. In *Sibley*

17  *Memorial Hospital v. Wilson*, the defendant was a hospital that, though not a direct employer,

18  "control[ed] the premises upon which … services were to be rendered, including appellee's

19  access to the patient." 488 F.2d 1338, 1342 (D.C. Cir. 1973). Similarly, in *Gomez v. Alexixan*

20  *Brothers Hospital*, 698 F.2d 1019, 1020 (9th Cir. 1983), the plaintiff worked for a professional

21  corporation (AES), and the defendant hospital "turned down" a "contract proposal … on behalf of

22  AES, for the operation of the hospital's emergency room"—the hospital was thus exercising its

23  own power over its own emergency room in a discriminatory fashion. *See also Velez v. Roche*,

24  335 F. Supp. 2d 1022, 1025-26 (N.D. Cal. June 30, 2004) (finding that hospital in which plaintiff

25  worked could be sued for hostile work environment on its own premises).

26         The Ninth Circuit's en banc decision in *Ass'n of Mexican-Am. Educators v. California*

27  puts the finest point on the matter. The court explained that *Sibley*'s holding was based on a

28  defendant's "considerable *power* over [the plaintiff's] ability to form employment relationships,"

- 5 -

231 F.3d at 580; emphasized the defendant State of California's "peculiar degree of control … over local school districts," *id.* at 581; and found an indirect employer relationship based on these "comprehensive powers," *id.* And although Plaintiff also cites *Lutcher v. Musicians Union Local 47*, that case rejected an indirect employer theory and otherwise does not support Plaintiff's position. 633 F.2d 880, 993 (9th Cir. 1980).

As far as the First Amended Complaint discloses, "Workday has no control over any premises, no power over day-to-day operations, no right to supervise, and no ability to force a customer to make decisions in the hiring process or otherwise." Mot. 8. Its customers are entirely at liberty to define the criteria by which Workday's software operates, stop using Workday software at any time, or disregard input from the software altogether and hire whomever they choose. The mere fact that these employers *choose* to use Workday software to assist with their hiring functions does not somehow endow Workday with the sort of "peculiar control," *Anderson*, 336 F.3d at 932, or "comprehensive powers," *Ass'n of Mexican-Am. Educators*, 231 F.3d at 581, necessary to make it the de facto employer as to every position at every customer that uses Workday software. This Court should reject the inapt indirect employer theory.

**C.** **Workday Cannot Be Held Liable As An Agent For Providing Software**.

Finally, Plaintiff fails to defend an agency-based theory of liability. Mot. 8-10.

It is not clear what type of agency theory Plaintiff is even advancing here. He does not seriously contest that a classic "respondeat superior" theory is unavailable. Respondeat superior is a theory for holding the *principal* liable, not the agent. So, while it may be conceivable that a "software vendor" could be an "agent," it is only "employers" who "may be held responsible for the actions of [such] agents." *See Select Issues: Assessing Adverse Impact in Software, Algorithms, and Artificial Intelligence Used in Employment Selection Procedures Under Title VII of the Civil Rights Act of 1964*, U.S. E.E.O.C. (May 18, 2023), available at https://www.eeoc.gov/laws/guidance/select-issues-assessing-adverse-impact-software-algorithms-and-artificial. Plaintiff does not dispute this reality; instead, he simply quotes the same proposition without acknowledging it forecloses a respondeat superior theory. Opp. 15-16. *See also Raines v. U.S. Healthworks Med. Grp.*, 15 Cal. 5th 268, 283 (2023) (under respondeat

- 6 -

1    superior theory "discriminatory [] actions taken by an employer's agent may create liability for

2    the employer." (citing *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994)). And

3    because respondeat superior is unavailable against Workday as a matter of law, Plaintiff's citation

4    to cases treating agency as a fact-bound question, Opp. 15, are immaterial.

5         As for the more stringent form of agency liability discussed in cases like *Raines*, Plaintiff

6    concedes that the legal standard is stringent: the agent must "exercise[] an administrative function

7    traditionally exercised by the employer." Opp. 16 (quoting *Raines*, 15 Cal. 5th at 287). He does

8    not argue that Workday's actions come anywhere close to those in the three cases Workday cited

9    in the motion— "adjudicating employment disputes," *DeVito v. Chicago Park Dist.*, 83 F.3d 878,

10   881 (7th Cir. 1996); formulating job standards, transferring, promoting, disciplining, or

11   terminating a customer's employees, *Williams v. City of Montgomery*, 742 F.2d 586, 589 (11th

12   Cir. 1984); or administering employee benefits, *Carparts Distrib. Ctr., Inc. v. Auto Wholesaler's*

13   *Ass'n of New England, Inc.*, 37 F.3d 12, 17-18 (1st Cir. 1994). He also does not point to a single

14   other case supporting a theory that has demanded anything less than this extraordinary level of

15   control over an entire administrative function.

16        Plaintiff instead stands on his empty refrain that Workday has assumed "traditional HR

17   functions" of "sourcing, reviewing, recommending, and reject[ing]" applicants through its

18   "automated decision-making tool." Opp. 16-17. But again, nothing in the First Amended

19   Complaint alleges that Workday recruits or solicits employees, or sets the criteria for their hiring.

20   There is no claim that Workday defines open employment opportunities, generates candidate

21   pools, or decides what qualifications or characteristics a candidate must have. The only thing the

22   First Amended Complaint alleges is that Workday provides an algorithmic screening tool and

23   helps its customers use it—in no sense does Workday "exercise … an administrative function

24   traditionally exercised by the employer" that the case law demands. *Raines*, 15 Cal. 5th at 287.

25        The very notion that Workday exercises delegated authority over the hiring functions of

26   its alleged 10,000 software users is quite extraordinary. To support such a sweeping theory, one

27   would expect unusual detail demonstrating how Workday totally has assumed each material step

28   in the process, for each of the employers that have ostensibly relinquished core functions to a

- 7 -

1  software vendor. Yet neither the First Amended Complaint nor Plaintiff's opposition clearly

2  explains what Plaintiff's theory is here. In his original Complaint, Plaintiff made no agency

3  allegations whatsoever. In the First Amended Complaint, he contends Workday "acts as an

4  agent," presumably referring to the Company itself. FAC ¶ 107. And in his Opposition (at 14), he

5  argues that "my.workday.com"—a url listed nowhere in the First Amended Complaint—"is an

6  Agent." Whatever Plaintiff's agency theory is, it is not sufficiently pled. And because Plaintiff

7  has once again failed to articulate any viable basis for Workday's liability, the First Amended

8  Complaint should be dismissed with prejudice.

9  **III.    PLAINTIFF FAILS TO STATE A CLAIM AGAINST WORKDAY**

10      **A.    Plaintiff Fails To State A Claim For Intentional Discrimination**.

11      Plaintiff's Opposition confirms that intentional discrimination claims have no place in this

12  case. To state an intentional discrimination claim, a plaintiff must allege that the defendant acted

13  with "discriminatory intent or motive." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Workday's

14  Motion explains why Plaintiff fails to do so. Mot. 10-12. In response, Plaintiff accuses Workday

15  of "want[ing] this Court to forget what this case is about." Opp. 19. Yet Plaintiff then articulates

16  his own theory in a way that completely undermines his claim. According to Plaintiff, the theory

17  is not that Workday calibrates its AI tools to discriminate (an untenable suggestion). Rather, the

18  idea is that the "tools *learn* to discriminate," not based on "the applicant's demographic

19  information," but through "other inputs that are correlated with a protected characteristic." Opp.

20  19 (emphasis added). Plaintiff cites paragraph 34 of the First Amended Complaint as support for

21  this theory. Nearby paragraph 36 then states: "To illustrate, Amazon famously abandoned a

22  *facially neutral hiring algorithm* in 2017 because of *its disparate impact* on female candidates."

23      Plaintiff thus has a problem: His disparate *treatment* theory, in his own telling, is actually

24  a disparate *impact* theory. This explains why Plaintiff has no answers to the various defects the

25  Motion identified in Plaintiff's claim of intentional discrimination.

26      ***Disclosure of protected traits.*** First, Plaintiff does not dispute that he never "disclosed his

27  protected traits to Workday."  Mot. 11. He says this does not matter because Workday's

28  algorithms can "figure out omitted demographic features" through "other inputs." Opp. 19. To be

- 8 -

1    clear, Plaintiff has never alleged that Workday's algorithms work by literally determining

2    protected characteristics and then making decisions based on them. Plaintiff's notion is that an

3    algorithm can "dr[a]w inferences from a biased sample of the population … and simply

4    reproduce[] that prejudice which disadvantaged" a group not properly represented in the sample.

5    FAC ¶ 37; Opp. 19 (noting generalized concerns regarding about whether "AI or ML tools can

6    ever be made bias free"). So, he says, Workday's algorithms may "offer recommendations that

7    *reflect whatever biases employers happen to exhibit.*" FAC ¶ 38.

8        This does not work as a disparate treatment theory. Plaintiff alleges merely that

9    Workday's *algorithms* (but not Workday itself), could reflect implicit bias in a customer's own

10   sample population. That gives rise to no inference that Workday intended to discriminate against

11   him on any basis for any job for any employer.

12       *Qualifications.* Plaintiff also does not refute that the First Amended Complaint fails to

13   plead factual allegations concerning the 100+ jobs that he contends are the basis of his

14   discrimination claim. Mot. 11. He states that he instead "offered a sampling" by title and

15   company. Opp. 20. But this Court has explained why more is necessary:

16               Because of the particularities of how the case is set up, it's like
                 having 80 to 100 people who have applied to one job; it's just the
17               reverse of that. But, in a situation where we're looking at the reverse
                 of that, it becomes all the more important that we understand what it
18               is that this one person says his qualifications are, what kinds of jobs
                 he's applying to, what kind of luck he's had in other situations where
19               Workday wasn't involved getting work. And so it seems to me that
                 if plaintiffs are going to hang their hat on this one person, then we
20               need to know more about him and what jobs he's applied to.

21   Decl. of Kayla Grundy, Ex. A. (Tr. of Proceedings (Jan. 9, 2024)) at 21-22.

22       The First Amended Complaint does not address the Court's points. Far from "clearly"

23   showing Plaintiff "only applied for [] jobs within his educational and experiential job histories,"

24   Plaintiff's allegations leave ambiguous more than 88 of the roles allegedly at issue. And a review

25   of Plaintiff's job history brings no clarity, because Plaintiff has held jobs in customer service,

26   collections, engineering, and as an Uber driver. FAC ¶ 26. This is therefore not a case in which

27   Plaintiff applied to the same or similar jobs across employers such that the general criteria can be

28   assumed similar. Plaintiff applied to myriad roles at myriad employers and claims he was

- 9 -

1   discriminated against, but he refuses to identify the vast majority of the jobs at issue.

2        The Court cannot plausibly conclude Plaintiff was discriminated against without facts

3   supporting that he was qualified for the jobs to which he applied. Workday does not contend

4   Plaintiff must attach job descriptions or "explain his qualifications bullet point by bullet point" as

5   Plaintiff argues, Opp. 20, but rather, that Plaintiff must plausibly plead that he was qualified for

6   the roles from which he was rejected. Even for the 12 roles for which Plaintiff offers any detail,

7   his allegations remain insufficient because a conclusory statement that he "met [the] experiential

8   and educational requirements" of a stated position is not enough. FAC ¶¶ 61-88; *Ali v.*

9   *ServiceNow, Inc*., 2019 WL 11542365, at \*4 (N.D. Cal. Sept. 23, 2019), aff'd, 797 F. App'x 322

10   (9th Cir. 2020) (plaintiff's "statement that 'he believes that he meets and exceed[s] all the five job

11   posting requirements' is insufficient.").

12        **Causation.** Finally, Plaintiff points to no allegations establishing that his protected traits

13   "were either the sole reason or a motivating factor" for the alleged rejections he received. *Ali,*

14   2019 WL 11542365, at \*3; Mot. 11-12. In his Opposition, Plaintiff purports to invoke an

15   "inexorable zero" theory—the idea that because he was allegedly hired for 0 out of 100 jobs, he

16   has automatically alleged causation. Opp. 20. The "inexorable zero" doctrine plainly does not

17   apply here. The inference of discrimination that arises with the "inexorable zero" is meant to

18   address egregious examples of discrimination where an employer has so completely excluded all

19   individuals of a certain group that animus is the only explanation. *See Intl. Broth. of Teamsters v.*

20   *U.S.*, 431 U.S. 324 n.23 (1977) ("fine tuning of the statistics could not have obscured the glaring

21   absence of minority line drivers"); *see also EEOC v. Marquez Bros. Int'l, Inc.*, 2017 WL

22   4123915, at \*7 (E.D. Cal. Sept. 18, 2017) ("there is an inference of discrimination when . . . the

23   employer has hired almost no members of a protected group.").

24        But the logic does not hold where the same one person is hired for zero of many open job

25   positions. What makes the inexorable zero theory work is the implausibility that a large group of

26   different people who happen to share one protected characteristic were coincidentally excluded

27   for reasons other than that characteristic. Where the same person is not hired for many jobs, it is

28   just as, if not more, likely that this person was not hired for *non*-discriminatory reasons.

1   Plaintiff's inexorable zero theory of causation thus fails, and the Court should dismiss Plaintiff's

2   intentional discrimination claim.

3                       **B.    Plaintiff's Disparate Impact Claims Fail**.

4           As Workday's Motion explains, Plaintiff's disparate impact claims also fail because

5   Plaintiff fails to plausibly allege a disparity, an employment practice, or causation. Mot. 12-14.

6   Rather than respond to these arguments, Plaintiff revives his prior argument that Workday's

7   Motion rests on his failure to "plead a prima facie case." Opp. 21. Workday made no such

8   argument. As Plaintiff fails to address the arguments Workday did make, dismissal is warranted.

9           *Disparity.* First, Plaintiff does not even attempt to argue he has pled a disparity, instead he

10  dismisses Workday's objection as a matter to be addressed on the merits. *See* Opp. 22. But a

11  plaintiff cannot obtain costly discovery—particularly in a case styled as a sweeping class action—

12  without plausibly alleging a fundamental element of the claim. *Lee v. Hertz Corp.*, 330 F.R.D.

13  557, 561 (N.D. Cal. 2019) (plaintiff "must plead the general elements to make a claim facially

14  plausible"). Indeed, particularly in a case like this one, where Plaintiff alleges multiple theories of

15  discrimination, it is all the more important that Plaintiff meet the plausibility standard. Yet here, it

16  is not even apparent from the FAC who Plaintiff even contends is advantaged over him by the

17  "algorithmic decision making" in which Workday allegedly engages. Plaintiff cites *Nat'l Fair*

18  *Hous. All. v. Fed. Nat'l Mortg. Assn'n,* 294 F. Supp. 3d 940, 948 (N.D. Cal 2018) to argue that

19  Workday's attack on his failure to plead a disparity is nothing more than a dispute about

20  methodology that cannot be resolved at the pleadings stage. Opp. 22. Plaintiff is wrong. First, he

21  has alleged *no disparity at all*. Workday could not quibble about a methodology that does not

22  exist. Second, *Nat'l Fair Hous. All.* simply stands for the proposition that *where a plaintiff has*

23  *pled a statistical disparity*, objections to the methodology upon which the plaintiff relies to

24  identify that disparity and argue causation are better considered on summary judgment than on a

25  motion to dismiss. *Nat'l Fair Hous. All.*, 294 F. Supp. 3d at 948. The case is irrelevant here,

26  where Plaintiff has failed to plead a disparity in the first instance (statistical or otherwise).

27          *Employment practice.* Plaintiff also fails to point to allegations specifying an employment

28  practice that causes a disparate impact. In his Opposition, Plaintiff asserts that the specific policy

                                          - 11 -

at issue is "Workday's decision to market, sell, and employ algorithmic decision-making tools, instead of human judgment, to decide who gets a job." Opp. 23. There are several problems with this formulation. First, the allegation does not appear in the First Amended Complaint. Indeed, there are no allegations at all in the First Amended Complaint about "human judgment to decide who gets a job." *See, generally*, FAC. Second, it is not a single practice.  It begs the question of whether it allegedly is Workday's decision to (1) market; (2) sell; or (3) employ such tools that Plaintiff is challenging, or whether it is three distinct theories. Finally, even assuming Plaintiff intends to rely on the "policy" of "employ[ing] algorithmic decision-making," Plaintiff's allegations make clear there is no single "algorithm" at issue. To the contrary, Plaintiff references differences in the alleged algorithm based on the employer at issue. *See, e.g.,* FAC ¶¶ 99-104.

The case is therefore distinguishable from *Huskey v. State Farm Fire & Casualty Co.* 2023 WL 5848164 (N.D. Ill 2023). In addition to being non-binding, out of circuit authority, *Huskey* is distinguishable because the plaintiff there pled more facts to support the alleged policy of the "use of algorithmic decision-making tools to automate claims processing." *Id.* at *8. In *Husky*, two Black homeowners alleged that State Farm used a discriminatory claims-processing policy that scrutinized Black policyholders' claims more than White policyholders' claims. *Id*. at 2. The Plaintiffs alleged in detail their experiences with State Farm of filing a claim under their homeowners insurance policy compared to their White neighbor's experience. *Id*. at 1. Further, plaintiffs alleged that *State Farm* collected "extensive data about policyholders, which includes: classifications as to race, [] gender, [] education, [] employment" and much more. *Id*. Finally, plaintiff relied on "survey evidence showing three distinct, statistically significant disparities between the experiences of Black versus white State Farm policyholders." *Id*. at 8. *Huskey* is therefore everything this case is not. Here, Plaintiff does not allege any facts, does not provide any survey evidence, and does not identify any non-protected groups to show how Workday's algorithmic decision-making tools allegedly discriminated against him on the basis of protected traits, other than his conclusory assertion that it did.

***Causation.*** Last, Plaintiff fails to point to allegations establishing a causal connection between Workday's policy and the disparities by alleging facts or producing statistical evidence.

1    *Nat'l Fair Hou. All*, 294 F. Supp. 3d at 948 ("A plaintiff who fails to allege facts at the pleading

2    stage or produce statistical evidence demonstrating a causal connection cannot make out a prima

3    facie case of disparate impact."). The First Amended Complaint does neither. Plaintiff calls

4    Workday's arguments "nitpicking." Opp. 24. But Plaintiff is accusing Workday of discrimination,

5    while seeking to represent a nationwide class of "tens of thousands" of individuals who have

6    applied to jobs at one of Workday's thousands of customers. It is hardly too much to ask that he

7    plausibly allege the practice or practices he is challenging, and articulate a viable theory for how

8    it would cause a disparate impact across three different protected classes.

9       ***The law does not permit disparate impact claims against employment agencies.*** Not only

10   does Plaintiff fail to plausibly plead that Workday is an employment agency, as Workday argued

11   in its original Motion to Dismiss (ECF 17 at 17-18) and again in its Motion to Dismiss the First

12   Amended Complaint (at 12, n.3), neither Title VII nor the ADEA authorize a disparate impact

13   claim against employment agencies. Although Plaintiff nominally argues that disparate impact

14   claims are permitted against employment agencies, he cites to statutory language that does not

15   function to grant any right to relief. Instead, 42 U.S.C. § 2000e-2(k) serves only to describe the

16   burden shifting framework. To read into the statute a congressional intent to permit a disparate

17   impact claim against employment agencies based on use of the umbrella term "respondent" with

18   respect to describing the burden of proof in the face of the plain omission of language giving rise

19   to such a claim in 42 U.S.C. § 2000e-2(a)-(c) is contrary to the principles of statutory

20   interpretation. Notably, Plaintiff cites to no case supporting his interpretation of § 2000e-2(k). The

21   Court should dismiss Plaintiff's disparate impact claim.

22      **C.**  **Plaintiff's FEHA Claim Fails**.

23      Finally, Plaintiff's sixth cause of action for aiding and abetting discrimination should be

24   dismissed. Mot. 14-15. To begin, Plaintiff does not dispute that if this Court dismisses his federal

25   claims, his FEHA claim would fail for lack of subject matter jurisdiction. 28 U.S.C. § 1367(c).

26      Setting that aside, Plaintiff also fails to defend his aiding and abetting claim by ignoring

27   the intent requirement attendant to his claim. Indeed, Plaintiff argues that Workday has

28   "consciously chosen to not include guardrails to prevent its algorithmic decision-making tools

1    from discriminating against members of protected classes, thereby aiding and abetting its client-

2    customers' bias." Opp. 24. In making such an argument Plaintiff ignores that (1) his First

3    Amended Complaint does not mention "guardrails" at all; and (2) Workday cited case law that a

4    failure to act (e.g., by putting up guardrails) is not sufficient to support an aiding and abetting

5    claim. Indeed, Plaintiff does not distinguish any of the case law cited in Workday's Motion.

6    *Vernon v. State*, 116 Cal. App. 4th 114, 131 (Cal. Ct. App. 2004) ("Mere knowledge that

7    [discrimination] is being committed and the failure to prevent it does not constitute aiding and

8    abetting" because "[a]s a general rule, one owes no duty to control the conduct of another.")

9    (internal citations omitted); *see also Ortiz v. Georgia P.*, 973 F. Supp. 2d 1162, 1184 (E.D. Cal.

10   2013) ("A failure to act is a far cry from providing substantial assistance"); *Smith v. BP*

11   *Lubricants USA Inc.*, 64 Cal. App. 5th 138, 146-47 (2021) (dismissing claim where plaintiff

12   alleged "no facts suggesting concerted activity between" codefendants, "which is the crux of an

13   aiding abetting claim under FEHA"); *Wynn v. Natl. Broad. Co., Inc.*, 234 F. Supp. 2d 1067, 1115

14   (C.D. Cal. 2002), dismissed, No. CV00-11248-SVW(RZX), 2002 WL 31681865 (C.D. Cal. Mar.

15   6, 2002) ("[S]ubstantial assistance or encouragement" requires more than the mere inaction "to

16   prevent discrimination"); *Ortiz v. Georgia P.*, 973 F. Supp. 2d 1162, 1184 (E.D. Cal. 2013)

17   (same). The Court should dismiss Plaintiff's FEHA claim.

18   **IV.    <u>CONCLUSION</u>**

19          Workday respectfully requests the Court grant its Motion, this time with prejudice.

20   Dated: April 12, 2024.                          ORRICK, HERRINGTON & SUTCLIFFE LLP

21

22                                          By: _____*/s/ Kayla D. Grundy*_____

23                                                      JULIE A. TOTTEN
                                                        ERIN M. CONNELL
24                                                      KAYLA D. GRUNDY
                                                     ALEXANDRA R. ELLIOTT
25                                                   Attorneys for Defendant
                                                        WORKDAY, INC.

26

27

28

- 14 -