JULIE A. TOTTEN (STATE BAR NO. 166470)
jatotten@orrick.com
ERIN M. CONNELL (STATE BAR NO. 223355)
econnell@orrick.com
KAYLA D. GRUNDY (STATE BAR NO. 300513)
kgrundy@orrick.com
ALEXANDRIA R. ELLIOTT (STATE BAR NO. 320293)
aelliott@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    (415) 773-5700
Facsimile:     (415) 773-5759

Attorneys for Defendant
WORKDAY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK L. MOBLEY, for and on behalf of himself and other persons similarly situated;<br><br>Plaintiff,<br><br>v.<br><br>WORKDAY, INC.<br><br>Defendant. | Case No. 3:23-cv-00770-RFL<br><br>**OPPOSITION TO MOTION OF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION FOR LEAVE TO FILE ACCOMPANYING BRIEF AS AMICUS CURIAE**<br><br>Date:          May 7, 2024<br>Time:          10:00 a.m.<br>Courtroom:  15, 18th Floor<br>Judge:         Hon. Rita F. Lin<br><br>Amended Complaint:  February 20, 2024 |

### I.   <u>INTRODUCTION</u>

Rather than submitting an objective brief articulating the Equal Employment Opportunity Commission's ("EEOC") views on the legal issues before this Court, the EEOC effectively seeks leave to file a second opposition to Workday's pending motion to dismiss.  Indeed, the EEOC's proposed amicus brief literally urges this Court to deny Workday's motion—a request normally reserved for the party whose claims are at issue. Particularly where the parties are both represented by competent counsel capable of briefing and litigating the relevant issues before this Court, allowing the EEOC to participate in this litigation improperly prejudices Workday and does little to assist the Court. Moreover, case law from this Court and courts around the country confirms the EEOC's motion and proposed amicus brief are improper for at least three reasons. First, the EEOC's brief is inappropriately partisan. Rather than provide the EEOC's neutral interpretation of the relevant statutes, it advocates for Plaintiff and seeks to bolster Plaintiff's opposition. Second, the EEOC's brief merely repeats the arguments made by Plaintiff's counsel, not only once, but *twice*, given the parties have now completed two full rounds of briefing on both Workday's first and second motions to dismiss. And third, the EEOC unreasonably delayed filing its motion until three days before Workday's reply deadline, further demonstrating the EEOC's brief unduly prejudices Workday. For each of these reasons and as described in greater detail below, the Court should deny the EEOC's motion. To the extent the Court is inclined to grant the EEOC's motion, Workday respectfully requests the Court also consider Workday's response to the EEOC's brief, which is attached to this opposition as Exhibit A.

### II.   <u>ARGUMENT</u>

"Whether to permit a nonparty to submit a brief, as amicus curiae, is, with immaterial exceptions, a matter of judicial grace." *Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000). "For several very substantial reasons . . . courts do not 'grant rote permission to file an amicus curiae brief.'" *Trunk v. City of San Diego*, No. 06CV1597-LAB (WMC), 2007 WL 9776582, at *1 (S.D. Cal. Dec. 10, 2007) (quoting *Nat'l Org. for Women, Inc*, 223 F.3d at 617). Courts can and do reject motions to file amicus briefs when the proposed amicus

1   improperly seeks to advocate for a party, *Ashker v. Pfeiffer*, No. 121CV00423ADAEPGPC, 2023

2   WL 4906766 (E.D. Cal. Aug. 1. 2023); the brief fails to offer unique information or perspective,

3   *IO Grp., Inc. v. Veoh Networks, Inc.*, No. C06-03926 HRL, 2007 WL 2433385 (N.D. Cal. Aug.

4   22, 2007); the parties already are ably represented by counsel, *Jones v. Becerra*, No. 3:19-CV-

5   01226-L-AHG, 2020 WL 8920621 (S.D. Cal. Jan. 14, 2020); or granting the motion would

6   prejudice the parties, *Karuk Tribe of Cal. v. U.S. Forest Serv.*, No. C 04-4275 SBA, 2005 WL

7   8177402 (N.D. Cal. June 13, 2005). Because each of these concerns is present here, this Court

8   should deny the EEOC's motion.

9   **A.   The EEOC's Brief Is Inappropriately Partisan**

10       The EEOC's brief is plainly a second opposition to Workday's motion to dismiss.  Rather

11   than objectively articulating the EEOC's views on the parameters of the applicable legal concepts

12   at issue, it inappropriately urges this Court to deny Workday's motion and advocates for Plaintiff

13   in place of Plaintiff's counsel.[1] *See Ashker*, 2023 WL 4906766, at *2–3 (rejecting amicus brief

14   that "seeks to improperly advocate in favor of Plaintiff without acting as his counsel with all the

15   duties and responsibilities that come with such representation"). The entire purpose of amici

16   curiae is to provide courts with "*impartial* information on matters of law about which there was

17   doubt, especially in matters of public interest," not to act as "an adversary party in interest in the

18   litigation." *U.S. v. Michigan*, 940 F.2d 143, 164–65 (6th Cir. 1991). "While there is no rule that

19   amici must be completely disinterested in the litigation, partisanship generally is not proper in a

20   trial court." *Twitch Interactive, Inc. v. Fishwoodco GmbH*, No. 22-CV-03218-VKD, 2023 WL

21   3751798, at *6 (N.D. Cal. May 31, 2023), *adopted in relevant part by* No. 5:22-CV-03218-EJD,

22   2023 WL 7458374 (N.D. Cal. Nov. 9, 2023); *Jones*, 2020 WL 8920621, at *1 (rejecting amicus

23

24   _____

     [1] Plaintiff's "Statement in Support of EEOC's Amicus Filing" (ECF No. 63) underscores this

25   reality. While Workday disputes the points made in Plaintiff's "statement," and questions the
     propriety of Plaintiff filing a statement in favor of the *EEOC*'s motion—particularly one that

26   raises new facts and arguments—these new allegations have no bearing on the legal questions
     pending before the Court. Instead, Plaintiff's statement merely supports Workday's argument that

27   granting the EEOC's motion will distract from the relevant issues and allow the EEOC to proceed
     as an advocate for Plaintiff, who already is represented by counsel in this case.

28

1    brief because its "usefulness is diminished at the trial level due to its obvious partisanship").

2           The EEOC's brief does not offer any unique information regarding the relevant law, its

3    development, or its policy goals. The EEOC does not provide this Court with any relevant EEOC

4    guidance on the use of software in the hiring process, nor does the EEOC articulate any special

5    perspective the EEOC may have on the emergence of AI in the hiring process. Instead, the

6    EEOC's brief merely restates the arguments Plaintiff already has made in his briefing (both in

7    opposition to Workday's pending motion, as well as in opposition to Workday's initial motion to

8    dismiss). Accordingly, the EEOC's brief is nothing more than a second opposition to Workday's

9    motion to dismiss, and represents an inappropriate attempt to act as counsel for Plaintiff—plainly

10   a legitimate reason for denying the EEOC's motion. *See Ashker*, 2023 WL 4906766, at *2–3.

11            **B.**   **The EEOC's Brief Is Superfluous To Arguments Made By Plaintiff's**
                       **Experienced Counsel**

12           District courts routinely decline to allow non-parties to participate as amici where, like

13   here, the parties to the proceeding are adequately represented by counsel and have ably addressed

14   the relevant legal issues in their briefing. *See Jones*, 2020 WL 8920621, at *1 (noting that amicus

15   briefs are "seldom appropriate at . . . the trial level where the parties are adequately represented

16   by experienced counsel") (citation omitted). This is especially true where "any unique

17   perspectives or information the proposed amici might have to offer are not especially pertinent"

18   to the court's ability to decide a particular issue, or amici merely repeat arguments made by the

19   parties. *Abadia-Peixoto v. U.S. Dept. of Homeland Sec.*, 277 F.R.D. 572, 576 (N.D. Cal. 2011).

20   Among the concerns animating this limitation is that amicus briefs that favor one party "may be

21   intended to circumvent the page limitations on the parties' briefs, to the prejudice of any party

22   who does not have an amicus ally." *Nat'l Org. for Women*, 223 F.3d at 617.

23           Here, Plaintiff and Workday are represented by experienced counsel. *See* ECF No. 47

24   ("FAC") ¶ 12 (explaining that Plaintiff's counsel is capable of adequately representing the class

25   Plaintiff seeks to certify). Indeed, the parties *already* have adequately briefed and argued the

26   relevant law in connection with Workday's first motion to dismiss, and have now completed a

27   second round of thorough briefing on the very same issues. The EEOC's belated attempt to

28

- 3 -

intervene is—at best—superfluous to the arguments made by the parties. *See Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753-PJH, 2023 WL 4303644, at *8 (N.D. Cal. June 30, 2023) (denying motion for leave to file amicus brief that "reiterates arguments already made" by the parties); *Motiv Grp., Inc. v. Cont'l Cas. Co.*, No. 220CV09368ODWEX, 2021 WL 1240779, at *5 (C.D. Cal. Apr. 1, 2021) (denying motion for leave to file amicus brief that "sets forth arguments similar to those in [the plaintiff's] pleading and opposition"); *IO Grp., Inc.*, 2007 WL 2433385, at *1 (denying motion for leave to file amicus brief because the "proposed brief does not appear to provide . . . unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide") (citation omitted).

Moreover, allowing the EEOC to file its adversarial brief plainly allows Plaintiff to improperly "circumvent the page limitations on the parties' briefs." *Nat'l Org. for Women*, 223 F.3d at 617. The prejudice that results from this reality is particularly stark here, where Plaintiff already sought and received 10 additional pages in his own opposition to Workday's motion—*after* Workday had filed its motion—an advantage to which Workday objected. ECF No. 57. As explained above, a plain reading of the EEOC's brief confirms it is not designed to help this Court understand the relevant law. Instead, it advocates for Plaintiff. It does not offer any unique information or perspective from the EEOC. Indeed, the EEOC has issued guidance that is publicly available on its website (which the parties have cited) touching on the very issues about which it argues in Plaintiff's favor in this case. *See* EEOC, *Select Issues: Assessing Adverse Impact in Software, Algorithms, and Artificial Intelligence Used in Employment Selection Procedures Under Title VII of the Civil Rights Act of 1964* (May 18, 2023).[2] Particularly where the EEOC already has the opportunity to make its views on these issues publicly known, the Court should not condone the improper attempt to intervene in this litigation merely to repeat Plaintiff's arguments and advocate for denying Workday's pending motion. Because the EEOC's brief merely seeks to repeat and support Plaintiff's arguments, the Court should deny the EEOC's

---

[2]   Available at https://www.eeoc.gov/laws/guidance/select-issues-assessing-adverse-impact-software-algorithmsand-artificial.

1  motion.

2  ### C.  The EEOC's Delay Prejudices Workday

3  District courts routinely deny motions from non-parties to participate as amicus curiae

4  when those motions are filed after or near the parties' briefing deadlines. *See Karuk*, 2005 WL

5  8177402, at *3 (denying motion to participate as amicus "after all of the briefing on [a] matter has

6  been submitted," because granting the motion "at this stage in the proceedings would prejudice

7  the parties and needlessly cause delay"); *Bounty Mins., LLC v. Chesapeake Expl., LLC*, No.

8  5:17CV1695, 2019 WL 7048981, at *10 (N.D. Ohio Dec. 23, 2019) (denying motion to

9  participate as amicus after briefing closed and three days before argument because granting the

10  motion would prejudice the parties). This is especially true where, as here, the proposed amicus

11  brief is filed in support of one party, and the other party's briefing deadline would prevent it from

12  meaningfully responding to the amicus brief. *See Friends of Animals v. U.S. Fish & Wildlife*

13  *Serv.*, No. 4:18-CV-00053-DN-PK, 2021 WL 4440347, at *2–3 (D. Utah Sept. 28, 2021)

14  (denying motion because "the State Amici filed their Motion after briefing was scheduled and

15  nearly complete—on the deadline for Plaintiff to file its reply brief"). Here, not only did the

16  EEOC wait to file its motion (and proposed brief) until three days before Workday's reply brief in

17  support of its motion was due, but the EEOC has offered no explanation or excuse for its

18  suspicious timing.[3] This Court should deny the EEOC's motion on this basis alone. *See Karuk*

19  *Tribe*, 2005 WL 8177402, at *3 (motion to participate as amicus denied where non-party "has not

20  presented the Court with any compelling reason why the Court should permit him to intervene

21  after all of the briefing on this matter has been submitted"); *Bounty Mins.*, 2019 WL 7048981, at

22  *10 (same).

23  _____

24  [3]  The EEOC's delay is particularly suspicious here, as Plaintiff was required to file his claims first *with the EEOC*. *See* FAC ¶ 6. The EEOC has thus been aware of Plaintiff's allegations

25  for years. *See id.* (explaining Plaintiff filed his initial charge of discrimination with the EEOC on June 3, 2021, and his amended charge on July 19, 2021). Further, the EEOC

26  declined to investigate Plaintiff's allegations, instead choosing to issue Plaintiff a closure letter and right-to-sue notice with no findings. *See id.*

27

28

1

### III.    <u>CONCLUSION</u>

2

For any and all of the reasons stated above, this Court should deny the EEOC's Motion for

3    Leave to File an Amicus Curiae Brief in Support of Plaintiff Derek L. Mobley and in Opposition

4    to Defendant Workday's Motion to Dismiss.

5    Dated: April 23, 2024.                                    ORRICK, HERRINGTON & SUTCLIFFE LLP

6

7                                                      By:    _____*/s/ Erin M. Connell*_____

8                                                              JULIE A. TOTTEN
                                                               ERIN M. CONNELL
9                                                              KAYLA D. GRUNDY
                                                               ALEXANDRIA R. ELLIOTT
10                                                             Attorneys for Defendant
                                                               WORKDAY, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP. TO EEOC MOT. FOR LEAVE TO FILE ACCOMPANYING BRIEF AS AMICUS CURIAE – CASE
NO. 3:23-cv-00770-RFL

# EXHIBIT A

1    JULIE A. TOTTEN (STATE BAR NO. 166470)
jatotten@orrick.com
2    ERIN M. CONNELL (STATE BAR NO. 223355)
econnell@orrick.com
3    KAYLA D. GRUNDY (STATE BAR NO. 300513)
kgrundy@orrick.com
4    ALEXANDRIA R. ELLIOTT (STATE BAR NO. 320293)
aelliott@orrick.com
5    ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
6    405 Howard Street
San Francisco, CA  94105-2669
7    Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

9    Attorneys for Defendant
WORKDAY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK L. MOBLEY, for and on behalf of himself and other persons similarly situated;<br><br>           Plaintiff,<br><br>      v.<br><br>WORKDAY, INC.<br><br>           Defendant. | Case No. 3:23-cv-00770-RFL<br><br>**DEFENDANT WORKDAY, INC.'S BRIEF IN RESPONSE TO BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date:      May 7, 2024<br>Time:      10:00 a.m.<br>Courtroom:  15, 18th Floor<br>Judge:    Hon. Rita F. Lin<br><br>Amended Complaint:  February 20, 2024 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................ 1

ARGUMENT ................................................................................................................................ 2

I.     WORKDAY IS NOT AN EMPLOYMENT AGENCY ....................................................... 2

       A.    WORKDAY DOES NOT PROCURE EMPLOYEES ......................................... 3

       B.    WORKDAY DOES NOT TEST APPLICANTS, AND PLAINTIFF
             CANNOT PLAUSIBLY ALLEGE OTHERWISE ............................................... 6

       C.    WORKDAY'S SOFTWARE IS NOT A "PERSON" ........................................... 7

II.    WORKDAY IS NOT PLAINTIFF'S INDIRECT EMPLOYER ....................................... 8

       A.    AN INDIRECT EMPLOYER HAS THE POWER TO DICTATE HIRING
             CHOICES ............................................................................................................ 9

       B.    THE EEOC FAILS TO JUSTIFY DEPARTING FROM THIS
             STANDARD ...................................................................................................... 10

III.   WORKDAY IS NOT AN AGENT ................................................................................... 12

       A.    THE EEOC FAILS TO PROVIDE ANY AUTHORITY JUSTIFYING
             APPLYING THE AGENCY THEORY HERE .................................................... 12

       B.    THE EEOC'S POSITION HERE IS INCONSISTENT WITH THE
             POSITIONS IT TAKES IN ITS TRAININGS AND GUIDANCE ..................... 13

CONCLUSION ........................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Pac. Mar. Ass'n,*
   336 F.3d 924 (9th Cir. 2003) ................................................................................... 8

*Ass'n of Mexican-Am. Educators v. California,*
   231 F.3d 572 (9th Cir. 2000) ................................................................... 8, 9, 10, 11

*Brush v. S.F. Newspaper Printing Co.,*
   315 F. Supp. 577 (N.D. Cal. 1970), *aff'd,* 469 F.2d 89 (9th Cir. 1972) ........... 3, 4, 6

*Cannon v. Univ. of Chi.,*
   559 F.2d 1063 (7th Cir. 1976) ............................................................................... 5

*Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New Eng., Inc.,*
   37 F.3d 12 (1st Cir. 1994) .................................................................................... 12

*DeVito v. Chi. Park Dist.,*
   83 F.3d 878 (7th Cir. 1996) .................................................................................. 12

*Dixon v. CMS of the State of Ill.,*
   No. 14-cv-4986, 2016 WL 4158926 (N.D. Ill. Aug. 5, 2016) ............................ 6, 7

*Dumas v. Town of Mount Vernon,*
   436 F. Supp. 866 (S.D. Ala. 1977) ...................................................................... 5, 6

*Fair Hous. Couns. of San Fernando Valley v. Roommates.Com, LLC,*
   521 F.3d 1157 ....................................................................................................... 8

*Gomez v. Alexian Bros. Hosp. of San Jose,*
   698 F.2d 1019 (9th Cir. 1983) ........................................................................... 9, 10

*Greenfield v. Field Enters., Inc.,*
   No. 71-cv-2075, 1972 WL 155 (N.D. Ill. Feb. 1, 1972) ........................................ 3

*Gundogdu v. LinkedIn Corp.,*
   Case No. 23-60804-CIV-WPD (S.D. Fla. Aug. 4, 2023), *aff'd,* 2024 WL
   1597781 (11th Cir. Apr. 12, 2024) ........................................................................ 3

*Hill v. Miss. State Emp. Serv.,*
   918 F.2d 1233 (5th Cir. 1990) ............................................................................... 5

*Kaplowitz v. Univ. of Chi.,*
   387 F. Supp. 42 (N.D. Ill. 1974) ........................................................................... 5

*Kemether v. Pa. Interscholastic Athletic Ass'n,*
    15 F. Supp. 2d 740 (E.D. Pa. 1998) ...................................................................... 5

*Raines v. U.S. Healthworks Med. Grp.,*
    534 P.3d 40 (Cal. 2023) ........................................................................................ 12

*Riesgo v. Heidelberg Harris, Inc.,*
    36 F. Supp. 2d 53 (D.N.H. 1997) .......................................................................... 5

*Scaglione v. Chappaqua Cent. Sch. Dist.,*
    209 F. Supp. 2d 311 (S.D.N.Y. 2002) ................................................................ 5, 6

*Sciarra v. DaMar Staffing Sols. of Indianapolis, Inc.,*
    No. 1:07-CV-1580-LJM-JMS, 2009 WL 10719817 (S.D. Ind. Aug. 21, 2009) ...................... 5

*Shehadeh v. Chesapeake & Potomac Tel. Co. of Md.,*
    595 F.2d 711 (D.C. Cir. 1978) ............................................................................... 11

*Sibley Mem'l Hosp. v. Wilson,*
    488 F.2d 1338 (D.C. Cir. 1973) .............................................................. 9, 10, 11

*Spirt v. Tchrs. Ins. & Annuity Ass'n,*
    691 F.2d 1054 (2d Cir. 1982) .......................................................................... 12, 13

*Stewart v. Am. Ass'n of Physician Specialists, Inc.,*
    No. 5:13-cv-01670-ODW (DTBx), 2015 WL 7722349 (C.D. Cal. Nov. 30,
    2015) ........................................................................................................................ 4

*Vanguard Just. Soc. Inc. v. Hughes,*
    471 F. Supp. 670 (D. Md. 1979) ........................................................................... 11

*Whitsitt v. Hedy Holmes Staffing Servs.,*
    No. 2:13–cv–00117–MCE–AC, 2015 WL 5560119 (E.D. Cal. Sept. 21, 2015),
    *aff'd,* 671 F. App'x 1004 (9th Cir. 2016) ............................................................. 4

*Wilborn v. S. Union State Cmty. Coll.,*
    720 F. Supp. 2d 1274 (M.D. Ala. 2010) ................................................................ 5

*Williams v. Montgomery,*
    742 F.2d 586 (11th Cir. 1984) ............................................................................... 12

**Statutes**

29 U.S.C. § 630 ......................................................................................................... 1, 2

42 U.S.C. § 2000e .................................................................................................. 1, 2, 7

42 U.S.C. § 12111 ..................................................................................................... 1, 2

- iii -

**Other Authorities**

American Heritage Dictionary of the English Language (4th ed. 2006) ........................................ 3

EEOC, *The Americans with Disabilities Act and the Use of Software, Algorithms, and Artificial Intelligence to Assess Job Applicants and Employees* (May 12, 2022) ............................................................................................................................... 14

EEOC, *Select Issues: Assessing Adverse Impact in Software, Algorithms, and Artificial Intelligence Used in Employment Selection Procedures Under Title VII of the Civil Rights Act of 1964* (May 18, 2023) ......................................................... 13, 14

EEOC TRAINING INST.,
https://eeotraining.eeoc.gov/profile/web/index.cfm?PKwebID=0x2547fa13 ....................... 15

Oxford Dictionary of English (3d ed. 2010) ............................................................................ 3

Rev. Rul. 85-187, 1985-2 C.B. 338, 1985 WL 291469 (1985)..................................................... 8

Steven A. Wagner, *Artificial Intelligence in the Workplace: Real Life Examples of the Risks to Employers*, EEOC TRAINING INST. (Mar. 28, 2024)............................................ 15

Susan C. Morse, *Do Tax Compliance Robots Follow the Law?*, 16 Ohio St. Tech. L.J. 278 (2020) ............................................................................................................... 8

Webster's Third New International Dictionary Unabridged (3d ed. 2021) .................................. 3

1

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

2         For the first time ever, the EEOC takes the position in the amicus brief it has submitted to

3  this Court that a software vendor can be liable under federal antidiscrimination statutes based on

4  how its customers use its software in the hiring process. The EEOC's argument finds no support

5  in the statutory text of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age

6  Discrimination in Employment Act of 1964 ("ADEA"), or the Americans with Disabilities Act

7  of 1990 ("ADA"). And, like Plaintiff, the EEOC does not cite a single case, in any jurisdiction,

8  in which any court has recognized liability under the circumstances here. Indeed, the EEOC does

9  not even provide this Court with EEOC guidance or memoranda stating that software vendors

10  can be liable for the use of artificial intelligence ("AI") in the hiring process—and its own

11  guidance and training materials tell employers the opposite is true.

12         As Workday explained in its Motion to Dismiss, Workday—a software vendor—is not

13  an employment agency, an indirect employer, or an agent of an employer. As Plaintiff

14  acknowledges, Workday provides software that assists customers with organizing and

15  reviewing job applications based on those customers' own hiring criteria. *See* ECF No. 47

16  ("FAC") ¶ 38 (Workday's AI software "determines which candidates to recommend based on

17  the demonstrated interests of its client-employers in certain types of candidates," and "will offer

18  recommendations that reflect whatever biases employers happen to exhibit"). But Workday

19  itself, let alone its software program, has no control over its customers' hiring criteria, its

20  customers' individualized review of applications, or who its customers choose to hire—and

21  Plaintiff does not allege otherwise. Rather, it is Workday's customers who review applications

22  and make hiring decisions, and those customers use Workday's platform as a tool to assist them

23  in that process. Workday is not aware of any case (and neither Plaintiff nor the EEOC has cited

24  any) in which any court has extended liability to a software provider under facts such as these.

25         *First*, Workday is not an "employment agency" because Plaintiff does not and cannot

26  allege Workday "procures employees" for its customers or "procures" employment opportunities

27  for applicants. Rather, as Plaintiff acknowledges, Workday provides software that assists

28  customers in reviewing application materials to make hiring decisions.

- 1 -

*Second*, Workday is not an indirect employer because it has no control over who its customers hire. Every case in which the Ninth Circuit has recognized an indirect employer theory of liability has involved a defendant with enough power over a prospective employer's hiring process to actually veto that employer's hiring decision. Workday does not have that kind of power over its customers, and Plaintiff does not plausibly allege otherwise.

*Third*, Workday is not an agent of its customers because its customers have not delegated their hiring function to Workday—instead, Plaintiff's allegations describe a software program that lacks the ability to set hiring criteria, interview candidates, or hire candidates. Not only has the EEOC failed to identify any case in which the Ninth Circuit has adopted this theory of liability, it has also failed to identify any case anywhere that has applied the theory under facts such as these.

The EEOC's own guidance and training materials make clear it *never* contemplated a software provider would be liable under Title VII, the ADA, or the ADEA, even after this case was pending. And yet, for the first time ever, the EEOC advances just the opposite theory in its amicus brief to this Court. Armed with no case, no statutory language, and no guidance saying a software vendor can be liable for discrimination under facts such as these, the EEOC fails to justify the change in the law it asks this Court to effectuate. Accordingly, this Court should grant Workday's Motion to Dismiss, this time with prejudice.

## ARGUMENT

### I.   Workday Is Not An Employment Agency

Like Plaintiff, the EEOC fails to account for both the plain statutory language and relevant case law in arguing that Workday qualifies as an "employment agency." An "employment agency" is defined in Title VII, the ADA, and the ADEA as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer." 42 U.S.C. § 2000e(c); 42 U.S.C. § 12111(7); 29 U.S.C. § 630(c). The EEOC fails to provide a single case in which any court has determined that an entity qualifies as an "employment agency" when it sells software that allows prospective employers to organize and sort through job applications it has already received. The

- 2 -

1   reason for this omission is clear—software providers like Workday do not "procure" employees

2   for their customers. Without any support in the text or the case law, the EEOC's attempt to bring

3   Workday within the auspices of federal antidiscrimination statutes fails.

### A.  <u>Workday Does Not Procure Employees</u>

5   Armed mostly with a handful of inapposite district court cases from other jurisdictions,

6   the EEOC attempts to elide the distinction between "procur[ing] employees for an employer,"

7   and selling software that permits an employer to manage the job applications it receives. The

8   verb "procure" means to get, obtain, or acquire something, especially by special effort. *See*

9   *Procure*, Webster's Third New International Dictionary Unabridged (3d ed. 2021) ("to get

10  possession of," or to "gain, win"); *Procure*, Oxford Dictionary of English (3d ed. 2010) ("obtain

11  (something) especially with care or effort"); *Procure*, American Heritage Dictionary of the

12  English Language (4th ed. 2006) ("to get by special effort; obtain or acquire"). But Workday is

13  not accused of getting, obtaining, or acquiring job applicants for its customers, and the EEOC

14  does not identify any plausible allegations from Plaintiff's First Amended Complaint suggesting

15  otherwise.

16  As Workday explained in its Motion to Dismiss, none of Plaintiff's allegations supports a

17  finding that Workday "get[s] possession of," "acquire[s]," or "obtain[s]" employees for its

18  customers. *See* ECF No. 50 ("MTD") at 4–7. "[O]nly the most forced and tortured construction

19  of" the word "procure" "could bring within that definition" a software provider like Workday.

20  *Greenfield v. Field Enters., Inc.*, No. 71-cv-2075, 1972 WL 155, at *4 (N.D. Ill. Feb. 1, 1972);

21  *see also Stewart v. Am. Ass'n of Physician Specialists, Inc.*, No. 5:13-cv-01670-ODW (DTBx),

22  2015 WL 7722349, at *5 (C.D. Cal. Nov. 30, 2015) (noting "for a defendant to be an

23  employment agency, it must actively assist participants in the job search process and the pursuit

24  of employment must be a central and recurring component of the program" (citation omitted and

25  cleaned up)); *Gundogdu v. LinkedIn Corp.*, Case No. 23-60804-CIV-WPD (S.D. Fla. Aug. 4,

26  2023), *aff'd*, 2024 WL 1597781 (11th Cir. Apr. 12, 2024) (website that "provid[es] users with

27  access to employment opportunities" is not an employment agency merely because it "provides

28  job-search functions"); *Brush v. S.F. Newspaper Printing Co.*, 315 F. Supp. 577, 580 (N.D. Cal.

- 3 -

1970), *aff'd*, 469 F.2d 89 (9th Cir. 1972) (rejecting "broad" definition of "employment agency" because "we are convinced that the legislative history in the pending case shows that the term 'employment agency' was used in its ordinary sense").

In a much tougher case than this one, at least one court in this Circuit has recognized that an entity does not qualify as an employment agency for engaging in screening and referral activities. *See Whitsitt v. Hedy Holmes Staffing Servs.*, No. 2:13–cv–00117–MCE–AC, 2015 WL 5560119 (E.D. Cal. Sept. 21, 2015), *aff'd*, 671 F. App'x 1004 (9th Cir. 2016). In *Whitsitt*, the plaintiff alleged that he was terminated from a temporary position with his employer, and WorkNet, a third-party who was not his employer, referred "considerably younger and less experienced applicants to fill plaintiff's position." *Id.* at *2. The plaintiff went on to allege that he was discriminated against by a "screener" for WorkNet who threw out every application he filed. *Id.* Despite the plaintiff's allegation that "WorkNet 'screened' plaintiff for employment," the court held that the plaintiff failed to allege that WorkNet was an employment agency. *Id.* at *3.[1] Thus, a plaintiff's allegation that the defendant engages in "screening" and "referral" activities is insufficient to justify treating that defendant like an employment agency.

Notably, the EEOC fails to engage with the relevant statutory language, and never explains how Workday's software purportedly "procures" employees for its customers. Indeed, Workday is unaware of any case (and the EEOC does not cite one) holding that a software provider can be liable as an employment agency for providing software that assists customers in making hiring decisions. Instead, the EEOC cites a handful of inapposite cases from other jurisdictions for the general proposition that employment agencies sometimes also engage in employee-referral activities—but not for the proposition that sorting through previously filed applications (or selling software that performs that function) *makes* an entity an employment agency. *See* EEOC Br. at 4–8.

---

[1] The EEOC attempts to minimize *Whitsitt* by arguing it stands for "the unremarkable proposition that conclusory allegations are insufficient," EEOC Br. at 7 n.8. But the court in *Whitsitt* did not dismiss the plaintiff's allegations for being conclusory. Rather, and in recognition of the allegation that WorkNet "screened" the plaintiff's application for employment, the court found that the plaintiff failed to allege that WorkNet was an employment agency. *Id.* at *3.

Each case cited by the EEOC involved a defendant engaged in activities beyond what the EEOC calls "screening and referral activities," EEOC Br. at 5. *See, e.g.*, *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1291–92 (M.D. Ala. 2010) (employees of program provided applicants with job training, submitted job applications on applicants' behalf, invited recruiters to the program, and facilitated interviews); *Dumas v. Town of Mount Vernon*, 436 F. Supp. 866, 870 (S.D. Ala. 1977) (defendant conducted all hiring for the Town of Mount Vernon by testing, interviewing, and then referring candidates for employment); *Kaplowitz v. Univ. of Chi.*, 387 F. Supp. 42, 45–46 (N.D. Ill. 1974) (entire function of law school's "Placement Office" was to procure employment opportunities for students).[2]

In some of the cases the EEOC cites, the court did not even engage in any analysis on the relevant question, and instead took for granted that the defendant was an employment agency because the issue was not disputed, or the defendant was officially licensed *as* an employment agency. *See, e.g.*, *Hill v. Miss. State Emp. Serv.*, 918 F.2d 1233, 1234 n.1 (5th Cir. 1990) (noting in a footnote without analysis that a state entity that belonged to the "national network of state employment services," and actively assisted applicants with applying for jobs was an employment agency); *Sciarra v. DaMar Staffing Sols. of Indianapolis, Inc.*, No. 1:07-CV-1580-LJM-JMS, 2009 WL 10719817, at *1 (S.D. Ind. Aug. 21, 2009) (defendant was "a licensed employment agency that screens and refers job candidates to clients/employers seeking to fill positions"); *Kemether v. Pa. Interscholastic Athletic Ass'n*, 15 F. Supp. 2d 740, 763–64 (E.D. Pa. 1998) ("It is undisputed that an assignor *procures* PIAA-registered officials for work at PIAA member schools during the regular season." (emphasis added)); *Riesgo v. Heidelberg Harris, Inc.*, 36 F. Supp. 2d 53, 55 (D.N.H. 1997) (whether defendant was an employment agency seemingly undisputed and not analyzed).

And at least one case the EEOC cites affirmatively supports Workday. *Scaglione v. Chappaqua Central School District* involved a municipality's "personnel office" that was

---

[2]   Notably, though unmentioned by the EEOC, the Seventh Circuit later cabined *Kaplowitz*'s "liberal construction of the term employment agency" and application of that term as dicta. *See Cannon v. Univ. of Chi.*, 559 F.2d 1063, 1076 (7th Cir. 1976).

"responsible for overseeing and administrating all of the hiring procedures for civil service positions in towns and villages within the county." 209 F. Supp. 2d 311, 312 (S.D.N.Y. 2002). A municipality seeking to fill a vacancy was required to obtain a list of eligible candidates from the personnel office, and was permitted to hire only from that list. *Id.* at 312. Though the personnel office had far more influence over employers' hiring processes than Workday allegedly had here, the court goes out of its way to acknowledge "[i]t is questionable whether defendant" would be considered "an 'employment agency'" in the Ninth Circuit. *Id.* at 316 (citing *Brush*, 315 F. Supp. at 580). After all, this Court decided in *Brush* that in federal antidiscrimination statutes, "the term 'employment agency' was used in its ordinary sense, rather than in such a broad sense" as to include other kinds of entities, like newspapers. 315 F. Supp. at 582.

### B.      Workday Does Not Test Applicants, And Plaintiff Cannot Plausibly Allege Otherwise

The EEOC reads Plaintiff's allegations regarding "tests" far too generously, implying in its brief that Plaintiff accuses Workday of "administering pre-referral tests." EEOC Br. at 6. Instead, at most, Plaintiff merely alleges that some employers "required him to take a Workday *branded* assessment and/or personality test," FAC ¶¶ 55–56 (emphasis added), and that Workday's software uses test scores to "process and interpret an applicant's qualifications and recommend whether the applicant should be accepted or rejected," FAC ¶ 8. He does not specifically allege that Workday developed or scored any of these tests, or that the tests were administered by Workday (nor could he, consistent with Rule 11). *See* MTD at 5.

But in any event, the EEOC has not cited any case (and Workday is not aware of any) suggesting that testing applicants alone is sufficient to support a finding that a defendant operates as an employment agency. Instead, the EEOC points out that some employment agencies also administer tests, and cites as examples two cases, neither of which is within this jurisdiction. *See* EEOC Br. at 6; *Dumas,* 436 F. Supp. at 869 (defendant conducted many employment activities besides administering tests, such as interviewing candidates and placing them in open positions for the Town of Mount Vernon); *Dixon v. CMS of the State of Ill.*, No. 14-cv-4986, 2016 WL 4158926, at *2 (N.D. Ill. Aug. 5, 2016) (holding defendant was an

- 6 -

1    employment agency because, in addition to administering tests, defendant "procures employees

2    for state agencies, [and] controls some of the process for employment with state agencies").

3    Neither case turned on the fact that the defendants at issue administered employment tests.

4        **C.    Workday's Software Is Not A "Person"**

5        The EEOC also argues that if software performs a traditional function of an employment

6    agency, that means the software provider is an employment agency. *See, e.g.*, EEOC Br. at 6

7    ("Workday's algorithmic tools perform precisely the same screening and referral functions as

8    traditional employment agencies—albeit by more sophisticated means."). In doing so, it

9    conflates Workday with Workday's product, just as Plaintiff does. This fallacy cannot be

10   squared with the text of the statute, let alone any case law applying it, because the entity

11   performing the traditional functions of an employment agency must be a "person." *See, e.g.*, 42

12   U.S.C. § 2000e(c) ("The term 'employment agency' means any *person* regularly undertaking

13   with or without compensation to procure employees for an employer[.]" (emphasis added)).

14       A "person" is defined as "one or more individuals, governments, governmental agencies,

15   political subdivisions, labor unions, partnerships, associations, corporations, legal

16   representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations,

17   trustees, trustees in cases under title 11, or receivers." 42 U.S.C. § 2000e(a). Notably absent

18   from the definition are the terms "software," or "artificial intelligence tool." Neither Plaintiff nor

19   the EEOC attempts to explain how Workday's "algorithmic decision-making" or "screening

20   tools" qualify as a "person" within the definition of an "employment agency."

21   The answer to this puzzle is obvious—there are decision-makers using Workday's tools to make

22   hiring decisions, and those decision-makers are Workday's customers. As Plaintiff

23   acknowledges, Workday's algorithmic tools do not work in a vacuum—they respond to the

24   settings and preferences and hiring criteria set by Workday's customers. *See, e.g.*, FAC ¶¶ 38–

25   39. Here, the "person" using Workday's software to screen applicants is necessarily the

26   employer, the entity that knows the jobs into which it is hiring, configures the Workday software

27

28

1   to meet its needs, and receives the applications through its website—not Workday itself.[3]

2          The EEOC analogizes this case to a case involving immunity under the Communications

3   Decency Act ("CDA"), arguing that "online platforms cannot avoid liability when their own

4   design elements cause or contribute to unlawful discrimination." EEOC Br. at 9. But that case is

5   irrelevant to this one. In *Fair Housing Counsel of San Fernando Valley v. Roommates.Com,*

6   *LLC*, the Ninth Circuit analyzed whether a website that required users to divulge protected

7   characteristics could be immune under the CDA. 521 F.3d 1157, 1161–62. The CDA provides

8   websites like the defendant with "immunity for liability arising from content created by third

9   parties," but not content created by the website itself. *Id.* at 1162. Noting that the defendant was

10  the one responsible for creating the offending content by requiring users to answer the

11  impermissible questions about their protected characteristics, the court unsurprisingly concluded

12  that the website was not immune from liability for that content, and remanded to the district

13  court for further proceedings. *Id.* at 1166, 1175. Obviously, this case has nothing to do with

14  immunity under the CDA, or which entity is responsible for generating challenged content.

15  **II.      Workday Is Not Plaintiff's Indirect Employer**

16         The Ninth Circuit has made clear that the indirect employer theory is properly applied

17  only where (1) "the indirect employer was the entity performing the discriminatory act,"

18  *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 931 (9th Cir. 2003); and (2) the indirect employer

19  exerted "peculiar control" over the employment relationship, *see Ass'n of Mexican-Am.*

20  *Educators v. California*, 231 F.3d 572, 582 (9th Cir. 2000) ("*AMAE*"). Neither circumstance is

21  present here. Indeed, the EEOC fails to cite a single case in which a court has applied the

---

[3]   To illustrate this concept, Workday cited as an example that a vendor providing software (such as Microsoft Excel) that a customer can use for accounting purposes is not the equivalent of acting as that customer's accountant. *See* MTD at 6. The EEOC suggests in a footnote that there is some debate over whether providers of tax preparation software can in some circumstances be classified as "tax preparer[s]." *See* EEOC Br. at 9 n.9. But again, the EEOC provides no case in which a court has held that a software provider constitutes a tax preparer for merely providing software that customers could use to prepare their taxes, citing instead one law review article and a Revenue Ruling from 1985. *See id.* (citing Susan C. Morse, *Do Tax Compliance Robots Follow the Law?*, 16 Ohio St. Tech. L.J. 278, 283 n.13 (2020), and Rev. Rul. 85-187, 1985-2 C.B. 338, 1985 WL 291469, at *1 (1985)).

1   indirect employer theory to allegations such as these, and for good reason.  This Court should

2   decline the EEOC's invitation to be the first.

3       **A.**    <u>An Indirect Employer Has The Power To Dictate Hiring Choices</u>

4          Unlike here, each of the cases in which the Ninth Circuit has upheld the indirect

5   employer theory has involved a third-party entity with extraordinary control over the prospective

6   employer's hiring decision. In *AMAE*, the court engaged in lengthy and thorough analysis of the

7   ways in which the State of California controlled the state's public schools, including by

8   *prohibiting* school districts from hiring teachers who had not passed certain standardized tests

9   administered by the state. 231 F.3d at 580–84. The court concluded that the state was an indirect

10  employer because "the state dictates whom the districts may and may not hire." *Id.* at 582.

11  Similarly, in *Gomez*, the Ninth Circuit determined that a hospital was the indirect employer of a

12  physician after the hospital refused to contract with his employer for discriminatory reasons, thus

13  overriding his employer's decision to hire him as a director of the hospital's emergency room.

14  *Gomez v. Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019, 1020–22 (9th Cir. 1983).

15         Even *Sibley* itself, the case in which the D.C. Circuit first articulated the indirect

16  employer theory, involved a defendant with the power to override the hiring decisions of a

17  prospective employer. In *Sibley*, the court found that a hospital could be liable under Title VII

18  when it physically prevented a male nurse from performing services for female patients who

19  wanted to hire him for the day's work. *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1339–40,

20  1342 (D.C. Cir. 1973). Critically, employees of the hospital in *Sibley* independently "determined

21  that a female patient should not have a male nurse," and acted "without reference to the patient"

22  when barring the nurse from caring for the patients who hired him. *Id.* at 1342.

23         This case is nothing like those cases. Plaintiff does not allege that Workday has authority

24  to tell its customers who they must hire or to veto their hiring decisions. Plaintiff does not even

25  allege that Workday's software—let alone Workday itself—acts "without reference to" its

26  customers' hiring preferences. *Sibley*, 488 F.2d at 1342. Instead, Plaintiff alleges that Workday's

27  software, *as operated by Workday's customers*, can produce discriminatory results. *See* FAC ¶

28  38 (Workday's AI software "determines which candidates to recommend based on the

- 9 -

demonstrated interests of its client-employers in certain types of candidates," and "will offer

recommendations that reflect whatever biases employers happen to exhibit"). These allegations

are a far cry from alleging that Workday "dictate[d] whom [its customers] may and may not

hire." *See AMAE*, 231 F.3d at 582.

Obviously, Workday does not have nearly the level of power over its customers that the

defendants had in *Sibley*, *Gomez*, and *AMAE*—nor does Plaintiff allege otherwise. Accordingly,

there is no basis for finding Workday is an indirect employer.

### B.    The EEOC Fails To Justify Departing From This Standard

In an attempt to save Plaintiff's claims, the EEOC offers an artful but misleading

articulation of the legal standard for an indirect employer, arguing that "the relevant inquiry is

not whether the defendant controls the plaintiff's prospective employer, but whether the

defendant can control or interfere with the plaintiff's access to that employer." EEOC Br. at 12.

This framing suffers from two fatal defects. First, it is contrary to Ninth Circuit precedent.

Neither of the cases in which the Ninth Circuit upheld the indirect employer theory in the hiring

context involved "access" to a prospective employer. In *AMAE*, the Ninth Circuit found the State

of California to be an indirect employer because of "the peculiar degree of control that the State

of California exercises *over local school districts*"—not prospective employees' *access* to local

school districts. 231 F.3d at 581 (emphasis added). Similarly, the facts in *Gomez* had nothing to

do with accessing a prospective employer, as the plaintiff was (and remained) employed by the

same company who would have hired him as director of the hospital's emergency room. *Id.* at

1021.

Second, the EEOC offers no citation in support of this framing beyond *Sibley*. True,

*Sibley* involved a hospital that prevented a nurse (the employee) from physically "accessing"

patients (the employers), but that was simply the means by which the hospital exercised its

control over the patients' hiring decisions. 488 F.2d at 1342. Indeed, the application of the

indirect employer theory in that case made sense because the hospital had enough power over its

patients to physically prevent individuals those patients had hired from reporting for work. *See*

*id.* (hospital acted "without reference to the patient, [and] itself determined that a female patient

1    should not have a male nurse"). Thus, the "relevant inquiry" is not "whether the defendant can

2    control or interfere with the plaintiff's access to that employer," EEOC Opp. at 12, but instead

3    whether the defendant had control over the employer's ability to hire a particular candidate.

4        The EEOC fails to cite a single case in which any court, in any jurisdiction, has

5    determined that a software provider can be an indirect employer based on how it allows

6    employers to use its platform for hiring purposes, or even based on how it recommends

7    candidates for job openings. Instead, in support of the proposition that a defendant may be

8    considered an indirect employer for "exercis[ing] substantial authority and discretion in the area

9    of testing of applicants for entry level positions," the EEOC cites a nearly fifty-year-old opinion

10   from the district court in Maryland. EEOC Br. at 11 (quoting *Vanguard Just. Soc. Inc. v.*

11   *Hughes*, 471 F. Supp. 670, 696 (D. Md. 1979)). That case, however, involved a police

12   department that was *prohibited* from hiring an applicant who did not pass a mandatory

13   examination administered by the defendant. *Vanguard*, 471 F. Supp. at 721. Much like the State

14   of California in *AMAE*, then, the defendant in *Vanguard* had the power to remove candidates

15   from consideration completely, regardless of whether the police department wanted to hire them.

16   As explained, Plaintiff has not and cannot allege similar facts here, even if Workday had any

17   role in designing tests for job applicants (which it does not).

18       Similarly, the EEOC cites only one case—a nearly 50-year-old decision from the D.C.

19   Circuit—in support of the proposition that the indirect employer theory "appl[ies] with equal

20   force to discriminatorily-motivated propagation of adverse references." EEOC Br. at 11. That

21   case involved an applicant's former employer contacting every prospective employer with whom

22   she applied and providing adverse and discriminatorily motivated references. *See Shehadeh v.*

23   *Chesapeake & Potomac Tel. Co. of Md.*, 595 F.2d 711, 722 (D.C. Cir. 1978). As an initial

24   matter, the Ninth Circuit has never endorsed this application of the indirect employer theory, and

25   the EEOC does not provide examples of any other court doing so, either. But, in any event,

26   Plaintiff does not accuse Workday of providing adverse references about applicants to their

27   prospective employers, and the holding of *Shehadeh* is thus inapposite.

28

- 11 -

1

**III.**   **Workday Is Not An Agent**

2        Once again, the EEOC advocates for a massive expansion in liability for companies who

3   provide software to prospective employers, despite having zero justification for doing so in

4   either the text of the relevant employment statutes or any case law in this Circuit. As explained

5   in Workday's Motion to Dismiss, cases in which courts assign liability based on an agency

6   theory do so where the agent acted with significantly more delegated power than Plaintiff alleges

7   (or plausibly could allege) that Workday has over its customers' hiring process. *See* MTD, at 9–

8   10. And yet again, not a single case cited by the EEOC has applied the agency theory under facts

9   such as these. Indeed, the EEOC has not cited any case on this issue—under any set of facts—in

10  which the Ninth Circuit has applied the agency theory. Once again, this Court should decline the

11  EEOC's invitation to be the first.

12        **A.**   **The EEOC Fails To Provide Any Authority Justifying Applying The Agency Theory Here**

13        As explained in *Raines v. U.S. Healthworks Medical Group*, cited by the EEOC, the

14  Ninth Circuit has never expressly adopted the theory that an entity may be liable for its conduct

15  as an employer's "agent" in the hiring process. 534 P.3d 40, 48–49 (Cal. 2023); *see* EEOC Br. at

16  13 (quoting for the proposition that "[t]hese cases establish that an employer's agent can, under

17  certain circumstances, appropriately bear direct liability under the federal antidiscrimination

18  laws"). Of the jurisdictions recognizing such a theory, none has done so on facts like these.

19        As explained in Workday's Motion to Dismiss, the cases cited by Plaintiff, and now the

20  EEOC, are inapposite. *See* MTD at 10 (distinguishing *DeVito v. Chi. Park Dist.*, 83 F.3d 878,

21  881 (7th Cir. 1996) and *Williams v. Montgomery*,742 F.2d 586, 589 (11th Cir. 1984) as relying

22  on completely different facts). The EEOC also cites two cases in which courts have held that

23  entities who administer employee-benefit programs act as employers' agents.  *See Carparts*

24  *Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New Eng., Inc.*, 37 F.3d 12, 17–18 (1st Cir.

25  1994) (healthcare plans); *Spirt v. Tchrs. Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir.

26  1982) (pension funds). Far from simply providing employers with software by which employers

27  can sort through job applications based on their own hiring priorities, these defendants actually

28

- 12 -

developed and administered employee benefit programs entirely on behalf of the plaintiffs' employers. The EEOC fails to identify any similarities (and indeed, there are none) between entities that administer employee benefit programs on behalf of employers and entities that provide software to prospective employers.

### B.  The EEOC's Position Here Is Inconsistent With The Positions It Takes In Its Trainings And Guidance

In the last sentence of the penultimate paragraph of the EEOC's brief, the EEOC cites for the first time two technical assistance documents from the EEOC on the use of AI in the hiring process. *See* EEOC Br. at 13–14. The EEOC suggests that these citations stand for the proposition that a software vendor may be construed as an employer's agent, and thus face liability under federal discrimination statutes, based on whether employers rely on its software in the hiring process. But neither document says anything about liability for software vendors. Instead, both documents say that *employers* may be liable for discrimination arising from their use of software—even software developed by another entity—in the hiring process. Quoting the first, the EEOC states:

> The EEOC's own technical assistance states that a software vendor acts as an employer's agent "if the employer has given [the vendor] significant authority to act on the employer's behalf," which "may include situations where an employer relies on the results of a selection procedure that the agent administers on its behalf."

EEOC Br. at 13. The EEOC essentially represents that its technical assistance document supports a finding that a software vendor, like Workday, can be correctly categorized as an employer's agent, and therefore properly named as a defendant under relevant statutes, where employers "rel[y] on the results of a selection procedure that the agent administers on its behalf." But that is false. Had the EEOC quoted the relevant language in its entirety, it would be clear that the EEOC's position is that *employers* may be liable when they use or rely on a software program that has a discriminatory impact. In the first paragraph of a Q&A couplet where the question is: "Is an employer responsible under Title VII for its use of algorithmic decision-making tools even if the tools are designed or administered by another entity, such as a software vendor?" the EEOC's answer is as follows:

- 13 -

> In many cases, yes. For example, if an employer administers a selection procedure, *it may be responsible* under Title VII if the procedure discriminates on a basis prohibited by Title VII, even if the test was developed by an outside vendor. In addition, *employers may be held responsible* for the actions of their agents, which may include entities such as software vendors, if the employer has given them authority to act on the employer's behalf. This may include situations where an employer relies on the results of a selection procedure that an agent administers on its behalf.

EEOC, *Select Issues: Assessing Adverse Impact in Software, Algorithms, and Artificial Intelligence Used in Employment Selection Procedures Under Title VII of the Civil Rights Act of 1964* (May 18, 2023) (emphasis added).

Notably, nowhere in this technical assistance does the EEOC suggest that a software vendor may be liable on a theory that it was acting as an employer's agent.

The same is true for the second citation, which comes to the same conclusion in applying the ADA.  *See* EEOC, *The Americans with Disabilities Act and the Use of Software, Algorithms, and Artificial Intelligence to Assess Job Applicants and Employees* (May 12, 2022). Indeed, this technical assistance seemingly goes out of its way to suggest that an employer, but not a software vendor, would be liable for the use of software that discriminates against people with disabilities in the hiring process. For example, regarding reasonable accommodation requests relating to software, the EEOC states:

> [I]f an employer were to contract with a software vendor to administer and score on its behalf a pre-employment test, *the employer* likely would be held responsible for actions that the vendor performed—or did not perform—on its behalf. Thus, if an applicant were to tell the vendor that a medical condition was making it difficult to take the test (which qualifies as a request for reasonable accommodation), and the vendor did not provide an accommodation that was required under the ADA, *the employer likely would be responsible* even if it was unaware that the applicant reported a problem to the vendor.

*Id.* (emphasis added).

This position was a consistent one for the EEOC, until the filing of this amicus brief. In the EEOC's own training materials, the EEOC explicitly states that the lesson from this case—

- 14 -

*Mobley v. Workday*—is that "if your *company* uses software, computer systems, etc., created by someone else that discriminates, you will be on the hook, *not the vendor*."[4] In a separate slide on "Lessons Learned" from the same training, the EEOC states that while a "vendor may not be liable," for software that has a discriminatory effect in hiring, employers "will be!"

 The EEOC's own guidance and training materials make clear that it *never* contemplated a software provider would be responsible under Title VII, the ADA, or the ADEA for employment discrimination, even after this case was pending. And indeed, the EEOC has failed to provide this Court with any justification for expanding the law in the ways the EEOC advocates for here.

### <u>CONCLUSION</u>

 For each of these reasons and as argued in Workday's Motion to Dismiss, the Court should grant Workday's Motion to Dismiss in its entirety, this time with prejudice.

Dated: April 23, 2024.     ORRICK, HERRINGTON & SUTCLIFFE LLP

       By:     */s/ Erin M. Connell*
           JULIE A. TOTTEN
           ERIN M. CONNELL
           KAYLA D. GRUNDY
          ALEXANDRIA R. ELLIOTT
          Attorneys for Defendant
           WORKDAY, INC.

---

[4] Steven A. Wagner, *Artificial Intelligence in the Workplace: Real Life Examples of the Risks to Employers*, EEOC TRAINING INST. 8-10 (Mar. 28, 2024) (emphasis added); *see also* EEOC TRAINING INST., https://eeotraining.eeoc.gov/profile/web/index.cfm?PKwebID=0x2547fa13.