Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

DEREK L. MOBLEY, for and on      )
behalf of himself and other      )
persons similarly situated,      )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   NO. 3:23-cv-00770 RFL
                                 )
WORKDAY, INC.,                   )
                                 )
          Defendant.             )
_____)

                        San Francisco, California
                        Tuesday, May 14, 2024

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        WINSTON COOKS, LLC
                        420 20th Street, Suite 2200
                        Birmingham, Alabama 35203
                   **BY:  LEE D. WINSTON, ATTORNEY AT LAW**


For Defendant:
                        ORRICK, HERRINGTON & SUTCLIFFE LLP
                        The Orrick Building
                        405 Howard Street
                        San Francisco, California 94105
                   **BY:  ERIN M. CONNELL, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1  **APPEARANCES**:  (CONTINUED)

2  For Defendant:

3                        ORRICK, HERRINGTON & SUTCLIFFE LLP
                        400 Capitol Mall, Suite 3000
                        Sacramento, California 95814

4              BY:  **JULIE A. TOTTEN, ATTORNEY AT LAW**
                   **ALEXANDRIA R. ELLIOTT, ATTORNEY AT LAW**

5

6                        ORRICK, HERRINGTON & SUTCLIFFE LLP
                        300 West 6th Street, Suite 1850

7                        Austin, Texas 78701-3956
              BY:  **RACHAEL JENSEN, ATTORNEY AT LAW**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Tuesday - May 14, 2024**                              **10:02 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Okay.  Before we get started, there are a |
| 5 | number of people logged in on Zoom listening to the |
| 6 | proceedings.  So I just want to remind everyone that these |
| 7 | proceedings are being reported and recorded by this Court.  Any |
| 8 | other recording of this proceeding, either by video, audio, |
| 9 | including screenshots or other copying of the hearing, is |
| 10 | strictly prohibited. |
| 11 | Okay.  Calling Civil Case 23-770, Mobley vs. Workday, Inc. |
| 12 | Counsel, please come to the podiums; state your |
| 13 | appearances for the record. |
| 14 | **MR. WINSTON:**  Lee Winston for the plaintiff. |
| 15 | **MS. CONNELL:**  Good morning, Your Honor.  Erin Connell |
| 16 | at Orrick Herrington & Sutcliffe for defendant Workday. |
| 17 | **THE COURT:**  Good morning to both of you. |
| 18 | I put out questions.  It's now a couple of weeks ago.  I |
| 19 | just want to make sure that everybody got those. |
| 20 | I see everybody nodding. |
| 21 | Let's just go through the questions, and then after we |
| 22 | finish the questions, if you have more you'd like me to know |
| 23 | about a particular topic, I'm open to hearing it. |
| 24 | So let's start with the first question.  This is really a |
| 25 | question for Workday. |

1          Imagine a scenario where you have a software vendor who

2    intentionally provides employers with a tool that the vendor

3    knows automatically screens out all applicants who previously

4    attended historically black colleges when recommending

5    candidates to be considered for interviews.  The employers have

6    no idea that the software contains this functionality.

7    According to Workday's interpretation of Title VII, would any

8    entity be liable for this act of intentional discrimination?

9          **MS. CONNELL:**  Thank you, Your Honor.

10          Under the facts of this hypothetical, if the employer's

11   use of the software did, in fact, result in unlawful

12   discrimination, the employer would likely be liable under a

13   theory of disparate impact discrimination, as one would expect

14   that a tool that screens out candidates who applied -- or,

15   excuse me -- who attended historically black colleges and

16   universities would have a disparate impact on black applicants

17   and their exclusion would not be job related and consistent

18   with business necessity.

19          **THE COURT:**  Let's leave aside disparate impact.  What

20   about an intentional discrimination claim?  Is it your view

21   there would be no intentional discrimination claim against

22   either the employer or the software vendor?

23          **MS. CONNELL:**  There would not be a claim against the

24   vendor because the employment discrimination laws, including

25   Title VII, that are at issue here, only cover the conduct of

1    certain entities.

2        So under the facts of this hypothetical, if the software

3    vendor, just based on these facts, all they did was sell the

4    software to the employer and then the employer chose to use it,

5    the employer is on the hook for that -- for their choice of

6    using the software that they purchased.

7        So even though, obviously, this vendor in this

8    hypothetical is engaged in a bad act -- they intentionally

9    designed the software to discriminate -- the reprehensibility

10   of the conduct is not the test for coverage.  You still need to

11   analyze whether the vendor is an employer, an employment

12   agency, an indirect employer or, in jurisdictions other than

13   the Ninth Circuit, an agent as -- under the theory articulated

14   in *Raines*.

15       **THE COURT:**  What if you have a

16   software-as-a-service-type situation, where the employer is

17   working with a software vendor that has a platform and is

18   taking in the applications through its associated platform and

19   is kind of like an independent contractor, in a sense, in the

20   way that it works with the employer?

21       In that situation, it would seem, under Workday's

22   analysis, that the software vendor would be not liable because,

23   in your view, they're not an agent in any way of the employer

24   and, at the same time, the employer would not be liable because

25   there's no *respondeat superior* for what your independent

1    contractor does.  You have no idea what they're doing.

2        Am I understanding Workday's analysis correctly?

3        **MS. CONNELL:**  Well, under those different facts of the

4    hypothetical, you would have to go through each of the tests

5    for coverage.

6        So with regard to the software vendor, you would first

7    need to analyze, okay, is this vendor, under these facts, an

8    employment agency?

9        And the tests for whether an entity -- a third-party

10   entity is an employment agency include:  Is the vendor

11   procuring employer -- employees for the employer?  You'd have

12   to go through the tests.

13       **THE COURT:**  Let's just say that it's the same scenario

14   that I've outlined in Question 1, except that, just to be

15   clear, the software is a software as a service as opposed to

16   you buy the package and the employer is deploying it on their

17   computers on their own.

18       So in a software-as-a-service situation -- which is,

19   I think, similar to what is being alleged that Workday does.

20   In a software-as-a-service situation, would Workday have the

21   view that the software vendor is still not an agent and also

22   that the employer is, nonetheless, not liable either for the

23   intentional discrimination because the software vendor is

24   acting as an independent contractor and is not part of the

25   employer's purview?

1          **MS. CONNELL:**  Well, our view is that the employer

2     would still be liable.  And that has been the consistent view

3     of the EEOC and, more recently, the OFCCP, which is the

4     Office of Federal Contract Compliance Programs, the division

5     within the Department of Labor that regulates the

6     non-discrimination allegations of federal contractors under

7     Executive Order 11246, which follows Title VII.

8          And, in fact, OFCCP released guidance on April 29th, after

9     the briefing in this matter had closed, that makes very

10    clear -- I have a copy of it here, if Your Honor would like, or

11    we can provide a copy afterwards.  It is on this exact issue.

12         And the guidance is entitled "Artificial Intelligence and

13    Equal Employment Opportunity for Federal Contractors."  And it

14    makes very clear that employers are responsible for the

15    third-party tools that they purchase if they end out being

16    discriminatory, even if the employer didn't know.

17         **THE COURT:**  On an intentional discrimination basis or

18    only on a disparate impact basis?

19         I have seen the EEOC guidance saying that there's

20    disparate impact liability for employers who employ AI tools

21    that, unbeknownst to them, perpetuate discrimination in some

22    way, but I haven't seen that analysis in the intentional

23    discrimination context.

24         Is what you're talking about in the intentional

25    discrimination context too?

1        **MS. CONNELL:**  The guidance doesn't specify between

2   disparate impact and disparate treatment.  What the guidance is

3   talking about is coverage, who is the entity responsible.

4        Employers can't delegate their obligations under these

5   antidiscrimination laws to software vendors.  And it's not a

6   defense to say, "Well, I chose to use the software.  I deployed

7   the software.  And the software discriminated, but I didn't

8   know about it."  That's not a defense.

9        That's been the EEOC's consistent position up until this

10  litigation; that's the OFCCP's position in the guidance that it

11  just released; and that's what the case law has held.

12       **THE COURT:**  What's the theory on which the employer is

13  being held liable for intentional discrimination it has no idea

14  is happening inside the software?

15       **MS. CONNELL:**  Well, in this scenario, you would need

16  some more facts.  But the Uniform Guidelines on Employee

17  Selection Procedures do make clear that if employers are using

18  selection procedures -- and we'd have to know a little bit more

19  facts about this hypothetical to know if it actually was a

20  selection procedure -- they're supposed to be monitoring those

21  tools for disparate impact and to see if they're job related

22  and consistent with business necessity.

23       So if an employer is doing what it should be doing, which

24  is monitoring the impact of its tool, and can see that it's

25  having a disparate impact, you would need more facts.  I can't

1    say one way or the other that the employer would necessarily be

2    on the hook or off the hook for intentional discrimination.

3    They would have to somehow know, presumably, that the tool was

4    discriminating for a claim of intentional discrimination.  But

5    the broader point is that they can't delegate their obligation

6    to follow the laws to a software vendor.

7        And the vendor's liability would be covered under the

8    tests that are articulated for an employment agency, an

9    indirect employer.

10       And, again, as we explain in our response to the EEOC's

11   *amicus* brief, the third-party agency theory articulated in

12   *Raines* with regard to the California FEHA has never been

13   applied in the Ninth Circuit.  And there are very good reasons

14   why that reference to "agent" in Title VII and in the ADEA, in

15   the employer prong, which we'll get to in later questions,

16   should be considered as an acknowledgment of *respondeat*

17   *superior* liability and not as a basis for finding a liability

18   for third-party business entities, because Congress already has

19   articulated the basis for liability for third-party business

20   entities under Title VII in the employment agency prong.

21       **THE COURT:**  I think you can probably understand from

22   my question, what troubles me about Workday's interpretation is

23   the concept that the employer would not be liable for

24   intentional discrimination unless they knew that the software

25   was doing something that was intentionally discriminatory and

1  then, at the same time, the vendor would not be liable either

2  because the vendor would say:  Hey, we're just not covered by

3  Title VII.

4       And that seems like exactly the concern that animates the

5  third-party agency theory that was adopted in the line of cases

6  that you're just describing.  It's a fear that we're allowing

7  employers to evade liability by delegating their intentional

8  discrimination to some third party that seems to be outside the

9  scope of the statute but is actually controlling access to

10  employment positions.

11       So just with that broad policy concern of mine, what is

12  Workday's response to that policy concern?

13       **MS. CONNELL:**  So I think the policy concern is that

14  under -- you know, many states and municipalities have the

15  concern that in light of the fact that we now have vendors

16  selling AI tools that are outside the reach of these employment

17  statutes, they are not waiting for Congress.  They are

18  introducing legislation here in California, in New York, that

19  covers third-party vendors.  But the existing statutes and the

20  way that Congress wrote them don't get at that conduct.

21       The employer might have a claim against the vendor, not an

22  employment discrimination claim, but they may have a claim,

23  depending, again, on facts outside this hypothetical, depending

24  on the contracts that are drafted, depending on the

25  representations that were made.

But the test for coverage under these laws that are at issue in this case doesn't hinge on the reprehensibility of the conduct. Again, what -- in this hypothetical, it's a bad vendor; they're engaging in bad acts; but these employment discrimination laws, as drafted and interpreted by the courts, don't reach that bad conduct.

**THE COURT:** What about the prescription that Title VII should generally be interpreted broadly in order to allow it to remedy the discrimination that's at the heart of the statute, that's the concern behind the statute?

**MS. CONNELL:** That's true. But the solution that plaintiff and the EEOC are seeking here truly is a legislative solution. Congress could amend Title VII. It could introduce new laws, like the states are doing.

But the way that the statutes are written and the way that the case law has interpreted it, there is broad interpretation and then there's just going too far, where it really is a legislative fix.

And that really is the solution that's being advocated here, because these laws don't reach the conduct that's described for -- it's not -- and it's not that the applicants have no remedy. They do have a remedy. They have the remedy of a disparate impact claim against the employer. And maybe they have an intentional claim of discrimination. It depends on additional facts.

1          But under the facts of the hypothetical as articulated and
2    under the facts as pled against Workday, as alleged against
3    Workday in the first amended complaint, they're not -- that
4    conduct is not covered by the existing laws that are at issue
5    in this case.

6          **THE COURT:**  I think that sort of brings us to
7    Question 2, but let me give the plaintiff an opportunity to
8    respond to Question 1 as well.

9          **MR. WINSTON:**  Thank you.  Good morning, Your Honor.
10   Thank you.

11         As you might imagine, we disagree with that
12   interpretation.  We think Title VII is perfectly adequate and
13   it covers software vendors.  There's no software vendor
14   exemption written into the statute.  If we turn to the
15   statutory text, the only exemption is for religious
16   organizations.  Their AI is not a church.  It's not entitled to
17   an exemption.

18         The allegations of this complaint are that the HR
19   functions had been robotized, and you can't outsource that.  If
20   your company created the product, you're responsible for it.
21   It's that straightforward.  We're not asking the Court to make
22   a reach.  We're just asking it to apply the law that exists.

23         **THE COURT:**  I do think that takes us to Question 2,
24   which is, the parties agree that a defendant would be liable as
25   an employer's agent if the defendant "exercised an

1  administrative function traditionally exercised by the

2  employer."  That's the *Raines* case, which collects federal

3  cases that we were discussing earlier.  Is the decision to

4  reject a job candidate rather than invite them for an interview

5  an "administrative function traditionally exercised by the

6  employer" in its hiring process?

7       Let me give Workday an opportunity to respond to that

8  first.

9           MS. CONNELL:  So, respectfully, Your Honor, I think we

10  don't agree.  We don't agree that *Raines* applies to Title VII,

11  and so that was the point that I wanted to make.  *Raines* is a

12  case analyzing the California FEHA.

13           THE COURT:  Before you go down that road, will you

14  point me to where in your briefing is -- I think we had the

15  impression from your briefing that Workday was conceding this

16  was the appropriate test for agency.  Will you point me to

17  where in your briefing --

18           MS. CONNELL:  Sure.  It's in our response --

19           THE COURT:  -- your analysis is?

20           MS. CONNELL:  It's in our response to the EEOC's

21  *amicus* brief.  I can find the page.

22       I think in our -- in our motion to dismiss briefing, we

23  agree that's the test in *Raines*; but what we don't agree is

24  that *Raines* applies to Title VII, because if you read the

25  *Raines* case, it goes into a very thorough and detailed history

of the FEHA.  And on this point, the FEHA and Title VII are
structured very differently.

Title VII, as you know, has the employer prong and then it
has the employment agency prong.

FEHA does not -- surprisingly, does not contain a general
prohibition against discrimination for employment agencies.  It
prohibits very specific conduct by employment agencies.  It
prohibits the printing of discriminatory job postings.  It
prohibits asking unlawful medical questions in the interviewing
process.  It prohibits harassment.  It prohibits retaliation.
But the broad prohibition against employment discrimination is
not in FEHA.

And so if you -- and I'm not saying I agree with *Raines*,
but it makes more sense that the California Supreme Court, in
interpreting the FEHA, would interpret the reference to "agent"
in the "Employer" section of FEHA to be a -- not only be
*respondeat superior*, but to also give rise to a claim for
liability against third-party business agents.

But in Title VII and in the ADEA, Congress has a whole
separate section, the employment agency prong, that covers the
types of business entities that are covered and the types of
conduct that is covered.  There's a general prohibition.

And so to read the reference to "agent" in the employer
prong as also giving rise to third-party business entity
liability renders the employment agency superfluous or, at a

```
1    minimum, it's overriding the test that Congress chose and is
2    introducing a new test.
3         THE COURT:  What about the federal case law, the
4    federal appellate case law -- I know it's not Ninth Circuit
5    case law but -- from other circuits that cited in Raines that
6    is the basis for that standard that the Raines court was
7    summarizing from the federal case law?  Is there a reason to
8    think that that case law is distinguishable or that it's wrong
9    in some way in its interpretation of the federal statutes?
10        MS. CONNELL:  Well, none of that case law is in the
11   Ninth Circuit.
12        So to answer your second question first, we do think that
13   the reference to "agent" in Title VII in the employer prong is
14   an acknowledgment of respondeat superior.  So we would disagree
15   with those circuits that have found that that gives liability
16   to third-party business agents as employers.
17        But the cases are also very distinguishable.  They --
18        THE COURT:  I'm sorry.  Before you go down that road,
19   do you have cases that support your view, that reject Carparts
20   and Spirt and the other federal appellate cases that adopt this
21   Raines interpretation?
22        MS. CONNELL:  Since Raines came out -- so there are
23   several cases cited by Raines, including Miller vs. Maxwell
24   International's Inc., 991 F.2d 583, from the Ninth Circuit in
25   1993, which, in analyzing the agent language in Title VII's
```

employer prong, states, quote (as read):

     ". . . the obvious purpose of this agent

provision was to incorporate *respondeat superior*

liability into the statute."

Other circuit decisions that have held the same are

*Birkbeck vs. Marvel Lighting Corporation*, 30 F.3d 507, from the

Fourth Circuit in 1994.  It holds the same thing.  Similarly,

*Grant vs. Lone Star Company*, 21 F.3d 649, from the

Fifth Circuit in 1994, it makes the same holding there.

Now, the circuits that have gone the other way have

addressed situations either involving municipal settings where

you have things like a city or a district that has created a

personnel board and the personnel board's sole job is to hire

employees or fire employees; they operate separate from the

city; the city is doing other things; that's the personnel

board's job; that's what they do, or situations where you have

third-party benefits providers and the employer has contracted

out the provision of benefits and the employees contract

directly with the benefits providers and the employer has

nothing to do with the benefits that are -- the contracts and

the provision of benefits.  So that's very different.

So the cases that fall into that line of cases are:

*DeVito vs. Chicago Park District*, 83 F.3d 878, from the

Seventh Circuit in 1996.  That involved a personnel board for a

park district where the personnel board had the complete

1    authority to fire the plaintiff.

2        *Williams vs. City of Montgomery*, 742 F.2d 586, from the

3    Eleventh Circuit in 1984.  There again, the agent was a

4    personnel board for the city that had complete control and

5    autonomy to hire and fire city employees.

6        *Spirt vs. Teachers Insurance and Annuity Association*,

7    691 F.2d 1054, from the Second Circuit in 1982.  There, the

8    agent was a third-party benefits provider that contracted

9    directly with the plaintiffs.

10       And then *Carparts Distribution Center, Inc.* vs. *Auto*

11   *Wholesalers Association of New England*, 37 F.3d 12, from the

12   First Circuit in 1994.  Again, the agent was a medical benefits

13   provider who had sole autonomy for administering benefits to

14   employees.

15       So these are whole functions, the administering of

16   benefits or hiring and firing.  We're not aware of any case,

17   and we couldn't find any case, either in the FEHA context or in

18   those jurisdictions, that have adopted a *Raines*-like analysis

19   for Title VII where they've extended third-party liability to a

20   business entity for simply rejecting candidates and not

21   inviting them to interview as opposed to a whole function.  So

22   we're not aware of any case that would find -- even the cases

23   that have followed *Raines*, those cases I just named -- that

24   would find that in the facts of this hypothetical, a

25   third-party entity could be liable.

1          **THE COURT:**  Just looking at some of the language that

2   the Courts of Appeals in the Second Circuit and First Circuit

3   and the *Spirt* and *Carparts* cases used, it looks like their test

4   for what counts isn't:  Have you delegated an entire function

5   to the benefits administrator?

6          Instead, the test is "Is this third party one that

7   'significantly affects access of any individual to employment

8   opportunities'?" which would seem to encompass a situation

9   where a third party performs a gatekeeping function.  You can't

10  even get your foot in the door for an interview unless you get

11  past the third party.  That would seem to satisfy that

12  criterion.

13         What is your response to that language in those opinions?

14         **MS. CONNELL:**  I think that -- I don't think there is a

15  uniform test that has been articulated.  But if you look at the

16  facts of all of the cases, they have never applied a

17  third-party business entity theory of liability to facts like

18  this.

19         So that's what we have to go on, is what are the factual

20  situations, because, again, this is a judicially created

21  doctrine.  And *Raines* is in the FEHA context.  All of these

22  circuits are in circuits other than the Ninth Circuit.  So

23  there's not a uniform test that is uniformly applied.

24         And we would -- again, we disagree with this theory of

25  liability, in any event, and would strenuously argue against

this Court being the first court in the Ninth Circuit to apply
that type of theory to a third-party entity, particularly on
facts like these.

**THE COURT:** Let me go back to your earlier argument on
that point, which is the concept that the term "agent" refers
solely to *respondeat superior* liability, where the employer is
liable for the third-party software vendor or third-party actor
but there is no liability going the other direction; that is,
the third-party vendor would be liable for whatever it
has -- whatever administrative functions it's taken on.

Why is it that you're saying that if the Ninth Circuit is
finding *respondeat superior* liability based on the term
"agent," that the Ninth Circuit must mean that we can't have
other understandings of "agent" and that there's not a
situation in which the third party is liable as an agent
performing functions on behalf of the employer.

**MS. CONNELL:** Our argument -- our argument is that, to
date, the Ninth Circuit has only interpreted the word "agent"
to refer to *respondeat superior*.  And I'm articulating that the
better analysis is that that is what Congress meant, because to
get -- to preview one of your later questions, the word "agent"
in Title VII in this regard is in the employer prong.

And then there's the second employment agency prong.  And
so to read the reference to "agent" in the employer prong as
referring to a third-party business entity agent that can be

1   independently liable would render the employment agency prong

2   superfluous.  Why would you need a second prong that

3   articulates the circumstances under which third-party business

4   entities can be liable under Title VII if you're going to have

5   another theory under which they can be liable as employers?

6   It's just not the way that the statute is written.

7        And so we think the better interpretation of Title VII and

8   the ADEA is to interpret that reference to "agent" as a

9   reference to *respondeat superior*.

10       **THE COURT:**  Let me give plaintiff an opportunity to

11  respond.  I think it'd be helpful for me to hear your response

12  to the idea that the agency theory renders the employment

13  agency prong superfluous.

14       In other words, are there situations where somebody might

15  be an employment agency but not satisfy the agent prong?

16       **MR. WINSTON:**  No.  We disagree with their

17  interpretation.

18       Title VII speaks to agents being responsible for conduct.

19  To the extent they want -- they want immunity from Title VII.

20  They want *Raines* doesn't apply.

21       Title VII, to capture in this context, if you're screening

22  résumés, rejecting candidates, recommending people for

23  employment, you're serving as an agent and you have independent

24  liability for your decisions.  If you want to say that didn't

25  happen or it's not true, we can't argue about it on a motion to

dismiss.  That's what we have discovery for and trials.

But to try to escape liability at the outset saying, "We're not covered because we're a software vendor and we're not an agent.  We're not an independent" -- "You can't sue us as an independent agent, even though we're an independent agent."  The statute says -- it talks about employers and an agent.  They're an agent.

Now, you know, in the sexual harassment context in Title VII, if there's an individual, they said that that person -- there's no individual liability under Title VII.  But Workday's a corporation.  They're covered.

**THE COURT:**  What's the response to that point, that Title VII places liability on the employer and its agent, which would seem incompatible with the concept that "agent" only refers to the employer's liability for yet further acts?

**MS. CONNELL:**  The *Miller* case that I cited, in the Ninth Circuit, I mean, engages in this very analysis.  And it's saying that what that -- in the employer prong, what that means is that employers are responsible for the discriminatory acts of their agents.

And so that's like -- that's what the reference to "agents" is.  We're not asking for an exemption, and we're not saying we're immune.  We're simply saying that as a software vendor, that these -- we're not covered by these laws.

There's the threshold issue of coverage.  It's not the

1  reprehensibility of the conduct that's alleged that's the test

2  for coverage.  And so I think we've got to focus on the

3  coverage issue.

4      And that's our position, is that, you know, as the

5  Ninth Circuit has already found, that that reference to "agent"

6  refers to the concept of *respondeat superior*.

7          **THE COURT:**  What about -- I can't remember the

8  Supreme Court case off the top of my head, but my memory is

9  that the *Carparts* and *Spirt* cases all come from this footnote

10 in a Supreme Court case where the Court is expressing a concern

11 that without agency liability -- that is, without an ability to

12 hold third parties liable for what they're doing on behalf of

13 the employers -- you could have a situation like the one that's

14 alleged here, where the employer is essentially delegating its

15 discriminatory hiring to some third party and that third party

16 is now able to escape liability and so is the employer.

17      **MS. CONNELL:**  I believe the case -- I believe you

18 referred to it in your order, and I believe it had to do with

19 Los Angeles.  The name of it is escaping me.  It was a

20 statement in *dicta*.  And you're right, the other cases that

21 have gone in that direction have cited to that case.

22      But, again, our argument is that that case did not hold

23 that third-party agents are independently liable under

24 Title VII.  And, again, if you -- if you just look at the way

25 that the statutes are constructed, there would be no point in

having the employment agency prong if the reference to "agent" in the employer prong gave rise to third-party business entity liability.  It's just not -- those are choices Congress made. I mean, Congress could amend Title VII to cover third-party agents.

And, again, the states aren't waiting for Congress.  They are enacting laws all over the country, including here in California, that would get at third-party conduct, including by vendors.

But as drafted and as interpreted in the Ninth Circuit, the conduct that's alleged here is not covered by the statutes at issue.

**THE COURT:**  Let me move to the third question, which is, Mobley alleges that "Workday embeds artificial intelligence ('AI') and machine learning ('ML') into its algorithmic decision-making tools, enabling those applications to make hiring decisions."  He also alleges that the "Workday Assessment Connector" screens applicants using algorithms that incorporate "pymetrics," p-y-m-e-t-r-i-c-s, that are "trained on incumbent employees," and that this process injects bias into the hiring process.  Are those allegations sufficient to state a claim that Workday has designed its tools to actively participate in the decision-making process, rather than simply automating criteria preset by employers?

This is really a question for Workday too.

1          **MS. CONNELL:** So, no, Your Honor.  While we find these

2    allegations somewhat difficult to follow, if anything, they

3    underscore Workday's point that it's -- that the tools are

4    designed to be configurable by the employers who purchase them.

5          So paragraph 101 alleges just that.  He says that -- the

6    paragraph says that The Workday Assessment Connector helps

7    client-employers make their hiring decisions and internal

8    mobility decisions more predictive, and free of bias.

9          So with these allegations, plaintiff is alleging that

10   Workday's tools incorporate the employer's bias by prioritizing

11   candidates that are like those that the employer has already

12   hired.

13         But even taking those allegations as true at the motion to

14   dismiss stage, selling a tool that has the capacity to reflect

15   the user's own bias doesn't make the vendor an employment

16   agency, an indirect employer, or an agent of the employer.

17         Again, you need to focus on the conduct of what Workday

18   did; and in this hypothetical, or as alleged in the complaint,

19   Workday sold the software to the employer, and then the

20   decision that the employer made is to use the software.  I

21   mean, so it is the -- software doesn't function on its own.

22   Somebody has to deploy it.  And under the allegations of the

23   complaint, the entity, the person that is deploying the

24   software is the third-party employer.

25         And the question also -- I just want to also make the

 1   point that the question asks if this entity would be
 2   participating in the decision-making process.  But, again, the
 3   relevant tests are whether the defendant is an employer, an
 4   employment agency, or an indirect employer.  It's not enough to
 5   just participate in the decision-making process.  So back to --
 6   back to my original point.  Because it's the employer that's
 7   deploying the software, the employer is still the actor in
 8   the -- as alleged in the complaint, and it's still the employer
 9   that would be the entity that would be liable.

10        **THE COURT:**  I want to ask a little bit more about this
11   concept of the entity deploying the software is not the same as
12   the software vendor.

13        From the allegations of the complaint, it seemed to me
14   that the complaint was alleging that this is redirecting people
15   to a Workday website.  I think it was hp.workday.com, for
16   example, was one of the instances that's described, or
17   hpe@myworkday.com, so that it's a Workday platform that's on
18   the employer website, which sounds to me different than a
19   situation, for example, where you go into Costco and you buy a
20   TurboTax and you put it on your computer and then you use
21   TurboTax to prepare your taxes or whatever it is.

22        Instead, it's a software-as-a-service situation where
23   employees are being redirected to a Workday platform which is
24   taking in the application and then performing this analysis
25   and, allegedly, autorejecting people between the hours of

1    12:55 a.m. to 1:50 a.m. in one instance.  That's what

2    Mr. Mobley alleged happened to him.

3        So help me understand how the software here is alleged to

4    be deployed really independently of Workday?

5            MS. CONNELL:  Well, if you read the allegations in the

6    complaint as opposed to the opposition, what plaintiff actually

7    alleges is that it's a Workday-branded platform.  But if you

8    read the complaint in totality, it's still the employer's

9    platform using the Workday software.

10       So plaintiff hasn't alleged that -- and consistent with

11   Rule 11, could not allege that the employers are somehow

12   sending the employees back to Workday and that Workday, the

13   business entity, is making decisions.  It is still the software

14   being deployed by the employer on the employer's platform --

15   that's what the allegations make clear -- using the Workday

16   software.

17       And so it's still -- the person, the actor in this

18   scenario is still the employer.  And the guidance from the EEOC

19   and the OFCCP and the employment laws and the case law make

20   clear the employer can't delegate that obligation to a third

21   party.  The employer is responsible for the software that it

22   uses.  And it's not different that the software is more

23   advanced and uses AI.  The employer is still responsible for

24   its decision to use the software in making those selection

25   decisions.

1          **THE COURT:**  Let me give plaintiff an opportunity to

2     respond.

3          **MR. WINSTON:**  Workday -- so we think -- well, no.

4     Workday needs to take ownership of their AI models.  They

5     sell them on a subscription basis.  These are not, as you

6     described, Your Honor, one-off transactions where someone goes

7     into Costco and buys a program off the shelf.

8          Workday, according to the allegations of the complaint, is

9     actively involved in screening applications.  Mr. Mobley, he

10    sets forth in a number of paragraphs, starting about 55, that

11    all his applications went to -- on the employer -- whatever,

12    regardless of the employer, it goes to myworkday.com.  Workday

13    is doing something -- we don't know what they're doing -- with

14    the applications.  And they're also making -- it's more than

15    culling applications.  They're also making recommendations

16    based on the résumés they're receiving, according to their

17    marketing materials.

18         And so the whole thing to offload this on the customers is

19    not -- is not the answer.  Mr. Mobley is entitled to bring a

20    claim against Workday and to test their model to see what the

21    data is being trained on, and so forth, and get a scheduling

22    order.

23         **THE COURT:**  Let me move to the fourth question.

24         Do the parties agree that a claim against a "agent" of an

25    employer would proceed under the "employer" prong of Title VII

and the ADA, rather than the "employment agency" prong?  And accordingly, do the parties agree that a disparate impact claim would be available against such an "agent"?

I know that Workday's view, as counsel has explained, is that the agency prong doesn't apply at all and, also, that the agency prong doesn't create liability for the agent, only for the employer.

But assume that I found the other way on those issues and I did conclude that the parties -- or that -- and I did conclude that Mobley had stated a claim against Workday as an agent.  Would that mean that the disparate impact claim would be available against Workday?

**MS. CONNELL:**  No, Your Honor.

So, first, just to back up.  I think this question is meant to refer to Title VII and the ADEA.

**THE COURT:**  Oh, yes.  Thanks for catching that typo.

**MS. CONNELL:**  But I will say this.  So the -- you know, we agree -- I mean, the reference to the word "agent" is in the employer prong, and so I'm not going to repeat the arguments as to why you shouldn't go with that interpretation.

But we are not aware of any case that has found a disparate impact claim against a third-party agent.  And, in fact, if you look at the language of the ADA, which was enacted much later than Title VII and the ADEA -- it was enacted in 1990 so almost 30 years later -- there, you can see that

1    Congress knows how to authorize a disparate impact claim

2    against an employment agency.

3        The ADA doesn't have the employer prong and the employment

4    agency prong.  In the "Definitions" section, it just says

5    "Covered Entities," and then it lists "Employer" and it lists

6    "Employment Agency."

7        And then under the "Discrimination" section, it says

8    prohibited acts of discrimination for covered entities

9    includes, and then it outlines a number of things, including a

10   disparate impact claim.

11       So Congress knows how to authorize a disparate impact

12   claim against third-party agents.  It did not do that with

13   Title VII or the ADEA; and so we're not aware of any case that

14   has found disparate impact liability, even under a *Raines*-type

15   interpretation of Title VII.

16       The other important point that I want to --

17       **THE COURT:**  Let me ask.  Do you know of cases that

18   reject disparate impact liability for agents, or are you just

19   saying it hasn't come up?

20       **MS. CONNELL:**  As far as we're aware, it has not come

21   up, except in the employment agency context, and we cited those

22   cases at the last hearing.

23       But I do want to make a very important point as to the

24   ADEA, because the ADEA, unlike Title VII, does not recognize a

25   disparate impact claim for applicants as opposed to employees,

even against employers.  So the ADEA is different than
Title VII in that regard.

And there are two *en banc* circuit court decisions that
make this clear.  The first is *Kleber vs. CareFusion
Corporation*, 914 F.3d 480.  It's a Seventh Circuit decision
from 2019.  And the second is *Villarreal vs. R.J. Reynolds
Tobacco Company*, 839 F.3d 958, from the Eleventh Circuit in
2016.

So even if Your Honor were inclined to apply *Raines* and
were further inclined to say that third-party business entity
agents are subject to liability under the employer prong and,
therefore, are also subject to disparate impact claims under
Title VII, there still would be no disparate impact claim
available here under the ADEA because the ADEA does not
recognize disparate impact claims for applicants.

**THE COURT:**  Is this argument in your briefing?

**MS. CONNELL:**  It was in our briefing.  It was
referenced in the briefing on the first motion.

But because this hypothetical raises new -- you know, new
facts that weren't at issue in our briefing, our argument in
our briefing is that the -- you know, we didn't get to this
issue, if you will, because our argument is that employment
agencies aren't liable to disparate impact claims.  And so the
issue of whether a disparate impact claim for applicants under
the ADEA is available to employers wasn't an issue that came up

 1  in the briefing.

 2      But we do reference these cases and this argument in our

 3  initial motion to dismiss, I believe in a footnote, because it

 4  wasn't -- it just wasn't on all fours in terms of the arguments

 5  that we are making because it's not alleged here that Workday

 6  is an employer.

 7      **THE COURT:**  I'll give plaintiff an opportunity to

 8  respond.

 9      **MR. WINSTON:**  Workday meets the statutory definition

10  of an employer.  It has the requisite number of employees, and

11  it's engaged in industry affecting commerce.  And Title VII is

12  clear, it applies to any agent.  So we don't think that,

13  because they sell software that we allege is engaging in HR

14  functions, that they're entitled to a Title VII exemption which

15  does not appear in the statute, and that's what they're

16  seeking.

17      And Mr. Mobley should be able to go forward with his case

18  and have a scheduling order entered in the case.

19      **THE COURT:**  Do you have a response on the issue of the

20  ADA and -- ADEA and applicants?

21      **MR. WINSTON:**  The cases she described are out of

22  circuit.  They're correct; it wasn't as part of this motion, as

23  part of this briefing.

24      We think that the ADA does apply, but we would have to go

25  back to do some more briefing on it.

1          **THE COURT:**  That exhausts the questions that I had for

2     the parties.  I'm open to hearing more from either side if

3     there's anything else you want me to know before I take the

4     motion under submission.

5          Since it's Workday's motion, I'll give you the first

6     opportunity, and then I can hear from the plaintiff too.

7          **MS. CONNELL:**  Sure, Your Honor.

8          I did want to just emphasize the arguments that we make as

9     to the merits of the claims, you know, as to both the disparate

10    treatment and the disparate impact claim, as well as the aiding

11    and abetting claim.

12         In Your Honor's March 12, 2024, order granting Workday's

13    first motion to dismiss on the disparate treatment claims, on

14    the intent requirement, Your Honor noted that plaintiff had not

15    pled sufficient facts to give rise to an inference that Workday

16    intended to discriminate because plaintiff did not allege that

17    he disclosed any of his protected traits to Workday or that

18    Workday otherwise knew of his protected traits.  And Your Honor

19    further noted that plaintiff did not plausibly allege that he

20    was qualified for the jobs to which he has applied.  The only

21    thing that he alleges was his education.

22         The amended complaint that plaintiff has submitted here

23    does not address those shortcomings.  He has still not alleged

24    that -- well, I want to actually start with the qualifications

25    because I think that's the more important point.

1    Here, he alleges that he applied for 100 roles, but he

2    only names 11 of them, and the only thing he does for those 11

3    is he says the title of the job.  He doesn't -- and he does

4    allege more facts about his qualifications, but he says nothing

5    to tie his qualifications to the qualifications of those jobs.

6    And Your Honor's order made clear that he has to do exactly

7    that, and the case law makes clear that he has to do exactly

8    that.

9    A case that we cited last time, *Ali vs. ServiceNow*, 2019

10   Westlaw 11542365, from the Northern District of California,

11   September 23rd, 2019, there, the intentional discrimination

12   claim was dismissed because the plaintiff did exactly what

13   Mr. Mobley is doing here.  He alleged some of his

14   qualifications, but he didn't tie them to the jobs that are at

15   issue.  I have additional cases that I can cite that stand for

16   this same proposition.

17   And the larger problem is that he's only -- so for the

18   jobs that he's named, 10 out of -- or 11 -- excuse me -- out of

19   a hundred, all he's done is give the title.  But the vast

20   majority of them, he doesn't even say what the jobs are.  So if

21   he hasn't pled facts to plausibly show that he was qualified

22   for these roles, there's no discrimination.  That's not a

23   plausible discrimination claim.  There's no inference of

24   discriminatory intent.  There's no inference of causation.

25   It's just as likely that he was not hired because he's not

qualified than because of some kind of unlawful conduct by
Workday or by the employer or by anyone.

THE COURT: Doesn't he allege that -- I know it's in a
sort of conclusory fashion, but he says that "I applied for
these jobs" -- which sound like jobs in his field -- and then
he says, "I met the qualifications that were listed on those
jobs." And then he lays out in pretty extensive detail what
his particular qualifications are, which he has a lot of
qualifications in the field that he works in. Why isn't that
enough for the pleading plausibility standard? It's certainly
enough for notice pleading. So we're really talking about
*Iqbal/Twombly* and plausibility.

MS. CONNELL: Correct. So at paragraph 89, he alleges
that he applied to unnamed jobs at unnamed organizations,
quote, "that span numerous industry categories, including
professional and business services, financial services,
healthcare, education, insurance, government, technology,
media, retail, and hospitality."

I mean, that's basically all of corporate America. So
it's very hard to plausibly believe that he was qualified for
all of those jobs, unnamed jobs across just about every
industry that you can think of.

It can't be the case that in a case involving one job,
that the plaintiff has to plead more facts than in a case like
here, where he didn't -- he's going to go out and try and seek

 1  discovery as to these 80 to 100 jobs, but he has not pled any

 2  facts showing that he is qualified for them.  And just

 3  conclusory -- just making the conclusory assertion "Well, I was

 4  qualified for them" is insufficient under the law.

 5       Another case that stands for that is *Wassmann vs. City*

 6  *of Dana Point*, 2018 Westlaw 596346, from the Central District

 7  of California on July 2nd, 2018.  And another case,

 8  *Whitsitt vs. Ramball*, 2013 Westlaw 140114, from the Eastern

 9  District of California, January 10th, 2013.  Those cases make

10  very clear that you can't do what Mr. Mobley has done here.

11  You need to plead your qualifications; you need to plead the

12  requirements for the job; and then you need to articulate some

13  plausible theory as to why you are qualified.

14       You can't just put your qualifications and say, "I applied

15  to a hundred jobs in all of these industries all across America

16  and I was qualified for them but I was rejected."  The case law

17  makes clear that that's insufficient.  And so for his

18  disparate -- that would cover all of his disparate treatment

19  claims.

20       He also still has not plausibly alleged that Workday, the

21  entity, knew of his protected traits; and he hasn't plausibly

22  alleged, as we argue in our papers, that Workday had any

23  intention to discriminate against him based on those traits.

24  He also hasn't plausibly alleged causation.  And this goes to

25  both his disparate treatment claim and his disparate impact

1  claim.

2      What he articulates in his papers is this inexorable zero

3  theory.  He claims that he applied to a hundred jobs; he was

4  applied to none of them -- he was hired into none of them; and

5  therefore, the Court can infer intent.

6      That's not what the inexorable zero theory of inference

7  is.  What that theory comes from is the United States

8  Supreme Court in *Teamsters*, where you had a situation where the

9  employer employs zero minorities and zero women.  It's a

10  segregated workforce.  But the evidence further shows that

11  there are plenty of qualified women and qualified minorities in

12  the applicant pool or in the labor pool but the employer has

13  hired none of them.

14      The logic behind that inference doesn't apply when you

15  have a single person who's applying to jobs all across America

16  in every industry imaginable and isn't hired into any of them,

17  particularly where he doesn't also plead that he's qualified

18  for those jobs.  You just -- you can't infer intent in those

19  circumstances, and that's his only -- or causation, and that's

20  his -- plaintiff's only argument as to causation.

21      On the disparate impact claim, he also still willfully

22  fails to identify a single employment practice that was applied

23  by all of these employers, 10,000 employers who use Workday, he

24  says in his compliant, in the same way.  That's the requirement

25  under disparate impact.

1        Instead, he makes a variety of allegations about various

2    tools, various tests, sometimes a personality test, sometimes

3    pymetrics, but not always; and he doesn't explain how it's a

4    neutral practice that's been applied.  His only answer to that

5    is to say -- in his opposition, he says that the employment

6    practice that Workday engaged in is, quote -- this is at

7    page 23 of his opposition -- it was (as read):

8            "Workday's decision to market, sell, and employ

9        algorithmic decision-making tools, instead of human

10       judgment, to decide who gets a job."

11       But that, on its face -- first of all, it's not in the

12    complaint.  But it's not an employment practice.  That's a

13    sales and marketing strategy.  It just proves Workday's point

14    that he hasn't identified a practice that can ground his

15    disparate impact claim.

16       He also has not pled a disparity.  He really doesn't even

17    try.  All he says is that "I applied and I was never hired."  I

18    mean, that's it.  Like, he needs to plead some kind of

19    disparity, some facts underlying a disparity in order to

20    sufficiently plead a disparate impact claim, and he has not

21    done that here.

22       And then, lastly, on the aiding and abetting claim, as we

23    articulate in our papers, he does not plead facts to meet the

24    standard to sustain this claim.  Setting aside the argument

25    that if Your Honor -- we think Your Honor could dismiss this on

1  jurisdictional grounds because if the federal claims go,

2  there's no supplemental jurisdiction for the state law claim.

3      But on the merits of it, he needs to either plead facts

4  indicating that Workday knew its customers were discriminating

5  and substantially assisted them in doing that; and here, all he

6  alleges -- he cites to paragraphs 38 and 39 of the complaint,

7  but all he alleges is that Workday had awareness of bias out

8  there in the world.  That's not the same thing as knowledge

9  that employers are discriminating and substantial assistance to

10  carry out their own discrimination.

11      And, again, as we argue in our papers, he also has not

12  pled independent discrimination by Workday.  So, you know, he

13  has not -- on the merits of his claims, setting aside the

14  coverage issues, but on the merits, he still does not plead

15  sufficient facts to sustain the claims that he's brought.

16      We also make an attack on the prayer for punitive damages

17  which rises and falls with the intentional discrimination

18  claims.  It should go for all of the reasons that the

19  intentional discrimination claims should go.

20          **THE COURT:**  Let me give plaintiff a final opportunity

21  to respond.

22          **MR. WINSTON:**  Say it again.

23          **THE COURT:**  Let me give plaintiff a final opportunity

24  to respond.

25          **MR. WINSTON:**  Thank you, Your Honor.

1          Workday, they screen the applicants; they reject

2    applicants; they make recommendations for the applicants.

3          When my -- when -- Workday now, at the end, they want to

4    dispute his allegations as he's not qualified.  That's stuff

5    they can test in deposition.  Under the *McDonnell-Douglas* test,

6    if the person is qualified or not, that's something for

7    discovery.

8          Mobley has allegations that he's been to -- you know, he's

9    graduated from college; that he's qualified.  He's looked at

10   these job openings.  He sees what the knowledge, skills, and

11   what the job requirements are.  He has them.  He submits

12   applications.

13         From what I'm hearing today, it doesn't matter what

14   Mr. Mobley says.  They say there's no coverage.  He could tell

15   you each person he talked to.  They would say:  Sorry.  There's

16   no Title VII coverage because we're entitled to an exemption

17   because Title VII doesn't mention -- doesn't cover software

18   vendors.

19         The types of disputes that they have now are really stuff

20   for summary judgment and evidentiary hearings.  Under

21   *Iqbal/Twombly*, it's plausibility, not probability.  And we

22   would ask that the Court apply that decision.  Workday is

23   the -- they're serving in the gatekeeper function.

24         With regards to the disparate impact claim is not enough

25   to point to algorithmic tools as being the source of the

1    discrimination, in the Northern District of Illinois, Judge --

2    they recently found back in September that the *State Farm*

3    decision in that case to automate claims processing was enough.

4    The use of automation in the claims processing procedure was

5    found enough to sustain and have a motion to dismiss be denied.

6        We don't know what their algorithm trains the data on.  To

7    the extent we think the algorithm trains the data on the past

8    workforce, if the workforce becomes more diverse and their

9    software is backward looking, we don't know.  Does it really

10   reflect the people that are seeking the app- -- that are

11   seeking jobs?  That's stuff that they have to -- you know, that

12   will come out in discovery.  What is their data training on?

13   Why is this individual being rejected time and time again?

14        **THE COURT:**  Do you have a cite for this Northern

15   District case that you're talking about?

16        **MR. WINSTON:**  Yes.  It's in our papers.  She just

17   mentioned it.  Page 23, *Husky vs. State Farm*, 223 WL 5848164

18   at 8.  The plaintiffs point to a specific policy, State Farm's

19   decision to automate claims processing.

20        (As read):

21            "Plaintiffs need not pin down the policy with

22        greater precision at this stage."

23        **THE COURT:**  Thank you.  Argument was very helpful for

24   the Court.

25        I'm going to take the motion under submission and issue a

1    written order.

2            **MS. CONNELL:**  Thank you, Your Honor.

3            **MR. WINSTON:**  Thank you.

4            **THE CLERK:**  Court is in recess.

5                (Proceedings adjourned at 11:01 a.m.)

6                        ---o0o---

7

8                **<u>CERTIFICATE OF REPORTER</u>**

9            I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:  Saturday, May 18, 2024

13

14

15

16   _____

17            Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
           CSR No. 7445, Official United States Reporter

18

19

20

21

22

23

24

25