UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK MOBLEY,<br><br>            Plaintiff,<br><br>    v.<br><br>WORKDAY, INC.,<br><br>            Defendant. | Case No.  23-cv-00770-RFL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 50 |

Derek Mobley brings this action for employment discrimination against Workday, Inc., alleging that Workday's algorithm-based applicant screening tools discriminated against him and other similarly situated job applicants on the basis of race, age, and disability. Workday's motion to dismiss the initial complaint was granted with leave to amend, and Workday now moves to dismiss the First Amended Complaint ("FAC") for failure to state a claim. The motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

I.    THE FIRST AMENDED COMPLAINT'S ALLEGATIONS

   A.    Workday's Products and Services

Workday allegedly provides "human resource management services," including applicant screening services, on a subscription basis to businesses spanning numerous different industries. (Dkt. No. 47 ("FAC") at 2, ¶¶ 89–90.)[1] In particular, Workday provides its customers with a platform on the customer's website to collect, process, and screen job applications. (*See id.* at 2, ¶¶ 49–55.) Workday's website states that it can "reduce time to hire by automatically dispositioning or moving candidates forward in the recruiting process." (*Id.* ¶ 94.) Workday

---

[1] Citations to page numbers refer to the ECF pagination.

1

allegedly "embeds artificial intelligence ('AI') and machine learning ('ML') into its algorithmic decision-making tools, enabling these applications to make hiring decisions." (*Id.* ¶ 99.) In addition, Workday's applicant screening tools allegedly integrate "pymetrics" that "use neuroscience data and AI," in combination with existing employee referrals and recommendations. (*Id.* ¶¶ 100–01.) According to Mobley, these tools "determine whether an employer should accept or reject an application" and are designed in a manner that reflects employer biases and relies on biased training data. (*Id.* ¶¶ 28, 38–48, 102–03.) An applicant can advance in the hiring process only if they get past Workday's screening algorithms. (*Id.* ¶ 98.)

    **B.**  **Mobley's Qualifications and Experience with Workday**

  Mobley is an African American male over the age of forty with a bachelor's degree in finance from Morehouse College—an all-male Historically Black College and University ("HBCU"). (FAC ¶¶ 4, 19–23.) He is also an honors graduate of ITT Technical Institute and Server+ certified. (*Id.* ¶ 24.) Mobley suffers from anxiety and depression. (*Id.* ¶¶ 4, 19.) Since 2010, he has worked in various financial, IT help-desk, and customer-service oriented jobs. (*Id.* ¶¶ 25–26.) For example, Mobley has experience as an Advanced Solutions Engineer with Hewlett Packard Enterprise, a Customer Service Representative with the Internal Revenue Service, and a Support Specialist, Level 1A Manager with AT&T Digital Life. (*Id.* ¶ 26.)

  Mobley has allegedly applied to over 100 positions with companies that use Workday's screening tools for talent acquisition and hiring since 2017. (*Id.* ¶ 49.) Mobley's application process generally proceeded as follows: Mobley would see a job posting on a third-party website (*e.g.*, LinkedIn), and clicking on the job link redirected him to the Workday platform on the employer's website. (*Id.* ¶¶ 51–53.) The Workday platform then prompted Mobley to create a username and password to access the employment opportunity, after which he either uploaded his resume or entered his information manually. (*Id.* ¶¶ 54–55.) Mobley's resume includes his graduation from Morehouse in 1995 and his employment history. (*Id.* ¶ 55.)

  Numerous positions also required him to take a Workday-branded assessment and/or personality test. (*Id.* ¶¶ 56, 72–73.) Mobley alleges that these assessments and personality tests

2

are likely to reveal mental health disorders or cognitive impairments, and that those like Mobley who suffer from depression and anxiety are likely to perform worse on these assessments and be screened out. (*Id.* ¶¶ 56–60.) Workday's screening tools then allegedly use the information from those tests and assessments to evaluate an applicant's qualifications and recommend whether the applicant should be accepted or rejected. (*Id.* ¶ 8.)

Despite his qualifications, Mobley was allegedly denied employment for every one of the 100-plus applications that he submitted to companies using Workday's platform. (*Id.* ¶ 49.) For example, when Mobley was working for Hewlett Packard on a contract basis, he applied via hpe@myworkday.com for a Service Solutions Technical Consultant position, the qualifications for which allegedly mirrored those for the role he was already in. (*Id.* ¶¶ 61–62.) His application was rejected the next month. (*Id.* ¶ 62.) On another occasion, Mobley applied for a Customer Services Specialist position with Unum via unum@myworkday.com at 12:55 a.m., but his application was rejected less than an hour later. (*Id.* ¶¶ 84–85.) Other applications for customer service roles submitted through Workday were also rejected. (*See, e.g., id.* ¶¶ 72–74, 80–81, 86–87.) For the positions to which he applied, Mobley alleges that he met their experiential and educational requirements. (*Id.* ¶¶ 66–88.)

C.  **Claims Asserted**

Mobley alleges that Workday's algorithmic decision-making tools discriminate against job applicants who are African American, over the age of forty, and/or disabled. (FAC at 1–2, ¶ 8.) He asserts federal law claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. § 12101 *et seq.*, for intentional discrimination on the basis of race and age and disparate impact discrimination on the basis of race, age, and disability. He also asserts a claim for aiding and abetting race, disability, and age discrimination under California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(i).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013)).

The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

In employment discrimination cases, the complaint "need not plead a prima facie case of discrimination." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002).  "[H]eightened fact pleading of specifics" is not required, but the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

III.   DISCUSSION

   A.   **Theories of Liability for Title VII, ADEA, and ADA Claims**

As relevant here, Title VII, the ADEA, and the ADA prohibit discrimination by an "employer" or "employment agency." 42 U.S.C. §§ 2000e-2, 12111, 12112; 29 U.S.C. § 623. In addition, as further detailed below, indirect employers and agents of employers qualify as "employers" under those statutes and the case law interpreting them. Mobley alleges that Workday is liable for employment discrimination on three theories: as an (1) employment agency, (2) agent of employers, and (3) indirect employer. Workday contends that, as a software vendor, it is not a covered entity under these statutes and moves to dismiss the federal claims against it. The motion to dismiss the federal claims is denied, as the FAC plausibly alleges Workday's liability on an agency theory.

   1.   **Agency**

      a.   **Agents' Liability for Discrimination**

The anti-discrimination laws under which Mobley has sued all prohibit discrimination not just by employers themselves but also by agents of those employers. Title VII, the ADA, and the ADEA all define the term "employer" to include "any agent of" an employer. 42 U.S.C. §§ 2000e(b), 12111(5)(A); 29 U.S.C. § 630(b). Employers cannot escape liability for discrimination by delegating their traditional functions, like hiring, to a third party. *See City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 718 n.33 (1978) ("We do not suggest, of course, that an employer can avoid his responsibilities by delegating discriminatory programs to corporate shells. Title VII applies to 'any agent' of a covered employer." (quoting 42 U.S.C. § 2000e(b))). Accordingly, federal appellate courts outside of the Ninth Circuit have held that an employer's agent may be independently liable when the employer has delegated to the agent "functions [that] are traditionally exercised by an employer." *Williams v. City of Montgomery*, 742 F.2d 586, 589 (11th Cir. 1984) (per curiam). "Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship." *Id.* (citation omitted);

5

*see also Spirt v. Tchrs. Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir. 1982) (applying agency theory to hold that "delegation of responsibility for employee benefits [to a third-party administrator] cannot insulate a discriminatory plan from attack under Title VII"); *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 17–18 (1st Cir. 1994) (same).

Workday argues that the Ninth Circuit has rejected this concept of agency liability under the federal anti-discrimination statutes altogether, citing to *Miller v. Maxwell's International Inc.*, 991 F.2d 583 (9th Cir. 1993). (Dkt. No. 76 ("Hearing Tr.") at 15:22–16:4, 19:4–20:9.) According to Workday, the term "agent" in the anti-discrimination statutes establishes only *employers'* liability for the acts of their agents and does not allow *agents* to be separately held liable for functions performed on behalf of employers. Workday further asserts that recognizing any form of agency liability would render the term "employment agency" superfluous.

These arguments were raised for the first time at oral argument. In its briefing, Workday had not contested that agents of employers could be held liable when the employer delegates traditional employment functions to them, but only whether Mobley had sufficiently pleaded facts to establish that the theory applied. (Dkt. No. 50 ("Mot.") at 15; Dkt. No. 61 at 12.) As such, those arguments are waived. *See Booth v. United States*, 914 F.3d 1199, 1206 (9th Cir. 2019) (declining to consider argument raised for the first time during oral argument).

Even if the Court were to consider the arguments, Workday's position is contrary to the plain language of the federal anti-discrimination statutes and unsupported by the holding of *Miller*. Title VII, the ADA, and the ADEA define the term "employer" as "a person engaged in an industry affecting commerce" who has at least fifteen employees (or twenty for the ADEA) for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and "any agent" of such a person. 42 U.S.C. §§ 2000e, 12111(5)(A); 29 U.S.C. § 630(b). The statutes then prohibit "employers" (or, in the case of the ADA, any "covered entity," which is defined to include employers) from engaging in certain acts of discrimination. 42 U.S.C. §§ 2000e-2(a), 12111(2), 12112(a); 29 U.S.C. § 623(a). Accordingly, by their plain

6

language, the statutes make it unlawful for "any agent" of an employer to engage in those practices.

The statutory provisions imposing liability on agents do not render the separate provisions about employment agencies superfluous. *See, e.g.*, 42 U.S.C. § 2000e(c). Workday's argument appears to construe the term "employment agency" as synonymous with being an agent of an employer. (Hearing Tr. at 19:17–20:6.) But employment agencies, as defined by the anti-discrimination statutes, carry out different functions than employers and their agents do. Employment agencies "procure employees for an employer," meaning they find candidates for an employer's positions; they do not actually employ those employees. *See, e.g.*, 42 U.S.C. § 2000e(c); *see also Greenfield v. Field Enters., Inc.*, No. 71 C 2075, 1972 WL 155, at *4 (N.D. Ill. Feb. 1, 1972) (defining procure to mean to "find[] workers" for an employer). As such, employment agencies face a different set of restrictions than employers: employment agencies are liable when they "fail or refuse to refer" individuals for consideration by employers on prohibited bases, but they are not subject to the prohibitions applicable to employers in carrying out their traditional functions, such as hiring, discharging, compensating, or promoting employees. 42 U.S.C. § 2000e-2(b). Liability as an employment agency and liability as the agent of an employer are thus not coextensive. An entity that is liable as an employment agency is not necessarily liable as an agent of an employer or vice versa. Indeed, that is the situation here. As explained below, Mobley has not sufficiently alleged that Workday finds employees for employers to render it liable as an employment agency, but Workday may be liable on an agency theory because the FAC plausibly alleges that Workday's customers delegated their traditional function of rejecting candidates or advancing them to the interview stage to Workday. Therefore, even where the term "agent" in the anti-discrimination statutes' definitions of "employer" is construed to allow third-party liability, the term "employment agency" maintains its distinct meaning.

*Miller* does not foreclose agency liability either. There, the Ninth Circuit held that individual supervisors were not liable under Title VII and the ADEA as agents of employers.

7

*Miller*, 991 F.2d at 587. Noting that those statutes apply only to larger employers, the court reasoned that "[i]f Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees." *Id.* Moreover, the court concluded that there was no need to separately hold individual supervisors liable where the employer was already subject to liability, due to the high level of control employers have over their employees. "No employer will allow supervisory or other personnel to violate Title VII when the employer is liable for the Title VII violation. An employer that has incurred civil damages because one of its employees believes he can violate Title VII with impunity will quickly correct that employee's erroneous belief." *Id.* at 588.

      The Ninth Circuit did not address the question of liability of third-party agents of employers, and neither of the rationales concerning individual supervisors applies to third-party agents like Workday. Workday is not an "individual employee[]" with "limited resources." *Id.* at 587. Nor are Workday and its algorithmic decision-making tools alleged to be under the tight control of its customers, such that imposing liability on Workday would be redundant of imposing liability on its customers. Indeed, at oral argument, the Court asked Workday to address a hypothetical in which a software vendor intentionally provides employers with a tool that the vendor knows, but the employers do not, automatically screens out all applicants who previously attended historically black colleges when recommending candidates to be considered for interviews. Workday's counsel acknowledged that the employer would have to know what was happening for a claim of intentional discrimination to be viable. (Hearing Tr. at 9:3–4.) Without agency liability, it appears that no party would be liable for intentional discrimination in that scenario.

      This is the very gap that the agency theory is intended to address. Accepting Workday's argument, and consequently ignoring this gap, would allow companies to escape liability for hiring decisions by saying that function has been handed over to someone else (or here, artificial intelligence). Such an outcome cuts against the well-recognized directive that courts are to construe remedial statutes such as Title VII, the ADEA, and the ADA broadly to effectuate their

8

purposes.  *See Moyo v. Gomez*, 32 F.3d 1382, 1386 (9th Cir. 1994).  Furthermore, there is no need to wait for a legislative fix, as Workday contends, because Congress anticipated this issue and crafted a solution by including the term "agent" in the definition of employer, and by including that separately from the term "employment agency."

Accordingly, under the plain language of the anti-discrimination statutes, as well as the case law interpreting their purpose and structure, a third-party agent may be liable as an employer where the agent has been delegated functions traditionally exercised by an employer.

### b. Allegations that Workday Acted as an Agent

The FAC plausibly alleges that Workday's customers delegate traditional hiring functions, including rejecting applicants, to the algorithmic decision-making tools provided by Workday.  According to the FAC, Workday's software is not simply implementing in a rote way the criteria that employers set forth, but is instead participating in the decision-making process by recommending some candidates to move forward and rejecting others.  Workday allegedly embeds artificial intelligence and machine learning into its algorithmic decision-making tools to "make hiring decisions," and its software can "automatically disposition[] or mov[e] candidates forward in the recruiting process."  (FAC ¶¶ 94, 99.)  This is illustrated by the rejection emails Mobley allegedly received in the middle of the night, giving rise to a plausible inference that the decision was automated.  (*Id.* ¶¶ 77, 85.)

Evaluating and dispositioning candidates are at the core of the traditional employment functions that the anti-discrimination laws seek to address.  In listing unlawful conduct, Title VII and the ADEA both provide that employers may not "refuse to hire" employees on prohibited grounds such as race, disability, or age.  42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1).  Similarly, the ADA prohibits employers from discriminating against a qualified individual on the basis of disability "in regard to job application procedures" and "the hiring" of employees.  42 U.S.C. § 12112(a).  Given Workday's allegedly crucial role in deciding which applicants can get their "foot in the door" for an interview, Workday's tools are engaged in conduct that is at the heart of equal access to employment opportunities.

Moreover, Workday's role in the hiring process is no less significant because it allegedly happens through artificial intelligence rather than a live human being who is sitting in an office going through resumes manually to decide which to reject. Nothing in the language of the federal anti-discrimination statutes or the case law interpreting those statutes distinguishes between delegating functions to an automated agent versus a live human one. To the contrary, courts applying the agency exception have uniformly focused on the "function" that the principal has delegated to the agent, not the manner in which the agent carries out the delegated function. *See Williams*, 742 F.2d at 589.

For example, in *Spirt*, a third-party benefits administrator allegedly calculated retirement benefits based on mortality tables that systematically led to higher payments to male employees. 691 F.2d at 1056. In analyzing whether the administrator could be liable under an agency theory, the Second Circuit did not address how the administrator performed its responsibility, such as whether it used an automated tool or whether the personnel calculating the payments did so from within the administrator's offices rather than the employer's. Instead, the focus was solely on the nature of the function delegated. The third-party administrator was liable as an agent under Title VII because the employer had delegated its "responsibility for employee benefits" to the administrator. *Id*. at 1063.

Drawing an artificial distinction between software decisionmakers and human decisionmakers would potentially gut anti-discrimination laws in the modern era. By Workday's argument, the administrator in *Spirt* could escape liability if it had simply sold the employer an automated system designed to pay women lower retirement benefits instead of running the calculations itself manually. Indeed, if the Court were to draw the distinction invited by Workday, employers could delegate hiring, firing, promotion, compensation, benefits, and myriad other employment decisions to third-party algorithmic decision-making tools. Although outside human decisionmakers would be required to comply with anti-discrimination laws under the agency liability doctrine, outside software tools created by those same humans would not. Employers could thus "delegat[e] discriminatory programs" to third-party software tools, with

job applicants and employees having little recourse to challenge such discrimination. *See Manhart*, 435 U.S. at 718 n.33. Nothing in the text of the anti-discrimination statutes or the case law interpreting them supports that startling result.

Of course, many software vendors do not qualify as agents because they have not been delegated responsibility over traditional employment functions. For example, if an employer used a spreadsheet software program to sort workers by birthdate and then filtered out all applicants over the age of forty from consideration, the software vendor would not have acted as the employer's agent for purposes of the anti-discrimination statutes, because the spreadsheet is not participating in the determination of which employees to hire. Likewise, if an employer informed applicants via email that they had been rejected, the email provider would not be an agent for anti-discrimination purposes because the email program is not participating in deciding who to refuse to hire. By contrast, Workday does qualify as an agent because its tools are alleged to perform a traditional hiring function of rejecting candidates at the screening stage and recommending who to advance to subsequent stages, through the use of artificial intelligence and machine learning.

In sum, the FAC adequately alleges that Workday is an agent of its client-employers, and thus falls within the definition of an "employer" for purposes of Title VII, the ADEA, and the ADA. Because the Court concludes that Workday is an "employer" based on an agency theory, this Order does not reach Mobley's alternative argument that Workday is an "employer" under an indirect employer theory. *See Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 932 (9th Cir. 2003) ("*Sibley* [*Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973),] and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer and where the indirect employer had some peculiar control over the employee's relationship with the direct employer."). The motion to dismiss the federal discrimination claims is therefore denied to the extent those claims are based on Workday's liability as an employer.

### 2. Employment Agency

To the extent that Mobley seeks to hold Workday liable for violating the employment agency provisions of Title VII, the ADEA, and the ADA, the motion to dismiss is granted. The FAC does not plausibly allege that Workday is an employment agency within the meaning of those statutes. Title VII and the ADA both define an "employment agency" as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person." 42 U.S.C. §§ 12111(7), 2000e(c). The ADEA similarly defines the term to cover "any person regularly undertaking with or without compensation to procure employees for an employer and includes an agent of such a person." 29 U.S.C. § 630(c).

Mobley does not allege that Workday procures job opportunities for employees. There are no allegations in the FAC that Workday brings job listings to the attention of those looking for employment. Indeed, the FAC indicates the opposite: Mobley allegedly finds job postings on his own, and his interaction with Workday does not begin until after he has decided to apply to a particular opportunity. (FAC ¶¶ 51–52.) Thus, the primary issue is whether Mobley sufficiently alleges that Workday procures employees for employers. He has not done so.

"[T]he statutory requirement that an employment agency be one that 'regularly' undertakes to procure employees . . . indicates that the Congress had in mind to include only those engaged to a significant degree in that kind of activity as their profession or business." *Brush v. S.F. Newspaper Printing Co.*, 315 F. Supp. 577, 580 (N.D. Cal. 1970). The thrust of the FAC is that Workday allegedly *screens* applicants using allegedly discriminatory algorithmic tools. This is not sufficient to allege that Workday "procures" employees, *i.e.*, finds candidates for employers. *See Greenfield*, 1972 WL 155, at *4 (defining procure to mean to "find[] workers" for an employer); *Whitsitt v. Hedy Holmes Staffing Servs.*, No. 2:13-CV-0117, 2014 WL 5019667, at *4 (E.D. Cal. Oct. 7, 2014) (reasoning that "screening" a candidate for employment did not necessarily make an entity an employment agency), *report and recommendation adopted*, No. 2:13-CV-0117, 2014 WL 6901868 (E.D. Cal. Dec. 5, 2014). As

noted above, Mobley alleges that he found employment opportunities on his own. There are no factual allegations supporting that Workday recruits or solicits candidates. The FAC's allegation that "Workday's systems source candidates" is conclusory. (FAC ¶ 95.)

Therefore, the motion to dismiss the Title VII, ADEA, and ADA claims based on an employment agency theory is granted. Dismissal is without leave to amend. Mobley was already granted leave to amend once to add factual allegations to support his claims, and further leave to amend would be futile.[2]

### B. Disparate Impact Claims

Workday's motion to dismiss Mobley's disparate impact discrimination claims is denied. "To plead a prima facie case of disparate impact, a plaintiff must (1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact." *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023) (citation and internal quotation marks omitted). "At the pleading stage, the complaint need only allege facts giving rise to plausible inferences that the disparity exists and is caused by the identified practice." *Liu v. Uber Techs. Inc.*, 551 F. Supp. 3d 988, 990 (N.D. Cal. 2021) (citing *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1224 (9th Cir. 2021)). Workday challenges the sufficiency of the FAC's allegations as to disparity, specific employment practice, and causation. All elements are adequately alleged.

#### 1. Specific Employment Practice

First, the FAC pleads a specific employment practice: Workday's use of algorithmic decision-making tools to screen applicants. (FAC ¶ 28.) The FAC alleges that these tools rely on biased training data and information obtained from pymetrics and personality tests, on which applicants with mental health and cognitive disorders perform more poorly. (*Id.* ¶¶ 38–39, 57–

---

[2] As the Title VII and ADA claims based on an employment agency theory are dismissed, the Court does not reach Workday's argument that those statutes do not authorize disparate impact claims against employment agencies. (*See* Mot. at 18 n.3.)

60, 100, 102.) Workday contends that Mobley does not allege a specific employment practice because, based on the FAC's allegations, the screening tools vary from employer to employer: "the recommendation algorithmic decision-making tool caters to the prejudicial preferences of the client-employer," and not all employers require the pymetrics and personality tests. (Mot. at 19 (citing FAC ¶¶ 39, 56).) Although there are allegedly variances in Workday's screening tools based on customer hiring preferences, the FAC plausibly alleges that there is a common component that discriminates against applicants based on a protected trait. This is supported by allegations that Mobley was rejected from over one hundred jobs that he was allegedly qualified for, across many different industries and employers. (*See* FAC ¶¶ 49, 61–89.)

### 2. Disparity

"[A]t the pleading stage, allegations of a disparity need not be so precise. For example, a plaintiff can survive a motion to dismiss by pointing to visually obvious inconsistencies between the racial composition of the defendant's employees and that of the surrounding population. A plaintiff may also draw on their own personal observations and experience, such as by alleging that they and their female colleagues received lower performance evaluations despite performing as well as or better than their male peers." *Liu*, 551 F. Supp. 3d at 991 (citations omitted).

Although the FAC does not allege who was hired instead of Mobley for any of the positions to which he applied, this is not fatal to Mobley's disparate treatment claims given the nature of Mobley's allegations. Unlike a typical employment discrimination case where the dispute centers on the plaintiff's application to a single job, Mobley has applied to and been rejected from over 100 jobs for which he was allegedly qualified. The common denominator for these positions is Workday, which provided the hiring companies with a platform for application intake and screening. In a traditional employment discrimination case, this data would be analogous to having over one hundred qualified applicants like Mobley—African American, over 40 years old, and suffering from depression and anxiety—all strike out for jobs with one

14

employer.³  *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 341–42 & n.23 (1977) (affirming a finding of racial disparity based on "glaring absence of minority line drivers" where "many line drivers continued to be hired throughout this period, and . . . almost all of them were white").  Indeed, Mobley's situation is even more compelling because he has struck out not just with one employer but with a whole range of employers across multiple industries that use Workday's platform, including for a job with a company that he was already doing, but as a contractor.  The zero percent success rate at passing Workday's initial screening, combined with the FAC's allegations regarding bias in Workday's training data and the tools' reliance on information from pymetrics and personality tests, plausibly supports an inference that Workday's algorithmic tools disproportionately reject applicants based on factors other than qualifications, such as a candidate's race, age, or disability.  At this stage, these allegations are sufficient to allege a disparate impact on applicants with Mobley's protected traits.

### 3. Causation

The FAC sufficiently alleges that the disparity is caused by Workday's algorithmic screening tools.  As noted above, Mobley was rejected at the screening stage from over 100 positions of a wide range and type, even though he was allegedly qualified for all of those jobs.  Mobley also allegedly received rejection emails at early hours in the morning, outside of regular business hours.  (*See, e.g.*, FAC ¶¶ 67, 77.)  On one occasion, Mobley received a rejection at 1:50 a.m., less than one hour after he had submitted his application.  (*Id.* ¶¶ 84–85.)  The sheer number of rejections and the timing of those decisions, coupled with the FAC's allegations that Workday's AI systems rely on biased training data (*id.* ¶¶ 38–40, 102–03), support a plausible inference that Workday's screening algorithms were automatically rejecting Mobley's applications based on a factor other than his qualifications, such as a protected trait.  *See U.S. Equal Emp. Opportunity Comm'n v. Marquez Bros. Int'l Inc.*, No. 1:17-CV-0044, 2017 WL

---

³ *Liu* is distinguishable on this basis, as the plaintiff in that case was essentially asking the court to infer a disparity based solely on his own termination.  551 F. Supp. 3d at 991 ("Ultimately, all that Liu has alleged so far is that he himself was terminated, and the Court cannot draw an inference of disparity from a single data point.").

4123915, at *7 (E.D. Cal. Sept. 18, 2017) (concluding that inference of discrimination against non-Hispanic applicants was sufficiently alleged based on individual anecdotal accounts of discrimination and the racial homogeneity of the defendant's workforce). Furthermore, the causation element is supported by the FAC's cites to academic and other literature about bias in data models and algorithms, as well as Amazon's since-abandoned attempt at using "a facially neutral hiring algorithm" that had a disparate impact on female candidates. (*See, e.g.*, FAC ¶¶ 30, 36, 42–48.) *See Liu*, 551 F. Supp. 3d at 991–92 ("[P]lausible allegations stemming from social science research on similar corporate practices can support an inference of causation.").

The motion to dismiss the disparate impact claims under Title VII, the ADEA, and the ADA is therefore denied.[4]

### C.     Intentional Discrimination Claims

Workday's motion to dismiss is granted as to Mobley's claims that Workday intentionally discriminated against him based on race and age. To state a claim for disparate treatment, a plaintiff must allege sufficient facts to show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Sheets v. City of Winslow*, 859 F. App'x 161, 162 (9th Cir. 2021) (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) ("Analysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title

---

[4] For the first time at the hearing on the motion to dismiss on May 14, 2024, Workday argued that the ADEA does not recognize a disparate impact claim for job applicants (as opposed to employees), relying on out-of-circuit authority. (Hearing Tr. at 29:23–30:15 (citing *Kleber v. CareFusion Corp.*, 914 F.3d 480 (7th Cir. 2019) (en banc); *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (11th Cir. 2016) (en banc)).) This argument was not discussed in the briefing and has been waived. *See Booth*, 914 F.3d at 1206. In any event, the Court concludes that job applicants may bring disparate impact claims under the ADEA for the reasons articulated in *Rabin v. PricewaterhouseCoopers LLP*, 236 F. Supp. 3d 1126 (N.D. Cal. 2017).

VII disparate treatment case."). Workday contests whether Mobley has sufficiently alleged that he was qualified for the jobs at issue and that circumstances surrounding his rejections give rise to an inference that Workday intended to discriminate based on protected traits. As explained below, although Mobley has adequately alleged his qualifications and disclosure of his protected traits, the FAC fails to allege specific facts from which the Court could plausibly conclude that Workday intended its screening tools to be discriminatory.

### 1. Qualifications

Mobley sufficiently alleges that he was qualified for the positions from which he was rejected. The FAC sets forth Mobley's various degrees and certifications and areas of experience, supported by his prior work experience. (FAC ¶¶ 20–27.) The FAC offers a sampling of some of the 100-plus jobs for which Mobley allegedly applied, stating the title of the position and the employing company. (*Id.* ¶¶ 61–87.) Those positions appear to be in industries Mobley allegedly had prior experience in and were similar to roles he formerly held. (*Compare, e.g., id.* ¶ 26 *with id.* ¶¶ 72, 80, 84.) For example, Mobley alleges that he applied for a position with Hewlett Packard whose qualifications mirrored the contractor role he was already in with the company. (*Id.* ¶¶ 61–62.) Taken all together, these allegations plausibly allege that Mobley was qualified for the roles to which he applied. The level of specificity requested by Workday is not required for notice pleading.

### 2. Disclosure of Protected Traits

Workday contends that the intentional discrimination claims must be dismissed because Mobley does not allege that he disclosed his protected traits when applying for the positions at issue. Drawing all reasonable inferences in Mobley's favor, the FAC plausibly alleges such disclosure. Mobley alleges that algorithmic decision-making tools, like Workday's, can discern an applicant's demographic information based on "other inputs that are correlated with race (or another protected classification), like zip code, college attended, and membership in certain groups." (FAC ¶ 34.) He further alleges that he provided information through Workday's branded platforms for each of its employer customers, including about his degree from a HBCU,

17

year of graduation in 1995, and extensive work history. Based on these allegations, the FAC sufficiently alleges facts from which the Court could plausibly infer that Workday's tools could perceive that Mobley was African American and over the age of forty.

### 3. Intent

Mobley has not adequately alleged that Workday intended its screening tools to be discriminatory. "Stating a claim for disparate treatment requires pleading facts giving rise to an inference that the employer *intended* to discriminate against the protected group." *Liu*, 551 F. Supp. 3d at 992; *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) ("[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age."). As explained above, the FAC plausibly alleges that Workday's screening tools have disparate impacts based on race, age, and disability. However, the FAC lacks allegations supporting that Workday intended this outcome. Mobley argues that "Workday is aware of the discriminatory effects of its applicant screening tools" (Dkt. No. 59 at 8), but the Ninth Circuit has held that "[i]t is insufficient for a plaintiff alleging discrimination under the disparate treatment theory to show that the employer was merely aware of the adverse consequences the policy would have on a protected group." *Liu v. Uber Techs., Inc.*, Nos. 22-16507, 22-16712, 2024 WL 3102801, at *4 (9th Cir. June 24, 2024) (quoting *Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012)).

Therefore, the motion to dismiss Mobley's intentional discrimination claims under Title VII, the ADEA, and Section 1981 is granted without leave to amend, as Mobley has already had an opportunity to add factual allegations to support his claims. If discovery reveals evidence of Workday's discriminatory intent, then Mobley may seek leave to add back his intentional discrimination claims.[5]

---

[5] The Court declines to consider Workday's motion to strike punitive damages, which is raised in a single sentence in a footnote. (Dkt. No. 50 at 18 n.2.) *See Cheever v. Huawei Device USA, Inc.*, No. 18-CV-06715-JST, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019) (treating argument raised solely in a footnote as waived).

18

### D.    FEHA Claim

Mobley claims that Workday aided and abetted its customers to engage in unlawful race, disability, and age discrimination in violation of California's Fair Employment and Housing Act. Cal. Gov't Code § 12940(i).  Under that statute, "[i]t is an unlawful employment practice . . . [f]or any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so."  *Id.*  FEHA does not define what it means to "aid" and "abet," so California courts apply "the common law definition of aiding and abetting."  *Fiol v. Doellstedt*, 58 Cal. Rptr. 2d 308, 312 (Ct. App. 1996).  Accordingly, to plead an aiding and abetting claim, a plaintiff must allege that (1) his employer subjected him to discrimination; (2) the alleged aider and abettor knew that the employer's conduct violated FEHA; and (3) the alleged aider and abettor gave the employer substantial assistance or encouragement to violate FEHA.  *Smith v. BP Lubricants USA Inc.*, 278 Cal. Rptr. 3d 587, 594 (Ct. App. 2021).

The FAC fails to state at least the first two elements.[6]  Mobley does not allege that any of the specific companies to which he applied discriminated against him, nor that Workday allegedly knew that the conduct of these employers was discriminatory.  The FAC's allegations all center on Workday's alleged conduct, *i.e.*, its use of algorithmic decision-making tools and pymetrics/personality tests that are allegedly biased—not the conduct of any direct employer.  Thus, it is unclear from the FAC how Workday allegedly aided and abetted another party's discrimination, as required to state a claim under Cal. Gov't Code § 12940(i).  *See Janken v. GM Hughes Elecs.*, 53 Cal. Rptr. 2d 741, 755 (Ct. App. 1996) ("Aiding and abetting occurs when one helps another commit a prohibited act.").  The motion to dismiss the FEHA claim is therefore granted with leave to amend.  Any amended FEHA claim based on the aider and abettor provision must identify the companies/employers that allegedly discriminated against Mobley, and allege specifically what the employers' discriminatory conduct was, how Workday knew of

---

[6] The Court's discussion of the FEHA claim assumes without deciding that Workday is an entity subject to liability under FEHA's aider and abettor provision.  *See Raines v. U.S. Healthworks Med. Grp.*, 534 P.3d 40, 54 (Cal. 2023).

the discriminatory conduct, and how Workday either assisted or encouraged the discriminatory conduct.

## IV. CONCLUSION

Based on the foregoing, Workday's motion to dismiss the First Amended Complaint is **GRANTED IN PART AND DENIED IN PART**.  Specifically, the motion to dismiss is **GRANTED WITHOUT LEAVE TO AMEND** as to the Title VII, ADEA, and ADA claims, to the extent they are based on an employment agency theory, and the intentional discrimination claims under Title VII, the ADEA, and Section 1981; **GRANTED WITH LEAVE TO AMEND** as to the FEHA claim; and otherwise **DENIED**.  If Mobley wishes to file a Second Amended Complaint correcting the deficiencies with the FEHA claim identified above, he shall do so within **21 days of this Order**.  Mobley may not add new claims or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.  If no such amended complaint is filed by that date, the claims that were dismissed in this Order will remain dismissed, and the case will proceed on the remaining claims only.

An initial case management conference is **SET** for **August 7, 2024, at 10:00 a.m.**, via videoconference.  The parties shall file a joint case management statement by **July 31, 2024**.

**IT IS SO ORDERED.**

Dated: July 12, 2024

RITA F. LIN
United States District Judge