JULIE A. TOTTEN (STATE BAR NO. 166470)
jatotten@orrick.com
ERIN M. CONNELL (STATE BAR NO. 223355)
econnell@orrick.com
KAYLA D. GRUNDY (STATE BAR NO. 300513)
kgrundy@orrick.com
LAUREN M. GOLDSMITH (STATE BAR NO. 293269)
lgoldsmith@orrick.com
ALEXANDRIA R. ELLIOTT (STATE BAR NO. 320293)
aelliott@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:      (415) 773-5759

Attorneys for Defendant
WORKDAY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK L. MOBLEY, for and on behalf of himself and other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WORKDAY, INC.,<br><br>Defendant. | Case No. 3:23-cv-00770-RFL<br><br>**DEFENDANT WORKDAY, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**<br><br>Date:          April 8, 2025<br>Time:          10:00 a.m.<br>Courtroom:   15, 18th Floor<br>Judge:         Hon. Rita F. Lin<br><br>Amended Complaint:  February 20, 2024 |

**TABLE OF CONTENTS**

Page

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF RELEVANT FACTS ................................................................... 2

        A.      Workday Recruiting ........................................................................................ 2

        B.      Relevant Procedural History ......................................................................... 4

        C.      Plaintiff's Motion for Conditional Certification and Proposed Collective ............ 5

        D.      Plaintiff and the Opt-In Plaintiffs ................................................................ 6

                1.      Plaintiff Derek Mobley ....................................................................... 6

                2.      Opt-In Plaintiff Jill Hughes ............................................................... 7

                3.      Opt-In Plaintiff Knight-Bell ............................................................. 7

                4.      Opt-In Plaintiff Richard Lieb ............................................................ 8

                5.      Opt-In Plaintiff Sheilah Johnson-Rocha .......................................... 9

III.    LEGAL STANDARD ................................................................................................. 9

IV.     ARGUMENT ............................................................................................................. 12

        A.      Putative Collective Members Are Dissimilar in Virtually All of the Ways
                That Matter to Their ADEA Claims. ........................................................... 12

                1.      The putative collective includes individuals who are plainly not
                        "similarly situated" to Plaintiff because they do not have Plaintiff's
                        ADEA claim. ....................................................................................... 13

                2.      Plaintiff has failed to show that even he and the opt-in plaintiffs are
                        similar in the ways that matter to their ADEA claims. ................... 15

                3.      Putative collective members are so dissimilar that trying their
                        claims together would be logistically impossible. .......................... 18

        B.      Plaintiff Does Not Allege a Single Decision, Policy, Or Plan That Could
                Justify Conditional Certification. ................................................................ 20

                1.      Plaintiff fails to explain how Workday's highly configurable
                        software can constitute a single decision, policy, or plan across
                        applicants, jobs, and employers. ....................................................... 20

                2.      Plaintiff's allegations are undermined by the significant discovery
                        that has taken place so far, which the Court can and should
                        consider. .............................................................................................. 25

        C.      Plaintiff's Proposed Notice Is Nothing More Than a Prohibited
                "Solicitation." ............................................................................................... 26

        D.      A Notice Is Impossible to Disseminate. ...................................................... 28

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION

**TABLE OF CONTENTS**
(continued)

**Page**

    E.    The Parties Should Be Permitted to Meet And Confer Regarding the Form And Content of Any Notice. ................................................................................ 29

        1.    Plaintiff's proposed notice is partial in Plaintiff's favor. .......................... 30

        2.    Plaintiff's proposed notice is misleading, including incorrect information and omitting critical information. ........................................... 31

        3.    The procedure Plaintiff proposes for disseminating a notice is deficient. ................................................................................................... 32

V.    CONCLUSION ............................................................................................................ 33

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION

**Cases**

*Campbell v. City of Los Angeles,*
　903 F.3d 1090 (9th Cir. 2018)............................................................................*passim*

*Chetwood v. T-Mobile USA, Inc.,*
　2020 WL 1689730 (W.D. Wash. Apr. 7, 2020) ............................................... 30, 32

*Clark v. A&L Homecare & Training Ctr.,*
　68 F.4th 1003 (6th Cir. 2023)..........................................................................*passim*

*Colson v. Avnet, Inc.,*
　687 F. Supp. 2d 914 (D. Ariz. 2010).......................................................................17

*Escobar v. Whiteside Constr. Corp.,*
　2008 WL 3915715 (N.D. Cal. Aug. 21, 2008)........................................................26

*Gonzales v. Charter Commc'ns, LLC,*
　2020 WL 8028108 (C.D. Cal. Dec. 4, 2020) ..........................................................30

*Heaps v. Safelight Sols., LLC,*
　2011 WL 1325207 (S.D. Ohio Apr. 5, 2011) .................................................... 31, 32

*Heath v. Google Inc.,*
　215 F. Supp. 3d 844 (N.D. Cal. 2016) .............................................................*passim*

*Hemmings v. Tidyman's Inc.,*
　285 F.3d 1174 (9th Cir. 2002)................................................................................12

*Henry v. JPMorgan Chase & Co.,*
　2016 WL 11759747 (C.D. Cal. Sept. 26, 2016).............................................*passim*

*Hoffmann-La Roche Inc. v. Sperling,*
　493 U.S. 165 (1989) ........................................................................................*passim*

*Korenblum v. Citigroup, Inc.,*
　195 F. Supp. 3d 475 (S.D.N.Y. 2016) .............................................................. 11, 16

*Liu v. Uber Techs.,*
　551 F. Supp. 3d 988 (N.D. Cal. 2021) ...................................................................14

*Luque v. AT&T Corp.,*
　2010 WL 4807088 (N.D. Cal. Nov. 19, 2010)........................................................26

*Parker v. Perdue Foods, LLC,*
　2024 WL 1120391 (M.D. Ga. Mar. 14, 2024) ................................................. 11, 16

*Ramirez v. Ghilotti Bros.*,
    941 F. Supp. 2d 1197 (N.D. Cal. 2013) .................................................................. 26

*Rivera v. Saul Chevrolet, Inc.*,
    2017 WL 3267540 (N.D. Cal. July 31, 2017) .................................................... 10, 11, 16

*Sanchez v. Sephora USA, Inc.*,
    2012 WL 2945753 (N.D. Cal. July 18, 2012) .......................................................... 26

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ........................................................................................ 12, 22

*Stanfield v. First NLC Fin. Servs.*,
    2006 WL 3190527 (N.D. Cal. Nov. 1, 2006) ........................................................ 32, 33

*Swales v. KLLM Transp. Servs.*,
    985 F.3d 430 (5th Cir. 2021) ....................................................................... *passim*

*Trinh v. JP Morgan Chase & Co.*,
    2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) .................................................... *passim*

*Velasquez v. HSBC Fin. Corp.*,
    266 F.R.D. 424 (N.D. Cal. 2010) ............................................................................ 17

*Villa v. United Site Servs. of Cal., Inc.*,
    2012 WL 5503550 (N.D. Cal. Nov. 13, 2012) ........................................................ 26

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................ 11, 13

*Wynn v. Nat'l Broad. Co.*,
    234 F. Supp. 2d 1067 (C.D. Cal. 2002) .............................................................. 19, 21

*Zavala v. Wal Mart Stores, Inc.*,
    691 F.3d 527 (3d Cir. 2012) .................................................................................. 19

**Statutes**

42 U.S.C. § 1981 ................................................................................................... 4

Age Discrimination in Employment Act of 1967 (ADEA),
    § 2 *et seq.*, 29 U.S.C. § 621 *et seq.* .............................................................. *passim*

Americans with Disabilities Act of 1990 (ADA),
    § 2 *et seq.*, 42 U.S.C. § 12101 *et seq.* ...................................................................... 4

California Fair Employment and Housing Act (FEHA),
    Cal. Gov't Code § 12900 *et seq.* ............................................................................... 4

Fair Labor Standards Act of 1938 (FLSA),

§ 1 *et seq.*, 29 U.S.C. § 201 *et seq.*.................................................................................... 13, 17

Title VII of the Civil Rights Act of 1964,
    § 701 *et seq.*, as amended, 42 U.S.C. § 2000e *et seq.* ........................................................ 4, 13

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................................................. 10, 33

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiff's Motion for Conditional Certification (ECF No. 106, "Motion" or "Mot.") asks this Court to do the impossible:  To throw open its doors to hundreds of millions of people all over the world—none of whom Workday could identify, much less contact—by sending them a notice inviting them to file their claims in this Court.  Not because they are actually similarly situated to the Plaintiff in this case; to the contrary, the Motion makes no attempt to limit the universe of notice recipients to individuals who could bring a claim that looks anything like Plaintiff's.  The only facts Plaintiff and these individuals have in common is that they were at least 40 years old when they applied to any job with any employer who used Workday's software, and they supposedly were not "recommended" for a job.  Plaintiff cites no case in which notice was sent to such a staggeringly broad collective, and Workday is not aware of any.  This case should not be the first.

Plaintiff also fails to meet his burden to support his assertions with even his own declaration, instead basing his Motion on a handful of generalized declarations from *other* people and unsubstantiated allegations that anyone rejected from a job after applying through Workday must have been the victim of age discrimination perpetuated by artificial intelligence ("AI").  These declarations and allegations also fail to support Plaintiff's Motion because they show neither similarity nor a common decision, policy, or plan.  What's more, Plaintiff knows that these allegations are false because he already has significant discovery confirming that Workday does not "recommend" candidates for employment, does not screen candidates in the employment process, does not design, implement, or grade personality or other assessment tests, does not use "pymetrics," and does not possess, own, or control applicants' data.  Yet Plaintiff's perfunctory Motion—which he could have filed a year ago—relies on the same generalized allegations he made in his complaint.  Because any notice would go to countless recipients who are not "potential plaintiffs" because they are not similarly situated to Plaintiff, Plaintiff's proposed notice is nothing more than a "solicitation of claims" prohibited by the Age Discrimination in Employment Act ("ADEA") and Supreme Court precedent.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 174 (1989); *Swales v. KLLM Transp. Servs.*, 985 F.3d 430, 442 (5th Cir. 2021) (district courts

"use[] notice as a claims-solicitation tool" when they "ignore[] the 'similarly situated' analysis" and "send notice to employees who are not potential plaintiffs"); *Clark v. A&L Homecare & Training Ctr.*, 68 F.4th 1003, 1010 (6th Cir. 2023) ("[N]otice sent to employees who are not, in fact, eligible to join the suit amounts to solicitation of those employees to bring suits of their own.").

Finally, the notice Plaintiff requests is also logistically impossible to disseminate. As Plaintiff is well aware, Workday does not have applicant data or contact information that could be used for notice purposes. Even if it did, there is no way to determine *ex ante* whether proposed notice recipients were at least 40 years old when they applied for a job or whether they were qualified for the positions to which they applied. There is also no way for proposed notice recipients to determine whether they were "denied employment recommendations" by Workday.

For each of these reasons and as described in greater detail below, the Court should deny Plaintiff's Motion with prejudice.

## II.   STATEMENT OF RELEVANT FACTS

### A.   Workday Recruiting

Workday is a leading enterprise platform that provides more than 10,000 companies with cloud-based solutions to help solve some of today's most difficult business challenges, including supporting their workforce. Declaration of Jamie Moore ("Decl. Moore") ¶ 6. Workday Recruiting is a software product that helps customers manage their talent acquisition process—from creating a job listing to onboarding a new hire. *Id.* ¶ 7.[1] Workday Recruiting is a product that customers purchase and use how they choose; it is not a service that Workday offers or performs on customers' behalf. *Id.* ¶ 20. Accordingly, Workday does not have access to its customers' job postings or to job application materials that are submitted by candidates directly to Workday's customers. *Id.* Customers' applicant data also is not shared with or accessible to Workday or other Workday customers. *Id.* ¶ 9.

While Workday offers limited customer support, such as helping customers initially set up Workday Recruiting or troubleshooting software issues, customers operate the software without

---

[1]   Plaintiff has failed to allege that any specific Workday product discriminated against him. Workday assumes that Plaintiff's challenge is aimed at Workday Recruiting, which was the only product Workday sold that could even arguably be said to incorporate any use of artificial intelligence when Plaintiff filed his complaints in this case.

any assistance or intervention by Workday.  *Id.* ¶ 20.  Customers also determine the information an applicant must submit when they apply to a job, and customers make hiring decisions regarding applicants.  *Id.* ¶¶ 11, 20.

Customers who purchase Workday Recruiting purchase the same "off the shelf" product, like customers who purchase Microsoft Word.  *Id.* ¶ 10.  However, Workday Recruiting is highly configurable, meaning that customers can enable, disable, use, or ignore its many features.  *Id.*  Workday Recruiting also allows customers to integrate third-party assessments into the application process, making those assessments available to candidates who choose to apply for a job through Workday.  *Id.* ¶ 19.  But Workday does not provide or even encourage the use of those assessments, nor does Workday "grade" those assessments.  *Id.*  If a customer chooses to incorporate third-party assessments into its hiring process, however, Workday Recruiting can be configured to display assessment scores in the customer's interface.  *Id.*

While Workday Recruiting can incorporate AI functionality, every job application submitted by an applicant is available to the customer for individualized review.  *Id.* ¶ 11.  Customers can review the applications using whatever method they choose, and customers can ignore any criteria they find unimportant—including information provided by an AI feature.  *Id.* ¶ 17.  Some customers may choose to review every application they receive and reject or advance each candidate one at a time.  *Id.* ¶¶ 15, 17.  Other customers may choose to sort applicants into groups for rejection or advancement and send mass rejection emails, which are drafted by the customer.  *Id.* ¶¶ 15, 16.  And still other customers may review applications only for candidates who were personally recommended for the job by someone known to the customer.  *Id.* ¶ 17.  Workday does not prescribe or even encourage any particular method for reviewing applications, aside from emphasizing to customers the importance of human decisionmaking in the hiring process.  *Id.* ¶ 18.

Workday Recruiting also allows customers to automate some aspects of their hiring processes based on triggering conditions chosen by the customer.  *Id.* ¶ 16.  For example, a customer can set up Workday Recruiting to automatically reject every application it receives stating that the applicant is unwilling to relocate to the location of the job.  *Id.*  In that case, when the customer

receives an application that indicates that a candidate is unwilling to relocate, the customer can configure Workday Recruiting to transmit a rejection email to that applicant—immediately or at some later time. *Id.* Of course, this feature is *not* related to AI or any "algorithmic decisionmaking" by Workday Recruiting. *Id.* Workday Recruiting does not, through artificial intelligence or otherwise, decide which applicants should be automatically advanced or rejected during the hiring process. *Id.* Instead, the software responds to whatever settings the customer has affirmatively chosen. *Id.*

**B.  <u>Relevant Procedural History</u>**

Plaintiff filed his initial complaint in this case over two years ago, on February 21, 2023. *See* ECF No. 1. The complaint asserted four claims of disparate impact and disparate treatment discrimination based on race, disability, and age under Title VII, the Americans With Disabilities Act ("ADA"), and the ADEA. *Id.* After this Court granted Workday's first motion to dismiss with leave to amend, *see* ECF Nos. 17, 45, Plaintiff filed his First Amended Complaint, approximately one year ago, on February 20, 2024. ECF No. 47. In that complaint, Plaintiff added a claim for discrimination based on race under 42 U.S.C. § 1981 and aiding and abetting discrimination under California's Fair Employment and Housing Act ("FEHA"). *Id.* Workday then moved to dismiss the First Amended Complaint, which this Court granted in part and denied in part. ECF Nos. 50, 80. Specifically, this Court dismissed Plaintiff's Title VII, ADEA, and ADA claims to the extent they were based on an employment agency theory, the intentional discrimination claims under Title VII, the ADEA, and Section 1981, and the aiding and abetting claim under FEHA. ECF No. 80. This Court denied Workday's motion to dismiss on, among other claims, Plaintiff's claim for disparate impact discrimination under the ADEA. *Id.*

In denying Workday's motion to dismiss Plaintiff's disparate impact claim under the ADEA, the Court held that Plaintiff adequately pled the existence of a "specific employment practice," a "significant disparate impact on a protected class or group," and "a causal relationship" between the two. *Id.* at 13; *see id.* at 13-16. The Court found a plausible allegation of a "specific employment practice"—"Workday's [supposed] use of algorithmic decision-making tools to screen applicants"—"supported by allegations that Mobley was rejected from over one hundred jobs that

he was allegedly qualified for, across many different industries and employers." *Id.* at 13-14.  The Court also found a plausible allegation of a disparity because of Plaintiff's "zero percent success rate" across "over 100 jobs for which he was allegedly qualified" "with a whole range of employers across multiple industries that use Workday's platform, including for a job with a company that he was already doing, but as a contractor." *Id.* at 14-15.  And finally, the Court found a plausible allegation of causation, again because "Mobley was rejected at the screening stage from over 100 positions of a wide range and type, even though he was allegedly qualified for all of those jobs," and because he "allegedly received rejection emails at early hours in the morning, outside of regular business hours." *Id.* at 15-16.

**C.**    **Plaintiff's Motion for Conditional Certification and Proposed Collective**

After two years of litigation, Plaintiff moved to conditionally certify an ADEA collective comprised of "[a]ll individuals aged 40 and over who, from September 24, 2020, through the present . . . applied for job opportunities using [Workday's] job application platform and were denied employment recommendations."  Mot. 9.  Plaintiff alleges that Workday has a "policy or practice of discriminatory job screening" that "disproportionately disqualifies individuals over the age of forty (40) from securing gainful employment."  Mot. 1.  Plaintiff's Motion describes Workday's alleged "practice of discriminatory job screening" in different ways:

- "[S]creen[ing]" applicants, *e.g.*, Mot. 1;
- "[F]lagg[ing]" applications "for rejection," Mot. 2;
- "[S]ourc[ing] candidates and then us[ing] algorithmic decision-making tools to recommend job opportunities," Mot. 8; and
- "[S]cor[ing] . . . application[s] in the hiring process," Mot. 13.

Plaintiff further alleges that "Workday's algorithmic decision-making tools" act on these applications based on "training data and information obtained from pymetrics and personality tests," Mot. 1-2 (quoting ECF No. 80 at 13), as well as "machine learning," and "neuroscience data," Mot. 8.  Workday's "algorithms," Plaintiff alleges, "are only trained on incumbent employees at a company, allowing the pymetrics Workday Assessment Connector to build a homogenous workforce not representative of the applicant pool."  Mot. 8.  Further, Plaintiff alleges

that "Workday also encourages and uses the recommendations of incumbent employees for hiring decisions," which "has a differential effect upon applicants over 40, because any lack of work force diversity allows for incumbent employees to consciously or unconsciously refer or recommend few workers over the age of 40." Mot. 8-9.

In support of Plaintiff's allegations regarding Workday's technology, Plaintiff offers three factual allegations—(1) that he and the opt-in plaintiffs applied for hundreds of unspecified jobs and were rejected for (almost) all of them; (2) that he and the opt-in plaintiffs were qualified for those jobs; and (3) that he and the opt-in plaintiffs sometimes received rejection emails shortly after submitting an application or outside business hours. *See* Mot. 3-8; Declaration of Roderick T. Cooks (ECF No. 106-1, "Decl. Cooks"), Exhibits 1-4.

Plaintiff does not submit a declaration in support of his own factual allegations.

Plaintiff does submit declarations from the four opt-in plaintiffs who filed consents to join this litigation before Plaintiff filed his Motion. All four opt-in plaintiffs claim that they applied to over 100 jobs through Workday. *See* Decl. Cooks, Exhibits 1-4.

**D.**     **Plaintiff and the Opt-In Plaintiffs**

    **1.**     **Plaintiff Derek Mobley**

Plaintiff Mobley has "a bachelor's degree in finance and is also an honors graduate of ITT Technical Institute." Mot. 4 (citing ECF No. 47 ¶¶ 20-24). Plaintiff has worked in "various financial, IT help-desk, and customer service-oriented jobs." *Id.* (citing ECF No. 47 ¶¶ 25-26). Plaintiff claims that since 2017, he has applied for "over 100" jobs with employers that "exclusively use Workday," and his applications were rejected "every time." *Id.* (citing ECF No. 47 ¶¶ 49-55). During his deposition, Plaintiff testified that other than 20 jobs, he had no "other documentation or recollection" of any other job to which he applied through Workday and was not hired. Decl. of Julie A. Totten ("Decl. Totten"), Exhibit E, Deposition of Derek L. Mobley ("Mobley Dep.") at 30:18-24. Plaintiff further testified that he applied for jobs in industries in which he had no experience or for which he sometimes omitted his only relevant experience from his resume. *See*, *e.g.*, *id.* at 128:12-129:15 (testifying that when he applied to be a fraud analyst, his relevant experience was "not on [his] resume"); *id.* at 130:12-131:5 (testifying that when he applied to be a

corporate travel consultant, his relevant experience was "not reflected on [his] resume"). And that he sometimes omitted his dates of education from his resume because "employers might utilize the dates to determine [his] age." *Id.* at 44:11-19.

### 2. Opt-In Plaintiff Jill Hughes

Plaintiff Hughes has a B.A. degree in English and an M.A. degree in media studies. Decl. Cooks, Exhibit 1, Declaration of Jill E. Hughes ("Decl. Hughes"), Exhibit A. Hughes has worked as a "Senior Medical Writer, Project Manager, and Scientific Director with experience writing/strategizing for major media as well as the corporate and medical arenas." Decl. Hughes ¶ 8. Hughes claims that she has applied for "hundreds" of jobs through Workday since December 2023. *Id.* ¶ 4. Hughes identifies nine employers to which she claims she applied but does not state when she applied, what role she applied for, the requirements of the role, or whether she was qualified for the role. *Id.* According to Hughes, she received "at least one" rejection email from these nine companies for unspecified jobs, which in some cases stated that she "[did] not meet the minimum requirements" for the role, even though in Hughes' subjective view, she met the unspecified requirements. *Id.* ¶ 5. Hughes claims that she sometimes received "[a]utomated" rejection emails "minutes or a few hours" after applying and "outside of business hours," although she does not state her time zone or the time zone of any employer. *Id.* ¶ 6. Hughes claims that she received an interview through Workday for Cardinal Health, but ultimately was rejected, and that "[i]t appears that *nobody* who applies for/interviews for that role as posted via Workday is ever hired." *Id.* ¶ 10 (emphasis added). During her deposition, Hughes admitted that she sometimes applied to roles for which she was not qualified, and that she "always" omits the dates in which she was employed or dates of education if she is given the option. Decl. Totten, Exhibit A, Deposition of Jill Hughes ("Hughes Dep.") at 136:2-8; *id.* at 173:16-22 (Q. "Would you agree that you in fact don't meet the basic qualifications for this role?" A. "Yeah, I definitely don't.").

### 3. Opt-In Plaintiff Knight-Bell

Plaintiff Knight-Bell has a B.S. degree in commerce and business administration. Decl. Cooks, Exhibit 2, Declaration of Vanessa Knight-Bell ("Decl. Knight-Bell"), Exhibit A.

Knight-Bell has worked in "various financial, business analyst, and customer service-oriented jobs." *Id*. ¶ 7. Knight-Bell claims that since 2018, she has applied for "hundreds" of jobs with approximately 40 different employers that use Workday. *Id*. ¶ 4. Knight-Bell identifies four employers to which she claims she applied but does not state when she applied, what role she applied for, the requirements of the role, or whether she was qualified for the role. *Id*. According to Knight-Bell, she received rejection emails from unspecified jobs, which in some cases specified that she "[did] not meet the minimum requirements" for the role, even though in Knight-Bell's subjective view, she met the unspecified requirements. *Id*. ¶ 5. Knight-Bell claims that she sometimes received "automated" rejection emails a "few hours" after applying and "outside of business hours," although she does not state her time zone or the time zone of the employer. *Id*. Knight-Bell admits that she received a job with Target after applying through Workday. *Id*. ¶¶ 4-5. During her deposition, Knight-Bell admitted that she applied for jobs that she was not qualified for. Decl. Totten, Exhibit C, Deposition of Vanessa Knight-Bell ("Knight-Bell Dep.") at 74:21-75:2 (Q. "So you will still apply, even if you don't check every box that is required per the job posting, right?" A. "Yes . . . .").

### 4. Opt-In Plaintiff Richard Lieb

Plaintiff Lieb has a degree in graphic design. Decl. Cooks, Exhibit 4, Declaration of Richard W. Lieb, Jr. ("Decl. Lieb") ¶ 8. Lieb has "an extensive background in Marketing and its integration with social media." *Id*. Lieb claims that he has applied for "hundreds" of jobs through Workday since 2022. *Id*. ¶ 4. Lieb identifies a single employer to which he claims he applied but does not state when he applied, what role he applied for, the requirements of the role, or whether he was qualified for the role. *Id*. ¶ 4. According to Lieb, he received rejection emails from unspecified jobs, some of which specified that he did not meet the minimum qualifications for the job, even though in his subjective view, he met the unspecified requirements. *Id*. ¶ 5. Lieb claims that he sometimes received "[a]utomated" rejection emails a "few hours" after applying and "outside of business hours," although he does not state his time zone or the time zone of the employer. *Id*. ¶ 6. Lieb's resume, which he attached to his declaration, indicates that he received his degree in 2015 and provides his work history dating back to only 2017. *Id*. Exhibits A-D.

During his deposition, Lieb admitted to applying for jobs for which he was not qualified "just because they were there." Decl. Totten, Exhibit D, Deposition of Richard Lieb ("Lieb Dep.") at 36:3-37:4; *see id.* at 148:12-18 (Q. "Do you think that you were qualified for this position?" A. "No, I probably was not.").

### 5. Opt-In Plaintiff Sheilah Johnson-Rocha

Plaintiff Johnson-Rocha has a Bachelor of business administration and Master of Science in management. Decl. Cooks, Exhibit 3, Declaration of Sheilah Johnson-Rocha ("Decl. Johnson-Rocha") ¶ 8. Johnson-Rocha has worked in "the pharmaceutical and biotechnology industries." *Id*. Johnson-Rocha claims that she has applied for "approximately 2,000" jobs, a "large majority" of which were through Workday, since March 2023. *Id.* ¶ 4. Johnson-Rocha does not identify a single employer to which she claims she applied, or state when she applied, what role she applied for, the requirements of the role, or whether she was qualified for the role. *Id.* According to Johnson-Rocha, she received rejection emails from unspecified jobs, which in some cases specified that she "[did] not meet the minimum requirements" for the role, even though in Johnson-Rocha's subjective view, she met the unspecified requirements. *Id.* ¶ 5. Johnson-Rocha claims that she sometimes received "automated" rejection emails "within a few hours" after applying and "outside of business hours," although she does not state her time zone or the time zone of any employer. *Id*. Johnson-Rocha claims "many of the jobs for which [she] ha[s] applied are not filled and are continually reposted." *Id.* Johnson-Rocha's resume, which she attached to her declaration, does not indicate when she received her degrees and provides her work history dating back to only 2007. *Id.*, Exhibit A. During her deposition, Johnson-Rocha admitted to applying for jobs for which she was not qualified. Decl. Totten, Exhibit B, Deposition of Sheilah Johnson-Rocha ("Johnson-Rocha Dep.") at 175:5-9 (Q. "The requirements for this role on page 2 list bachelor's in life sciences with advanced degree preferred. Do you have a bachelor's in life sciences?" A. "No.").

### III. LEGAL STANDARD

"The Age Discrimination in Employment Act of 1967 (ADEA) . . . provides that an employee may bring an action on behalf of himself and other employees similarly situated." *Hoffmann-La Roche*, 493 U.S. at 167. District courts are authorized to issue notices to "potential

plaintiffs" for purposes of collectively adjudicating "similarly situated" employees' ADEA claims. *Id.* at 169-70. But dissemination of a notice must be "orderly, sensible," and consistent with the requirements of the ADEA and the Federal Rules of Civil Procedure. *Id.* at 170. District courts do not have "unbridled discretion" to send a notice that functions as a "solicitation of claims." *Id.* at 174.

A notice "function[s]" as a "solicitation of claims" when it goes out to recipients who are not "potential plaintiffs." *Id.* at 169; *see Swales*, 985 F.3d at 442 (a "notice sent is proper in scope" when it is "sent only to potential plaintiffs"). Notice recipients are not "potential plaintiffs" when they are not "eligible to join the suit"—for example, because they are not similarly situated to the named plaintiffs. *Clark*, 68 F.4th at 1010; *see Swales*, 985 F.3d at 434.

The process of determining whether a notice should issue is sometimes called "provisional" or "conditional certification." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1101 (9th Cir. 2018) (explaining the term is "misappropriate[d]" "from the Rule 23 context"). Courts in the Ninth Circuit "condition[]" "the dissemination of notice to putative collective members . . . on a preliminary determination that the collective as defined in the complaint satisfies the 'similarly situated' requirement" of the ADEA. *Id.* at 1109.[2] "Party plaintiffs" are similarly situated when they are "alike in ways that matter to the disposition of their [ADEA] claims." *Id.* at 1114.

A plaintiff moving for dissemination of a notice to "putative class members" must provide "substantial allegations, supported by declarations or discovery, that the putative class members were together the victims of a single decision, policy, or plan." *Henry v. JPMorgan Chase & Co.*, 2016 WL 11759747, at *2 (C.D. Cal. Sept. 26, 2016) (quotation omitted). The "plaintiff bears the burden of showing that the plaintiff and the putative collective action members are 'similarly situated.'" *Rivera v. Saul Chevrolet, Inc.*, 2017 WL 3267540, at *2 (N.D. Cal. July 31, 2017).

The plaintiff's burden is "commensurate with the stage of the proceedings." *Campbell*, 903 F.3d at 1109. Ordinarily, a plaintiff moves to conditionally certify a collective "at or around the

---

[2]  To be clear, while Workday is basing its arguments as to why Plaintiff's Motion should be denied on the prevailing two-step framework, multiple courts in other jurisdictions have questioned or rejected this framework, including because it is not required by, or even consistent with, the ADEA's text and purpose. Accordingly, Workday reserves the right to challenge the validity of this standard in the event the Court's decision is appealed to the Ninth Circuit.

pleading stage"—*prior* to the discovery process.  *Id*.  In that circumstance, courts apply a standard "loosely akin to a plausibility standard" applicable to a motion to dismiss.  *Id*.  "However, because the rationale for the lenient standard disappears once a plaintiff has had an opportunity to conduct discovery, the standard may become less lenient as the litigation progresses."  *Parker v. Perdue Foods, LLC*, 2024 WL 1120391, at *3 (M.D. Ga. Mar. 14, 2024); *see also Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, at 481-82 (S.D.N.Y. 2016) ("[N]either law nor logic supports rigidly applying the same standard of review at all points prior to discovery's close.").  Any "evidence obtained in discovery should" "advance[] the ball down the field" in the plaintiff's favor. *Korenblum*, 195 F. Supp. 3d at 482 (quotation omitted).

"Unsupported assertions of widespread violations are not sufficient to meet [a plaintiff's] burden, even at the lenient first step."  *Henry*, 2016 WL 11759747, at *3.  Rather, "at least some evidence is necessary to support the 'substantial allegations' in the complaint."  *Rivera*, 2017 WL 3267540, at *6.  A plaintiff's "own speculative beliefs" of similarity or the existence of a common practice, without "real evidence" in support, is insufficient to meet his burden.  *Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161, at *4 (S.D. Cal. Apr. 22, 2008).

"[W]hat matters" in the analysis "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Campbell*, 903 F.3d at 1115 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  "A 'collective action' in which, as a practical matter, no material dispute truly could be heard on a collective basis would hardly be consistent with the [ADEA]'s remedial purpose."  *Id.* at 1115-16.

When a putative collective is overbroad such that members of the collective are not "similarly situated," the court should deny conditional certification, not redraw the collective. *Heath v. Google Inc.*, 215 F. Supp. 3d 844, 858 (N.D. Cal. 2016) ("declin[ing] to narrow the scope" of the proposed collective because "[t]o do so would improperly prevent [the defendant] from identifying infirmities in such an alternative definition and deprive the Court of sufficient evidence and argument on which to base such a determination").  A denial of preliminary or conditional certification "precludes dissemination of . . . [a] notice."  *Campbell*, 903 F.3d at 1109.  Additionally,

if the denial is "premised on the party plaintiffs' failure to satisfy the 'similarly situated' requirement," the denial may be "with prejudice," which "functions as an unfavorable adjudication of the right to proceed in a collective." *Id.* "In such cases, if opt-in plaintiffs have already joined, they will be dismissed without prejudice to the merits of their individual [ADEA] claims, and the original plaintiff will be left to litigate alone." *Id.*

## IV. ARGUMENT

### A. Putative Collective Members Are Dissimilar in Virtually All of the Ways That Matter to Their ADEA Claims.

To be similarly situated, the plaintiffs in this case must be "alike in ways that matter" to adjudicating *the same* disparate impact claim under the ADEA. *Campbell*, 903 F.3d at 1115-16. A disparate impact claim under the ADEA requires plaintiffs to: "(1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir. 2002). This Court held that Plaintiff adequately alleged these elements because of the specific features of his claim—that he was allegedly rejected for over 100 jobs for which he was allegedly qualified. *See* ECF No. 80 at 13-16. But the collective is not limited to individuals who could bring such a claim. Rather, it includes individuals who were rejected from one job, or a handful of jobs, or no jobs at all, whether they were qualified for those jobs or not. On its face, then, the collective lacks similarity, because it includes individuals who cannot make the same claim Plaintiff makes here.

Additionally, collective adjudication makes no sense here because of the unique nature of these claims, which span industries, employers, jobs, qualifications, and more. Adjudicating questions like whether Workday's technology was responsible for an applicant being rejected for a job, as opposed to any other factor, like the applicant's qualifications, would "require[] a highly individualized inquiry into each potential opt-in's [and employer's] circumstances." *Swales*, 985 F.3d at 442; *see also Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (ADEA claim failed in part because the challenged practice "was based on reasonable factors other than age"). This case would thus "quickly devolve into a cacophony of" perhaps hundreds of millions of "individual

- 12 -

1  actions," *Swales*, 985 F.3d at 442, making collective adjudication *impossible*. *See Campbell*, 903

2  F.3d at 1115-16 ("A 'collective' action in which, as a practical matter, no material dispute truly

3  could be heard on a collective basis would hardly be consistent with the FLSA's remedial

4  purpose."). This result would completely undermine Congress's purpose of promoting the

5  "efficient resolution" of similar claims. *Hoffmann-La Roche*, 493 U.S. at 170.

6      This Court cannot postpone these considerations for step two. "[I]gnor[ing] the 'similarly

7  situated' analysis" at step one, *Swales*, 985 F.3d at 442, and sending a notice despite the fact that

8  recipients are not "eligible to join the suit" because they are not "similarly situated" to the Plaintiff,

9  *Clark*, 68 F.4th at 1010, would violate the Supreme Court's prohibition against using a notice as a

10  "solicitation of claims," *Hoffmann-La Roche*, 493 U.S. at 174. Independent of whatever happens

11  at step two, sending a notice under these circumstances would be legal error.

12          **1.   The putative collective includes individuals who are plainly not**
                  **"similarly situated" to Plaintiff because they do not have Plaintiff's**
13                **ADEA claim.**

14

15      Plaintiff's proposed collective cannot be certified because it does nothing to limit the

16  universe of future opt-in plaintiffs to individuals who could bring the same claim he does for

17  disparate impact discrimination under the ADEA. *See Wal-Mart*, 564 U.S. at 350 ("Quite

18  obviously, the mere claim by employees of the same company that they have suffered a Title VII

19  injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims

20  can productively be litigated at once."); *Campbell*, 903 F.3d at 1115 (what matters is "the capacity

21  of a classwide proceeding to generate common answers apt to drive the resolution of the litigation")

22  (quoting *Wal-Mart*, 564 U.S. at 350). This Court previously held that Plaintiff stated a

23  disparate-impact claim under the ADEA because he alleged that although he applied for over 100

24  jobs for which he was allegedly qualified, he had a "zero percent success rate at passing Workday's

25  initial screening." ECF No. 80 at 15.[3] Plaintiff's "zero percent success rate" across a high number

26

_____

27  [3]  Workday does not concede that Plaintiff sufficiently alleged a disparate impact claim under the ADEA and reserves
        the right to challenge this determination on appeal. Workday also does not concede that any of these allegations
28      are true, including the number of jobs to which Plaintiff applied, his qualifications for those jobs, or the existence
        of a "screening" process by Workday.

of applications, this Court determined, justified an inference of discrimination. *Id.* at 13-16. But the same would not be true for the members of Plaintiff's putative collective—which is comprised of individuals who are at least 40 and who were "denied employment recommendations."[4]

First, the collective would include people whose claims are not "similar" to Plaintiff's because they did not experience a "zero percent success rate" when applying for jobs through Workday. ECF No. 80 at 13-16. Because an "employment recommendation" is different from a rejection, the collective would include individuals who were interviewed or even hired for the jobs to which they applied, whether Workday supposedly "recommended" them or not. Indeed, three of the opt-in plaintiffs recount being interviewed or hired for jobs after applying through Workday, though they also generally allege many other rejected applications. *See* Decl. Hughes at ¶ 10 (interviewed); Decl. Knight-Bell ¶ 5 (hired); Dep. Johnson-Rocha at 58:15-23, 142:11-15 (interviewed). Individuals who actually had some success when applying for jobs through Workday are not entitled to the same "inference of discrimination" this Court gave Plaintiff based on Plaintiff's alleged "zero percent success rate." ECF No. 80 at 13-16.

Second, the collective would include individuals who were rejected from only one job, or only a few jobs. These claims would be completely different from Plaintiff's, which is premised on the allegation that he was rejected from "over 100 jobs." *See* ECF No. 80 at 14. Whether or not such individuals could survive a motion to dismiss if they brought these claims on their own, they certainly could not do so based on anything like the reasoning applied by this Court. *Compare Liu v. Uber Techs.*, 551 F. Supp. 3d 988, 991 (N.D. Cal. 2021) ("[A]ll that Liu has alleged so far is that he himself was terminated, and the Court cannot draw an inference of disparity from a single data point."); *with* ECF No. 80 at 14-15 & 15 n.3 (distinguishing *Liu* because "the plaintiff in that case was essentially asking the court to infer a disparity based solely on his own termination," but here, Plaintiff alleges he applied for over 100 jobs and received none).

Third, the notice that Plaintiff requests includes, on its face, individuals who were not qualified for the jobs to which they applied. *See Heath*, 215 F. Supp. 3d at 857 (declining to certify

---

[4] As Plaintiff is aware, Workday does not offer any "employment recommendation[s]" through its software. Decl. Totten, Exhibit F at 7. Thus, in reality, *nobody* can be a member of the putative collective. *See infra* p. 25.

collective including "every individual applicant over the age of 40 without regard to their qualifications" because "[c]ommon sense dictates that Google would have rejected those individuals based on their lack of qualifications, not their age").  Plaintiff has not asked this Court to certify a collective comprised of, for example, licensed accountants who were denied accounting jobs, or certified teachers who were denied teaching jobs.  He has asked this Court to certify a collective comprised of, basically, anyone who was at least 40 and has ever applied for a job through Workday—which could be hundreds of millions of people who "[c]ommon sense dictates," *id.*, were rejected for non-discriminatory reasons.  A potential plaintiff who cannot even allege that he was qualified for the position to which he applied is not entitled to the same inference of discrimination afforded to Plaintiff's allegations.  *See* ECF No. 80 at 15.

It is difficult to imagine how a plaintiff could plausibly state a claim for disparate impact discrimination under the ADEA without alleging they applied to some high number of jobs, they were rejected from those jobs, and they were qualified for those jobs.  Allowing a plaintiff to bring a claim through collective adjudication that they could not have brought on their own is impossible to square with Congress's purpose in amending the ADEA to "limit[] private [ADEA] plaintiffs to employees who asserted claims *in their own right* and free[] employers of the burden of representative actions."  *Hoffmann-La Roche*, 493 U.S. at 173 (emphasis added).  But more importantly, even if those plaintiffs could somehow bring a disparate impact claim under the ADEA, their claims would not be similar "in ways that matter" to Plaintiff's, *Campbell*, 903 F.3d at 1114.

### 2.    <u>Plaintiff has failed to show that even he and the opt-in plaintiffs are similar in the ways that matter to their ADEA claims.</u>

Plaintiff's Motion fails to clear even the low hurdle of showing that he and the opt-in plaintiffs are similarly situated.  In his single paragraph of argument, Plaintiff describes the similarity between himself and the opt-in plaintiffs at such a high level of generality that the only fact that matters is that the opt-in plaintiffs allege that they applied for many jobs through Workday

Recruiting and were usually rejected. *See* Mot. 12-13.[5]  This is plainly insufficient.

To start, Plaintiff has not submitted a sworn declaration regarding any of the facts underlying *his* own claim, like how many applications he submitted and to which jobs with which employers—likely because he could not truthfully attest that he applied to "hundreds" of jobs or that he was qualified for every job to which he applied.  *See*, *e.g.*, Mobley Dep. at 30:18-24 (testifying that other than 20 jobs, Plaintiff has no "other documentation or recollection" of any other job to which he applied through Workday and was not hired); 128:12-129:15 (testifying that his only experience relevant to fraud analyst job is "not on [his] resume"); 130:12-131:5 (testifying that his only experience relevant to corporate travel consultant job is "not reflected on [his] resume").  Given his failure to submit a shred of evidence supporting even his own ADEA claim, there can be no question that Plaintiff has failed to show that he is similarly situated to the opt-in plaintiffs, much less all of the members of the collective he is seeking to represent.  *Henry*, 2016 WL 11759747, at *3 ("[U]nsupported assertions of widespread violations are not sufficient to meet [a plaintiff's] burden, even at the lenient first step."); *Rivera*, 2017 WL 3267540, at *6 ("[A]t least some evidence is necessary to support the 'substantial allegations' in the complaint."); *Trinh*, 2008 WL 1860161, at *4 (plaintiff's "own speculative beliefs" of similarity or the existence of a common practice, without "real evidence" in support, is insufficient to meet his burden).  This failure is especially perplexing at this stage of the litigation, when the parties have already completed discovery regarding Plaintiff, including his deposition.  *See Campbell*, 903 F.3d at 1109 (plaintiff's burden is "commensurate with the stage of the proceedings"); *Parker*, 2024 WL 1120391, at *2 ("As the litigation progresses and the parties conduct discovery, . . . the standard may become less lenient."); *Korenblum*, 195 F. Supp. 3d at 482 (any "evidence obtained in discovery should" "advance[] the ball down the field" in the plaintiff's favor) (quotation omitted).

Plaintiff submits declarations of the four opt-in plaintiffs, but they offer almost no information to support the conclusion that Plaintiff and the opt-ins are substantially similar.  Not

---

[5]  Like Plaintiff, the opt-in plaintiffs refer to receiving rejection emails outside American business hours or shortly after submitting an application.  But Workday Recruiting allows customers to adjust their settings to automatically send rejection emails to applicants who meet specific triggering conditions, like applicants who indicate they are not authorized to work in the location of the position.  *See* Decl. Moore ¶ 16.  These settings do not involve any use of AI or decision by Workday.

one provides even a single example of a job to which they applied and were rejected (or not "recommended"), let alone an explanation for why they were qualified for that job. *See* Decl. Cooks, Exhibits 1-4. Plaintiff's vague and conclusory allegations, supported by the opt-ins' barebones declarations, come nowhere close to meeting Plaintiff's burden to show that he and the opt-in plaintiffs are "alike in ways that matter," *Campbell*, 903 F.3d at 1114, to determining whether the harm they allegedly suffered was *because of* "Workday's AI." *See Velasquez v. HSBC Fin. Corp.*, 266 F.R.D. 424, 431 (N.D. Cal. 2010) (denying conditional certification because the plaintiff's declarations "indicate[d] that they may have individual FLSA claims" but not that they were "similarly situated such that the Court should authorize that notice be sent to approximately 10,000 former [employees] around the country"); *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 928-29 (D. Ariz. 2010) (declaration referencing discussions with "unidentified" coworkers, "unspecified" company communications, and "undocumented" employee interactions insufficient for conditional certification).

And Plaintiff offers no explanation or argument for how he and the opt-in plaintiffs are similarly situated. Instead, he leans entirely on "the lenient standard of step one conditional certification," Mot. 12; *see id.* at 12-13. But even on a lenient standard, "there are limits, and the district court cannot function as a rubber stamp for any and all claims that come its way under this statute." *Colson*, 687 F. Supp. 2d at 929-30. Neither this Court nor Workday should be required to make Plaintiff's arguments for him. *Swales*, 985 F.3d at 443 n.65 ("[A] plaintiff should not be able to simply dump information on the district court and expect the court to sift through it and make a determination as to similarity.").

Moreover, despite the opt-in plaintiffs' vague and conclusory claims, it is already obvious that there are "wide disparities" in their "qualifications and/or experiences" that "must be [the collective's] death knell." *Heath*, 215 F. Supp. 3d at 857-58; *see Campbell*, 903 F.3d at 1119 (factual differences material to the disposition of collective members' claims would destroy the "efficiencies of collective litigation"). For one thing, the opt-in plaintiffs come from completely different backgrounds and industries, from biotechnology to graphic design and marketing to medical and pharmaceutical communications, making their success applying for jobs (even if they

actually identified what those jobs were) impossible to compare. *See* Decl. Cooks, Exhibits 1-4. Additionally, unlike Plaintiff, some of the opt-in plaintiffs even acknowledge that they were interviewed or hired for jobs they applied to through Workday. *See*, *e.g.*, Decl. Hughes at ¶ 10 (interviewed); Decl. Knight-Bell ¶ 5 (hired); Dep. Johnson-Rocha at 58:15-23, 142:11-15 (interviewed). And one of the opt-in plaintiffs alleges that she applied for thousands of jobs, mostly through Workday Recruiting, and was rejected for "almost all" of them; but she does not claim that her success rate was lower when applying through Workday Recruiting compared to other application methods. Decl. Johnson-Rocha at ¶ 4. Further, at their depositions, all four of the opt-in plaintiffs admitted that they did not meet the minimum qualifications for at least some of the jobs to which they applied through Workday. *See*, *e.g.*, Hughes Dep. at 173:16-22 (Q. "Would you agree that you in fact don't meet the basic qualifications for this role?" A. "Yeah, I definitely don't."); Lieb Dep. at 148:12-18 (Q. "Do you think that you were qualified for this position?" A. "No, I probably was not."); Knight-Bell Dep. at 74:21-75:2 (Q. "So you will still apply, even if you don't check every box that is required per the job posting, right?" A. "Yes . . . ."); Johnson-Rocha Dep. at 175:5-9 (Q. "The requirements for this role on page 2 list bachelor's in life sciences with advanced degree preferred. Do you have a bachelor's in life sciences?" A. "No.").

These differences are emblematic of the differences that will pervade the collective as a whole, making dissemination of a notice to this collective contrary to the similarity requirement in the ADEA.

### 3. Putative collective members are so dissimilar that trying their claims together would be logistically impossible.

This Court cannot conditionally certify a collective that is so massive and dissimilar that "as a practical matter, no material dispute truly could be heard on a collective basis." *Campbell*, 903 F.3d at 1115-16. That is precisely what Plaintiff requests here.

For one thing, the sheer size of Plaintiff's putative collective should set off alarm bells. Even Plaintiff estimates that "266 million applications" were submitted and "24 million job offers" were extended through Workday in 2023 "alone." Mot. 3. On their own, Plaintiff's allegations would mean that in the approximately five-year period from September 2020 to the present, *see*

Mot. 9, around 1.1 billion applications were rejected using Workday.  Mot. 3; *see also* Decl. Moore ¶ 7 ("Between 2020 and 2024, Workday's customers . . . received more than 1.1 billion applications . . . through Workday Recruiting.").  Even if a notice somehow could be disseminated to only individuals who were at least 40 years old when they applied through Workday and believe they met the minimum qualifications for the job, any notice would still invite potentially *hundreds of millions* of potential plaintiffs to file their claims in this case.  There is simply no possibility that hundreds of millions of plaintiffs—who applied to different jobs with different employers, and who were subject to each employer's separate hiring practices—could be similarly situated in the "ways that matter," *Campbell*, 903 F.3d at 1114, to determining whether they were rejected *because of* Workday's "algorithmic decision-making tools."  *See Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 537-38 (3d Cir. 2012) (putative collective members lacked similarity because there were "significant differences in the factual and employment settings of the individual claimants," and "different defenses might be available to Wal–Mart with respect to each proposed plaintiff"); *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1084-85 (C.D. Cal. 2002) (denying certification of collective comprised of writers suing various defendants in the television industry for age discrimination because individualized issues and defenses "would abound" where "the [c]ourt would be faced with the potential of over 2500 different hiring decisions").

      "If the ultimate issue to be determined is whether each [applicant] was" rejected for a job because of Workday's software, then "the 'similarly situated' inquiry must be analyzed in terms of the nature of each putative plaintiff's" qualifications for the jobs to which they applied.  *Trinh*, 2008 WL 1860161, at *4.  In this case, whether the putative collective members were qualified for the positions to which they applied "necessarily involves a fact-by-fact inquiry into the circumstances of each [applicant] to see if he or she" meets the educational, experiential, and other requirements of each job posting.  *Id.*  And because the collective spans industries, employers, and roles, adjudicating whether every opt in was qualified for a specific job would be a never-ending process.  *See Heath*, 215 F. Supp. 3d at 857 (denying conditional certification of a collective that included "every individual applicant over the age of 40 without regard to their qualifications").  The facts useful to determining whether an electrician was qualified for a customer service job would

be worthless to determining whether a lawyer was qualified for a software job. *See id.* Even for ostensibly similar roles, particular employers may require specific qualifications, like special certifications or licenses, that other employers do not require. Plaintiff and the opt-ins "have not put forth any arguments suggesting that . . . the putative class will rely on *any* common evidence to prove that" they were qualified for the positions to which they applied. *Trinh*, 2008 WL 1860161, at *4.

Courts analyzing complex litigation concerning factual differences like these "have concluded that the need for individual evidence makes a class or collective action an unwieldy method for determining the rights of many litigants." *Id*. These individualized inquiries completely defeat the purpose of collective adjudication, which is to reduce the costs of adjudication and promote judicial efficiency. *See Hoffmann-La Roche*, 493 U.S. at 170 ("The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."). This is especially true where, as here, a notice would mean opening the floodgates to hundreds of millions of plaintiffs to adjudicate their fact-specific claims all at once in this Court. The ADEA does not authorize this absurd and inefficient result.

**B.**     **Plaintiff Does Not Allege a Single Decision, Policy, Or Plan That Could Justify Conditional Certification.**

Plaintiff's Motion fails to offer so much as a cogent theory—let alone "substantial allegations, supported by declarations or discovery"—for how "the putative class members" could be "together the victims of a single decision, policy, or plan," *Henry*, 2016 WL 11759747, at *2, despite having applied for jobs with completely different employers who have completely different hiring preferences and processes. Instead, Plaintiff throws out a series of incoherent factual allegations that *he knows to be false* and asks this Court to cobble together a theory for him. This Court should decline to do so.

**1.**     **Plaintiff fails to explain how Workday's highly configurable software can constitute a single decision, policy, or plan across applicants, jobs, and employers.**

Plaintiff's Motion offers almost no information on what decision, policy, or plan supposedly affects all members of the putative collective the same way. *See Campbell*, 903 F.3d at 1120

(collective adjudication requires a "uniform practice" or "policy," not "variable practices variably applied"). Instead, Plaintiff assumes that Workday's supposed use of "algorithmic decision-making tools" is a sufficient common policy, even though Plaintiff's allegations imply that those tools would *not* apply the same way across employers. *See* Mot. 8 (alleging that Workday's "algorithms are only trained on incumbent employees *at a company*" to allow that company to "build a homogenous workforce") (emphasis added). It is far from clear that a plaintiff could ever certify a collective that spans an unlimited number of employers and decisionmakers, all of whom apply their own policies in making decisions about the applications they receive. *See Wynn*, 234 F. Supp. 2d at 1084 (declining to conditionally certify collective across employers because "such a claim cannot, in the interests of fairness and justice, be allowed to proceed"). Plaintiff has provided no case in which any court has ever done so, and Workday has been unable to find any. *See id.* at 1083 (describing as "unprecedented" the plaintiffs' "move of combining the decisions of several loosely-related entities, under an umbrella of a common industry-wide practice," and rejecting certification). In any event, Plaintiff's incoherent and unsupported allegations are nowhere near sufficient to justify certifying such a broad collective here.

### a. Plaintiff fails to explain how Workday's software supposedly discriminates against applicants across employers.

Plaintiff's only attempt to demonstrate that Workday's software discriminates against applicants across employers consists of a sole paragraph alleging that Workday's software "treated all applicants over the age of 40 alike" and "treat[ed] applicants over age 40 discriminatorily." Mot. 12-13. This unsupported and conclusory assertion is plainly insufficient to support his Motion. *See Henry*, 2016 WL 11759747, at *3 ("[U]nsupported assertions of widespread violations are not sufficient to meet [a plaintiff's] burden, even at the lenient first step.").

But even looking beyond this paragraph, Plaintiff's explanation of how Workday's software supposedly constitutes a uniform decision, policy, or plan is all over the place. At times, Plaintiff appears to allege that Workday has an intentional "policy or practice of discriminatory job screening," Mot. 1, and it categorically "uses its algorithmic decision-making tools to screen out applicants who are over the age of 40," Mot. 8. *See also* Mot. 2 (alleging Workday "has engaged

- 21 -

in a policy or practice that causes disparate impact *by discriminating* against applicants . . . who are age 40 and older") (emphasis added). Plaintiff implies that Workday intentionally trains its unspecified "algorithmic decision-making tools" to review applications and "screen out applicants" with application qualities that indicate the applicant is "over the age of 40." But because this Court already dismissed Plaintiff's claim for intentional discrimination under the ADEA, ECF No. 80 at 20, he cannot obtain certification of a collective based on allegations that Workday intentionally discriminates, as he no longer has an intentional discrimination claim. *See Hoffmann-La Roche*, 493 U.S. at 173 ("representative action by plaintiffs not themselves possessing claims was abolished" by collective adjudication procedure under the ADEA).

Other times, Plaintiff refers generically to a "facially neutral employment practice," Mot. 8-9, which Plaintiff sometimes calls a "proprietary screening process," Mot. 1, or simply a "policy of using algorithmic decision-making tools," *e.g.*, Mot. 1, that "has a differential effect upon applicants over 40," Mot. 8-9. But he fails to identify those tools or explain in any way how they are discriminatory. Despite having engaged in significant discovery, Plaintiff articulates no theory and provides no evidence. And he certainly does not plausibly allege that "Workday's AI" applies in the same way to different members of the collective. *See* Mot. 12 (alleging "all applicants over the age of 40" were treated "alike regarding the critical questions in this litigation").

Instead, Plaintiff relies entirely on this Court's decision on Workday's second motion to dismiss, in which the Court concluded that Plaintiff had alleged a "specific employment practice: Workday's use of algorithmic decision-making tools to screen applicants." ECF No. 80 at 13-14; *see* Mot. 1-2. But there are multiple reasons why that conclusion is inapplicable here.

First, at the motion to dismiss stage, the Court was considering whether Plaintiff had sufficiently alleged a "specific employment practice" as an element of *his* ADEA claim—not whether Plaintiff sufficiently alleged a "common decision policy or plan" in the context of collective adjudication. *Compare Smith*, 544 U.S. at 241 (for disparate impact claim, it is not enough to "point to a generalized policy that leads to . . . an impact" because employee must "identify[] the *specific* employment practices that are allegedly responsible for any observed statistical disparities"), *with Campbell*, 903 F.3d at 1120 (to survive decertification motion, plaintiff

must show a "uniform practice"—not "variable practices variably applied"). Nothing in the Court's order on Workday's prior motion suggests that the Court considered, much less decided, that any alleged specific employment practice amounted to a uniform practice that applied uniformly across applications, applicants, and employers. Without that uniformity, there can be no common decision, policy, or plan justifying collective adjudication. *See Campbell*, 903 F.3d at 1120.

Second, Plaintiff has failed in this Motion to support the factual basis for the Court's conclusion on Workday's motion to dismiss. At the pleading stage, this Court concluded that Plaintiff had sufficiently alleged Workday's technology represented a specific employment practice because Plaintiff alleged that his job applications were rejected "over one hundred" times, even though he alleged he was qualified for those jobs. ECF No. 80 at 14. This Court concluded that these allegations plausibly pled the existence of a disparate impact as to Plaintiff's individual claim. *Id.* But now that Plaintiff is seeking certification of a collective, he must support his factual allegations through "declarations or discovery" attached to his Motion, *Henry*, 2016 WL 11759747, at *2, "commensurate with th[is] stage of the proceedings," *Campbell*, 903 F.3d at 1109. He has failed to do so. Thus, he is not entitled to the same inferences he was afforded before simply because he repeats his unsupported allegations in this Motion.

       **b.**       **Plaintiff's own allegations confirm that there is no decision, policy, or plan that applies to applicants the same way across employers.**

Not only does Plaintiff fail to identify a common decision, policy, or plan that applies the same way across employers—which on its own warrants denying his Motion—but Plaintiff's factual allegations actually preclude the existence of one.

First, Plaintiff alleges that Workday's "algorithms are only trained on incumbent employees at a company, allowing the pymetrics[6] Workday Assessment Connector to build a homogenous workforce not representative of the applicant pool." Mot. 8. In other words, Plaintiff alleges that Workday's software reflects whatever workforce a specific employer already has. *See* Mot. 8-9 (alleging "Workday also encourages and uses the recommendations of incumbent employees for

---

[6] Workday Recruiting does not offer any assessments or assessment-like features, including those created by pymetrics. Decl. Moore ¶ 19. Rather, Workday Recruiting supports the use of third-party assessments, which customers can integrate into their application flow. *Id.*

hiring decisions," which supposedly "has a differential effect upon applicants over 40, because . . . incumbent employees [may] consciously or unconsciously refer or recommend few workers over the age of 40"). Even if that were true, a policy that necessarily applies dramatically differently from one employer to another cannot be a "uniform practice" applicable to all members of the collective across employers—rather, the policy would be "variably applied" even to the same candidate from one employer to another. *Campbell*, 903 F.3d at 1120. For example, if an employer had a median workforce over 40 years' old, then on Plaintiff's theory, the "algorithm" would actually *benefit* applicants who were at least 40.

Second, Plaintiff alleges that Workday's purported "algorithmic decision-making tools . . . rely on biased training data and information obtained from . . . personality tests," Mot. 1-2, though he makes clear in his First Amended Complaint that not all employers actually asked him to take a test, *see* ECF No. 47 at 20, and none of the opt-in plaintiffs mentions having ever taken one. The use of personality tests in an "algorithmic decision-making tool[]" then, cannot be a single decision, policy, or practice common to all collective members.

And third, Plaintiff has submitted declarations from opt-in plaintiffs who sometimes *did* receive interviews and were hired for jobs when they applied through Workday Recruiting. *See*, *e.g.*, Mot. 5, 6; Decl. Hughes at ¶ 10 (interviewed); Decl. Knight-Bell ¶ 5 (hired); Dep. Johnson-Rocha at 58:15-23, 142:11-15 (interviewed). Plaintiff provides no explanation for why the very same applicant would be hired for a job with one employer but rejected for a job with another if Workday's software is the real decision-maker and supposedly makes decisions the same way across employers. These allegations do nothing to establish a common decision, policy, or plan across employers. If anything, they prove the opposite—that from employer to employer, the technology Plaintiff believes Workday is using would vary significantly based on facts specific to each employer, like the composition of the employer's workforce and whether the employer uses an assessment or personality test. These "variable practices variably applied" do not constitute a "uniform practice" applicable to all members of the putative collective. *Campbell*, 903 F.3d at 1120. And without a specific decision, policy, or practice that applies uniformly to members of the collective, Plaintiff's Motion falls apart.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION

**2.**     **<u>Plaintiff's allegations are undermined by the significant discovery that has taken place so far, which the Court can and should consider.</u>**

District courts "need not, and should not, disregard . . . evidence" in making an initial determination of similarity under the ADEA, especially when the stakes of sending a notice are so high. *Swales*, 985 F.3d at 442-43; *Clark*, 68 F.4th at 1012 ("the district court should consider the parties' evidence" on similarity). Although the Ninth Circuit has never directly addressed this question, it has acknowledged that district courts look to "the pleadings" as well as "declarations" and "other evidence" in deciding whether to disseminate a notice. *Campbell*, 903 F.3d at 1109. And there is no logical reason not to. After all, the ADEA authorizes collective adjudication only for "employees similarly situated." *Hoffmann-La Roche*, 493 U.S. at 170.

Here, the significant discovery already exchanged in this case confirms Plaintiff's Motion has zero basis in reality. Workday does not offer "employment recommendations," so *no one* belongs in this collective, including Plaintiff. *See* Decl. Totten, Exhibit F at 7. As Workday has shown Plaintiff through discovery, Workday sells software products that customers can use to facilitate their own hiring processes, based on virtually whatever hiring criteria they want, without any involvement from Workday. *Id.* Many Workday customers do not enable any AI functionality on their software at all. *Id.* And those who do are not handing over their hiring process to Workday. Rather, those customers alone choose to use or ignore the AI functionality embedded in their software based on whether they find it useful. *Id.* Moreover, Workday does not recommend, screen out, or otherwise assess or predict applicants' likelihood of success in a role. *Id.* As Plaintiff is well aware, then, customers do not "delegate their selection decisions to Workday who in turn uses its algorithmic decision-making tools to screen out applicants who are over the age of 40," Mot. 8.

Plaintiff hopes to hide the truth behind a series of inapposite decisions in which district courts have not credited *contradictory* fact evidence submitted by defendants opposing conditional certification. *See* Mot. 11-12. But not one of those decisions addressed the situation here, where the Plaintiff's allegations have *no* evidentiary support, and are squarely contradicted by the *only* relevant evidence, which *already* has been produced by the defendant. *See Heath*, 215 F. Supp. 3d at 853-55 (plaintiff provided statistical evidence and declarations from others with similar

experiences); *Escobar v. Whiteside Constr. Corp.*, 2008 WL 3915715, at *4 (N.D. Cal. Aug. 21, 2008) (plaintiff submitted declarations saying workers were required to report at a specific time and defendant submitted declarations saying workers were not required to report at that time, so court did not resolve a "he-said-she-said" competition between declarations); *Sanchez v. Sephora USA, Inc.*, 2012 WL 2945753, at *3 (N.D. Cal. July 18, 2012) (finding evidentiary showing sufficient because "little, if any, discovery has yet been undertaken" at "this stage of the proceedings"); *Ramirez v. Ghilotti Bros.*, 941 F. Supp. 2d 1197, 1205 (N.D. Cal. 2013) (declining to weigh competing declarations); *Luque v. AT&T Corp.*, 2010 WL 4807088, at *5 (N.D. Cal. Nov. 19, 2010) (declining to weigh competing declarations); *Villa v. United Site Servs. of Cal., Inc.*, 2012 WL 5503550, at *13-14 (N.D. Cal. Nov. 13, 2012) (declining to weigh competing declarations).

Particularly given the incredible breadth of the collective alleged here, at a minimum, this Court can and should consider Workday's evidence confirming that employers use Workday's software to effectuate *their own* decisions, policies, and plans—and, therefore, it is impossible for every member of the putative collective to be subject to the *same* decision, policy, or plan across employers, industries, and jobs. *See Swales*, 985 F.3d at 442; *Clark*, 68 F.4th at 1012.

**C.** **Plaintiff's Proposed Notice Is Nothing More Than a Prohibited "Solicitation."**

The similarly situated analysis is not something that can be "ignore[d]" at step one of the conditional certification process and then meaningfully applied for the first time at step two. *Swales*, 985 F.3d at 442. That is because Supreme Court precedent "flatly forbids" district courts from "send[ing] notice," *id.*, when it is clear from the face of the complaint and motion that recipients are "not, in fact, eligible to join the suit," *Clark*, 68 F.4th at 1010, because they are not "alike in ways that matter to the disposition of their [ADEA] claims," *Campbell*, 903 F.3d at 1114.

In *Hoffmann-La Roche*, the Supreme Court explained that "[c]ourt intervention in the notice process for case management purposes is distinguishable in form and function from the solicitation of claims." 493 U.S. at 174. A notice "function[s]" as a "solicitation of claims," *id.*, when it goes out to recipients who are not "potential plaintiffs," *id.* at 169. *See Swales*, 985 F.3d at 442 (a "notice sent is proper in scope" when it is "sent only to potential plaintiffs"). "[E]mployees who are not,

in fact, eligible to join the suit" are not potential plaintiffs. *Clark*, 68 F.4th at 1010. And employees who are not "similarly situated" to the named plaintiff are not eligible to join the suit. *Swales*, 985 F.3d at 434; *see Hoffmann-La Roche*, 493 U.S. at 177 (Scalia, J., dissenting on courts' authority to facilitate a notice, but acknowledging that courts have an "ever-present duty" to ensure plaintiffs who "become parties are *in fact* similarly situated to the representative" in a collective action). When a district court "ignores the 'similarly situated' analysis" and "send[s] notice to employees who are not potential plaintiffs," it "cross[es] the line from using notice as a case-management tool to using notice as a claims-solicitation tool." *Swales*, 985 F.3d at 442 (citing *Hoffmann-La Roche*, 493 U.S. at 174). Such a notice exceeds district courts' "authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure." *Hoffmann-La Roche*, 493 U.S. at 170. And that is exactly what Plaintiff requests here.

This case perfectly illustrates why such solicitations are unlawful. Sending a notice, all on its own, can be a "dispositive" decision "in the sense of forcing a defendant to settle—because the issuance of notice can easily expand the plaintiffs' ranks a hundredfold." *Clark*, 68 F.4th at 1007; *see also Swales*, 985 F.3d at 436 (issuance of a notice "exerts formidable settlement pressure"). And if those plaintiffs are not similarly situated to the named plaintiff, and their claims cannot be tried together, then the notice has "merely stir[red] up litigation" that would not have otherwise existed—and against which the defendant must now defend itself if those plaintiffs file individual actions. *Swales*, 985 F.3d at 441. That concern is particularly strong in a case like this one, where Plaintiff seeks to notify *hundreds of millions of people* that Plaintiff's attorneys stand ready to represent notice recipients in a (even meritless) suit against Workday.

Additionally, sending a notice to an audience this large would unfairly malign Workday's products on the world stage. Plaintiff's proposed collective encompasses essentially the entire world. While a notice (normally) is not meant to signal a court's endorsement of the merits of an action, under these circumstances, such a broad notice could chill Workday's customers from continuing to use Workday's products, or could dissuade potential customers from buying those products in the first place. *See Hoffmann-La Roche*, 493 U.S. at 174 ("[C]ourts must be scrupulous

1    to respect judicial neutrality.  To that end, trial courts must take care to avoid even the appearance

2    of judicial endorsement of the merits of the action.").  All without even a sliver of proof that

3    Workday's software does anything Plaintiff alleges—and, as Plaintiff now knows from discovery,

4    it does not.

5        Given the many inadequacies in Plaintiff's Motion and the obvious lack of similarity among

6    members of the putative collective, there is no justification for imposing these costs on Workday.

7    And indeed, sending the kind of solicitation Plaintiff requests would be legal error.  *Id.*

8        **D.    A Notice Is Impossible to Disseminate.**

9        Plaintiff's request to disseminate a notice is also impossible to accomplish because

10    Workday does not have access to the kind of applicant data Plaintiff seeks for sending a notice, let

11    alone determining *who* should receive one.

12        First, as Plaintiff is well aware through discovery, Workday does not have access to either

13    applicants' personal information (which is why Plaintiff has been serving third-party subpoenas on

14    dozens of Workday's customers), or to information regarding how applicants' applications were

15    reviewed and dispositioned.  Decl. Totten, Exhibit F at 22-23.  Workday also has no way of

16    obtaining that information.  Workday has thousands of customers, all of whom have contracts with

17    Workday prohibiting Workday from accessing applicants' confidential personal data.  Decl. Moore

18    ¶ 21.  Plaintiff's request is akin to asking Microsoft to turn over the information of every customer

19    who has ever used Microsoft Word's paperclip feature.  That would be an impossible task.

20    Workday cannot be required to produce information it does not have and cannot reasonably obtain.

21        Additionally, even if Workday had the applications of every individual who applied for a

22    job through Workday Recruiting during the relevant period, which could be *billions* of applications,

23    *see supra* p. 18-19, it would be impossible to go through every single application for evidence of

24    applicants' age.  Contrary to Plaintiff's assertion, there is no automated way for Workday to

25    determine candidates' ages based on their application materials.  Instead, Workday would need to

26    review each application individually for some indicia of age.  That is simply an impossible exercise

27    (and one that is especially unjustifiable given the many deficiencies in Plaintiff's Motion).

28        Moreover, even if it were possible to review billions of applications individually, there is

no reason to believe that every applicant's materials would include some indicia of age, much less a reliable one—especially for applicants who do not have college degrees, attended college later in life, do not include their graduation date, or do not include their work history past a certain date. *See*, *e.g.*, Mobley Dep. at 44:15-17 (Q. "Why did you stop that [including dates of your education] as a practice?" A. "Because I feared that employers might utilize the dates to determine my age."); Hughes Dep. at 136:2-8 (Q. "Have you submitted applications where you omit your years, the specific dates in which you were employed or the date upon which you received your degree?" A. "If the option is available to omit it, I always do."); Johnson-Rocha Dep. at 157:17-25 (Q. "How do you believe the algorithmic decision-making tools determined your age?" A. "From my years of experience in the industry . . . . That's why I dropped the [2003 employer] off, because people were telling me start dropping off the bottom of your CV so they don't know how old you are.").

Finally, Plaintiff seeks contact information for individuals who were "scored" using "Workday's AI," but his putative collective is supposedly limited to individuals who did not receive an "employment recommendation[]." *Compare* Mot. 9, (defining collective as individuals who were "denied employment recommendations"), *with* Mot. 15 (asking for "the names and contact information for potential class members, *i.e.*, whose employment application(s) was scored by Workday's AI"). In other words, Plaintiff requests the contact information for individuals who were "scored" by Workday's AI, whether they received an employment recommendation (if such a thing existed) or not. Individuals who do not even fall within the proposed collective cannot be eligible to receive a notice. *See Swales*, 985 F.3d at 442 (citing *Hoffmann-La Roche*, 493 U.S. at 174). Additionally, as Plaintiff also knows, Workday does not "recommend" candidates for employment. Decl. Totten, Exhibit F at 7. Thus, even if Plaintiff amended his request to align with the definition of the putative collective, there would still not be anyone eligible to receive a notice. Dissemination of a notice is thus impossible.

**E.** **The Parties Should Be Permitted to Meet And Confer Regarding the Form And Content of Any Notice.**

Plaintiff's request to debate the content of and procedure for disseminating his proposed notice before the Court has even determined the scope of the putative collective is premature.

Courts conditionally certifying a collective typically order the parties to meet and confer "regarding the language and form of the proposed notice[]." *Chetwood v. T-Mobile USA, Inc.*, 2020 WL 1689730, at *4 (W.D. Wash. Apr. 7, 2020); *see, e.g.*, *Heath*, 215 F. Supp. 3d at 859 (same). Here, should the Court decide to conditionally certify the collective, the parties should be permitted to meet and confer regarding Plaintiff's notice proposal and *then* bring any disputed issues to the Court. *See*, *e.g.*, *Gonzales v. Charter Commc'ns, LLC*, 2020 WL 8028108, at *6 (C.D. Cal. Dec. 4, 2020) ("When parties disagree about the content and manner of notice, it is appropriate for them to meet and confer to try to reach agreement about proper notice.") (collecting cases).

A quick glance at Plaintiff's notice proposal explains why—it is riddled with objectionable language and procedural defects that both prejudice Workday and interfere with recipients' ability to "make informed decisions about whether to participate" in the action. *Hoffmann-La Roche*, 493 U.S. at 170. A brief list is included below.

### 1. Plaintiff's proposed notice is partial in Plaintiff's favor.

As the Supreme Court warned in *Hoffmann-La Roche*, "courts must be scrupulous to respect judicial neutrality" and "take care to avoid even the appearance of judicial endorsement of the merits of the action" when issuing a notice. *Id.* at 174. Plaintiff's proposed notice, if authorized, would violate these principles.

For example, at the beginning of Plaintiff's proposed notice, the proposed notice suggests that Plaintiff is correct on the merits of his ADEA claim by referring to a "[c]ollective action lawsuit against Workday *for violations* of the [ADEA]." Decl. Cooks, Exhibit 5 at 1 (emphasis added). This suggestion that Plaintiff and recipients have valid claims against Workday for violations of the ADEA impermissibly signals this Court's endorsement on the merits. *See Hoffmann-La Roche*, 493 U.S. at 174. This statement should be deleted.

Plaintiff's proposed notice also impermissibly suggests that Workday may try to retaliate against someone for joining the lawsuit, *see* Decl. Cooks, Exhibit 5 at 3 ("Federal law prohibits Workday or retaliating against you for 'opting-in' to this lawsuit or otherwise exercising your rights.")—which is impossible because Workday has no visibility into the applications submitted using its software, as explained above. *See supra* p. 28; Decl. Totten, Exhibit F at 22-23. But by

making the statement, the proposed notice implies this Court's view is the opposite; that Workday can and does interfere in its customers' hiring process. That is tantamount to the Court's endorsement of the Plaintiff's theory on the merits of this lawsuit. *Hoffmann-La Roche*, 493 U.S. at 174. It should be deleted from any notice.

And to make matters worse, Plaintiff's proposed notice waits until the last page of the four-page document to explain that the Court "has taken no position in this case regarding the merits of Plaintiff's claims or of [Workday's] defenses." Decl. Cooks, Exhibit 5 at 4. This information should be included at the *beginning* of any notice to prevent "the appearance of judicial endorsement of the merits of the action," *Hoffmann-La Roche*, 493 U.S. at 174.

**2.** **Plaintiff's proposed notice is misleading, including incorrect information and omitting critical information.**

Plaintiff's proposed notice is also confusing and likely to mislead recipients. For one thing, it repeatedly refers to members of the putative collective as "class members"—which may confuse notice recipients about the form of collective adjudication available to them here. *See*, *e.g.*, Decl. Cooks, Exhibit 5 at 2 ("If you choose to participate in the suit as a class member . . . ."). For another, it repeatedly invites recipients to "make a claim"—which impermissibly implies that recipients can come and "claim" a monetary reward, rather than come and *bring a lawsuit*. *See id.* ("Persons eligible to make a claim in this lawsuit"; "How to make a claim in this lawsuit"; and "If you wish to make a claim"). These statements are misleading and run afoul of the requirement that a notice be clear and accurate. *See Hoffmann-La Roche*, 493 U.S. at 170 (recipients' ability to "make informed decisions about whether to participate" in the action "depend on [their] receiving accurate" notice).

Plaintiff's proposed notice also omits necessary information. The proposed notice functions as an advertisement for Plaintiff's attorneys, and does not at all indicate that notice recipients have the option of hiring *their own* attorneys or proceeding *pro se*. *See*, *e.g.*, *Heaps v. Safelight Sols., LLC*, 2011 WL 1325207, at *9 (S.D. Ohio Apr. 5, 2011) ("[T]he notice shall contain a statement indicating that the opt-in plaintiffs are entitled to be represented by the named Plaintiffs' counsel or by counsel of his or her own choosing.") (collecting cases).

Plaintiff's proposed notice likewise fails to inform recipients that collective members could incur certain costs if Workday prevails. *See*, *e.g.*, *Stanfield v. First NLC Fin. Servs.*, 2006 WL 3190527, at *5 (N.D. Cal. Nov. 1, 2006) (acknowledging "potential Plaintiffs should be made aware of any fees or costs for which they may be liable before opting in to the lawsuit" and ordering parties to meet and confer to revise notice accordingly).

And the proposed notice fails to inform recipients that if they choose to opt into the collective, they could be required to sit for depositions or testify in court. Instead, it vaguely informs recipients that they "might be required to provide *information* or testimony relevant to the lawsuit." Decl. Cooks, Exhibit 5 at 2 (emphasis added). This warning is insufficient to convey the process plaintiffs may be required to participate in should they opt into the collective, and thus fails to provide potential plaintiffs a fair statement of their rights and obligations. *See*, *e.g.*, *Heaps*, 2011 WL 1325207, at *8 ("language fully describing possible discovery requirements of opt-in plaintiffs" "allow[s] potential plaintiffs to make a reasoned decision about the time they would need to invest in the suit should they decided to opt-in"); *see also Hoffmann-La Roche*, 493 U.S. at 170 (purpose of notice is to help recipients "make informed decisions about whether to participate" in the action).

### 3. The procedure Plaintiff proposes for disseminating a notice is deficient.

Again, disseminating a notice would be impossible because Workday does not possess, own, or control any of the information that would be necessary to determine who should receive a notice, much less where to send one. But in the event the Court authorizes some form of notice, Workday objects to Plaintiff's proposed procedure for disseminating a notice.

First, Plaintiff's proposed 90-day notice period is unnecessarily protracted. 60 days would be more than sufficient given that this case has been highly publicized during the two years that it has been litigated. *See*, *e.g.*, *Stanfield*, 2006 WL 3190527, at *6.

Second, Plaintiffs are not entitled to disseminate a notice via text message, which is cumbersome, intrusive, and insecure. *See*, *e.g.*, *Chetwood*, 2020 WL 1689730, at *5 ("Out of concerns for privacy, the Court declines to require production of telephone numbers at this time and will not order notice by text message."). Plaintiff also requests Workday hand over applicants'

mailing addresses, even though Plaintiff does not propose mailing the proposed notice to putative collective members. Mot. 14-15. Plaintiff has no basis for requesting this sensitive information without an intent to mail a notice. Additionally, Plaintiff's Motion says nothing about protecting applicants' data whatsoever, despite calling for Workday to hand over that data to a third party. The parties should meet and confer to determine how best to protect applicants' data.

And finally, if the Court is inclined to grant Plaintiff's request, Plaintiff should be required to bear any costs associated with sending a notice. *See Stanfield*, 2006 WL 3190527, at *5 (ordering plaintiffs to "bear the costs of notice," as plaintiffs usually do in the Rule 23 context).

## V.    CONCLUSION

Workday respectfully requests the Court deny Plaintiff's Motion in its entirety with prejudice. In the alternative, Workday requests the Court provide the parties with the opportunity to meet and confer regarding the form and content of and procedure for disseminating any notice, and only after bring any remaining disputes to the Court for resolution.

Dated: March 6, 2025                                ORRICK, HERRINGTON & SUTCLIFFE LLP


                                                    By:    */s/ Julie A. Totten*
                                                           JULIE A. TOTTEN
                                                           Attorneys for Defendant
                                                           WORKDAY, INC.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION