UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK MOBLEY,<br><br>        Plaintiff,<br><br>    v.<br><br>WORKDAY, INC.,<br><br>        Defendant. | Case No. 23-cv-00770-RFL<br><br>**NOTICE OF QUESTIONS FOR HEARING**<br><br>Re: Dkt. No. 106 |

The Court requests that the parties be prepared to address the following questions at the hearing on Plaintiff's Motion for Conditional Class Certification, set for hearing on April 29, 2025, at 10:00 a.m., in Courtroom 15 at the San Francisco Courthouse.

1. Plaintiff Mobley plausibly alleged that Workday discriminates against applicants over 40 by scoring applications using an AI/ML-based system at the screening stage in a manner that has a disparate impact on older applicants. Workday contends that its scoring algorithms cannot be viewed as a single practice because different employers may configure their systems to rely on the score to different degrees, and because the algorithm may have a different effect on employers whose incumbent workforce is older versus employers with a younger incumbent workforce. Is it appropriate to examine the effect of the challenged scoring algorithms on an employer-by-employer level, though? For example, imagine a classic disparate impact case where an employer required all employees to take a test of physical strength that had a disparate impact on employees over 40, and considered that test in evaluating employees for promotion. Some divisions might weigh that test more heavily (e.g., the warehouse team versus the accounting team), and some offices might be affected

1

less than others (e.g., one office has a high number of physically strong older employees who play basketball together every week). But there would still be a common issue of whether the overall companywide policy of using the discriminatory exam in making promotion decisions had a disparate impact, even if the effect varied by division or office location. Does a similar logic apply to employers' reliance on Workday's allegedly discriminatory scores at the screening stage?

2. Workday argues that some Opt-In Plaintiffs and some members of the proposed collective action received fewer rejections than Mobley or were unqualified for the jobs for which they applied. Do those individuals' claims nonetheless still share the same common core issue with Mobley: that is, whether Workday's scoring system causes an illegal discriminatory impact on applicants over 40?

3. Workday suggests that those who were unqualified or received few rejections should be excluded from the proposed collective. But, for disparate impact claims, Article III standing to seek injunctive relief can be based on the denial of the *opportunity* to compete on equal footing, not the denial of the job itself. Thus, an individual may seek injunctive relief to avoid being subjected to the allegedly discriminatory scoring system in the future, even if they would still have been denied the jobs to which they had applied in the past or they had some success in getting interviews in the past. Given that the proposed collective seeks injunctive relief, why should these individuals be excluded?

4. Workday represents that "no one" is in the proposed collective because its systems do not make "employment recommendations." At the same time, Workday's interrogatory responses state: "Workday customers who purchase Workday Recruiting have access to Candidate Skills Match ('CSM'), which they can choose to turn on or off. If a customer chooses to turn on CSM, CSM utilizes artificial intelligence to parse an employer's job posting and an applicant's application and/or resume; extract skills in the employer's job posting, on the one hand, and skills from

the application and/or resume on the other hand; and determine the extent to which the applicant's skills match the role to which they applied. The results of CSM are reported as 'strong,' 'good,' 'fair,' 'low,' 'pending,' and 'unable to score.'" Why do the CSM results not constitute an AI "recommendation"? Similarly, why do the Workday Assessment Connector ("WAC") results not constitute a ML "recommendation"?

5. Plaintiffs define the collective to include those who were "denied employment recommendations." Do Plaintiffs understand that to mean any situation in which an applicant received a score lower than the highest possible score, and that such score was communicated to the employer (i.e., that the employer turned on the feature to receive the score)? To the extent that there are line-drawing problems in determining who should be within the collective, is that a basis for denying notice to the collective in its entirety?

6. Workday asserts that it does not have "possession, custody or control" of applicant data due to contractual obligations to its customers. If ordered by the Court to provide said data, would Workday still lack legal authority to access to the data necessary to prepare a list of individuals to be noticed? If so, should the Court order Workday to subpoena the required information from its customers? Also, if the information is equally available to Plaintiffs as to Workday, why is it not Plaintiffs' responsibility to obtain the data via third-party subpoena?

7. Can Workday identify which of its customers have enabled AI or ML scoring tools at the screening stage, such as CSM or WAC? Assuming the answer is yes, and further assuming that Workday can lawfully access applicant information, can Workday identify the score that its CSM or WAC tools assigned to a particular applicant?

8. Workday observes that many employers do not collect applicants' dates of birth. Does Workday's software allow Workday to extract or otherwise estimate an applicant's college or high school graduation year?

9. To the extent that there are difficulties identifying members of the proposed collective due to recordkeeping issues, would it be appropriate for the Court to order publication notice? *See Carrillo v. Schneider Logistics, Inc.*, No. 11-cv-8557, 2012 WL 556309, at *13 (C.D. Cal. Jan. 31, 2012), *aff'd*, 501 F. App'x 713 (9th Cir. 2012). In that situation, would the parties still need to individually investigate each proposed opt-in member to see how they had been scored?

At the hearing, each side will address each question in the sequence stated above, and then at the end, the parties will have additional time to present any additional argument that they wish the Court to hear. The parties **shall not** file written responses to this Notice of Questions.

**IT IS SO ORDERED.**

Dated: April 24, 2025

RITA F. LIN
United States District Judge