Pages 1 - 55

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

DEREK MOBLEY, for and on        )
behalf of himself and other     )
persons similarly situated,     )
                                )
          Plaintiff,            )
                                )
  VS.                           )    NO. 23-CV-00770-RFL
                                )
WORKDAY, INC.,                  )
                                )
          Defendant.            )
_____  )

                          San Francisco, California
                          Tuesday, April 29, 2025

                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    WIGGINS CHILDS PANTAZIS FISHER & GOLDFARB
                    301 19th Street North
                    Birmingham, AL 35203
               BY:  ROBERT L. WIGGINS, JR., ATTORNEY AT LAW

                    WINSTON COOKS, LLC
                    351 24th Street North
                    Box 122
                    Birmingham, AL 35203
               BY:  LEE. D. WINSTON, ATTORNEY AT LAW
                    RODERICK T. COOKS, ATTORNEY AT LAW


          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

**APPEARANCES:** (Continued)

For Defendant:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    400 Capitol Mall, Suite 3000
                    Sacramento, CA 95814
           BY:  **JULIE A. TOTTEN, ATTORNEY AT LAW**
                **KAYLA D. GRUNDY, ATTORNEY AT LAW**
                **ALEXANDRIA R. ELLIOTT, ATTORNEY AT LAW**

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, CA 94105-2669
           BY:  **ERIN M. CONNELL, ATTORNEY AT LAW**

**Tuesday - April 29, 2025**                                    **10:02 a.m.**

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:**  Calling Civil Case 23-770,
Mobley v. Workday, Inc.

Counsel, please step forward to the podiums and state your
appearances.

**MR. WIGGINS:**  Rob Wiggins for the plaintiffs.

**MS. TOTTEN:**  Good morning, Your Honor.  Julie Totten,
Erin Connell, Kayla Grundy, and Ali Elliott appearing on behalf
of Workday.

**THE COURT:**  Good morning to all of you.

Last week I put out some of the main questions that I have
about the pending motion.  I'd like to just walk through those.
And then, at the end, if you have anything else you'd like me
to know or think about as I'm considering this motion, I'll be
open to hearing it.

So let's just start with Question 1.  I'm going to read
out the question to make sure that everyone's on the same page.
And then, for Question 1, I'd like to hear from Workday first,
and then I can give plaintiff an opportunity.

So Question 1 is that Plaintiff Mobley plausibly alleged
that Workday discriminates against applicants over 40 by
scoring applications using an AI/ML-based system at the
screening stage in a manner that has a disparate impact on

1  older applicants.

2      Workday contends its scoring algorithms cannot be viewed

3  as a single practice because different employers may configure

4  their systems to rely on the score to different degrees and

5  because the algorithm may have a different effect on the

6  employers whose incumbent workforce is older versus employers

7  with a younger incumbent workforce.

8      My question is, is it appropriate to examine the effect of

9  the challenged scoring algorithms on an employer-by-employer

10 level though?  For example, imagine a class disparate impact

11 case where an employer required all employees to take a test of

12 physical strength that had a disparate impact on employees over

13 40, and consider that test in evaluating employees for

14 promotion.

15     Some divisions might weigh that test more heavily, like

16 the warehouse team versus the accounting team, and some offices

17 might be affected less than others, like one office that has a

18 high number of physically strong older employees who play

19 basketball together every week.  But there would still be a

20 common issue of whether the overall companywide policy of using

21 the discriminatory exam in making promotion decisions had a

22 disparate impact, even if the effect varied by division or

23 office location.

24     So does a similar logic apply to employers' reliance on

25 Workday's allegedly discriminatory scores at the screening

 1  stage?  I'll give Workday the first opportunity to address that

 2  question.

 3           **MS. TOTTEN:**  Thank you, Your Honor.  So I have three

 4  short preliminary comments, and then we'll address the

 5  hypothetical and the question that you posed.

 6           First, while your order on Workday's motion to dismiss the

 7  first amended complaint did find that plaintiff has plausibly

 8  alleged that Workday discriminates against applicants over 40

 9  by scoring applications using an AI/ML-based system at the

10  screening stage, plaintiff's proposed definition of the

11  collective here is significantly broader than that, as stated

12  on page 9 of their motion.

13           Rather than tailoring his proposed collective to just

14  those applicants processed by AI or ML, and just those

15  customers who relied on the information provided by the AI/ML,

16  he instead seeks to certify, as a collective, quote, "All

17  individuals, 40 or over, who applied for job opportunities

18  using Workday's job application platform and were denied

19  employment recommendations," closed quote.

20           This is not consistent with your order.  And utilizing

21  this definition would sweep in every applicant, 40 or over, who

22  applied to every job at every Workday customer.  This is simply

23  untenable and no similar case has ever been certified.

24           We do note that, on page 15 of plaintiff's motion, he uses

25  a slightly different definition that is closer, but still not

the same as your order.  There he states that notice should be
delivered to individuals whose employment applications were
scored by Workday's AI for any of their customers and were 40
years of age or older at the time.

Although we contest certification is appropriate at all,
this definition is much more consistent with your order, which
is also then relevant to this question.

Second, I would like to point out that while you did find
the plaintiffs plausibly alleged that Workday discriminates
against applicants over 40 by scoring applications using an
AI/ML-based scoring system in a manner that has a disparate
impact on older applicants, plausibility is not the standard at
this conditional certification stage.  Rather, plaintiff must
make substantial allegations that the putative class members
were subject to an illegal policy, plan, or decision by showing
that there is some factual basis beyond just mere averments in
the complaint for collective allegations.

These allegations must be supported by declarations.
Unsupported allegations of ADEA violations are not sufficient
to meet the plaintiff's burden, as noted on page 16 of our
opposition.

Here, Mr. Mobley submitted no declaration to support his
allegations.  And the declaration submitted by the opt-in
plaintiffs -- four of them -- are conclusory at best.  Thus,
plaintiff has not met his burden at this stage of the

1    proceeding of showing that there is a single policy, plan, or

2    decision in question here.

3        Third, I would like to address your statement that Workday

4    argues Candidate Skills Match's algorithm would have a

5    different impact on employers whose incumbent workforce is

6    older versus employers with a younger incumbent workforce.  To

7    be clear, this is not Workday's position.  Workday does not

8    argue that CSM, Candidate Skills Match, is trained on the

9    incumbent workforce or that the age of the incumbent workforce

10   would impact how CSM operates in any way, because it's simply

11   not true.

12       Workday only mentions a company's incumbent work -- sorry.

13   Workday only mentioned a company's -- a company's incumbent

14   employee population in response to plaintiff's argument that

15   Workday's algorithms are trained on incumbent employees.  That

16   is at plaintiff's motion, page 8.

17       You're right, Your Honor, that we based an argument on

18   their allegation in the complaint that was simply based on

19   their allegation in the complaint.

20           **THE COURT:**  It was --

21           **MS. TOTTEN:**  It is not based on reality.

22           **THE COURT:**  It was about their allegation about

23   Workday Assessment Connector, which it was not quite clear to

24   me from the briefing.  But I wonder, is that the same as

25   Candidate Skills Match or is it a different tool?  And then if

1  it's a different tool than Candidate Skills Match, than is that

2  the tool that you're talking about when you say that there

3  would be potentially a difference between training on an

4  incumbent workforce that's older versus younger?

5      **MS. TOTTEN:**  Good questions, but not at all, Your

6  Honor.  The Workday Assessment Connector is nothing more, Your

7  Honor, than a bridge.  Workday partners with third-party

8  companies that provide offerings that might be of interest to

9  its customers.  They are not Workday.  They have nothing to do

10 with Workday, other than it's an integration tool that allows

11 seamless integration so that a Workday customer, if it chooses

12 to do a personality test or some other test, has the ability to

13 choose to basically, like, import that test that a third-party

14 provider -- so it's the connector -- that bridge is the

15 integration between a third-party product and the ability to

16 have a seamless experience for the customer and the applicant.

17 That is all that that is.

18     **THE COURT:**  So when Workday says on its web page,

19 according to the complaint, that -- I think the language was,

20 "Our skills intelligence foundation helps you build diverse

21 teams by expanding candidate pools with equitable, AI- and

22 ML-driven job recommendations" -- is it talking about something

23 other than Candidate Skills Match?

24     **MS. TOTTEN:**  I'm not familiar with exactly where that

25 quote comes from, Your Honor.  I'm not --

 1          **THE COURT:**  From

 2    Workday.com/products/talent-management/talent-acquisition is

 3    the allegation in the complaint.

 4          **MS. TOTTEN:**  I'm just not -- I haven't looked back at

 5    that recently.  There is no doubt that Workday is selling a

 6    product, Workday Recruiting.  And Workday Recruiting does allow

 7    its customers to try to make more sense of the inundation that

 8    they had received when they receive -- you know -- the way that

 9    people used to apply for a job is really quite different than

10    the way that you apply for a job now.

11          You used to get out your, you know, typewriter and maybe

12    your computer and prepare a résumé.  And it was on a piece of

13    paper.  And, you know, you mailed it in to an employer or you

14    delivered it in person.  And, now, because it is all digital,

15    they are inundated with -- you know -- employers -- Workday's

16    customers -- received thousands of applications for, you know,

17    numerous of the jobs that they post.

18          Workday provides a platform, Workday Recruiting, tool,

19    setting apart Candidate Skills Match.  We won't even talk about

20    that for a moment.  They are non-AI, non-ML components of

21    Workday Recruiting that allow customers the ability to assess

22    and kind of like batch individuals based on a question they

23    might pose, for example.

24          **THE COURT:**  I understand that there's non-AI/ML

25    components.  But surely Workday is not denying that it has AI

1    and ML components to the candidate evaluation process when

2    employers are trying to sift through those thousands of

3    résumés.

4         **MS. TOTTEN:**  For those customers who choose to use the

5    AI/ML components, we have identified what it is.  You pointed

6    it out in another one of your questions.  It's called Candidate

7    Skills Match.  And Candidate Skills Match, Your Honor, operates

8    in a different way than what your hypothetical suggests.  So --

9         **THE COURT:**  Is Candidate Skills Match the only AI/ML

10   component to that process that Workday offers?

11        **MS. TOTTEN:**  Yes.  It is the only AI/ML component

12   within Workday Recruiting that assists in kind of the -- an

13   extra layer of, like, helping to sort the candidates and assess

14   the degree to which -- the job requisition requirements.

15        So customer prepares a job requisition.  Within that job

16   requisition, Your Honor, are job requirements.  They use

17   certain words -- right? -- to describe a job.  The applicant

18   submits their application or résumé.  They use certain words to

19   describe what their knowledge, experience, and skills are,

20   primarily focused on skills here, and Candidate Skills Match

21   essentially just matches the words the customer chooses to the

22   words that the applicant chooses in their application.

23        **THE COURT:**  Or at least that's Workday's position.

24   And you are all partway through discovery on this issue, but

25   nowhere near complete, as I understand it.

1    Okay.  So, thank you, I appreciate the point.  So you said

2   you had three points, and then you wanted to address the

3   question directly.

4        **MS. TOTTEN:**  So I got through my three points.  So

5   thank you.

6        So turning to your question, respectfully, Your Honor, the

7   analogy that you provided does not fit how Candidate Skills

8   Match -- the feature of Candidate Skills Match -- actually

9   operates.

10       So in your example, a single employer requires all

11  employees across various divisions to take the same test, with

12  each division interpreting the results differently.  A more apt

13  scenario would be that while each division uses a strength

14  test, as you suggest, some do that by requiring pull-ups.  Some

15  require carrying a 50-pound bag.  And others require throwing a

16  ball as far as possible.  Each test is different.  So the

17  individuals who took the pull-up test, for example, could not

18  be compared to the individuals who took the weight-carrying

19  test.

20       The analogy also does not work because Candidate Skills

21  Match does not in and of itself contain any substantive content

22  or requirements.  There are no test questions, for example.

23  There's no functional requirement of something like the ability

24  to carry a 50-pound weight baked into Candidate Skills Match.

25  Rather, Candidate Skills Match is a sorting framework.  It's an

1   algorithm, meaning it's just a set of steps that are followed

2   once the inputs are provided.  The customers supply the initial

3   input -- the job requisition that they create -- and then the

4   applicants provide the application or résumé that they create.

5        Each time an application or résumé is submitted to an open

6   customer job requisition, that is when Candidate Skills Match

7   goes to work basically.  It's triggered.  And what it is

8   looking for is it's -- again, it's categorically assessing the

9   extent to which the skills listed by the customer in the job

10  requisition match the skills that are listed in the application

11  or résumé.

12       So even if you viewed the process of scoring as a test,

13  which we dispute -- we do not believe that it is a test,

14  because it doesn't have any intrinsic valuation to it.  It's

15  not a weight test.  There's no test questions.  It has no

16  intrinsic value in and of itself, until you actually run the

17  applications through it.  And then it starts to have some

18  value.  That's where it has an offering.

19       So each time you do that, a unique job requisition -- so

20  it's compared to the unique job résumé -- and we dispute that

21  that constitutes a test, Your Honor.  But if you did view that

22  as a test, you would not be able to aggregate the instances of

23  scoring one test to another, because each one would be

24  different.

25       So if, for example, we take Mr. Mobley; right?  If

1   Mr. Mobley says that he applied to 100 jobs, and let's say that
2   he received the lowest score on all of them, for example -- he
3   got a "low" -- in some of the instances, depending upon what
4   the job was and what the job requisition said, a low score may
5   be appropriate.  Because he did not have any of the skills that
6   were required in the job requisition for that job, as selected
7   by the customer.

8        But in another situation, perhaps if hypothetically --
9   speaking, of course, hypothetically -- if Candidate Skills
10  Match wasn't working well, then -- and it gave a "0" or a "low"
11  in a situation where he had a few skills -- and let's say it
12  should have been a "good" -- right? -- there's no way, without
13  going instance by instance of running Candidate Skills Match --
14  application by application, job requisition by job
15  requisition -- there's no way to aggregate that to determine
16  whether there is a disparate impact.

17       **THE COURT:**  One question I have about that position is
18  that it sounds like in order to assess whether the Candidate
19  Skills Match is doing something more than just a key word match
20  or something along those lines, there needs to be some merits
21  assessment and discovery.

22       And that the answer to that question -- how much does
23  Candidate Skills Match do and how much is it responsible -- if
24  there is a disparity in applying Candidate Skills Match across
25  different employees and across different employers, how much of

1    that is Workday's fault in the sense of the way Candidate

2    Skills Match is built versus the employer's fault in terms of

3    which key words they're picking and what they're putting into

4    the process?

5        That seems to me to be both a merits inquiry and an

6    inquiry that would be common across the collective.  What's

7    wrong with that view?

8        **MS. TOTTEN:**  It's not common across the collective,

9    Your Honor, because there is no common test.  There is no

10   common test.

11       **THE COURT:**  But isn't that the common question?  If

12   Workday is creating what is effectively a common test, is the

13   common question -- or help me understand what I'm -- what

14   Workday's response would be to that.

15       **MS. TOTTEN:**  Sure.  I'll start by stepping back a

16   moment to what we're here for today; right?  I understand you

17   want to kind of talk about the merits.  But I want to talk

18   about conditional certification -- right? -- and what is

19   required.  Because this could be incredibly prejudicial for

20   Workday, as you might imagine, for notice to be sent out and it

21   to have to grapple with tarnishment to its reputation by the

22   mere insinuation that its products are discriminatory.

23       So there's a standard that has to be met.  And it's set in

24   the *Campbell v. City of Los Angeles* case.  And *Campbell* says

25   that you -- that you -- that plaintiff has to show similarity

1    in ways that matter to adjudicating, here, their disparate

2    impact claim.  *Campbell* holds that what matters in the analysis

3    is not just any similarity.

4        And so your question, Your Honor, about isn't there, like,

5    one common theme, sure, there's a common theme at the very

6    highest level.  But it's not just any similarity between the

7    party plaintiffs, but a legal or factual similarity material to

8    the resolution of plaintiff's claim.  And that's in the sense

9    of having the potential to -- the potential to advance these

10   claims collectively to some resolution -- the ability to

11   adjudicate it on a collective basis.

12       And there is no ability to adjudicate this case on a

13   collective basis, at least without depriving Workday of the

14   right to be able to adequately defend itself, because the ADA

15   regulations here say that an individual challenging an

16   allegedly unlawful practice is responsible for isolating and

17   identifying the specific employment practice that allegedly

18   caused any observed statistical disparities.

19       There is no specific employment practice alleged here.

20   Again, they have a way, way overbroad definition that they're

21   seeking to certify in the first instance.  And that would cover

22   thousands of customers and millions of potential applicants.

23       And it's just simply not the way that -- the way that

24   Candidate Skills Match works is just simply not a common thing.

25   It's a score.  Every time that it is presented with data, it

1    gives a score.  That is not common.  You would have to assess

2    each application and each résumé to determine whether or not

3    there's any disparate impact, whether or not Candidate Skills

4    Match made an error or didn't do it right.  And that cannot be

5    done on a collective basis, Your Honor.

6          **THE COURT:**  Let me give plaintiff an opportunity to

7    respond.

8          **MR. WIGGINS:**  I think the best evidence that it can be

9    done is that they did it.  There's two stages to this.  The

10   impact -- you have disparate impact as developed; then you have

11   it as applied.

12       They're looking only at the post-configuration as-applied

13   stage.  The algorithm and the selection procedure can have

14   impact -- and does -- in its development.  They say that

15   themselves in Exhibit 1 to the Trindell deposition.  They lay

16   out how they go about developing this.

17       There's a development stage and a determination of bias at

18   that stage.  Then there's an as-applied or as-configured stage.

19   And they're separate.  They do two different bias studies.

20   Now, then you look at how they -- how do they do that?  They do

21   it not employer by employer; they do it across the board.

22       At the development stage -- for example, in the New York

23   City bias study that's in their -- on their website -- they had

24   ten randomly selected large global employers -- all the data

25   from those ten.  Not one by one, not criteria by criteria, but

 1  collectively as one single practice.  And that's how you do it.

 2  That's what the Uniform Guidelines say when it says you analyze

 3  the total process.

 4      Also, I don't think they could ever do anything

 5  differently because the components aren't measurable.  They

 6  don't keep data on that.  You cannot isolate the components.

 7  You can't go question by question.  They -- it's a single

 8  score.  It's a composite score.  And it's applied as a

 9  composite.  It's not applied question by question or employer

10  by employer at the developmental stage.  And it's the disparate

11  impact at that stage that's at issue as much as at the

12  as-applied stage, because the bias at that first stage carries

13  over into how you apply it.  The -- it perpetuates, in other

14  words.

15      So how do you handle that?  The case law says -- you asked

16  the question -- is anything more fine-tuned than the total

17  process capable of separation for analysis?  That's a statutory

18  term in Title VII.  Age impact is based on Title VII.

19      So if it's not -- if this more -- this

20  component-by-component or criteria-by-criteria method that

21  they're supposing goes on -- we contest that and that is a

22  merits issue -- you won't be able to measure that.  You'll be

23  required, by statute, to measure it at the total -- the single

24  practice level -- the total process level -- because you have

25  nothing else to measure it by.  They don't have the data to do

anything more.  The -- that's why they use ten random
employers -- global large employers.

The -- so you also have this problem:  They want to use
the four-fifths rule, the 80 percent rule of the Uniform
Guidelines.  And that is what they do use.  That is not a
component-by-component process.  That's a bookend process.  How
many people went in the system; how many came out?  There's no
room within that formula to do what she's suggesting, and, yet,
that's the one they use, because they use a single-practice
method in their day-to-day work.

**THE COURT:**  Let's move to the second question.  I know
there may be more to say, and you may have further responses,
but, at the end, there will be time for you to tell me anything
else you want me to know.  I want to make sure we move through
some of the questions.

And it may be that some of that's relevant to the next
question, which is that Workday argues that some opt-in
plaintiffs and some members of the proposed collective action
received fewer rejections than Mobley or were unqualified for
the jobs for which they applied.  Do these individuals' claims
nonetheless still share the same common core issue with Mobley;
that is, whether Workday's scoring system causes an illegal
discriminatory impact on applicants over 40?

And given our conversation about the prior question, I
think that really goes to the issue of whether there's a common

answer to the question of whether Candidate Skills Match is

driving a discriminatory impact across different employers or

whether, as Workday contends, that any discriminatory impact is

caused by the employers' configuration of the algorithm.

        **MS. TOTTEN:**  Thank you, Your Honor.

    So there -- there is no way -- there's no common way to

drive to resolution of this case.  And plaintiffs -- going back

to their burden -- because, again, that is what this motion is

about.  It is not about the merits per se.  It's only about the

merits as it relates to analysis of whether or not they're

similarly situated.

    And everything that we just heard is not anywhere in their

brief.  I will say that.  This is all new.  And what is in

their moving papers, Your Honor, is an absence.  There's an

absence of any specific employment practice alleged.  There's

an absence of any significant disparate impact alleged, other

than pure speculation.  Mr. Mobley says, "I applied to 100 or

more jobs, and I was denied for all of them."  That cannot be

enough to satisfy the significant disparate impact that they

must show at this stage.

    Oftentimes, Your Honor, in cases like this, we will see

expert witnesses at this early stage to talk about the

statistical analysis that they have done on the data that has

been provided.  There is none here.  There is no expert.  A

proffer of an expert and what the expert would do to unpack

1    this could have been done.  But that was not done.  They simply

2    have not met their burden, have no proposal, no plan, no way to

3    show any significant disparate impact.

4        And then, finally, Your Honor, they have to show -- and

5    this is where it gets very challenging for them and goes to

6    your question -- they have to show a causal relationship

7    between the challenged practice and the alleged disparate

8    impact.  They don't have anything to be able to show that,

9    other than pure speculation.

10       And the reason they don't, Your Honor, again, is because

11   of the way that the tool works.  They don't come forward to get

12   past this issue that we're raising about the fact that

13   Candidate Skills Match is not what they say that it is.  It is

14   simply a score.  It is simply one possible measure that some

15   employers -- some customers -- may take into consideration or

16   may not take into consideration at all.  So --

17            **THE COURT:**  Is the information that you gave me about

18   Candidate Skills Match in the declaration?  Because it did not

19   seem to me that the declaration that was submitted by Workday

20   had a lot of information about how Candidate Skills Match works

21   or that it's -- that it uses this key-word process necessarily.

22   There was a little bit in the interrogatory response, but I

23   didn't get the explanation that you provided to me.  But maybe

24   it was somewhere else in the papers that I hadn't focused on.

25            **MS. TOTTEN:**  It is in the interrogatory response.  I

1    put more words around it, Your Honor.  But the substance of

2    what I said and how Candidate Skills Match works is in the

3    interrogatory response, which is an exhibit to the -- to my

4    declaration.

5        So, Your Honor -- I'm happy to pause if you want to keep

6    looking at that.

7            **THE COURT:**  I have it here now.  But I'm not sure I

8    see a lot of the issue that we've been focused on there.  But I

9    understand the argument.

10           **MS. TOTTEN:**  Okay, Your Honor.

11       So, Your Honor, as to people who received fewer rejections

12   or were unqualified or for people who were offered

13   interviews -- or actually were given a job in the case of two

14   of the declarants after they alleged they used Workday's

15   allegedly discriminatory AI -- Your Honor, those show that

16   there is no causal relationship that plaintiffs can establish.

17       Because if they are saying that the Workday AI is

18   developed in a way that automatically rejects or automatically

19   offers a more negative rating of those individuals who are over

20   40 -- which, by the way, Candidate Skills Match would not even

21   know, because the customers don't even know who is over 40 and

22   who is not -- it is not a data point that is collected -- then,

23   Your Honor, that is -- the fact that these people were given

24   interviews and were given jobs is indicative of the fact that

25   they do not have the ability to show the causal connection.

1    It's missing here.

2        **THE COURT:**  But isn't -- causal connection is across

3    the collective; right?  So this would be a merits argument made

4    at the -- at a later stage.  That after the collective has

5    potentially been certified, we've gathered all the data, and

6    now we can -- Workday's argument at that stage would be, "We

7    can see, when we look across the class, that there -- you

8    know -- lots of people who are over 40 have been very

9    successful in the system.  And they are no less successful in

10   the Workday system than they are in other comparable ways of

11   applying to jobs."

12       But that also sounds like it would be a collective-wide

13   common answer to the question.  So help me understand why

14   Workday's view is otherwise on that.

15       **MS. TOTTEN:**  Your Honor, it's that they haven't met

16   their burden at this stage.  They cannot just say they think

17   that it has this impact.  That's not enough, Your Honor.  It's

18   not what the law says they have to come forward with.  There

19   are three prongs to a disparate impact -- their affirmative

20   burden of what they need to show.  And they have failed on each

21   burden, including the causal connection.  They haven't shown

22   anything at this stage.

23       It's not -- it is contextual, in terms of thinking down

24   the road about what the case would look like.  But it's also:

25   What have they proffered now?  And they have proffered nothing

now, Your Honor.  Other than simply their complaint and the

allegations in their complaint and four conclusory

declarations, they've proffered nothing to support that there

actually is any causal relationship.

And, Your Honor, if you look at the *Heath v. Google* and

*Rabin v. PricewaterhouseCoopers* cases, both decided by the

Ninth Circuit --

**THE COURT:**  I've read both of them.

**MS. TOTTEN:**  Yes.  They bear on this issue of the

causal connection, as well, because they both -- you know,

through -- they both kind of meandered through the procedural

process a little bit differently.  And I won't go through that,

since it sounds like you have reviewed them recently.

But, you know, in *Heath v. Google* we had a more narrow,

defined definition -- right? -- that included people who were

interviewed.  Because people who were interviewed likely did

have the qualifications that were necessary for the job versus,

like, Mr. Heath's definition, which was the entire universe of

people over 40 who applied, you know, for any of these software

engineer jobs.

And the Court, looking at that, said it's common sense

that -- and this goes to causation, Your Honor -- it's common

sense that people who were not qualified for the job are not --

are -- people who aren't qualified for -- are not qualified for

the job should not be in the same collective.  They should not

1  be in the same collective.  Because if you're not qualified for

2  the job, you shouldn't even be included in any disparate impact

3  calculations, Your Honor.

4         **THE COURT:**  I have to say, I really puzzled over that

5  comment in the opinion, which brings me to my third question.

6  And I'll give plaintiff an opportunity to address what defense

7  said and also what I'm going to ask about in the third

8  question.  So, don't worry, you'll have your turn.

9         But just in terms of the third question I had, you know,

10  Workday was -- I saw that argument in Workday's papers saying

11  that those who are unqualified or got fewer rejections should

12  be excluded from the collective.  But it seemed to me, looking

13  at the case law, that, for disparate impact claims, causation

14  is a component, but causation is a class-wide or

15  collective-wide analysis.  You look at whether the practice has

16  a disparate impact on the group.

17         But then, in terms of each individual plaintiff, the

18  Article III standing inquiry looks to whether there was the

19  denial of the opportunity to compete on equal footing, not the

20  denial of the job themselves.

21         So in an injunctive relief case, if an individual is

22  seeking to avoid being subjected to the allegedly

23  discriminatory scoring system in the future, they would still

24  have standing, even if they had been denied jobs -- they would

25  have still been denied the jobs to which they had applied in

the past or they had some success in getting interviews in the past.

So given that there's an injunctive relief component to the proposed class or the proposed collective, why should those individuals be excluded from the class?

**MS. TOTTEN:** Yeah. So, Your Honor, first, to make clear -- I know you know this -- but Workday is not suggesting that anybody be excluded from the class. That is not our argument. Rather, our argument is there should be no class at all, because they have failed to meet their burden. Again, I know you know that.

But with respect to your thought, Your Honor, we don't see this as a standing issue. Even if those who are unqualified have Article III standing to obtain injunctive relief, as you suggest, they still need to meet the standard to join a collective action under the ADEA, which requires that they be similarly situated.

So the fact that every member of the collective may have standing to bring some ADEA claim doesn't mean that their claims can actually be adjudicated together. And, again, this is because, even for injunctive relief, Your Honor, it's the same three prongs the plaintiff has to meet in order to bring this as a collective action: A significant disparity with respect to a specific employment practice for the protected group, the existence of a significant disparity, and the causal

1   relationship.  They must -- so it's the exact same standard.

2           **THE COURT:**  But the causal relationship is whether the

3   practice causes a disparate impact across the whole group.  So

4   as plaintiff was describing, looking nationwide at how the

5   Candidate Skills Match is applied and whether that algorithm

6   has a disparate impact across the group.

7           **MS. TOTTEN:**  So as to the concept of denial of

8   opportunity -- going there next, Your Honor -- it is reasonable

9   that a showing of qualifications may not need to be required if

10  plaintiff is challenging something that he's not challenging

11  here:  A specific employment practice.

12       Let's take an example.  An employer requires a high school

13  diploma in order to be able to get a job.  Or an employer uses

14  a pencil and paper test for a promotion at a fire department or

15  a police station.  In that case, Your Honor, the specific

16  employment practice in question -- the test or the

17  requirement -- can cause an unlawful disparate impact unless

18  it's job related.

19       First of all, that is a Title VII concept.  And so CSM is

20  not a test.  It's a process.  It's a framework.  And if it --

21  again, so if it is viewed as a test -- each résumé and each

22  application is its own test.  We dispute that it's a test.  But

23  even if it is, each résumé and application, when it's scored,

24  is its own test.

25       You don't have the high school diploma or the -- or the

pencil-and-paper test that has a qualitative component to it.
You don't have that with Candidate Skills Match.  It is merely
taking inputs that both parties provide and giving a score.  It
is not blocking anybody like moving forward in the same way
that a high school diploma requirement would at the outset of
an application process, if that makes sense.

          **THE COURT:**  Yeah.  I understand the argument that it's
a -- it is, itself, not a substantive qualification that's
imposed.  It's an algorithm to amalgamate substantive
qualification requirements that employers have input into the
system, essentially.

     But I -- again, I'm coming back to kind of the issue of
there being a common answer to the question as to what -- how
much Candidate Skills Match does in the process.  And the
allegation is that these folks who are getting rejected across
the board, not even ever getting an interview for jobs that
they have applied to -- which they appear to be qualified for,
for the most part -- they're just never getting their foot in
the door.

     And I think the question is, really, what is -- what is
causing that?  Because there's an inference that, you know,
when they're applying on the Workday platform, they're having
this result.  So what is causing that result?  There's, like,
one uncommon component, which is the Workday's AI/ML job
recommendation.

1          And I understand Workday's merits position is that that

2     job recommendation algorithm is not our algorithm's fault; it's

3     the employer's fault.  But that seems to me a common question

4     for which there will likely be a common answer.

5          So I know I'm repeating myself, but I don't think I'm

6     really getting an answer to why that's not a common answer

7     across -- that would apply across the proposed collective.

8          **MS. TOTTEN:**  Well, correlation, Your Honor, does not

9     prove causation.  They're two different concepts.  And just

10    because -- you know -- again, like, based on virtually no

11    evidence -- we are in discovery.  We have deposed four opt-ins.

12    We have deposed Mr. Mobley.  And, still, they came forward

13    with, like, no evidence.  We have produced thousands of pages

14    of documents, Your Honor.  But they came forward with nothing.

15         And, Your Honor, the case can move forward.  They can

16    litigate these claims.  Mr. Mobley and the four opt-ins can

17    litigate their claims.  If they believe the Candidate Skills

18    Match is discriminating against them based on their personal

19    experience, they have the ability to bring these cases -- to

20    bring this case -- as an individual case.

21         But they cannot bring a collective action without meeting

22    their burden of proof, which they have not done.  There are no

23    common answers, because there's not a common question.  There

24    is no specific employment.  It's not like the high school

25    diploma requirement, Your Honor.  It's not.  And what do you

```
 1   have to do if you're an employer then; right?  You have to
 2   validate that --
 3            THE COURT:  What I really hear you saying is you're
 4   really leaning on this concept of there needs to be an
 5   evidentiary showing at this stage.  Plaintiffs need to come
 6   forward with evidence, you know, proving that this is common
 7   across the -- or that how Workday's algorithm works -- that it
 8   is the source of the discrimination against those over 40.
 9            But it seems to me that, under Campbell, it's -- there's
10   this two-step process that's described that the Ninth Circuit
11   says virtually all the District Courts use, and the Ninth
12   Circuit really appears to bless, in Campbell, even though they
13   don't quite come out and say that.  And in the first step of
14   that process, really, it's the allegations --
15                     (Cell phone ringing.)
16            THE COURT:  It's really the allegations that are the
17   basis for it.  And sometimes there's declarations.  And,
18   really, the courts are saying it's not even -- we're not even
19   at a stage where we'll look at contrary declarations from the
20   defendant.  So at that initial first step of the collective
21   action process, why are you seeing the burden being as high as
22   what you described compared to the way I'm seeing it in the
23   case law?
24            MS. TOTTEN:  Well, because we're looking at the cases,
25   Your Honor, that say that you have to have more than just the
```

1  allegations and conclusory allegations.  You have to submit

2  more.  And plaintiffs haven't submitted more.  They submitted

3  conjecture, speculation.  There's no actual evidence.  None of

4  the opt-ins described any of the jobs that they actually

5  applied for, and how many they were actually denied, and any

6  reason that they were given for the denial.  Many of the

7  opt-ins describe how -- when we deposed them -- how they

8  weren't actually qualified for the jobs that they applied for.

9       So how could you put -- if you -- if you want to think

10  about what this case looks like down the road -- if we're going

11  to kick the proverbial can down the road, which we think would

12  be a denial of Workday's due process rights, to be clear, like,

13  then, what do you have down the road?  You have a grouping of

14  qualified and unqualified individuals all mushed together.

15       And how -- how are we going to be able to do a disparate

16  impact analysis when the whole -- the whole scoring application

17  itself here has to do with meeting, like, kind of the minimum

18  qualifications, as stated in the job requisitions.  And if they

19  don't do that, how are we going to know that we're comparing

20  apples to apples, qualified individuals to qualified

21  individuals, to then be able to run a disparate impact

22  analysis?

23       That is who is the applicable population to compare --

24  qualified individuals, Your Honor.  You can't put unqualified

25  individuals into the analysis.

1          **THE COURT:**  Why not, though?  Because I think -- as I

2     understand the disparate case law, it's the opportunity -- it's

3     the fact that you've been subjected to this discriminatory

4     test, even if you couldn't have overcome it in the past because

5     you were applying for a job for which you were not qualified.

6     If you're going to apply to a job in the future for which you

7     would be qualified, then being subjected to the test in the

8     future is something that you have standing to challenge,

9     because it's the opportunity to be on equal footing.

10         **MS. TOTTEN:**  But how, Your Honor, are you going to run

11    that disparate impact analysis in the first instance to

12    determine whether any injunctive relief is needed?  Because you

13    would have unqualified -- you would have millions of one

14    qualified people and millions of qualified people all -- you

15    know -- all mushed together.  And that would be unfair, because

16    the applicable population to assess whether or not there is a

17    disparate impact is a qualified population, Your Honor.

18         The -- I understand the denial of opportunity theory that

19    you were thinking of.  But it's just not applicable, in part,

20    because, going back to the very first thing that I said, this

21    is not an employment test.  This is not a -- this is not

22    something that can be validated by UGESP -- the Uniform

23    Guidelines on Employee Selection Procedures, Your Honor.

24         And just to have clarity with regard to that, Your Honor,

25    the regulations, 28 CFR Section 50.14, the guidelines on UGESP,

1    Your Honor, specifically exclude age cases.  They do not need

2    to be validated.  They do not need to be validated because it's

3    a different framework for age cases than it is for Title VII

4    cases.

5        If you go look, Your Honor, at all of the cases that

6    you're thinking of about denial of opportunity, they're all

7    going to be Title VII race and gender cases.  That's what they

8    are.  There aren't any age cases, Your Honor, because you don't

9    need to validate.  You don't need that.

10       The theory in those cases is that first initial

11   qualification -- before you can get to the next step -- is the

12   thing that is having a disparate impact.  And if that thing is

13   not validated, Your Honor, then that can be a viable theory.

14   But that is not our case here.

15           **THE COURT:**  Let me give plaintiff an opportunity to

16   respond.

17           **MR. WIGGINS:**  They will have their due process at the

18   decertification stage.  That's what the law gives them.  That's

19   what's due.  They'll have the opportunity at trial on the

20   merits.  Causation is a liability issue.  It's strictly a

21   liability issue.

22       We had this issue of people in the class who don't have an

23   injury in the *Bouaphakeo* case -- *Tyson v. Bouaphakeo*.  That

24   was -- the Court granted certiorari on that very issue.  It was

25   the certification of that Rule 23 class, which is the higher

standard, was invalid because you had people that weren't
injured, and they said no.  Because you simply take them out
once there's a verdict.  You then have the information you need
to identify who's injured and who's not injured.  You don't
deal with it at this stage.

The decertification stage is next if notice is granted.
We can -- we think notice is needed so that people can
participate so they'll know they can come forward and address
these issues she's raising.  She wants to have decertification
with them not even knowing the case exists, not even knowing
they can participate, not even knowing if they've got valid
important information.  So we're at the notice stage.  Only the
notice stage.  And --

THE COURT:  Now -- go ahead.

MR. WIGGINS:  And I think the class deserves notice in
order to be able to participate.

THE COURT:  I have a question about the way you've
defined the class.  I'm going to skip Question 4, because I
think we've addressed it already, and go to Question 5, which
is really about the way plaintiffs define the collective as
those who were denied employment recommendations.

It seems to me that this -- this definition would only
apply to situations where the employer is relying or the
employer is considering the score that is given to a candidate
at the screening stage.  For example, if an employer has turned

off that function in their Workday software, and they don't

ever receive a recommendation, then employees that they've

considered would not be in the proposed collective.

Am I understanding the definition that you've provided

correctly?

MR. WIGGINS:  I'm not sure, Your Honor.  This is my

answer to that:  The turning on and the turning off is

something that we're still doing discovery on.  They have

bragged about all that they've given us.  They've given us

nothing.  We've got no data that we can crank out disparate

impact calculations, except what we've gotten from audit --

from the bias audits -- that have been publicly put on their

website.  When you look at that, there's tremendous disparate

impact.  More than 15 standard deviations off the chart.

So it's not true to say we don't have a basis.  It's just

that we don't have the best basis, which is the data that we're

trying to get and we're in the middle of talking about.  So --

THE COURT:  But is it your view that if it's really

true that an employer has turned off the AI/ML function -- they

don't even get a score in the first place -- that the -- and

then they reject somebody that they have -- that that employee

has been denied a recommendation to the employer?

MR. WIGGINS:  That would be an issue when you get to

the individualized stage of the case for individual -- it's in

Bouaphakeo -- which individuals are going to get damages or

backpay or whatever.  It's not an issue at the certification

stage.  And that's the exact argument that the defendant made

in Bouaphakeo -- Tyson made in *Bouaphakeo*.  And they didn't win

on that.  They lost on that, because it was premature.

        **THE COURT:**  But how can you say that somebody's been

denied a recommendation if no information was provided about

them?

        **MR. WIGGINS:**  Well, if that's true, first.  Secondly,

is it possible that, too, has disparate impact?  And we're just

at too of a premature stage to really answer that question very

well.

        **THE COURT:**  And --

        **MR. WIGGINS:**  Let me add one thing, Your Honor.

        **THE COURT:**  You may.

        **MR. WIGGINS:**  Look at the description of how they

developed this.  That turning on/turning off is not a factor.

It's not a factor in the development.  It's not a factor at any

point of Exhibit 1 that I referred to earlier, which is their

own -- it's called the AI fact sheet.  It's what they give

customers to explain the process and justify the process.

And --

        **THE COURT:**  When you say, "It's not factor," you're

contesting whether customers can, in fact, configure their

software to turn off the AI/ML function?  Is that what you mean

when you say, "It's not a factor"?

1          **MR. WIGGINS:**  Well, if they -- we haven't -- our

2     thinking on this hasn't gone as far as it needs to.  But, in my

3     mind, it's no different than rejecting them.  If you turn the

4     thing off, and that don't get the opportunity to be scored,

5     what have you done to them?

6          **THE COURT:**  Yeah.  But you turn it off for everyone;

7     right?  I think that's the allegation, that employers don't use

8     that function at all.

9          **MR. WIGGINS:**  There's no evidence of that.  There's no

10    evidence of that.  We're trying to take it -- get evidence on

11    that.  And the -- they've entered into a common interest

12    defense agreement where the employers are balking at giving us

13    anything.  And we're going to have to work that out.  We're in

14    the middle of trying to work that out.

15         **THE COURT:**  So what is your view on who counts as

16    being, quote, "denied an employment recommendation"?  Is it

17    anybody who got a score that's not the highest score?

18         **MR. WIGGINS:**  The method they use is to compare to the

19    highest score.  The Uniform Guidelines -- that's what the

20    Uniform Guidelines adopts.  I think it's justified,

21    particularly at the notice stage, because if you -- if you're

22    one lower than the highest, you may have lost a job.  You

23    probably did lose a job if it's a single vacancy.  You

24    necessarily did if it's a single vacancy.  That's as far as I

25    would go on that.

1          **THE COURT:**  And when you're talking about employment

2     recommendations, you're talking about recommendations involving

3     the AI/ML functionality in Workday; am I correct?

4          **MR. WIGGINS:**  We believe the AI has a role in the

5     rejection phase.  People getting the things in the middle of

6     the night phase.  But we need discovery on that to be positive.

7     But from the way we read their documents and their

8     descriptions, there's -- AI is plucking out these knock-out

9     questions.  And it's what is -- the knock-out is based on.

10         **THE COURT:**  Are you taking the position, then, that if

11    people have been denied employment recommendations because the

12    employers have said anybody who is outside of San Francisco --

13    if you live outside San Francisco, I'm automatically rejecting

14    these applications, and then Workday implements that

15    requirement -- is it your view that that person has been denied

16    an employment recommendation?  Or does it only count if

17    somebody's been denied a recommendation because of an AI or

18    machine learning kind of component?

19         **MR. WIGGINS:**  Rejection is a non-recommendation.  And

20    that's the way we see it.  There's no difference between

21    rejecting someone and not recommending someone.

22         **THE COURT:**  What is the basis for that in your

23    complaint?  Because it seems like your complaint is really

24    based on this concept that Workday's AI and ML functions have a

25    disparate impact in screening out applicants.  But if it's

1    really just the employers are saying, "If you live outside of

2    the 94102 Zip Code, we're going to automatically reject you,"

3    it's hard for me to see how that's Workday's fault and what the

4    plausible allegation would be that -- or the substantial

5    allegation would be -- that there's a, you know, single

6    practice by Workday that is causing that denial.

7            **MR. WIGGINS:**  Well, none of -- first of all, we'll go

8    back to none of that has any relevance or role in the

9    developmental -- the disparate impact -- the disparate impact

10   as developed, not as applied.

11       You only get to the configuration issue after you've

12   finished all your bias studies, all your evaluation, all your

13   development, and you put it on the market.  There are no

14   employers before that, except generically and in large groups.

15   They have --

16           **THE COURT:**  But the collective needs to be people who

17   have been subjected to this thing; right?

18           **MR. WIGGINS:**  Yes, that's correct.

19           **THE COURT:**  And when you're talking about the

20   development stage, you're talking about the development of the

21   AI/ML functions?

22           **MR. WIGGINS:**  Well, what I'm saying -- I'm not doing a

23   good job of it -- what I'm saying is the AI plays a role in

24   that initial -- let's take the *Griggs* example.  You have a high

25   school education, and then you subject it to a test if you have

1   a high school education.  The high school education is the

2   knock-out stage.  If the AI goes through and finds who's got

3   the high school education, that's an AI function.  It's part of

4   the algorithm.  And so that's the way we look at it right now.

5   And that's what we're trying to do discovery on.

6          **THE COURT:**  I understand the argument.

7      To the extent that there's line-drawing problems and who

8   counts as being in the collective -- I recognize we're in this

9   early stage of the process -- what is your -- what is

10  plaintiff's position in terms of what the Court should do about

11  line drawing?  Because at a certain point -- I can't just draw

12  the line so far out that there's all these people who are in

13  the collective, potentially, who have -- who are really not

14  subject to the single practice at issue.  So how do you propose

15  that the Court deal with the line-drawing questions?

16         **MR. WIGGINS:**  Line drawing, as I read the law, is the

17  stage two decertification issue where you've now got -- you've

18  got some real human beings to look at and decide, are they in

19  here or they should be dismissed and -- or weeded out in some

20  means?

21     You can't do that, at this stage, without converting the

22  notice stage into the decertification stage and, under their

23  theory, into the trial of the merits stage.

24         **THE COURT:**  Let me give Workday an opportunity to

25  respond on that issue.

1          **MS. TOTTEN:**  Thank you, Your Honor.

2      We, of course, disagree.  If there are any line-drawing

3  issues -- and there definitely are -- now is the time for those

4  issues to be assessed.  Both *Heath* and *Rabin* -- *Heath v. Google*

5  and *Rabin v. PricewaterhouseCoopers* -- give examples of the

6  Northern District exercising its discretion to do just that.

7  To not collectively certify a class of individuals that was so

8  overbroad that they couldn't possibly have that similarly

9  situated status.  And if the Court is inclined to certify, we

10  would absolutely request that it be limited to the Candidate

11  Skills Match AI/ML question.

12      And on some of the points that Counsel made, they have --

13  they were talking about the data -- they have subpoenaed about

14  35 customers, Your Honor.  And 33 of them, to this point --

15  that goes to your next question too -- but, to this point, 33

16  of them, in their responses to the subpoenas, Your Honor, said

17  we do not use Candidate Skills Match or any AI in the

18  processing of our applications.

19      Those customers should not be subjected to any notice

20  going out to any of their applicants because they say they did

21  not use -- they -- there is a toggle button to turn Candidate

22  Skills Match on and off.  And they did not ever enable it.  And

23  they should not be included -- those customers should not be

24  included in what we are -- this exercise that we're engaged in

25  here.

1    **THE COURT:**  Does Workday have the ability to see if

2  Candidate Skills Match has been turned on or off for a

3  particular customer?

4    **MS. TOTTEN:**  So Workday does have the ability to see,

5  Your Honor, if Candidate Skills Match has been enabled.  That

6  does not mean that it's actually used, nor does it actually see

7  anything with regard to the applicant data.  It does not see

8  any scores generated.  It does not know how the recruiters

9  might be using the data, if at all.

10   It's possible that they have it on, Your Honor, but they

11  don't have it -- the recruiters themselves can design their

12  grid of applicants that have, like, various categories.  And

13  it's quite possible that they could design their grid in a way

14  that doesn't even -- even if they're running Candidate Skills

15  Match, it doesn't even load those scores into their grid,

16  because a particular recruiter might not find it informative.

17   So enabled -- they can see that it's enabled -- turned on,

18  turned off.  They are unable to tell exactly, like, how it is

19  used, if at all, in a meaningful way.

20   **THE COURT:**  You could see that a particular company

21  has turned it on or off, but you can't see if they have

22  included it in the grid, for example?

23   **MS. TOTTEN:**  Correct.

24   **THE COURT:**  And then just going to the next question

25  then, Workday has a whole section in its briefing where it's

1  talking about the lack of contractual authority to access

2  applicant data that is its customers' data.  If there were a

3  court order requiring Workday to provide a list of potential

4  members in the collective or to help identify those members of

5  the collective, would Workday still lack contractual authority?

6  I know a lot of the contracts tend to have a phrase that says,

7  "Except by court order, the company may not access customer

8  data."  So what's the situation there?

9            MS. TOTTEN:  Yeah.  So, I mean, to -- I do want to

10  say, at the outset -- I believe I've mentioned it already, but

11  I just don't -- it's an important point, and I don't want to

12  lose sight of it -- is that Workday -- there is no collection

13  of age data from any applicants from any company that I am

14  aware of.  It just is not a data point that is collected.

15       Setting that aside, Your Honor, if Workday were compelled

16  by the Court to provide its customers' data, it would be

17  required to then engage in a formal notice procedure to its

18  customers, which really would be confirming that Workday does

19  not have, what is defined under the law, legal control over its

20  customers' data.  And, therefore, it's not discoverable under

21  Rule 34.

22       In the Ninth Circuit, Your Honor, quote/unquote,

23  "Practical ability to obtain the requested document from a

24  related organization is not enough to constitute control,

25  because the related organization could legally, and without

1  breaching any contract, refuse to turn over such documents."

2     And, Your Honor, that is *In Re Citric Acid Litigation*,

3  191 F.3d at 1107 and '08.  "Instead, control is defined as the

4  legal right to obtain documents upon demand" -- same case --

5  "and it is plaintiffs' burden to demonstrate Workday has such

6  control."  And the cite for that is *United States v.*

7  *International Union of Petroleum*, 870 F.2d 1450.

8     Here, Your Honor, the master subscription agreement

9  Workday customers signed -- it has changed over time, so

10 there's a variety of different clauses -- however, the

11 agreements do prohibit Workday from using customer data except

12 for very specific instances, including to provide service to

13 the customer, to prevent or address technical problems, or in

14 accordance with customer instructions.  It also clearly states

15 that the customer owns all of their customer data.

16    Workday is expressly prohibited from disclosing that data

17 to anyone other than the customer or other individuals the

18 customer has expressly authorized.  So these provisions are

19 fundamental to the relationship between Workday and its

20 customers.  So if --

21       **THE COURT:**  Will you describe what the exception is

22 for the court order then?  In a situation in which there's a

23 court order, does Workday's contract with its customer

24 authorize Workday to obtain the customer data, which I'm

25 assuming Workday has access to through its hosting or cloud

```
1   services?

2        MS. TOTTEN:  Your Honor, I believe that the contract

3   has changed over time.  There's not one uniform contract.  I

4   don't believe all the contracts have that provision.  But the

5   provision where it does exist just references a court order as

6   one exception.  But we believe, Your Honor --

7        THE COURT:  So under some of the contracts, if there

8   is a court order, the customers have agreed that Workday is

9   authorized to take their customer data?

10       MS. TOTTEN:  Your Honor, then -- then we would have to

11  engage in the notice process to our customers to put them on

12  notice that there is a court order.  And, Your Honor, they

13  could still refuse, in which case -- like, for that reason, and

14  for all of the reasons that we mentioned, we believe it is

15  plaintiff's burden.  It is plaintiff's burden.  They issued

16  subpoenas, Your Honor.

17       If they believe that the customer data -- which is clearly

18  owned by the customers -- if they believe that this data is

19  imperative to their case, they should be the ones getting the

20  data, Your Honor.  We should not have to be adverse to our

21  customers to go get data in a hostile situation.  That would

22  just be untenable for any service provider to basically have to

23  go take a court order and say, "This Court is ordering you to

24  turn over your most highly sensitive data in this litigation to

25  which you are not a party."  It is --
```

1          **THE COURT:**  Why would it not make sense for there to

2     be a court order for Workday to get the data from its

3     customers?  Workday would go through the notice process.  Some

4     of its customers would say, "No problem.  Happy to have you

5     handle it so we don't have to do this work ourselves."  And

6     then some percentage of your customers would say, "No, we stand

7     on our rights and we refuse."  And then it would be plaintiff's

8     burden to then go subpoena those customers.  Why would that not

9     make sense as an approach?

10         **MS. TOTTEN:**  Because it puts us in an adversary

11    position with our customers, Your Honor.  No customer wants

12    their data --

13         **THE COURT:**  Well, I know why you don't like it.  But

14    I'm asking why is there -- what is the legal barrier to taking

15    that approach, which seems like it would be the most sensible

16    one from a practical perspective?

17         **MS. TOTTEN:**  Because, Your Honor, it doesn't meet the

18    definition of "legal control."  We do not have legal control,

19    based on the cases that I cited to you.  We do not have legal

20    control.

21         **THE COURT:**  Is the master services agreement that you

22    mentioned in the record somewhere that was submitted?

23         **MS. TOTTEN:**  No.  I believe it has -- some variations

24    of them have been produced in this case, if that's what you

25    mean, "in the record."  But they certainly all have not.  So I

1    believe there may be different flavors that have not yet been

2    produced.

3            **THE COURT:**  So some of the master service agreements

4    have been produced, some have not, and neither side has put it

5    before the Court?

6            **MS. TOTTEN:**  Correct, Your Honor.

7            **THE COURT:**  What's Workday's view?

8            **MR. WIGGINS:**  Your Honor, she -- the contract she's

9    referring to -- the master subscription agreement -- doesn't

10   require notice like she's talking about.

11       Section 4.1 -- and I have it here if we want to have

12   copies of it -- says, "Each party shall disclose confidential

13   information of the other party only as follows:  Number 4, to

14   the extent the receiving party is ordered to produce

15   confidential information of the disclosing party by any court

16   of competent jurisdiction."

17       And so it's a mandatory duty -- there's no need -- the

18   employer has no voice in it.  It's already given its consent.

19   That is consent.

20           **THE COURT:**  Okay.

21           **MR. WIGGINS:**  And the next paragraph, Section 4.2, is

22   called -- Compelled Disclosure is the title -- and it says

23   this:  "A disclosure by one party of confidential information

24   of the other party, to the extent required by law, shall not be

25   considered a breach of this agreement."

1        Now, we know that it is required by law:  Rule 34, the

2   Uniform Guidelines, the California Fair Employment Practices

3   statute.  It's required by law to give us this disparate impact

4   information.  And so it just -- they're conflating two

5   different parts to the agreement.  It's our position that the

6   customers have already given their consent.

7        THE COURT:  Let me -- I understand that there's a

8   potential fact dispute on this issue, but I want to move on to

9   the next question that I had, which is -- we've already

10  answered part of this -- but I heard Workday say that it can

11  identify which of its customers has Candidate Skills Match

12  enabled.  Can Workday also identify the score that Candidate

13  Skills Match gave to a particular applicant?

14       MS. TOTTEN:  Workday does not have the ability to see

15  the scores, Your Honor, without customer consent.  That is part

16  of the customers' data.

17       THE COURT:  If the customers consented to that, would

18  Workday be able to see that information?

19       MS. TOTTEN:  Yes, Your Honor.

20       THE COURT:  Okay.

21       My next question was about the date of birth/age issue.

22  So I saw, in Workday's submission, that a lot of the employers

23  don't collect dates of birth and I also saw that some of the

24  opt-in plaintiffs said that they didn't put their graduation

25  dates on their résumé because they were concerned about age

discrimination or they didn't include all of their work

history.

    So, really, this is a question for plaintiffs.  How -- how

do you propose that the Court deal with that issue?  If the

point is that we're going to notify everyone over 40, what's

the plan for how we would do that under your proposal?

    **MR. WIGGINS:**  We agree with the direction the Court

was going, that -- we think that is actually part of the Fair

Employment Practice statute in the state.  It actually mentions

graduation dates as an inquiry to make.  But --

    **THE COURT:**  So it's the idea we're going to get some

people if we use graduation date as a proxy, but we won't get

everybody, and it will be an imperfect proxy, but it's kind of

better than nothing?

    **MR. WIGGINS:**  Right, yes.

And there's other things just like graduation:  Length of

employment, seniority, how long you've been in the business.

You know, there's lot of telltale signs that AI can pick up on.

We don't know yet how the algorithm is set up to do this or

even if it is set up to do this.  We're still in discovery on

that.  But there are ways to do it.

    And, secondly, short of that, let the people tell -- just

put it in the notice that you've got to be over 40 years old to

opt-in.  And you have publication either by -- or there are not

too many newspapers left -- but, you know, TikTok or -- you

1    know -- there's many ways that people give notice in these

2    cases these days -- publish notices.

3         THE COURT:  Let me give Workday an opportunity to

4    respond on the age issue.

5         MS. TOTTEN:  Thank you, Your Honor.

6    Workday's software does not extract graduation years from

7    candidate résumés or any other data that would be indicative of

8    a candidate's age.  Again, it doesn't have access to customer

9    data, which includes the applicant data.

10        And, you know, we also saw, from the testimony, which we

11   included portions of in our motion, that the plaintiffs

12   manipulated in some -- and I don't mean that in a nefarious

13   way -- but they just -- they structured their résumés in a way

14   purposely to try to hide their age.  And so it's -- looking at

15   a résumé is not going to necessarily tell you.  They left off

16   their early jobs, for example.  They left off their graduation

17   date.  And so that's just simply not going to be an adequate

18   way of addressing this issue.

19        And throwing the doors open and allowing anybody over 40

20   who, you know, thinks they have a claim against Workday to get

21   notice is, again, a violation of Workday's due process rights,

22   Your Honor.

23        THE COURT:  Are you --

24        MS. TOTTEN:  Shouldn't they be scored --

25        THE COURT:  Wait.  Let me just -- before we go down

that road, are you really saying that Workday's customers don't
have the ability to sort by graduation year, or see candidates
by graduation year in any way, or even to -- and that Workday's
AI doesn't have the capacity to be able to figure out what
people's graduation years are from their applications?

          MS. TOTTEN:  The functionality of Candidate Skills
Match is to do exactly what I said, Your Honor.  It is to look
at the skills that are in the job requisition and to compare
them against the skills that are -- there is no functionality
in Candidate Skills Match that looks at experience actually.

          THE COURT:  Not limit it to Candidate Skills Match,
but I think if the task is to identify people, I don't think
Workday's -- I'm assuming your software is more than just
Candidate Skills Match, and that you have a lot more that you
offer through Workday Recruiting.  But I just -- I'm surprised
at the notion that Workday Recruiting doesn't allow employers
to see somebody's graduation year or doesn't have a way for
employers to be able to observe the graduation year or extract
that information in some way.

          MS. TOTTEN:  I do not know the answer to that
question, so I do not want to make a representation as to
whether the non-candidate -- I know, very well, what the
functionality is of Candidate Skills Match.  I do not know all
of the functionality regarding Workday Recruiting, so I do not
want to make a representation that is not accurate.  I would

1    need to confer with my client and get back to you on that.

2            **THE COURT:**  Okay.  Fair enough.

3        So then that gets us to the issue that -- which was my

4    last question on the list -- that plaintiff's counsel alluded

5    to, which is, if we can't figure out who's in the class because

6    of all of these recordkeeping problems and the difficulty of

7    identifying people through the records, it seems that,

8    generally, the case law when the Court is faced with a choice

9    between notifying nobody and -- because we can't figure out who

10   they are -- and a publication notice or other alternative forms

11   of notice -- courts have routinely picked alternative forms of

12   notice, because it's better than the alternative of really just

13   denying notice completely.

14       What's Workday's response to that?

15           **MS. TOTTEN:**  Your Honor, you know our belief that

16   there is no case to be conditionally certified here.

17       Setting that aside, if Your Honor were inclined, again, it

18   should be cabined to those individuals who were processed

19   through Candidate Skills Match, Your Honor.  And individuals do

20   not know whether or not they were or were not processed through

21   Candidate Skills Match.  So it would be inherently unfair to,

22   again, throw the doors open to allow millions, probably, of

23   individuals to potentially be able to opt in.

24       We would much prefer a method, Your Honor, where we use a

25   list of who has enabled Candidate Skills Match, and to try to

1  find a way to work with customers.  Again, we think the

2  plaintiff should be the ones subpoenaing the customers and not

3  Workday.

4      The provision that he cited to you from that contract was

5  missing a reference to Section 4.2 of the contract, Your Honor,

6  which would be enlightening for you to look at, as well.  But I

7  think it's not part of the record, so -- we're happy to provide

8  it.  But it does require a notice procedure, Your Honor.  That

9  representation was disingenuous.

10     So it would be absolutely inherently unfair to throw the

11 doors open and allow -- it would be, really, an unlawful

12 solicitation of claims rather than a proper, well thought-out

13 process to keep this case -- if Your Honor is finding specific

14 employment process or procedure with regard to the use of AI

15 and ML in Candidate Skills Match, then it should just be the

16 applicants for those customers who have either used it or

17 enabled it.

18         **THE COURT:**  My thought, if I do conclude that notice

19 to the proposed collective is appropriate, would be to lay out

20 what I think the boundaries of that notice ought to be and then

21 to send the parties to meet-and-confer to discuss the most

22 practical way to get that done.  And then if we need to, we can

23 have a second session to discuss the practicalities and

24 conflicts that you all are not able to resolve on that issue.

25         I'm open to hearing your reactions to that, but I also

1  want to give you all an opportunity to tell me anything else

2  you think I should know that we haven't covered through my

3  questions today.

4       **MS. TOTTEN:**  Can I just add one little thing onto that

5  right now, because it goes right here, which is we would also

6  welcome the opportunity to meet-and-confer regarding the notice

7  itself.  Because, as we raised in our opposition, it contains

8  some errors and issues that we think are prejudicial.

9       **THE COURT:**  I did see that.

10      **MS. TOTTEN:**  Thank you.

11      **THE COURT:**  And it would include that.

12      **MS. TOTTEN:**  Thank you.

13      **THE COURT:**  Anything else plaintiff believes the Court

14 should know that's not in your papers and that we haven't

15 discussed already?  And then I'll give Workday the last word.

16      **MR. WIGGINS:**  I wanted to add one thing, Your Honor --

17 well, actually, two things.

18      One, is, when you look at the contract, assuming you do,

19 the 3.6 should be looked at, because it says that Workday

20 owns -- and that's their word -- owns the aggregated and

21 statistical data produced in the process of doing these

22 screenings.  And if owning is not control, I don't know what

23 is.

24      Secondly, as far as identifying people by age, they have

25 the right, under state law, to have applicant flow logs to keep

1  up with these type of things so they can analyze disparate

2  impact.  I don't know if they've complied with the law.  But if

3  they have, that's another source.

4          **THE COURT:**  Let me give -- were you done?

5          **MR. WIGGINS:**  Yes.

6          **THE COURT:**  Okay.  Let me give Workday an opportunity

7  to have the last word.

8          **MS. TOTTEN:**  Thank you, Your Honor.

9      We would implore the Court to carefully consider what has

10 been presented to you by the plaintiff.  The purpose of the

11 collective action structure is to promote the efficient

12 resolution of similar claims.  Nothing would be efficient here,

13 because there is no single policy or plan that is present.

14     And plaintiff has not met his burden, as described in

15 depth, so I won't go into it again, with regard to the three

16 required elements to at least show some ability as the case

17 would play out to be able to demonstrate that he can meet those

18 burdens.

19     Each of these plaintiffs, Your Honor -- as I said

20 earlier -- they all have the ability individually to move

21 forward with an individual ADEA claim.  They do not have to

22 rely on the collective action procedure to do so.  And there's

23 absolutely no reason, given the fact that they have not met

24 their burden, for the Court to decide otherwise.

25     But -- so they are not prejudiced by a denial here,

1  because they are able to still adjudicate their case.  But

2  certifying a collective this broad, as they propose, Your

3  Honor, involving thousands of Workday customers and potentially

4  hundreds of millions of applicants who applied through

5  Workday's customers, would deprive Workday of an ability to

6  defend itself against plaintiff's claims, and to do so

7  properly, because it would require the inspection of each AI/ML

8  score given through the Candidate Skills Match.

9       And that just cannot be done collectively, Your Honor, in

10  a collective adjudication, without the ability to take that on

11  a case-by-case, job-requisition-by-job-requisition basis.  So,

12  Your Honor, we respectfully request that plaintiff's motion be

13  denied with prejudice.

14       **THE COURT:**  Thank you, all, for the argument and for

15  the papers, which were very helpful.  I'm going to take the

16  matter under submission and issue a written order.

17       **MS. TOTTEN:**  Thank you, Your Honor.

18       **THE COURT:**  Thank you.

19       **THE COURTROOM DEPUTY:**  Court is in recess.

20            (Proceedings adjourned at 11:23 a.m.)

21                      ---oOo---

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, May 1, 2025

_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court