Lee D. Winston
(lwinston@winstoncooks.com)
Roderick T. Cooks
(rcooks@winstoncooks.com)
Attorneys at Law
Winston Cooks, LLC
420 20th Street North
Suite 2200
Birmingham, AL 35203

Robert L. Wiggins, Jr.
(rwiggins@wigginschilds.com)
Ann K. Wiggins
(awiggins@wigginschilds.com)
Jennifer Wiggins Smith
(jsmith@wigginschilds.com)
Wiggins Childs Pantazis Fisher and Goldfarb
301 North 19th Street
Birmingham, AL 35203

Attorneys for the Plaintiff And The Proposed Classes And The Collective

JULIE A. TOTTEN (STATE BAR NO. 166470)
jatotten@orrick.com
ERIN M. CONNELL (STATE BAR NO. 223355)
econnell@orrick.com
KAYLA D. GRUNDY (STATE BAR NO. 300513)
kgrundy@orrick.com
ALEXANDRIA R. ELLIOTT (STATE BAR NO. 320293)
aelliottt@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:      (415) 773-5759

Attorneys for Defendant
WORKDAY, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK L. MOBLEY, for and on behalf of himself and other persons similarly situated;<br><br>        Plaintiff,<br><br>    v.<br><br>WORKDAY, INC.<br><br>        Defendant. | Case No. 3:23-cv-00770-RFL<br><br>**PARTIES' JOINT LETTER REGARDING HIREDSCORE**<br><br>Courtroom:    15, 18th Floor<br>Judge:             Hon. Rita F. Lin<br><br>Complaint Filed:  February 21, 2023 |

Pursuant to the Court's Order, *see* ECF No. 154 at 3, the Parties submit this letter addressing whether applicants subjected to HiredScore are within the scope of the collective.

**Workday's Position**

Workday acquired HiredScore—a talent orchestration technology company—in April 2024, more than a year after Plaintiff filed his original Complaint. Prior to acquisition, HiredScore had independently developed two AI technologies to assist customers in recruiting: Spotlight and Fetch. These AI technologies were on the market for 6 years and HiredScore had its own customers who used the features on top of their existing non-Workday applicant tracking systems. In other words, unlike Candidate Skills Match ("CSM"), which is embedded in Workday's Recruiting "platform," HiredScore is a separate product, built on a wholly separate technology platform, that can run on Workday or any other applicant tracking system. There are two AI features within HiredScore: Spotlight and Fetch. Spotlight is an AI feature that matches information submitted by candidates to employer-created job requisitions. While the functionality may seem similar to CSM, Spotlight runs on a different AI model, relies on different inputs, was trained on different data, and produces different results than CSM. Fetch is an AI feature that surfaces internal employees or previously unsuccessful candidates to a company for consideration for alternate roles at a company in certain circumstances. Once surfaced by Fetch, the recruiter must invite the candidate to apply and the candidate must actually do so, before they will be considered for the position. Unlike Spotlight and CSM, Fetch does not score candidates. Spotlight and Fetch, the only recruiting AI features outside of CSM, are outside the scope of this litigation.[1]

### A. Plaintiffs Have Not Challenged And Lack Standing To Challenge HiredScore

Plaintiffs' allegations are the starting point to determine the scope of this case and courts limit attempts to expand beyond those allegations at later stages of a proceeding. *See, e.g.*, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291–92 (9th Cir. 2000) (explaining all theories of liability must be alleged to effect notice on defendant); *Ghadiri v. Home Depot*, 2020 WL 4760185, at *2 (C.D. Cal. May 21, 2020) ("Plaintiff's case is limited to the [ADA] allegations identified in his Complaint."). Here, Plaintiffs' allegations are specific to technology developed and trained by Workday—what they refer to as the "Workday platform." Spotlight and Fetch, which were not developed or trained by Workday, but instead acquired during the pendency of this action, are not contemplated by Plaintiffs' allegations and Plaintiff has no standing to contest them.

Plaintiff filed his FAC on February 20, 2024, before Workday acquired HiredScore. Plaintiff's allegations focus solely on ***Workday's*** AI tools that he claims caused him to be rejected for employment. Because HiredScore was a separate and unrelated entity at the time, Plaintiff's allegations cannot arise from HiredScore's products. *See* FAC ¶ 49 ("Since 2017, Mr. Mobley has applied for over 100 positions that ***exclusively use Workday, Inc.*** as a screening platform for talent acquisition and/or hiring. Each time he has been denied.") (emphasis added). Nor could Workday's allegedly insufficient "guardrails" have been the cause of any harm attributed to HiredScore. *See*

---

[1] Workday requests 45 days to identify the relevant customers and to provide legal notice of the Court's order prior to compliance, so customers have sufficient notice and the opportunity to object. Workday also requests the Court confirm it is only required to identify customers for whom it has data showing that the software generated a rank or score. Where such data is not available, Workday will provide customers that have enabled the feature.

*id.* ¶ 45 (Workday's tools "lack sufficient guardrails to prevent discrimination").[2]

Plaintiff's failure to allege anything about HiredScore defeats his standing to challenge its products. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff bears the burden of showing a concrete and particularized actual or imminent injury fairly traceable to defendant). Absent such a showing, Plaintiffs cannot maintain allegations pertaining to Spotlight or Fetch.

Plaintiffs' response misunderstands or misconstrues the "integration" of HiredScore into Workday post-acquisition. Workday concedes that HiredScore no longer exists as a separate entity and that Workday now sells HiredScore products as part of its business. These facts do not make Spotlight, Fetch, and CSM one product, or as relevant here, one employment practice. Nor does it alter the nature of Plaintiffs' allegations which are related solely to AI features developed and trained by Workday. Plaintiffs' FAC recognizes the differences in these products—including the data on which the products were trained—is important. *See, e.g.*, FAC ¶ 48 ("Limited diversity in the workforce responsible for creating models for training leads to bias in data mining which in turn leads to discriminatory and biased selection decisions."). And Fetch cannot even be compared to Spotlight and CSM, as it engages in an entirely different function.

Additionally, Plaintiff's new position that he applied to a customer that used HiredScore is disingenuous at best. Setting aside that the allegation is nowhere in his complaint, he disclaimed this very allegation in meet-and-confer conversations and instead took the position that excluding HiredScore from the litigation is premature because a ***future*** opt in might have applied to a HiredScore customer. Indeed, Plaintiff seems to suggest that he has necessarily been subjected to HiredScore by applying to jobs after the date of acquisition. This is not true. To this day, HiredScore continues to be sold as a separate product from Workday Recruiting. Even after April 2024, some Workday customers use CSM and others use HiredScore—any presumption otherwise by Plaintiffs is simply incorrect.[3]

Ultimately, Plaintiffs' FAC is cabined to ***Workday's*** AI tools—it does not include tools Workday acquired more than a year after Plaintiff filed his initial complaint and more than a month after he filed his FAC.

### B. Applicants Are Not Similarly Situated Across CSM And HiredScore

HiredScore is also out of scope because applicants subjected to CSM, Spotlight, and Fetch are not similarly situated. Nor have the parties briefed or the Court considered whether they are. *See* ECF No. 112 at 1 (Reply ISO Cond. Cert.) ("It is axiomatic that opt-ins are 'alike in ways that matter…' when, as here, they have had their applications handled or processed on the basis of the ***same Workday recruitment and screening procedures or services. Notice is not sought for anyone else***.") (emphasis added). To be similarly situated, putative plaintiffs must be "victims of a single decision, policy, or plan." *Henry v. JPMorgan Chase & Co.*, 2016 WL 11759747, at *2 (C.D. Cal. Sept. 26, 2016). It is inconceivable that these three distinct products could be a single

---

[2] Notably, the Court required Plaintiff to amend his complaint to sufficiently allege a disparate impact claim. Introducing HiredScore to the case creates the same problem Workday identified with Plaintiff's original complaint—he would again fail to identify a specific employment practice that allegedly caused the disparate impact. *See Liu v. Uber Techs. Inc.*, 551 F. Supp. 3d 988, 990 (N.D. Cal. 2021).

[3] Plaintiffs cite various websites and articles that have not been authenticated, are not subject to judicial notice, and are improperly introduced as evidence. Workday also notes that Athena Karp's current title is "SVP Product & Solutions Marketing," not "General Manager of the "HiredScore at Workday" department.

decision, policy, or plan. Each works differently from the others.[4] Moreover, because the collective applies to applicants using "Workday Inc.'s job application platform," and HiredScore may be used on any application platform, HiredScore is outside the scope of the collective.

As just one example of the differences between CSM and Spotlight, CSM compares skills extracted from a candidate's resume and the skills requested in a job requisition and assigns a score to suggest how well those skills match. Spotlight, on the other hand, considers the job title and description, the location of the role and the candidate, minimum years or industry-specific experience, education level and major, and more. Because the inputs are different, the way CSM and Spotlight process and score those inputs is also distinct. These are merely examples of distinctions between the products, each of which lead to different results with respect to different applicants and employers. These differences are material. In other contexts, courts have rejected similar attempts to expand the litigation. *See, e.g.*, *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 302 F.R.D. 448, 464 (N.D. Ohio 2014) (modifying class to exclude washer models that did not share design defect); *Simmons v. Ford Motor Co.*, 592 F. Supp. 3d 1262, 1279 (S.D. Fla. 2022) (denying class certification where design defect in Ford Mustangs and Expeditions not "materially identical"). The Court should not permit Plaintiff to expand his case so drastically at this stage absent full briefing on this issue.

**Plaintiffs' Position**

**I.  Workday's Practices During The Period It Has Owned HiredScore**

Workday does not contend that HiredScore is a separate or independent corporate entity in the period since it was acquired by Workday and terminated as a business entity on April 29, 2024. The New York Secretary of State's records show that HiredScore, Inc. was permanently terminated and ceased to exist on that date. Since then, HiredScore has merely been an internal department of Workday, not a separate corporate entity or subsidiary. HiredScore's former CEO, Athena Karp, became Workday's General Manager of the "HiredScore at Workday" department.[5]

As such, HiredScore is Workday and Workday is HiredScore. And HiredScore's customers and AI-powered products and services are Workday's customers and AI-powered products and services. They are one and the same.[6] All of HiredScore's former AI products and services have been fully merged and integrated into Workday Recruiting. Workday's public announcements and webpages define "Workday HiredScore" as "an AI-powered platform that integrates with Workday to automate and enhance the talent acquisition process, enabling more effective candidate screening, ranking, and matching." *Id.* at https://www.suretysystems.com/insights/workday-hiredscore-revolutionizing-talent-acquisition-and-management-with-ai/ (Oct. 22, 2024). Workday explains on the same webpage that "HiredScore ***integrates with the Workday Recruiting platform*** to empower recruiter capacity, hiring managers, and other HR professionals to attract, hire, and retain top-tier talent." *Id.*

---

[5]  *Workday's Acquisition of HiredScore: A Conversation With Athena Karp*, Workday Webpage, https://blog.workday.com/en-us/workday-acquisition-hiredscore-conversation-athena-karp.html (Apr. 1, 2024); *Workday + HiredScore: Revolutionizing Talent Acquisition and Management with AI*, https://www.suretysystems.com/insights/workday-hiredscore-revolutionizing-talent-acquisition-and-management-with-ai/ (dated Oct. 22, 2024; last visited July 14, 2025).

[6]  *Id.* at https://www.suretysystems.com/insights/workday-hiredscore-revolutionizing-talent-acquisition-and-management-with-ai/ (Oct. 22, 2024).

(emphasis added). It also states that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening." *Id.* (October 22, 2024). Workday's Press Release announcing its purchase of HiredScore on February 26, 2024 admits that "[t]he **combination** of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, will provide customers with a **comprehensive . . .** talent acquisition and internal mobility offering." "Workday Announces Intent to Acquire HiredScore," [https://newsroom.workday.com/2024-02-26-Workday-Announces-Intent-to-Acquire-HiredScore#:~:text=PLEASANTON, Calif., Feb. 26, 2024 / PRNewswire /,insights to improve recruiting and talent mobility processes](https://newsroom.workday.com/2024-02-26-Workday-Announces-Intent-to-Acquire-HiredScore) (emphasis added); *id.* ("Workday and HiredScore will ***provide a combined offering*** that will better enable recruiters to use data to connect talent to open opportunities. This includes solutions that assist with identifying candidates whose skills and experience ***most closely match*** a customer's open jobs. * * * ***The combined Workday and HiredScore offering*** will help ... streamlin[e] and expedit[e] hiring processes through ***automated notifications*** ..., all in their flow of work." *Id.* (emphasis added). Also, well before 2024, HiredScore's AI software had already been integrated with Workday's applicant tracking system (ATS) and human capital management (HCM) software for joint customers and subscribers. *See e.g., HiredScore Overview*, HRLineup, [https://www.hrlineup.com/hiredscore/](https://www.hrlineup.com/hiredscore/) .

The foregoing facts also establish Mobley's standing to challenge the disparate impact of such combined "Workday HiredScore" AI software that was "integrate[d] with the Workday Recruiting platform." *Id.* Mobley applied for job opportunities that were subject to such integration, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other customer-employers. The applications of various Opt-In Plaintiffs have similarly been processed through that same integrated process both before and since April 2024, such as those of Vanessa Knight-Bell, Sheliah Johnson-Rocha, Jill Hughes, Ric Lieb and others.

Workday's "combination" and "integration" of HiredScores's former AI software is still the same *Workday* practice that is pled in the Amended Complaint and found to state a plausible theory of liability. No part of that Complaint has been mooted by Workday's acquisition and integration of the parts of HiredScore's AI software than are sufficiently consistent with Workday's AI software to permit such integration. While such integration may be thought to *improve* Workday's AI software, the fact remains that it is still at its core the very same ***Workday*** application and screening process that is pled in the Amended Complaint. That is particularly true for the Complaint's claim for injunctive relief which is necessarily based on Workday's practice as it evolves and exists at the time of such injunction, not any predecessor practice that fell by the wayside along the way.

## II. Workday's Practices And Successor Status For The Pre-Acquisition Period

Workday's current argument is primarily based on distinctions limited to details of HiredScore's AI-related software from as much six years ago *before* Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies for mutual customers, including the development of a certified "bi-directional" integration with Workday Recruiting which: (1) allowed seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enabled recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software *within* Workday's

human capital management (HCM) software and ecosystem.[7] In being interviewed about the HiredScore acquisition and integration into the Workday platform, Cristina Goldt, General Manager for Talent Optimization at Workday, revealed that "We've been partners for quite some time, we have joint customers, and we were seeing the value that our customers were getting out of our joint solutions. * * * When combined with Workday, it makes Workday that much more powerful. * * * And we've seen across our clients, over half of employees engage with the job ***recommendations*** the system is sending them." *Workday Launches New AI Capabilities in Hiring and Talent Management Following HiredScore Acquisition*, Diginomica, https://diginomica.com/workday-launches-new-ai-capabilities-hiring-and-talent-management-following-hiredscore-acquisition (dated August 1, 2024 ; last visited July 14, 2025). All of such pre-acquisition integration allowed Workday users to access and use HiredScore's AI process without leaving Workday's recruiting platform. *See also* footnote 1 *supra.*

The above facts establish the named Plaintiff's and Opt-In's standing and similarly-situated status during the pre-acquisition 2021-2024 period for which Workday is the successor agent/employer for the three year ADEA limitations period prior to April 2024. *See e.g., Bates v. Pacific Maritime Asso.*, 744 F.2d 705, 709-710 (9th Cir. 1984) ("There are three principal factors bearing on the appropriateness of successor liability for employment discrimination: (1) the continuity in operations and work force of the successor and predecessor employers, (2) the notice to the successor employer of its predecessor's legal obligation, and (3) the ability of the predecessor to provide adequate relief directly."). The above facts show that all three such factors are satisfied here. *See also* Order, ECF 80 at 5-11 (finding Workday is an employer/agent for its subscriber customers).

---

[7] "Q: "HiredScore was an **existing Workday partner.** Are there plans to **further integrate HiredScore's products across the Workday platform?** A: That's right—Workday already supports a certified bi-directional integration with HiredScore. We're really proud when our customers tell us that we have one of the best Workday integrations. Since becoming a partner, the customer value we deliver through this integration has only continued to improve.." Workday's Acquisition of HiredScore: A Conversation With Athena Karp, Workday Webpage Apr. 1, 2024, https://blog.workday.com/en-us/workday-acquisition-hiredscore-conversation-athena-karp.html (emphasis added).

Dated: July 16, 2025

WIGGINS CHILDS PANTAZIS, FISHER & GOLDFARB, LLC

By:    */s/ Robert L. Wiggins, Jr.*
ROBERT L. WIGGINS, JR.
ANN K. WIGGINS
JENNIFER WIGGINS

LEE D. WINSTON
RODERICK T. COOKS
WINSTON COOKS LLC

Attorneys for Plaintiff
DEREK MOBLEY

*ADMITTED PRO HAC VICE*

Dated: July 16, 2025

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:    */s/ Julie A. Totten*
JULIE A. TOTTEN
ERIN M. CONNELL
KAYLA D. GRUNDY
ALEXANDRIA R. ELLIOTT
Attorneys for Defendant
WORKDAY, INC.