LEE D. WINSTON (ASB: 6407O72L)
*Admitted pro hac vice*
lwinston@winstoncooks.com
RODERICK T. COOKS (ASB: 5819O78R)
*Admitted Pro Hac Vice*
rcooks@winstoncooks.com
WINSTON COOKS, LLC
420 20th Street North, Suite 2200
Birmingham, AL 35203

ROBERT L. WIGGINS, JR. (ASB: 1754G63R)
*Admitted Pro Hac Vice*
rwiggins@wigginschilds.com
ANN K. WIGGINS (ASB: 7006i61a)
*Admitted Pro Hac Vice*
awiggins@wigginschilds.com
JENNIFER WIGGINS SMITH (ASB:9622E53S)
*Admitted Pro Hac Vice*
jsmith@wigginschilds.com
WIGGINS CHILDS PANTAZIS FISHER AND GOLDFARB
301 North 19th Street
Birmingham, AL 35203

Attorneys for the Plaintiff and the
Proposed Classes and Collective

**[ADDITIONAL COUNSEL CONTINUED ON NEXT PAGE]**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEREK L. MOBLEY, for and on behalf of himself and other persons similarly situated;<br><br>Plaintiff,<br><br>v.<br><br>WORKDAY, INC.<br><br>Defendant. | Case No. 3:23-cv-00770-RFL<br><br>**JOINT CASE MANAGEMENT STATEMENT**<br><br>Courtroom:    15, 18th Floor<br>Judge:         Hon. Rita F. Lin<br><br>Complaint Filed:  February 21, 2023 |

1  Jay Greene, JD, CPA
   greenattorney@gmail.com
2  Greene Estate, Probate, and Elder Law Firm
   447 Sutter Street, Suite 435
3  San Francisco, CA 94108

4  Attorneys for the Plaintiff and
   the Proposed Classes and Collective
5
   JULIE A. TOTTEN (STATE BAR NO. 166470)
6  jatotten@orrick.com
   ERIN M. CONNELL (STATE BAR NO. 223355)
7  econnell@orrick.com
   KAYLA D. GRUNDY (STATE BAR NO. 300513)
8  kgrundy@orrick.com
   ALEXANDRIA R. ELLIOTT (STATE BAR NO. 320293)
9  aelliottt@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
10 The Orrick Building
   405 Howard Street
11 San Francisco, CA  94105-2669
   Telephone:    (415) 773-5700
12 Facsimile:    (415) 773-5759

13 Attorneys for Defendant
   WORKDAY, INC.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On August 27, 2025, the Parties appeared before the Court for a Case Management Conference ("CMC"). Following the CMC, this Court ordered a further CMC be set for October 1, 2025. ECF No. 166. The Court further ordered the Parties to submit a Case Management Statement that (1) addresses the third-party administrator preliminarily selected by the Parties, including the administrator's experience, particularly with respect to confidentiality and similar types of cases and administration, (2) describes Plaintiffs' proposed distribution plan, and (3) attaches Plaintiffs' proposed long form notice and short form notice. *Id.* The Court further asked that the Parties propose a reasonable timeline for Workday's customers to object to being included on the customer list and raise any arguments about whether Plaintiffs' counsel should be permitted to view the list of customers. The Parties identify their respective positions on these issues below.

**PLAINTIFFS' POSITIONS:**

**I.     Workday Is Required To Produce The Data And List Showing The Employers Who Enabled The Challenged Application Platform And Screening Procedures**

On June 4, 2025, Workday agreed that it "would **provide Plaintiffs** with a list of the Workday customers that have enabled AI software features." ECF 148 Transcript at 4:21-5:7 (June 4, 2025) (emphasis added).[1] The Court has subsequently reiterated that it "do[es] want to get that list in Plaintiff's hands" and doesn't "see what the point is in delaying that" because "obviously, Plaintiffs are going to have to have the list in order for you all to meet and confer about whether the settlement administrator properly identified who's on the list and who's not, and I just don't see how we can make this work without Plaintiffs having the list at some point." ECF 167, Tr. at 11:10-16, 14:19-15:4 (August 27, 2025); Order, ECF no. 166 at 2 ("Individuals who did not apply to an employer on the list . . . may seek the advice of Plaintiffs' counsel to raise the issue with the court

---

[1] THE COURT:  Let me just start with what seems to be the area of agreement, but I want to check in with the parties to make sure it is.  As I understand it, the parties are in agreement that Workday would *provide Plaintiffs with a list* of the Workday customers that have enabled AI software features . . . Am I understanding that correctly?  Let me just check in with Workday about that.
MS. CONNELL:  **Yes**.  Thank you, your Honor.  We have had some updates since we submitted the joint statement, and we wanted to talk with you about those. . . ." ECF 148, Tr. at 4:21-5:7 (June 4, 2025) (emphasis supplied).

if they disagree."); *id.* at 3 ("Plaintiffs shall provide Workday with a list of all individuals who they believe were improperly deemed ineligible. * * * At the conclusion of the meet and confer period, the parties shall submit to the Court a single list of the individuals whose eligibility remains in dispute.").

Even if that difficulty had not been so clearly the case, Workday obviously concedes that its enabler list and data are not confidential for the third-party administrator it insists on hiring. That same non-confidentiality applies to the Plaintiffs' attorneys for the same reason. Both the third-party and Plaintiffs' attorneys are governed by the same protective order, and such attorneys are no more likely to violate that protective order for the list at issue than they are for the many other confidential documents that they have kept strictly confidential in this case.

Workday's contrary argument is a red herring. It argues that *its customers* oppose giving the list to the Plaintiffs, but those third party customers have no standing whatsoever to oppose such production. They neither own nor have any rights regarding such list or the underlying "aggregated transactional data" on which it is based. Workday admits that the list is based solely on the "aggregated transactional data" that it owns and possesses separate and apart from its customers. ECF no. 149 at 11 (CMS filed July 2, 2025) (Workday stating that "through aggregated transactional data, Workday can identify whether CSM scores have been generated in a customer's tenant. * * *"); *id.* (Workday admitting it "does have aggregated transactional data that provides general information about usage of certain aspects of Workday's products" and that it "believes that over time, this transactional data fairly captures whether applicant scores exist in a particular customer tenant."); Master Subscription Agreement at §3.6 (Exhibit #5 attached).[2]

---

[2] *See also,* ECF 120, Transcript at 40:9-11, 41:1--23, April 29, 2025 ("Workday does have the ability to see, Your Honor, if Candidate Skills Match has been enabled."); CMS, p. 9 (ECF no. 131, May 28, 2025). (Workday stating it "is able to identify only whether a customer enabled the CSM feature."); ECF 167, Transcript at 22:4-23:19, August 27, 2025 (confirming Court's "understanding

In addition, the customers' Master Subscription Agreement with Workday expressly stipulates that Workday is the *only* party who "**owns the aggregated and statistical data** derived from the operation of the *Service*, including, without limitation, the . . . reports processed in the *Service* and the performance results for the *Service*." *Id.* at §3.6 (emphasis added). The term "Service" is defined as Workday's "software-as-a-service applications," *id.* §11, which includes the software applications challenged in this lawsuit.[3] Even more broadly, Section 3.1 of the customers' Master Subscription Agreement provides that "Workday and its licensors ***own all right***, title and interest in and to the *Service*, Documentation, and other Workday Intellectual Property Rights." *Id.* at §3.1 (emphasis added). [**add** Documentation definition].

*Nothing* within such Master Agreement states or suggests that customer consent is required in order for Workday to produce, share or use *its own property*, such as the "aggregated transactional data" on which its list of AI enablers is based. *Id.* Nor is there anything in such customer Agreement that states or suggests that customer notice or consent is necessary in order for Workday to comply with this Court's orders or the requirements of Rule 34. *Id.* In all the many months that this issue has been debated since last April, Workday has never once identified *any* provision of its contract with customers that it contends to require such customer notice or consent for *any* property that Workday owns, much less for the "aggregated transactional data" that the customers have contractually stipulated they do not own or have any rights to. *Id.* at §3.1, §3.6. Instead of identifying or citing any such provision of its customer contract, Workday has done the opposite by explicitly distinguishing the difference between "'customer data' and its own

---

that Workday has the information, and it is in Workday's possession [to identify] which customers have enabled AI features."); ECF 148, Transcript at 4:21-5:7 (June 4, 2025).

[3] The above quoted Master Subscription Agreement is the one Workday has produced in regard to Plaintiff Mobley's claim against Workday's rejection of his application for employment with Unum. All of the other Master Subscription Agreements that Workday has produced for other customers include the same provisions as quoted above.

"aggregated transactional data" — that while it "does not have its customers' data [it] does have aggregated transactional data," ECF 149 at 11, that it owns and controls independently from its customers. *Id.* and Master Subscription Agreement at §3.1, §3.6 (Exhibit 5 hereto).

Workday's customers have also already given their consent to Workday producing such data when they executed §4.1 of their Master Subscription Agreement which states that "each party may disclose to the other party Confidential Information" and that such information may be shared with third parties when "the Receiving Party is ordered to produce Confidential Information of the Disclosing Party by any court of competent jurisdiction . . . [or] to the extent otherwise required by Law." *Id. at* §4.1. The customers' consent to production of such data is also repeated in the next section entitled "Compelled Disclosure" which states that they agree "[a] disclosure by one party of Confidential Information of the other party to the extent required by Law **shall not be considered a breach of this Agreement** . . . ." *Id.* at §4.2 (emphasis added).

This Court's orders to produce the documents and information at issue are clearly such a "Law" that "shall not be considered a breach of this Agreement." *Id.* at §4.2. Such "Law" also comes from the document production provisions of Rule 34 which explicitly require Workday to produce the documents and information at issue because it has "possession" and *"custody"* of such documents and "aggregated transactional data." Rule 34(a) requires Workday "to produce . . . any designated documents . . . which are in the **possession**, **custody** or control of the party upon whom the request is served." Fed. R. Civ. P. 34(a) (emphasis added). Workday admits that it has such "possession" and "custody" of both the list and the "aggregated transactional data" on which it is based, as already shown above.[4] Workday has no basis for arguing that its contract with customers

---

[4] Workday's "aggregated transactional data" and "aggregated and statistical data" come within the terms of Plaintiffs' formal production requests and are specifically named in Plaintiffs' follow-up emails requesting Workday's promised list of AI enablers and the underlying derived aggregated data on which it is based.

1  somehow overrides Rule 34 or Title VII.  Federal courts have consistently held that "documents

2  are deemed to be within the 'possession, custody or control' for purposes of Rule 34 if the party

3  has *actual* possession, custody or control, or has the legal right to obtain the documents on demand."

4  *In Re Bankers Trust Co.,* 61 F.3d 465, 469 (6th Cir. 1995) (Court's emphasis); *Resolution Trust*

5  *Corp. v. Deloitte & Touche*, 145 F.R.D. 108, 110 (D. Colo. 1992).

6

7  **II.    Workday's Proposed Customer Objection Process And Hearsay Declarations Address Only Stage II Decertification Questions, Not Notice or Collective Membership Issues**

8         Workday's proposal that "the Court adopt a procedure by which customers may object to

9  their name being included on the [AI enabler list] if the customer has never **used** Candidate Skills

10 Match, Spotlight, or Fetch to score, sort, screen, or rank applicants." Workday Section *infra.*

11 (emphasis added). Whether a customer actual "used" such tools "to score, sort, screen, or rank

12 applicants" has been held to be a Stage II decertification question after completion of discovery,

13 not an issue relevant to giving notice or determining collective membership at this pre-discovery

14 stage of the case. Order, ECF 128 at 6, 18-19. In making that determination, the Court found that

15 examining the latter notice questions and AI enabling questions would not thrust too far forward in

16 the pre-discovery stage of the case based on the following findings of fact:

17

18              First, Workday acknowledged at oral argument that it is able to see whether
             its customers have enabled any AI features. Second, Workday does not dispute that
19           applicant data is hosted by Workday, and that while Workday's customers sign
             contracts that prohibit Workday from accessing applicants' confidential personal
20           data, the contract contains an exception applicable when Workday is subject to a
             court order. Third, Workday confirmed that, assuming customer consent, it can
21           identify the score that its CSM feature gave an applicant (and can presumably do so
             for other features as well).
22

23 ECF no. 128 at 18.

24        In noting those understandings and admissions, the Court held that it could not go any

25 further than such a "enabling" based determination because the question of whether such enabling

26 customers actually used such AI tools thereafter would require discovery, evidence and litigation

27 not ripe or available until the Stage II decertification phase of the case.  Order, ECF 128 at 6, 18-

28

19. In doing so, it expressly rejected Workday's argument that such matters should be resolved at the pre-notice stage based on nothing more than attorney arguments. Order, ECF 128 at 6, 18-19. That is even more true of Workday's current argument that the Court should enter findings of fact on the basis of sealed hearsay Declarations from customers rather than the actual business records of collective members' AI scores that Workday admits it possesses. *Id.* Such a Declaration is inadmissible hearsay because it is an out-of-court statement offered for the truth of the matter asserted and it affords no opportunity for cross-examination that tests the credibility of such a sealed declaration.

For these reasons, the current AI "enabling" issue is  the only pre-discovery question that can be resolved and Plaintiffs request that Workday be ordered to immediately provide them that list  so the case can legitimately move forward with the discovery necessary to reach and resolve the current Stage II decertification scoring-based issue that Workday tries to short-circuit with mere hearsay Declarations. Up to now, Workday has argued and recognized that even with resolution of the AI "enabling" issue, "[t]he parties will still need to know whether a potential opt-in **was in fact scored** and if so, the value of that score."  ECF 149 at 11-12 (CMS filed July 2, 2025). Its current sealed Declarations do not even propose to address that issue, much less afford a permissible means of resolving it.

Plaintiffs also request that the Court simultaneously address the discovery logjam caused by Workday's identical objections to production of such automated scores.  That production dispute depends on the same "possession" and "custody" issues that must be decided here. Discovery toward decertification cannot move forward until that parallel objection is first resolved.  In other words, Workday already has the only list relevant to the Third-party Administrator and it is now proposing that the Court add an entirely new and separate "process for customers to submit their objections, along with a declaration supporting their objections under seal and under the penalty of

perjury" by which **the Court,** not the Third-party Administrator, "can sustain the objection and that customer will be excluded from the customer list or overrule the objection and the customer will remain on the customer list." *Id.* Workday Section  below. The Court has already rejected that proposal in slightly different form based on Workdays' following admission that it possesses and can see the scores themselves "if customers consented to that."  ECF 120 at 41:24-42:21, 43:8-46:6, 47:7-20 (April 29, 2025);  ECF 128, Order at 6, 18-19.

> THE COURT: Let me -- I understand that **there's a potential fact dispute on this issue,** but I want to move on to the next question that I had, which is  -- we've already answered part of this -- but I heard Workday say that it can identify which of its customers has Candidate Skills Match enabled. Can Workday also identify **the score** that Candidate Skills Match gave to a particular applicant?
> MS. TOTTEN: Workday does not have the ability to see the scores, Your Honor, *without customer consent.* That is part of the customers' data.
> THE COURT: **If the customers consented to that, would Workday be able to see that information?**
> **MS. TOTTEN: Yes, Your Honor.**
> THE COURT: Okay.

ECF 120, Tr. 41:24-42:21, 43:8-46:6, 47:7-20 (April 29, 2025).

The Court has already found that "Workday confirmed that, assuming customer consent, it can identify the score that its CSM feature gave an applicant, and can presumably do so for other features as well." ECF no. 128 at 18. And as shown above, the customers have consented to Workday's production of such scores in §4.1 and §4.2 of the Master Subscription Agreement the customers executed with Workday. Workday itself admits in its section below that it "can discern whether Candidate Skills Match scores exist in a customer's tenant" and that it has "list[ed] every Workday, Inc. customer who scored candidates with CSM and/or has gone live with HiredScore **according to Workday's data."** Workday Section below (emphasis added).

III.    **Workday's Requested Third-party Administrator Is Not Needed Or Justified**

Given the fact that Workday's list of enablers list is based on its "aggregated and statistical data" that is neither confidential or owned by its customers, the original basis for requiring the

inordinate expense of its requested third--party administrator is moot and no longer justified. The Court's Order states that "[a] third-party administrator is necessary to ensure confidentiality of sensitive information provided by opt-ins and employers," Doc. 166 at 3, but that it is now known not to be true because that such list is not based on any confidential data or information. It is instead based **solely** on "aggregated and statistical data" that contains **no** applicant identities or applicant "sensitive" confidential information traceable to an identifiable applicant. And it is now equally well known that such "aggregated and statistical data" contains **no** confidential data or information that is owned by customers or for which customers have any legal rights whatsoever. *See* ECF 149 at 11; Master Subscription Agreement at §3.6 (Exh. 5 quoted above hereto). And even if that was not the case, such list and data would not be confidential any more for the Plaintiffs' attorneys than it is for the third-party administrator that is to be given such list. Moreover, there is no risk that Plaintiffs' attorneys will violate the Court's protective order for a list that has no confidentiality to begin with.

There is no proper basis for putting the Plaintiffs to such a large and unprecedented third-party expense on that basis. Workday's proposed third-party administrators have informed the Parties that they will charge between $175,000 and $1.7 million for that work depending on the number of claims to be reviewed. That charge of $1.7 million only covers one million opt-ins. Twice that number would be twice that dollar amount ($3.4 million dollars). Those charges also do not include their charges for handling the social media publication notice which is similarly exorbitant. *See* Exhibit 7. That expense would not exist but for **Workday's** requested substitution of such a publication notice for the targeted email notice it pursued but abandoned merely to avoid customer unhappiness with having to provide such email addresses Workday's proposed third-party administrator expense would also not exist but for **Workday's** request to hire such a third party in order to avoid customer unhappiness with having to provide the enablers list to the applicant

1    collective or Plaintiffs' counsel.

2    **IV.    The Limitations Period Should Be Deemed Tolled As Workday Represented**

3         The expense and delay caused by Workday's pre-opt-in and third-party administrator

4    process should also no be imposed because Workday has reneged on its representation that "there

5    wouldn't be an issue with the statute of limitations running for the opt-in Plaintiffs." ECF no. 148,

6    Transcript at 13:10-14:15 (June 4, 2025) (Workday's statement that it had "analyzed this, and our

7    interpretation of the law is that the opt-in Plaintiffs would essentially piggyback on Mobley's filing

8    . . . [a]nd so, there wouldn't be an issue with the statute of limitations running for the opt-in

9    Plaintiffs."). Because the proposed pre-opt in form and third-party administrator process will not

10   toll the injured applicants' limitations period with any assurance, it would be inequitable to not

11   permit them to immediately file the necessary consent-to-join form that is their right to file under

12   the age discrimination statute. Plaintiffs have relied on Workday's presentation and agreement that

13   "there wouldn't be an issue with the statute of limitations running for the opt-in Plaintiffs, " ECF

14   148 at 13:10-14:15, and the would not have agreed to substitute publication notice targeted email

15   notice that has led to the pre-opt in form and third-party administrator process that now somehow

16   preempts their statutory right to file a true consent to join form that will toll their limitations period

17   without the delay and expense they are now experiencing and cannot be undone with any assurance.

18        Workday's admitted understanding that "there wouldn't be an issue with the statute of

19   limitations running for the opt-in Plaintiffs," ECF 148 at 13:10-14:15, was agreed to in the context

20   of it's request to substitute publication notice for the targeted email notice that it had been pursuing

21   up to that point. *Id.* . Plaintiffs only agreed to that substitution on the expressed understanding that

22   Derek Mobley's tolling of the limitations period for opt-in Plaintiffs was not being challenged by

23   Workday. *Id.* Plaintiffs have also continued to rely on that understanding and representation in the

24   nearly four months that have expired since June 4th and will continue through and beyond today

(September 24, 2025).[5] Judicial or equitable estoppel should prevent al of that from occurring,[6] but there is no assurance that it will or that it would not itself cause more expense, risk and delay. Filing the statutory consent-to-join is the only action that can accomplish that in any definitive manner.

Workday now belatedly offers "to stipulate that the statute of limitations for any particular opt-in plaintiff shall be tolled from the date they submit their opt-in eligibility form", but that is not what it said and agreed to when it represented that it had "analyzed this, and our interpretation of the law is that the opt-in Plaintiffs would essentially piggyback on Mobley's filing . . . [a]nd so, there wouldn't be an issue with the statute of limitations running for the opt-in Plaintiffs." ECF no. 148, Transcript at 13:10-14:15 (June 4, 2025). Having the same tolling as Derek Mobley tolls the limitations period from September 24, 2020 forward, not merely on some unknown future date that they are eventually allowed to file a true statutory consent-to-join form rather than being entangled in the ongoing delay of the current  pre-opt-in and third-party administrator process. For example, many injured applicants would have known about their statutory right to file such a consent-to-join form at least since last May absent all the Workday-imposed substituted notices and procedures that have delayed such notice for more than four months,  and continues today with no end insight.

## V.    The Complaint Challenges Workday's Entire Platform, Not Just "Workday Recruiting" or "Candidate Skills Match"

Workday's opt-in "eligibility" argument is based solely on its Candidate Skills Match

---

[5]   Since at least late May, Workday has repeatedly represented that it was diligently seeking its customers' consent to the list of who enabled its AI features, but it has now belatedly disclosed that it has no such responses that it is willing to share with the Court or with Plaintiffs.

[6] *Wong v. Flynn-Kerper*, 999 F.3d 1205, 1211 (9th Cir. 2021) ("Equitable estoppel applies if the party to be estopped knew the facts and intended for his conduct to be acted on, and if the party asserting estoppel was ignorant of the true facts and relied on the other party s conduct to her injury."); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (Judicial estoppel "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."); *Bender v. Twilio, Inc.*,2025 U.S. Dist. LEXIS 154858, *15 (N.D. Calf. 2025) ("The purpose behind equitable estoppel is to prevent a party from relying on an agreement for one purpose while disavowing [another] clause of the agreement.") (quotation  marks omitted); *Brown v. Transworld Sys., Inc.*, 2024 U.S. Dist. LEXIS 166562, *22 (W.D. Wash. 2024) (same).

feature ("CSM"). It argues that to be "eligible" to opt-in to this case, an applicant must have been scored by its Candidate Skills Match AI feature. *Id.* Candidate Skills Match, however, is just an *"extra layer"* of applicant screening on Workday's application platform, not its sole screening mechanism. ECF 120, Tr. at 9:4 -11:5 (Workday stating that CSM is "an extra layer . . . helping to sort the candidates and assess *the degree* to which job requisition requirements" are met.) (emphasis added). The Court has already found, however, that Workday's applicant platform is not limited to CSM's "extra layer" of applicant screening because "the allegations in the FAC—and the scope of the collective that received preliminary certification—are not limited to Workday Recruiting." Order at 2-3 (Doc. 158) (citing *e.g.*, Dkt. No. 47 ¶¶ 90, 97, 99; Dkt. No. 106 at 14). The operative Complaint is simply not limited to CSM as the sole "automated decisionmaking" being challenged or as the sole cause of the disparate impact that the Court found to be "plausible." ECF 80; ECF 128.

## VI.    Plaintiffs' Dissemination Plan

Plaintiffs' Dissemination Plan is attached as Exhibit 8_. Contrary to Workday's argument, the Plan includes each step and component necessary for such dissemination. It also includes the steps and components recommended by the three media notice specialists Workday recommends for design and implementation of such notice dissemination. *Compare* Exh. 8 (Plaintiffs' proposed Dissemination Plan) *with* Exh. 7 (dissemination steps and components recommended by Workday's three consultants). Workday has had ample opportunity to edit the proposed Dissemination Plan since it was sent to them ten days ago on Monday, September 15, 2025. *See* Exh. 8 attached. Plaintiffs have twice requested that Workday to provide any additional or alternative steps or components that they recommend to include, but they refused to do so. It never responded to the first such request and outright refused to respond to the second request. Consequently, Plaintiffs know of no additional or alternative steps or components that support

Workday's contention that the Dissemination Plan is "insufficient" or otherwise non-compliant with the Court's instructions (ECF 166).

## VII.    Short Form Notice For Media Advertisements

Plaintiffs' proposed "short-form" notice for use in media ads was created as an example of such ads content *before* they received Workday's three media consultants' bids to author or design the content of such ads. *See* Exh. 4. Plaintiffs promptly asked for revisions and clarifications of such proposals and only received such revisions shortly before this CMS was due. Plaintiffs are in the process of deciding what components of the media specialists' proposals they can afford to pay for, but assistance in the design of the ad's content is likely to be one such component.

As with the Dissemination Plan as whole, Plaintiffs have not received any additional or alternative ad content suggested by Workday. Instead, it merely complains that Plaintiffs' short-form notice only describes a vague "mechanism through which the short form notice will be distributed." That, however, is not the function or purpose of the short-form notice. The "mechanism" is set forth in Dissemination Plan, not the "short-form" ad content that is merely a component of the Dissemination Plan. As already shown, the Dissemination Plan is sufficient in light of the input expected from whatever specialists in social media outreach are hired at the next step of the notice process. Both the short-form ad content and the Dissemination Plan are currently as final as they can be at this stage of the process.

## VIII. Long Form Notice

Contrary to Workday's argument, Plaintiffs proposed long-form notice includes the full definition of the collective, fully informs opt-ins of the consequences of their decision to opt in or not, their freedom to choose their own counsel, and otherwise includes each component recommended by the Court (ECF 166). The full definition of the collective is "All individuals 40 years of age or older who, at any time from September 24, 2020 to the present, applied for job opportunities using Workday, Inc.'s job application platform." *See* Order at ¶ 2 (b)(i) ("To submit

a form, you only need to know that you were over 40 years old at the time you applied for job opportunities using Workday, Inc.'s job application platform."). The additional terms proposed to be added by Workday are not part of the definition of the collective in saying: "In this context, being 'denied' an 'employment recommendation' means that (i) the individual's application was scored, sorted, ranked, or screened by Workday's AI; (ii) the result of the AI scoring, sorting, ranking, or screening was not a recommendation to hire; and (iii) that result was communicated to the prospective employer, or the result was an automatic rejection by Workday." Those additional terms apply to the subsequent review of an individual's form, questionnaire answers and documents, not the *notice* of the right to submit such forms and information. The Court has defined that right in ¶ 2 (b)(i) as follows: "To submit a form, you only need to know that you were over 40 years old at the time you applied for job opportunities using Workday, Inc.'s job application platform."Order at ¶2 (b)(i) (ECF 166). The additional terms proposed to be added by Workday will deter and confuse recipients of the notice because Workday has opposed letting them know whether "(i) [their] "application was scored, sorted, ranked, or screened by Workday's AI; (ii) the result of the AI scoring, sorting, ranking, or screening was not a recommendation to hire; and (iii) that result was communicated to the prospective employer, or the result was an automatic rejection by Workday." *See* Workday Exh. That deterrence to opting in should not be added to the notice without giving recipients the information necessary to self-assess if they meet those terms. Right now, that will occur only *after* the notice is published and can only discourage responding to the notice until then.

Plaintiffs proposed long-form notice also includes the additional terms listed by the Court in the Order entered August 28, 2025 at ¶ 2 (a-d) (ECF 166). Plaintiffs have attached their proposed long form notice as **Exhibit 1.**

IX.    **Electronic Opt-In Form**

The same contradiction applies to Workday's criticism of Plaintiffs' proposed Opt-In form (Exh. 2 attached). Contrary to Workday's argument, Plaintiffs proposed Opt-In form includes the previously proposed questionnaire items as part of the Opt-In form itself (Exh. 2) and the accompanying Questionnaire (Exh. 3) that Plaintiffs have added in response to Workday's belated request for a separate Questionnaire document. Before that, separation of the Opt-In form and Questionnaire had proved redundant, cumbersome and confusing, and that is still partially true now that Plaintiffs have separated the Opt-In form from its supporting Questionnaire as shown in Exhibits 2 & 3. Together, however, the two documents contain all of the items Workday currently insists upon, including the responding individual's (1) name, (2) birthdate, (3) address, (4) telephone number, (5) email address, and (6) jobs applied for. They also include each of the other items Workday advocates in its section below, including: (1) whether the individual wants to be assisted or represented by Plaintiffs' counsel; (2) whether the individual's  confirm that they applied to a job using Workday's application platform ; (3) whether the individuals believe they were denied an employment opportunity and/or recommendation for the jobs they applied for; and (4) whether the individual's wish to submit the resume[s] they used in applying for such job opportunities. That is all that has been required and more.

**WORKDAY'S POSITIONS:**

**A. Third-Party Administrator**

Pursuant to the Court's order, Workday provided Plaintiffs' counsel with three bids from third-party administrators on September 10, 2025, including bids from: (1) Simpluris; (2) Angeion Group; and (3) Rust Consulting. Workday solicited revised bids from each of these three administrators to ease comparisons across the three and provided those revised bids to Plaintiffs on September 20, 2025. Each of these third-party administrators has significant experience with large class action lawsuits, including those spanning millions of potential class members. Each also maintains legally compliant high security and confidentiality standards.

It is Workday's understanding that Plaintiffs do not agree to use any of these three administrators—or any third-party administrator at all—if Workday does not agree to bear the costs. The Court already ordered the use of a third-party administrator and further ordered what the

cost split will be. Plaintiffs have offered no grounds to seek reconsideration of the Court's order which would require a motion based on changed facts or law, which do not exist here. Moreover, the Court's order remains correct—a third party administrator is necessary here to preserve confidentiality and in light of the potential volume of eligibility requests given their expertise with managing high-volume data. While Plaintiffs suggest there is no confidential data or information at issue, this is false. The potential opt-in plaintiffs' personal information is confidential—particularly where potential opt ins elect to choose their own counsel—and so is Workday's customer list. Plaintiffs' arguments about "aggregated and statistical data" are inapposite because such data is not at issue. Instead, what is at issue is the disclosure of the names of customers who use specific features of the Workday's products, which reveals confidential business information about those customers. The Court has already decided this issue, too. Revisiting these issues now is improper and inefficient, particularly given the many issues that remain unresolved.

**B. Plaintiffs' Proposed Dissemination Plan**

Plaintiffs' proposed dissemination plan is insufficient and does not provide a roadmap for how Plaintiffs intend the dissemination to work. Workday's position is that Plaintiffs must propose a detailed, concrete dissemination plan that articulates the exact steps to be taken to facilitate distribution of the notice to discuss with Workday and ultimately to be approved by the Court. The existing plan is insufficient for that purpose. Workday identified these deficiencies to Plaintiffs during the Parties' meet-and-confer discussion on September 19, 2025. Plaintiffs have stated that they cannot formalize a concrete dissemination plan without the guidance of a retained third-party administrator, although they simultaneously now contend that no third-party administrator is necessary.

**C. Plaintiffs' Short Form Notice, Long Form Notice, and Opt-In Eligibility Form**

**1. Short Form Notice**

Plaintiffs' short form notice is insufficient. While it includes some proposed text, the mechanism through which the short form notice will be distributed is vague and the document specifically states that the "final format and any necessary edits would be determined by specialists in social media outreach." Workday believes Plaintiffs must finalize these details, and provide

1    Workday an opportunity to comment, before the Court can approve the short form notice and notice

2    can commence. Other than a vague reference to having spoken to some experts, Plaintiffs have

3    provided no information about what steps have been taken to finalize their proposal. Moreover,

4    Plaintiffs again state that they will have more concrete details on their short form notice following

5    the retention of a media consultant at the next stage—and yet, they oppose retaining a third-party

6    administrator to assist with the notice and opt-in process.

7              **2.  Long Form Notice**

8              Plaintiffs have submitted a proposed long form notice. Workday has edited that proposed

9    long form notice in redline, attached as **<u>Exhibit A</u>**. Most notably, Workday does not agree that its

10   customer list should be published on the opt-in website, as Plaintiffs propose. The Court has already

11   acknowledged the confidentiality of the list in its rulings on the notice plan to date. Workday also

12   rejects the language in Plaintiffs' long form notice that minimizes the impact of opting in on

13   potential plaintiffs' rights.

14             **3.  Opt-In Eligibility Form**

15             Plaintiffs' proposal for the opt-in eligibility form departs from the Parties' previous

16   agreement. *See* ECF No. 166 (acknowledging that the opt-in form shall "include the questionnaire

17   and release described in the Parties' prior case management statement (Dkt. No. 149)"). Workday

18   submits the original form agreed to by the Parties, modified to include an appropriate place for

19   potential opt-in plaintiffs to submit their job applications, if they choose to do so. Workday objects

20   to a process that includes the upload of documents as opposed to manual entry of employers to the

21   extent such a process will increase administrator costs that the Court has already decided Workday

22   will bear. Workday's proposal is attached as **<u>Exhibit B</u>**.

23        **D.  Timeline for Customers to Object**

24             Workday proposes that the Court adopt a procedure by which customers may object to their

25   name being included on the customer list if the customer has never used Candidate Skills Match,

26   Spotlight, or Fetch to score, sort, screen, or rank applicants. As Workday has repeatedly explained,

27   Workday's access to information about whether and how customers use its products is limited. For

28   example, while Workday can discern whether Candidate Skills Match scores exist in a customer's

1    tenant, Workday cannot discern whether those scores were made available to the customer's hiring

2    and recruiting teams. Unless Candidate Skills Match is configured to be visible in a candidate grid,

3    those scores could run in the background and the hiring manager or recruiter would not know they

4    exist. For any customers that have not configured the scores, the candidate scores necessarily were

5    not "communicated to the employer" and those applicants, even if scored, fall outside the definition

6    of the collective preliminarily certified by the Court. This is just one example of the nature of an

7    objection a customer may raise concerning their actual use of the AI features at issue.

8        To address this concern, minimize burden to third parties that are properly out of scope of

9    this action, and to streamline the process to maximize efficiency, Workday proposes that the Court

10    approve a process for customers to submit their objections, along with a declaration supporting

11    their objections under seal and under the penalty of perjury. Based on that submission, the Court

12    can sustain the objection and that customer will be excluded from the customer list or overrule the

13    objection and the customer will remain on the customer list. Workday proposes that the deadline

14    for customers to submit such declarations be thirty days following entry of the Court's order.

15        Plaintiffs' argument that an objection process is a "stage II decertification" question misses

16    the mark. Workday has not suggested an objection process aimed at ensuring applicants included

17    in the collective are similarly situated; rather, the objection process is intended to ensure that the

18    individuals permitted to opt in are properly within the collective definition. That is, the customer

19    objection process is intended to ensure that only people who were "sorted, scored, screened, or

20    ranked," **and** "that result was communicated to the prospective employer" are permitted to opt in.

21    *See* ECF No. 128 at 18.[7] Particularly to the extent that customers can demonstrate to the Court that

22    the results of any "scoring, screening, ranking, or sorting" were not communicated to them as part

23    of hiring decisions, it only makes sense that those customers are permitted to exclude themselves

24    now to minimize the burden on third parties and the streamline the process moving forward for the

---

[7] Plaintiffs also claim that Workday's proposed objection process permits the Court to "enter findings of fact on the basis of a sealed hearsay Declaration." This is a red herring. Courts regularly consider declarations signed under the penalty of perjury and assess the admissibility and credibility of such testimony. To the extent the Court is inclined to also require an evidentiary hearing before sustaining or overruling an objection, it is able to do so.

1    parties and the third party administrator.[8]

2    **E.  Provision of Customer List to Plaintiffs' Counsel**

3          Workday continues to maintain that it should not be ordered to produce the customer list

4    directly to Plaintiffs' counsel at this time.[9] Workday's prior agreement to provide the list to

5    Plaintiffs for the purpose of facilitating notice is no longer relevant in light of the Parties' shift to

6    publication notice (which, contrary to what is implied by Plaintiffs' statement, was originally

7    suggested by Plaintiffs and to which Workday initially objected before realizing the impossibility

8    of effecting direct notice). Workday has also already repeatedly explained the contractual

9    limitations of disclosing information about Workday's customers. Workday's customer list is

10   confidential and proprietary, including because it discloses what software features customers

11   licensed, which reflects their business processes and decisions, and it implicates third parties whom

12   Plaintiff deliberately chose not to sue when naming Workday instead. Moreover, the customer

13   list—which includes every Workday, Inc. customer who scored candidates with CSM and/or has

14   gone live with HiredScore according to Workday's data during the relevant time period—will be

15   overbroad until someone who applied to the relevant employer opts in.

16          If the Court is inclined to order the disclosure of the customer list to Plaintiffs' counsel over

17   Workday's objection, Workday would request that it only be required to produce the customer list

18   ***after*** the objection process has concluded, such that no customers who successfully objected to

19   their inclusion on the list would be named. Workday would propose that the disclosure of the

20   customer list to Plaintiffs be made ten days after the objection process concludes.

21          Plaintiffs' proposed notice suggests that Workday's customer list will be made publicly

22   available on a case website. This is not appropriate or consistent with this Court's orders. That

23   _____

24   [8] Workday declines to brief the question of whether it has access to customer data as part of a case
     management statement where the Court has not requested the parties address the issue and such
25   conversations were not part of the parties' meet and confer discussions in anticipation of this
     statement. As Workday has repeatedly asserted, Workday has no legal control over its customers
26   data.

27   [9] Plaintiffs' portion of the Case Management Statement mischaracterizes Workday's position.
     Workday is not opposed to providing Plaintiffs the customer list at a later time, once it is narrowed
28   to the customers at issue.

suggestion, coupled with Plaintiffs' counsel's insistence on providing "lawyer assistance or advice" to potential opt-ins about answering the questionnaire regarding what jobs they have applied to raise serious concerns for Workday about how Plaintiffs intend to use the customer list if they are provided access to it during the pendency of the opt-in period. To the extent Plaintiffs' counsel are permitted access to the list prior to the conclusion of the opt-in period, Workday requests that counsel be expressly instructed that they are not permitted to identify to potential opt-ins (or anyone else not permitted access to documents marked attorneys' eyes only under the governing protective order) the names of the companies on the list. Rather, such assistance will be limited to correctly completing the form.

### F. Tolling Limitations Period

The Court ordered the Parties to meet and confer regarding whether the statute of limitations would be tolled for opt-in plaintiffs based on the statute of limitations applicable to Plaintiff Derek Mobley. Workday understands that, under the ADEA, similarly situated plaintiffs can piggyback on a named plaintiff's charge of discrimination for statute of limitations purposes. It is Workday's position, however, that the opt-in Plaintiffs are not similarly situated to Plaintiff Derek Mobley, and therefore, tolling will ultimately not apply to their claims. Nonetheless, for judicial economy and efficiency, Workday is willing to stipulate that the statute of limitations for any particular opt-in plaintiff shall be tolled from the date they submit their opt-in eligibility form. This procedure will permit Plaintiffs' counsel to file a single compilation of all Notice of Consent to Join forms on the docket together at the close of the opt-in period without any prejudice to any opt-in plaintiff.

Plaintiffs' claim that they somehow detrimentally relied on Workday's description of their research into the relevant case law during a previous case management conference is not only unreasonable in light of the context of the statements and Plaintiffs' failure to seek to meet and confer on the question until September 22, 2025, but is also belied by the fact that Plaintiffs have continued to file opt-in forms on a regular basis (with nearly 150 additional opt-in plaintiffs joined to date). Workday's recitation of its high-level understanding of the law does not amount to a stipulation to toll the statute of limitations for every opt-in plaintiff in this case. As the Court and Parties recognized during the same Case Management Conference Plaintiffs cite, further meet-and-

confer would be required to reach any agreement regarding the statute of limitations. No such meet-and-confer occurred following that case management conference. Plaintiffs' request that the Court apply equitable or promissory estoppel to toll the statute of limitations for each opt-in plaintiff is thus inappropriate.

Nonetheless, as described above, Workday would agree to toll the statute of limitations for each opt-in plaintiff for the time period between the date they submit their opt-in eligibility form to the date that their eligibility is determined. Workday expressly does not agree that any potential (or actual) opt-in plaintiffs are similarly situated to Derek Mobley or that they may piggyback on his charge.

**G. Products at Issue**

While not an issue the Court requested the Parties address, Plaintiffs now seek to relitigate whether "Workday's entire platform" is at issue in this case. While Workday does not understand Plaintiffs' point in raising this issue, Workday opposes Plaintiffs' attempt to relitigate the software features relevant to this dispute. The Court has held that the collective consists of: (i) people who were "scored, sorted, ranked, or screened by Workday's AI"; (ii) the result of that AI scoring, sorting, ranking or screening was "a recommendation not to hire"; and (iii) "that result was communicated to the prospective employer, or the result was an automatic rejection by Workday." ECF No. 128 at 18. Without conceding that any of its software squarely fits within the collective definition, Workday has represented that CSM, Spotlight, and Fetch are the only software features conceivably within scope. While Workday opposed the inclusion of Spotlight and Fetch, following the Parties' briefing on this issue, the Court held the relevant software features are CSM, Spotlight, and Fetch. This issue is decided. Plaintiffs cannot now seek to sweep in Workday's "entire platform" via a case management statement directed at finalizing a notice and opt-in process.

1

Dated: September 24, 2025                    WINSTON COOKS, LLC

2

3

4                                            By: _____
                                                       */s/ Lee D. Winston*
5                                                     LEE D. WINSTON
                                             Attorneys for Plaintiff and the Proposed
6                                                   Classes and Collective

Dated: September 24, 2025                    JULIE A. TOTTEN
7                                            ERIN M. CONNELL
                                             KAYLA D. GRUNDY
8                                            ALEXANDRIA R. ELLIOTT ORRICK,
                                             HERRINGTON & SUTCLIFFE LLP
9

10

11                                           By: _____
                                                       */s/ Kayla D. Grundy*
                                                      KAYLA D. GRUNDY
12                                                 Attorneys for Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

**TO:** All individuals 40 years of age or older who, at any time from September 24, 2020 to the present, applied for job opportunities using Workday, Inc.'s job application platform.

**Re:**   Collective action lawsuit against Workday for violations of the Age Discrimination in Employment Act ("ADEA").

This notice and its contents have been authorized by the United States District Court for the Northern District of California. The Court has taken no position in this case regarding the merits of Plaintiffs 'claims or of Workday's defenses. This notice is intended to provide information about whether you may be eligible to join the lawsuit as a party and, if so, the steps you must take to join.

## I.    <u>INTRODUCTION</u>

The purpose of this Notice is (1) to inform you of a collective action lawsuit against Workday, Inc., which you may be eligible to join as a party, (2) to provide information to help you decide whether you may be eligible to join, and, (3) if so, to explain how to join if you so desire.

As described below, you may be eligible to join the collective action as a party.   If you choose to do so, you must timely complete and submit the conditional Opt-In Consent To Join  form located on the official case webpage,_____.   That Opt-In Consent To Join must be submitted by [ __days from the end of the publication date].

## II.    <u>DESCRIPTION OF THE LAWSUIT</u>

Derek Mobley ("Plaintiff") filed this action against Workday, Inc. in the Northern District of California, Case No. 3:23-0770-RFL on behalf of himself and all others similarly situated, and his allegations include that Workday, Inc., through its job application platform screening practices violated the Age Discrimination in Employment Act ("ADEA"). Workday denies these allegations. The Court has not made any findings about whether Plaintiff's claims or Workday's denial of liabilty have any merit.

The class is defined as**:**

"All individuals aged 40 and over who, from September 24, 2020, through the present, applied for job opportunities using Workday,

Inc.'s job application platform and were denied employment recommendations."

### III.      <u>HOW TO JOIN THIS LAWSUIT</u>

To join this lawsuit you must have applied for employment opportunities using Workday's application platform while you were 40 or more years old and must complete the following additional requirements:

> (1)      fill out and electronically sign the Opt-In Consent To Join form and questionnaire located on the official case webpage at _____; and

> (2)      read and electronially sign the Information Disclosure Release form located on the same webpage.

To submit a form, you only need to know that you were over 40 years old at the time you applied for job opportunities using Workday, Inc.'s job application platform.

The form and questionnaire requires you to identify the employers to whom you remember submitting an application for employment through Workday's job application platform or that may have otherwise been subjected to Workday's screening procedures or products at any time since September 24, 2020. **Please be sure to carefully follow the instructions in that form and questionnaire by identifying all such employers that you remember applying to because that may affect your eligibility to join this lawsuit**

If you need assistance in making sure your answers to the form and questionnaire are complete, you can compare your answer to the list on the official case webpage that identifies all employers who have used Workday's job application platform and screening procedures during the period since September 24, 2020. You may also contact the Plaintiffs' attorneys listed on page __ of this Notice.

The purpose of the Information Disclosure Release is to authorize the employers you applied to through Workday to produce your applications and related information for purposes of this lawsuit only. Please be sure to read and electronically sign such Information Disclosure Release so that your documents and information are available in reviewing whether you are an eligible member of the collective certified by the Court.

If you fail to complete and submit the online Conditional Opt-In Consent To Join by the deadline date, [ __ DAYS AFTER NOTICE], you will not be considered as a party or potential party, will not be permitted to join this lawsuit, and will not receive any relief from the court, including through any settlement or judgment reached by the parties or ordered by the court.

All of the information from your Opt-In Consent To Join form, your questionnaire and documents produced pursuant to your Information Disclosure Release will be evaluated by a Third Party Administrator to determine whether to recommend to the Court that you are an eligible member of the collective certified by the Court.

You should receive notice of your status within 30 days of [the end of publication notice period. If you are screened and choose to opt in, your name will then be disclosed to the employer(s) you applied to, to determine whether you were denied an employment recommendation. This process may be lengthy.

If you are determined to satisfy the conditions for membership in the collective certified by the Court, the conditional status of your Opt-In Consent To Join will automatically become an unconditional Opt-In Consent To Join without need of further signature or documentation.

If you are recommended not to be eligible, you may consult with Plaintiffs' counsel and your eligibility to participate may be raised with the Court.

If you opt in you may ultimately be bound by a judgment. If you do not opt in, you will be precluded from future participation in the class.

If you do not want to be represented by Plaintiffs' Counsel, you have the right to hire a different attorney or represent yourself. Contact the third-party administrator at any point to advise them if you do not want to be represented by Plaintiffs' Counsel.

No collective has been finally certified, and regardless of your eligibility recommendation, you may still be dismissed from the case. If you opt in, you will be bound by a favorable or unfavorable judgment. If you do not opt in, you will be precluded from future participation in this case.

3

## IV.        NO RETALIATION PERMITTED

Federal law prohibits Workday from retaliating against you for "opting-in" to this lawsuit or otherwise exercising your rights

## V.        YOUR LEGAL REPRESENTATION IF YOU JOIN

If you elect to participate in this lawsuit by electronically completing and submitting a "Consent to Join" form your counsel will be:

| | |
|---|---|
| Roderick T. Cooks | Robert L. Wiggins, Jr. |
| Lee D. Winston | Ann K. Wiggins |
| Winston Cooks, LLC | Jennifer Wiggins Smith |
| 420 20th Street North Suite 2200. | Wiggins Childs Pantazis, |
| Birmingham, AL 35203 | Fisher and Goldfarb |
| | 301 19th Street South |
| | Birmingham, AL 35203. |

If you have questions about this Notice, the "Consent to Join" form, or the "Opt-In Eligibility" form, you may contact the attorneys listed above or the parties at [EMAIL ADDRESSES].

**PLEASE DO NOT CONTACT THE COURT WITH QUESTIONS ABOUT THIS LAWSUIT**

# Exhibit 2

## <u>ELECTRONIC CONSENT TO JOIN FORM</u>

(The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 216(b))

By my signature below, I consent to opt in and join the collective action *Mobley v. Workday, Inc.* case number 3:23-0770-RFL in the California Northern District Federal Court, which includes claims under The Age Discrimination in Employment Act of 1967 ("ADEA"). I understand and agree that by joining in this action, I will be bound by any adjudication of the Court in this action.

I represent to the Court that at times pertinent to this action I was at least 40 years old , applied for job opportunities using Workday, Inc.'s job application platform and was denied such employment opportunities and/or recommendations.

I designate the law firms Winston Cooks, LLC and Wiggins Child, Pantazis, Fisher & Goldfarb, LLC to represent me for all purposes in this action.

My name is: _____ (print name)

My birth date is: _____ (print date)

My address is: _____ (print street address)

_____ (city, state, zip code)

My email address is: _____ (print email address)

My phone number is _____ (print phone numbers)

My Signature: _____

Date on which I signed this Notice: _____ (today's date)

# Exhibit 3

## **QUESTIONNAIRE ACCOMPANYING OPT-IN NOTICE**

1.   Do you wish to opt in and join the collective action *Mobley v. Workday, Inc.* case number 3:23-0770-RFL in the California Northern District Federal Court, which includes claims under The Age Discrimination in Employment Act of 1967 ("ADEA").

YES ____        NO ____ (Check one box)

2.   Did you was apply for job opportunities using Workday, Inc.'s job application platform in the period since September 24, 2020?

YES ____        NO ____ (Check one box)

3.   Please list or upload the job applications you made using Workday, Inc.'s job application platform in the period since September 24, 2020 (you may upload a list or spreadsheet if you prefer)?

_____ (list companies you applied to)

_____

(add lines if needed).

4.   Were you at least 40 years old at the time of making such applications?

YES ____        NO ____ (Check one box)

5.   Do you wish to upload the resume you submitted to apply for the jobs you listed above? (Uploading is optional, not required).

YES __        NO ____
(If yes, upload the applicable resume[s] you wish to submit).

1

6.   Do you wish to have lawyer assistance or advice in determining your eligibility to opt-in or in  answering this Questionnaire?

YES _____        NO _____  (Check one box). If yes, you will be contacted

7.    Do you designate the lawyers representing the Plaintiffs to represent you for all purposes in this action?

YES __        NO _____  (Check one box. If yes, you will be contacted by Plaintiffs' attorneys)

My signature: _____

Date on which I signed this Notice: _____ (list date signed)

My address is: _____ (street address)

_____ (city, state, zip code)

My email address is: _____

My telephone number is: _____

2

# Exhibit 4

## SHORT FORM NOTICE TO BE DISTRIBUTED BY SOCIAL MEDIA

Proposed short form notice:

"Applied for a job through Workday after September 24, 2020 and got rejected?  Are you over the age of 40 and believe your resume was screened out by AI due to your age? You might be eligible to challenge those decisions in a lawsuit. Visit the following web site: xxxx."

Where possible the ads will contain a link directing applicants to the dedicated website, to self-identify, verify eligibility, and complete questionnaire and opt-in form.  The short form notice will be by banner, video and/or targeted notice.

Final format and any necessary edits would be determined by specialists in social media outreach.

# Exhibit 5

# Exhibit 6

Recruitment Privacy Statement | Workday US

 

# Recruitment Privacy Statement

Effective: April 2, 2025

**Prior Recruitment Privacy Statement**

**Download/print a copy of this Recruitment Privacy Statement**

# Introduction and Statement Scope

Workday respects individual privacy rights and we are committed to processing personal information fairly, responsibly and in accordance with applicable local laws.

This Global Recruitment Privacy Statement (**"Privacy Statement"**) describes how we process personal information when considering candidates for **roles with the Workday group**. This Privacy Statement:

- applies to any individual we consider hiring for a job, whether we identified them in the job market or they shared their information with us

- applies to all Workday role types including full-time or part-time employment, contract work, or internship opportunities

- explains how individuals can exercise their privacy rights with Workday.

Workday has offices all over the world. How Workday handles personal information varies based on local laws in our recruiting locations. As well as this Privacy Statement, Workday or authorized parties may provide **supplementary transparency information** to keep you informed about our processing practices.

Workday is a leading provider of enterprise cloud applications for finance and human resources. This means **Workday customers** (companies, schools, governments and other organizations) use our software applications to manage their recruitment, workforces, and finances.

for customers or other organizations that use Workday applications.

- Workday cannot respond directly to a request where the personal information processed relates to another organization's recruitment.

- If you have a question regarding another organization, you should refer to the recruiting organizations' privacy statement and contact information.

# Quick Links

We recommend that you read this Privacy Statement completely to understand how Workday processes personal information in connection with our recruitment practices. You can also easily jump to specific sections of interest if you prefer:

What personal information do we collect and process?

Does Workday process sensitive personal information?

When is personal information required?

Will you contact me about future Workday roles and potential matches?

Does Workday share your personal information?

Does Workday use Artificial Intelligence ("AI") tools?

Can my personal information be used for recruitment research, training or development?

How long does Workday retain your personal information?

What are your privacy rights?

How does Workday protect your personal information?

Does Workday transfer your personal information internationally?

Certifications

[Want to contact us?](#)

[Additional region-specific disclosures](#)

# What personal information do we collect and process?

**Information you provided**
Information will be collected directly from you when you:

- introduce yourself to Workday at an event or join the [Workday Talent Community](#) to be considered for potential future roles

- create a candidate account to apply for roles

- apply for a role at Workday

- meet with us during in-person, telephone, or online meetings as a job applicant.

**Information obtained from other sources**
Information is generated about you during our recruitment processes by recruiting teams and Workday systems.

You can also apply for a role at Workday using various third-party career and recruitment sites, such as LinkedIn and SeekOut. Doing so connects your profile from the third party platform with Workday systems and the Workday job application process.

We collect personal information from external sources outside of Workday, when considering applications or searching for talented personnel, in accordance with applicable law, including:

- **recruiting agencies, academic institutions, professional organizations, alumni and resume sharing platforms** and similar parties supporting job searches

- **Workday personnel** who refer you

- **independent background checking and verification suppliers**

- **referees** in response to reference requests

- **future group companies** that join the Workday global structure through a merger, acquisition or purchase of assets.

The table below provides a summary of the typical talent and recruitment purposes for which we collect and process personal information, in accordance with applicable law, with examples of the personal information processed in each case.

You can read more about the "legal bases" we rely on to process personal information for these purposes under the "[Legal basis for processing](#)" section if you are from the EU or UK or another location with similar legal requirements.

| No. | Purpose(s) | Personal Information Processed for This Purpose |
|-----|------------|------------------------------------------------|
| 1 | Providing access to our recruitment site, posting job specifications, and managing site security. | We process the following personal information for this purpose:<br><br>• **Recruitment site account information:** registration details, residential address, email address, phone number and other contact information and site account passwords.<br><br>• **Information about use of our recruitment site:** we may deploy tools and cookie technologies to assess website usage. This includes information about how many individuals are visiting job posts, how long they are staying on the sites, which pages are most popular, devices and IP addresses. |
| 2 | Identifying and shortlisting prospects and job applicants. | We process the following personal information for this purpose:<br><br>• **Information concerning your job application(s):** application letters, resumes/CVs, including: skills, education |

and academic records, employment experience descriptions, roles and prior job titles, years of experience in a role or industry, languages, reasons for moving, notice periods, professional qualifications and certifications, right to work and security clearances.

- **Information that identifies you:** including your full and known names, gender, date of birth, age, your generation, national identifiers, government identification numbers, photographs, codes and documentation, citizenship, nationality and passport information.

- **Information connected with your current location:** residency information, distances from offices and work preference types, including remote, onsite or flex work options.

- **Information from online research:** professional profiles online, publications, interviews, blogs, registrations, certifications and citations.

- **Verifying contact information:** email, address or phone numbers, in connection with out-reach to prospective individuals who have not registered a careers account with us.

- **Information on your interests:** details of any memberships or professional and private interests, hobbies (which may include information revealing "Sensitive Personal Information" described below).

| 3 | Facilitating our recruitment processes, and managing in-person and online meetings and assessments. | We process the following personal information for these purposes: <br><br> • **Information about your schedule:** meeting availability or geographic location and mobility that you provide to your talent acquisition contact within your application information or via automated scheduling invites, virtual assistant, or chatbot technology functions and communications tools. <br><br> • **Information about the roles you are interested in, future jobs, and professional goals** <br><br> • **Information about your required adjustments to working arrangements:** To the extent required or permitted by local law, we process information concerning health and any disabilities in connection with any adjustments or accommodations to interview and working arrangements you require (which may include information revealing "[Sensitive Personal Information](#)" described below). <br><br> • **Information about your compensation expectations:** future package and benefits aspirations. <br><br> • **Information about your travel expenses:** current and future data on your expenses and banking details so that Workday can reimburse approved travel expenses. <br><br> • **Assessment information:** the results of a candidate assessment or certified skills test with Workday or a third-party |
|---|---|---|

| | | |
|---|---|---|
| | | provider if we ask you to complete a role-specific, job related assessment during the recruitment process.<br><br>• **Information about your referees and reference providers:** their name and contact details, employer, job role, relationship to you and their views about your previous roles and suitability.<br><br>• **Video:** images if you attend an interview or assessment at a Workday office, including images captured by video surveillance cameras used for safety and crime prevention purposes. For more information, see our [Video Surveillance Privacy Statement.](#) |
| 4 | Making a hiring decision for current or future employment opportunities. | We process the following personal information for this purpose:<br><br>• **Information relating to our assessment of your application:** including our interview notes and confidential interviewer opinions, your references, role-relevant public information, as well as records of our decision-making process. |
| 5 | Verifying your information and carrying out necessary background checks.<br><br>• Once you have signed a job offer or agreement, Workday or our independent supplier will reach out to you to | We or our approved service providers process the following personal information for this purpose in connection with the relevant activities:<br><br>• **Verifying the accuracy of the information you or referees provide:** evidence of prior employment history, roles, locations and dates, education |

|   | begin the background check process. <br><br> • Designated hiring service team members are informed if a check meets or does not meet company standards, but Workday does not hold the underlying information verified. If there is a discrepancy, we will notify you of next steps. | and professional qualifications or registrations. <br><br> • **Background checks:** To the extent required or permitted by local law, verifying your identity, security clearances and other background or consumer reports applicable to the role, Workday or customer projects, assignments or secondments (which may include information revealing "[Sensitive Personal Information](#)" described below). <br><br> • **Information about your right to work:** To the extent required or permitted by local law, we process personal information to verify your eligibility to work in a given location, assisting you with obtaining a migrant visa or work permits, details of your work permit applications, permit status, expiration dates, permitted work categories, visas and visa numbers, passports, citizenship or nationality, ID card information including numbers, photographs, social or tax codes. |
|---|---|---|
| 6 | Promoting, monitoring, and reporting of diversity and equal opportunities | We process the following personal information for this purpose: <br><br> • **Information necessary to monitor Workday's non-discrimination and inclusivity obligations, or to meet local regulatory reporting requirements:** To the extent required or permitted by local law, information on your nationality, racial and ethnic origin, gender including gender identity, sexual orientation, |

| | | |
|---|---|---|
| | | religion, disability and age which may be aggregated (see more on this below). This may include information revealing "Sensitive Personal Information" described below. |
| 7 | Defending Workday against potential complaints, enquiries and responding to legal requests. | We process the following personal information for this purpose:<br><br>• **Complaint and legal response information:** your own and third-party views about you or the concern raised, comments regarding suitability, and other responses in connection with your application and our handling of this.<br><br>The specific information processed depends on the nature of the complaint, inquiry, or request and who raises it. |
| 8 | Improving Workday's recruitment processes and services. | We process the following personal information for this purpose:<br><br>• **Feedback information:** any information on the Workday recruitment process provided to Workday talent acquisition or other Workday personnel, Workday staff or via voluntary surveys initiated by Workday.<br><br>• See also "Can my personal information be used for recruitment research, training, testing or development?" section below. |
| 9 | Contacting you about future Workday opportunities and news. | We process the following personal information for this purpose:<br><br>• **Talent Community and Unsuccessful Candidate Database Information:** your |

| | | contact details, contact preferences, roles you mention you are interested in, how we were introduced to you, (e.g. whether via an event, introduction, third party careers website, etc.), your profile suitability for specific job requisitions and any prior applications |
| | | • See more on the section: "Will you contact me about future Workday roles and potential matches? " and "Does Workday use AI tools to process my job applications to support the recruitment process?" below. |

**Information collected automatically.**

When you visit the Workday Recruitment site, we use cookies, tracking pixels, and scripts. For more information about the technologies we use, why we use them, and how you can control these technologies, please review the Workday Recruitment Site Cookie Notice.

# Does Workday process sensitive personal information?

We understand that certain personal information requires greater protection. The meaning of "sensitive" or "special category" personal information differs globally, but typically includes information about your racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union membership, biometric data, data concerning health, sexual orientation, and criminal history. In some jurisdictions, it can also include the contents of your communications where Workday is not an intended recipient, or your precise geolocation.

We do not process sensitive personal information about you unless it's needed to operate our business, such as for legitimate recruitment and employment-related purposes or to support you as a job applicant to, or employee of, Workday. If we need to

For example:

- We may process limited information about your racial or ethnic origin, gender, gender identity, sexual orientation, and disabilities collected to assess fairness and non-discrimination, and to create and cultivate an inclusive work environment, including where required:
  - to comply with equal employment and anti-discrimination laws
  - to strengthen Workday Value, Inclusion, Belonging and Equity initiatives with your explicit consent, where required by applicable laws;

- We may also process information about your physical or mental condition to provide work-related accommodations, such as during fitness to work dialogue or limited information in the context of health and insurance benefits provided or arranged for you and your beneficiaries, to promote a healthy workforce as well as to support and manage work or upcoming absences.

Workday is proud to be an equal opportunity workplace. Workday does not use sensitive personal information to make recruitment or employment decisions. As a general rule, you can decline to provide sensitive personal information if you prefer not to say. There is no negative impact on any application if you prefer not to say.

# When is personal information required?

Workday will inform you if there's a legal, business or recruitment requirement to provide personal information. Generally, we'll only ask for what is necessary and proportionate to consider you for a role and the relevant recruiting purpose. If you're unable to provide the information required, we'll explain if there might be any consequences or delays to your applications.

When we ask for your consent to collect or use your personal information by Workday or a third party, you're not obliged to give consent - you can choose freely whether you wish to consent to that specific collection or use.

# Workday roles and potential matches?

Yes. If you are curious about Workday but there is not a current job opening you wish to apply for, you can become a member of the Workday Talent Community or if your initial job application is not successful we'll add your information to our internal Candidate Database and may reach out to you about future roles. You can advise your talent acquisition contact if you'd prefer not to be added.

During future recruitment initiatives, Workday may assess if there are matches where your profile might be a fit for an upcoming role and may invite you to apply. We may also send you information about Workday news and careers events. Workday Talent acquisition assesses your resume/CV, qualifications and experience when identifying and shortlisting potential candidates based on prior exchanges with you and may use Workday's AI tools. You can provide a new version of your resume/CV at a later point and update your contact preferences at any time.

See: "Does Workday use AI tools to process my job application to support the recruitment process?" and "What are your privacy rights?"

We will keep the information for future job match purposes for a reasonable period after your application based on local laws and guidance. Keep in mind, if your initial application is unsuccessful, we need to retain information to respond to queries and assess compliance with local laws for a period, but you can still ask to be removed from future role consideration, job invitations and Workday news. See: "How long does Workday retain your personal information?".

If you accept a role at Workday, the information collected during the recruitment process will form part of your personnel file and Workday profile and will be processed in accordance with our Employment Privacy Statement, which will be provided to you during onboarding.

# information?

There are a number of situations where we may need to share your personal information with others in line with the recruitment and business purposes outlined above. Workday takes care to disclose personal information to only those recipients who require access to perform their legitimate tasks and duties.

We'll disclose your personal information to the following categories of internal and external recipients:

- **Subsidiaries and other group companies**. Members of the Workday Group around the world:
  - Including for purposes 1–9.

- **Third-party suppliers and service providers.** This may include technology and recruiter systems, software providers, including virtual assistant and chatbot technology, recruitment and search agencies, testing or assessment institutions, survey tool providers, payment processors, travel management, our background checks providers, and benefits providers. We do so on a "need-to-know basis" and in line with contractual provisions we implement with the suppliers.
  - Including for purposes 1–9.

- Courts, tribunals, regulators, public authorities, and professional advisers (including immigration specialists, tax advisers, accountants and lawyers) to comply with our legal and regulatory obligations, inquiries or matters, including to respond to a complaint, court order, audit, warrant, subpoena, administrative, regulatory or judicial process, request or incident

- Third parties as necessary: to establish, exercise or defend against potential, threatened, or actual litigation; when we have a good faith belief that disclosure is necessary to protect your safety, the safety of others, or compliance with local standards applicable to Workday; or in connection with a business transition or restructure, such as a merger, acquisition by another company, or sale of all or a portion of Workday's assets.

- Any other third parties where you've consented, instructed Workday to share your personal information or where disclosure is reasonable.

When we engage third parties and suppliers to process personal information on Workday's behalf, we implement appropriate measures to provide assurance that third-party organizations do so in a manner consistent with this Privacy Statement and applicable law, and that the security and confidentiality of the information is maintained. This is in addition to the privacy and security obligations applicable to the third party in connection with their processing and services under applicable law.

Third-party recipients also have their own privacy statements outlining their data processing approach, that you may wish to consult where the third party has their own business purposes or if you have a direct relationship with them.

# Does Workday use Artificial Intelligence ("AI") tools?

Yes. We use responsible AI tools that assist us to process personal information for the recruitment and business purposes described in the table above. Workday is committed to using tried, tested and trusted AI tools to empower our talent acquisition team members and support their human judgment and valuable experience. We also believe AI can significantly enhance the recruitment experience for our prospective workmates. We currently use AI tools to review job applications, CVs and resumes and schedule interview times and availability.

Workday implements robust risk management practices to test our AI tools for fairness and to mitigate bias and similar risks. We also seek assurances from third parties that may provide AI tools before any deployment, alongside due diligence reviews.

**Does Workday use AI tools to process job applications to support its recruitment process?**
Yes. We receive very large volumes of applications and candidates, and to process these we use AI tools that help our recruiters identify and evaluate how closely candidate applications and resumes/CVs align with a given job requisition. The AI-powered tooling helps to improve consistency, accuracy and speed in the recruitment process and reduce the potential for human bias or errors.

have disclosed about your skills, experience, location, and education as applicable. The tools then work out how closely this personal information matches the requirements of the role available, and assigns a suggested grade reflecting how close the match is, for example: "candidate exceeds", "meets" or "does not meet some or all the basic qualifications".

The Workday talent acquisition team uses these suggested AI generated grades to help shortlist and prioritize applications in the recruitment process. Our talent acquisition team is trained in the responsible use of AI recruitment tools and as a general rule the grades are one of several factors they consider throughout the candidate consideration process for those minimally qualified for the role, in conjunction with screening interviews and hiring manager interviews. Workday hiring managers and prospective teammates in the recruiting department are involved in ultimate hiring decisions across all stages of the hiring process.

In some recruitment exercises, for example, where we have particularly high volumes of applicants, it is not possible for every CV/resume or application to be reviewed by a member of the talent acquisition team during initial sifting stages, and so your application may not be successful if an open role is filled while you are still in the recruitment process and/or you do not meet the minimum job requirements.

We will use such AI recruitment tools consistent with the requirements of applicable privacy laws. For more information, see: "**What are your privacy rights?**" below.

# Can my personal information be used for recruitment research, training, testing or development?

Yes. We may use the personal information our candidates submit for recruitment research, training, testing and development, including:

- **Business reporting:** Workday may produce or receive summary reports for Workday's talent acquisition teams and leaders to understand overall recruitment metrics, including volumes, geographies or candidate pool inclusivity and

Product development: Workday's own product technology can be developed using applicant and candidate data leveraged in Workday recruitment practices. AI models (that support the functioning of Workday AI products) may be improved and trained by learning from patterns manifest in Workday's own recruitment practices, for example, recruiters for "sales roles" tend to advance candidates with "negotiation experience" therefore future iterations of Workday's AI models may learn to place greater weight on "negotiation experience" for those select roles without impacting you personally - such improvements could help future applicants and candidates. These enhancements also support Workday and third parties including customers who later use Workday's cloud application services for future recruitment exercises.

- **Internal testing:** Workday may conduct assessments to support its responsible AI commitments to manage risks related to fairness, non-discrimination, inclusivity and efficacy.

We aim to implement privacy enhancing and security safeguards to responsibly use certain information within wider data sets to protect individual privacy. Specifically, de-identifying, pseudonymizing and/or aggregating techniques which are designed to mitigate and reduce individual privacy risk impacts are used when possible, for responsible security, research, analytics, reporting, product development purposes.

This use of data for responsible product development, reporting and testing supports Workday's legitimate interests in innovation and improvement. Workday is required to work with quality and representative candidate datasets to train, test and develop Workday's AI technology.

Please note that Workday does not share or license personal information provided during your applications to Workday, including identifiable job applications, resume/CV information, suggested grades or reports with other businesses for their own recruitment or other purposes.

# How long does Workday retain your personal information?

information:

- Following the completion of a recruitment process and hiring decision so that we can consider and respond to potential enquiries, complaints, legal or compliance matters involving Workday's recruitment operations

- To keep you informed of future vacancies if you wish and maintain accurate records of your contact preferences.

You can update your preferences regarding future contact at any time, but please be aware that we'll need to retain other information if we have lawful bases and purposes at the time of the request.

We have processes in place to delete recruitment information between six months and four years following an unsuccessful application. The period differs based on local laws and guidance in the recruiting location. To determine the appropriate retention period for personal information within our records, we consider many factors relevant to the Workday business and your recruitment, including:

- our legal and regulatory obligations or any available guidance

- claims risk and limitation periods

- prevailing legitimate business needs

- the amount, nature, and sensitivity of the personal information

- the potential risk of harm from unauthorized use or disclosure of your personal information considering our technical security controls

- if we can achieve any prevailing purposes through other means.

# What are your privacy rights?

In some recruiting and role locations, you may have certain legal rights over the personal information we hold about you. In summary, the privacy rights can include the right to:

- Obtain **access** to your personal information that is being processed by us, have inaccurate personal information **corrected** and request the **deletion** of your personal information.

- **Object to the processing** of your personal information carried out based on our legitimate interests.

consent or a personal contract.

- **Withdraw your consent** at any time, if we have collected and processed your personal information for a specific activity with your consent. Withdrawing your consent will not affect the lawfulness of any processing we conducted prior to your withdrawal, nor will it affect processing of your personal information conducted in reliance on lawful processing grounds other than consent.

- **Not to be subject to a solely automated decision (including profiling) which produces legal or similarly significant effects.** Under applicable privacy laws, we can only use solely automated tools that produce legal or significant effects within our recruitment processes if we have your consent to do so, it is necessary to enter into or perform a contract with you, or we are authorised by law. In such cases, you can contact our talent acquisition team and seek a human review.

- **Lodge a complaint with a data protection supervisory authority.** As a rule, you can contact the supervisory authority of your usual place of residence, your place of work, or the registered office of the "data controller". You can also request the details of your competent supervisory authority by using the details in the "**Want to Contact Us?**" section. The "**Additional region specific disclosures**" section below provides further information about how to complain to your local data protection supervisory authority.

- **Lodge a case with a local court to claim a judicial remedy.** If you believe there has been an infringement of your privacy rights or the requirements under applicable privacy laws, you can file a case with a court or similar judicial body to seek appropriate redress. You can file a case with a court in your usual place of residence, your place of work, the registered office of the data controller or the location of the applicable data protection supervisory authority. This right to seek a judicial remedy, is in addition to your right to lodge a complaint with a data protection supervisory authority.

We may need to ask you to provide information so that we can confirm your identity before responding to a request.

Workday will not discriminate against you for exercising your privacy rights. We'll explain how any of the rights operate in your situation, including:

- If the right differs in your location or because of the legal basis for the processing activity
- If Workday has prevailing processing needs and what they are

behalf, can exercise your privacy rights by contacting us using the details in "**Want to Contact Us?**" below or by submitting your request through our **web form**.

If you can provide details of any concerns, this may assist Workday expedite the response. In any event, we will respond without undue delay and keep you updated. We will usually provide a substantive response within one month of your request but this may be extended to three months in some complex cases.

# How does Workday protect your personal information?

We have various teams that are dedicated to maintaining appropriate security arrangements to keep your information safe and secure with privacy risks, safeguards and protections in mind. We take cyber and personal information security seriously.

We implement technical, organizational, and contractual measures to protect the personal information against accidental loss, destruction, access or other incidents and the privacy risks involved.

Please note security of information transmitted through the internet can never be guaranteed. You are responsible for maintaining the security of your password or other form of authentication involved in accessing password-protected or secured areas of any Workday recruitment web page or process. Access to and use of password-protected and/or secure areas of any Workday recruitment web pages or processes are restricted to authorized users only.

# Does Workday transfer your personal information

Recruitment Privacy Statement | Workday US

Yes. Workday is headquartered in the U.S. and operates as a global business. We transfer, store, access and process your personal information in various international locations, including countries:

- where you are applying or being considered for a role

- outside your jurisdiction

where [Workday](#) or Workday-contracted third-party suppliers, customers or relevant third-party recipients have operations.

# Certifications

### U.S. Data Privacy Framework

Workday adheres to the principles of the EU-U.S. Data Privacy Framework ("**EU-U.S. DPF**"), the "**UK Extension**" to the EU-U.S. DPF, and the Swiss-U.S. Data Privacy Framework ("**Swiss-U.S. DPF**") as set forth by the U.S. Department of Commerce. Workday relies on the EU-U.S. DPF, the UK Extension and the Swiss-U.S. DPF as a legal basis for transfers of personal information. To learn more, visit our Data Privacy Framework Notice [here](#).

### APEC Cross-Border Privacy Rules System

The Workday privacy practices, described in this Privacy Statement, comply with the APEC Cross-Border Privacy Rules (**"CBPR"**) system. The APEC CBPR system provides a framework for organizations to ensure protection of personal information transferred among participating APEC economies. More information about the APEC framework can be found [here](#).



# Will Workday make changes to this Privacy Statement?

inform you, consistent with the significance of the changes.

You can see when this Privacy Statement was last updated by checking the "last updated" date displayed at the top of this Privacy Statement.

# Want to contact us?

If you have any questions about this Privacy Statement, or wish to exercise your privacy rights, please submit your request through our **web form** or through one of the mailing addresses below:

**If you are applying to a role located in the EEA, UK or Switzerland, contact:**

Workday Limited
Attn.: Privacy
Kings Building, May Lane
Dublin 7
Ireland

**If you are applying to a role located anywhere else, contact:**

Workday, Inc.
Attn.: Privacy
6110 Stoneridge Mall Road
Pleasanton, CA 94588
USA

You can also contact the Workday affiliate in the country in which you applied for a role or responded to a recruitment search process with any questions about your personal information. For a list of Workday affiliates and their contact details, see here.

If you have an unresolved privacy or data use concern that we have not addressed satisfactorily, please contact our U.S. based third-party dispute resolution provider (free of charge) at  https://feedback-form.truste.com/watchdog/request.

# Additional region-specific disclosures

## California

If you're located in California, please note the following additional disclosures:

**Workday does not "sell" to third parties, or "share" with third parties for targeted advertising purposes,** the personal information that it collects or processes as part of the recruitment, employment, or personnel management process or any related processes (including as those terms are defined under the California Privacy Rights Act).

For California residents, if you are submitting a request to access, please specify if you would like to access personal information categories or specific pieces of personal information. In addition to many of the rights described above, California residents have the right to opt out of a business's sale of your personal information or sharing of your personal information to third parties for targeted advertising. **Workday does not sell your personal information or share your personal information with third parties for targeted advertising**. Workday also does not use your sensitive personal Information for any purpose other than to operate our business, for legitimate recruitment-related purposes, or where otherwise permitted by, or necessary to comply with, applicable laws, and therefore does not provide a right to limit the use of sensitive personal information.

When you submit a request, we will first acknowledge receipt of your request within 10 business days after receipt of your request. We will provide a substantive response to your request within 45 calendar days after its receipt. If we require more time (up to 90 days or the permitted time frame), we will inform you of the reason and extension period in writing.

Only you or an authorized agent (as described below) may make a verifiable consumer request related to your personal information.

- **How to Authorize an Agent.** You may designate an authorized agent to submit your verifiable consumer request on your behalf only if the authorized agent has your written permission to do so and you have taken steps to verify your identity directly with us.

your authorized agent to make the request. Making a verifiable consumer request does not require you to create an account with us. To allow us to verify your request, we may require that you provide at least two pieces of personal information that we already have in our possession, if we cannot already verify you. We will verify your consumer request by comparing the information you provide to information already in our possession, and take additional steps to minimize the risk of fraud.

# European Economic Area, United Kingdom and Switzerland

If you're located in the EEA, UK and Switzerland, please note the following additional disclosures:

### Who is the responsible data controller?

Workday Limited is the data controller primarily responsible for protecting your personal information, although it shares responsibility for protecting your personal information with the European Workday affiliate that you applied to, or that has contacted you about a role (the **"Local Workday Affiliate"**). Workday Limited and the Local Workday Affiliate are joint data controllers.

We encourage you to contact Workday Limited with any questions you have about your personal information, although you can also contact your Local Workday Affiliate if you prefer. As between Workday Limited and your Local Workday Affiliate, Workday Limited is primarily responsible for:

- Preparing and providing you with this Privacy Statement
- Fulfilling any requests you make to exercise your privacy rights
- Determining the lawful bases for processing of your personal information
- Ensuring appropriate technical and organizational security measures are implemented to protect your personal information
- Reporting any personal data breaches that may occur in accordance with applicable privacy laws
- Conducting data protection impact assessments where required
- Engaging a third party supplier or data processor

Workday Limited is based in Ireland and is Workday's main establishment and European headquarters. Workday Limited is regulated by the Irish Data Protection Commissioner, whose contact details are available here.

Workday Limited and your Local Workday Affiliate will cooperate as necessary to ensure the proper fulfillment of the responsibilities described above, in addition to any other requirements that apply under this Privacy Statement and privacy laws. Both will ensure compliance with the data protection principles at all times.

Contact details for Workday Limited and your Local Workday Affiliate are provided under the "**Want to Contact Us?**" section above.

**Lodging a complaint**

You may lodge a complaint with a data protection authority such as the supervisory authority of your usual place of residence. A full list of EEA data protection authorities is available here. Contact details for the Irish Data Protection Commissioner are available here. In the UK, the data protection authority is the Information Commissioner's Office and in Switzerland the Federal Data Protection and Information Commissioner.

**Legal basis for processing**

Under local privacy laws, there are various grounds which we need to rely on when processing your personal information. The legal basis will depend on the information concerned and the specific context and collection purposes.

For individuals in the EEA and UK or another jurisdiction which prescribes similar legal basis requirements, our legal basis for collecting and using the personal information, including sensitive personal information, is described in the following tables.

# Purposes of processing personal information and legal bases

| Legal basis | Processing Purpose(s) |
|---|---|
| **Consent** - we will ask for your consent to the extent that it is required by EU, UK or | Purpose(s): |

| | |
|---|---|
| In certain cases, such as background checks, you will be asked to advise the third-party service provider of your consent or withdrawal. | out necessary background checks. 6. Promoting, monitoring, and reporting of diversity and equal opportunities, 9. Contacting you about future Workday opportunities and news (if you sign up to be a member of the Workday Talent Community). <br> • When we use cookies on our sites. |
| **Contract** - processing needed to enter a contract with you, or perform the obligations. | 2. Identifying and shortlisting prospects and job applicants. |
| **Legal obligation** - to the extent that applicable EU or UK law (as applicable) requires us to process your personal information for this purpose, including regulatory guidance, and responding to a court or tribunal order. | Purpose(s): 5. Verifying your information and carrying out necessary background checks. 6. Promoting, monitoring, and reporting of diversity and equal opportunities 7. Defending Workday against potential complaints, enquiries and responding to legal requests. |
| **Legitimate interests** - we rely on this legal basis to the extent that we need to process your personal information for a legitimate reason and none of the grounds above applies. <br><br> Legitimate interests can include: <br><br> • Workday's recruitment, employment and corporate legitimate interests. <br><br> • Workday's and its service providers' interests to administer | Purpose(s): 1. Providing access to our recruitment site, posting job specifications and managing site security. 2. Identifying and shortlisting prospects and job applicants. 3. Facilitating our recruitment processes, managing in-person and online meetings and assessments. 4. Making a hiring decision for current or future employment opportunities. 7. Defending Workday against potential complaints, enquiries and responding to legal requests. |

| | |
|---|---|
| now and in the future<br>• Improving Workday's cloud services and technology<br>• Promoting and protecting Workday's values and reputation.<br><br>We will not rely on this basis where an individual's interests and rights should override. The interests of Workday and third parties are considered alongside individual privacy rights, benefits and potential impacts. | processes and services.<br>9. Contacting you about future Workday opportunities and news (if you are unsuccessful in your initial application). |

The processing grounds we rely upon to process your sensitive personal information, are set out below:

## Purposes of processing sensitive personal information and legal bases

| Sensitive personal information ground | Processing Purpose(s) |
|---|---|
| **Employment law rights and obligations** - to the extent necessary under EU/UK employment laws. | 6. Promoting, monitoring, and reporting of diversity and equal opportunities. |
| **Legal claims** - to the extent necessary to process your sensitive personal information to exercise, establish or defend any legal claims or pursuant to the order of an EU, UK or other court. | 7. Defending Workday against potential complaints, enquiries and responding to legal requests. |
| **Explicit consent** - to the extent we have obtained your explicit consent to process the sensitive personal information. | Purpose(s):<br>2. Identifying and shortlisting prospects and job applicants.<br>5. Verifying your information and carrying out necessary background checks. |

| | of diversity and equal opportunities. |
| --- | --- |

**Transferring personal information internationally**

We process personal information in the U.S. and other countries outside the EEA, UK and Switzerland.

Local importer privacy laws can be different to your home location. When we transfer personal information, we take appropriate measures to protect the exported information, your fundamental rights and freedoms, and your ability to exercise individual rights in accordance with local law.

- We ensure the recipient is in a country that provides an adequate level of data protection based on the adequacy decisions of competent authorities, such as for personal information transfers within the Workday group to the U.S. - Workday, Inc. is certified to import personal information under the EU-U.S. DPF, the UK Extension and the Swiss-U.S. DPF.

- We also enter "standard contractual clauses" ("**SCCs**") with data importers. SCCs are terms approved by competent authorities in the EEA, UK, Switzerland and other locations, as industry standard data transfer safeguards for cross border processing. You may have a right to request a copy of the SCCs. You can use the details in the "**Want to Contact Us?**" section.

Where it's necessary, we implement additional contractual, technical and organizational measures to ensure that personal information transferred is subject to an essentially equivalent level of protection.



**Products**                                                                    ⌄



**Learn** ⌄

**Company** ⌄

Legal · Privacy · Accessibility · Subscriptions · ☑✕ Your Privacy Choices · Cookie Preferences

© 2025 Workday, Inc.

# Exhibit 7

EXHIBIT 8

### Plaintiffs' Notice Dissemination Plan

In addition to the Notice Dissemination Plan the Plaintiffs served on September 10, 2025, the following supplemental description of such Plan is provided at the request of Defendant Workday, Inc.

Dissemination will occur in the following manner:

(a) a digital media advertising program will be developed to run on desktop and mobile devices aimed at a target audience profile based on age, myworkdayjobs.com presence and related factors as needed;

(b) the ad program will have a reach and frequency within the target audience profile of no less than 70%;

(c) reports of the reach and frequency within the target audience will be provided weekly in order to adjust the digital ad program, as needed, to meet or exceed the minimum 70% penetration projected.

(d) the digital advertising program and notice forms will begin publication no later than 14 days from the completed development of the ads' content;

(e) program-based advertising purchases will be based on the lowest cost per exposure of multiple media outlets rather than a single or fixed set of outlets.

(f) the digital advertising program will direct recipients to a secure website portal containing relevant case documents, the form notice of opt-in rights, the accompanying forms to use to respond to such notice, instructions on how to electronically transmit such forms directly from the webpage portal, instructions on how to communicate with Plaintiffs' counsel to request assistance or answer questions, and such other information as may be necessary;

(g) additional technology-based tools will be used to handle incoming correspondence and communications, including such tools as chatbox, autoresponder and IVR supplemented by such in-person telephone or electronic communications as may be needed to effectively and promptly respond to all forms of inquiries and communications.

EXHIBIT A

**TO:** All individuals 40 years of age or older who, at any time from September 24, 2020 to the present, applied for job opportunities using Workday, Inc.'s job application platform and were denied an employment recommendation. In this context, being denied an employment recommendation means that your job application was scored, sorted, ranked, or screened by Workday's artificial intelligence ("AI"); the result of the AI scoring, sorting, ranking, or screening was not a recommendation to hire; and your score was communicated to the prospective employer or resulted in an automatic rejection by Workday.

**Re:** Collective action lawsuit against Workday for alleged violations of the Age Discrimination in Employment Act ("ADEA").

This notice and its contents have been authorized by the United States District Court for the Northern District of California. The Court has taken no position in this case regarding the merits of Plaintiffs 'claims or of Workday's defenses. This notice is intended to provide information about whether you may be eligible to join the lawsuit as a party and, if so, the steps you must take to join.

## I.     INTRODUCTION

The purpose of this Notice is (1) to inform you of a collective action lawsuit against Workday, Inc., which you may be eligible to join as a party, (2) to provide information to help you decide whether you may be eligible to join, and, (3) if so, to explain how to join if you so desire.

As described below, you may be eligible to join the collective action as a party. If you choose to do so, you must timely complete and submit the conditional Opt-In Consent To Join form located on the official case webpage, _____. That Opt-In Consent To Join must be submitted by [ —60 days from the end of the publication date date notice is finalized].

## II.     DESCRIPTION OF THE LAWSUIT

Derek Mobley ("Plaintiff") filed this action against Workday, Inc. in the Northern District of California, Case No. 3:23-0770-RFL on behalf of himself and all others similarly situated, and his allegations include that Workday, Inc., through its AI job application platform screening practices violated the Age Discrimination in Employment Act ("ADEA"). Workday denies these allegations. The Court has not made any findings about whether Plaintiff's claims or Workday's denial of liabilty liability have any merit.

## III.     PERSONS WHO ARE ELIGIBLE TO JOIN IN THIS LAWSUIT

The class is defined as: You are eligible to join this lawsuit if,: "All individuals aged 40 and over who (1), from September 24, 2020, through the present, you were 40 years old or more when you applied for job opportunities using Workday, Inc.'s job application platform, (2) your job application was scored, sorted, ranked, or screened by Workday's AI, (3) the result of the AI scoring, sorting, ranking, or screening was a recommendation not to hire, and (4) your score was communicated to the prospective employer or resulted in an automatic rejection by Workday.

Actual eligibility will be determined following the procedures described below. ; and were denied employment recommendations." **In this context, being "denied" an "employment recommendation" means that (i) the individual's application was scored, sorted, ranked, or screened by Workday's AI; (ii) the result of the AI scoring, sorting, ranking, or screening was not a recommendation to hire; and (iii) that result was communicated to the prospective employer, or the result was an automatic rejection by Workday.**

## IV.    HOW TO JOIN THIS LAWSUIT

To join this lawsuit you must have applied for employment opportunities using Workday's application platform while you were 40 or more years old and must complete the following additional requirements:

> (1)    fill out and electronically sign the Opt-In Consent To Join form and questionnaire located on the official
>
> case webpage at_____ ; and

> (2)    read and ~~electronically~~electronically sign the Information Disclosure Release form located on the same webpage.

To submit a form, you only need to know that you were over 40 years old at the time you applied for job opportunities using Workday, Inc.'s job application platform, but only applicants who were in fact scored, sorted, ranked, or screened by Workday's AI and for whom the result of such scoring, sorting, ranking, or screening was not a recommendation for hire communicated to the employer may properly join the lawsuit. After you submit your Opt-In eligibility form, your responses will be assessed against the criteria for joining the collective, which may include the disclosure of your personal identifying information to the employers you identify.

The form and questionnaire requires you to identify the employers to whom you remember submitting an application for employment through Workday's job application platform or that may have otherwise been subjected to Workday's screening procedures or products at any time since September 24, 2020. **Please be sure to carefully follow the instructions in that form and questionnaire by identifying all such employers that you remember applying to because that may affect your eligibility to join this lawsuit.**

If you need assistance in making sure your answers to the form and questionnaire are complete, you ~~can compare your answer to the list on the official case webpage that identifies all employers who have used Workday's job application platform and screening procedures during the period since September 24, 2020. You~~ may also contact the Plaintiffs' attorneys listed on page __ of this Notice.

The purpose of the Information Disclosure Release is to authorize the employers you applied to through Workday to produce your applications and related information for purposes of this lawsuit only. Please be sure to read and ~~electronically~~electronically sign such Information Disclosure Release so that your documents and information are available in reviewing whether you are an eligible member of the collective certified by the Court.

If you fail to complete and submit the online Conditional Opt-In Consent To Join by the deadline date, [60 DAYS AFTER NOTICE BEGINS], you will not be considered as a party or potential party, will not be permitted to join this lawsuit, and will not receive any relief from the court, including through any settlement or judgment reached by the parties or ordered by the court.

All of the information from your Opt-In Consent To Join form, your questionnaire and documents produced pursuant to your Information Disclosure Release will be evaluated by a Third Party Administrator to determine whether to recommend to the Court that you are an eligible member of the collective certified by the Court.

You should receive notice of your status within 30 days of [the end of publication notice period]. If you are screened and choose to opt in, your name will then be disclosed to the employer(s) you applied to, to determine whether you were denied an employment recommendation. This process may be lengthy.

## V.    LEGAL EFFECT OF FILING OR NOT FILING THE CONSENT FORM

If you are determined to satisfy the conditions for membership in the collective certified by the Court, the conditional status of your Opt-In Consent To Join will automatically become an unconditional Opt-In Consent To Join without need of further signature or documentation.

If you are recommended not to be eligible, you may consult with Plaintiffs' counsel and your eligibility to participate may be raised with the Court.

If you opt in you ~~may~~ will ultimately be bound by a judgment or settlement of claims under the Age Discrimination in Employment Act, whether favorable or unfavorable~~.~~ As a party, you may be required to provide information or testimony relevant to the lawsuit and you may potentially incur certain fees or costs. If you do not opt in, you will be precluded from future participation in the class. You will not be bound by any judgment regarding any claim you have under the Age Discrimination in Employment Act, whether favorable or unfavorable.

~~If you do not want to be represented by Plaintiffs' Counsel, you have the right to hire a different attorney or represent yourself. Contact the third-party administrator at any point to advise them if you do not want to be represented by Plaintiffs' Counsel.~~

No collective has been finally certified, and regardless of your eligibility recommendation, you may still be dismissed from the case. ~~If you opt in, you will be bound by a favorable or unfavorable judgment. If you do not opt in, you will be precluded from future participation in this case.~~

## VI.    NO RETALIATION PERMITTED

Federal law prohibits Workday from retaliating against you for "opting-in" to this lawsuit or otherwise exercising your rights

## VII.    YOUR LEGAL REPRESENTATION IF YOU JOIN

If you elect to participate in this lawsuit by electronically completing and submitting a "Consent to Join" form your counsel will be:

Roderick T. Cooks                           Robert L. Wiggins, Jr.

Lee D. Winston                              Ann K. Wiggins

Winston Cooks, LLC                          Jennifer Wiggins Smith

420 20th Street North Suite 2200.           Wiggins Childs Pantazis,

Birmingham, AL 35203                        Fisher and Goldfarb

                                            301 19th Street South
                                            Birmingham, AL 35203.

If you have questions about this Notice, the "Consent to Join" form, or the "Opt-In Eligibility" form, you may contact the attorneys listed above or the parties at [EMAIL ADDRESSES].

*If you do not want to be represented by Plaintiffs' Counsel, you have the right to hire a different attorney or represent yourself. Contact the third-party administrator at any point to advise them if you do not want to be represented by Plaintiffs' Counsel.*

**PLEASE DO NOT CONTACT THE COURT WITH QUESTIONS ABOUT THIS LAWSUIT**

4

# EXHIBIT B

# ELECTRONIC OPT-IN ELIGIBILITY FORM

(The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 216(b))

By submitting this form, I am requesting the parties assess my eligibility to join the collective action *Mobley v. Workday, Inc.* case number 3:23-cv-0770-RFL, pending in the Northern District of California Federal Court, which includes claims under The Age Discrimination in Employment Act of 1967 ("ADEA"). I understand and agree that whether I am eligible to join this action will be determined based on my responses to the questions below and any supplemental information that I may be asked to provide. I understand that by submitting this form, I am not joining the action and that I will be contacted using the contact information below with updates regarding my eligibility to join the action. If I am eligible to join, I further understand that I will have to formally opt-in to the collective by filing a notice with the Court.

I [ ] intend to represent myself in connection with this lawsuit; [ ] will retain my own counsel; [ ] designate the law firms Winston Cooks, LLC and Wiggins Child, Pantazis, Fisher & Goldfarb, LLC to represent me for all purposes in this action. [Choose one]

My name is: _____

My birthdate is: _____

My address is: _____(street address)

_____(city, state, zip code)

My telephone number is: _____(area code and telephone number)

My e-mail address is: _____(insert e-mail address)

[ ] By checking this box, I confirm that since September 11, 2021, I applied for at least one job using Workday, Inc.'s job application platform and believe I was denied an employment recommendation.

Within the relevant time frame, I applied to the following job through the Workday, Inc. platform and was denied an employment recommendation [identify employer applied to, the job title, and date of application]:

_____.

Select add additional job to complete the information for each job you applied to and believe meets the criteria stated above.

[ ] I have uploaded the resume and/or job application with which I applied to these jobs to this eligibility form. [Optional]

[ ] I consent to [third party administrator] sending and receiving information related to my job applications to the companies to which I applied, including Personal Identifying Information, as necessary, to assess my eligibility to join the lawsuit.

By submitting this form, I attest that I have fully and completely answered each of the questions posed herein to the best of my ability. I understand that I may not have a further opportunity to provide information to determine my eligibility to join the litigation.

My signature: _____

Date on which I signed this Notice: _____(today's date)