1    LEE D. WINSTON (ASB: 6407O72L)
     *Admitted pro hac vice*
2    lwinston@winstoncooks.com
     RODERICK T. COOKS (ASB: 5819O78R)
3    *Admitted Pro Hac Vice*
     rcooks@winstoncooks.com
4    WINSTON COOKS, LLC
     420 20th Street North, Suite 2200
5    Birmingham, AL 35203

6    ROBERT L. WIGGINS, JR. (ASB: 1754G63R)
     *Admitted Pro Hac Vice*
7    rwiggins@wigginschilds.com
     ANN K. WIGGINS (ASB: 7006i61a)
8    *Admitted Pro Hac Vice*
     awiggins@wigginschilds.com
9    JENNIFER WIGGINS SMITH (ASB:9622E53S)
     *Admitted Pro Hac Vice*
10    jsmith@wigginschilds.com
     WIGGINS CHILDS PANTAZIS FISHER AND GOLDFARB
11    301 North 19th Street
     Birmingham, AL 35203

12

13    Attorneys for the Plaintiff and the
     Proposed Classes and Collective

14    **[ADDITIONAL COUNSEL CONTINUED ON NEXT PAGE]**

15             UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17

18    DEREK L. MOBLEY, for and on behalf of      Case No. 3:23-cv-00770-RFL
     himself and other persons similarly situated;
19                             **JOINT CASE MANAGEMENT**
              Plaintiff,              **STATEMENT**
20
21             v.                        Courtroom:       15, 18th Floor
                                     Judge:            Hon. Rita F. Lin
22    WORKDAY, INC.
                                   Complaint Filed: February 21, 2023
             Defendant.
23

24

25

26

27

28

Jay Greene, JD, CPA
greenattorney@gmail.com
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108

Attorneys for the Plaintiff and
the Proposed Classes and Collective

JULIE A. TOTTEN (STATE BAR NO. 166470)
jatotten@orrick.com
ERIN M. CONNELL (STATE BAR NO. 223355)
econnell@orrick.com
KAYLA D. GRUNDY (STATE BAR NO. 300513)
kgrundy@orrick.com
ALEXANDRIA R. ELLIOTT (STATE BAR NO. 320293)
aelliottt@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:     (415) 773-5759

Attorneys for Defendant
WORKDAY, INC.

On October 1, 2025, the Parties appeared before the Court for a Case Management Conference ("CMC"). Following the CMC, this Court ordered a further CMC be set for October 22, 2025. ECF No. 172. The Court further ordered the Parties to submit a Case Management Statement including (1) Plaintiffs' proposed dissemination plan, (2) the Parties' agreed upon third party administrator, and (3) edits or objections to the proposed notice forms. ECF No. 175; 177. The Parties identify their respective positions on these issues below.

**PLAINTIFFS' POSITIONS:**

The Parties met on October 2, 2025 pursuant to the Court's Orders for the Parties to meet and confer on the following, that: (1) Plaintiffs devise and produce a revised social media dissemination and notice plan (ECF 175, §1); (2) the Parties discuss and attempt to reach agreement on retention of a third-party administrator (*id.* at Exh. A, § 3(a)(iii); (3) the Parties review and respond to the Court's proposed "Long Form Notice and Pre-Opt In Form" (*id.* at § 2 and ECF 177, p.1 & Exh. A)[1]; and (4) Workday produce its List of employers who enabled or used the AI features of its job application platform (*id.* at §§ 3-4).

Plaintiffs' revised social media Dissemination Plan is attached as Exhibit 1, including the requisite mockups of the social media ads to be disseminated in Exhibit 1-A [2] and requisite "declaration from Plaintiffs' social media consultant describing the plan for how the notice will be advertised and why that is likely to reach a sufficiently broad audience, " ECF 175, Exh. A, §1(c), in Exhibit 1-B.

**A. Dissemination Plan**

Plaintiffs and Workday met and conferred on October 2, 2025 regarding efforts to reach "an agreement on the retention of a third-party administrator." ECF 175, Exh. A, §3(a)(iii). Workday

---

[1] The Court ordered that "[t]he parties should meet and confer regarding the proposed forms, and submit any edits or objections to the forms in their [next] joint case management statement." *Id.* at p. 1; *see also* ECF 175 at 1-2 ("The parties may raise any objections to the proposed revised forms in their case management statement.").

[2] Plaintiffs' media specialist has advised that the content of the Short Form Notice the Court quoted in its Order (ECF 175, Exh A., §1(b)) is longer than what will typically fit in a single social media ad. Her attached mock-ups show what does fit using the language and spirit of the approved short-form notice. *See* Exh. 1-A attached. Workday has notified Plaintiffs that Group Angeion has similarly advised that "the short form language the Court ordered is a bit long" and and "show[ed] how it would appear" in several mocked-up ads.

proposed Angeion Group for that role and the Plaintiffs agreed to consider that Group once an anticipated plan revision and cost allocation was received from Angeion regarding the Court's Order that "[t]he cost will be split between Plaintiffs and Workday, except that Workday will pay the cost of the manual portion of the administrator's review to determine which employer is referenced in the pre-opt-in form." ECF 175, Exh A., §3(a)(iv). Workday emailed that revision to Plaintiffs on Thursday, October 9, 2025 and Plaintiffs met with Angeion Group the next day, Friday, October 10, 2025. The Plaintiffs then emailed their Dissemination Plan to Workday early that afternoon along with a request to meet and confer if Workday had any questions or disagreements with the Plan. *Id.* No response to the content of the Plan was received until yesterday, October 14, 2025, the day before this Case Management Statement was due. The Parties then met and conferred yesterday afternoon on several topics, including the Dissemination Plan and updates added that day.

The Dissemination Plan is structured to address both the Court's "Stage 1" and "Stage 2" bifurcation (ECF 175, Exh. A, §1; ECF 177, Exh. A, §I), albeit separately in the manner specified in the Plan (Exh.1). The content of the Stage 1 notice first addresses the elements of the statutory opportunity to opt-in to the collective action or to instead file a separate lawsuit, which is the principal purpose of the notice allowed by *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989). *Cf.* ECF 175, Exh. A, §1(a); ECF 177, Exh. A, §I. The Stage 2 notice addresses the third-party administrator's matching procedure that comes into play after an individual elects to litigate their claim on a collective basis. The third-party administrator's matching process is part of the Stage 2 determination of whether an individualis "similarly situated" to the named Plaintiff. *Cf.* ECF 175, Exh. A, §1(b); ECF 177, Exh A, §III.A). That Stage 2 determination is separate and independent from the Stage 1 decision of whether to opt-in to the collective action rather than file a separate lawsuit. *Mickles v, Country Club*, 887 F.3d 1270, 1278 (11th Cir. 2018) ("The plain language of § 216(b) supports that those who opt in become party plaintiffs upon the filing of a consent and that nothing further, including conditional certification, is required."); *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1101-1102 (9th Cir. 2017) (following *Mickles, supra* and *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)). The Supreme Court has instructed that such

notice must not only be "accurate and timely," but that it must also be "not otherwise contrary to statutory commands." *Hoffmann-La Roche,* 493 U.S. at 170. "Congress has stated its policy that ADEA plaintiffs should have the *opportunity* to proceed collectively." *Id.* (emphasis added).

Plaintiffs' Dissemination Plan complies with those instructions by first giving notice of "the pendency of the collective action, so that [recipients] can make informed decisions about *whether* to participate [collectively]," *id.*, 493 U.S. at 170 (emphasis added) , **or** instead file a separate lawsuit. *Id.* To be accurate and "not contrary to statutory commands," *id.* the Stage I notice also gives notice of the principal rights and opportunities provided by §216(b) and §256 of the Act — that the recipient has the right to become "a party to any such action [when] he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. §216(b). That is an essential part of the notice authorized by *Hoffmann-La Roche. Id.* The dissemination also gives notice of the comparative advantages and disadvantages in deciding "whether to participate [collectively]" *id.* **or** file a separate lawsuit, such as "the advantage of lower individual costs to vindicate rights by the pooling of resources," *id.* at 170, and the right to share in common representation by Plaintiffs' counsel that is similar to the joint representation provided in the Court's proposed Notice (ECF 177, Exh. A, §V, p. 4); *see also*, *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1439 (9th Cir. 1984) (finding it an abuse of discretion to "limit[] the ability of plaintiffs and counsel to assist class members in filing back-pay claims and [to] refuse[] to identify plaintiffs' counsel in the notice, making it difficult for class members to direct inquiries to them.") (emphasis added); *id.* at 1441 ("The availability of a federal magistrate to help claimants is no substitute for an advocate who will help claimants to present their claims in the best possible light. * * * The district court must allow all class members a reasonable time in which to submit claims prepared with the aid of counsel ab initio rather than supplementary to their original claims. The original claims should be disregarded unless no new claim is presented."); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 91, 101 (1981) (holding that "the District Court exceeded its authority under the Federal Rules of Civil Procedure" and the Constitution in "limit[ing] communications from named plaintiffs and their counsel to prospective class members during the pendency of a class action."); *id.* at 101-102 (reversing order interfering with individual's access to

communications with plaintiffs' counsel because "the order created at least potential difficulties for them as they sought to vindicate the legal rights of a class of employees. The order interfered with [counsel's] efforts to inform potential class members of the existence of this lawsuit" and "made it more difficult for respondents . . . to obtain information about the merits of the case from the persons they sought to represent.").

The social media dissemination also provides notice of the overall opt-in process, including the third-party administrator's matching procedure that is part of the Stage 2 determination of whether the individual is "similarly situated" to the named Plaintiff in accordance with the Ninth Circuit's holding in *Campbell* —that candidates may file a notice of intent to join as a party regardless of whether they have been previously found or certified to be "similarly situated" to the named plaintiff or not, that "[a] collective action is instituted when workers join a collective action complaint by filing opt-in forms with the district court," *id.* at 1101, that "[u]nder section 216(b), workers have a 'right' to bring or join a collective action, and may create the collective action **of their own accord** by filing opt-in forms," *id.* (citing *Genesis Healthcare Corp. v. Symczyk,* 569 U.S. 66, 75 (2013) (emphasis added), that "[w]hether opt-in forms are filed **after or before** preliminary certification **is . . . entirely up to the workers joining the litigation**, *id.,* that "preliminary certification is '*neither necessary nor sufficient* for the existence of a [collective] action," *id.* (Court's emphasis, quoting *Myers v. Hertz Corp*., 624 F.3d 537, 555 n.10 (2d Cir. 2010)), and that "unlike in the Rule 23 context, the district court in a collective action plays no such gatekeeping role," *id.,* under §216(b) and §256 of the FLSA. *Campbell,* 903 F.3d at 1101-1102. "Preliminary certification in the FLSA context does not 'produce a class with an independent legal status[] or join additional parties to the action,'" *id.* (quoting *Symczyk*, 569 U.S. at 75) because "[t]he **sole consequence'** of a successful motion for preliminary certification is 'the sending of court-approved written notice' to workers who may wish to join the litigation as individuals." *Id.* (emphasis added, quoting *Symczyk*, 569 U.S. at 75).

That has been the practice that has been followed in this case since nearly a year ago when individuals began becoming formal parties to this case by following *Campbell's* foregoing standards for filing written consents to join pursuant to the terms of §216(b). *See* ECF 103. Since

then, more than 150 opt-ins have "commenced," 29 U.S.C. §256, their individual §216(b) claims against Workday without being required to first be individually determined or conditionally certified as "similarly situated" to the named Plaintiff. "Although §216(b) also requires an opt-in plaintiff be similarly situated to the named plaintiff, the opt-in plaintiffs **remain party plaintiffs until the district court determines they are not similarly situated and dismisses them."** *Campbell*, 903 F.3d at ___ (emphasis added); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013).

That same holding applies to all the remaining potential opt-ins who each have that same right as those 150 or more opt-ins to "commence" their individual claims against Workday under §216(b) and §256. *See e.g.,* Order at 3 (ECF 175) (ordering that "the statute of limitations for any particular opt-in plaintiff shall, at minimum, be tolled from the date they submit their Pre-Opt-in Form"). Under the statute, tolling begins only at the point the individual files the requisite written consent required to "commence" the individual's action under §256. *Id.* The above type of intent to opt-in form authorized by the Court "commence[s]" the individual's action under §256 and §216(b) and thereby tolls the limitations period.

To hold otherwise would deny those individuals standing and adverse "similarly situated" decision blocks them from ever becoming a party. *Campbell,* 903 F.3d at 1104-1105; *Mickles,* 887 F.3d at 1278; *Marino v. Ortiz,* 484 U.S. 301, 304 (1988)."The rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well settled." *Marino,* 484 U.S. at 304. The Ninth Circuit holds opting in as a party is the *sine qua non* for standing to appeal an adverse "similarly situated" decision. *Campbell,* 903 F.3d at 1104-1105. Only individuals who are actually allowed to file the necessary "consent to join" form can ever have standing to appeal adverse rulings, conduct discovery, fully toll their limitations period, or otherwise pursue their claims absent filing a separate individual lawsuit. *Id.*

In this case, however, that would not be an equitable or intended result of the Court's adoption of Workday's third-party administrator proposal and procedure which was instituted solely as an accommodation of Workday not wanting to produce the names and addresses necessary to provide individual targeted email notice that would have avoided the publication notice and

resulting third-party administration process. Plaintiffs' Dissemination Plan solves that inequity by giving notice that individuals retain the statutory right to become parties to this case by filing the consent to join form mandated by §216(b).

Plaintiffs and their counsel also should not be put in the position of providing notice to the collective that is inaccurate and "contrary to statutory command" by not telling them they have a statutory right opt-in. Plaintiffs are the ones who speak and make representations through the notice conveyed as part of the social media ads and dissemination, not Workday or anyone else. The Court has previously noted that fact, stating that it is Plaintiffs' counsel who has the "obligation [to] adequately represent the collective," ECF 171, §1, in providing such notice. *See e.g. Domingo v. New England Fish Co.*, 727 F.2d 1429, 1439 (9th Cir. 1984) (reversing restriction on plaintiffs' and attorneys' freedom of speech and association under the First Amendment); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 91, 101-102 (1981) (holding the Constitution protects "communications from named plaintiffs and their counsel to prospective class members during the pendency of a class action" when an "order created at least potential difficulties for them as they sought to vindicate the legal rights of a class of employees . . . [by] interfer[ing] with [counsel's] efforts to inform potential class members of the existence of this lawsuit" and by "ma[king] it more difficult for respondents . . . to obtain information about the merits of the case from the persons they sought to represent.").

Even if that were not the law of the Circuit, Workday's third-party administrator process adds no significant convenience to determining whether individuals responding to the notice are, in fact, similarly situated to the named Plaintiff. The Court has already held that "Workday's list of employers who have used AI features will not be 'controlling.' If there is a dispute regarding whether a customer used AI features, and the parties are unable to resolve it, that dispute will be for the Court to decide." ECF 175, Exh. A, §3(d)(ii). "If you are found ineligible to join the Lawsuit, and you wish to dispute this determination with the help of Plaintiffs' counsel, the Form authorizes Plaintiffs' counsel to receive your complete Opt-In Eligibility and Authorization Form." *Id.* There are already substantial grounds for Workday's List doubting the validity and reliability of that List as evidence of who enabled Workday's AI process.

Moreover, Workday's section of this Case Management Statement correctly states that "Plaintiffs agree there should be a separate Consent to Join form." Such a separate section is necessary the currently proposed hybrid "Opt-In Eligibility Form" combines confidential information furnished to the third-party administrator that is inappropriate to be included in the simple consent form required to be publicly filed under §216(b) and §256 of the FLSA statute. The Parties requested separate Consent to Join form should only include a brief statement of consent together with the individual's name, mail and email address and phone number.

**B. <u>Third-Party Administrator</u>**

Plaintiffs have notified Workday that they are willing to agree to Angeion performing the third-party administrator services defined in the Court's Order at ECF 175, Exh. A, §1(b), §3(d)(ii), §3(e), but not any of the extra or other services Angeion has offered to perform beyond that. Further discussion with Angeion and Workday is needed on those items. Plaintiffs only agree to retain Angeion as third-party administrator conditioned on its role and authority being strictly limited to the following:

> 1(b) <u>Stage 2.</u> Third-party administrator screens pre-opt-in forms using list provided by Workday of employers who used Workday AI features (including CSM, Spotlight and Fetch) since September 24, 2020 ("Employer List")

> 3(d)(ii) Workday's list of employers who have used AI features will not be "controlling." If there is a dispute regarding whether a customer used AI features, and the parties are unable to resolve it, that dispute will be for the Court to decide. ***

> 3(e) The third-party administrator will provide the parties with updates confirming the number of opt-ins deemed eligible and ineligible based on their eligibility form on a weekly basis. Within **<u>7 days</u>** after the close of the opt-in period, the third-party administrator will provide the parties a final list of all eligible opt-ins and their eligibility forms (which shall be treated as confidential under the Protective Order in this case).

ECF 175, Exh. A, § 1(b), § 3(a)(iv), §3(d)(i, ii), §3(e).

In regard to Workday's contention regarding the meaning of the Court's Order that "[t]he cost [of the third party administrator] will be split between Plaintiffs and Workday, except that Workday will pay the cost of the manual portion of the administrator's review to determine which employer is referenced in the pre-opt-in form," ECF No. 175 at 6, the Plaintiffs agree with

Workday's statement that it "understands the Order means that Workday is responsible for any added administrator costs as a result of Workday's insistence that its customer list remain confidential. In other words, Workday bears the cost of objecting to a drop down list of customers in the eligibility form." Workday Case Management Statement, *infra*.

Plaintiffs agree with that statement as far as it goes. The record shows, however, that Workday's push for such third-party administrator process gradually grew out of Workday's prior effort to avoid having to produce the applicant names and addresses necessary for the individualized targeted email notice that it had been insisting upon in its then pending Case Management Statement. To avoid production of such applicant names of addresses, Workday suddenly began advocating publication notice as a substitute for such targeted individual notices to each applicant's email address. *Id.* Once that switch was made, Workday also began arguing for the third-party administrator process in which the case is now embroiled. All of that delay since last April, and the looming expense and further delay from implementing its third-party administrator process, has occurred "as a result of Workday's insistence that its customer list remain confidential" and as a result its "object[ion]] to a drop down list of customers in the eligibility form." Workday Case Management Statement, *infra* at p.__.

## C. Proposed Long-Form Notice And Opt-In Form

Plaintiffs' objections to the Court's proposed opt-in form and long-form notice all revolve around the problems already addressed in the the Dissemination Plan sectionabove.

First, as already shown, the Parties agree "there should be a separate Consent to Join form" rather than a hybrid "Opt-In Eligibility Form" that combines confidential information furnished to the third-party administrator and the consent form in a single document. The consent form should be a separate short, simple consent as required by §216(b) and §256, and the Questionnaire should be a selarate document that contains everything else the third-party administrator needs for that Stage 2 process, including all confidential information, if any.

Plaintiffs also request that § I of the long-form notice include notice of the Stage 1 issue of whether the individual chooses to opt-in to the collective action or to file a separate lawsuit. That includes framing that choice through notice of the statutory right and opportunity to opt-in in a way

sufficient for recipients to understand the advantages and disadvantages that usually affect that decision, such as "the advantage of lower individual costs to vindicate rights by the pooling of resources," *Hoffman LaRoche* at 170, and the right to share in common representation by Plaintiffs' counsel. Section 1 should also be limited to those Stage 1 issues and the separate Stage 2 third-party administrator and "similarly situated" issues should be dealt with separately in a reduced §3 that briefly identifies subsequent proceedings but moves the bulk of the detailed step-by-step specification of what that subsequent evidentiary process will entail to the separate third-party administrator's Stage 2 notice and instructions to bemtransmitted by means of a  targeted individualized email of the Questionnaire beinf  to *only* those persons who file an intent to join form at Stage 1. That way the third-party administrator is fully in charge of receiving and storing all confidential information transmitted as part of the Stage 2 responses and uploads. Right now, the detail of the Stage 2 "similarly situated" process in §3 unnecessarily dominates the biggest part of the entire long-form notice and unnecessarily deters opting in rather than filing a separate lawsuit.

Plaintiffs also request that Section 2 be amended to provide a more concrete, less abstract example of what has been found to constitute the named Plaintiffs' similarly situated claim as follows:

## II.    DESCRIPTION OF THE LAWSUIT

Derek Mobley ("Plaintiff") filed this action against Workday, Inc. in the Northern District of California, Case No. 3:23-0770-RFL ("Lawsuit"), on behalf of himself and all others similarly situated. His allegations include that Workday, Inc., through its use of certain Artificial Intelligence ("AI") features on its job application platform, violated the Age Discrimination in Employment Act ("ADEA"). Workday denies these allegations. The Court has not made any findings about whether Plaintiff's claims or Workday's denial of liability have any merit.

The Court has provisionally certified an ADEA collective, which includes: "All individuals aged 40 and over who, from September 24, 2020, through the present, applied for job opportunities using Workday, Inc.'s job application platform and were denied employment recommendations." For example, Derek Mobley's Complaint alleged the following:

Mobley also allegedly received rejection emails at early hours in the morning, outside of regular business hours. (*See, e.g.*, FAC ¶¶ 67, 77.) On one occasion, Mobley received a rejection at 1:50 a.m., less than one hour after he had submitted his application. (*Id.* ¶¶ 84–85.) The sheer number of rejections and the timing of those decisions, coupled with the FAC's allegations that Workday's AI systems rely on **biased training data** (*id.* ¶¶ 38–40, 102–03), support a plausible inference that Workday's screening algorithms were automatically rejecting Mobley's applications based on a factor other than his qualifications, such as a protected trait.

Order at 15-16. (Doc. 80).

In this context, being "denied" an "employment recommendation" means that (i) the individual's application was scored, sorted, ranked, or screened by Workday's AI; (ii) the result of the AI scoring, sorting, ranking, or screening was not a recommendation to hire; and (iii) that result was communicated to the prospective employer, or the result was an automatic rejection by Workday.

For you to join this Lawsuit as a party to the certified ADEA collective, the Court will ultimately need to determine that you meet all the requirements described in the above paragraph. The eligibility determination process is described below. **However, all you need to know, right now, to request an eligibility determination is that, on or after September 24, 2020, you applied for employment opportunities using Workday's application platform while you were 40 or more years old.**

ECF 177 at §II, p. 1 (Court's emphasis).

## WORKDAY'S POSITIONS:

### A. Workday's Comments on Plaintiffs' Proposed Dissemination Plan

Workday raises the following concerns with Plaintiffs' Proposed Dissemination Plan:

First, Plaintiff's Proposed Dissemination Plan references reinforcement, retargeting, and ongoing adjustments but those processes are not defined. Plaintiffs must state their Dissemination Plan for Workday's comment and the Court's approval. It is not appropriate for Plaintiffs to have the apparent liberties built into the proposed dissemination plan to modify it at-will after Court approval. For example, in the section "Optimization and Monitoring," Plaintiffs state "adjustments will be made to maintain broad national coverage and cost-effective reach, based on standard metrics" but it is not obvious whether that means Plaintiffs intend to reallocate financial resources

across approved social media platforms, modify the content of notices, or expand into different social media platforms.

Second, Plaintiffs' Proposed Dissemination Plan indicates the social media campaign will last "at least 60 days." The Court has already ordered there will be a 60-day notice period. After that, the social media campaign will end.

Third, while Workday appreciates that Plaintiffs' Proposed Dissemination Plan no longer indicates that Plaintiffs intend to use Workday's highly confidential customer list as part of its social media campaign, the version provided on the morning of this filing (October 15, 2025) states that Plaintiffs intend to "target[] Workday customers using its job application platform." Workday's customers are entities, not individuals, and accordingly Workday customers are not the appropriate target of any social media campaign. Furthermore, the proposed plan does not explain what it means to "target" an audience with respect to the "Workday Applicant Audience," as compared to the "Active Job Seeker Audience" which at least attempts to explain the criteria involved, even if it fails to explain the mechanics. During the parties' meet and confer discussion, Plaintiffs could not further explain the process and committed to following up with Workday. Plaintiffs have provided no further explanation.

Fourth, the Parties disagree about the scope of Plaintiffs' social media consultant's role as compared to the third party administrator. Plaintiffs propose that the social media consultant maintain a webpage where potential opt-in plaintiffs can select between filing a consent form, requesting the assistance of plaintiffs' counsel, and "consent to document disclosures." From those options, individual potential opt-ins will be sent emails. Setting aside that Workday does not know what "consent to document disclosures" means (and this language was newly added after the Parties' meet and confer call), this is not the process contemplated by the Court and is outside the scope of a social media consultant, which should be responsible for designing, placing, and tracking social media advertisements. The third party administrator will be responsible for the case webpage, which will include the approved long form notice (which includes Plaintiffs' counsel's contact information), Opt-In Eligibility form, and any necessary case documents (if there are any). There is no basis for individual emails to be sent to potential opt-ins. Plaintiffs separately reference a

secure website portal, which is much more aligned to the process previously contemplated by the Court and the Parties. However, Plaintiffs do not address whether or how their "mobile-optimized landing page" with "clearly labeled buttons for three main options" described on the top of page 3 of their proposal squares with "a secure website portal containing the court-approved long-form notice" and related forms described at the bottom of page 3 of their proposal.

Similarly, Plaintiffs state that their proposed dissemination plan "is structured to separately address both the Courts 'Stage 1' and 'Stage 2' bifurcation," but the dissemination plan need not do so. The third party administrator process and the dissemination plan are separate processes. Other than the third party administrator providing Plaintiffs' social media consultant with the appropriate link of the case website, the two need not interact. Plaintiffs' dissemination plan should not address anything more than where Plaintiffs intend to post the court-approved short form notice, how they have selected those locations, why that plan is sufficient to reach a broad enough audience, and how they intend to monitor the advertisements throughout the 60-day notice period. Moreover, Plaintiffs are wrong that the third-party administrator's matching procedure is a "Stage 2 determination of whether the individual is 'similarly situated' to the named Plaintiff." Rather, the third party administrator's role is intended as a preliminary step to ensure that only those who could conceivably meet the collective definition are permitted to opt in—whether those individuals are similarly situated to each other and the named Plaintiff will be addressed at decertification.

Fifth, Plaintiffs provide several pages of "mockups" and variations on advertisement language. Under the section "Compliance Considerations," Plaintiffs note that "all ad creatives and copy will be reviewed and approved by counsel prior to launch," but that ignores that the Court has already approved the text of a short form notice. The Court's October 2, 2025 Order dictates the short form notice language based on Plaintiffs' original proposal, Workday's concerns, and argument at the October 1, 2025 Case Management Conference. The Court has not permitted—and it is not appropriate for—Plaintiffs to unilaterally modify that Order. In addition to being contrary to the Court's Order, the proposed language is vague, incomplete, and misleading including, for example, with respect to the repeated phrase "Workday applicants," and to the extent it suggests the "federal court is providing notice" instead of Plaintiffs' counsel.

Sixth, the Court ordered Plaintiffs to support their proposed dissemination plan with a declaration from their social media consultant. Plaintiffs refer to such a declaration in their CMC statement but did not provide a copy of that declaration to Workday in advance. Accordingly, Workday may have further concerns based on the credentials of Plaintiffs' chosen social media consultant. Plaintiffs have declined to identify the consultant to date.

Finally, on 1:55 pm on Friday, October 10, Plaintiffs provided a two-paged proposed dissemination plan. It was marked "Highly Confidential – Workday, Inc. Attorneys' Eyes Only." On Tuesday, October 14 at 8:44am, Plaintiffs provided a substantially revised proposed plan (spanning 22 pages instead of 2). It was also marked AEO under the protective order. Workday met and conferred with Plaintiffs via email and by phone the same afternoon concerning their proposed plan and questioned the AEO designation of the plan, including because the proposal did not obviously include any confidential or sensitive information and because Plaintiffs were ordered to file the proposed plan with the Court. Plaintiffs confirmed that they so-marked the proposed plan because it was "only fair" that Workday not be permitted to share the proposal with their consultants, if any, because the third party administrator bids were marked proprietary and confidential. Plaintiffs then stated they would consider whether they would remove the designation, whether they intended to file the proposed plan under seal, or would take some other action. They did not identify, however, any confidential information contained in the proposal. On the morning of October 15, 2025, Plaintiffs provided a further revised proposal that continued to bear the AEO designation but separately confirmed "the AEO designation will come off before filing." Plaintiffs did not respond to Workday's further request that the improper designation be removed immediately or explained, but did later provide a further updated version that was de-designated. Such gamesmanship is violative of the terms of the protective order and the blatant disregard for the terms of the protective order cause Workday great concern in the light of the highly confidential and sensitive customer list Workday was compelled to provide.

**B. Third Party Administrator**

Workday agrees to use Angeion as the third party administrator in this case. Based on the Parties' meet and confer discussions, the Parties appear to have a fundamental disagreement about

this Court's order that "The cost [of the third party administrator] will be split between Plaintiffs and Workday, except that Workday will pay the cost of the manual portion of the administrator's review to determine which employer is referenced in the pre-opt-in form." ECF No. 175 at 6. Workday understands the Order means that Workday is responsible for any added administrator costs as a result of Workday's insistence that its customer list remain confidential. In other words, Workday bears the cost of objecting to a drop down list of customers in the eligibility form. Plaintiffs have instead taken the position that Workday is responsible for any "manual" costs of the administrator as reflected by any per hour charge including, for example, staffing of a call center and drafting court documents. Workday also understands that Plaintiffs' position is that Workday must bear the cost of the entirety of the processing of Opt-In Eligibility forms, even if the processing is handled electronically or is unrelated to employer matching. These costs are not the result of the confidentiality of the customer list and are more properly shared costs per the Court's Order.

Plaintiffs ultimately state that they only agree to retain Angeion as a third-party administrator conditioned on its role and authority being limited to screening pre-opt-in forms. Neither Workday nor the Court have ever suggested anything different. Screening the opt-in forms, however, is a process that Angeion must facilitate, including through setting up a case webpage and developing the electronic form consistent with the Court's final order.

Plaintiffs' portion of the case management statement makes repeated references to "Workday's third-party administrator process." Plaintiffs claim that Workday's "third-party administrator proposal and procedure was instituted solely as an accommodation of Workday no[t] wanting to produce the names and addresses necessary to provide individual targeted email notice that would have avoided the publication notice." This is incorrect. As Plaintiffs well-know, Workday does not have legal control of its customers' data and could not produce names and addresses for its customers' applicants. Additionally, for avoidance of doubt, it was ***Plaintiffs*** who first suggested public notice—not Workday. *See* ECF No. 131. Workday ultimately agreed to public notice because it does not have the names and addresses Plaintiff seeks to accomplish targeted notice and the process of obtaining those names would require the involvement of hundreds of Workday customers.

**C. Edits or Objections to the Proposed Notice Forms**

Workday has two overarching comments on the notice forms proposed in the Court's October 3, 2025 Order Re Proposed Notice Forms, and small proposed line edits as reflected in Exhibit 2.

First, the Court's proposed forms contemplate that potential opt-in plaintiffs will be automatically opted in to the case after submitting the Opt-In Eligibility Form and if deemed eligible by the third-party administrator. While Workday understands the efficiency of such a process, it would require the Opt-In Eligibility Form (as opposed to a separate Consent to Join form) be filed with the Court at the conclusion of the process. The Court's proposed notice details the confidentiality of the Opt-In Eligibility Form and the specific circumstances under which it will be disclosed, but does not include that the form will be publicly filed if the potential opt-in is deemed eligible. It appears that such a reference would be properly included and/or eligible individuals will have to provide a separate form to be filed on the public docket. Workday understands that Plaintiffs agree there should be a separate Consent to Join form.

Second, in the Court's Order Granting Preliminary Collective Certification, ECF No. 128, the Court stated as follows:

> Questions remain regarding where to draw the line between someone who was and someone who was not 'recommended.' Does anything less than a 'strong' CSM score qualify as a denial of a recommendation? How should the results of any other features be measured? However, the fact that these questions remain outstanding does not mean that no collective may be certified. . . . Accordingly, the parties are ordered to meet and confer to determine how to define a 'recommendation,' along with the other issues further detailed below.

Order at 11. To date, Plaintiffs have declined to define what constitutes a "recommendation." Because the "employment recommendation" language remains a part of the defined conditionally certified collective and is repeatedly referenced in the proposed Notice and Opt-In Eligibility form, Workday's position is that Plaintiffs must state their position concerning which ratings they deem actionable as part of the collective. With respect to CSM, it generates a category of match between an applicant's stated skill and the job requisition's stated skills including "Strong," "Good," "Fair," "Low," and "Unable to Score." On the other hand, Spotlight generates letter grades A through D to

represent the match of an applicant's qualifications and the job's stated qualifications. And Fetch generates no such categories or scores. The Parties need alignment on what the criteria is to be a member of the collective before the notice process begins in earnest.

Finally, Workday's proposed line edits to the Court's Notice and Opt-In Eligibility form are designed to clarify that the eligibility process described is preliminary, confirm that eligible opt-in plaintiffs were denied employment opportunities, clarify that this collective is just one part of the broader lawsuit, and require that potential opt-in plaintiffs affirmatively state that they believe they meet the criteria for inclusion (as opposed to that they may).[3]

### D. Misuse of the CMC Statement

Through their portions of the case management statement, Plaintiffs continue a pattern of seeking to relitigate issues the Court has already decided without formally seeking reconsideration of the Court's prior orders. Plaintiffs also use the CMC statement to impermissibly brief legal issues rather than address the procedural aspects of the collective notice and opt-in process as requested by the Court. Plaintiffs also continue to address and include matters not discussed as part of the meet and confer process leading up to submission of a CMC statement. A case management statement is not an appropriate place to seek reconsideration, nor is it appropriate to brief legal issues not pending before the Court.

---

[3] While Plaintiffs generally take umbrage with the Court's forms, Plaintiffs have not proposed edits, nor have they proposed their own long form notice, for Workday to comment upon (although they state they will attach such edits to this statement). Workday maintains that the Court's Notice and Opt-In Eligibility form properly apprises potential opt-ins of the process and consequences of opting in, or not.

1    Dated: October 15, 2025                    WINSTON COOKS, LLC

2

3
                                               By: _____/s/ Lee D. Winston_____
4                                                        LEE D. WINSTON
                                                  Attorneys for Plaintiff and the Proposed
5                                                      Classes and Collective

6    Dated: October 15, 2025                    JULIE A. TOTTEN
                                               ERIN M. CONNELL
7                                               KAYLA D. GRUNDY
                                               ALEXANDRIA R. ELLIOTT
8                                               ORRICK, HERRINGTON & SUTCLIFFE
                                               LLP
9

10
                                               By: _____/s/ Julie A. Totten_____
11                                                        JULIE A. TOTTEN
                                                    Attorneys for Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT
                                                         [CASE NO. 23-CV-00770-RFL]

**PLAINTIFFS' EXHIBIT 1**

# PLAINTIFFS' REVISED DISSEMINATION PLAN

## Overview

This plan provides a step-by-step description of Plaintiffs' social media notice and how Plaintiffs' social media consultant will disseminate deploy, and monitor a 60-day digital notice campaign based on the plan. The plan uses paid advertising across Meta (Facebook and Instagram), LinkedIn, and Google platforms to reach adults aged 40 and older who may have applied for employment through Workday's systems. These platforms were selected for their proven ability to reach the 40+ demographic, their transparency in reporting audience data, and their compliance capabilities.

## Concensus Platforms

**Facebook & Instagram (Meta Ads):** Highest concentration of 40+ users, allows demographic targeting, and provides integrated lead forms.

**LinkedIn Ads**: Professional credibility, targeting of active job seekers and industries where Workday is widely used.

**Google Search & Display**: Captures individuals actively searching for legal representation or age discrimination information. Also provides retargeting opportunities.

**X (formerly Twitter):** Reaches a highly engaged audience of professionals, HR personnel, and technology users who regularly discuss employment, recruiting, and artificial intelligence topics, all directly relevant to this case. X's real-time content environment allows the notice to appear alongside trending discussions on workplace fairness, AI in hiring, and employment law, ensuring that the campaign reaches individuals likely to have applied through or interacted with Workday's recruiting systems.

## Number of Users Per Platform

**Facebook & Instagram:** Used by approximately 80% of U.S. adults aged 40–64 (Pew Research Center, 2024).

**LinkedIn:** Used weekly by roughly 60% of adults aged 40–64, particularly among professionals and job seekers.

**Google Search & Display**: Reaches over 90% of U.S. internet users monthly (Statista 2025).

**X (formerly Twitter):** Used by an estimated 27% of adults aged 40–64, but over-indexes for professionals, journalists, and tech users who discuss AI, recruiting, and employment issues (Pew Research Center 2024).

### Why These Platforms Will Reach the Target Audience

According to 2024 data from the Pew Research Center, approximately 80% of U.S. adults aged 40–64 use Facebook or Instagram, and 60% use LinkedIn at least once a week. Nielsen's 2024 Digital Ad Ratings report further confirms that campaigns targeting adults aged 40 and over on these platforms achieve verified reach accuracy above 90%. Together, these platforms cover the vast majority of working-age adults, including those most likely to have interacted with employers that use Workday's recruiting software. Their combined reach ensures broad, demographically appropriate notice distribution consistent with federal notice standards.

### Ad Spend Allocation

| | |
|---|---|
| **Facebook & Instagram (Meta Ads):** | 50% |
| **LinkedIn:** | 25% |
| **Google Search & Display:** | 15% |
| **X:** | 10% |

To achieve flexible optimization, this allocation may be reallocated by Plaintiffs' media consultant among such platforms or others as needed based on performance data (i.e., Cost Per Click, Click-Through Rate, and On-Site Conversion Rate) to ensure the greatest reach and engagement among the target audience

### Schedule & Duration

The Plan will run for at least 60 days in three graduated phases:
- Phase 1 (Days 1–15): Awareness across all platforms.
- Phase 2 (Days 16–45): Lead generation optimization, reinforcement/retargeting ads
- Phase 3 (Days 46–60): Reinforcement/Retargeting ads

This proposed 60-day graduated digital notice plan is expected to be sufficient notification to individuals over 40 who applied for jobs through Workday and may want to consent to join this case. The allocation across Facebook/Instagram, LinkedIn, and Google provides broad reach, professional credibility, and intent capture. The plan is transparent, targeted, and compliant with federal standards for class action notice. The dissemination will employ a layered targeting approach across Meta, Google and LinkedIn to maximize reach and frequency among the target audience. This includes:

1. **Workday Applicant Audience:** Targeting Workday customers using its job appication platform.
2. **Lookalike Audiences:** Creating lookalike audiences (Meta and LinkedIn) based on the demographics and behavior of the Workday Applicant Audience to find similar users, thereby expanding reach.
3. **Active Job Seeker Audience:** Targeting users showing recent activity related to job seeking, resume updates, or interaction with professional content/sites known to use Workday's software.

All advertisements will direct users to a single, mobile-optimized landing page This page will feature highly visible, clearly labeled buttons for the three main options: File a Consent Form, Request Assistance of Plaintiffs' Counsel and Consent To Document Disclosures. Responders who elect to file a Consent Form rather than a separate lawsuit will be emailed a Questionaire eliciting information on the names of the employers they applied to in the relevant period and any other sensitive or confidential information agreed upon to be needed by the third-party administrator. Such email will come directly from the third-party administrator and all responses will be returned directly to the third-party administrator for safekeeing of all sensitive or confidential infirmation on terms agreed upon by the Parties.

### Optimization and Monitoring
Campaign performance will be monitored daily to ensure that ads are being delivered efficiently and proportionally across age, region, and platform. Adjustments will be made to maintain broad national coverage and cost-effective reach, based on standard metrics such as Cost Per Thousand Impressions (CPM), Click-Through Rate (CTR), and Conversion Rate. This iterative process ensures the notice continues to appear to new, relevant users throughout the campaign duration.

### Compliance Considerations
All advertisements will be neutral, notice-style, and strictly informational. Messaging will avoid solicitation and instead direct individuals to official notice landing page. All ad creatives and copy will be reviewed and approved by counsel prior to launch. They will contain no persuasive language or calls to action beyond directing individuals to the official notice website. No personal data will be collected by the social media consultant; all form submissions will occur solely through the secure website.

### Electronic Form Responses

The digital advertising program will direct recipients to a secure website portal containing the court-approved long-form notice, the accompanying forms to use to respond to such notice, instructions on how to electronically transmit such forms and communicate with Plaintiffs' counsel to request assistance or answer questions directly from the webpage portal and other relevant court-approved case documents.

### Content of Dissemination Notice And Mockup of Social Media Ads

Examples of the content and appearance of the social media ads are attached. The content of the notice to be disseminated from the webpage will first include notice of the pendency of the collective action under §216(b) and §256 of the FLSA and the recipients' right under such statute to "be a party to any such action [whenever] he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought," 29 U.S.C. §216(b), q such party status is a necessary precondition to standing to appeal any subsequent determination that the recipient is not "similarly situated" to the other Plaintiffs, and that the determination of the latter "similarly situated" status will be made at the post-discovery decertification stage of the case in accordance with the standards of *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2017). *See* Case Management Statement filed Ocober 15, 2025 for further explanation of such content.

### Structure Of Dissemination Plan

The Dissemination Plan is structured to separately address both the Court's "Stage 1" and "Stage 2" bifurcation (ECF 175, Exh A, §1; ECF 177, Exh A, §I), The content addressing Stage 1 gives notice of the statutory opportunity to opt-in to the collective action or to instead file a separate lawsuit in accordance with the principal purpose of the notice allowed by *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989). *Cf.* ECF 175, Exh A, §1(a); ECF 177, Exh A, § I. The content addressing Stage 2 gives notice of the third-party administrator's matching procedure and the overall "similarly situated" determination that comes after the individual has chosen to pursue their individual claim on a collective basis, *Cf.* ECF 175, Exh A, §1(b); ECF 177, Exh A, §III.A).This is further addressed in the Plaintiffs' Report section of the Joint Case Management Statement filed herewith.

## Exhibit A - SHORT FORM NOTICE MOCKUPS

The following mock-ups illustrate the Short Form Notice as it will appear in digital advertisements across Meta (Facebook and Instagram), LinkedIn, Google Display/Search, and X

(formerly Twitter). These examples are provided to demonstrate the appearance, tone, and layout of the notice content as it will be displayed on users' feeds or search results.

All ad copy is drawn directly from the Court-approved Short Form Notice and has been formatted in compliance with each platform's technical requirements. The materials are neutral, factual, and non-promotional and contain no persuasive or solicitational language. Each ad directs users exclusively to the official notice website managed by the Court-appointed Notice Administrator, where the full Long Form Notice is hosted.

These mock-ups are illustrative only. Final versions may vary slightly in size, aspect ratio, or character length to conform to specific platform display standards, but the substance, tone, and notice language will remain identical to those approved by Plaintiffs' counsel and consistent with this submission.

## 1. Instagram & Facebook Ads

# Were you rejected after applying through <u>Workday</u>?

**Applied for a job after September 24, 2020 and got rejected?**



If you were over 40 or over,
believe AI screening impacted your application, you
may request to join a federal lawsuit.

**Learn More**                                                          >

♡  ◯  ◁                                                                    ⊓

**89 views**

 **Workdaycase** Applied for a job after September 24, 2020 and got rejected? If you were 40 or over, believe AI screening impacted your application, you may request to join a federal lawsuit.

View all 14 comments



**Workdaycase.com**
Sponsored · 🌐

Applicants 40 or over who applied through Workday after September 24, 2020 and were rejected may request to join a lawsuit.

WORKDAYCASE.COM
**Did AI impact your job application?**
Learn How

👍 Like     💬 Comment     ↪ Share

**<u>Variation 1 (Notice)</u>**
**<u>Headline: Official Court Notice</u>**
**Headline 2**: Workday Applicant Class Member Notice
**Body or Caption**: LEGAL NOTICE

Information for applicants age 40 and older who sought employment through Workday after September 24, 2020. Your legal rights concerning the application process may be affected.
**CTA**: Learn more: [Website]

**Variation 2 (Time + Date Focused)**
**Headline**: Official Court Notice
**Headline 2**: Notice: Applicants Age 40 & Over
**Body or Caption:** A federal court is providing notice to certain job applicants who used the Workday application platform between 9/24/2020 and the present.
**CTA**: View Notice [Website]

**Variation 3 (Neutral + Direct)**
**Headline**: Were you rejected after applying through Workday?
**Body or Caption**: Applied for a job after September 24, 2020 and got rejected? If you were 40 or over believe AI screening impacted your application, you may request to join a federal lawsuit.
**CTA**: Learn more: [Website]

**Variation 4 (Informative + Concise)**
**Headline**: Age and Job Applications
**Body or Caption**: If you applied through Workday after September 24, 2020, were 40 or over, and got rejected, you may have legal options.
**CTA**: Click the link below to see if you qualify. [Website]

**Variation 5 (Question + CTA)**
**Headline**: Did AI impact your job application?
**Body or Caption**: Applicants 40 or over who applied through Workday after September 24, 2020 and were rejected may request to join a lawsuit.
**CTA**: Learn how: [Website]

**Variation 6 (Story-style / Relatable)**
**Headline**: Job Rejection?
**Body or Caption**: Applied through Workday after Sept 24, 2020 and didn't hear back? Were you 40 or over? You could challenge AI screening decisions. Find out more: [Website]
**CTA**: Learn More / Visit [Website]
## 2. LinkedIn Ads



**Variation 1- Sponsored Content**
**Headline**: Workday Applicants: Official Court Notice
**Body**: Individuals 40 or older who applied for jobs through Workday after Sept 24 2020 may be affected. Read the official notice.
**CTA**: Learn More [Website]

**Variation 2 - Message Ad 1**

**Subject**: Official Court Notice – Workday Applicants
**Body**: This is a Court-Authorized Legal Notice.
If you are age 40 or older and applied for a job through Workday after September 24, 2020, this notice may affect your rights.
The U.S. District Court authorized this message to inform potential class members about a pending lawsuit regarding Workday's employment screening system.

To review the full notice and learn more, please visit the official case website below.

**CTA**: Learn More [Website]


### Variation 3 - Message Ad 2
**Subject**: Court-Authorized Notice – Age & Employment
**Body**: The U.S. District Court approved this legal notice to inform job applicants 40 and older who used Workday's platform after Sept 24, 2020.
This communication is for informational purposes only and does not mean you are a class member or entitled to relief. Visit the official site for details and deadlines.

**CTA**: Learn More [Website]

### Variation 4 - Text Ad (Sidebar) 1
**Headline**: Court Notice – Workday
**Body**: If you applied via Workday after 9/24/20 and are 40+, read this official notice.
**CTA**: Learn More [Website]

### Variation 5 - Text Ad (Sidebar) 2
**Headline**: Age & Job Applications
**Body**: U.S. Court authorized notice for Workday applicants 40+ since Sept 2020.
**CTA**: Learn More [Website]

## 3. Google Ads

**Sponsored**



Workday Case
https://workdaycase > google ad mockup test  ⋮

### Age 40+| Age Bias Case| Workday Lawsuit Notice

Did you apply for a job via Workday after 9/24/2020? See if your legal rights are impacted by this federal notice.

**Variation 1**
**Headline 1:** Workday Lawsuit Notice
**Headline 2:** Ages 40+
**Headline 3:** Official Court Information
**Description:** Did you apply for a job via Workday after 9/24/2020? See if your legal rights are impacted by this federal notice.

**Variation 2**
**Headline 1:** Workday Age Bias Case
**Headline 2:** 40+ Applicant Notice
**Headline 3:** Legal Rights Affected
**Description:** Applicants age 40 or over who applied through Workday may be affected by a court notice. Visit the court-approved notice portal.

**Variation 3**
**Headline 1:** Workday Job Applications
**Headline 2:** Age 40 and Over Notice
**Headline 3:** Court-Authorized Update
**Description:** Applied via Workday after Sept 24 2020? A federal court issued a legal notice.

**Variation 4**
**Headline 1:** Workday Applicants 40+
**Headline 2:** Official Court Notice
**Headline 3:** Employment Information
**Description**: U.S. District Court authorized a notice for Workday users age 40 and over.

**Variation 5**
**Headline:** OFFICIAL COURT NOTICE
**Text:** Workday Applicants Age 40+ Applied after 9/24/2020. Review your legal rights.
**CTA:** View Notice

**Variation 6**
**Headline:** AI may have screened you out. 40 or over and rejected? You could join a lawsuit.
**Text:** Workday Hiring Process Notice. Information for applicants age 40 or over who used the platform.
**CTA:** Learn More

**Variation 7**
**Text:** Rejected for a Workday job after Sept 24, 2020? 40 or over? Review the official court notice.
**CTA:** Learn More

**Variation 8**
**Headline 1:** Workday Hiring Notice
**Headline 2:** Applicants Age 40 +
**Headline 3:** Court-Authorized Info
**Description:** Information for adults 40 and over who applied via Workday after Sept 24 2020.

**Variation 9**
**Text:** 40 or over and denied by Workday? This official notice may concern your application.
**CTA:** Learn More

## 4. X



**Workday Case**

If you are an individual age 40+ who applied through Workday after September 24, 2020, your legal rights may be affected by an ongoing federal lawsuit.



Workdaycase.com
Workday 40+ Applicant Notice

Promoted

**<u>Variation 1</u>**
**Headline**: Workday Applicant Legal Notice
**Body**: FEDERAL COURT NOTICE: Information for Workday job applicants age 40 and over who applied after 9/24/2020. Review your rights concerning the hiring process.
**CTA**: Learn More / Visit Website  [Website]


**<u>Variation 2</u>**
**Headline**: A Federal Court Notice is Available
**Body**: ATTENTION WORKDAY APPLICANTS
Have you reviewed the court-mandated notice for individuals age 40+ applying after 9/24/2020? This notice is about potential legal rights.
**CTA**: View Notice  [Website]


**<u>Variation 3</u>**
**Headline**: Workday 40+ Applicant Notice
**Body**:  If you are an individual age 40+ who applied through Workday after September 24, 2020, your legal rights may be affected by an ongoing federal lawsuit.
**CTA**: Learn More  [Website]


**<u>Variation 4</u>**
**Headline**: Official Court Notice
**Headline 2**: AI Hiring Lawsuit Notice
**Body**: COURT-APPROVED NOTICE: A lawsuit is proceeding concerning Workday's AI-based screening tools and their impact on job applicants age 40 and over who applied after 9/24/2020.
**CTA**: Read Full Notice [Website]


**<u>Variation 5</u>**
**Headline**: Official Court Notice
**Headline 2**: Workday Case: Response Due
**Body**: DEADLINE ALERT: Applicants to Workday age 40 or older who applied after 9/24/2020 must act by the court-set deadline to preserve their rights in the ongoing lawsuit.
**CTA**: View Deadline Info [Website]


**<u>Variation 6</u>**
**Headline**: Official Court Notice
**Headline 2**: Am I Part of the Applicant Class?
**Body**: LEGAL NOTICE REGARDING: Individuals who applied for a job through Workday and satisfy all three criteria: 1) Age 40+ 2) Applied after 9/24/2020 3) Were rejected.
**CTA**: Check Eligibility Now [Website]

**PLAINTIFFS' EXHIBIT 1B**

Docusign Envelope ID: 400EA200-4924-48DE-ABBD-CA7054062D20

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEREK L. MOBLEY, for and on behalf of himself and other persons similarly situated; | Case No. 3:23-cv-00770-RFL-LB |
| Plaintiff, | Complaint Filed: February 21, 2023 |
| v. | |
| WORKDAY, INC. | |
| Defendant. | |

**<u>DECLARATION OF ABBY GARCIA</u>**

I, Abby Garcia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

## 1. Qualifications

I am a social media consultant with over 13 years' experience designing and managing paid digital advertising campaigns for public awareness, consumer protection, and legal notice programs. I am a graduate of the University of California-Los Angeles. I have been retained by Plaintiffs 'counsel to assist in developing and implementing the social media component of the collective action notice plan in this matter.

## 2. How the Notice Will Be Advertised

The digital notice campaign will use paid advertisements on major, reputable social media and digital platforms, specifically Meta (Facebook and Instagram), LinkedIn, Google Display/Search, and X (formerly Twitter).

Each advertisement will:

·   Contain language approved in the Court-approved Short Form Notice,

·   Some of the proposed mock-ups included in the attached dissemination plan for further consideration contain variations to the notice language for brevity designed to fit within the social media context,

1
2
3

- · Be neutral, factual, and non-promotional,

- · Include a direct link to the notice website where collective members can access the full notice and additional case information.

4
5

The campaign will run for 60 days, using paid placements targeted to adults aged 40 and older in the United States. Ads will appear in users 'feeds and search environments as sponsored content, ensuring visibility alongside their normal online activity.

6
7

This approach combines:

8
- · **Broad demographic coverage** (Facebook and Instagram),

9
- · **Professional targeting** (LinkedIn),

10
- · **High-intent search reach** (Google), and

11
- · **Supplemental awareness among HR, tech, and policy communities** (X/Twitter).

12
All advertisements will undergo review and final approval prior to publication.

13
14
15

The accompanying Proposed Digital Notice Plan outlines the campaign schedule, platform mix, and creative review process. My role is to oversee implementation of that plan and ensure that each placement complies with platform policies.

16
## 3. Why This Plan Will Reach a Sufficiently Broad Audience

17
18
19
20

The chosen platforms are among the most widely used digital networks by adults aged 40 and older. According to public research by the Pew Research Center (2024), roughly 80% of U.S. adults aged 40–64 use Facebook or Instagram weekly, and over 60% use LinkedIn or YouTube. This ensures that the platforms selected are representative of the target population and capable of delivering notice to a broad, diverse audience nationwide.

21
22
23

By combining the broad demographic reach of Meta (Facebook and Instagram), the professional targeting capabilities of LinkedIn, the intent-based visibility of Google Search and Display, and the supplemental awareness generated on X (formerly Twitter), the campaign ensures that notice appears repeatedly across multiple contexts and user groups, making it reasonably calculated to reach a broad and representative audience of adults aged 40 and over.

24
25

This multi-platform approach, supported by neutral creative and counsel oversight, satisfies the requirements standard federal notice practices by ensuring that the message reaches users through multiple pathways rather than relying on a single source or channel.

26
27

Using multiple platforms with distinct user bases ensures that notice is:

28
- · **Repeated across different contexts** (social, professional, and search),

Declaration of Abby Garcia
Mobley et sl. v. Workday, Inc. 3:23-cv-00770-RFL-LB

- · **Delivered to users with varied online behaviors**, and
- · **Not dependent on a single medium** or demographic subset.

This combination of reach, platform diversity, and continuous exposure makes the plan reasonably calculated to reach a sufficiently broad audience of potential collective members, satisfying standard federal notice practices.

## 4. Compliance and Neutrality

All advertisements will be compliant with applicable platform policies. The campaign will not collect any personal information or track user behavior. All user interactions will occur through a secure website.

## 5. Conclusion

Based on my professional experience and the characteristics of the selected platforms, it is my opinion that this digital advertising plan is reasonably calculated to reach a broad and representative audience of adults aged 40 and older who may be members of the collective. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15 day of October 2025, at Los Angeles, California.

/s/ *Abby Garcia*
DocuSigned by:
646E7428C6D4447...
**Abby Garcia**
Social Media Consultant

# DEFENDANT'S EXHIBIT 2

<u>**Exhibit A – Long Form Notice**</u>

**TO:** All individuals 40 years of age or older who, at any time from September 24, 2020 to the present, applied for job opportunities using Workday, Inc.'s job application platform.

**Re:** Collective action lawsuit against Workday for alleged violations of the Age Discrimination in Employment Act ("ADEA").

## I. INTRODUCTION

This notice and its contents have been authorized by the United States District Court for the Northern District of California. The Court has taken no position in this case regarding the merits of Plaintiffs' claims or of Workday's defenses. This notice is intended to provide information about whether you may be eligible to join the lawsuit as a party and, if so, the steps you may take to join.

If you wish to have your eligibility assessed and to join the lawsuit if found eligible, you must submit an Opt-In Eligibility and Authorization Form, which you can find on the official case webpage, _____ . That form must be submitted by **[60 days from the date notice is finalized].**

## II. DESCRIPTION OF THE LAWSUIT

Derek Mobley ("Plaintiff") filed this action against Workday, Inc. in the Northern District of California, Case No. 3:23-0770-RFL ("Lawsuit"), on behalf of himself and all others similarly situated. His allegations include that Workday, Inc., through its use of certain Artificial Intelligence ("AI") features on its job application platform, violated the Age Discrimination in Employment Act ("ADEA"). Workday denies these allegations. The Court has not made any findings about whether Plaintiff's claims or Workday's denial of liability have any merit.

The Court has provisionally certified an ADEA collective, which includes: "All individuals aged 40 and over who, from September 24, 2020, through the present, applied for job opportunities using Workday, Inc.'s job application platform and were denied employment recommendations." In this context, being "denied" an "employment recommendation" means that (i) the individual's application was scored, sorted, ranked, or screened by Workday's AI; (ii) the result of the AI scoring, sorting, ranking, or screening was not a recommendation to hire; and (iii) that result was communicated to the prospective employer, or the result was an automatic rejection by Workday.

For you to join this Lawsuit as a party to the certified ADEA collective, the Court will ultimately need to determine that you meet all the requirements described in the above paragraph. The preliminary eligibility determination process is described below. **However, all you need to know, right now, to request an eligibility determination is that, on or after September 24, 2020, you applied for and were denied employment opportunities using Workday's application platform while you were 40 or more years old.**

## III. HOW TO JOIN THIS LAWSUIT

If you would like to join this Lawsuit, you must:

1) Have applied for employment opportunities using Workday's application platform since September 24, 2020, while you were 40 or more years old and were denied.

2) Fill out and electronically sign the Opt-In Eligibility and Authorization Form ("Form") located on the official case webpage at _____ .

3) Wait while your Form is reviewed by a Court-approved third-party administrator, who will determine whether the employer(s) you applied to may have used Workday AI features. You should receive notice of your status within 30 days of [the end of publication notice period]. If the third-party administrator determines that you are eligible to join the Lawsuit, you will be opted in to the Lawsuit. Otherwise, you will receive an ineligibility notice, and instructions on how you can dispute your status.

4) If you are opted in to the Lawsuit, wait while counsel for the parties investigate whether you were denied an employment recommendation. This process may be lengthy.

5) If you are determined to satisfy all the conditions for membership in the ADEA collective certified by the Court, you will remain a party to the Lawsuit. If you do not satisfy the conditions for membership, you will be dismissed from the Lawsuit by the Court. That means you will be removed as a party from this Lawsuit, though you may still be able to pursue your own separate lawsuit, depending on your situation.

A. **Effect of Submitting the Opt-In Eligibility and Authorization Form**

The Form requires you to identify the employers to whom you ~~remember submitting~~submitted an application for employment through Workday's job application platform since September 24, 2020 and were denied the position. **Please be sure to identify *all* employers that you remember applying to during the relevant time period, because this may affect your eligibility to join this Lawsuit.** You may, but do not have to, upload documentation of your job applications submitted through Workday's job application platform, to assist the third-party administrator in evaluating your eligibility. However, even if you upload documentation, you must still describe each one of your applications by manually entering information about each application in the Form fields.

The information you submit in your Form will be reviewed by a court-approved third-party administrator, who will decide if you may be eligible to join this Lawsuit as an ADEA ~~class~~ collective member. The third-party administrator's review is limited to determining whether any of the employers you listed on your Form are employers who enabled Workday's AI features during the time period in question.

The third-party administrator will treat the information you submit in your Form as confidential. It can only be shared for the reasons described below:

Only if you are found to be eligible to join the Lawsuit, the Form authorizes the third-party administrator to disclose to counsel for the parties in this Lawsuit (1) your name, birth date, and contact information; (2) the details (including documents) you have provided about your applications to employers who have enabled Workday's AI features ("Qualifying Applications").

Only if you are found to be eligible to join the Lawsuit, the Form authorizes counsel for the parties to this Lawsuit to (1) contact the employers who received your Qualifying Applications, and (2) receive from the employers all information and documentation regarding your Qualifying Applications, including personal identifying information, only for use in this Lawsuit. Authorizing the disclosure of your documents and information is necessary to determine whether you satisfy all the conditions for membership in the collective certified by the Court, so that you may remain a party to the Lawsuit.

If you are found ineligible to join the Lawsuit, and you wish to dispute this determination with the help of Plaintiffs' counsel, the Form authorizes Plaintiffs' counsel to receive your complete Opt-In Eligibility and Authorization Form.

By signing and submitting the Form, you consent to opt in and join the Lawsuit if you are deemed eligible. If you are found eligible, you will be automatically opted into the Lawsuit and will become a party without needing to take any further action.

If you do not complete and submit the Form by [60 days from the date notice is finalized], you will not be permitted to join the ~~Lawsuit~~ ADEA collective in the future.

**B.** **Legal Effect of Opting In**

If you are found eligible and are opted in to the Lawsuit, you will be bound by a favorable or unfavorable judgment on Plaintiffs' ADEA claim. If you do not opt in, you will be precluded from future participation in this case, including participation in any settlement related to the ADEA claim, but you may still bring your own separate lawsuit, depending on your situation.

No ADEA collective has been finally certified, and regardless of your initial eligibility recommendation, you may still be dismissed from the case.

## IV. NO RETALIATION PERMITTED
Federal law prohibits Workday from retaliating against you for "opting-in" to this Lawsuit or otherwise exercising your rights.

## V. YOUR LEGAL REPRESENTATION IF YOU JOIN
The Plaintiffs in this case are represented by:

[Plaintiffs' counsel's names and addresses]

If you have questions about this Notice or the Opt-In Eligibility and Authorization Form, you may contact the third-party administrator at _____ , or the attorneys listed above ("Plaintiffs' Counsel") at [EMAIL ADDRESSES].

If you want to join the Lawsuit, but you do not want to be represented by Plaintiffs' Counsel, you have the right to hire a different attorney or represent yourself. Contact the third-party administrator at any point to advise them if you do not want to be represented by Plaintiffs' Counsel.

**PLEASE DO NOT CONTACT THE COURT WITH QUESTIONS ABOUT THIS LAWSUIT.**

**OPT-IN ELIGIBILITY AND AUTHORIZATION FORM**
**(The Age Discrimination in Employment Act of 1967)**

By submitting this form, I am requesting an assessment of my eligibility to join the collective action Mobley v. Workday, Inc., case number 3:23-cv-0770-RFL ("Lawsuit"), pending in the Northern District of California Federal Court, which includes claims under the Age Discrimination in Employment Act of 1967 ("ADEA"). I understand and agree that whether I am eligible to join the Lawsuit will be determined based on my responses to the questions below and any supplemental information that I may be asked to provide.

By submitting this form, I am also consenting to formally opt in to join the Lawsuit as a member of the ADEA collective, if I am found to be eligible to do so. If I am eligible to join, I understand that I will be automatically opted in to the Lawsuit as a party without providing any further authorization.

My name is: _____
My birthdate is: _____
My address is: _____
My telephone number is:
My e-mail address is: _

[ ] By checking this box, I confirm that since September 24, 2020, I applied for at least one job using Workday, Inc.'s job application platform, I was 40 or older at the time I applied, and believe I believe I may be been was denied an employment recommendation.

Within the relevant time frame, I applied to the following job through the Workday, Inc. platform and believe that I was denied an employment recommendation [identify employer applied to, the job title, and date of application]:
                                                                                          .
[Select add additional job to complete the information for each job you applied to
and believe meets the criteria stated above.]

[ ] [Optional] I have uploaded the resume and/or job application with which I applied to these jobs to this Form. I understand that even though I have uploaded documentation of application(s), I must still describe the application(s) by manually entering the information in the Form.

[ ] If I am found to be eligible to join the Lawsuit, I consent to have [third-party administrator]

disclose to counsel for the parties to this Lawsuit (1) my name, birth date, and contact information; and (2) the details (including documents) I have provided about my applications to employers who have enabled Workday's AI features ("Qualifying Applications").

[ ] If I am found to be eligible to join the Lawsuit, I consent to have counsel for the parties to this Lawsuit (1) contact the employers who received my Qualifying Applications, and (2) receive all information and documentation regarding my Qualifying Applications, including personal identifying information, only for use in this Lawsuit. I authorize the employers to release this information to counsel for the parties to this Lawsuit.

[ ] I consent to opt in and join the collective action Mobley v. Workday, Inc., case number 3:23-0770-RFL in the California Northern District Federal Court, which includes claims under The Age Discrimination in Employment Act of 1967 ("ADEA"). I understand and agree that by joining in this action, I will be bound by any adjudication of the Court in this action. By submitting this form, I attest that I have fully and completely answered each of the questions posed herein to the best of my ability.

[ ] If I am found ineligible to join the Lawsuit, and I wish to dispute this determination with the help of Plaintiffs' counsel, I authorize Plaintiffs' counsel to receive my complete Opt-In Eligibility and Authorization Form.

My signature:

Date on which I signed this Notice: _____(today's date)