# Exhibit "D"

Lee Winston (admitted pro hac vice)
lwinston@winstoncooks.com
State of Alabama Bar No.:6407O72L
Roderick T. Cooks
rcooks@winstoncooks.com
State of Alabama Bar No.:5819O78R
Winston Cooks, LLC
420 20th Street North
Suite#2200
Birmingham, AL 35203
Telephone: (205) 482-3551
Facsimile: (205) 278-5876

Robert L. Wiggins, Jr.(admitted pro hac vice)
rwigginns@wigginschilds.com
Ann K. Wiggins (admitted pro hac vice)
awiggins@wigginschilds.com
Jennifer Wiggins-Smith
jsmith@wigginschilds.com
The Kress Building
301 19th Street North
Birmingham, Al 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

**LOCAL COUNSEL:**
Jay Greene
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108
Phone 415-905-0215
greeneattorney@gmail.com

**Attorneys for the Plaintiffs, Collective and Proposed Classes**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEREK L. MOBLEY, et al.,<br><br>Plaintiffs,<br><br>WORKDAY, INC.<br><br>Defendant. | DECLARATION OF RODERICK T. COOKS IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT |

## DECLARATION OF RODERICK T. COOKS

1. I, Roderick T. Cooks, hereby declare as follows, based on personal knowledge:

2. I am an attorney licensed to practice law in the State of Alabama. I am attorney with the firm Winston Cooks, LLC and represent Plaintiff and the putative classes in the above-referenced matter. I am over the age of eighteen and have personal knowledge of the matters stated herein.

3. The First Amended Complaint was filed on February 20, 2024. Dkt. 47. After it was filed, Plaintiffs' counsel learned of the proposed Class Representatives and their experiences with Workday.

4. Plaintiffs' counsel filed EEOC charges for the proposed Class Representatives, after the filing of the First Amended Complaint. (Dkt. 47).

5. Proposed Class Representatives Jill E. Hughes, Sheilah Johnson-Rocha, and FaithLinh Rowe have exhausted their administrative remedies by filing Charges of Discrimination against Workday with the Equal Employment Opportunity Commission and receiving their Notice of Right to Sue. Proposed Class Representative Rowe also received a Notice to Complainant of Right to Sue from the State of California Civil Rights Department.

6. Plaintiffs' counsel did not receive Notice of Right to Sue for the proposed Class Representatives until August 13, 2025, and is filing the Second Amended Complaint within the 90-days provided by Title VII and within one-year pursuant to Government Code section 12965.

7. Attached hereto as Exhibit E is a true and correct copy of Plaintiff's proposed Second Amended Complaint with a redline version.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 12, 2025

Roderick T. Cooks

Roderick T. Cooks

# Exhibit "E"

Lee Winston (admitted pro hac vice)
lwinston@winstoncooks.com
State of Alabama Bar No.:6407O72L
Roderick T. Cooks
rcooks@winstoncooks.com
State of Alabama Bar No.:5819O78R
Winston Cooks, LLC
420 20th Street North
Suite#2200
Birmingham, AL 35203
Telephone: (205) 482-3551
Facsimile: (205) 278-5876

Robert L. Wiggins, Jr.
rwigginns@wigginschilds.com
Ann K. Wiggins (admitted pro hac vice)
awiggins@wigginschilds.com
Jennifer Wiggins-Smith
jsmith@wigginschilds.com
The Kress Building
301 19th Street North
Birmingham, Al 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

**LOCAL COUNSEL:**
Jay Greene
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108
Phone 415-905-0215
greeneattorney@gmail.com

**Attorneys for the Plaintiff, Collective and Proposed Classes**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

DEREK L. MOBLEY, et al.,

Plaintiffs,

WORKDAY, INC.

Defendant.

CLASS ACTION

SECOND AMENDED COMPLAINT

JURY TRIAL DEMANDED

## NATURE OF COMPLAINT

Derek L. Mobley ("Mobley") Jill E. Hughes ("Hughes"), Sheilah Johnson-Rocha ("Johnson-Rocha") and Faithlinh Rowe ("Rowe") (collectively, "Representative Plaintiffs"), bring this suit for injunctive, monetary, and declarative relief against Defendant Workday, Inc. ("Workday" or "Defendant") for engaging in a pattern or practice of illegal discrimination on the basis of race (African American), sex (female), age (over 40), and/or disability in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967,

the ADA Amendments Act of 2008 ("ADAAA"), and the California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq. Defendant Workday, Inc.'s ("Workday" or "Defendant") continuous and systemic pattern or practice of discriminatory job screening—which includes the use of proprietary Large Language Models ("LLM"), Artificial Intelligence ("AI"), and Machine Learning ("ML") products to evaluate/screen applicants for employment—has a disparate impact on African American, female, over-40, and disabled applicants, including the Representative Plaintiffs and the proposed classes.

Workday provides human resource management services to medium-sized and large, global organizations that span numerous industry categories, including professional and business services, financial services, healthcare, education, government, technology, media, retail, and hospitality. Firms purchase a subscription to Workday's services and as part of their subscription, customers are provided applicant screening services to include professional consulting to enable them to use Workday applications. In May of 2023, the Bureau of Labor Statistics reported more than 9.8 million job openings in the U.S. Workday recruiting processed 2.2 million U.S. job requisition transactions in May, representing nearly 22% of all U.S. job openings that month. At that rate, Workday was projected to process more than 36 million requisitions, screen 266 million applications, and make 24 million job offers in 2023 alone. Workday processes this massive number of applications by using automated screening tools that rely on artificial intelligence.

Defendant Workday, Inc.'s artificial intelligence ("AI") systems and screening tools rely on algorithms and inputs created by humans who often have built-in motivations, conscious and unconscious, to discriminate. This discrimination is the result of a specific policy: Workday's decision to employ an automated system—in lieu of human judgment—to determine how the high-volume of applications it reviews should be processed for its clients-customers.

Specifically, Workday uses machine-learning algorithms and artificial-intelligence tools (collectively "algorithmic decision-making tools") to screen out applicants who are African-American, disabled, and/or over the age of 40. Defendant Workday's algorithmic decision-making tools and applicant screening system determine whether an employer should accept or reject an application for employment based on the individual's race, age, and or disability. All applicants who attempt to access employment via Workday's platform have been uniformly subject to this policy during the Class Period, including the Plaintiff and the proposed Class. It is thus reasonable to attribute any systematic difference in the rate of successful applicants to Workday's policy of using algorithmic decision-making tools to screen all applications. This causal connection is unsurprising: algorithmic decision-making tools have been known to cause bias in hiring.

Workday's automated system—for a variety of reasons that Workday should know about and could easily prevent—is much more likely to deny applicants who are African-American, suffer from disabilities and/or are over the age of 40. Because their applications are more likely to be flagged for rejection, African-American, disabled and over 40 applicants are disproportionately more likely to denied jobs. As a result, African-American, disabled, and those over 40, experience greater rates of rejection for employment which negatively impacts their career prospects, earnings, and quality of life.

The Plaintiff and, upon information and belief, the classes he seeks to represent have made numerous applications for employment using the Workday platform only to be rejected. Because of this high rate of rejection, Plaintiff, and the classes he seeks to represent have also been discouraged from seeking employment with firms that use the Workday hiring platform as such application is futile because of Workday's discriminatory algorithmic decision-making tools. The hiring discrimination African-Americans, the disabled, and those over the age of 40

have experienced and are experiencing because of Workday's discriminatory algorithmic decision-making tools cause tangible financial harm, and are unreasonable, vexatious, and humiliating. Accordingly, Plaintiffs seek damages as well as declaratory and injunctive relief.

**JURISDICTION AND VENUE**

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), and (4),2201 and 2202, 42 U.S.C. 2000d-2 and 2000e5(f), and 29 U.S.C. § 621, et seq. Supplemental jurisdiction for the state law claims are invoked pursuant to 28 U.S.C. §1367.

2. This is a suit authorized and instituted pursuant to the Act of Congress known as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., as amended, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., and the ADA Amendments Act of 2008 ("ADAAA").

3. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(B) & (c) because Workday is located here and the acts complained of occurred in the Northern District of California.

**PARTIES**

4. Plaintiff, Derek Mobley is an African -American male, over the age of forty (40) and who suffers from depression and anxiety. Mobley is an applicant.

5. Plaintiff Jill E. Hughes is a female over the age of 40. She has a disability as defined under the ADAAA. Hughes is a qualified professional who has applied for positions through Workday's platform and has been disproportionately affected by the Defendant's proprietary AI/ML products, which have a disparate impact on female, disabled and over-40 applicants. Beginning on or about April 15, 2024, Hughes experienced rejections exemplifying this impact. Hughes has opted in as part of the age collective action. [See, Dkt. 103-1].

6. Plaintiff Sheilah Johnson-Rocha is an African American female over the age of 40. Johnson-Rocha is a qualified professional who has applied for positions through Workday's platform and has been disproportionately affected by the Defendant's proprietary AI/ML products, which have a disparate impact on African American, female, and over-40 applicants. On or about September 3, 2024, Johnson-Rocha experienced rejections exemplifying this impact. Johnson -Rocha has opted in as part of the age collective action. [See, Dkt. 103-1].

7. Plaintiff Faithlinh Rowe is a female over the age of 40. Rowe is a qualified HRIS professional with extensive HR experience. She has applied for multiple positions through Workday's platform, including directly to Workday, Inc., and has been disproportionately affected by the Defendant's proprietary AI/ML products, which have a disparate impact on female and over-40 applicants. Rowe has opted in as part of the age collective action. [See, Dkt. 122-1].

8. Defendant Workday is an agent of employers who have delegated to it authority to make decisions in the hiring process, including by relying on the results of selection procedures that Workday administers on the employers 'behalf to make hiring decisions, alternatively Workday is an indirect employer because it controls access to employment opportunities. Defendant Workday's headquarters and principal place of business is located at 6110 Stoneridge Mall Road, Pleasanton, California.

**CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII, THE ADEA AND THE ADAAA**

9. On June 3, 2021, Mobley filed a charge of discrimination with the Oakland Field Office of the United States Equal Employment Opportunity Commission. On July 19, 2021, Mobley filed an amended charge of discrimination. On November 22, 2022, the EEOC issued Mobley a Dismissal and Notice of Right to Sue, giving him ninety-days from its receipt to file a case.

10. Thus, Mobley has satisfied all prerequisites to bring this action pursuant to Title VII, the ADEA, and the ADAAA.

## CLASS ACTION ALLEGATIONS

11. The Representative Plaintiff brings this action in his own behalf and on behalf of all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and seek to represent the following subclasses:

•All African-American applicants or former applicants who from September 24, 2020, to the present were subjected to the challenged discriminatory screening process.

• All female applicants or former applicants who from November 8, 2023, to the present were subjected to the challenged discriminatory screening process.

•All applicants or former applicants over the age of forty (40) who from September 24, 2020, to the present were subjected to the challenged discriminatory screening process.

•All applicants or former applicants who have a diagnosed mental health or cognitive condition who from September 24, 2020, to the present were required to take a Workday branded cognitive assessment or personality tests as part of the application process.

Mobley in the case at bar challenges systemic discrimination by, and seeks class-wide relief against, Workday for its utilization of discriminatory screening tools as part of its employment policies and procedures which constitute a pattern and practice of discrimination on the basis of race, age, and disability with respect to selections. These screening tools have been continuously utilized by the Defendant since at least 2017, and their implementation and use has personally harmed the named Plaintiff, and the putative class members he seeks to represent. Workday's client-customers delegate to it the hiring process, recruitment, and onboarding of employees. Workday then utilizes screening tools, to include Workday branded assessments and/or tests, to process and interpret an applicant's qualifications and recommend whether the applicant should be accepted or rejected.

Workday's utilization of these screening tools relies upon subjective practices which have caused disparate impact and disparate treatment to applicants who are African-American, over the age of forty (40) or and/or disabled. Applicants who are not members of these protected groups and who are similarly situated to the Representative Plaintiff, have not been subjected to such discriminatory treatment.

**A. COMMON QUESTIONS OF LAW AND FACT**

12. The prosecution of the claims of the Representative Plaintiffs requires adjudication of numerous questions of law and fact common to his individual claims and those of the putative classes he seeks to represent. The common questions of law would include, inter alia: (a) whether the Defendant's screening products cause African-American, individuals over the age of forty (40), and/or individuals with a disability to be disproportionately and more likely denied employment; (b) whether the Defendant's doing so cannot be justified as a necessary business practice for evaluating potential employees; and (c) whether the Defendant's screening products have a disparate impact on applicants who are African-American, over the age of forty (40), and/or disabled in violation of the "Civil Rights Act of 1964," 42 U.S.C. § 2000 et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., and the ADA Amendments Act of 2008 ("ADAAA"). The common questions of fact would include, inter alia: (1) whether Workday's administration of its screening products discriminated against the aforementioned applicants because of their race, age, and/or disability with regards to hiring; (2) whether compensatory and punitive damages, injunctive relief, and other equitable remedies for the class are warranted; and (3) whether Workday discriminated against the aforementioned protected groups in other terms and conditions of employment. The details of the Representative Plaintiffs' claims are encompassed within the claims prosecuted on behalf of the class and set forth in this Complaint.

**B. TYPICALITY**

13. The claims of the Representative Plaintiffs are typical of those of the members of the class. The Representative Plaintiffs and all class members have been and are similarly adversely affected by the systemic racially discriminatory practices complained of herein. Specifically, the representative claims, like those of the class members, arise out of Defendant's pervasive discriminatory conduct with regard to aforementioned discrimination in hiring and other terms and conditions of employment. The relief necessary to remedy the claims of the Representative Plaintiffs is the same relief that is necessary to remedy the claims of the putative class members in this case.

The Representative Plaintiffs seek the following relief for individual claims and class claims asserted herein: (1) declaratory judgment that Defendant has engaged in systemic discrimination against African-Americans, individuals over the age of forty (40), and/or the disabled; (2) a permanent injunction against such continuing discrimination; (3) injunctive relief which reforms Workday's screening products, policies, practices and procedures so that the Representative Plaintiffs and the class members will be able to compete fairly in the future for jobs and enjoy terms and conditions of employment traditionally afforded similarly situated employees outside of the protected categories; (4) backpay, front pay, compensatory damages, and other equitable remedies necessary to make the Plaintiffs, and the class, whole from Workday's past discrimination; and, (5) attorneys' fees, costs, and expenses.

**C. NUMEROSITY AND IMPRACTICABILITY OF JOINDER**

14. The class that the Representative Plaintiffs seek to represent is too numerous to make joinder practicable. The proposed class consists of numerous former, current, and future applicants who have been denied employment due to the discriminatory administration of

Workday's screening products. Workday's pattern or practice of discrimination also makes joinder impracticable by making it impractical and inefficient to identify many members of the class prior to the determination of the merits of Workday's class wide liability. Thus, the number of class members is currently indeterminate, but is certainly numerous.

### D.    ADEQUACY OF REPRESENTATION

15.    The Representative Plaintiffs will fairly and adequately protect the interests of the class inasmuch as they are broadly representative, as reflected in the preceding paragraphs. There are no conflicts of interest present with the members of the proposed class as each would benefit from the imposition of a remedy for the Defendant's discriminatory employment practices. The Representative Plaintiffs has retained counsel experienced in litigating major class actions in the field of employment discrimination, and who are prepared and able to meet the time and fiscal demands of class action litigation of this size and complexity. The combined interest, experience, and resources of the Representative Plaintiffs and their counsel to litigate competently the individual and class claims of employment discrimination at issue satisfy the adequacy of representation requirement under Fed.R.Civ.P. 23(a)(4).

### E.    EFFICIENCY OF CLASS PROSECUTION OF COMMON CLAIMS

16.    Certification of a class of similarly-situated applicants is the most efficient and economical means of resolving the questions of law and fact that are common to the individual claims of the Representative Plaintiffs and the proposed class. The individual claim of the Representative Plaintiffs require resolution of the common question of whether Defendant has engaged in a systemic pattern of discrimination against African-Americans, those over forty (40) and the disabled. The Representative Plaintiffs seek remedies to undo the adverse effects of such discrimination in his own life and career. The Representative Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on him individually and

on the putative classes he seeks to represent, in general. In order to gain such relief for himself, as well as for the putative class members, the Representative Plaintiffs will first establish the existence of systemic discrimination as the premise of the relief they seek. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the subclasses affected by the common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Representative Plaintiffs, the classes and the Defendant. The Representative Plaintiffs' individual and class claims are premised upon the traditional bifurcated method of proof and trial for systemic disparate treatment claims of the type at issue in this complaint. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

**F. CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(b)(2)**

17. Workday has acted on grounds generally applicable to the Representative Plaintiffs and the proposed class by adopting and following systemic practices and procedures that discriminate on the basis of race, age, and/or disability. Workday's screening products are regularly used to discriminate on the basis of race, age, and/or disability. Workday has refused to act on grounds generally applicable to the putative class by: (1) refusing to adopt or follow screening productions and selection procedures which do not systemically discriminate on the basis of race, age, and/or disability. Workday's discriminatory screening products have made appropriate final injunctive relief and declaratory relief with respect to the class as a whole. The injunctive relief and declaratory relief are the predominate reliefs sought because they are both the cumulation of the proof of the Defendant's individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the Representative Plaintiffs and the

classes members entitlement to monetary and non-monetary remedies at Stage II of such a trial. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against individuals on the basis of race, age, and/or disability. Such relief is the factual and legal predicate for the Representative Plaintiffs and the class members entitlement to injunctive and equitable remedies caused by such systemic discrimination.

**G. ALTERNATIVELY CERTIFICATION IS SOUGHT PURSUANT TO FED. R.CIV. P. 23(b)(3)**

18. The common issues of fact and law affecting the claims of the Representative Plaintiffs and proposed class members, including, but not limited to, the common issues identified above, predominate over any issues affecting only individual claims. A class action is superior to other available means for the fair and efficient adjudication of the claims of the Representative Plaintiffs and members of the proposed classes. The cost of proving the Defendant's pattern or practice of discrimination makes it impracticable for the named Plaintiffs and members of the proposed class to control the prosecution of their claims individually. The Northern District of California is the most logical forum in which to litigate the claims of the Representative Plaintiffs and the proposed class in this case because the Defendant's home office is here and it engages in or ratifies illegal conduct adversely affecting the Plaintiff here.

**H. ALTERNATIVELY, CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(c)(4) FOR INJUNCTIVE AND DECLARATORY RELIEF**

19. Alternatively, claims for injunctive and declaratory relief for the Injunctive Relief Class are properly certified under Federal Rule of Civil Procedure 23(c)(4) because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

### I. ALTERNATIVELY, CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(c)(4) FOR CLASS WIDE LIABILITY

20. Alternatively, class wide liability claims are properly certified under Federal Rule of Civil Procedure 23(c)(4) for the Classes because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

### J. PUNITIVE DAMAGES MAY ALTERNATIVELY BE CERTIFIED PURSUANT TO FED.R.CIV.P. 23(b)(2).

21. Punitive damages liability may alternatively be certified under Federal Rule of Civil Procedure 23(b)(2) because such relief focuses on the conduct of Workday and not the individual characteristics of the Plaintiffs and are an allowable form of incidental monetary relief.

## CLAIMS OF REPRESENTATIVE PLAINTIFFS

### Derek Mobley

22. Derek L. Mobley is an African-American male. He is over the age of forty (40) and suffers from anxiety and depression. Mobley was born in 1974.

23. Mobley is a graduate of Morehouse College in Atlanta, Georgia.

24. Founded in 1867, Morehouse College remains the only all-male Historically Black College or University in the world.

25. Graduates of Morehouse include Martin Luther King Jr., U.S. Senator Raphael Warnock, Shelton "Spike" Lee (award winning filmmaker), Samuel L. Jackson (award winning actor), and Jeh Charles Johnson (Obama Administration's Secretary of Homeland Security) to name a few.

26. Mobley graduated Morehouse in 1995 with a bachelor's degree in finance, cum laude.

27. Mobley is also an honors graduate of ITT Technical Institute. He is also Server+ Certified.

28. Since 2010, Mobley has worked in various financial, IT help-desk and customer service-oriented jobs.

29. Jobs and positions Mobley has occupied since graduating college include:

a. Capitol City Bank & Trust Company-Special Assets Manager/Commercial Credit Analyst;

b. Internal Revenue Service-Customer Service Representative;

c. AT&T Digital Life-Support Specialist, Level 1A Manager;

d. Bank of America-Card Services Collections Supervisor;

e. GE Capital-Floor Plan Account Manager;

f. DSD Mortgage, LLC-Owner and Manager Mortgage Company;

g. EAN Services, Inc. (Enterprise Rental Car)-Insurance Callbacks Representative;

h. Hewlett Packard Enterprise (HPE)-Advanced Solutions Engineer;

i. Uber Technologies-Contract Driver; and,

j. Allstate-Claims Dispatcher and Workflow Processor/Catastrophe Controller.

30. Mobley possesses extensive knowledge in multiple critical roles within the Enterprise server, banking, finance, and insurance industries.

**Jill E. Hughes**

31. Jill E. Hughes is a white female. She is over the age of 40 and is a cancer survivor with a current asthma diagnosis. Ms. Hughes 'date of birth is February 4, 1974.

32. Ms. Hughes has a B.A. from the University of Cincinnati and an M.A. from the University of Chicago and has more than 28 years of executive-level experience in her

professional career as a Senior Medical Writer, Project Manager, and Scientific Director with experience writing/strategizing for major media as well as the corporate and medical arenas.

33. Since December of 2023, Ms. Hughes has applied for hundreds of positions that use Workday, Inc. as a screening tool for sourcing, recruiting, talent acquisition and/or hiring.

34. Examples of employers that she has submitted applications to include 3M; Cigna; Veralto; Stryker; Becton Dickinson; FIS Global; General Electric; Huntington; and Parsons Corporation. She has been denied employment each time.

35. The companies listed above have sent at least one automated rejection for role(s) for which she met or exceeded the posted hiring requirements.

36. In some cases, the automated rejection emails stated "You do not meet the minimum requirements for this role" even though I met or exceeded all posted requirements based on my professional resume and portfolio of prior work.

37. Automated rejections were often received within minutes or a few hours of applying and were often sent at odd times outside of business hours (ie, 2:40 a.m. on a Sunday morning; 11:00 pm on a weekday), indicating a human did not review the applications.

**Sheilah Johnson-Rocha**

38. Sheilah Johnson-Rocha is an African-American female. She is over the age of 40. Ms. Johnson-Rocha's date of birth is January 30, 1983.

39. Ms. Johnson-Rocha has three college degrees: (1) an Associates in Arts (Business Administration); Bachelor of Business of Administration; and, a Master of Science-Major in Management. She also possesses various certifications within the pharmaceutical and biotechnology industry. She has worked in the pharmaceutical and biotechnology industries for the past 21 years.

40. Since March 2023, Ms. Johnson-Rocha has submitted approximately 2,000 job applications to various pharmaceutical and biotech companies.

41. A large majority of the companies to which she has applied use Workday's job application platform. Upon information and belief, her qualifications and experience exceeded all criteria in the job requisitions for each of the roles for which she applied, however almost all of her applications were met with an automated rejection notification.

42. Furthermore, many of the jobs for which she applied were not filled and are continuously re-posted. When the jobs are re-posted, she re-applied only to receive an automated rejection email.

43. In some cases, the automated rejection emails stated "You do not meet the minimum requirements for this role" even though she met or exceeded all posted requirements based on her professional resume. Automated rejections were often received within a few hours of applying or were sent at odd times outside of business hours, indicating a human did not review the applications.

**Faithlinh Rowe**

44. Faithlinh Rowe is an Asian-American female. She is over the age of 40. Ms. Rowe was born in 1981.

45. Ms. Rowe is a qualified HRIS professional with extensive HR experience.

46. She has unsuccessfully applied for multiple positions through Workday's platform, including directly to Workday, Inc.

47. On July 15, 2024, Rowe applied for an Associate Director HR Technology position at AT&T via the Workday platform.

48. Upon submission, her application was immediately rejected despite her qualifications, deeming her no longer under consideration.

49. How Workday's AI/ML screens applications remain a mystery to the applicants like Ms. Rowe.

**How Algorithmic Discrimination Works**

50 Defendant Workday unlawfully offers "algorithmic decision-making tools" that power applicant screening systems that in turn determine whether an employer should accept or reject an application for employment based on the individual's race, age, and or disability.

51. Today, discrimination is perpetuated through businesses seeking efficiencies by embracing automation and data mining. Employers use algorithmic models to quickly analyze large numbers of applications automatically based on given criteria such as keywords, skills, former employers, years of experience and schools attended ("data mining") to detect patterns and assist in making future decisions ("data analytics").

52. Data mining learns by example and accordingly what a model learns depends on the examples to which it has been exposed.[1] "Biased training data lead to discriminatory models."

53. For hiring purposes data is mined on the front-end from applications via an Applicant Tracking System ("ATS), which can be located on the company's website or extracted from applicants on job boards. An applicant tracking system (ATS) is a software application that enables the electronic handling of recruitment and hiring needs. Most job and resume boards (Reed Online, LinkedIn.com, Monster.com, Hotjobs, CareerBuilder, Indeed.com) have partnerships with ATS software providers to provide parsing support and easy data migration from one system to another.

54. Newer applicant tracking systems (often the epithet is next-generation) are

[1]"Biased training data lead to discriminatory models." 1 Solon Barocas and Andrew D. Selbst, Big Data's Disparate Impact, California Law Review Vol. 104, No. 3 (June 2016), pp. 671-732.

Platforms as a service, where the main piece of software has integration points that allow providers of other recruiting technology to plug in seamlessly. The ability of these next-generation ATS solutions allows jobs to be posted where the candidate is and not just on-job boards. This ability is being referred to as omnichannel talent acquisition.

55. So-called "machine-learning" algorithms are designed to learn based upon the algorithm's access to a designated data set or an algorithm-driven search for data residing within an ATS.

56. Unfortunately, algorithms too often have discriminatory effects, even where demographic data such as race, age, and disability are not included as inputs. This is because algorithms can "learn" to use omitted demographic features by combining other inputs that are correlated with race (or another protected classification), like zip code, college attended, and membership in certain groups.

57. Moreover, if the data mined is based on the intentional prejudices or biases of prior trainers or a lack of diversity in the data set, data mining will learn from the unlawful example that these decisions furnish.

58. To illustrate, Amazon famously abandoned a facially neutral hiring algorithm in 2017 because of its disparate impact on female candidates. There, the training data presented to the algorithm consisted of resumes submitted to Amazon by applicants over a 10-year period, without presenting data to the algorithm explicitly indicating the applicants 'gender. But most of these applicants were white males. Rather than sort candidates by qualifications or merit, the algorithm learned to favor male candidates by prioritizing language more commonly used by males, penalizing the word "women's" in resumes, and devaluing candidates who had graduated from all-women's colleges.

59.    The algorithm simply drew inferences from a biased sample of the population (in the Amazon case all white males) and simply reproduced that prejudice which disadvantaged female applicants.

60.    Upon information and belief, Workday determines which candidates to recommend based on the demonstrated interests of its client-employers in certain types of candidates, Workday will offer recommendations that reflect whatever biases employers happen to exhibit.

61.    Upon information and belief, if Workday's algorithmic decision-making tools observe that a client-employer disfavors certain candidates who are members of a protected class, it will decrease the rate at which it recommends those candidates. Thus, the recommendation algorithmic decision-making tool caters to the prejudicial preferences of the client-employer.

62.    Algorithmic decision-making and data analytics are not, and should not be assumed to be, race neutral, disability neutral, or age neutral. Too often, they reinforce and even exacerbate historical and existing discrimination.

63.    For example, a 2019 study found that a clinical algorithm that many hospitals were using to determine which patients need care was biased: Black patients assigned the same level of risk—and thus allocated the same health care resources—were much sicker than white patients. This happened because the algorithm had been trained on historical health care spending data, which reflects a history in which Black patients had less money to spend on their health care than white patients. From this, the algorithm falsely concluded that Black patients were healthier than equally sick white patients.

64. Academics and government actors alike have cautioned that when approached without appropriate forethought and oversight, data analytics "can reproduce existing patterns of discrimination, inherit the prejudice of prior decision makers, or simply reflect the widespread biases that persist in society. It can even have the perverse result of exacerbating existing inequalities by suggesting that historically disadvantaged groups actually deserve less favorable treatment."

65. Indeed, according to Federal Trade Center ("FTC") Commissioner Kelly Slaughter, "[i]n recent years, algorithmic decision-making has produced biased, discriminatory, and otherwise problematic outcomes in some of the most important areas of the American economy. These harms are often felt most acutely by historically disadvantaged populations, especially Black Americans and other communities of color." Interest in the susceptibility of data analytics and algorithmic decision-making to bias has become increasingly widespread.

66. For example, in 2022, the California Department of Insurance released the bulletin Allegations of Racial Bias and Unfair Discrimination in Marketing, Rating, Underwriting, and Claims Practices by the Insurance Industry, which declared that:

"technology and algorithmic data are susceptible to misuse that results in bias, unfair discrimination, or other unconscionable impacts among similarly-situated First Amended Class Action Complaint consumers. A growing concern is the use of purportedly neutral individual characteristics as a proxy for prohibited characteristics that result in racial bias, unfair discrimination or disparate impact. The greater use by the insurance industry of artificial intelligence, algorithms, and other data collection models have resulted in an increase in consumer complaints relating to unfair discrimination in California and elsewhere. . . ."

67. Upon information and belief, Workday's algorithmic decision-making tools lack sufficient guardrails to prevent discrimination. The conscious failure to include such guardrails is intentional and shows a reckless disregard for the anti-discrimination laws.

68. Further, lack of guardrails creates a phenomenon referred to as AI drift. AI drift occurs when an AI system's performance and behavior change over time, often due to the evolving nature of the data it interacts with and learns from. This can result in the Artificial intelligence system making predictions or decisions that deviate from its original design and intended purpose. "AI drift can perpetuate or amplify existing biases present in training data, leading to discriminatory or unfair outcomes. For instance, a hiring AI might start favoring certain demographics or perpetuating gender or racial biases" . . .i.e. disparate impact.

69. Donald Tomaskovic-Devey, a sociology professor who heads the Center for Employment Equity commented as follows on Workday's diversity "Workday's website makes strong claims of corporate commitment to diversity, but at 2.4% Black, it is one of the poorest performing tech companies I have encountered."

70. Safiya Umoja Noble, Associate Professor, University of California, Los Angeles explained "The use of automated HR technologies has already shown many failings with respect to ensuring diversity -- and, in fact, many undermine it by screening out qualified women and perpetuating discrimination against African Americans who don't 'whiten' their resumes, who are often evaluated through software screening systems." Limited diversity in the workforce responsible for creating models for training leads to bias in data mining which in turn leads to discriminatory and biased selection decisions.

**<u>Mobley's Applications</u>**

71. Since 2017, Mobley has applied for over 100 positions that exclusively use

Workday, Inc. as a screening platform for talent acquisition and/or hiring. Each time he has been denied.

72. Workday is currently used by more than 10,000 organizations around the world and across industries—from medium-sized businesses to more than 50 percent of the Fortune 500.6 The Workday customer community has 65 million users, and as of April 2023, nearly one in four of all U.S. job openings was processed on the Workday platform.[6]

73. Mobley's application process generally began with him responding to a job advertisement or posting by a prospective employer on a third-party website such as LinkedIn, Indeed, Monster, or Careerbuilders.

74. Mobley then clicks on the job advertisement or posting link which directs him to the Workday platform on the employer's website.

75. For example, a job posting or advertisement link for Hewlett Packard Enterprise would say hpe@myworkday.com.

76. Mobley would then be prompted by the Workday platform to create a username and password to access the employment opportunity.

77. After creating a username and password, Mobley would then upload his resume` or enter his information manually. Mobley's resume` includes his graduation from Morehouse, a leading Historically Black College or University, and shows his extensive employment history which could be assessed as a proxy for age.

78. Numerous positions for which Mobley applied required him to take a Workday branded assessment and/or personality test.

79. Upon information and belief, these assessments and personality tests are unlawful

---

[6]https://newsroom.workday.com/company-overview

disability related inquiries designed to identify mental health disorders or cognitive impairments and have no bearing on whether Mobley would be a successful employee.

80. These assessments and personality tests are likely to reveal mental health disorders and cognitive impairments and test for characteristics that correlate with them.

81. Persons with these disorders and impairments are likely to perform worse on these assessments and tests and be screened out. Mobley suffers from depression and anxiety.

82. Upon information and belief, these tests are “disability inquiries” and/or “medical examinations” in that they are designed to reveal mental-health disorders such as excessive anxiety, depression, and certain cognitive impairments.

83. In September 2017, Mobley applied for a position with Hewlett Packard Enterprise, a company for which he was already working on a contract basis, via hpe@myworkday.com.

84. His application was for a Service Solutions Technical Consultant’s position whose qualifications mirrored the position he occupied at the time.

85. On October 16, 2017, Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

86. In September 2018, Mobley applied for a Fraud Analyst position with Equifax, via equifax@myworkday.com.

87. On October 1, 2018, Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

88. On September 23, 2018, Mobley applied for a Corporate Travel Consultant’s position with Expedia, via expedia@myworkday.com.

89. On October 2, 2018, at 2:19 a.m., Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

90. On March 31, 2019, Mobley applied for a Claim Support Representative's position with Fiserv, via fiserv@myworkday.com.

91. The very next morning, April 1, 2019, at 9:40 a.m., Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

92. In June 2019, Mobley applied for a Help Desk Support Technician with the NCR Corporation, via ncr@myworkday.com.

93. On June 20, 2019, Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

94. On August 31, 2019, Mobley applied for an Associate Customer Care Specialist position with Duke Energy, via dukeenergy@myworkday.com.

95. As part of the application process, Mobley was required to complete a Workday branded assessment for which he received no feedback.

96. Mobley was rejected for this position and was never notified as to why, even though he met its experiential and educational requirements.

97. Upon information and belief, the Workday branded assessment Mobley took was not "bias free" as claimed in its marketing materials.

98. Again, on August 31, 2019, Mobley applied for a Customer Service Representative position with Unum, via unum@myworkday.com.

99. That same day at 12:52 a.m., Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

100. On September 1, 2019, Mobley applied for a Purchase Specialist position with Quicken Loans, via the Quicken Loans Workday System quickenloans@myworkday.com.

101. On September 3, 2021, Mobley was notified of his rejection for this position via

email, even though he met its experiential and educational requirements.

102. On March 25, 2021, Mobley applied for a Service Center Representative position with Sedgwick, via sedgwick@workday.com.

103. On April 6, 2021, Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

104. On April 1, 2021, Mobley applied for a Virtual Telesales Representative position with Comcast, via comcast@myworkday.com.

105. On April 12, 2021, Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

106. On January 29, 2022, at 12:55 a.m., Mobley applied for a Customer Services Specialist [Full-time or Part-time & remote working] with Unum, via unum@myworkday.com.

107. Less than one-hour later [1:50 a.m.], Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements. Clearly, Mobley's applications are being processed by Workday's algorithmic decision-making tools.

108. On January 9, 2024, Mobley applied for a Customer Support Representative position with ResMed, via resmed@myworkday.com.

109. On January 11, 2024, at 3:52 a.m., Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

110. Despite being qualified, and in many instances over-qualified, Mobley has not been successful at securing employment with any employer that uses the Workday platform as a screening tool for applicants.

111. Mobley has applied to firms that form Workday's core business which is medium-sized and large, global organizations that span numerous industry categories, including professional and business services, financial services, healthcare, education, insurance, government, technology, media, retail, and hospitality.

112. Firms purchase a subscription for Workday's services and as part of their subscription, customers are provided support services, including professional consulting, to enable them to delegate their human resource hiring function to the Workday platform.

113. Workday acts as an agent on behalf of the employers, who have delegated their employment hiring decision-making authority to it.

114. Acting expressly or impliedly and at the direction of employers, Workday denied Mobley and the putative class members employment unless they participated in the Workday platform. The Workday platform is the only way to gain employment with these employers.

115. Workday's subscription-based service reflects an on-going relationship with their client-employers and includes significant engagement in the process of hiring employees.

116. Workday's website states that it can "reduce time to hire by automatically dispositioning or moving candidates forward in the recruiting process."

117. In what it terms "Talent Management" Workday's systems source candidates and then use algorithmic decision-making tools to recommend job opportunities.

118. Workday's marketing materials state that "[a]dditionally, we offer extensive customer training opportunities and a professional services ecosystem of experienced Workday consultants and system integrators to help customers not only achieve a timely adoption of Workday but continue to get value out of our applications over the life of their subscription."

119. Workday's relationships with its client-employers are not one-off transactions but ongoing business arrangements where employers delegate their hiring function Workday who in turn uses its algorithmic decision-making tools to screen out applicants who are African-American, disabled, and/or over the age of 40.

120. As stated previously, a prospective employee can only advance in the hiring process if they get past the Workday platforms screening algorithms.

121. Workday embeds artificial intelligence ("AI") and machine learning ("ML") into its algorithmic decision-making tools, enabling these applications to make hiring decisions.

122. Workday's AI and ML also enables incumbent employees at firms to participate in the talent acquisition process by making referrals and recommendations. Workday does this by integrating pymetrics into its algorithmic decision-making tools for applicant screening.

123. The pymetrics Workday Assessment Connector is supposed to use neuroscience data and AI to help client-employers make their hiring and internal mobility decisions more predictive, and free of bias.

124. Upon information and belief, these algorithms are only trained on incumbent employees at a company, allowing the pymetrics Workday Assessment Connector to build a homogenous workforce not representative of the applicant pool.

125. Similarly, Workday also encourages and uses the recommendations of incumbent employees for hiring decisions. Upon information and belief, this facially neutral employment practice has a differential effect upon African-Americans, the disabled, and workers over the 40, because any lack of work force diversity allows for incumbent employees to consciously or unconsciously refer or recommend few, if any members of these protected classes.

126. These systems of recruiting new workers operate to discriminate against African-Americans, workers over the age of 40, and the disabled because they lock in the status quo.

127. A wealth of literature discusses the potential for bias resulting from algorithmic decision-making. As the FTC has acknowledged, algorithmic bias is everywhere. Mounting evidence reveals that algorithmic decisions can produce biased, discriminatory, and unfair outcomes in a variety of high-stakes economic spheres including employment, credit, health care, and housing.

128. In the housing context in particular, tools infected with bias are integrated into home financing, leasing, marketing, sales, and zoning decisions. For example, a 2021 report analyzing more than 2 million conventional mortgage applications found that lenders who processed applicants through Fannie Mae and Freddie Mac's FICO algorithms were 80% more likely to reject Black applicants than financially equivalent white applicants.

129. Using their "AI", "ML", assessments, tests, and pymetrics to make job recommendations (algorithmic decision-making tools) or control access to jobs (equitable or otherwise), makes Workday an agent for its client-employers.

130. Client-employers delegate to Workday certain aspects of the employers 'selection decisions as to Mobley and the putative Class Members.

131. Chief among those was the decision to screen out Class Members from gaining employment.

132. Employers directed job applicants to the Workday job screening platform which then determines if they receive a job.

133. According to Workday's Marketing Materials, "Our skills intelligence foundation helps you build diverse teams by expanding candidate pools with equitable, AI- and ML-driven job recommendations."

134. Disposing of candidates "en masse" through the use of algorithmic decision-making tools delegates to Workday the responsibility to oversee the applicant hiring process.

135. This process is the only means an employee who applies for a job with an employer who uses the Workday platform can obtain employment.

136. Workday is contracted to provide these services.

137. Workday's ability to limit the employment opportunities of Mobley and the putative Class Members directly interferes with any direct employment relationship between them and prospective employers.

138. Workday's client contracts with them to provide these services via their algorithmic screening tools.

139. Workday is an indirect employer by virtue of its ability to discriminatorily interfere and exert peculiar control over the prospective employee's relationship with the direct employer.

140. Representative Plaintiff Mobley is challenging the use of these common discriminatory screening tools per se, and not merely the individualized manifestations of their use, the fact that the common components may vary to some small degree or be applied by different customers is of no consequence.

141. Individuals impacted the same way by these processes number in the thousands if not tens of thousands.

142. The selection tools, assessments, and/or tests utilized by Workday, Inc. in making selection decisions-to include screening and hiring applicants discriminate on the basis of race in violation of §703(k) of Title VII, 42 U.S.C. §2000e-2(k).

143. Upon information and belief, these processes disparately impact African-American applicants because they have the effect of disproportionately excluding African-Americans from jobs.

144. Furthermore, these selection procedures are not job-related, nor are they consistent with any business necessity.

146. Workday, Inc. is an employment agent because employers delegate to them the authority to act on the employer's behalf and rely on Workday's recommendation on whom to hire.

147. Upon information and belief, Mobley and other African-Americans have been discriminated against because of their race (African-American), in violation of Title VII Civil Rights Act of 1964, as amended.

148. Furthermore, the screening tools, to include assessments and tests, marketed by Workday for the administration of its products discriminate on the basis of disability in violation of the ADA Amendments Act of 2008 (ADAAA).

149. Upon information and belief, these screening tools disparately impact disabled applicants because they have the effect of disproportionately excluding individuals with disabilities. Furthermore, the screening tools are not job-related, nor are they consistent with any business necessity.

150. Finally, the screening tools marketed by Workday for hiring applicants discriminate on the basis of age in violation of the Age Discrimination in Employment Act of 1967 (ADEA).

151. Upon information and belief, these screening tools disparately impact applicants over the age of 40 because the assessments and/or tests have the effect of disproportionately excluding them. Furthermore, they are not job-related, nor are they consistent with any business necessity.

**COUNT ONE**

**Intentional Employment Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

152 Plaintiffs recognize that the Court has previously dismissed Count One stated in ¶¶ 130-137 of the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

**COUNT TWO**

**Disparate Impact Discrimination on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964 and Disability in Violation of the ADAAA of 2008 Class Representatives Derek L. Mobley, Jill E. Hughes and Sheilah Johnson-Rocha**

153. Plaintiffs restate and incorporate ¶¶ 50-151 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count..

154. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis of race or gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September, 2024. Such Workday reported data shows that Workday's job application platform and AI screening process has disparate impact against African-Americans at a statistically significant rate of greater than 15.25 standard deviations from what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process is race neutral.

155. That degree of racial disparity is equivalent to odds greater than one in a quadrillion that such process and AI features do not disproportionately impact African Americans.

156. That same data for 724,352 applicants for employment with ten of Workday's largest customers also shows that Workday's job application platform and AI screening and selection process has disparate impact against women greater than 36.5 standard deviations. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

157. It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

158. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

159. Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

160. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

161. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM)

software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

162. Since April 29, 2024. HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer-employers.

163. The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024, including, but not limited to, Plaintiffs Jill E. Hughes Sheliah Johnson-Rocha, Faithlihn Rowe and others.

164. Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater than three standard deviations from what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

165. Representative Derek L. Mobley, an African-American male who is diagnosed with anxiety and depression.

166. Representative Plaintiff Mobley's diagnoses are covered by the ADAAA of 2008.

167. He is a cum laude graduate of Morehouse College with a bachelor's degree in finance and is an honors graduate of ITT Technical Institute, holding a Server+ certification.

168. Representative Plaintiff Mobley is a qualified professional who has applied for over one hundred positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on African-American and disabled applicants.

169. For example, Mobley has applied to Fiserv Solutions, LLC, Sedgwick Claims Management Services, Inc., and ResMed, Inc.

170. He was rejected for every position despite meeting the experiential and educational requirements. At least one rejection was received within one hour of his application.

171. Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech.

172. Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted ~2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on African-American applicants.

173. Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

174. She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours.

175. Representative Plaintiff Jill E. Hughes possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director.

176. She is a cancer survivor and suffers from asthma, which are both covered disabilities under the ADAAA of 2008.

177. Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on disabled applicants.

178. Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications: Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

179. She received rejections for all these positions, which often cited unmet minimum requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours.

180. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of race.

181. Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of race. There is no business necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category. Workday's AI screening and selection criteria and process are a pretext for racial discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

182. Workday's employment practices operate as the functional equivalent of a pretext for discrimination.

183. Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

184. Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against the Representative Plaintiffs and the proposed class both within and outside the liability period in this case.

185. As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, the Representative Plaintiffs and the class they seek to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

186. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of Title VII.

187. In the absence of a direct employment relationship Workday can still be held liable under Title VII for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**COUNT THREE**

**Intentional Discrimination**
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623(a)**(1)

188. Plaintiffs recognize that the Court has previously dismissed Count One of the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

**COUNT FOUR**

**Disparate Impact Discrimination**
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623(a)(2)**
**Class Representatives Derek L. Mobley, Jill E. Hughes, Sheilah Johnson-Rocha, and Faithlinh Rowe**

189. Plaintiffs restate and incorporate ¶¶ 50-70, 162-163 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count Four.

190. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

191. It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

192. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

193. Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

194. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

195. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM)

software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

196.    Since April 29, 2024. HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer -employers.

197.    The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024, including, but not limited to, Plaintiffs Jille E. Hughes, Sheliah Johnson-Rocha, Faithlinh Rowe, and others.

198.    Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater than three standard deviations from what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

199.    Representative Derek L. Mobley, an African-American male born in 1974, is over 40 and manages anxiety and depression.

200. He graduated cum laude from Morehouse College in 1995 with a bachelor's degree in finance and is an honors graduate of ITT Technical Institute, holding a Server+ certification.

201. Representative Plaintiff Mobley is a qualified professional who has applied for over one hundred positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

202. For example, Mobley has applied to Fiserv Solutions, LLC, Sedgwick Claims Management Services, Inc., and ResMed, Inc.

203. He was rejected for every position despite meeting the experiential and educational requirements. At least one rejection was received within one hour of his application.

204. Representative Plaintiff Jill E. Hughes is a white female who possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director. She was born in 1974 and is over the age of 40.

205. Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

206. Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications: Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

207. She received rejections for all these positions, which often cited unmet minimum requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours.

208. Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech. She was born in 1983 and is over the age of 40.

208. Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted ~2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

209. Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

210. She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours.

211. Representative Plaintiff Faithlinh Rowe is an Asian-American female with many years of , Human Resource experience. She was born in 1981 and is over the age of 40.

212. Representative Plaintiff Rowe is a qualified professional who has submitted numerous applications Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

213. Representative Plaintiff Rowe applied for an Associate Director HR Technology role at AT&T on Jul 15, 2024, and received an immediate rejection, despite meeting the position's qualifications.

214. Likewise, on May 12, 2025, at 1:10 p.m., Representative Plaintiff Rowe applied for a Director, Human Resource Information Systems position with Kyndryl, Inc., by 1:40 p.m. (30 minutes later) she received a rejection email from kyndryl@myworkday.com.

215. This Claim is brought by the Representative Plaintiffs on behalf of themselves and the collective they seek to represent.

216. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of age.

217. Workday maintains discriminatory policies, patterns, and/or practices that have an adverse impact on employees ages 40 and older in violation of the ADEA and are not, and cannot be, justified by reasonable factors other than age.

218. Employers have delegated hiring decisions to Workday who then, upon information and belief, utilize discriminatory algorithmic decision-making tools that consciously or unconsciously discriminate against applicants on the basis of age.

219. For purposes of the ADEA, Workday is also an agent and/or indirect employer because (1) it has been delegated authority to make hiring decisions by direct employers and (2) it has the ability to interfere with and control access to employment opportunities with direct employers.

220. There is no business necessity justifying the disparate impact these automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools have on individuals in this protected category.

221. Workday's AI screening and selection criteria and process are a pretext for age discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

222. Workday's employment practices operate as the functional equivalent of a pretext for age for discrimination.

223. Workday used discriminatory automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools both within and outside the liability period in this case.

224. As a direct result of Workday's discriminatory policies and/or practices as described above, the Representative Plaintiff and the collective he seeks to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

**COUNT FIVE**

**Intentional Discrimination**
**42 U.S.C. § 1981**

225. Plaintiffs recognize that the Court has previously dismissed Count Five stated in ¶¶ the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

**COUNT SIX**

**Aiding and Abetting Race, Disability, and Age Discrimination**
**Cal. Gov. Code §12940(I)**

226. Plaintiffs recognize that the Court has previously dismissed Count Six stated in the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

**COUNT SEVEN**

**Disparate Impact Discrimination on the**
**Basis of Gender in Violation Title VII of the Civil Rights Act of 1964**
**and California Fair Employment and Housing Act (FEHA)**
**Gov. Code § 12940 et seq.**

227. Plaintiffs restate and incorporate ¶¶ 50-70 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count Four.

228. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate

impact on the basis of gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September, 2024.

229.    That data for 724,352 applicants for employment with ten of Workday's largest customers shows that Workday's job application platform and AI screening and selection process has disparate impact against women at greater than 36.5 standard deviations from what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process were gender neutral.

230.    That degree of gender disparity is equivalent to odds greater than one in a quadrillion that such process and AI features do not disproportionately impact women.

231.    Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

232.    It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

233.    It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

234.    Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including  identifying candidates whose skills and experience most closely match a customer's open jobs."

235. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

236. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

237. Representative Plaintiff Jill E. Hughes is a white female who possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director.

238. Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on female applicants.

239. Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications: Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

240. She received rejections for all these positions, which often cited unmet minimum requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours.

241. Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech.

242. Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted ~2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on female applicants.

243. Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

244. She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours.

245. Representative Plaintiff Faithlinh Rowe is an Asian-American female with many years of , Human Resource experience.

246. Representative Plaintiff Rowe is a qualified professional who has submitted numerous applications Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on female applicants.

247. Representative Plaintiff Rowe applied for an Associate Director HR Technology role at AT&T on Jul 15, 2024, and received an immediate rejection, despite meeting the position’s qualifications. Likewise, on May 12, 2025, at 1:10 p.m., Representative Plaintiff Rowe applied for a Director, Human Resource Information Systems position with Kyndryl, Inc., by 1:40 p.m. (30 minutes later) she received a rejection email from kyndryl@myworkday.com.

248. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of gender.

249. Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of gender. There is no business necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category.

250. Workday's AI screening and selection criteria and process are a pretext for racial discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

251. Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

252. Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against the Representative Plaintiffs and the proposed class both within and outside the liability period in this case.

253. As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, the Representative Plaintiffs and the class they seek to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

254. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of Title VII and California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq.

255. In the absence of a direct employment relationship Workday can still be held liable under Title VII and FEHA for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**COUNT EIGHT**

**Disparate Impact Discrimination on the Basis of Race, and Age in violation of the California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq.**

256. Plaintiffs restate and incorporate ¶¶ 50-70, 112-151 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count Four.

257. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis of race or gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September, 2024.

258. Such Workday-reported data shows that Workday's job application platform and AI screening process has disparate impact against African-Americans at a statistically significant rate of greater than 15.25 standard deviations from what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process is race neutral.

259. That degree of racial disparity is equivalent to odds greater than one in a quadrillion that such process and AI features do not disproportionately impact African Americans.

260. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

261. It has also publicly announced and advertised that its "AI-powered" products,

Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

262. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

263. Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

264. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

265. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

266. Since April 29, 2024, HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of

HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer -employers.

267. The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024, including, but not limited to, Plaintiffs Jill E. Hughes, Sheliah Johnson-Rocha, Faithlinh Rowe and others.

268. Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater than three standard deviations from what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

269. Representative Plaintiff Rowe is an Asian-American female over the age of 40, with many years of Human Resource experience.

270. Representative Plaintiff Rowe is a qualified professional who has submitted numerous applications Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on Asian, female, and over the age of 40 applicants.

271. Representative Plaintiff Rowe applied for an Associate Director HR Technology role at AT&T on Jul 15, 2024, and received an immediate rejection, despite meeting the position's qualifications. Likewise, on May 12, 2025, at 1:10 p.m., Representative Plaintiff Rowe applied for a Director, Human Resource Information Systems position with Kyndryl, Inc., by 1:40 p.m. (30 minutes later) she received a rejection email from kyndryl@myworkday.com.

272. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of race and age.

273. Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of race and age. There is no business necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category.

274. Workday's AI screening and selection criteria and process are a pretext for racial discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use. Workday's employment practices operate as the functional equivalent of a pretext for discrimination.

275. Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

276. Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against Representative Plaintiff Rowe and the proposed class both within and outside the liability period in this case.

277. As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, Representative Plaintiff Rowe and the class she seeks to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

278. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq.

279. In the absence of a direct employment relationship Workday can still be held liable under FEHA for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**PRAYER FOR RELIEF**

WHEREFORE, the Representative Plaintiff and the Proposed Classes pray for relief as follow:

1. Certification of the case as a class action on behalf the proposed subclasses;

2. Designation of Plaintiff as representative of the subclasses;

3. Designation of Plaintiff's Counsel of record as Class Counsel;

4. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII, the ADEA, the ADAAA, and Cal. Gov. Code §12940(I);

5. A preliminary and permanent injunction against the Company and its officers, agent, successors employees, representatives, and any and all persons acting in correct with them from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

6. An order that the Company institute and carry out policies, practices, and programs that provide equal employment opportunities for all minorities, and that it eradicate the effects of its past and present unlawful employment practices;

7. For back pay, front pay and other monetary relief according to proof (including interest and benefits);

8. For all damages sustained as a result of the Company's conduct according to proof;

9. For compensatory damages, nominal damages, and liquidated damages according to proof;

10. For exemplary damages in an amount commensurate with the Company's ability to pay, to deter future conduct, and to set an example for others;

11. For reasonable attorneys 'fees and cost including under to the extent allowable by law;

12. Pre-judgment and post-judgment interest, as provided by law;

13. For such ancillary orders, decrees and such further legal and equitable relief as may be necessary to enjoin and restrain the improper conduct and wrongdoing of Defendant; and

14. For such other and further relief as the Court deems proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

*<u>/sRoderick T. Cooks</u>*
Roderick T. Cooks (admitted pro hac vice)
Lee Winston (admitted pro hac vice)
Robert L. Wiggins, Jr. (admitted pro hac vice)
Ann K. Wiggins (admitted pro hac vice)
Jennifer Wiggins-Smith (admitted pro hac vice)
Attorney for the Plaintiff and the Proposed Classes and the Collective

**<u>OF COUNSEL</u>**:
Roderick T. Cooks (admitted pro hac vice)
Lee Winston (admitted pro hac vice)
lwinston@winstoncooks.com
State of Alabama Bar No.:6407O72L
Roderick T. Cooks
rcooks@winstoncooks.com
State of Alabama Bar No.:5819O78R
Winston Cooks, LLC
420 20th Street North
Suite#2200
Birmingham, AL 35203
Telephone: (205) 482-3551
Facsimile: (205) 278-5876

Robert L. Wiggins, Jr.
rwiggins@wigginschilds.com
Ann K. Wiggins
awiggins@wigginschilds.com
Jennifer Wiggins-Smith
jsmith@wigginschilds.com
Wiggins Childs Pantazis Fisher Goldfarb, LLC
The Kress Building,
301 19th Street North
Birmingham, AL 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

**LOCAL COUNSEL**:
Jay Greene
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108
Phone 415-905-0215
greeneattorney@gmail.com
Attorneys for the Plaintiff, Collective and Proposed Classes

## Certificate of Service

I hereby certify that on November 12, 2025, I electronically filed the foregoing document with the United States District Court for the Northern District of California by using the CM/ECF system which notifies:

Erin M. Connell econnell@orrick.com

Julie Ann Totten jtotten@orrick.com

Kayla Delgado Grundy kgrundy@orrick.com

*s/Roderick T. Cooks*
Of Counsel

# Exhibit "F"

Lee Winston (admitted pro hac vice)
lwinston@winstoncooks.com
State of Alabama Bar No.:6407O72L
Roderick T. Cooks
rcooks@winstoncooks.com
State of Alabama Bar No.:5819O78R
Winston Cooks, LLC
420 20th Street North
Suite#2200
Birmingham, AL 35203
Telephone: (205) 482-3551
Facsimile: (205) 278-5876

Robert L. Wiggins, Jr.(admitted pro hac vice)
rwigginns@wigginschilds.com
Ann K. Wiggins (admitted pro hac vice)
awiggins@wigginschilds.com
Jennifer Wiggins-Smith
jsmith@wigginschilds.com
The Kress Building
301 19th Street North
Birmingham, Al 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

**LOCAL COUNSEL:**

Jay Greene
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108
Phone 415-905-0215
greeneattorney@gmail.com

**Attorneys for the Plaintiff, Collective and Proposed Classes**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| DEREK L. MOBLEY, et al., | ] | CLASS ACTION |
| Plaintiffs, | ] | SECOND AMENDED COMPLAINT |
| WORKDAY, INC. | ] | JURY TRIAL DEMANDED |
| Defendant. | ] | |

## NATURE OF COMPLAINT

~~Plaintiff,~~ Derek L. Mobley ("Mobley"~~) or "Representative Plaintiff") brings this suit for injunctive, monetary, and declarative relief against Defendant Workday, Inc. ("Workday") for engaging in a pattern or practice of illegal discrimination on the basis of race, age, and/or disability in violation of Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866 ("42 U.S.C. § 1981), the Age Discrimination in Employment Act of 1967, and the ADA Amendments Act of~~

~~2008 ("ADAAA"). Defendant Workday, Inc.'s ("Workday" or "Defendant") continuous and systemic pattern or practice of discriminatory job screening which disproportionately disqualifies African-Americans, individuals over the age of forty (40) and individuals with disabilities from securing gainful employment.~~ Jill E. Hughes ("Hughes"), Sheilah Johnson-Rocha ("Johnson-Rocha") and Faithlinh Rowe ("Rowe") (collectively, "Representative Plaintiffs"), bring this suit for injunctive, monetary, and declarative relief against Defendant Workday, Inc. ("Workday" or "Defendant") for engaging in a pattern or practice of illegal discrimination on the basis of race (African American), sex (female), age (over 40), and/or disability in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the ADA Amendments Act of 2008 ("ADAAA"), and the California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq. Defendant Workday, Inc.'s ("Workday" or "Defendant") continuous and systemic pattern or practice of discriminatory job screening—which includes the use of proprietary Large Language Models ("LLM"), Artificial Intelligence ("AI"), and Machine Learning ("ML") products to evaluate/screen applicants for employment—has a disparate impact on African American, female, over-40, and disabled applicants, including the Representative Plaintiffs and the proposed classes.

Workday provides human resource management services to medium-sized and large, global organizations that span numerous industry categories, including professional and business services, financial services, healthcare, education, government, technology, media, retail, and hospitality. Firms purchase a subscription to Workday's services and as part of their subscription, customers are provided applicant screening services to include professional consulting to enable them to use Workday applications. In May of 2023, the Bureau of Labor Statistics reported more than 9.8 million job openings in the U.S. Workday recruiting processed 2.2 million U.S. job requisition transactions in May, representing nearly 22% of all U.S. job openings that month. At that rate,

Workday was projected to process more than 36 million requisitions, screen 266 million applications, and make 24 million job offers in 2023 alone. Workday processes this massive number of applications by using automated screening tools that rely on artificial intelligence.

Defendant Workday, Inc.'s artificial intelligence ("AI") systems and screening tools rely on algorithms and inputs created by humans who often have built-in motivations, conscious and unconscious, to discriminate. This discrimination is the result of a specific policy: Workday's decision to employ an automated system—in lieu of human judgment—to determine how the high-volume of applications it reviews should be processed for its clients-customers. Specifically, Workday uses machine-learning algorithms and artificial-intelligence tools (collectively "algorithmic decision-making tools") to screen out applicants who are African-American, disabled, and/or over the age of 40. Defendant Workday's algorithmic decision-making tools and applicant screening system determine whether an employer should accept or reject an application for employment based on the individual's race, age, and or disability.

All applicants who attempt to access employment via Workday's platform have been uniformly subject to this policy during the Class Period, including the Plaintiff and the proposed Class. It is thus reasonable to attribute any systematic difference in the rate of successful applicants to Workday's policy of using algorithmic decision-making tools to screen all applications. This causal connection is unsurprising: algorithmic decision-making tools have been known to cause bias in hiring.

Workday's automated system—for a variety of reasons that Workday should know about and could easily prevent—is much more likely to deny applicants who are African-American, suffer from disabilities and/or are over the age of 40. Because their applications are more likely to be flagged for rejection, African-American, disabled and over 40 applicants are disproportionately more likely to denied jobs. As a result, African-American, disabled, and those over 40, experience

greater rates of rejection for employment which negatively impacts their career prospects, earnings, and quality of life.

The Plaintiff and, upon information and belief, the classes he seeks to represent have made numerous applications for employment using the Workday platform only to be rejected. Because of this high rate of rejection, Plaintiff, and the classes he seeks to represent have also been discouraged from seeking employment with firms that use the Workday hiring platform as such application is futile because of Workday's discriminatory algorithmic decision-making tools. The hiring discrimination African-Americans, the disabled, and those over the age of 40 have experienced and are experiencing because of Workday's discriminatory algorithmic decision-making tools cause tangible financial harm, and are unreasonable, vexatious, and humiliating. Accordingly, Plaintiffs seek damages as well as declaratory and injunctive relief.

## JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), and (4),2201 and 2202, 42 U.S.C. 2000d-2 and 2000e5(f), and 29 U.S.C. § 621, et seq. Supplemental jurisdiction for the state law claims ~~is~~are invoked pursuant to 28 U.S.C. §1367.

2. This is a suit authorized and instituted pursuant to the Act of Congress known as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., as amended,~~ "The Civil Rights Act of 1866," 42 U.S.C. § 1981,~~ the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., and the ADA Amendments Act of 2008 ("ADAAA").

3. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(B) & (c) because Workday is located here and the acts complained of occurred in the Northern District of California.

**PARTIES**

4. Plaintiff, Derek Mobley is an African -American male, over the age of forty (40) and who suffers from depression and anxiety. Mr. Mobley is an applicant.

5. Plaintiff Jill E. Hughes is a female over the age of 40. She has a disability as defined under the ADAAA. Hughes is a qualified professional who has applied for positions through Workday's platform and has been disproportionately affected by the Defendant's proprietary AI/ML products, which have a disparate impact on female, disabled and over-40 applicants. Beginning on or about April 15, 2024, Hughes experienced rejections exemplifying this impact. Hughes has opted in as part of the age collective action. [See, Dkt. 103-1].

6. Plaintiff Sheilah Johnson-Rocha is an African American female over the age of 40. Johnson-Rocha is a qualified professional who has applied for positions through Workday's platform and has been disproportionately affected by the Defendant's proprietary AI/ML products, which have a disparate impact on African American, female, and over-40 applicants. On or about September 3, 2024, Johnson-Rocha experienced rejections exemplifying this impact. Johnson -Rocha has opted in as part of the age collective action. [See, Dkt. 103-1].

7. Plaintiff Faithlinh Rowe is a female over the age of 40. Rowe is a qualified HRIS professional with extensive HR experience. She has applied for multiple positions through Workday's platform, including directly to Workday, Inc., and has been disproportionately affected by the Defendant's proprietary AI/ML products, which have a disparate impact on female and over-40 applicants. Rowe has opted in as part of the age collective action. [See, Dkt. 122-1].

58. Defendant Workday is an employment agency pursuant to Section 703(b) of the Act, 42 U.S.C. § 2000e-2(b). Defendant Workday is also an agent of employers who have delegated to

it authority

-to make decisions in the hiring process, including by relying on the results of selection procedures

-that Workday administers on the employers 'behalf to make hiring decisions, alternatively -Workday is an indirect employer because it controls access to employment opportunities. -Defendant Workday's headquarters and principal place of business is located at 6110 Stoneridge -Mall Road, Pleasanton, California.

**CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII, THE ADEA AND THE ADAAA**

69. On June 3, 2021, Mr. Mobley filed a charge of discrimination with the Oakland Field Office of the United States Equal Employment Opportunity Commission. On July 19, 2021, Mr. Mobley filed an amended charge of discrimination. On November 22, 2022, the EEOC issued Mr. Mobley a Dismissal and Notice of Right to Sue, giving him ninety-days from its receipt to file a case. Thus, Mr. Mobley has satisfied all prerequisites to bring this action pursuant to Title VII, the ADEA, and the ADAAA.

710. Thus, Mobley has satisfied all prerequisites to bring this action pursuant to Title VII, the ADEA, and the ADAAA.Mr. Mobley's claims arising under 42 U.S.C. § 1981 do not require administrative exhaustion and are subject to a four-year statute of limitations. 28 U.S.C. § 1658.

**CLASS ACTION ALLEGATIONS**

811. The Representative Plaintiff brings this action in his own behalf and on behalf of all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and seek to represent the following subclasses:

~~•All African-American applicants or former applicants who from June 3, 2019, to the present were subjected to the challenged discriminatory screening process.~~

~~•All applicants or former applicants over the age of forty (40) who from June 3, 2019, to the present were subjected to the challenged discriminatory screening process.~~

~~•All applicants or former applicants who have a diagnosed mental health or cognitive condition who from June 3, 2019, to the present were required to take a Workday branded cognitive assessment or personality tests as part of the application process.~~

•All African-American applicants or former applicants who from September 24, 2020, to the present were subjected to the challenged discriminatory screening process.

• All female applicants or former applicants who from November 8, 2023, to the present were subjected to the challenged discriminatory screening process.

•All applicants or former applicants over the age of forty (40) who from September 24, 2020, to the present were subjected to the challenged discriminatory screening process.

•All applicants or former applicants who have a diagnosed mental health or cognitive condition who from September 24, 2020, to the present were required to take a Workday branded cognitive assessment or personality tests as part of the application process.

~~Mr.~~ Mobley in the case at bar challenges systemic discrimination by, and seeks class-wide relief against, Workday for its utilization of discriminatory screening tools as part of its employment policies and procedures which constitute a pattern and practice of discrimination on the basis of race, age, and disability with respect to selections. These screening tools have been continuously utilized by the Defendant since at least 2017, and their implementation and use has personally harmed the named ~~the~~ Plaintiff, and the putative class members he seeks to represent. Workday's client-customers delegate to it the hiring process, recruitment, and onboarding of employees. Workday then utilizes screening tools, to include Workday branded assessments and/or tests, to ~~s~~ process and interpret an applicant's qualifications and recommend whether the applicant should be accepted or rejected.

Workday's utilization of these screening tools relies upon subjective practices which have caused disparate impact and disparate treatment to applicants who are African-American, over the age of forty (40) or and/or disabled. Applicants who are not members of these protected groups and who are similarly situated to the Representative Plaintiff, have not been subjected to such discriminatory treatment.

### A. COMMON QUESTIONS OF LAW AND FACT

~~9~~12. The prosecution of the claims of the Representative Plaintiffs requires adjudication of numerous questions of law and fact common to his individual claims and those of the putative classes he seeks to represent. The common questions of law would include, inter alia: (a) whether the Defendant's screening products cause African-American, individuals over the age of forty (40), and/or individuals with a disability to be disproportionately and more likely denied employment; (b) whether the Defendant's doing so cannot be justified as a necessary business practice for evaluating potential employees; and (c) whether the Defendant's screening products have a disparate impact on applicants who are African-American, over the age of forty (40), and/or disabled in violation of the "Civil Rights Act of 1964," 42 U.S.C. § 2000 et seq., ~~the "Civil Rights Act of 1866," 42 U.S.C. § 1981and 1981a,~~ the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., and the ADA Amendments Act of 2008 ("ADAAA"). The common questions of fact would include, inter alia: (1) whether Workday's administration of its screening products discriminated against the aforementioned applicants because of their race, age, and/or disability with regards to hiring; (2) whether compensatory and punitive damages, injunctive relief, and other equitable remedies for the class are warranted; and (3) whether Workday discriminated against the aforementioned protected groups in other terms and conditions of employment. The details of the Representative Plaintiff~~'~~s' claims are encompassed within the claims prosecuted on behalf of the class and set forth in this Complaint.

### B. TYPICALITY

~~10~~13. The claims of the Representative Plaintiffs are typical of those of the members of the class. The Representative Plaintiff and all class members have been and are similarly adversely affected by the systemic racially discriminatory practices complained of herein. Specifically, the representative claims, like those of the class members, arise out of Defendant's pervasive discriminatory conduct with regard to aforementioned discrimination in hiring and other terms and conditions of employment. The relief necessary to remedy the claims of the Representative Plaintiff is the same relief that is necessary to remedy the claims of the putative class members in this case. The Representative Plaintiffs seek~~s~~ the following relief for individual claims and class claims asserted herein: (1) declaratory judgment that Defendant has engaged in systemic discrimination against African-Americans, individuals over the age of forty (40), and/or the disabled; (2) a permanent injunction against such continuing discrimination; (3) injunctive relief which reforms Workday's screening products, policies, practices and procedures so that the Representative Plaintiff and the class members will be able to compete fairly in the future for jobs and enjoy terms and conditions of employment traditionally afforded similarly situated employees outside of the protected categories; (4) backpay, front pay, compensatory damages, and other equitable remedies necessary to make the Plaintiff, and the class, whole from Workday's past discrimination; and, (5) attorneys' fees, costs, and expenses.

### C. NUMEROSITY AND IMPRACTICABILITY OF JOINDER

~~11~~14. The class that the Representative Plaintiffs seek~~s~~ to represent is too numerous to make joinder practicable. The proposed class consists of numerous former, current, and future applicants who have been denied employment due to the discriminatory administration of

Workday's screening products. Workday's pattern or practice of discrimination also makes joinder impracticable by making it impractical and inefficient to identify many members of the class prior to the determination of the merits of Workday's class wide liability. Thus, the number of ~~C~~class members is currently indeterminate, but is certainly numerous.

**D. ADEQUACY OF REPRESENTATION**

~~12~~15. The Representative Plaintiff will fairly and adequately protect the interests of the class inasmuch as they are broadly representative, as reflected in the preceding paragraphs. There are no conflicts of interest present with the members of the proposed class as each would benefit from the imposition of a remedy for the Defendant's discriminatory employment practices. The Representative Plaintiffs has retained counsel experienced in litigating major class actions in the field of employment discrimination, and who are prepared and able to meet the time and fiscal demands of class action litigation of this size and complexity. The combined interest, experience, and resources of the Representative Plaintiffs and their~~his~~ counsel to litigate competently the individual and class claims of employment discrimination at issue satisfy the adequacy of representation requirement under Fed.R.Civ.P. 23(a)(4).

**E. EFFICIENCY OF CLASS PROSECUTION OF COMMON CLAIMS**

~~13~~16. Certification of a class of similarly-situated applicants is the most efficient and economical means of resolving the questions of law and fact that are common to the individual claims of the Representative Plaintiffs and the proposed class. The individual claim of the Representative Plaintiffs require~~s~~ resolution of the common question of whether Defendant has engaged in a systemic pattern of discrimination against African-Americans, those over forty (40) and the disabled. The Representative Plaintiffs seek~~s~~ remedies to undo the adverse effects of such discrimination in his own life and career. The Representative Plaintiffs ha~~s~~ve standing to seek such relief because of the adverse effect that such discrimination has had on him individually and on the

putative classes he seeks to represent, in general. In order to gain such relief for himself, as well as for the putative class members, the Representative Plaintiffs will first establish the existence of systemic discrimination as the premise of the relief they seek. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the subclasses affected by the common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Representative Plaintiffs, the classes and the Defendant. The Representative Plaintiff's' individual and class claims are premised upon the traditional bifurcated method of proof and trial for systemic disparate treatment claims of the type at issue in this complaint. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

**F. CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(b)(2)**

1417. Workday has acted on grounds generally applicable to the Representative Plaintiff and the proposed class by adopting and following systemic practices and procedures that discriminate on the basis of race, age, and/or disability. Workday's screening products are regularly used to discriminate on the basis of race, age, and/or disability. Workday has refused to act on grounds generally applicable to the putative class by: (1) refusing to adopt or follow screening productions and selection procedures which do not systemically discriminate on the basis of race, age, and/or disability. Workday's discriminatory screening products have made appropriate final injunctive relief and declaratory relief with respect to the class as a whole. The injunctive relief and declaratory relief are the predominate reliefs sought because they are both the cumulation of the proof of the Defendant's individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the Representative Plaintiffs and the classes members entitlement to monetary and non-monetary remedies at Stage II of such a trial. Declaratory and injunctive relief

flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against individuals on the basis of race, age, and/or disability. Such relief is the factual and legal predicate for the Representative Plaintiff’s and the class members entitlement to injunctive and equitable remedies caused by such systemic discrimination.

## G. ALTERNATIVELY CERTIFICATION IS SOUGHT PURSUANT TO FED. R.CIV. P. 23(b)(3)

~~15~~18. The common issues of fact and law affecting the claims of the Representative Plaintiffs and proposed class members, including, but not limited to, the common issues identified above, predominate over any issues affecting only individual claims. A class action is superior to other available means for the fair and efficient adjudication of the claims of the Representative Plaintiffs and members of the proposed classes. The cost of proving the Defendant’s pattern or practice of discrimination makes it impracticable for the named Plaintiffs and members of the proposed class to control the prosecution of their claims individually. The Northern District of California is the most logical forum in which to litigate the claims of the Representative Plaintiffs and the proposed class in this case because the Defendant’s home office is here and it engages in or ratifies illegal conduct adversely affecting the Plaintiff here.

## H. ALTERNATIVELY, CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(c)(4) FOR INJUNCTIVE AND DECLARATORY RELIEF

~~16~~19. Alternatively, claims for injunctive and declaratory relief for the Injunctive Relief Class are properly certified under Federal Rule of Civil Procedure 23(c)(4) because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## I. ALTERNATIVELY, CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(c)(4) FOR CLASS WIDE LIABILITY

~~17~~20. Alternatively, class wide liability claims are properly certified under Federal Rule of Civil Procedure 23(c)(4) for the Classes because such claims present only common issues, the

resolution of which would advance the interests of the parties in an efficient manner.

**J. PUNITIVE DAMAGES MAY ALTERNATIVELY BE CERTIFIED PURSUANT TO FED.R.CIV.P. 23(b)(2).**

~~18~~21. Punitive damages liability may alternatively be certified under Federal Rule of Civil Procedure 23(b)(2) because such relief focuses on the conduct of Workday and not the individual characteristics of the Plaintiff and are an allowable form of incidental monetary relief.

## CLAIMS OF REPRESENTATIVE PLAINTIFF

**Derek Mobley**

~~19~~22. Derek L. Mobley is an African-American male. He is over the age of forty (40) and suffers from anxiety and depression. ~~Mr.~~ Mobley was born in 1974.

~~20~~23. ~~Mr.~~ Mobley is a graduate of Morehouse College in Atlanta, Georgia.

~~21~~24. Founded in 1867, Morehouse College remains the only all-male Historically Black College or University in the world.

~~22~~25. Graduates of Morehouse include Martin Luther King Jr., U.S. Senator Raphael Warnock, Shelton "Spike" Lee (award winning filmmaker), Samuel L. Jackson (award winning actor), and Jeh Charles Johnson (Obama Administration's Secretary of Homeland Security) to name a few.

~~23~~26. ~~Mr.~~ Mobley graduated Morehouse in 1995 with a bachelor's degree in finance, cum laude.

~~24~~27. ~~Mr.~~ Mobley is also an honors graduate of ITT Technical Institute. He is also Server+ Certified.

~~25~~28. Since 2010, ~~Mr.~~ Mobley has worked in various financial, IT help-desk and customer service-oriented jobs.

~~26~~29. Jobs and positions ~~Mr.~~ Mobley has occupied since graduating college include:

a.  Capitol City Bank & Trust Company-Special Assets Manager/Commercial Credit Analyst;

b.  Internal Revenue Service-Customer Service Representative;

c.  AT&T Digital Life-Support Specialist, Level 1A Manager;

d.  Bank of America-Card Services Collections Supervisor;

e.  GE Capital-Floor Plan Account Manager;

f.  DSD Mortgage, LLC-Owner and Manager Mortgage Company;

g.  EAN Services, Inc. (Enterprise Rental Car)-Insurance Callbacks Representative;

h.  Hewlett Packard Enterprise (HPE)-Advanced Solutions Engineer;

i.  Uber Technologies-Contract Driver; and,

j.  Allstate-Claims Dispatcher and Workflow Processor/Catastrophe Controller.

~~27~~30.  ~~Mr.~~ Mobley possesses extensive knowledge in multiple critical roles within the Enterprise server, banking, finance, and insurance industries.

**Jill E. Hughes**

31.  Jill E. Hughes is a white female.  She is over the age of 40 and is a cancer survivor with a current asthma diagnosis.  Ms. Hughes 'date of birth is February 4, 1974.

32.  Ms. Hughes has a B.A. from the University of Cincinnati and an M.A. from the University of Chicago and has more than 28 years of executive-level experience in her professional career as a Senior Medical Writer, Project Manager, and Scientific Director with experience writing/strategizing for major media as well as the corporate and medical arenas.

33.  Since December of 2023, Ms. Hughes has applied for hundreds of positions that use Workday, Inc. as a screening tool for sourcing, recruiting, talent acquisition and/or hiring.

34.    Examples of employers that she has submitted applications to include 3M; Cigna; Veralto; Stryker; Becton Dickinson; FIS Global; General Electric; Huntington; and Parsons Corporation.  She has been denied employment each time.

35.    The companies listed above have sent at least one automated rejection for role(s) for which she met or exceeded the posted hiring requirements.

36.    In some cases, the automated rejection emails stated "You do not meet the minimum requirements for this role" even though I met or exceeded all posted requirements based on my professional resume and portfolio of prior work.

37.    Automated rejections were often received within minutes or a few hours of applying and were often sent at odd times outside of business hours (ie, 2:40 a.m. on a Sunday morning; 11:00 pm on a weekday), indicating a human did not review the applications.

**Sheilah Johnson-Rocha**

38.    Sheilah Johnson-Rocha is an African-American female.  She is over the age of 40. Ms. Johnson-Rocha's date of birth is January 30, 1983.

39.    Ms. Johnson-Rocha has three college degrees: (1) an Associates in Arts (Business Administration); Bachelor of Business of Administration; and, a Master of Science-Major in Management.  She also possesses various certifications within the pharmaceutical and biotechnology industry.  She has worked in the pharmaceutical and biotechnology industries for the past 21 years.

40.    Since March 2023, Ms. Johnson-Rocha has submitted approximately 2,000 job applications to various pharmaceutical and biotech companies.

41.    A large majority of the companies to which she has applied use Workday's job application platform.  Upon information and belief, her qualifications and experience exceeded all

criteria in the job requisitions for each of the roles for which she applied, however almost all of her applications were met with an automated rejection notification.

42. Furthermore, many of the jobs for which she applied were not filled and are continuously re-posted. When the jobs are re-posted, she re-applied only to receive an automated rejection email.

43. In some cases, the automated rejection emails stated "You do not meet the minimum requirements for this role" even though she met or exceeded all posted requirements based on her professional resume. Automated rejections were often received within a few hours of applying or were sent at odd times outside of business hours, indicating a human did not review the applications.

**Faithlinh Rowe**

44. Faithlinh Rowe is an Asian-American female. She is over the age of 40. Ms. Rowe was born in 1981.

45. Ms. Rowe is a qualified HRIS professional with extensive HR experience.

46. She has unsuccessfully applied for multiple positions through Workday's platform, including directly to Workday, Inc.

47. On July 15, 2024, Rowe applied for an Associate Director HR Technology position at AT&T via the Workday platform.

48. Upon submission, her application was immediately rejected despite her qualifications, deeming her no longer under consideration.

49. How Workday's AI/ML screens applications remain a mystery to the applicants like Ms. Rowe.

**How Algorithmic Discrimination Works**

~~28~~50. Defendant Workday unlawfully offers "algorithmic decision-making tools" that

power applicant screening systems that in turn determine whether an employer should accept or reject an application for employment based on the individual's race, age, and or disability.

~~29.~~51. Today, discrimination is perpetuated through businesses seeking efficiencies by embracing automation and data mining. Employers use algorithmic models to quickly analyze large numbers of applications automatically based on given criteria such as keywords, skills, former employers, years of experience and schools attended ("data mining") to detect patterns and assist in making future decisions ("data analytics").

~~30~~52. Data mining learns by example and accordingly what a model learns depends on the examples to which it has been exposed.[1] "Biased training data lead to discriminatory models."

~~31~~53. For hiring purposes data is mined on the front-end from applications via an Applicant Tracking System ("ATS), which can be located on the company's website or extracted from applicants on job boards. An applicant tracking system (ATS) is a software application that enables the electronic handling of recruitment and hiring needs. Most job and resume boards (Reed Online, LinkedIn.com, Monster.com, Hotjobs, CareerBuilder, Indeed.com) have partnerships with ATS software providers to provide parsing support and easy data migration from one system to another.

~~32~~54. Newer applicant tracking systems (often the epithet is next-generation) are Platforms as a service, where the main piece of software has integration points that allow providers of other recruiting technology to plug in seamlessly. The ability of these next-generation ATS solutions allows jobs to be posted where the candidate is and not just on-job boards. This ability is being referred to as omnichannel talent acquisition.

~~33~~55. So-called "machine-learning" algorithms are designed to learn based upon the

---

[1]"Biased training data lead to discriminatory models." 1 Solon Barocas and Andrew D. Selbst, Big Data's Disparate Impact, California Law Review Vol. 104, No. 3 (June 2016), pp. 671-732.

algorithm's access to a designated data set or an algorithm-driven search for data residing within an ATS.

~~34~~56. Unfortunately, algorithms too often have discriminatory effects, even where demographic data such as race, age, and disability are not included as inputs. This is because algorithms can "learn" to use omitted demographic features by combining other inputs that are correlated with race (or another protected classification), like zip code, college attended, and membership in certain groups.

~~35~~57. Moreover, if the data mined is based on the intentional prejudices or biases of prior trainers or a lack of diversity in the data set, data mining will learn from the unlawful example that these decisions furnish.

~~36~~58. To illustrate, Amazon famously abandoned a facially neutral hiring algorithm in 2017 because of its disparate impact on female candidates. There, the training data presented to the algorithm consisted of resumes submitted to Amazon by applicants over a 10-year period, without presenting data to the algorithm explicitly indicating the applicants 'gender. But most of these applicants were white males. Rather than sort candidates by qualifications or merit, the algorithm learned to favor male candidates by prioritizing language more commonly used by males, penalizing the word "women's" in resumes, and devaluing candidates who had graduated from all-women's colleges.

~~37~~59. The algorithm simply drew inferences from a biased sample of the population (in the Amazon case all white males) and simply reproduced that prejudice which disadvantaged female applicants.

~~38~~60. Upon information and belief, Workday determines which candidates to recommend

based on the demonstrated interests of its client-employers in certain types of candidates, Workday will offer recommendations that reflect whatever biases employers happen to exhibit.

~~39~~61.   Upon information and belief, if Workday's algorithmic decision-making tools observe that a client-employer disfavors certain candidates who are members of a protected class, it will decrease the rate at which it recommends those candidates. Thus, the recommendation algorithmic decision-making tool caters to the prejudicial preferences of the client-employer.

~~40~~62.   Algorithmic decision-making and data analytics are not, and should not be assumed to be, race neutral, disability neutral, or age neutral. Too often, they reinforce and even exacerbate historical and existing discrimination.

~~41~~63.   For example, a 2019 study found that a clinical algorithm that many hospitals were using to determine which patients need care was biased: Black patients assigned the same level of risk—and thus allocated the same health care resources—were much sicker than white patients. This happened because the algorithm had been trained on historical health care spending data, which reflects a history in which Black patients had less money to spend on their health care than white patients. From this, the algorithm falsely concluded that Black patients were healthier than equally sick white patients.

~~42~~64.   Academics and government actors alike have cautioned that when approached without appropriate forethought and oversight, data analytics "can reproduce existing patterns of discrimination, inherit the prejudice of prior decision makers, or simply reflect the widespread biases that persist in society. It can even have the perverse result of exacerbating existing inequalities by suggesting that historically disadvantaged groups actually deserve less favorable treatment."

~~43~~65.   Indeed, according to Federal Trade Center ("FTC") Commissioner Kelly Slaughter,

"[i]n recent years, algorithmic decision-making has produced biased, discriminatory, and otherwise problematic outcomes in some of the most important areas of the American economy. These harms are often felt most acutely by historically disadvantaged populations, especially Black Americans and other communities of color." Interest in the susceptibility of data analytics and algorithmic decision-making to bias has become increasingly widespread.

~~44~~66. For example, in 2022, the California Department of Insurance released the bulletin Allegations of Racial Bias and Unfair Discrimination in Marketing, Rating, Underwriting, and Claims Practices by the Insurance Industry, which declared that:

"technology and algorithmic data are susceptible to misuse that results in bias, unfair discrimination, or other unconscionable impacts among similarly-situated First Amended Class Action Complaint

consumers. A growing concern is the use of purportedly neutral individual characteristics as a proxy for prohibited characteristics that result in racial bias, unfair discrimination or disparate impact. The greater use by the insurance industry of artificial intelligence, algorithms, and other data collection models have resulted in an increase in consumer complaints relating to unfair discrimination in California and elsewhere. . . ."

~~45~~67. Upon information and belief, Workday's algorithmic decision-making tools lack sufficient guardrails to prevent discrimination. The conscious failure to include such guardrails is intentional and shows a reckless disregard for the anti-discrimination laws.

~~46~~68. Further, lack of guardrails creates a phenomenon referred to as AI drift. AI drift occurs when an AI system's performance and behavior change over time, often due to the evolving nature of the data it interacts with and learns from. This can result in the Artificial intelligence system making predictions or decisions that deviate from its original design and intended purpose. "AI drift can perpetuate or amplify existing biases present in training data, leading to discriminatory

or unfair outcomes. For instance, a hiring AI might start favoring certain demographics or perpetuating gender or racial biases" . . .i.e. disparate impact.[2]

4769. Donald Tomaskovic-Devey, a sociology professor who heads the Center for Employment Equity commented as follows on Workday's diversity "Workday's website makes strong claims of corporate commitment to diversity, but at 2.4% Black, it is one of the poorest performing tech companies I have encountered."[3]

[2] 2https://www.analyticsinsight.net/what-is-ai-drift-and-the-risks-associated-with-it/

[3] https://www.techtarget.com/searchhrsoftware/news/252485468/Workday-admits-to-Black-diversity-problem-pledges-to-improve

[4]

[4]

~~48~~70. Safiya Umoja Noble, Associate Professor, University of California, Los Angeles explained "The use of automated HR technologies has already shown many failings with respect to ensuring diversity -- and, in fact, many undermine it by screening out qualified women and perpetuating discrimination against African Americans who don't 'whiten' their resumes, who are often evaluated through software screening systems." Limited diversity in the workforce

[4] ~~Id.~~

responsible for creating models for training leads to bias in data mining which in turn leads to discriminatory and biased selection decisions.~~[5]~~

**Mobley's Applications**

~~49~~71. Since 2017, ~~Mr.~~ Mobley has applied for over 100 positions that exclusively use Workday, Inc. as a screening platform for talent acquisition and/or hiring. Each time he has been denied.

~~50~~72. Workday is currently used by more than 10,000 organizations around the world and across industries—from medium-sized businesses to more than 50 percent of the Fortune 500.6 The Workday customer community has 65 million users, and as of April 2023, nearly one in four of all U.S. job openings was processed on the Workday platform.~~[6]~~

~~51~~73. ~~Mr.~~ Mobley's application process generally began with him responding to a job advertisement or posting by a prospective employer on a third-party website such as LinkedIn, Indeed, Monster, or Careerbuilders.

~~52~~74. ~~Mr.~~ Mobley then clicks on the job advertisement or posting link which directs him to the Workday platform on the employer's website.

~~53~~75. For example, a job posting or advertisement link for Hewlett Packard Enterprise would say hpe@myworkday.com.

~~54~~76. ~~Mr.~~ Mobley would then be prompted by the Workday platform to create a username and password to access the employment opportunity.

~~55~~77. After creating a username and password, ~~Mr.~~ Mobley would then upload his resume`

~~[5] Id.~~

~~[6] https://newsroom.workday.com/company-overview~~

or enter his information manually. ~~Mr.~~ Mobley's resume` includes his graduation from Morehouse, a leading Historically Black College or University, and shows his extensive employment history which could be assessed as a proxy for age.

~~56~~78. Numerous positions for which ~~Mr.~~ Mobley applied required him to take a Workday branded assessment and/or personality test.

~~57~~79. Upon information and belief, these assessments and personality tests are unlawful disability related inquiries designed to identify mental health disorders or cognitive impairments and have no bearing on whether ~~Mr.~~ Mobley would be a successful employee.

~~58~~80. These assessments and personality tests are likely to reveal mental health disorders and cognitive impairments and test for characteristics that correlate with them.

~~59~~81. Persons with these disorders and impairments are likely to perform worse on these assessments and tests and be screened out. Mobley suffers from depression and anxiety.

~~60~~82. Upon information and belief, these tests are "disability inquiries" and/or "medical examinations" in that they are designed to reveal mental-health disorders such as excessive anxiety, depression, and certain cognitive impairments.

~~61~~83. In September 2017, ~~Mr.~~ Mobley applied for a position with Hewlett Packard Enterprise, a company for which he was already working on a contract basis, via hpe@myworkday.com.

~~62~~84. His application was for a Service Solutions Technical Consultant's position whose qualifications mirrored the position he occupied at the time.

~~63~~85. On October 16, 2017, ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~64~~86. In September 2018, ~~Mr.~~ Mobley applied for a Fraud Analyst position with Equifax, via equifax@myworkday.com.

~~65~~87. On October 1, 2018, ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~66~~88. On September 23, 2018, ~~Mr.~~ Mobley applied for a Corporate Travel Consultant's position with Expedia, via expedia@myworkday.com.

~~67~~89. On October 2, 2018, at 2:19 a.m., ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~68~~90. On March 31, 2019, ~~Mr.~~ Mobley applied for a Claim Support Representative's position with Fiserv, via fiserv@myworkday.com.

~~69~~91. The very next morning, April 1, 2019, at 9:40 a.m., ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~70~~92. In June 2019, ~~Mr.~~ Mobley applied for a Help Desk Support Technician with the NCR Corporation, via ncr@myworkday.com.

~~71~~93. On June 20, 2019, ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~72~~94. On August 31, 2019, ~~Mr.~~ Mobley applied for an Associate Customer Care Specialist position with Duke Energy, via dukeenergy@myworkday.com.

~~73~~95. As part of the application process, ~~Mr.~~ Mobley was required to complete a Workday branded assessment for which he received no feedback.

~~74~~96. ~~Mr.~~ Mobley was rejected for this position and was never notified as to why, even though he met its experiential and educational requirements.

~~75~~97. Upon information and belief, the Workday branded assessment ~~Mr.~~ Mobley took was not "bias free" as claimed in its marketing materials.

~~76~~98. Again, on August 31, 2019, ~~Mr.~~ Mobley applied for a Customer Service

Representative position with Unum, via unum@myworkday.com.

~~77~~99. That same day at 12:52 a.m., ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~78~~100. On September 1, 2019, ~~Mr.~~ Mobley applied for a Purchase Specialist position with Quicken Loans, via the Quicken Loans Workday System quickenloans@myworkday.com.

~~79~~101. On September 3, 2021, ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~80~~102. On March 25, 2021, ~~Mr.~~ Mobley applied for a Service Center Representative position with Sedgwick, via sedgwick@workday.com.

~~81~~103. On April 6, 2021, ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~82~~104. On April 1, 2021, ~~Mr.~~ Mobley applied for a Virtual Telesales Representative position with Comcast, via comcast@myworkday.com.

~~83~~105. On April 12, 2021, ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~84~~106. On January 29, 2022, at 12:55 a.m., ~~Mr.~~ Mobley applied for a Customer Services Specialist [Full-time or Part-time & remote working] with Unum, via unum@myworkday.com.

~~85~~107. Less than one-hour later [1:50 a.m.], ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements. Clearly, Mobley's applications are being processed by Workday's algorithmic decision-making tools.

~~86~~108. On January 9, 2024, ~~Mr.~~ Mobley applied for a Customer Support Representative position with ResMed, via resmed@myworkday.com.

~~87~~109. On January 11, 2024, at 3:52 a.m., ~~Mr.~~ Mobley was notified of his rejection for this position via email, even though he met its experiential and educational requirements.

~~88~~110. Despite being qualified, and in many instances over-qualified, ~~Mr.~~ Mobley has not been successful at securing employment with any employer that uses the Workday platform as a screening tool for applicants.

~~89~~111. ~~Mr.~~ Mobley has applied to firms that form Workday's core business which is medium-sized and large, global organizations that span numerous industry categories, including professional and business services, financial services, healthcare, education, insurance, government, technology, media, retail, and hospitality.

~~**Workday is an Employment Agency**~~

~~90~~112. Firms purchase a subscription for Workday's services and as part of their subscription, customers are provided support services, including professional consulting, to enable them to delegate their human resource hiring function to the Workday platform.

~~91~~113. Workday acts as an agent on behalf of the employers, who have delegated their employment hiring decision-making authority to it.

~~92~~114. Acting expressly or impliedly and at the direction of employers, Workday denied ~~Mr.~~ Mobley and the putative class members employment unless they participated in the Workday platform. The Workday platform is the only way to gain employment with these employers.

~~93~~115. Workday's subscription-based service reflects an on-going relationship with their client-employers and includes significant engagement in the process of hiring employees.

~~94~~116. Workday's website states that it can "reduce time to hire by automatically dispositioning or moving candidates forward in the recruiting process."

~~95~~117. In what it terms "Talent Management" Workday's systems source candidates and then use algorithmic decision-making tools to recommend job opportunities ~~then use algorithmic decision-making tools to recommend job opportunities~~.

~~96~~118. Workday's marketing materials state that "[a]dditionally, we offer extensive

customer training opportunities and a professional services ecosystem of experienced Workday consultants and system integrators to help customers not only achieve a timely adoption of Workday but continue to get value out of our applications over the life of their subscription."

~~97~~119. Workday's relationships with its client-employers are not one-off transactions but ongoing business arrangements where employers delegate their hiring function Workday who in turn uses its algorithmic decision-making tools to screen out applicants who are African-American, disabled, and/or over the age of 40.

~~98~~120. As stated previously, a prospective employee can only advance in the hiring process if they get past the Workday platforms screening algorithms.

~~99~~121.    Workday embeds artificial intelligence ("AI") and machine learning ("ML") into its algorithmic decision-making tools, enabling these applications to make hiring decisions.

~~100~~122.    Workday's AI and ML also enables incumbent employees at firms to participate in the talent acquisition process by making referrals and recommendations. Workday does this by integrating pymetrics into its algorithmic decision-making tools for applicant screening.

~~101~~123.    The pymetrics Workday Assessment Connector is supposed to use neuroscience data and AI to help client-employers make their hiring and internal mobility decisions more predictive, and free of bias.

~~102~~124.    Upon information and belief, these algorithms are only trained on incumbent employees at a company, allowing the pymetrics Workday Assessment Connector to build a homogenous workforce not representative of the applicant pool.

~~103~~125. Similarly, Workday also encourages and uses the recommendations of incumbent employees for hiring decisions. Upon information and belief, this facially neutral employment practice has a differential effect upon African-Americans, the disabled, and workers over the 40, because any lack of work force diversity allows for incumbent employees to consciously or unconsciously refer or recommend few, if any members of these protected classes.

~~104~~126. These systems of recruiting new workers operate to discriminate against African-Americans, workers over the age of 40, and the disabled because they lock in the status quo.

~~105~~127. A wealth of literature discusses the potential for bias resulting from algorithmic decision-making. As the FTC has acknowledged, algorithmic bias is everywhere. Mounting evidence reveals that algorithmic decisions can produce biased, discriminatory, and unfair outcomes in a variety of high-stakes economic spheres including employment, credit, health care, and housing.

~~106~~128. In the housing context in particular, tools infected with bias are integrated into home financing, leasing, marketing, sales, and zoning decisions. For example, a 2021 report analyzing more than 2 million conventional mortgage applications found that lenders who processed applicants through Fannie Mae and Freddie Mac's FICO algorithms were 80% more likely to reject Black applicants than financially equivalent white applicants.

~~**Workday Acts as an Agent**~~

~~107~~129. Using their "AI", "ML", assessments, tests, and pymetrics to make job

recommendations (algorithmic decision-making tools) or control access to jobs (equitable or otherwise), makes Workday an agent for its client-employers.

~~108~~130. Client-employers delegate to Workday certain aspects of the employers' selection decisions as to Mobley and the putative Class Members.

~~109~~131. Chief among those was the decision to screen out Class Members from gaining employment.

~~110~~132. Employers directed job applicants to the Workday job screening platform which then determines if they receive a job.

~~111~~133. According to Workday's Marketing Materials, "Our skills intelligence foundation helps you build diverse teams by expanding candidate pools with equitable, AI- and ML-driven job recommendations."[7]

~~112~~134. Disposing of candidates "en masse" through the use of algorithmic decision-making tools delegates to Workday the responsibility to oversee the applicant hiring process.

~~113~~135. This process is the only means an employee who applies for a job with an employer who uses the Workday platform can obtain employment.

~~114~~136. Workday is contracted to provide these services.

~~**Workday is an Indirect Employer**~~

[7] https://www.workday.com/en-us/products/talent-management/talent-acquisition.html

~~115~~137. Workday's ability to limit the employment opportunities of Mobley and the putative Class Members directly interferes with any direct employment relationship between them and prospective employers.

~~116~~138. Workday's client contracts with them to provide these services via their algorithmic screening tools.

~~117~~139. Workday is an indirect employer by virtue of its ability to discriminatorily interfere and exert peculiar control over the prospective employee's relationship with the direct employer.

~~**Discriminatory Practices**~~

~~118~~140. ~~Mr.~~ Representative Plaintiff Mobley is challenging the use of these common discriminatory screening tools per se, and not merely the individualized manifestations of their use, the fact that the common components may vary to some small degree or be applied by different customers is of no consequence.

~~119~~141. Individuals impacted the same way by these processes number in the thousands if not tens of thousands.

~~120~~142. The selection tools, assessments, and/or tests utilized by Workday, Inc. in making selection decisions-to include screening and hiring applicants discriminate on the basis of race in violation of §703(k) of Title VII, 42 U.S.C. §2000e-2(k).

~~121~~143. Upon information and belief, these processes disparately impact African-American applicants because they have the effect of disproportionately excluding African-Americans from jobs.

~~122~~144. Furthermore, these selection procedures are not job-related, nor are they consistent with any business necessity.

~~123. Title VII prohibits discrimination by employment agencies. Section 703(b) of the Act, 42 U.S.C. § 2000e-2(b), reads: "it shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin. Section 701(c) of the Act, 42 U.S.C. § 2000e(c), defines the term "employment agency" as: any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.~~

~~124~~146. Workday, Inc. is an employment agen~~cy~~t ~~as that term is defined by Title VII~~ because employers delegate to them the authority to act on the employer's behalf and rely on Workday's recommendation on whom to hire.

~~125~~147. Upon information and belief, ~~Mr.~~ Mobley and other African-Americans have been

~~intentionally~~ discriminated against because of their race (African-American), in violation of Title VII Civil Rights Act of 1964, as amended.

~~126~~148. Furthermore, the screening tools, to include assessments and tests, marketed by Workday for the administration of its products discriminate on the basis of disability in violation of the ADA Amendments Act of 2008 (ADAAA).

~~127~~149. Upon information and belief, these screening tools disparately impact disabled applicants because they have the effect of disproportionately excluding individuals with disabilities. Furthermore, the screening tools are not job-related, nor are they consistent with any business necessity.

~~128~~150. Finally, the screening tools marketed by Workday for hiring applicants discriminate on the basis of age in violation of the Age Discrimination in Employment Act of 1967 (ADEA).

~~129~~151. Upon information and belief, these screening tools disparately impact applicants over the age of 40 because the assessments and/or tests have the effect of disproportionately excluding them. Furthermore, they are not job-related, nor are they consistent with any business necessity.

**~~CLASS CLAIMS~~**

**~~RESERVATION OF RIGHTS AND NON-WAIVER~~**

**COUNT ONE**

**Intentional Employment Discrimination in**

**Violation of Title VII of the Civil Rights Act of 1964**

152~~64.~~ Plaintiffs recognize that the Court has previously dismissed Count One stated in ¶¶ 130-137 of the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

**~~COUNT ONE~~**

**~~Intentional Employment Discrimination in~~**
**~~Violation of Title VII of the Civil Rights Act of 1964~~**

~~130. Representative Plaintiff restates and incorporates by reference all applicable paragraphs above as part of this Count of Complaint.~~

~~131. Workday as an employment agency, agent, and/or indirect employer has intentionally discriminated against the Representative Plaintiff and the class he seeks to represent with regards to selection procedures and other terms and conditions of employment because of their race, African-American, in violation of Title VII of the Civil Rights Act of 1964.~~

~~132. Workday's conduct has been intentional, deliberate, willful and conducted with disregard for the rights of the Plaintiff and members of the proposed class.~~

~~133. By reason of Workday's discriminatory employment practices, the Representative Plaintiff and the proposed class members have experienced extreme harm, including loss of compensation, wages, back and front pay, and other employment benefits, and, as such, are entitled to all legal and equitable remedies available under Title VII of the Civil Rights Act of 1964.~~

~~134. Employers have delegated to Workday the decision to either permit or withhold Class Members from gaining employment. Prospective applicants cannot gain employment without accessing the Workday platform.~~

~~135. Workday utilizes "AI", "ML", assessments, tests and other screening tools in a~~

discriminatory fashion that blocks African-American applicants from employment opportunities.

136. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of Title VII.

137. In the absence of a direct employment relationship Workday can still be held liable under Title VII for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**COUNT TWO**

**Disparate Impact Discrimination on the Basis of Race and Disability in Violation of Title VII of the Civil Rights Act of 1964 and Disability in Violation of the ADAAA of 2008 Class Representatives Derek L. Mobley, Jill E. Hughes and Sheilah Johnson-Rocha, and the ADA Amendments Act of 2008**

153. Plaintiffs restate and incorporate ¶¶ 50-151 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count..

1534. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis of race or gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September, 2024.

153. Such Workday reported data shows that Workday's job application platform and AI screening process has disparate impact against African-Americans at a statistically significant rate of greater than 15.25 standard deviations from what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process is race neutral.

155. That degree of racial disparity is equivalent to odds greater than one in a quadrillion that such process and AI features do not disproportionately impact African Americans.

156.    That same data for 724,352 applicants for employment with ten of Workday's largest customers also shows that Workday's job application platform and AI screening and selection process has disparate impact against women greater than 36.5 standard deviations. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

157.    It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

158.    It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

159.    Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including  identifying candidates whose skills and experience most closely match a customer's open jobs."

160.    All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

161.    Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related

technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

162. Since April 29, 2024. HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer -employers.

163. The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024, including, but not limited to, Plaintiffs Jill E. Hughes Sheliah Johnson-Rocha, Faithlihn Rowe and others.

164. Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater than three standard deviations from what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

~~138~~165. Representative Derek L. Mobley, an African-American male who is diagnosed with anxiety and depression.

166. Representative Plaintiff Mobley's diagnoses are covered by the ADAAA of 2008.

167. He is a cum laude graduate of Morehouse College with a bachelor's degree in finance and is an honors graduate of ITT Technical Institute, holding a Server+ certification.

168. Representative Plaintiff Mobley is a qualified professional who has applied for over one hundred positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on African-American and disabled applicants.

169. For example, Mobley has applied to Fiserv Solutions, LLC, Sedgwick Claims Management Services, Inc., and ResMed, Inc.

170. He was rejected for every position despite meeting the experiential and educational requirements. At least one rejection was received within one hour of his application.

Representative Plaintiff restates and incorporates by reference all applicable paragraphs above as part of this Count of the Complaint.

139171. The algorithmic decision-making tools that Workday uses to screen out African-American and disabled applicants make it an employment agency under Title VII and the ADA. For purposes of these statutes, Workday is also an agent and/or indirect employer because (1) it has been delegated authority to make hiring decisions by direct employers and (2) it has the ability to interfere with and control access to employment opportunities with direct employers.

140. Workday as an employment agency, agent, and/or indirect employer utilizes discriminatory screening tools that consciously or unconsciously discriminate against applicants on the basis of race and/or disability. There is no business necessity justifying the disparate impact these screening tools have on individuals in these protected categories.

141. Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech.

172. Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted ~2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on African-American applicants.

173. Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

174. She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours. ~~Because there are no guardrails to regulate Workday's conduct, the algorithmic~~

175. Representative Plaintiff Jill E. Hughes possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director.

176. She is a cancer survivor and suffers from asthma, which are both covered disabilities under the ADAAA of 2008.

177. Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on disabled applicants.

178. Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications: Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

179. She received rejections for all these positions, which often cited unmet minimum requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours. ~~decision-making tools it utilizes to screen out applicants provide a ready mechanism for discrimination.~~

~~142. Workday's algorithmic decision-making screen out tools discriminated against the~~

~~Representative Plaintiff and the proposed class both within and outside the liability period in this case.~~

~~143. As a direct result of Workday's discriminatory screening tools as described above, the Representative Plaintiff and the class he seeks to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.~~

~~144. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of Title VII and the ADA.~~

~~145. In the absence of a direct employment relationship Workday can still be held liable under Title VII and the ADA for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.~~

180. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of race.

181. Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of race. There is no business necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category. Workday's AI screening and selection criteria and process are a pretext for racial discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

182. Workday's employment practices operate as the functional equivalent of a pretext

for discrimination.

183.    Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

184.    Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against the Representative Plaintiffs and the proposed class both within and outside the liability period in this case.

185.    As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, the Representative Plaintiffs and the class they seek to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

186.    Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of Title VII.

187.    In the absence of a direct employment relationship Workday can still be held liable under Title VII for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**COUNT THREE**

**Intentional Discrimination**
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623(a)(1)**

188.    Plaintiffs recognize that the Court has previously dismissed Count One ~~stated in ¶¶ 130-137~~ of the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

~~**COUNT THREE**~~

~~**Intentional Discrimination**~~
~~**Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623(a)(1)**~~

~~146. Representative Plaintiff restates and incorporates by reference all applicable paragraphs above as part of this Count of the Complaint.~~

~~147. This claim is brought by the Representative Plaintiff on behalf of himself and the collective he seeks to represent.~~

~~148. Employers delegated hiring decisions to Workday who then, upon information and belief, utilized algorithmic decision-making tools that screened out applicants on the basis of age. For purposes of the ADEA, Workday is also an agent and/or indirect employer because (1) it has been delegated authority to make hiring decisions by direct employers and (2) it has the ability to interfere with and control access to employment opportunities with direct employers.~~

~~149. Workday intentionally utilized algorithmic decision-making tools to screen out the Representative Plaintiff and the collective on the basis of age in violation of the ADEA.~~

~~150. The discriminatory conduct that constitutes Workday's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.~~

~~151. As a direct result of Workday's intentional utilization of discriminatory algorithmic decision-making tools as described above, the Representative Plaintiff and the collective have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.~~

~~152. The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 29 U.S.C. § 623(a)(1).~~

## COUNT FOUR

**Disparate Impact Discrimination**
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623(a)(2)**
**Class Representatives Derek L. Mobley, Jill E. Hughes, Sheilah Johnson-Rocha, and Faithlinh Rowe**

17889. 52. Plaintiffs restate and incorporate ¶¶ 50-70, 162-163 above on the same basis as if -those allegations were restated verbatim as part of the allegations of this Count Four.

190. 179.Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis of race or gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September, 2024.

153. Such Workday-reported data shows that Workday's job application platform and AI screening process has disparate impact against African-Americans at a statistically significant rate of greater than 15.25 standard deviations from what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process is race neutral.

154. That degree of racial disparity is equivalent to odds greater than one in a quadrillion that such process and AI features do not disproportionately impact African Americans.

155. That same data for 724,352 applicants for employment with ten of Workday's largest customers also shows that Workday's job application platform and AI screening and selection process has disparate impact against women greater than 36.5 standard deviations. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

191. It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

192. It does that, in part, by integrating the HiredScore AI-powered recruitment and

scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

193.    Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

194.    All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

195.    Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

196.    Since April 29, 2024. HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer

-employers.

197.    The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024, including, but not limited to, Plaintiffs Jille E. Hughes, Sheliah Johnson-Rocha, Faithlinh Rowe, and others.

198.    Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater than three standard deviations from what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

~~153~~199.    Representative Derek L. Mobley, an African-American male born in 1974, is over 40 and manages anxiety and depression.

200.    He graduated cum laude from Morehouse College in 1995 with a bachelor's degree in finance and is an honors graduate of ITT Technical Institute, holding a Server+ certification.

201.    Representative Plaintiff Mobley is a qualified professional who has applied for over one hundred positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

202.    For example, Mobley has applied to Fiserv Solutions, LLC, Sedgwick Claims Management Services, Inc., and ResMed, Inc.

203.    He was rejected for every position despite meeting the experiential and educational requirements.  At least one rejection was received within one hour of his application.

204.    Representative Plaintiff Jill E. Hughes is a white female who possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director.  She was born in 1974 and is over the age of 40.

205.   Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

206.   Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications:  Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

207.   She received rejections for all these positions, which often cited unmet minimum requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours.

208.   Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech.  She was born in 1983 and is over the age of 40.

208.   Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted ~2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

209.   Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

210.   She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours.

211.   Representative Plaintiff Faithlinh Rowe is an Asian-American female with many years of , Human Resource experience.  She was born in 1981 and is over the age of 40.

212.   Representative Plaintiff Rowe is a qualified professional who has submitted numerous applications Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

213. Representative Plaintiff Rowe applied for an Associate Director HR Technology role at AT&T on Jul 15, 2024, and received an immediate rejection, despite meeting the position's qualifications.

214. Likewise, on May 12, 2025, at 1:10 p.m., Representative Plaintiff Rowe applied for a Director, Human Resource Information Systems position with Kyndryl, Inc., by 1:40 p.m. (30 minutes later) she received a rejection email from kyndryl@myworkday.com. Representative Plaintiff restates and incorporates by reference all applicable paragraphs above as part of this Count of the Complaint.

154. 215. This Claim is brought by the Representative Plaintiffs on behalf of himselfthemselves and -the collective they seeks to represent.

216. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of age.

217. Workday maintains discriminatory policies, patterns, and/or practices that have an adverse impact on employees ages 40 and older in violation of the ADEA and are not, and cannot be, justified by reasonable factors other than age.

155. 218. Employers have delegated hiring decisions to Workday who then, upon information and belief, utilize discriminatory algorithmic decision-making tools that consciously or unconsciously discriminate against applicants on the basis of age.

219. For purposes of the ADEA, Workday is also an agent and/or indirect employer because (1) it has been delegated authority to make hiring decisions by direct employers and (2) it has the ability to interfere with and control access to employment opportunities with direct employers.

~~156.~~ 220. There is no business necessity justifying the disparate impact these ~~screen out~~ automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools ~~tools~~ have on individuals in this protected category.

~~197.~~ 221. Workday's AI screening and selection criteria and process are a pretext for ~~racial~~age discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

~~197.~~ 222. Workday's employment practices operate as the functional equivalent of a pretext for age for discrimination.

~~157.~~ 223. Workday used discriminatory automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools ~~algorithmic decision-making tools~~ both within and outside the liability period in this case.

224.   ~~158.~~   As a direct result of Workday's discriminatory policies and/or practices as described

above, the Representative Plaintiff and the collective he seeks to represent have suffered damages

including, but not limited to, lost past and future income, compensation, and benefits.

~~**COUNT FIVE**~~

~~**Intentional Discrimination**~~
~~**42 U.S.C. § 1981**~~

~~159.   Representative Plaintiff restates and incorporates by reference all applicable paragraphs above as part of this Count of Complaint.~~

~~160.   Workday as an employment agency, agent, and/or indirect employer has intentionally discriminated against the Representative Plaintiff and the class he seeks to represent with regards to selection procedures and other terms and conditions of employment because of their race, African-American, in violation of 42 U.S.C. § 1981.~~

~~161.   Workday's conduct has been intentional, deliberate, willful and conducted with disregard for the rights of the Plaintiff and members of the proposed class.~~

~~162.   By reason of Workday's discriminatory employment practices, the Representative Plaintiff and the proposed class members have experienced extreme harm, including loss of compensation, wages, back and front pay, and other employment benefits, and, as such, are entitled to all legal and equitable remedies available under 42 U.S.C. § 1981.~~

~~163.   Employers have delegated to Workday the decision to either permit or withhold Class Members from gaining employment. Prospective applicants cannot gain employment without accessing the Workday platform.~~

~~164.   Workday utilizes "AI", "ML", assessments, tests and other screening tools in a discriminatory fashion that blocks African-American applicants from employment opportunities.~~

~~165. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of 42 U.S.C. § 1981.~~

~~166. In the absence of a direct employment relationship Workday can still be held liable under 42 U.S.C. § 1981 for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.~~

**~~COUNT SIX~~**

**~~Aiding and Abetting Race, Disability, and Age Discrimination~~**
**~~Cal. Gov. Code §12940(I)~~**

~~167. Representative Plaintiff restates and incorporates by reference all applicable paragraphs above as part of this Count of Complaint.~~

~~168. In perpetrating the abovementioned actions and omissions, Workday as employment agency, agent, or indirect employer engaged in a pattern and practice of unlawful aiding and abetting of discrimination in violation of California's Fair Employment and Housing Act, Cal. Gov. Code §12940(i).~~

~~169. Workday attempted to and did in fact, aid, abet, incite, compel, and/or coerce their client-customers to engage in unlawful race, disability, and age discrimination the class members as described above.~~

~~170. As a direct and proximate result of the aforesaid discrimination based on race, disability, and age, the class members have sustained injury in the form of severe emotional distress, humiliation, embarrassment, and mental anguish, all to their damage in an amount according to proof.~~

~~171. Workday's acts were wanton, willful and intentional, and were committed with malicious and reckless disregard for the rights and sensibilities of the class members.~~

**COUNT FIVE**

**Intentional Discrimination**
**42 U.S.C. § 1981**

225. Plaintiffs recognize that the Court has previously dismissed Count Five One stated in ¶¶ 130-137 of the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

**COUNT SIX**

**Aiding and Abetting Race, Disability, and Age Discrimination**
**Cal. Gov. Code §12940(I)**

226. Plaintiffs recognize that the Court has previously dismissed Count Six One stated in ¶¶ 130-137 of the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

**COUNT SEVEN**

**Disparate Impact Discrimination on the**
**Basis of Gender in Violation Title VII of the Civil Rights Act of 1964**
**and California Fair Employment and Housing Act (FEHA)**
**Gov. Code § 12940 et seq.**

227. Plaintiffs restate and incorporate ¶¶ 50-70 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count Four.

228. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis ofof race or gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September, 2024.

229. That data for 724,352 applicants for employment with ten of Workday's largest customers shows that Workday's job application platform and AI screening and selection process has disparate impact against women at greater than 36.5 standard deviations from what would be

expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process ~~is~~were gender neutral.

~~154.~~ 230. That degree of gender disparity is equivalent to odds greater than one in a quadrillion

that such process and AI features do not disproportionately impact ~~African Americans~~women.

. 231. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

232. It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ...., all in [customers] flow of work."

233. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

234. Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

235. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

236. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM)

software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

237.    Representative Plaintiff Jill E. Hughes is a white female who possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director.

238.    Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on female applicants.

239.    Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications:  Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

240.    She received rejections for all these positions, which often cited unmet minimum requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours.

241.    Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech.

242.    Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted ~2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on female applicants.

243.    Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

244.    She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours.

245.    Representative Plaintiff Faithlinh Rowe is an Asian-American female with many years of , Human Resource experience.

246.    Representative Plaintiff Rowe is a qualified professional who has submitted numerous applications Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on female applicants.

247.    Representative Plaintiff Rowe applied for an Associate Director HR Technology role at AT&T on Jul 15, 2024, and received an immediate rejection, despite meeting the position's qualifications. Likewise, on May 12, 2025, at 1:10 p.m., Representative Plaintiff Rowe applied for a Director, Human Resource Information Systems position with Kyndryl, Inc., by 1:40 p.m. (30 minutes later) she received a rejection email from kyndryl@myworkday.com.

248.    The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of gender.

249.    Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of gender.  There is no business necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category.

250.    Workday's AI screening and selection criteria and process are a pretext for racial

discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

251. Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

252. Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against the Representative Plaintiffs and the proposed class both within and outside the liability period in this case.

253. As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, the Representative Plaintiffs and the class they seek to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

254. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of Title VII and California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq.

255. In the absence of a direct employment relationship Workday can still be held liable under Title VII and FEHA for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**COUNT EIGHT**

**Disparate Impact Discrimination on the Basis of Race, ~~Gender,~~ and Age in violation of the California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq.**

~~.~~256. Plaintiffs restate and incorporate ¶¶ 50-70, 112-151 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count Four.

257. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis of race or gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September, 2024.

258. Such Workday-reported data shows that Workday's job application platform and AI screening process has disparate impact against African-Americans at a statistically significant rate of greater than 15.25 standard deviations from what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process is race neutral.

259. That degree of racial disparity is equivalent to odds greater than one in a quadrillion that such process and AI features do not disproportionately impact African Americans. ~~155.~~

~~That same data for 724,352 applicants for employment with ten of Workday's largest customers also shows that Workday's job application platform and AI screening and selection process has disparate impact against women greater than 36.5 standard deviations.~~

~~155.~~ 260. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

261. It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

262. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

263.    Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including  identifying candidates whose skills and experience most closely match a customer's open jobs."

264.    All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

265.    Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

266.    Since April 29, 2024, HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer -employers.

267.    The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024, including, but not limited to, Plaintiffs Jill E. Hughes, Sheliah Johnson-Rocha, Faithlinh Rowe and others.

268.    Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater than three standard deviations from what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

269.    Representative Plaintiff Rowe is an Asian-American female over the age of 40, with many years of Human Resource experience.

270.    Representative Plaintiff Rowe is a qualified professional who has submitted numerous applications Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on Asian, female, and over the age of 40 applicants.

271.    Representative Plaintiff Rowe applied for an Associate Director HR Technology role at AT&T on Jul 15, 2024, and received an immediate rejection, despite meeting the position's qualifications. Likewise, on May 12, 2025, at 1:10 p.m., Representative Plaintiff Rowe applied for a Director, Human Resource Information Systems position with Kyndryl, Inc., by 1:40 p.m. (30 minutes later) she received a rejection email from kyndryl@myworkday.com.

272.    The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of race and age.

273.    Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of race and age.  There is no business

necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category.

274.    Workday's AI screening and selection criteria and process are a pretext for racial discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use. Workday's employment practices operate as the functional equivalent of a pretext for discrimination.

275.    Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

276.    Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against Representative Plaintiff Rowe and the proposed class both within and outside the liability period in this case.

277.    As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, Representative Plaintiff Rowe and the class she seeks to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

278.    Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq.

279.    In the absence of a direct employment relationship Workday can still be held liable under FEHA for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**PRAYER FOR RELIEF**

WHEREFORE, the Representative Plaintiff and the Proposed Classes pray for relief as follow:

1. Certification of the case as a class action on behalf the proposed subclasses;

2. Designation of Plaintiff as representative of the subclasses;

3. Designation of Plaintiff's Counsel of record as Class Counsel;

4. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII, ~~42 U.S.C. § 1981,~~ the ADEA, the ADAAA, and Cal. Gov. Code §12940(I);

5. A preliminary and permanent injunction against the Company and its officers, agent, successors employees, representatives, and any and all persons acting in correct with them from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

6. An order that the Company institute and carry out policies, practices, and programs that provide equal employment opportunities for all minorities, and that it eradicate the effects of its past and present unlawful employment practices;

7. For back pay, front pay and other monetary relief according to proof (including interest and benefits);

8. For all damages sustained as a result of the Company's conduct according to proof;

9. For compensatory damages, nominal damages, and liquidated damages according to proof;

10. For exemplary ~~and punitive~~ damages in an amount commensurate with the Company's ability to

pay, to deter future conduct, and to set an example for others;

11. For reasonable attorneys 'fees and cost including under to the extent allowable by law;

12. Pre-judgment and post-judgment interest, as provided by law;

13. For such ancillary orders, decrees and such further legal and equitable relief as may be necessary to enjoin and restrain the improper conduct and wrongdoing of Defendant; and

14. For such other and further relief as the Court deems proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

*/s/~~Lee Winsto~~Roderick T. Cooks~~n~~*
Roderick T. Cooks (admitted pro hac vice)
Lee Winston (admitted pro hac vice)
Robert L. Wiggins, Jr. (admitted pro hac vice)
Ann K. Wiggins (admitted pro hac vice)
Jennifer Wiggins-Smith (admitted pro hac vice)
Attorney for the Plaintiff and the Proposed Classes and the Collective

**OF COUNSEL**:
Roderick T. Cooks (admitted pro hac vice)
Lee Winston (admitted pro hac vice)
lwinston@winstoncooks.com
State of Alabama Bar No.:6407O72L
Roderick T. Cooks
rcooks@winstoncooks.com
State of Alabama Bar No.:5819O78R
Winston Cooks, LLC
420 20th Street North
Suite#2200
Birmingham, AL 35203
Telephone: (205) 482-3551
Facsimile: (205) 278-5876

Robert L. Wiggins, Jr.
rwiggins@wigginschilds.com
Ann K. Wiggins
awiggins@wigginschilds.com
Jennifer Wiggins-Smith
jsmith@wigginschilds.com
Wiggins Childs Pantazis Fisher Goldfarb, LLC
The Kress Building,
301 19th Street North
Birmingham, AL 35203

Telephone: (205) 314-0500
Facsimile: (205) 254-1500

**LOCAL COUNSEL**:
Jay Greene
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108
Phone 415-905-0215
greeneattorney@gmail.com
Attorneys for the Plaintiff, Collective and Proposed Classes

**Certificate of Service**

I hereby certify that on November 12, 2025, I electronically filed the foregoing document with
the United States District Court for the Northern District of California by using the CM/ECF system which notifies:

Erin M. Connell econnell@orrick.com

Julie Ann Totten jtotten@orrick.com

Kayla Delgado Grundy kgrundy@orrick.com

*s/~~Lee Winston~~Roderick T. Cooks*
Of Counsel