1   Lee D. Winston (ASB: 6407O72L)                Robert L. Wiggins, Jr. (ASB:17534G63R)
    *Admitted pro hac vice*                       *Admitted pro hac vice*
2   lwinston@winstoncooks.com                     rwiggins@wigginschilds.com
    Roderick T. Cooks (ASB: 5819O78R)             Ann K. Wiggins (ASB:7006i61a)
3   *Admitted Pro Hac Vice*                       *Admitted pro hac vice*
    rcooks@winstoncooks.com                       awiggins@wigginschilds.com
4   Bethany Mae Logan (1360X15Z)                  Samuel Fisher (ASB: 2675E68S)
    *Admitted Pro Hac Vice*                       *Admitted pro hac vice*
5   bneal@winstoncooks.com                        sf@wigginschilds.com
    Winston Cooks, LLC                            Jennifer Wiggins Smith (ASB:9622E53S)
6   420 20th Street North, Suite 2200,            *Admitted Pro Hac Vice*
7   Birmingham, AL 35203                          jsmith@wigginschilds.com
                                                  Nicki L. Lawsen (ASB: 2602C00K)
8   Jay Greene, JD, CPA                           *Admitted Pro Hac Vice*
9   Green Estate, Probate and Elder Law Firm      nlawsen@wigginschilds.com
    447 Sutter Street, Suite 435                  Freddrick M. Moore (ASB: 7952L20o)
10  San Francisco, Calf. 94108                    *Admitted Pro Hac Vice*
11                                                mmoore@wigginschilds.com
                                                  Wiggins Childs Pantazis Fisher and Goldfarb
12                                                301 North 19th Street, Birmingham, AL 35203
13              *Attorneys for the Plaintiff and Proposed Class and Collective Members*

14  Julie A. Totten (State Bar No. 166470)
    jatotten@orrick.com
15  Erin M. Connell (State Bar No. 223355)
    econnell@orrick.com
16  Kayla D. Grundy (State Bar No. 300513)
    kgrundy@orrick.com
17  Alexandria R. Elliott (State Bar No. 320293)
    aelliott@orrick.com
18  Orrick, Herrington & Sutcliffe LLP
    The Orrick Building, 405 Howard Street
19  San Francisco, CA  94105-2669
    Telephone:    (415) 773-5700, Facsimile:    (415) 773-5759
20                          Attorneys for Defendant, WORKDAY, INC.

21              UNITED STATES DISTRICT COURT
22         FOR THE NORTHERN DISTRICT OF CALIFORNIA

23  DEREK L. MOBLEY for and on behalf of          Case No. 3:23-cv-00770-RFL
    himself and other persons similarly situated, **PARTIES' JOINT DISCOVERY**
24  *Plaintiff,*                                   **DISPUTE LETTER**
                                                   Courtroom: B (15th Floor)
25          v.                                     Magistrate Judge Laurel Beeler

26  WORKDAY, INC.,
    *Defendant.*
27

28          PARTIES' JOINT DISCOVERY DISPUTE LETTER

Dear Judge Beeler:

This joint letter comes pursuant to the Court's Standing Order on discovery disputes. As required, the Parties have met and conferred about the disagreements addressed below.

**Plaintiffs' Position**

The Parties met and conferred on February 9, 2026, regarding Workday's responses and objections to Plaintiffs' second document production requests served December 2, 2025. Exh. A;  ECF 220-1; ECF 226-1 ("second RFPs"). Plaintiffs first served their section of this letter on February 13, 2026, and the parties have exchanged drafts and replies in the more than two weeks since then.

**I. The Data And Document Requests At Issue**

Plaintiffs' second document requests seek production of Workday's raw factual data and records essential to identifying and calculating racial, gender, age, and disability disparities in its applicant screening and hiring process. *See* Exhs. A, B, C & D (identifying and quoting data). Workday has not argued that such raw factual data is privileged except for the limited category it calls "bias testing data, and sometimes refers to as "bias audit data" or just "Testing Data." *See infra* pp. 4-5 and ECF no. 124 at 4. Workday has not included the remaining data requests as part of that privilege category or objection. *Id.* All such remaining data and records necessary to calculate race, gender, age, or disability disparities are **physical facts** that exist independently from any attorney or attorney-client communication or privilege. The Supreme Court has long held that the attorney-client privilege "extends only to communications and not to facts." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). "[T]he data underlying the statistical analysis is not protected from disclosure by the attorney-client privilege or the work-product doctrine." *Suboh v. Bellsouth Bus. Sys.*, 2004 U.S. Dist. LEXIS 31422, **24-25 (N.D. Ga. 2004) (citing *Upjohn*, 449 U.S. at 395). Workday has not argued or attempted to satisfy its burden of showing that any attorney was involved in generating such underlying data, or that any confidential attorney-client communication — rather than a mere business communication — is at issue. *Greer v. Cnty. of San Diego*, 127 F.4th 1216, 1227 (9th Cir. 2025) ("the objecting party has the burden of establishing the privileged nature of the communication").

Rather than asserting attorney-client privilege regarding such underlying factual data — a position it does not even maintain in its current response — Workday argues instead that it "has already agreed to produce applicant data for individuals who applied to Workday and were issued scores via CSM or Spotlight, including anonymized demographic, job, and candidate qualification data" and that "it is in the process of collecting this data . . . by the end of February." *Infra* at 5. Although that belated production commitment is welcomed as far as it may go, it falls dramatically short of what was actually requested three months ago on December 2, 2025. *Id.* First, no such documents were promised or even referenced in response to second RFPs 8, 12 (first half), 13, 19-20, and others. Exh. B (quoting such requests). Second, the documents promised in response to second RFPs 1-2, 12 (second half), and others do not address or relate to the specific subparts of each such request. *See* Exh. A & B at 2nd Request nos. 1(a-h), 2(a-h), 3, 4(a-g), 7(a-d), 14(a-e), 17, 24, and 25. Plaintiffs are  "entitled to individualized, complete responses to each of the requests, as numbered and identified in the requests, accompanied by production of each of the documents responsive to the request, regardless of whether the documents have already been produced." *Amaya v. Menzies Aviation USA, Inc.*, 2024 U.S. Dist. LEXIS 220642 *, 2024 WL 5413116 (C.D. Cal. December 4, 2024) (quoting *Louen v. Twedt*, 236 F.R.D. 502, 505 (E.D. Cal. 2006).

1

**PARTIES' JOINT DISCOVERY DISPUTE LETTER**

## II. Workday's Waiver Argument Is A Red Herring That Does Not Apply Here

Workday's waiver argument rests on a fundamental legal error: a party cannot waive rights with respect to privilege objections which were never made to begin with. Nor can a failure to brief such a non-existent objection in a prior phase of the case waive a motion to compel such documents when they continue not to be produced thereafter, as here. There was simply nothing to brief, and nothing to waive, regarding privilege objections which were never *made in that phase or currently.* *See infra* at 4-5; ECF nos. 124 at 4 & nos. 130, 133, 136, 141) (asserting privilege and requiring briefing only as to "bias testing data" that was "curated" by in-house counsel)).

Plaintiffs agree with, and do not dispute, the following facts on this subject in Workday's waiver section below at pp.4-5:

- "Workday asserted privilege objections over its **testing** of its products, the Parties met and conferred about those objections, and Plaintiffs initiated a joint discovery dispute which was filed with the Court and culminated in a deadline by which Plaintiffs were to file further briefing." *Infra* at 4 (citing ECF 124; emphasis added);
- "At that time, Plaintiffs' counsel informed counsel for Workday that they intended to challenge Workday's privilege assertion over its **bias testing**." *Infra* at 5 (emphasis added);
- "Therein, Workday stated that its internal audits and analyses were privileged. Plaintiffs knew then—and Workday has reaffirmed many times since that day—that Workday asserted privilege over its **bias testing**." *Infra* at 5 (referring to and citing ECF 124) (emphasis added);
- "Unlike testing data, Workday has *never* asserted privilege over data about job applicants who applied to work for Workday since Workday began using CSM or HiredScore." *Infra* at 5 (Workday's emphasis).
- Workday's Position only requests that the Court "decline to consider Plaintiffs' arguments regarding **bias testing data** which should have been briefed more than six months ago." *Infra* at 5.
- "At the time of Workday's responses to Plaintiffs' requests, Workday confirmed to Plaintiffs that it would produce applicant data as described in its responses by the end of the month." *Infra* at 5.[1]
- The Parties' prior Joint Letter included "the issue of whether Workday's **bias testing** is privileged and whether Workday has **possession, custody, and control** of its customers' data." *Infra* at 4 (citing ECF nos. 124 at 4-5, 130, 133, 141; parenthesis omitted; emphasis added).

Those agreed-upon facts show that Workday's waiver argument *only* applies to its "bias testing data," not the other types of data requested in Plaintiffs' second RFPs. (Exhs. A, B, C & D). Nor do such second RFPs duplicate the first. *See* Exh. B (side-by-side comparison of first RFP Nos. 9, 14, and 15 with second RFP Nos. 8, 12–14, 19). The second RFPs target distinct, non-privileged categories of raw data and records that Workday has never argued to be privileged to begin with. *Id.* Workday's privilege asserted for its "bias testing data" — that "Workday's counsel curated the [bias testing] data" by "advis[ing] which data fields to include in its analysis" and "attorney work product dataset" — simply never applied to the quite different data requested in Plaintiffs' second RFPs. *Id.*; *see also* ECF 124, at p. 4 (Workday's section). The briefing of that limited privilege did not go forward once Workday notified Plaintiffs' counsel that its attorney-curated "testing" data "*does not exist anymore.*" (emphasis added).  Exh. E (July 8, 2025 email telling Plaintiffs' counsel that it had just been "learned that Workday no longer has the data it used to conduct its privileged bias testing" and that "the data plaintiff seeks does not exist anymore.") (emphasis added); ECF 124 at 4 (admitting "Workday no longer has access to even the limited, attorney work product dataset."); No conceivable waiver occurs in that circumstance. Rather than pursuing such futile briefing, Plaintiffs

---

[1] Workday's claimed "end of February" production is itself unreasonable under the circumstances. It cites *Steadfast Insurance Co. v. United States* for the proposition that production within a reasonable time is sufficient. But that case involved a routine production timeline — not a situation, as here, where requests were served nearly three months prior and where the producing party failed to even commit to a production date until after a discovery dispute was initiated. Rule 34 provides 30 days to respond. Given that Workday has now unilaterally taken three months without producing any such data, it should be ordered to serve such production immediately.

**PARTIES' JOINT DISCOVERY DISPUTE LETTER**

prepared and served their second Requests for the raw aggregate and statistical data currently sought that was not subject to that same attorney "testing data" privilege or objection. *See* ECF 124 at 4.

Furthermore, the second RFPs were served by and on behalf of newly added Opt-In Plaintiffs and amended class representatives — 24 separate individuals who were not parties to this case when the first round of discovery and the May 8, 2025 dispute arose. *See* ECF 220-1, p. 2; ECF 231(2nd Amended Complaint). As independent Parties in their own right, *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1101-02 (9th Cir. 2017), those newly added Parties are not bound by discovery decisions made by Derek Moseley before they joined this case. *See* 29 U.S.C. §216(b). Workday's citation to *Donahoe v. Arpaio* addresses intervenors in a traditional sense—it has no application to FLSA opt-in plaintiffs, who are independent parties with independent rights. The second RFPs also encompass newly added gender discrimination and California FEHA claims not addressed in any prior proceeding, further defeating any claim of duplication or waiver.

Workday's authorities only address delay in pursuing *already-pending* motions to compel, not new requests. *See Unilin Beheer B.V. v. NSL Trading Corp.*, 2015 WL 12698283 (motion to compel already on file); *Kenyon Energy, LLC v. Exyte Energy, Inc.*, 2024 WL 4011887 (same). They are inapposite.

### III. Workday Has Full Possession And Control Of The Requested Data & Records

Workday cannot credibly contend that it lacks possession or control of such underlying "aggregate" or "statistical" data. Section 3.6 of its Master Agreement with customer-employers stipulates that Workday "**owns the aggregated and statistical data** derived from the operation of the Service, including, without limitation, the reports processed in the Service and the performance results for the Service." Exh. I attached. Section 3.1 also states that "Workday and its licensors **own** all right, title and interest in and to the Service, Documentation, and other Workday Intellectual Property Rights." *Id.* (emphasis added). In its capacity as owner, Workday necessarily has possession and control of the documents and records it owns and stores.

### IV. No Privilege Log Identifies Any Priveleges Asserted For Second RFP Data

Contrary to Workday's argument, its privilege log for Plaintiffs' first RFPs—whatever its adequacy—does not identify any privilege asserted for the type of raw data and records requested in Plaintiffs' second RFP nos. 8, 12 (first half) 13–14, 19 or RFP nos. 1-4, 7, 12 (2nd half), 17, 24, 25. Nor has Workday otherwise identified any privilege it asserts for such data requests.

### V. Relief Requested

Plaintiffs respectfully request that the Court: (1) order Workday to produce all documents responsive to the second RFPs for which no valid privilege has been asserted within 14 days; (2) order Workday to produce a compliant privilege log for the second RFPs within 14 days; and (3) reject Workday's waiver defense in its entirety as inapplicable to discovery requests for which it has asserted no privilege or that postdate the prior proceedings on which it relies.

### **Workday's Position**

Plaintiffs have continued to change the scope of this discovery dispute over time. Workday responds to Plaintiffs' positions as articulated in this letter below.

### I.    Meet and Confer Efforts

The Parties met and conferred on February 9, 2026. Plaintiffs informed Workday that they intended to ask the Court to address the discovery issues raised in the Parties' May 8, 2025 joint discovery letter, ECF No. 124, despite Workday's position that Plaintiffs waived those arguments by failing to comply with the Court's order, ECF Nos. 130, 133, 141. Plaintiffs are wrong in stating those disputes were not part of the parties' meet and confer efforts. *See* Ex. F. Plaintiffs further stated

1  that they intended to challenge Workday's position that its production is complete. Finally, Plaintiffs
2  identified a number of requests by request number that they intended to address but did not
   specifically state their concerns with Workday's responses.

3     **II.    Plaintiffs' Testing Data Request**

4        Despite their characterization otherwise, Plaintiffs' data requests are not new. Plaintiffs first
   propounded requests for "audit documents performed [] for bias," "any tests, validations, and/or
5  assessments . . . including but not limited to bias testing or auditing," and "Workday's internal data
   regarding the impact of AI or ML deployed on applicants" on September 3, 2024. Workday asserted
6  privilege objections over its testing of its products, the Parties met and conferred about those
7  objections, and Plaintiffs initiated a joint discovery dispute which was filed with the Court and
   culminated in a deadline by which Plaintiffs were to file further briefing. *See* ECF No. 124 (briefing
8  the issue of whether Workday's bias testing is privileged and whether Workday has possession,
   custody, and control of its customers' data); *see also* ECF Nos. 130, 133, 141. Plaintiffs never filed
9  such briefing.
        Plaintiffs seek to avoid their waiver by propounding duplicative requests and calling them
10  "new." This is improper. *See e.g.*, *Viastat, Inc. v. Space Systems/Loral, Inc.*, 2013 WL 3467413 (S.D.
11  Cal. July 10, 2013) (declining to permit "an end run around discovery deadlines that were missed
   through a party's own lack of due diligence" and warning that "The consequences for failing to meet
12  Court deadlines are undermined if the neglectful party is allowed to seek the same information
13  through a different discovery vehicle."). Plaintiffs' cites to *Campbell* and 29 U.S.C. § 216(b) do not
   dictate otherwise. If the opt-in plaintiffs sought a fresh bite at the apple, they were required to initiate
14  their own litigation, not join this one where Plaintiffs and their counsel had already made discovery
   decisions. *See, e.g.*, *Donahoe v. Arpaio*, 2012 WL 2675237, at *3 (D. Ariz. July 6, 2012) ("An
15  intervenor must join subject to the proceedings that have occurred prior to his intervention; he cannot
16  unring the bell") (internal citations and quotations omitted). Plaintiffs' amended complaint also does
   not change the analysis. *See El-Shawary v. US Bank Nat'l Ass'n as Tr. for GSR Mortg. Loan Tr. 2006-
17  4F Mortg. Pass-Through Certificate Series 2006-4F*, No. C18-1456-JCC, 2020 WL 6270798, at *4
   (W.D. Wash. Oct. 26, 2020) (amended complaint "do[es] not justify a wholesale reopening of
18  discovery or an opportunity for Defendants to conduct discovery they failed to diligently pursue
19  during the discovery period."). Ultimately, Plaintiffs point to no authority suggesting they are entitled
   to propound duplicative discovery on behalf of new Plaintiffs, and they are not.
20      When initially setting a briefing schedule these same issues Plaintiffs seek to raise now,
   this Court ordered Plaintiffs to file a brief by May 30, 2025. ECF No. 130. The Court then extended
21  Plaintiffs' briefing deadline, pursuant to the Parties' stipulation, to June 10, 2025, and subsequently
22  to July 11, 2025. ECF Nos. 133, 141. On July 9, 2025, Plaintiffs' counsel requested that Workday
   agree to extend the briefing schedule further. Workday agreed to do so and, at 7:16 PM the day before
23  their brief was due, Plaintiffs filed a request to extend the schedule. ECF No. 155. The Court never
   ruled on the Parties' stipulation and therefore, Plaintiffs' brief was due on July 11, 2025. *See* Local
24  Rule 6-1(b) ("A Court order is required for any enlargement or shortening of time that alters an event
   or deadline already fixed by Court order."). Notwithstanding, Plaintiffs also did not file their brief by
25  their proposed stipulated deadline of September 26, 2025. ECF No. 155.
        Now, Plaintiffs seek to re-raise issues they first brought to the Court's attention almost a year
26  ago and that the Court ordered they brief *more than six months ago*. Plaintiffs' failure to file a
   discovery motion in accordance with the Court's order should preclude them from raising this issue
27  now. *See Unilin Beheer B.V. v. NSL Trading Corp.*, No. CV 14-2210 BRO (SSX), 2015 WL
   12698283, at *3 (C.D. Cal. July 24, 2015) ("Undue delay in filing a motion to compel may be a
28  sufficient ground for denying the motion."); *Kenyon Energy, LLC v. Exyte Energy, Inc.*, No. CV 22-
   00534 HG-RT, 2024 WL 4011887, at *1 (D. Haw. July 26, 2024) ("[motion to compel] fails in its

                                    4
              **PARTIES' JOINT DISCOVERY DISPUTE LETTER**

entirety because, by waiting six months to raise discovery challenges to objections Plaintiffs interposed on September 29, 2023, Defendant failed to act with appropriate diligence"); *Patriot Rail Corp. v. Sierra R. Co.*, 2011 WL 3319579, at *2 (E.D. Cal. 2011) (even if motion to compel was filed within deadline set by court, six-month delay in filing motion showed lack of diligence and made motion untimely); *Exp.-Imp. Bank of Korea v. ASI Corp.*, No. CV162056MWFJPRX, 2018 WL 2718046, at *2 (C.D. Cal. May 29, 2018) (denying motion to compel where "Plaintiff declined or failed to follow the Court's instructions in filing its supplemental brief," and therefore "forfeited its right to have its motion heard on the merits.").

Plaintiffs have known that Workday claimed privilege over its bias testing since January 2025. On January 12, 2025—before this matter was referred to this Court for discovery disputes—the Parties agreed to exchange categorical privilege logs. At that time, Plaintiffs' counsel informed counsel for Workday that they intended to challenge Workday's privilege assertion over its bias testing. Workday produced its first categorical privilege log on January 21, 2025. Therein, Workday stated that its internal audits and analyses were privileged. Plaintiffs knew then—and Workday has reaffirmed many times since that day—that Workday asserted privilege over its bias testing. Plaintiffs cannot propound duplicative discovery requests to reopen disputes that they long ago abandoned.

The Court should decline to consider Plaintiffs' arguments regarding bias testing data which should have been briefed more than six months ago.[2]

### III.    Plaintiffs' Request for Workday Applicant Data

Plaintiffs continue to conflate two entirely distinct sets of data, despite Workday's attempts to clarify. Unlike testing data, Workday has ***never*** asserted privilege over data about job applicants who applied to work for Workday since Workday began using CSM or HiredScore. At the time of Workday's responses to Plaintiffs' requests, Workday confirmed to Plaintiffs that it would produce applicant data as described in its responses by the end of the month. Workday is diligently working on compiling the requested data and cannot produce the data before it is collected. Workday has no reason to maintain applicant exports including the information Plaintiffs request in the regular course of business. Furthermore, Workday requested clarifying information from Plaintiffs concerning part of their request for applicant information on February 2, 2026. Plaintiffs have declined to clarify their request, despite follow up requests by Workday.

### IV.    Privilege Log

Finally, Plaintiffs allege that Workday's extensive privilege log is deficient. Workday's privilege log meets the requirements of this Court's Standing Order. Plaintiffs' second set of discovery requests are almost entirely duplicative of their first set. Indeed, the vast majority of Workday's responses confirm that Workday has already produced the responsive, nonprivileged documents it agreed to produce. Given the extensive overlap, Workday's privilege log applies equally to the present discovery requests. Plaintiffs' argument to the contrary is meritless.

### V.    Conclusion

Workday requests that the Court deny Plaintiffs any relief as to discovery issues raised in their letter.

---

[2] To the extent the Court is inclined to reach the merits of Plaintiffs' arguments, Workday requests that the Court (again) order additional briefing on these issues. *See* ECF No. 130.

**PARTIES' JOINT DISCOVERY DISPUTE LETTER**

Dated: March 2, 2026

WIGGINS CHILDS FISHER GOLDFARB
By: s/Robert L. Wiggins, Jr.

Lee D. Winston (ASB: 6407O72L)
*Admitted pro hac vice*
lwinston@winstoncooks.com
Roderick T. Cooks (ASB: 5819O78R)
*Admitted Pro Hac Vice*
rcooks@winstoncooks.com
Bethany Mae Logan (ASB: 1360X15Z)
*Admitted Pro Hac Vice*
bneal@winstoncooks.com
Winston Cooks, LLC
420 20th Street North, Suite 2200
Birmingham, Alabama 35203
Telephone: (205) 502-0970
Facsimile: (205) 278-5876

Robert L. Wiggins, Jr. (ASB: 1754G63R)
*Admitted Pro Hac Vice*
rwiggins@wigginschilds.com
Ann K. Wiggins (ASB: 7006i61a)
*Admitted Pro Hac Vice*
awiggins@wigginschilds.com
Samuel Fisher (ASB: 2675E68S)
*Admitted Pro Hac Vice*
sf@wgginschilds.com
Jennifer Wiggins Smith (ASB:9622E53S)
*Admitted Pro Hac Vice*
jsmith@wigginschilds.com
Nicki L. Lawsen (ASB: 2602C00K)
*Admitted Pro Hac Vice*
nlawsen@wigginschilds.com
Freddrick M. Moore (ASB: 7952L20o)
mmoore@wiggins childs.com
*Admitted Pro Hac Vice*
Wiggins Childs Pantazis Fisher and
Goldfarb
301 North 19th Street
Birmingham, Alabama 35203
Telephone: (205) 314-0500,
Facsimile: 205) 254-1500

Attorneys for the Plaintiff and the Proposed Classes and Collective

ORRICK, HERRINGTON & SUTCLIFFE LLP

Julie A. Totten (State Bar No. 166470)
jatotten@orrick.com
Erin M. Connell (State Bar No. 223355)
econnell@orrick.com
Kayla D. Grundy (State Bar No. 300513)
kgrundy@orrick.com
Alexandria R. Elliott (State Bar No. 320293)
aelliott@orrick.com
Orrick, Herrington & Sutcliffe LLP
The Orrick Building, 405 Howard Street
San Francisco, CA 94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Attorneys for Defendant Workday, Inc.

## EXHIBIT A

## Comparison Of 1st Requests For Audit Data To 2nd Requests For Raw Component Data

**1st RFP #9:** "Workday's internal data regarding the impact of AI or ML deployed on applicants of color, and if available, on age, and/or applicants with disabilities."

**1st RFP # 14:** Produce any audit documents performed by an independent auditor for bias regarding Workday's AI and/or ML.

**1st RFP # 15:** "Produce any audit documents performed internally for bias regarding Workday's AI and/or ML."

**2nd RFP # 8:** "Produce and identify…all … data or other information which identify, … components or aspects of Workday's application, screening or selection process … including …(e) … all 'Aggregated Data', statistical data and/or other deidentified data which shows …whether such features or components have disparate impact … on Workday's applicants or candidates for employment as Workday employees based in whole or in part on race, gender, age or disability.…"

**2nd RFP # 12:** "In regard to [whether] …Workday uses 'AI tools …to process personal information … and "to review job applications, CVs and resumes" …, produce and identify … the following: \*\*\* (c) the data …that show[s] …whether such "AI tools" have … disparate impact …or 'bias'…, including… all "Aggregated Data", statistical data and/or other "deidentified" data … which permits … analysis of the disparate impact … of such…"AI tools."

**2nd RFP 13:** "In regard to…Workday's "Recruitment Privacy Statement" that it uses "AI grading" … during initial sifting stages" and/or … [for] minimum job requirements," produce and identify the . . data or other information which identify… (f) the disparate impact … of such AI grading …and/or "minimum job requirements" … including, …all 'Aggregated Data,' statistical data and/or other 'deidentified' data … on which such analysis or determination was based.

**2nd RFP 14 (c):** "In regard to Workday's statement that its 'talent acquisition team uses . : . AI generated grades to help shortlist and prioritize applications in the recruitment process,', …produce and identify the … data or other information which…, disclose … (c) the disparate impact … of such 'AI generated grades [used] to help shortlist and prioritize applications in the recruitment process' in whole or in part, including … all 'Aggregated Data,' statistical data and/or other 'deidentified' data, information, records or documents . . . ."

**2nd RFP 19:** "In regard to the … [whether] Workday 'use[s] AI tools to process job applications …, produce and identify … (d) all data and/or analysis which shows …that the foregoing "AI tools" …have … disparate impact"

**2nd RFP 20:** "In regard to … [whether] Workday's 'AI tooling extracts personal information … and "then work[s] out how closely this personal information matches the requirements of the role available, and assigns a suggested grade reflecting how close the match is … , produce and identify … (c) all such data …which shows … whether such AI-powered 'extractions' and 'matches' have …disparate impact."

## EXHIBIT B

### WORKDAY'S SUBSTANTIVE RESPONSES TO 2ND RFPs SERVED FEB. 2, 2026

### REQUEST FOR PRODUCTION NO. 1:

Produce and identify the application, recruitment, and hiring-related documents, data and/or information of each person who applied to Workday to be hired or employed as a Workday employee between September 24, 2020 and the present, or whose application to be hired or employed as a Workday employee was active at any point between September 24, 2020 and the present, including but not limited to any and all documents, data and/or individual and aggregate information that identifies, states, shows and/or that otherwise discloses, infers or relates to the following information for each such person:

(a)    their name, race, gender, birthdate, mail address, email address, phone number and other contact information;

(b)    the jobs, positions and other job opportunities for which they applied or were considered, including the dates they applied or were considered;

(c) the scores, ranks or other metric or criterion applied or used in screening or disposing of their application or candidacy for each such job or position;

(d)    the specific screening or selection procedure or criteria used or relied upon to produce or apply such scores, ranks or other metric or criterion;

(e)    the persons's [*sic*] education, job history, prior experience and/or qualifications at the time they applied or were considered; and

(f)    the disposition, outcome or result of their application or candidacy, including the jobs or positions that they were hired or selected to fill, if any, and the dates they held such each such job[s]or position[s];

(g)    the reason[s] that any such applicant or candidate was not selected or hired for any Workday jobs or positions for which they applied or were considered for but not selected;

(h)    and any and all aggregate tabulation and/or analysis of the foregoing information, data, records or other documentation in whole or in part, including, but not limited to, any and all "bias audits," "statistical testing" and/or other tabulation and/or analysis of the disparate impact or effect of such matters in whole or in part.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

\*\*\* Construing this Request to seek data about candidates who applied for employment with Workday and were issued scores via CSM or Spotlight, Workday will produce anonymized demographic, job, and candidate qualification data for candidates that applied to Workday and were so scored since September 24, 2020.

### REQUEST FOR PRODUCTION NO. 2:

Separately for each of the following opt-in parties to this case who applied to be hired for a Workday job or position since September 24, 2020—Jason Adams, Diana El-Berry, Anthony Fox, Cynthia Monfredi, Katrina Nelson, Roger Mosley, David Stephenson, Denise Russell, Elizabeth Louis, Kenyon Johnston, Michael Street, Tracey Harriott, Theresa Gal, Shanice Love,

Leigh-Ann Carnegie, Stephen Duclos, John Erwin, Jr., Felicia Ives, Dionne Joseph, Noah Westwind, Tunde Adedoyin, Steve Hurry and Christopher Phelan—produce and identify for each such person any and all records, documents, data and/or other individual and aggregate categories of information set forth in Request For Production #1 (a-h) above.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

*** Construing this Request to seek data about candidates applying for employment with Workday,…Workday will produce demographic, job, and candidate qualification data for candidates that Plaintiffs identify as applying to Workday since September 24, 2020.

### REQUEST FOR PRODUCTION NO. 3:

Produce and identify … all records, data, information,[etc] that shows …or relates to the assessment or documentation of the adverse or disparate impact … of your Candidate Skills Match ("CSM") … and/or other Workday AI-related algorithm(s) or feature(s), including Fetch and/or Spotlight … on race, gender, age or disability, including … any such adverse impact or disparities in recruiting, screening, scoring, ranking, hiring, promoting or retaining Workday employees … before or after September 24, 2020.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

***Workday responds as follows: … Workday has produced non-privileged documents sufficient to describe its analyses of CSM, Spotlight, and Fetch. Workday will not produce additional documents in response to this Request because …Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025.[citing ECF Nos. 130, 133, 141]

### REQUEST FOR PRODUCTION NO. 4:

Produce and identify any and all records, data, information, analysis, "bias audits" or other documents that identify [or] show, …Workday's jobs, …for which applicants or candidates are screened, scored, ranked, hired, …or evaluated on the basis of either Candidate Skills Match, Fetch, Spotlight or any other Workday AI-related feature …including … the following: ***

      (b)     any and all data and information used by or for Workday to conduct "bias audits" or otherwise assess …whether there are racial, gender, age or disability differences in the impact … of Workday's AI features …on recruiting, hiring, promoting or retaining Workday employees generally and/or for specific Workday jobs … or functions;

      (c)     any and all such "bias audits" and other analysis conducted by or for Workday to assess …such adverse or disparate impact on Workday's applicants and/or employees generally and for specific Workday jobs … and/or functions;

      (d)     any and all analysis conducted by or for Workday which found, suggested or inferred any such adverse or disparate impact on Workday's applicants and/or employees generally and/or for specific Workday jobs … and/or functions;

      (e)     any and all documents, records, data, information, analysis, or "bias audits" that identify and/or describe the specific duties, qualifications and components of Workday's jobs or positions that (i) have been assessed, scored, ranked or otherwise screened or affected by Workday's AI features or algorithm[s]; and/or (ii) have been found or inferred to have had adverse or disparate impact or effect on applicants and/or candidates for such jobs or positions or for components of the screening, scoring, ranking and processing for such jobs and positions.

(f)    any and all documents, records, data, information, analysis, or "bias audits" which identify, show, tend to show and/or describe how Workday's AI features or algorithm[s] assess, score, rank, or otherwise screen applicants or candidates for specific Workday jobs and positions, and/or specific knowledge, skills, abilities, job experience or personal characteristic's [sic] of Workday's jobs, positions and functions;

(g)    any and all records, data, information, analysis, "bias audits" or other documents that identify and/or show the "Aggregated Data", statistical data and/or other "deidentified" data that discloses, describes or lists the the [sic] applications, CVs, resumes and/or other information that Workday has received from, or as part of or through, its job application platform, and/or any aspect of Workday's AI or other tools, products, services, algorithms, criteria, scores, ranks or other means of considering or processing information about Workday's applicants or candidates for employment as Workday employees ("screening and selection criteria and procedures"), including, but not limited to, all such analysis, quantification, tabulation or data based in whole or in part on race, gender, age or disability, and/or differences in the adverse impact, effect or "bias" of such screening and selection procedures based in whole or in part on race, gender, age or disability at any point in time.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Subject to and without waiving the aforementioned objections, Workday responds as follows: Construing this Request to seek data about candidates who applied for employment with Workday and were issued scores via CSM or Spotlight, Workday will produce anonymized applicant demographic, job, and candidate qualification data for candidates that applied to Workday and were so scored since September 24, 2020.

**REQUEST FOR PRODUCTION NO. 5:**

Produce and identify any and all records, data, information, analysis, "bias audits" or other documents that identify, show, tend to show, disclose, describe or list each Workday's screening, selection or recruitment procedures that use, includes or rely upon artificial intelligence, in whole or in part, including, but not limited to, each and every Workday product, service, platform, algorithm, function and/or other procedure or component that, includes or relies upon artificial intelligence in screening, selecting, recruiting or retaining applicants, candidates or employees for Workday jobs or positions.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Subject to and without waiving the aforementioned objections, Workday responds as follows: After a reasonably diligent search, and construing this Request to seek documents identifying Workday software features that use artificial intelligence to screen, sort, score, or rank applicants for employment, Workday has produced documents sufficient to identify such features.

**REQUEST FOR PRODUCTION NO. 6:**

Produce and identify any and all documents, records, data or other information which identifies, discloses or lists Workday's official and/or colloquial name or other means of identifying each Workday product, service, platform, algorithm, function and/or other screening, selection or recruitment procedure or component, including, but not limited to, those that use, include or rely upon artificial intelligence to hire, employ, promote or retain Workday employees.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**
Subject to and without waiving the aforementioned objections, Workday responds as follows: After a reasonably diligent search, and construing this Request to seek documents identifying Workday software features that use artificial intelligence to screen, sort, score, or rank applicants for employment, Workday has produced documents sufficient to identify such features.

**REQUEST FOR PRODUCTION NO. 7:**
Produce and identify any and all documents, records, data or other information which identifies, discloses or lists the following for each of Workday's AI-related screening, selection or recruitment procedures, components, platforms, products, services, and/or features: (a) the name, race, gender, age, and/or disability of each Workday applicant, candidate and/or employee who has been scored, ranked, screened or otherwise assessed pursuant to such AI-related procedures in whole or in part; (b) the resulting scores, ranks and/or other assessments of each such person pursuant to each such AI-related tool or procedure; (c) the particular Workday product, service, platform and/or algorithm which produced such score, rank or assessment for each such person; and (d) the dates and time period that Workday used, included or relied upon each such AI-related screening, selection or recruitment procedureor [*sic*] component.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**
Subject to and without waiving the aforementioned objections, Workday responds as follows: Construing this Request to seek data about candidates who applied for employment with Workday and were issued scores via CSM or Spotlight, Workday will produce anonymized applicant demographic, job, and candidate qualification data for candidates that applied to Workday and were so scored since September 24, 2020.

**REQUEST FOR PRODUCTION NO. 8:**
Produce and identify…all documents, records, data or other information which identify, … components or aspects of Workday's application, screening or selection process which use or have been based on … its AI-related features or algorithm[s] including …: (a) the Workday jobs … which are filled … on the basis of each such AI features or components; (b) the results of any "bias audits" or other analysis of the … disparate impact … of each such AI feature or component; … and  (e) … all 'Aggregated Data', statistical data and/or other deidentified data which shows or is related to whether such features or components have disparate inpact… on Workday's applicants or candidates for employment as Workday employees based in whole or in part on race, gender, age or disability.…

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**
*** Workday responds as follows: … Workday has produced documents sufficient to …describe Workday's non-privileged analyses of these features. Workday will not produce additional documents in response to this Request because … Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch. *** *See* ECF Nos. 130, 133, 141.

**REQUEST FOR PRODUCTION NO. 9:**
Produce and identify any and all documents, records, data or other information which identify, disclose or list the Workday products, services, platforms, algorithms and components

which do not use, include or rely upon artificial intelligence in screening, selecting, recruiting or retaining applicants, candidates or employees for Workday jobs or positions.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Subject to and without waiving the aforementioned objections, Workday responds as follows: Workday produced its Human Capital Management manual which describes the Workday Recruiting product including features that do not use artificial intelligence.

**REQUEST FOR PRODUCTION NO. 10:**

Produce and identify…all documents, records, data or other information which identify, …Workday's screening, selection or recruitment procedures that have been developed on the basis [of ] or subject to Workday's policies, practices and protocols set forth in its "AI Fact Sheet" (as defined above… WORKDAY_MOB_00002741-00002746.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

\*\*\* Workday responds as follows: Exhibit A reflects the Fact Sheet describing analyses Workday performed with respect to CSM. Workday has already produced documents and information sufficient to describe its non-privileged analyses of CSM. Workday will not produce additional documents in response to this Request because …Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch. …*See* ECF Nos. 130, 133, 141.

**REQUEST FOR PRODUCTION NO. 11:**

Produce and identify any and all documents, records, data or other information which identify, disclose or list the components of Workday's screening, selection or recruitment procedures that have been developed on the basis of, or subject to, Workday's applicant "Recruitment Privacy Statement" attached as Exhibit B hereto.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Subject to and without waiving the aforementioned objections, Workday responds as follows: Workday's Recruitment Privacy Statement does not apply to particular "screening, selection or recruitment procedures." Rather, the Recruitment Privacy Statement addresses how Workday processes personal information when considering candidates for roles with Workday.

**REQUEST FOR PRODUCTION NO. 12:**

In regard to the provision in your "Recruitment Privacy Statement" …stating that Workday uses "AI tools that assist us to process personal information for the recruitment [of Workday] employees," to "empower our talent acquisition team members" and "to review job applications, CVs and resumes and schedule interview times and availability" (Exh. B), produce and identify …the following:

      (a)     the "AI tools that assist us to process [such personal information" …;

      (b)     the applications, CVs, resumes and/or other information that Workday reviewed, considered or processed as part of such "AI tools'… including …such applicants' names, race, gender, …and other data or information that Workday reviewed, considered or processed;

      (c)     the data … that analyze[s], show[s] …whether such "AI tools" have … disparate impact …or 'bias' related, to race, gender, age or disability … including… all "Aggregated Data",

statistical data and/or other "deidentified" data, documents or information which permits or may permit analysis of the disparate impact or effect of such Workday "AI tools."

### RESPONSE TO REQUEST FOR PRODUCTION NO. 12:

\*\*\* Workday responds as follows: ...Workday has produced documents sufficient to identify the Workday features Workday uses to review job applications, CVs and resumes and to describe the non-privileged analyses of such features. Workday will not produce additional documents in response to this Request because ...Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch. ... .Construing this Request to also seek data about candidates who applied for employment with Workday and were issued scores via CSM or Spotlight, Workday will produce anonymized demographic, job, and candidate qualification data for candidates that applied to Workday and were so scored since September 24, 2020.

### REQUEST FOR PRODUCTION NO. 13:

In regard to the statement in Workday's "Recruitment Privacy Statement" (Exh. B) that it uses "AI grading" as "one of several factors. . . to be reviewed by a member of the talent acquisition team during initial sifting stages" and/or when the applicant "do[es] not meet the minimum job requirements." (Exh. B), produce and identify the documents, records, data or other information which identify... and/ or describe: (a) such AI grading or scoring factors and how they are used in reviewing applicants' CV/resume and/or application "during initial sifting stages" and/or when the applicant "do[es] not meet the minimum job requirements," id.; (b) the nature and content of such AI grading or scoring factors and/or "minimum job requirements"; (c) the AI grading or scoring process; (d) the "minimum job requirement" process; (e) the persons whose applications for Workday employment were reviewed or assessed "during initial sifting stages" on the basis of "minimum job requirements"; (f) the disparate impact, effect or "bias" of such AI grading or scoring factors and/or "minimum job requirements" based [on] race, gender, age or disability, in whole or in part, including, ...all "Aggregated Data", statistical data and/or other "deidentified" data, documents or information on which such analysis or determination was based.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

\*\*\* Workday responds as follows: ... Workday has produced documents sufficient to describe its applicant screening features which use artificial intelligence, including as to the categories of information sought in this Request [and] has further produced documents sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch. Workday **will not produce** additional documents in response to this Request because ... Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch. ... *See* ECF Nos. 130, 133, 141.

### REQUEST FOR PRODUCTION NO. 14:

In regard to Workday's statement that its "talent acquisition team uses . . . AI generated grades to help shortlist and prioritize applications in the recruitment process," (Exh. B , entitled "AI generated grades to shortlist and prioritize applications"), produce and identify the documents, records, data or other information which identify, disclose and/ or describe:

(a)    all such "AI generated grades to help shortlist and prioritize applications in the recruitment process" *id.* and how such "AI generated grades . . . help shortlist and prioritize applications in the recruitment process," *id.*

(b)    the persons whose application[s] for Workday employment were reviewed or assessed on the basis of such "AI generated grades [used] to help shortlist and prioritize applications in the recruitment process" *id.* in whole or in part, including such person's name, race, gender, birthdate, disabilities, personal contact information, date of application, and Workday jobs applied for and/or obtained, and;

(c) the disparate impact, effect or "bias" of such "AI generated grades [used] to help shortlist and prioritize applications in the recruitment process" *id.* in whole or in part, including, but not limited to, any and all "Aggregated Data", statistical data and/or other "deidentified" data, information, records or documents related to such anaysis ir [*sic*] determination.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**
\*\*\* Workday responds as follows: Construing this Request to seek data about candidates who …were issued scores via CSM or Spotlight, Workday will produce anonymized demographic, job, and candidate qualification data for candidates that applied to Workday and were so scored since September 24, 2020.

**REQUEST FOR PRODUCTION NO. 15:**
In regard to your stated contention that "Candidate Skills Match was trained on Workday Skills Cloud ontology as well as Workday proprietary datasets" (Exh. A, Workday "AT Fact Sheet," (WORKDAY_MOB_00002743), produce and identify the documents, records, data or other information which identify, disclose and/ or describe such "Workday Skills Cloud ontology," such "Workday proprietary datasets" and all other data and information on which your "Candidate Skills Match was trained on." *Id.*

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**
Subject to and without waiving the aforementioned objections, Workday responds as follows: After a reasonably diligent search, Workday has produced all versions of Workday's Skills Ontology and the training data underlying the Skills Embedding Model in its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 16:**
In regard to the statement in your "AI Fact Sheet" that "Candidate Skills Match" and/or "Workday Skills Cloud" and ontology are "trained using Workday proprietary datasets containing over 200 million people profiles and customer data contributions" (WORKDAY_MOB_00002743), produce and identify all such "Workday proprietary datasets containing over 200 million people profiles and customer data contributions" *id.* all such "Workday Skills Cloud," "ontology," and all iterations of such "Candidate Skills Match," *id.* and all other AI-related products, services, platforms or algorithms on which have been trained on, built or established.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**
Subject to and without waiving the aforementioned objections, Workday responds as follows: After a reasonably diligent search, and construing this Request to seek training data for the Skills Cloud Ontology, Workday has produced all training data underlying the Skills Embedding Model in its possession, custody, and control.

**REQUEST FOR PRODUCTION NO. 17:**

In regard to your stated contention that "Workday performed statistical testing in accordance with established legal standards in order to identify and help mitigate impermissible bias in Candidate Skills Match" (WORKDAY_MOB_00002745), produce and identify: (a) all such "statistical testing" that "Workday performed . . . in order to identify and help mitigate impermissible bias in Candidate Skills Match," *id.*; (b) all other AI-related products, services, platforms, algorithm[s] or components for which such "statistical testing" was performed; (c) all "Workday proprietary datasets, customer data contributions and other data and information used or relied upon in performing such "statistical testing …; (d) all such "statistical testing" methodologies used or applied … (g) all such "bias," impact, and/or effect identified, detected or "mitigated," *id.* in relation to such "statistical testing"; and (h) the statistical significance and/or degree of such "bias," disparate impact, and/or differences both before and after such "mitigation" efforts; …

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

*** Workday responds as follows: … Workday has produced documents sufficient to describe non-privileged analyses of CSM. Workday will not produce additional documents in response to this Request because>.. Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch.… [citing ECF Nos. 130, 133, 141]

**REQUEST FOR PRODUCTION NO. 18:**

In regard to your stated contention that because "the risk of impermissible bias is a material consideration for ML use cases that evaluate individuals for employment opportunities, Workday took a variety of actions during the product design lifecycle aimed at mitigating these risks, including targeted design decisions and statistical testing designed to detect and mitigate impermissible bias" (WORKDAY_MOB_00002744), produce and identify any and all documents, records, data or other information which identify, disclose and/ or describe (a) such "actions during the product design lifecycle aimed at mitigating these risks, including targeted design decisions and statistical testing designed to detect and mitigate impermissible bias."*id.*; (b) such "mitigation" and/or "targeted design decisions and statistical testing designed to detect and mitigate impermissible bias," *id.* ; and (c) the statistical significance and/ or degree of such "statistical testing designed to detect and mitigate impermissible bias," id. both before and after such mitigation efforts. *Id.*

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Subject to and without waiving the aforementioned objections, Workday responds as follows: After a reasonably diligent search, Workday has produced documents sufficient to show the development of CSM.

**REQUEST FOR PRODUCTION NO. 19:**

In regard to the provision in your "Recruitment Privacy Statement" for hiring Workday employees (Exh. B) which states that Workday "use[s] AI tools to process job applications to support its recruitment process, … produce and identify **…** (d) all data and/or analysis which shows or infers that the foregoing "AI tools" or "AI-powered tooling" have adverse or disparate impact or "bias" on the basis of race, gender, age, disability or any other factor. *Id.*

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

    \*\*\* Workday responds as follows: ...Workday has produced documents sufficient to identify the Workday features that conceivably use AI to sort, score, screen, or rank applicants for employment, including CSM, Spotlight, and Fetch. Workday has further produced documents sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch. Workday will not produce additional documents in response to this Request because ... Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch. [citing ECF Nos. 130, 133, 141].

**REQUEST FOR PRODUCTION NO. 20:**

    In regard to the provision in your "Recruitment Privacy Statement" for hiring Workday employees (Exh. B) which states that Workday's "AI tooling extracts personal information from within candidate applications and resumes ... and that such AI tools "then work out how closely this personal information matches the requirements of the role available, and assigns a suggested grade reflecting how close the match is ... , **produce and identify ...** (c) all such data and/or analysis which shows or infers whether such AI-powered "extractions'" and "matches" have adverse or disparate impact or "bias" based on race, gender, age, disability or any other factor. *Id.*

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

    \*\*\* Workday responds as follows: ... Workday **has produced** documents sufficient to identify the Workday features that conceivably use AI to sort, score, screen, or rank applicants for employment, including CSM, Spotlight, and Fetch. Workday **has further produced** documents sufficient to describe its non-privileged analyses of CSM, Spotlight, and Fetch. Workday **will not produce** additional documents in response to this Request because ...Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch. \*\*\*

**REQUEST FOR PRODUCTION NO. 21:**

    In regard to the provision in your "Recruitment Privacy Statement" for hiring Workday employees (Exh. B) stating that Workday "seek[s] assurances from third parties that may provide AI tools before any deployment, alongside due diligence reviews," *id.* produce and identify any and all documents, records, data or other information which identify, disclose and/ or describe: (a) all such AI tools and "assurances from third parties," *id.*; (b) what such "assurances" were given and who gave them; (c) what "due diligence reviews" occurred; and (d) which such "AI tools" had adverse or disparate impact or "bias" on the basis of race, gender, age, disability or any other factor. *Id.*

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

    Subject to and without waiving the aforementioned objections, Workday responds as follows: The scope of this lawsuit is limited to ***Workday's*** AI tools that score, screen, rank, or sort applicants. Workday will not produce documents or information related to third-party AI products, as such documents have no bearing on Plaintiffs' claims or Workday's defenses in this case.

**REQUEST FOR PRODUCTION NO. 22:**

    In regard to the statement in your "AI Fact Sheet" that "for legal, ethical, and diversity and inclusion reasons, many customers want or need to proactively and independently assess the tools they use in making employment decisions" and "might want to create a custom report to extract

data for their own assessment [based on the following] class reporting fields (CRFs) that are relevant to the Job Application Business Object":

- Skills Match Score*
- Skills Match Score Details*
- Skills Matched*
- Gender
- Race
- Stage.

(WORKDAY_MOB_00002743), produce and identify any and all documents, records, data or other information which identify, disclose and/ or describe (a) who and how "many customers . . independently assess[ed] the tools they use[d] in making employment decisions," *id.*, (b) which such customers "create[d] a custom report to extract data for their own assessment [based on the foregoing] class reporting fields (CRFs)" (c) which such "class reporting fields" had adverse oe [*sic*] disparate impact on the basis of race, gender, age, disability or any other factor; and (d) who made such determination and on what basis.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

Subject to and without waiving the aforementioned objections, Workday responds as follows: After a reasonably diligent search, Workday does not know whether or how its customers have generated such reports and accordingly has no responsive documents in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 23:**

Produce and identify all documents which show, or tend to show, infer or otherwise support your contention that "Workday implements robust risk management practices to test our AI tools for fairness and to mitigate bias and similar risks," as stated in Workday's "Recruitment Privacy Statement," Exh. B.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Subject to and without waiving the aforementioned objections, Workday responds as follows: After a reasonably diligent search, Workday produced documents sufficient to show its Responsible AI program and approach.

**REQUEST FOR PRODUCTION NO. 24:**

**Produce and identify:**

(a)          all "test[s] for indirect discrimination under both statistical and practical significance in line with existing legal standards" referred to in your attached "AI Fact Sheet" (Exh. A at. WORKDAY_MOB_00002745);

(b)     all "multi-phased rounds of testing, with successive iterations of the product, and remediation of detected bias by adjusting the match score threshold definitions" and that "[w]ith each successive round, Workday saw improvements to the testing results" referred to in your AI Fact Sheet (Exh.A at WORKDAY_MOB_00002745); (WORKDAY_MOB_00002745)

(c) all "initial ethics and bias assessment[s] [of] whether the ML tool might give rise to impermissible bias: for example, whether the tool has the potential to create material inequities with respect to employment or financial opportunities" Exh.A at WORKDAY_MOB_00002744;

(d)    all tests or assessments in which "[t]ools] deemed at risk for impermissible bias during the initial assessment proceed through a series of review steps before and after being made available in Production" Exh.A at WORKDAY_MOB_00002744;

(e)    all tests, standards and/or calculations of "statistical and practical significance" you utilized or applied. Exh. A at WORKDAY_MOB_00002745;

(f)    the "statistical and practical significance" that resulted from any of such calculations or statistical testing. Exh. A at WORKDAY_MOB_00002745;

(g)    all testing, analysis and data related to your contention that "[u]ltimately, Workday arrived at definitions of the match scores that appropriately mitigated adverse results in alignment with established legal practices" Exh.A at WORKDAY_MOB_00002745;

(h)    all "Model QA" and "Model Testing" in which the "model is tested routinely in Workday internal testing environments and undergoes QA testing anytime the model is updated" Exh.A at WORKDAY_MOB_00002743

(i)    all testing and analysis when such "Model QA" and "Model Testing" are "validated by defining a set of real-world job requisitions and creating job applications that include complete resumes, and measuring the Normalized Discounted Cumulative Gain (NDCG) score against the expected results" Exh.A at WORKDAY_MOB_00002743;

(j)    all "testing. . . done by changing relevant information (Key Model Inputs) such as adding or removing skills qualifications on the job requisition, and explicit skills on the job application, to ensure that the changes produce the expected result" Exh.A at WORKDAY_MOB_0000274;

(k)    all "group testing where stakeholders performed functional and end-to-end testing has been completed to validate feature functionality" Exh. A at WORKDAY_MOB_00002743.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 24:

Subject to and without waiving the aforementioned objections, Workday responds as follows: \*\*\* Workday has produced documents sufficient to describe any non-privileged analyses of CSM. Workday will not produce additional documents in response to this Request because …Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch.\*\*\*

### REQUEST FOR PRODUCTION NO. 25:

Produce and identify all documents which show, or tend to show, infer or otherwise support the following contentions in your "AI Fact Sheet" attached hereto as Exhibit A:

(a)    that Workday "reviewed the ML model inputs to confirm that the fields weren't likely to give rise to impermissible bias against a protected class." Workday's "AI Fact Sheet," Exh. A at WORKDAY_MOB_00002745; [Wd says "has produced sufficient"]

(b)    that "Workday uses a lifecycle review process that evaluates a ML product based on the development phase, the maturity of the product, and the `susceptibility of a tool to impermissible bias" and that such "lifecycle approach

provides for iterative assessment of ML offerings as they evolve." Exh. A at WORKDAY_MOB_00002744; [Wd says "has produced sufficient"]

    (c)    that Workday's "decisions that are made throughout the design and development of a ML tool can affect the likelihood that the tool's output contains impermissible bias" Exh. A at WORKDAY_MOB_00002744; [Wd says "has produced sufficient"]

    (d)    that Workday "establish[ed] a baseline understanding of how the ML tool performs against real-world data" Exh. A at WORKDAY_MOB_00002745; [Wd says "has produced sufficient"]

    (e)    that to "best simulate the environment in which the ML tool is expected to perform, Workday leveraged customer-contributed data to form the test data sets . . . consisting of thousands of real-world job requisitions and millions of job applications" in order to "perform statistical testing for impermissible bias with respect to candidate gender, race, and disability" Exh. A at WORKDAY_MOB_00002745; [Wd. says "no longer exists" and "attorney/client priv".]

    ***

    (h)    that "Workday recognizes that bias evaluation for machine learning tools is inherently an ongoing process" WORKDAY_MOB_00002745; [Wd says "has produced sufficient"]

    (i)    that "Workday will continue to assess Candidate Skills Match for impermissible bias through continued monitoring and statistical testing at defined intervals and before the release of material changes to the feature" Exh. A at WORKDAY_MOB_00002745; [Wd says "has produced sufficient"]

    ***

    (o)    that performance of the model will be monitored against a growing corpus of validation datasets" Exh. A at WORKDAY_MOB_00002743; [Wd says "has produced sufficient"]

    (r)    Workday's feature "only considers Skills Cloud skills and doesn't consider tenanted skills as part of the [score]," "doesn't consider skill proficiency or strength in score calculations," and "Worker data (for internal candidates) such as performance reviews, and feedback, isn't considered in score calculations," Exh. A at WORKDAY_MOB_00002744);

    ***

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Subject to and without waiving the aforementioned objections, Workday responds as follows:

    a)    After a reasonably diligent search, Workday produced documents sufficient to show the development of CSM.

    b)    After a reasonably diligent search, Workday produced documents sufficient to show the development of CSM.

    c)    *** After a reasonably diligent search, Workday produced documents sufficient to show the development of CSM.

    d)    *** Workday has produced documents that describe Workday's non-privileged analyses. Workday will not produce additional documents in response to this Request

because … Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch.

e) *** Workday's bias testing was conducted at the direction of counsel for the purpose of informing legal advice and is protected by the attorney-client privilege and attorney work product doctrines. Notwithstanding the privileged nature of the data Workday's counsel selected for purposes of conducting its privileged bias testing, Workday has already informed Plaintiffs this data does not exist.

h) After a reasonably diligent search, Workday is unaware of any documents responsive to this Request seeking Workday's state of mind. Notwithstanding, Workday has produced non-privileged documents sufficient to describe its analyses of CSM. Workday will not produce additional documents in response to this Request because … Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch.

i) After a reasonably diligent search, Workday produced non-privileged documents sufficient to describe its analyses of CSM. Workday will not produce additional documents in response to this Request because … Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch.

o) After a reasonably diligent search, Workday produced documents sufficient to show early adopter feedback of the model. Workday's bias testing was conducted at the direction of counsel for the purpose of informing legal advice and is protected by the attorney-client privilege and attorney work product doctrines. Workday **will not produce** additional documents in response to this Request because …Workday already produced non-privileged documents responsive to prior Requests 9 and 15 on or before December 15, 2025 that were sufficient to describe non-privileged analyses of CSM, Spotlight, and Fetch.

r) After a reasonably diligent search, Workday produced documents sufficient to show the functionality of CSM.

**Dated: February 2, 2026**    ORRICK, HERRINGTON & SUTCLIFFE LLP

## EXHIBIT C
### Court's Findings On "Biased Training Data"

"[T]he FAC pleads a specific employment practice: Workday's use of algorithmic decision-making tools to screen applicants. (FAC ¶ 28.) The FAC alleges that these tools rely on **biased training data** and information obtained from pymetrics and personality tests, on which applicants with mental health and cognitive disorders perform more poorly."
*Order*, Doc 80 at 13-14 (citing (FAC ¶¶ 38–39, 57–60, 100, 102) (emphasis added)

"The common denominator for these positions is Workday, which provided the hiring companies with a platform for application intake and screening."
*Order,* Doc 80 at 14-15 (emphasis added)

"The zero percent success rate at passing Workday's initial screening, combined with the FAC's allegations regarding **bias in Workday's training data** and the tools' reliance on information from pymetrics and personality tests, plausibly supports an inference that Workday's algorithmic tools **disproportionately reject** applicants based on factors other than qualifications, such as a candidate's race, age, or disability."
*Order,* Doc 80 at 14-15  (emphasis added)

"The sheer number of rejections and the timing of those decisions, coupled with the FAC's allegations that Workday's AI systems rely on **biased training data** (*id.* ¶¶ 38–40, 102–03), support a plausible inference that Workday's screening algorithms were **automatically rejecting** Mobley's applications based on a factor other than his qualifications, such as a protected trait. Furthermore, the causation element is supported by the FAC's cites to academic and other literature about **bias in data models and algorithms**, as well as Amazon's since-abandoned attempt at using "a facially neutral hiring algorithm" that had a disparate impact on female candidates. (*See, e.g.*, FAC ¶¶ 30, 36, 42–48.)
*Order,* Doc 80 at 13-14 (emphasis added; citing FAC ¶¶ 30, 36, 38–40, 42–48, 102–03)

**EXHIBIT D**

From: Grundy, Kayla Delgado kgrundy@orrick.com
Subject: Mobley v. Workday
Date: July 8, 2025 at 12:29 PM
To: Bob Wiggins rwiggins@wigginschilds.com, Ann Wiggins akw725@gmail.com, Smith, Jenny jsmith@wigginschilds.com,
Roderick Cooks rcooks@winstoncooks.com, Lee Winston lwinston@winstoncooks.com
Cc: Totten, Julie A. jatotten@orrick.com, Connell, Erin M. econnell@orrick.com, Elliott, Alexandria aelliott@orrick.com

Counsel,
We understand Plaintiffs will be briefing the discovery issues the parties raised via a joint letter in May, with your brief due on Friday. As we also have been preparing our briefing, we have learned that Workday no longer has the data it used to conduct its privileged bias testing. While we continue to maintain that the data underlying Workday's privileged bias testing is itself privileged—including because counsel directed the curation of the dataset used—we want to be transparent in that, even if the Court disagrees, the data Plaintiffs seek does not exist anymore.
Best,
Kayla
Kayla Delgado Grundy
Attorney at Law
Pronouns: she/her/hers
Orrick
San Francisco
T 415-773-5537
kgrundy@orrick.com

## EXHIBIT E

**From:** "Grundy, Kayla Delgado" <kgrundy@orrick.com>
**Date:** February 6, 2026 at 11:27:05 AM CST
**To:** Roderick Cooks <rcooks@winstoncooks.com>, "Elliott, Alexandria"
<aelliott@orrick.com>, Bob Wiggins <rwiggins@wigginschilds.com>
**Subject: RE: Mobley v. Workday - Discovery Issues**

Thanks, Rod. We will send an invite.

We understand the purpose of the call is to discuss our 2/4 letter and any clarification necessary concerning the forthcoming opt-in discovery responses, as well as Workday's 2/2 discovery responses. If there is anything specific concerning those responses you'd like us to be prepared to discuss, please let us know today. Bob's last email suggests there are additional topics to be discussed. If that is correct, please confirm what those topics are today, too.

Thanks,
Kayla

**From:** Bob Wiggins <rwiggins@wigginschilds.com>
**Sent:** Thursday, February 5, 2026 9:16 AM
**To:** Elliott, Alexandria <aelliott@orrick.com>
**Subject:** Re: Mobley v. Workday - Discovery Issues

Ali,
It looks like Monday is the earliest we can meet. We also want to simultaneously meet and confer on your objections to our discovery requests, the discovery issues Rod wrote you about and the proposed depostiion dates.
Bob

**END OF EXHIBIT**

**EXHIBIT F**

| | |
|---|---|
| **From:** | Grundy, Kayla Delgado |
| **Sent:** | Monday, February 9, 2026 9:42 PM |
| **To:** | Roderick T Cooks; Lee Winston; Bob Wiggins; Smith, Jenny; Bethany Neal; Malik Moore |
| **Cc:** | Totten, Julie A.; Connell, Erin M.; Elliott, Alexandria; Michaelidis, Chloe |
| **Subject:** | Summary of meet and confer call |

Counsel,

I am reaching out with a summary of this morning's meet and confer call. The parties met to discuss Workday's February 4, 2026 letter concerning opt-in plaintiffs' discovery responses, Workday's February 2, 2026 discovery responses, and a blog post.

- **Workday's February 4, 2026 Letter.** Plaintiffs clarified that they intend to provide substantive answers and documents in response to Workday's December 16, 2025 Special Interrogatories and Requests for Production by the response deadlines. Plaintiffs then shared their intention to respond on February 17, 2026 to the first half of the requests because February 14 is a weekend and February 16 is a holiday. Workday agreed that Plaintiffs could have until February 17, 2026 to respond.

- **Workday's February 2, 2026 Discovery Responses.** Plaintiffs sought clarification regarding when Workday would produce responsive documents. Workday clarified that it produced all the documents it agreed to produce and that the only outstanding information is applicant data that Workday previously informed Plaintiffs it would provide this month (i.e., on or before February 28, 2026). Plaintiffs stated they do not agree with this timing.

  Plaintiffs stated they have problems with every one of Workday's discovery responses and would be raising those issues with the court. When asked to lay out their positions in writing so that Workday could substantively respond, Plaintiffs declined and instead stated Workday can review its own responses and documents, as Plaintiffs' counsel had. Workday noted Plaintiffs' position on the issue and shared that meet and confer calls would be more productive if Plaintiffs identified their concerns in writing ahead of time.

- **Joint Discovery Letter.** Plaintiffs informed Workday they intend to proceed with a discovery dispute letter to Judge Beeler. Workday sought clarity on what topics Plaintiffs intend to raise in such a letter. Plaintiffs stated they would address revisiting the prior briefing and Workday's waiver argument, the timing of Workday's production, and Workday's assertions that it has already produced responsive documents. Plaintiffs also identified a number of requests by request number that they intend to address within these categories. While Plaintiffs did not

originally agree that the Court has referred the case to Judge Beeler for all discovery, we understand that following review of the Order, Plaintiffs now agree. In discussing the process for raising a discovery dispute with Judge Beeler, the parties agreed that if Plaintiffs provide Workday with a draft of their portion of the discovery letter by the morning of Wednesday, February 11, 2026, that Workday would provide its portion of the letter by Tuesday, February 17, 2026.

- **Privilege Log**. Plaintiffs requested Workday provide a "readable" copy of the privilege log. When Workday asked for more information about the issue with the privilege log, Plaintiffs stated the size of the print was not legible, particularly when printed. Workday agreed to look into the issue.

- **Workday's Blog Post**. Plaintiffs raised concerns about a blog post Workday published in which Plaintiffs disagree with language that they assert portrays them as "liars." Plaintiffs stated this could have a "chilling effect." Workday requested Plaintiffs share the exact language that is causing concern and the basis for that concern, and Plaintiffs agreed to do.

Thanks,
Kayla

**Kayla Delgado Grundy** Partner
Pronouns: she/her/hers

Orrick    Ⓥ
San Francisco

T 415-773-5537 kgrundy@orrick.com





**EXHIBIT G**

From: Bob Wiggins <rwiggins@wigginschilds.com>
Date: February 10, 2026 at 6:13:09 AM CST
To: "Grundy, Kayla Delgado" <kgrundy@orrick.com>
Cc: Roderick T Cooks <rcooks@winstoncooks.com>, Lee Winston
<lwinston@winstoncooks.com>, "Smith, Jenny" <jsmith@wigginschilds.com>, Bethany Neal
<bneal@winstoncooks.com>, Malik Moore <mmoore@wigginschilds.com>, "Totten, Julie A."
<jatotten@orrick.com>, "Connell, Erin M." <econnell@orrick.com>, "Elliott, Alexandria"
<aelliott@orrick.com>, "Michaelidis, Chloe" <cmichaelidis@orrick.com>
Subject: Re: Summary of meet and confer call

Kayla,

We don't agree with much of your summary below.  Before going further,  please send us the
video of the call.

Bob

# EXHIBIT H



Confidential

## MASTER SUBSCRIPTION AGREEMENT

This Master Subscription Agreement, effective as of December 18, 2013 ("**Effective Date**"), is by and between Workday, Inc. ("**Workday**") a Delaware corporation with offices at 6230 Stoneridge Mall Road, Pleasanton, CA 94588 and Unum Group ("**Customer**"), a Tennessee corporation with offices at 1 Fountain Square, Chattanooga, TN 37402. Whereas, Workday provides a subscription Service, Customer desires to subscribe to the Service, and this business relationship and the allocation of responsibilities regarding such Service are set forth in this Agreement. Therefore, the parties agree as follows:

1. **Customer's Use of the Service.**

1.1     **Provision of the Service.** Workday shall: (i) make the Service available in accordance with the Documentation and the SLA to Customer during the Term pursuant to this Agreement; (ii) not use Customer Data except to provide the Service or access to the Service, or to prevent or address service or technical problems, in accordance with this Agreement and the Documentation, or in accordance with Customer's instructions; and (iii) not disclose Customer Data to anyone other than Authorized Parties. The Service is provided in U.S. English. Workday has translated portions of the Service into other languages. Customer and its Authorized Parties may only use the translated portions of the Service for the number of languages listed in the applicable Order Form. Workday will provide service credits to Customer according to Exhibit A attached hereto.

1.2     **Customer Obligations.** Customer may enable access of the Service for use only by Authorized Parties solely for the internal business purposes of Customer and its Affiliates and Beneficiary in accordance with the Documentation and not for the benefit of any third parties. Customer is responsible for all Authorized Party use of the Service and compliance with this Agreement. Customer shall: (a) have sole responsibility for the accuracy, quality, and legality of all Customer Data; and (b) use reasonable efforts to prevent unauthorized access to, or use of, the Service, and notify Workday promptly of any such unauthorized access or use. Customer shall not:  (i) use the Service in violation of applicable Laws; (ii) in connection with the Service, send or store infringing, obscene, threatening, or otherwise unlawful or tortious material, including material that violates privacy rights; (iii) send or store Malicious Code in connection with the Service; (iv) interfere with or disrupt performance of the Service or the data contained therein; or (v) attempt to gain access to the Service or its related systems or networks in a manner not set forth in the Documentation. Customer shall designate a maximum number of named contacts as listed in the applicable Order Form to request and receive support services from Workday. Named Support Contacts must be trained on the Workday product(s) for which they initiate support requests. Customer shall be liable for the acts and omissions of all Authorized Parties and Customer Affiliates and Beneficiary in performing obligations under this Agreement.

2. **Fees.**

2.1     **Invoices & Payment.** Fees for the Service will be invoiced in accordance with the relevant Order Form. Except as otherwise set forth in an Order Form, all fees due hereunder (except fees subject to good faith dispute) shall be due and payable within thirty (30) days of receipt of invoice date. The parties shall attempt in good faith to promptly resolve any disputes with respect to fees. Except as otherwise stated in an Order Form, all fees are quoted and payable in United States dollars and are based on Service rights acquired and not actual usage. Customer shall provide Workday with complete and accurate billing and contact information including a valid email address for receipt of invoices.

2.2     **Non-cancelable & non-refundable.** Except as specifically set forth to the contrary under Section 6.2 "Warranty Remedies", Section 7.1 "Indemnification by Workday", Section 9.2 "Termination", Section 9.3 "Termination of Financial Modules" and under the SLA, all payment obligations under any and all Order Forms are non-cancelable and all payments made are non-refundable. The license rights for the number of Employees set forth on any respective Order Form cannot be decreased during the Term.

2.3     **Non-Payment and Suspension of Service.** If Customer's account is more than thirty (30) days past due (except with respect to charges subject to a reasonable and good faith dispute), in addition to any other rights or remedies it may have under this Agreement or by law, Workday reserves the right to (a) provide written notice to Executive Vice President and General Counsel (b) provide thirty (30) days to cure the nonpayment and (c) if the nonpayment is not cured within 10 days thereafter, suspend the Service until such amounts are paid in full.

2.4     **Taxes.** Customer shall pay no income taxes of Workday nor shall it pay any fee, charge or tax, however denominated, based on the business privilege, capital structure, license or franchise of Workday Customer shall pay all federal excise, local and state sales and use taxes, and international taxes to the extent applicable (collectively defined as "Taxes"), associated with Workday's fees pursuant to this Agreement. Such Taxes shall be stated separately on Workday's invoice and paid by Customer, unless Customer provides Workday with a valid tax exemption certificate authorized by the appropriate taxing authority. All amounts invoiced

©2013 Workday v13

CONFIDENTIAL

WORKDAY_MOB_00003081



**MASTER SUBSCRIPTION AGREEMENT**                                   Confidential

pursuant to this Agreement are payable in full and without reduction for Taxes. Workday shall remit all Taxes paid to Workday by Customer under this Agreement based on the "bill to" location specified on each invoice and Workday shall remit all such Taxes to the appropriate jurisdiction in a timely manner. Customer and Workday agree that current regulations state that Tennessee does not subject Software as a Service to sales tax and Workday agrees to send all billing to Customer's Chattanooga, TN address unless another address is specified in the applicable Order Form. If Workday has an obligation to collect Taxes due to changes of current regulations for which Customer is responsible under this Section, the appropriate amount shall be invoiced to and paid by Customer. To the extent Workday collects Taxes from Customer and does not timely remit them to the appropriate taxing authority, Workday shall indemnify and hold harmless Customer, Customer's employees, directors, officers, contractors and agents from and against any and all assessments by the applicable governmental agency relating to interest and penalties in connection with such amounts that are imposed with respect to any Taxes paid to Workday pursuant to this Agreement; however, Customer remains responsible for the payment of its Taxes. This indemnification obligation shall survive the termination of this Agreement.

**2.5    Audit Financial Billing.** During the Term of this Agreement but not more frequently than once per year, Workday shall make available to Customer or its chosen independent third party auditor, for examination only those financial books, records, and files of Workday that are necessary for Customer to verify Workday's charges for the Service provided under any Order Form(s) issued hereunder. Workday shall maintain complete and accurate records as is reasonably necessary to substantiate such charges. Customer shall provide Workday with reasonable notice prior to conducting such financial audit and the parties shall mutually agree upon the timing of such financial audit which shall be conducted in a manner that is not disruptive to Workday's business operations. Customer will pay for all costs related to such audits. Such right shall not extend to or require on-site audits of Workday's operations or third party hosting facilities, disclosure of any confidential information of any other Workday customer, or Workday's payroll records or other financial records not related to Service fees invoiced to Customer. If the audit reveals overcharges, Workday shall refund or credit the same to Customer at Customer's option. If the audit reveals undercharges, Customer will promptly pay to Workday such amounts. In addition, if any such audit reveals an overcharge of more than twenty percent (20%) of the actual fees for the period of the audit, Workday shall promptly reimburse Customer for the actual, reasonable cost of such audit.

**2.6    Employee Count Verification.** Workday may confirm the number of Employee records on its hosted servers once per year within thirty days before or after the anniversary of the Effective Date of this Agreement, and if the number of Employee records exceeds the number of permitted Employees on the relevant Order Form, the provisions in the Order Form for subscription fees for additional Employees will apply. In addition, upon Workday's request but not more frequently than quarterly, Customer will report to Workday the total number of Employees.

**3.    Proprietary Rights.**
**3.1    Ownership and Reservation of Rights to Workday Intellectual Property.** Workday and its licensors own all right, title and interest in and to the Service, Documentation, and other Workday Intellectual Property Rights. Subject to the limited rights expressly granted hereunder, Workday reserves all rights, title and interest in and to the Service, and Documentation, including all related Intellectual Property Rights. No rights are granted to Customer hereunder other than as expressly set forth and as contemplated in the Documentation and Agreement.

**3.2    License Grant.** Workday hereby grants Customer a royalty-free, non-exclusive, non-transferable, right to use the Service and Documentation, solely for the internal business purposes of Customer and Affiliates and Beneficiary and solely during the Term, subject to the terms and conditions of this Agreement within scope of use defined in the relevant Order Form. Customer understands and agrees that the fees specified in the applicable Order Forms are fees to use the service and shall not be considered royalties.

**3.3    License Restrictions.** Customer shall not (i) modify, copy or create any derivative works based on the Service or Documentation; (ii) license, sublicense, sell, resell, rent, lease, transfer, assign, distribute, time share, offer in a service bureau, or otherwise make the Service or Documentation available to any third party, other than to Authorized Parties as permitted herein; (iii) reverse engineer or decompile any portion of the Service or Documentation, including but not limited to, any software utilized by Workday in the provision of the Service and Documentation, except to the extent required by Law; (iv) access the Service or Documentation in order to build any commercially available product or service; or (v) copy any features, functions, integrations, interfaces or graphics of the Service or Documentation.

**3.4    Ownership of Customer Data.** As between Workday and Customer, Customer owns its Confidential Information, Customer Data and Personal Data (as defined in the Data Processing Exhibit attached hereto as Exhibit D).

Master Subscription Agreement between Workday and Unum Group



**MASTER SUBSCRIPTION AGREEMENT**                          Confidential

**3.5**     **Customer Input.** Workday shall have a royalty-free, worldwide, transferable, sub-licensable, irrevocable, perpetual license to use or incorporate into the Service any Customer Input. Workday shall have no obligation to make Customer Input an Improvement. Customer shall have no obligation to provide Customer Input.

**3.6**     **Aggregated Data Use.** Workday owns the aggregated and statistical data derived from the operation of the Service, including, without limitation, the number of records in the Service, the number and types of transactions, configurations, and reports processed in the Service and the performance results for the Service (the "Aggregated Data"). Nothing herein shall be construed as prohibiting Workday from utilizing the Aggregated Data for purposes of operating Workday's business, provided that Workday's use of Aggregated Data will not reveal the identity, whether directly or indirectly, of (i) Customer to any third party or (ii) any individual or specific data entered by any individual into the Service. In no event does the Aggregated Data include any personally identifiable information. Workday will indemnify and hold Customer harmless from any and all liability that arises from Workday's use of the Aggregated Data.

**4.     Confidentiality.**
**4.1     Confidentiality.**

During the course of performance of this Agreement, each party may disclose to the other party Confidential Information . The party receiving the Confidential Information ("Receiving Party") shall (i) use such Confidential Information only in connection with and for the purposes of the performance of its promises, duties and obligations under this Agreement and (ii) shall not disclose any Confidential Information of the other party except as reasonably necessary to perform its obligations or exercise its rights pursuant to this Agreement except with the other party's prior written permission.

The Receiving Party shall use efforts consistent with the manner in which it protects its own Confidential Information but in no case less than commercially reasonable effort to preserve the confidentiality of any information. Each party shall disclose Confidential Information of the other party only as follows: (i) to the Receiving Party's employees, officers, directors, agents and contractors to the extent that such persons need to know such Confidential Information of the Disclosing Party so that the Receiving Party may perform its promises, duties, and obligations under this Agreement; (ii) to the Receiving Party's accountants, auditors, attorneys, and other professional advisors to the extent such persons need to know Confidential Information of the Disclosing Party to provide professional services relating to the Receiving Party's business; (iii) to potential permitted assignees or successors of the Receiving Party to the extent such persons need to know Confidential Information of the Disclosing Party in connections with a potential sale, merger, consolidation or other corporate transaction involving the sale or assignment of the business assets of the Receiving Party; (iv) to the extent the Receiving Party is ordered to produce Confidential Information of the Disclosing Party by any court of competent jurisdiction or any competent judicial, governmental, supervisory or regulatory body subpoena ("Legal Demand"), but only if the party (a) gives prompt notice, if legally permissible, of the demand to the other party, including the contents of such demand, (b) reasonably cooperates in any such effort by the Disclosing Party, at the expense of the Disclosing Party, if the Disclosing Party wishes to contest the disclosure, and (c) in any event, only discloses Confidential Information to the extent necessary to protect or enforce its legal rights or to defend itself or to comply with the Legal Demand ; (v) to the extent otherwise required by Law. Prior to disclosing Confidential Information of the Disclosing Party to an employees, officers, directors, agents and contractors of the Receiving Party, the Receiving Party shall ensure that such employees, officers, directors, agents and contractors are under nondisclosure obligations materially at least as protective of the Confidential Information as those set forth herein.

**4.2     Compelled Disclosure.** A disclosure by one party of Confidential Information of the other party to the extent required by Law shall not be considered a breach of this Agreement, provided the party so compelled promptly provides the other party with prior notice of such compelled disclosure (to the extent legally permitted) and provides reasonable assistance, at the other party's cost, if the other party wishes to contest the disclosure.

**4.3     Remedies.** If a party discloses or uses (or threatens to disclose or use) any Confidential Information of the other party in breach of confidentiality protections hereunder, the other party shall have the right, in addition to any other remedies available, to injunctive relief to enjoin such acts, it being acknowledged by the parties that any other available remedies are inadequate.

Master Subscription Agreement between Workday and Unum Group

CONFIDENTIAL                                          WORKDAY_MOB_00003083



MASTER SUBSCRIPTION AGREEMENT

Confidential

**4.4     On-Site Security.** Workday understands that as of the Effective Date, Customer has a policy that requires Workday, and its employees, contractors or other representatives who are on or about Customer premises must be escorted by a Customer employee and obtain a visitor's badge from the Customer security office.

**4.5     Exclusions.** Confidential Information shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to the other party; (ii) was known to a party prior to its disclosure by the other party without breach of any obligation owed to the other party; (iii) was independently developed by a party without breach of any obligation owed to the other party; or (iv) is received from a third party without breach of any obligation owed to the other party. Customer Data shall not be subject to the exclusions set forth in this Section.

**5.  Customer Data.**
**5.1     Protection and Security.** During the Term of this Agreement, Workday shall maintain a formal security program materially in accordance with industry standards that is designed to: (i) ensure the security and integrity of Customer Data; (ii) protect against threats or hazards to the security or integrity of Customer Data; and (iii) prevent unauthorized access to Customer Data. Such security program will conform to the *Workday Security Exhibit* attached hereto, and is further described in Workday's most recently completed Service Organization Control 1 (SOC1) and Service Organization Control 2 (SOC2) audit reports or industry-standard successor reports. The most recently completed, as of the Effective Date, SOC1 and SOC2 audit reports are referred to as the "Current Audit Reports". In no event during the Term shall Workday materially diminish the protections provided by the controls set forth in Workday's Security Exhibit and the Current Audit Reports. Workday will (i) maintain its ISO 27001 certification ("ISO Certification") during the Term or (ii) at a minimum, continue to meet the standards set out in ISO 27001 to the extent such standards are covered by controls within the scope of the ISO Certification obtained by Workday. During the Term, Workday will maintain a current certification with the U.S. Department of Commerce under the U.S.-European Union and U.S.-Switzerland Safe Harbor Frameworks. The *Data Processing Exhibit* attached hereto will apply to the processing of Personal Data (as defined in the Data Processing Exhibit). Workday designs its Service to allow Customers to achieve differentiated configurations, enforce user access controls, and manage data categories that may be populated and/or made accessible on a country-by-country basis. Customer understands that its use of the Service and compliance with any terms hereunder does not constitute compliance with any Law. Customer understands that it has an independent duty to comply with any and all Laws applicable to it.

**5.2     Unauthorized Disclosure.** If either party believes that there has been a Security Breach, such party must notify the other party within five (5) days. Security Breach" means (i) any actual or reasonably suspected unauthorized use of, loss of, access to or disclosure of, Customer Data; provided that an incidental disclosure of Customer Data to an Authorized Party or Workday, or incidental access to Customer Data by an Authorized Party or Workday, where no reasonable suspicion exists that such disclosure or access involves theft, or is fraudulent, criminal or malicious in nature, shall not be considered a "Security Breach" for purposes of this definition, unless such incidental disclosure or incidental access triggers a notification obligation under any applicable Law and (ii) any security breach (or substantially similar term) as defined by applicable Law.

In the event of a Security Breach not caused by Customer, its Affiliates and Beneficiary or Authorized Parties, Workday shall promptly investigate such incident, including conducting a root cause analysis and implementing a corrective action plan. Workday shall share the summary results of such analysis and the implemented corrective action plan with Customer within a commercially reasonable time following such incident and the timeframe shall be determined by the severity of such incident.

Additionally, each party will reasonably assist the other party in remediating or mitigating any potential damage, including any notification which should be sent to individuals impacted or potentially impacted, or the provision of credit reporting services to such individuals. Each party shall bear the costs of such remediation or mitigation to the extent the breach or security incident was caused by it.

**5.3     SOC Reports.** On a semi-annual basis, Workday will retain a nationally recognized public accounting firm to conduct a SOC-1 Type II audit (or industry-standard successor reports) for the Service. As of the Effective Date, the coverage periods for Workday's SOC 1 are January 1 to June 30 and June 30 to December 31. On at least an annual basis, Workday will retain a nationally recognized public accounting firm to conduct a SOC-2 Type II audit to include availability, confidentiality and security (or industry-standard successor reports) for the Service. As of the Effective Date, the coverage periods for Workday's SOC 2 are January 1 to June 30 and June 30 to December 31; however, Workday reserves the right to move to an annual audit period. Upon Customer's request, Workday shall provide Customer with Workday's most recently completed SOC reports or comparable industry-standard

Master Subscription Agreement between Workday and Unum Group

CONFIDENTIAL

WORKDAY_MOB_00003084



**MASTER SUBSCRIPTION AGREEMENT**                    Confidential

**9.5    Retrieval of Customer Data.**  Upon request by Customer made within thirty (30) days after any expiration or termination of this Agreement (including any Transition Period), Workday will make Customer Data available to Customer through the Service on a limited basis solely for purposes of Customer retrieving Customer Data for a period of up to sixty (60) days after such request is received by Workday.  Customer Data will be made available in a format that is machine readable (for example, CSV, delimited text or Microsoft Excel).  After such sixty (60) day period, Workday will have no obligation to maintain or provide any Customer Data and may thereafter, unless legally prohibited, delete all Customer Data.  Additionally, during the Term of the Agreement, Customer shall have the right to extract data using Workday's standard web services.  If Customer requires Workday's assistance, Customer may acquire Workday professional services at Workday's then-current billing rates pursuant to a separately executed Statement of Work and Professional Services Agreement.  Customer will determine the scope of the professional services engaged to extract data from the Workday system and as such may increase or decrease Workday's professional services involvement in order to control costs.

**9.6    Transition Period before Final Termination.**  Upon any termination of the Agreement, Workday shall, upon Customer's request, continue to provide the Service to Customer (except where Workday is enjoined) pursuant to the terms of this Agreement for a transitional period of up to three (3) months (the "Transition Period").  Access to the Service during the Transition Period will be subject to the fees set out in the applicable Order Form, prorated on a monthly basis and payable in advance, based on the annual fees charged to Customer for the Service during the twelve month period immediately preceding the termination date.  During the Transition Period, Workday will provide cooperation and assistance as Customer may reasonably request to support an orderly transition to another provider of similar software, services, or to Customer's internal operations.  Such cooperation and assistance will be limited to consulting regarding the Workday Service and will be subject to a fee based on Workday's then-current rates for consulting services and such services will be set out in a statement of work to a professional services agreement between the parties.  Notwithstanding the foregoing, in the event of termination of this Agreement by Workday for breach by Customer, Workday may withhold the provision of transition Services and condition further performance upon (i) payment of undisputed fees then owed, (ii) prepayment of fees for further services, and (iii) receipt by Workday of an officer's certificate from Customer certifying ongoing compliance with the terms of this Agreement during the Transition Period.

**9.7    Surviving Provisions.**  The following provisions of this Agreement shall <u>not</u> survive and will have no further force or effect following any termination or expiration of this Agreement: (i) subsection (i) of Section 1.1 "Provision of the Service"; (ii) Section 3.2 "License Grant"; and (iii) any Order Form(s).  All other provisions of this Agreement shall survive any termination or expiration of this Agreement.

**10.  General Provisions.**
**10.1    Relationship of the Parties.**  The parties are independent contractors.  This Agreement does not create nor is it intended to create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties.  There are no third-party beneficiaries to this Agreement.  Workday shall pay all wages, federal and state taxes, occupational license taxes, and any other payment or benefit, including without limitation Workers' Compensation, which Workday is required by Law and or Workday's own policies to pay or provide on behalf of Workday's own employees.

**10.2    Notices.**  All notices under this Agreement shall be in writing and shall be deemed to have been given upon: (i) personal delivery; (ii) the third business day after first class mailing; or (iii) the second business day after sending by facsimile with telephonic confirmation of receipt.  Notices to Workday shall be addressed to the attention of its Vice President, Legal.  Notices to Customer shall be addressed to Customer's signatory of this Agreement.  Each party may modify its recipient of notices by providing notice pursuant to this Agreement.

**10.3    Waiver and Cumulative Remedies.**  No failure or delay by either party in exercising any right under this Agreement shall constitute a waiver of that right or any other right.  Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity.

**10.4    Force Majeure.**  Neither party shall be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) for causes beyond that party's reasonable control and occurring without that party's fault or negligence, including, but not limited to, acts of God, acts of government, flood, fire, civil unrest, acts of terror, strikes or other labor problems (other than those involving Workday or Customer employees, respectively), computer attacks or malicious acts, such as attacks on or through the Internet, any Internet service provider, telecommunications or hosting facility.  Dates

Master Subscription Agreement between Workday and Unum Group

CONFIDENTIAL                                    WORKDAY_MOB_00003088



**MASTER SUBSCRIPTION AGREEMENT**                                    Confidential

**10.11    Workday Diversity.**  Workday uses commercially reasonable efforts to ensure that Workday complies with its code of conduct.  Workday's code of conduct evidences that diversity is in keeping with Workday's core values as a company and Workday does not unlawfully discriminate in any employment decisions and Workday does not tolerate discrimination in violation of any characteristic that is protected by law.    As of the Effective Date, Workday's code of conduct is accessible via the link http://www.workday.com/Documents/pdf/investor/jr-code-of-conduct-011613.pdf

**10.12    Limited Use of the Service to Facilitate Transition to Divested Entities.**  If, during the Term, Customer spins off or sells a Customer Affiliate, division, operating unit, or business component (each, a "Divested Entity"), then Customer shall have the right, upon written notice to Workday but without the prior consent of Workday, to use the Service for the benefit of the Divested Entity for a period not to exceed six (6) months after the effective date of the divestiture or until the end of the Term (whichever is earlier) (the "Divestiture Transition Period"), it being understood that Customer shall continue to exercise the rights and satisfy the obligations hereunder and that such rights and obligations shall not be assigned or transferred to such Divested Entity pursuant to this Section.  In no event shall any such use of the Service relating to a divestiture be by or for a Competitor of Workday. During such Divestiture Transition Period, Customer will continue to pay the fees for the Service related to all of the Employees as if the Divested Entity continued to be an Affiliate of Customer, however, in no event will use of the Service for the benefit of the Divested Entity expand beyond Customer's scope of use related to the divested assets and employees prior to the divestiture.  In addition, Customer shall (i) pay Workday on a time and materials basis at Workday's then-current rates for any professional services provided by Workday related to such use, (ii) be solely responsible for ensuring that the Customer Data is accessible only by the appropriate individuals and entities, (iii) be solely responsible for any Divested Entity's compliance with the terms and conditions of this Agreement, and (iv) indemnify, defend and hold Workday harmless against any claims related to any use of the Service related to any Divested Entity.

**10.13    W-9.**  Workday agrees to promptly furnish Customer with a Form W-9 or any other applicable tax-related form as may be reasonably requested by Customer in writing to comply with tax information reporting regulations and requirements.

**10.14    Other Functionality Commitment.**  Workday has agreed to use commercially reasonable efforts to make the functionality specified on Exhibit H ("Additional Functionality") available by applicable due date specified on Exhibit H ("Due Date").  If Workday does not make the Additional Functionality available by the applicable Due Date, Customer will receive a one-time credit for late availability in the applicable amount specified on Exhibit H ("Late Availability Credit").  The credits described in this section and on Exhibit H are Customer's sole and exclusive remedy for Workday's failure to make the applicable Additional Functionality available.  Such credits will be applied to the next payment due for Subscription Service Fees under Order Form #1.  If Customer's anticipated date for beginning production use of the Subscription Service is delayed for any reason outside of Workday's control, the Due Dates specified in Exhibit H will be extended by the same amount of time.  In no event will Workday's failure to provide any or all of the Additional Functionality be deemed a breach of this Agreement or any Order Form or be deemed a breach of warranty

**11.  Definitions.**

**"Affiliate"** means any entity which directly or indirectly controls, is controlled by, or is under common control by either party.  For purposes of the preceding sentence, "control" means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

**"Agreement"** means this Master Subscription Agreement, including the Workday Production Support and Service Level Availability Policy (as may be updated from time to time), any exhibits or attachments hereto, and any fully executed Order Form.

**"Authorized Parties"** means Customer's Employees and third party providers authorized to access Customer's Tenants and/or to receive Customer Data by Customer (i) in writing, (ii) through the Service's security designation, or (iii) by system integration or other data exchange process.

**"Beneficiary"** means the portion of Customer's business that was acquired by Royal Bank of Canada ("RBC") and as part of the divesture agreement between Customer and RBC ("Divested RBC Entity"), Customer agreed to continue processing data associated with the employees of such Divested RBC Entity.  As of the Effective Date, there are 103 employees associated with the Divested RBC Entity.

**"Competitor"** means any entity that may be reasonably construed as offering competitive functionality or services to those offered by Workday.  If the parties cannot agree on whether an entity is a Competitor, then the opinion of three (3) financial analysts with

Page 10 of 30

Master Subscription Agreement between Workday and Unum Group



## MASTER SUBSCRIPTION AGREEMENT

adequate knowledge of the human resources and/or financials software and services industry (chosen by mutual agreement of the parties) commissioned at Workday's sole expense, shall determine such.

"**Confidential Information**" means  (a) any software utilized by Workday in the provision of the Service and its respective source code; (b) Customer Data; (c) each party's business or technical information, including but not limited to the Documentation, training materials, any information relating to earnings, financial condition, operations, volume of business, business methods, business systems, business and practices, plans, software plans, designs, costs, prices and names, finances, marketing plans, business opportunities, personnel, research, development or know-how that is designated by the disclosing party as "confidential" or "proprietary" or the receiving party knows or should reasonably know is confidential or proprietary; and (d) the terms, conditions and pricing of this Agreement (but not its existence or parties).

"**Customer Data**" means the electronic data or information submitted by Customer or Authorized Parties to the Service.

"**Customer Input**" means suggestions, enhancement requests, recommendations or other feedback provided by Customer, its Employees and Authorized Parties relating to the operation or functionality of the Service.

"**Documentation**" means Workday's electronic and hardcopy user guide for the Service, which may be updated by Workday from time to time.

"**Employee**" or "**Worker**" means employees, consultants, contingent workers, independent contractors, and retirees of Customer and its Affiliates and Beneficiary whose active business record(s) are or may be managed by the Service and for which a subscription to the Service has been purchased pursuant to an Order Form.  The number of permitted Employees will be as set forth in the applicable Order Form. Information related to former employees, consultants, contingent workers, independent contractors and retirees in the form of static, historical records may be maintained in the system but shall be excluded from the calculation of Employees unless self-service access to the record through the Service is provided to the individual.

"**Improvements**" means all improvements, updates, enhancements, error corrections, bug fixes, release notes, upgrades and changes to the Service and Documentation, as developed by Workday and made generally available for Production use without a separate charge to Customers.

"**Intellectual Property Rights**" means any and all common law, statutory and other industrial property rights and intellectual property rights, including copyrights, trademarks, trade secrets, patents and other proprietary rights issued, honored or enforceable under any applicable laws anywhere in the world, and all moral rights related thereto.

"**Law**" means any local, state, national and/or foreign law, treaties, and/or regulations applicable to a respective party.

"**Malicious Code**" means viruses, worms, time bombs, Trojan horses and other malicious code, files, scripts, agents or programs.

"**Order Form**" means the separate ordering documents under which Customer subscribes to the Workday Service pursuant to this Agreement that have been fully executed by the parties.

"**Production**" means the Customer's or an Employee's use of or Workday's written verification of the availability of the Service (i) to administer Employees; (ii) to generate data for Customer's books/records; or (iii) in any decision support capacity.

"**Service**" means Workday's software-as-a-service applications, including the Improvements, as described in the Documentation and subscribed to under an Order Form.

"**SLA**" means the *Workday Production Support* and *Service Level Availability Policy*, which may be updated by Workday from time to time; provided, however, any such changes will not materially diminish Workday's responsibilities.  The SLA in effective as of the Effective Date is attached hereto as an Exhibit F.

"**Tenant**" means a unique instance of the Service, with a separate set of customer data held by Workday in a logically separated database (i.e., a database segregated through password-controlled access).

Master Subscription Agreement between Workday and Unum Group

CONFIDENTIAL



## MASTER SUBSCRIPTION AGREEMENT

Confidential

IN WITNESS WHEREOF, the parties' authorized signatories have duly executed this Agreement.

| Unum Group | Workday, Inc. |
|---|---|
| *Michael A. Stankey (Dec 20, 2013)* | *William E Bagley (Dec 20, 2013)* |
| Signature | Signature |
| Michael A. Stankey | William E Bagley |
| Name | Name |
| President & COO, Workday | VP, Global Procurement |
| Title | Title |
| Dec 20, 2013 | Dec 20, 2013 |
| Date Signed | Date Signed |

CONFIDENTIAL

WORKDAY_MOB_00003092