# EXHIBIT 4

**PLAINTIFFS' RULE 30(b)(6) TOPICS PROVIDED PURSUANT TO LOCAL RULE 30-1 TO FACILITATE PRE-DEPOSITION NOTICE SCHEDULING DISCUSSIONS**

This list of 30(b)(6) topics is provided in order to facilitate the following requirements of Local Rule 30-1: "For the convenience of witnesses, counsel, and parties, *before noticing a deposition* of a party or witness affiliated with a party, the noticing party must confer about the scheduling of the deposition with opposing counsel." (emphasis added)

Upon request, Plaintiffs will provide an informal or abbreviated summary or cstegorization of the topics listed below.

## I. DEFINITIONS AND INSTRUCTIONS

As used herein, the following terms shall have the meanings set forth below:

**"AI Applicant Selection System" or "AASS"** means any algorithm, machine learning model, automated decision-making tool, software system, scoring engine, or artificial intelligence application used, in whole or in part, to screen, rank, score, filter, evaluate, shortlist, or select applicants for employment, including but not limited to resume screening tools, applicant tracking system (ATS) plug-ins, video interview analysis software, and any third-party vendor solutions. For purposes of the topics below, AASS includes without limitation Candidate Skills Match ("CSM"), Spotlight, and Fetch.

**"AI Fact Sheet"** means the document produced in this litigation titled "AI Fact Sheet" describing the Candidate Skills Match feature.

**"Bias Analysis Data" or "BAD"** means any data, reports, studies, audits, testing results, impact analyses, validation studies, or other records created, collected, or maintained for the purpose of analyzing, measuring, detecting, mitigating, or monitoring disparate impact, adverse impact, or other forms of bias within any AASS, including analyses conducted under the Uniform Guidelines on Employee Selection Procedures (UGESP) or similar frameworks.

**"Candidate Skills Match" or "CSM"** means the machine learning feature described in the AI Fact Sheet produced in this litigation, which scores job applicants based on skills matching against job requisitions.

**"Document"** has the broadest meaning permitted under the applicable rules and includes electronically stored information (ESI), emails, model logs, API records, reports, memoranda, and training data.

**"ESI" or "Electronically Stored Information"** means information created, stored, or best utilized in electronic form, including but not limited to databases, structured data files, model weights and parameters, training datasets, log files, audit trails, electronic mail, instant messages, configuration files, source code, version-controlled repositories, and metadata.

**"Protected Characteristic"** means race, color, national origin, sex (including gender identity and pregnancy), age (40+), disability, religion, and any other characteristic protected under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans

with Disabilities Act, the Fair Employment and Housing Act (FEHA), and applicable state and local law.

**"Relevant Time Period"** means through the present, unless otherwise specified.

**"Skills Cloud"** means the ontology and skill embeddings used to train and operate the Candidate Skills Match model.

**"Training Data"** means any data, dataset, or corpus of information used to develop, train, test, validate, fine-tune, or calibrate any AASS, including labeled and unlabeled data, historical applicant records, and synthetic data.

**"Vendor"** means any third-party company, contractor, developer, or service provider that designed, built, licensed, maintained, or audited any component of an AASS used by Defendant.

**"You," "Your," or "Defendant"** means Workday, Inc.  and its predecessors, successors, subsidiaries, affiliates, officers, directors, employees, agents, and representatives.

## II. MATTERS FOR EXAMINATION

The designated representative(s) shall be prepared to testify regarding the following topics:

### A. IDENTIFICATION AND DESCRIPTION OF AI APPLICANT SELECTION SYSTEMS

1. The identity, name, version history, and general description of each AASS used, piloted, or evaluated by Defendant during the Relevant Time Period, including the date(s) of deployment, modification, and any decommissioning.

2. The stated purpose, intended function, and scope of each AASS, including which job titles, positions, departments, or geographic locations were subject to selection through the AASS.

3. Whether each AASS was developed in-house, by a Vendor, or through a combination thereof; the identity of all Vendors; and the terms of any agreements governing each Vendor's obligations with respect to bias testing, auditing, and data retention.

4. The specific inputs, features, and variables processed by each AASS in evaluating applicants, including any proxies for Protected Characteristics that were considered or excluded.

5. The distinction between an "algorithm" and a "model" as used by Defendant, including the criteria, definitions, technical documentation, internal communications, and analyses used to classify CSM as an algorithm and to classify components of Spotlight and Fetch as containing both algorithmic and model components.

6. Defendant's identification, classification, and treatment of CSM, Spotlight, and/or Fetch (or any components thereof) as "Automated Employment Decision Tools" (AEDTs) under New York City Local Law 144 of 2021 or as "Automated-Decision Systems" (ADS) under the California Civil Rights Council's Employment Regulations Regarding Automated-Decision Systems (effective October 1, 2025, amending FEHA), and any

compliance analyses, bias audits, or disparate-impact reviews performed in connection with that classification.

7. The identification of all "Algorithmic Tools" (as that term is used and construed in Defendant's discovery responses) utilized by Defendant or its customers in connection with the applicant screening process, including CSM, Spotlight, and Fetch, and the basis for any statement that these are the only such tools at issue.

## B. MODEL IDENTITY, DEVELOPMENT, AND TRAINING DATA

8. All versions or iterations of each AASS that have been deployed in Defendant's production environment, including for each version: (a) the release date; (b) the retirement date, if any; (c) any material changes from the prior version; and (d) the training data used.

9. The source, composition, and demographic characteristics of all Training Data used in each AASS, including the Skills Cloud ontology and skill embeddings, the over-200-million person profiles referenced in the AI Fact Sheet, the extent to which historical hiring decisions and any known biases embedded therein were incorporated into the training process, and any customer data contributions incorporated into the training or validation datasets.

10. The steps taken to clean, pre-process, or balance Training Data to reduce or eliminate disparate impact prior to training each AASS, including any techniques applied to mitigate bias (e.g., re-weighting, re-sampling, adversarial debiasing).

11. Whether Training Data and model artifacts (including model weights, configuration files, and version histories) are retained; their current location; and the form in which they can be produced.

12. How each AASS derives or identifies skills from a job application, including whether and how it processes unstructured text such as resumes.

13. Any updates, changes, or modifications made to CSM, Spotlight, or Fetch since their initial development through the date of the deposition, including the reasons for any such changes.

## C. SCORING METHODOLOGY AND OUTPUTS

14. The methodology used to compute match score categories (Strong, Good, Fair, Low), including the specific thresholds applied to assign each category, whether those thresholds have changed across model versions, and any adjustments to match score threshold definitions made in response to bias testing, including the specific thresholds before and after each adjustment and the protected-class results that prompted each adjustment.

15. The basis on which the AASS assigns additional weight to skills designated as "required" in a job requisition, and any documentation governing that weighting methodology.

16. All circumstances under which a candidate receives a score of "Unable to score" or "Pending," and the approximate frequency with which each such score has been assigned.

17. The total number of job applications scored by each AASS from the date of first deployment through the present, broken down by score category.

18. Any known limitations in the AASS's ability to identify skills from non-traditional resumes, career gaps, non-English language backgrounds, or candidates without formal credentials.

19. The decision logic by which any AASS assigns applicant scores, rankings, classifications, recommendation tiers, or pass/fail outcomes, including: (a) the relationship between model outputs and downstream hiring decisions; (b) the thresholds, scoring rules, weights, or ranking criteria that determine whether applicants advance or are rejected; (c) any analyses of how such thresholds or scoring categories affect selection rates across Protected Characteristics; and (d) any testing conducted to determine how adjustments to model parameters, weights, or thresholds affect disparities in applicant outcomes.

## D. BIAS TESTING, AUDITING, AND VALIDATION

20. All pre-deployment and post-deployment bias testing, adverse impact analyses, validation studies, and audits conducted with respect to each AASS, including the methodologies employed, statistical tests applied (e.g., four-fifths rule, Fisher's Exact Test, regression analysis), the protected classes evaluated, the datasets used, and the results obtained.

21. The identity and qualifications of all individuals—whether employees, Vendors, or independent consultants—who conducted any bias analysis or validation study of the AASS, and the scope of their engagement, including the identity of any auditor(s) under NYC Local Law 144 or California FEHA regulations.

22. Any findings of disparate impact or bias identified in any audit or analysis of the AASS, the Protected Characteristic(s) affected, and all remedial measures taken or considered in response, including any instances in which the Adverse Impact Ratio (4/5ths rule) or ordered logit/probit test identified any potential indication of impermissible bias.

23. Whether Defendant has conducted or commissioned any ongoing or periodic monitoring of the AASS for bias or disparate impact after deployment, including the frequency of such monitoring, the metrics used, and the ESI generated thereby.

24. Compliance with the EEOC's Uniform Guidelines on Employee Selection Procedures, OFCCP regulations (if applicable), NYC Local Law 144 (automated employment decision tools), the Illinois AI Video Interview Act, and California's FEHA Automated-Decision Systems regulations, or any other federal, state, or local legal requirements governing AASS bias testing and transparency, including: (a) any bias audits (including independent audits), disparate-impact analyses, or validation testing performed to comply with such laws; (b) the audit methodology, selection of demographic categories, and results; (c) any publication or distribution of audit summaries; and (d) any communications with customers regarding such audits.

25. Any internal policies, guidelines, or standards governing the acceptable level of adverse impact for any AASS, and the source of any legal standards cited in connection with those policies.

26. All persons responsible for ongoing monitoring of each AASS for bias or data drift, and the frequency and methodology of that monitoring.

27. The basis for claiming attorney-client privilege or work-product protection over any bias testing of CSM, Spotlight, or Fetch.

## E. STATISTICAL METHODOLOGY AND CAUSAL ANALYSIS

28. The statistical methodologies used by Defendant to evaluate whether outputs of any AASS produce disparate impact on applicants based on any Protected Characteristic, including:

    (a) Any regression analyses conducted to evaluate disparities in applicant outcomes while controlling for job-related qualifications or other legitimate selection criteria.

    (b) Any statistical significance testing performed in connection with bias or adverse impact analyses, including hypothesis testing, p-values, confidence intervals, Fisher's Exact Test, or comparable statistical methods.

    (c) Any analyses conducted to determine whether disparities in applicant outcomes are attributable to the operation of the AASS itself rather than differences in applicant qualifications or other nondiscriminatory factors.

    (d) Any counterfactual analyses or simulations evaluating how applicant outcomes would change if Protected Characteristics were held constant or removed from the analysis.

    (e) The data fields, variables, and statistical controls used in such analyses.

## F. FEATURE IMPORTANCE, MODEL EXPLAINABILITY, AND PROXY VARIABLES

29. The design, implementation, and use of any model interpretability, explainability, or feature-importance analysis performed in connection with any AASS, including methodologies such as SHAP (Shapley Additive Explanations), LIME (Local Interpretable Model-Agnostic Explanations), permutation importance testing, partial dependence analysis, feature attribution methods, and gradient-based attribution methods.

30. Any analysis conducted to determine whether model inputs function as proxies for Protected Characteristics, including correlation analysis, regression testing, clustering analysis, or mutual information analysis.

31. The process by which input variables were selected, engineered, transformed, encoded, or excluded during development of the AASS.

32. Any steps taken to identify, mitigate, remove, or adjust variables that were determined to function as proxies for Protected Characteristics.

## G. MODEL TESTING, SIMULATION, AND SENSITIVITY ANALYSIS

33. Any testing conducted to evaluate how changes in input variables, model parameters, or scoring thresholds affect applicant outcomes, including: (a) simulation testing using synthetic or modified datasets; (b) sensitivity analyses evaluating how model outputs

change when particular variables or features are removed, modified, or weighted differently; (c) experiments conducted to determine whether removing variables correlated with Protected Characteristics alters applicant rankings or selection rates; and (d) testing performed to determine whether disparities remain after controlling for legitimate job-related qualifications.

## H. MODEL GOVERNANCE, RISK ASSESSMENTS, AND BIAS WARNINGS

34. Defendant's internal governance, risk assessment, and review processes relating to potential bias or discrimination associated with any AASS, including: (a) any algorithmic impact assessments, fairness reviews, risk assessments, or governance processes evaluating whether the AASS could produce discriminatory outcomes; (b) any internal communications, reports, presentations, memoranda, or analyses discussing potential bias, disparate impact, or legal compliance risks; (c) any warnings, concerns, or recommendations raised by engineers, data scientists, employees, vendors, consultants, or auditors regarding bias or discriminatory outcomes; (d) the steps taken by Defendant in response to such warnings or concerns; and (e) the identity of any internal committees, governance bodies, or review boards responsible for evaluating fairness, bias, or legal compliance of automated decision systems.

## I. MODEL OBJECTIVES, OPTIMIZATION GOALS, AND TRADEOFFS

35. The objectives and optimization goals used in designing, training, or deploying any AASS, including: (a) the performance metrics used to evaluate the system (accuracy, prediction performance, efficiency, or other operational metrics); (b) whether fairness, bias mitigation, or disparate impact reduction were incorporated as model design objectives; (c) any analyses evaluating potential tradeoffs between model performance metrics and fairness outcomes across Protected Characteristics; and (d) any discussions or decisions regarding whether to prioritize predictive accuracy or efficiency over fairness considerations.

## J. ESI — STRUCTURE, LOCATION, AND CUSTODIANS

36. The location, format, and structure of all ESI related to each AASS, including the names and types of all databases, repositories, storage systems, cloud platforms, and servers on which such ESI is stored or was stored during the Relevant Time Period.

37. The identity of all IT personnel, data engineers, HR technology staff, and other custodians who maintain, have access to, or are responsible for ESI related to each AASS.

38. The metadata fields associated with applicant records processed through the AASS, including any fields reflecting Protected Characteristics, applicant scores, rankings, disposition codes, and timestamps.

39. The existence, non-existence, location, and description of any "evaluation data" (including features, ground-truth labels, predictions/model outputs, or data used to determine whether predicted results of a model are accurate) for CSM, Spotlight, and/or

Fetch, including any efforts to locate or generate such data and the basis for any representation that no evaluation data exists or is in Defendant's possession, custody, or control.

40. Any metadata, general descriptions, definitions, group membership data, demographic data, or bias/disparity evaluation data associated with CSM, Spotlight, or Fetch, including any efforts to collect, review, or analyze such data and the basis for any representation that no such metadata or data exists or is in Defendant's possession, custody, or control.

## K. APPLICANT-LEVEL OUTCOME DATA

41. The data Defendant maintains regarding individual applicant outcomes generated by or in connection with each AASS, including applicant scores, ranking tiers, pass/fail designations, disposition codes, and whether the applicant was advanced, rejected, or placed in a hold status.

42. Whether Defendant collected, stores, or can reconstruct data on the race, sex, age, national origin, or disability status of applicants processed through the AASS, including through self-identification forms, OFCCP-required data collection, or demographic inference.

43. Log files, audit trails, or other ESI that would allow reconstruction of the decisions made by the AASS with respect to individual applicants, including the inputs provided and outputs generated for each applicant record.

44. With respect to Plaintiff [Name]: (a) the job requisition(s) against which Plaintiff's application was scored; (b) the score category assigned; (c) the specific skills identified as matching; (d) the specific skills identified as not matching; (e) the date the score was computed; and (f) whether any human recruiter reviewed Plaintiff's application independently of the AASS score, and if so, the identity of that person and the basis for any disposition decision.

## L. GOVERNANCE, POLICIES, AND INTERNAL COMMUNICATIONS

45. Defendant's internal policies, protocols, and governance frameworks governing the procurement, deployment, monitoring, and decommissioning of AASS, including any review or approval processes required prior to adoption.

46. Any complaints, grievances, internal investigations, or external regulatory inquiries— whether by the EEOC, OFCCP, state civil rights agencies, or others—concerning alleged bias or discrimination in connection with the AASS, and Defendant's response thereto.

47. All communications among Defendant's officers, directors, employees, and Vendors concerning the potential for bias, disparate impact, or legal risk associated with the AASS, including communications discussing modifications made to reduce bias.

48. Any notices, disclosures, or information provided (or required to be provided) by Defendant to its customers, applicants, or candidates concerning the use of CSM, Spotlight, or Fetch, including notices required under NYC Local Law 144 or California's FEHA regulations.

49. Defendant's policies, procedures, training, or guidance provided to customers regarding compliance with NYC Local Law 144 and California's FEHA Automated-Decision Systems regulations, including any warnings, disclaimers, or representations about the tools' compliance with anti-discrimination requirements, disparate-impact prohibitions, or recordkeeping obligations.

50. All documents, communications, data, or analyses concerning Defendant's efforts to ensure that CSM, Spotlight, and Fetch do not discriminate or cause unlawful disparate impact, and any modifications made to the tools in response to legal requirements.

## M. UPSTREAM VENDOR DATA INTEGRATION

51. The complete end-to-end workflow for receiving, processing, screening, scoring, and rejecting (or suppressing) job applications and contingent-worker submittals in Workday Recruiting and Talent Management, including every automated, rule-based, and algorithmic step from initial submission through final disposition or rejection email.

52. All integrations between Workday and third-party Vendor Management Systems (VMS), Managed Service Providers (MSPs), Recruitment Process Outsourcers (RPOs), or contingent-workforce platforms (including AgileOne Acceleration VMS, TalentETL, and similar systems), including the technical specifications, data feeds, APIs, EIBs, or integrations by which "Global Negative Reason Codes," vendor disqualification flags, rehire eligibility indicators, performance evaluations, issue/risk tags, and future-submittal suitability determinations are transmitted into Workday tenant environments.

53. Workday's Duplicate Management Framework (DMF), including all match rules (email, phone, name, resume job history, DOB, National ID, etc.), auto-merge logic, manual-merge processes, field-level data mapping during merges, and the precise effect of merging a new applicant profile with a historical contingent-worker or vendor profile on subsequent pre-screening, scoring, ranking, or rejection decisions.

54. The ingestion, storage, persistence, and use of upstream or third-party vendor-generated metadata (Global Negative Reason Codes, disqualification flags, rehire eligibility = NO, performance evaluations permanently attached to the Person Record, suitability flags, and risk/issue tags) within Workday's candidate/Person records, pre-screening rules, and any algorithmic or AI tools.

55. Workday's pre-screening rules, business process rules, conditional workflows, or eligibility checks that automatically interpret and apply upstream vendor flags (e.g., "Vendor Disqualified" → Auto Not Eligible; "Rehire Eligibility = No" → Bypass recruiter; Negative Reason Code → Auto-kill workflow), including the configuration, logic, code, and decision trees for these rules.

56. The role, functionality, and data inputs of HiredScore (Talent Intelligence / Talent Orchestration) within the applicant screening and rejection process, including how it consumes upstream vendor data, performs candidate grading/scoring/rediscovery, generates rejection recommendations, and interacts with CSM, Spotlight, Fetch, DMF, or pre-screening rules.

57. All "Global Negative Reason Code" lists or libraries used in Workday or its integrated VMS platforms (particularly codes related to illness/disability, childcare, transportation, performance issues, or other protected-characteristic proxies), how they are tagged during assignment termination/end-of-assignment processes, and how they are used for "future reporting purposes" or to determine "future submittals" or rehire suitability.

58. The contingent-worker assignment termination / "End Assignment" process in Workday or integrated VMS systems (including the four performance-evaluation questions, reason-code selection, and comments fields), and the mechanism by which this process generates permanent negative metadata attached to the worker's profile for use in future hiring or screening decisions.

59. Whether Workday classifies, treats, or considers the upstream vendor data feeds, DMF merging logic, negative-reason-code rules, pre-screening rules, or HiredScore components as part of its AEDTs under NYC Local Law 144 or ADS under California FEHA regulations, and any compliance analyses, bias audits, or disparate-impact reviews performed on this pipeline.

## N. ESI PRESERVATION, DISCOVERY RESPONSES, AND DOCUMENT PRODUCTION

60. All steps taken by Defendant to preserve ESI in connection with this litigation, including when any litigation hold was issued, to whom it was directed, and what categories of ESI were identified as subject to the hold.

61. Any ESI related to the AASS that has been deleted, overwritten, or lost since the Relevant Time Period, the circumstances of such loss, and whether the ESI can be recovered.

62. The format in which ESI related to the AASS can be produced, including whether production can be made in a format that preserves metadata, allows querying of structured data (e.g., CSV, SQL export), and reflects the complete operational record of the AASS.

63. Defendant's responses, supplemental responses, and second supplemental responses to Plaintiff's Requests for Production Nos. 1 through 6, including the factual basis, investigation, and analysis underlying each statement, assertion, and objection contained therein.

64. The search methodology employed, custodians searched, search terms or filters used, date ranges applied, locations/databases reviewed, and any determinations that responsive documents do not exist or are not in Defendant's possession, custody, or control in connection with Requests for Production Nos. 1–6.

65. The factual and technical basis for any prior representation in discovery responses or meet-and-confer correspondence that upstream vendor datasets, Global Negative Reason Codes, DMF documentation, HiredScore materials, pre-screening rules, or assignment-termination workflows were not responsive to Plaintiff's Requests for Production Nos. 1–

6, were not in Defendant's possession/custody/control, or otherwise need not be produced.

66. The identity of all custodians, databases, systems of record, and third-party vendors possessing or controlling documents, data, or communications responsive to the topics herein; the search methodology used (or not used) to locate such materials; and any determinations that responsive materials do not exist or were withheld on privilege or other grounds.

67. The identity of all persons with knowledge of the facts set forth in the responses to Requests for Production Nos. 1–6 and the identity of the person(s) who prepared, reviewed, or approved those responses.

### III. RULE 30(b)(2) REQUEST FOR DOCUMENTS

Pursuant to Federal Rule of Civil Procedure 30(b)(2), Plaintiff requests that Defendant produce the following documents prior to or at the time of the deposition:

1. All versions of the AI Fact Sheet, model card, technical documentation, or similar documents describing the design, function, inputs, outputs, training, testing, or limitations of each AASS, including CSM, Spotlight, and Fetch.

2. All documents constituting or describing the Skills Cloud ontology and skill embeddings used to train, retrain, or validate the Candidate Skills Match model, including version histories.

3. All training datasets, validation datasets, or test datasets used in connection with any version of each AASS, including any datasets derived from customer-contributed data and any documents describing the composition of the 200 million person profiles referenced in the AI Fact Sheet, including any demographic breakdowns.

4. All documents, datasets, analytic scripts, statistical models, reports, communications, and ESI relating to feature importance analyses, proxy-variable testing, bias evaluations, statistical testing, model simulations, algorithmic risk assessments, fairness reviews, or internal discussions concerning potential discriminatory effects of any AASS.

5. All documents relating to bias testing or ethics review of each AASS, including test plans, protocols, results, statistical reports, and remediation records; all communications, memoranda, or reports concerning impermissible bias, adverse impact, or disparate impact; and all documents relating to adjustments to match score threshold definitions made in response to bias testing results, including the pre- and post-adjustment thresholds and the rationale for each change.

6. All documents reflecting any internal ethics or lifecycle bias review conducted for any AASS, including assessments performed under any lifecycle review process, and all documents generated by or submitted to any internal AI ethics committee, bias review board, or similar body concerning any AASS.

7. All documents and communications with outside legal counsel, consultants, or experts concerning bias, disparate impact, or legal compliance of any AASS. [NOTE: Identify in privilege log per Burlington Northern.]

8. All documents relating to monitoring of each AASS for data drift, concept drift, or degradation in performance, and all model QA and testing records for each version, including NDCG scores and results from functional, end-to-end, or group testing.

9. All documents relating to bias audits, disparate-impact analyses, validation testing, or other assessments performed on CSM, Spotlight, or Fetch to comply with NYC Local Law 144 or California's FEHA Automated-Decision Systems regulations, including the identity of any auditor(s), audit methodology, selection of demographic categories, results, any publication or distribution of audit summaries, and any communications with customers regarding such audits.

10. All notices, disclosures, or information provided (or required to be provided) by Defendant to its customers, applicants, or candidates concerning the use of CSM, Spotlight, or Fetch, including notices required under NYC Local Law 144 or California's FEHA regulations; all policies, procedures, training, or guidance provided to customers regarding compliance with such laws; and all documents concerning Defendant's efforts to ensure these tools do not cause unlawful disparate impact.

11. All technical documentation, functional specifications, and user guides for each AASS, including model cards, data sheets, and algorithmic impact assessments; all validation studies, bias audits, adverse impact analyses, and testing reports; and all data dictionaries, schema diagrams, and data flow documentation showing how applicant data is ingested, processed, and stored by the AASS.

12. All contracts, statements of work, and data processing agreements with Vendors of the AASS, including any provisions relating to bias testing, auditing rights, and indemnification; and the Innovation Services Addendum (ISA) and all related exhibits governing customer use of CSM.

13. All internal policies and procedures governing use of the AASS, including any equal employment opportunity compliance checklists or AI governance policies; and all communications with customers concerning each AASS's bias testing results, limitations, or legal compliance obligations.

14. Candidate Skills Match scoring data and all Custom Reporting Field (CRF) data for Plaintiff [Name]'s job application(s), including raw score, score category, skills matched, skills not matched, API logs, Candidate Name or ID, Skills Match Score Details, Gender, Race, and Stage; and all documents reflecting any human recruiter's review of Plaintiff's application.

15. Candidate Skills Match score data for all applicants who applied to the same job requisition(s) as Plaintiff, including score category, gender, race, and disability status for each applicant, in a format amenable to statistical analysis; and all documents reflecting the hiring, advancement, or rejection decisions made for candidates on the requisition(s) at issue.

16. All litigation hold notices issued in connection with this litigation, including the date of issuance, the recipients, and the categories of data subject to the hold; all documents reflecting the retention, deletion, or archiving of AASS data for any applicant from [date range] to the present; and a representative sample of applicant records (suitably de-identified) processed through the AASS, including all associated scores, rankings, and disposition codes.

17. All documents, communications, and information responsive to Requests for Production Nos. 1–6 (including all subparts a–m), including any source, content, quantity, quality, validity, training, review, auditing, cleaning, or supplementation of any data used by CSM, Spotlight, or Fetch; all facts, documents, and communications supporting or contradicting any statement in Defendant's responses that "no responsive documents exist," "no such data exists," or that documents are not in Defendant's possession, custody, or control.

18. All documents relating to DMF match rules, VMS/MSP integration specifications, Global Negative Reason Code libraries, HiredScore data inputs and outputs, pre-screening rule configurations, and assignment-termination workflows described in Section II.M above.

19. Organizational charts identifying the departments and personnel responsible for procurement, deployment, oversight, and compliance review of each AASS.

## IV. RESERVATION OF RIGHTS

Plaintiff reserves the right to amend, supplement, or modify these topics prior to the notice of deposion  and deposition. as additional information or guidance becomes available. The designation of topics herein is not intended to limit the scope of examination at the deposition. Plaintiff further reserves the right to notice or call additional corporate representatives if Defendant's initial designee(s) lack sufficient knowledge on any topic identified herein.

Respectfully submitted,

_____