**PLAINTIFFS' EXHIBIT B**

**TRINDEL TESTIMONY ON AI FACT SHEET**

60

Q. Okay. Let's – I've got some documents that will help.

I think the first -- I want to -- let me just do some housekeeping first.

Well, let's go -- I've got **Exhibit 1.**

**(Deposition Exhibit 1 was marked** for identification.)

BY MR. WINSTON:

Q. Have you seen this document before? Take a look at it.

A. It's in a different format than I think I've seen before, but it looks to be a copy of the -- a **version of the candidate skills match AI fact sheet.**

Q. If you could turn to a page at the bottom with the numbers 2744.

A. Yes.

Q. Do you agree with the statement that "the risk of impermissible bias is a material consideration for ML use cases"?

MS. CONNELL: Objection; calls for an opinion

61

from a fact witness, vague and ambiguous, lacks foundation, incomplete hypothetical.

THE WITNESS: I'm not sure of the definition for the term "impermissible bias" in this sentence.

Trindel Deposition Transcript at 60:6-61:4 (March 4, 2025).

61

Q. And then it goes on to describe "targeted design decisions and statistical testing designed to detect and mitigate...bias."

MS. CONNELL: Where are you, Counsel?

MR. WINSTON: At the -- the last sentence on 2744 and then on the following page.

MS. CONNELL: Is there a question?

MR. WINSTON: Yes.

Q. Were you involved in the -- in any of the targeted design decisions --

62

MS. CONNELL: Objection; lacks --

BY MR. WINSTON:

Q. -- as a fact question?

1

MS. CONNELL: Lacks foundation, assumes facts.

THE WITNESS: I was not involved in the targeted design decisions described --

BY MR. WINSTON:

Q. Say again.

A. -- here.

I was not involved in the targeted design decisions listed here personally.

Trindel Deposition Transcript at 61:16-62:11 (March 4, 2025).

64

Q. Have you ever reviewed an ML model inputs to confirm the fields weren't likely to give rise to

65

impermissible bias against a protected class?

MS. CONNELL: Objection; vague, incomplete hypothetical.

THE WITNESS: Can you repeat that?

BY MR. WINSTON:

Q. Sure. I'm looking at the second sentence of the -- of the first paragraph. It says, "We also reviewed the ML model inputs to confirm that the fields weren't likely to give rise to an impermissible bias against a protected class." Have you ever been involved in such a review?

A. "We also" – I'm sorry. What page?

Q. 2745.

A. 2745.

Do you see it?

MS. CONNELL: I think he's looking here.

THE WITNESS: And your question on this sentence?

BY MR. WINSTON:

Q. Have you ever, yourself, been involved -- reviewed an ML model the way it is described in that sentence?

* * *

79

BY MR. WINSTON:

Q. Do you see in the third paragraph where it says, "To best" stimulate "the environment in which the ML tool is expected to perform, Workday leveraged customer-contributed data to form the test data sets"?

MS. CONNELL: I'm sorry, Counsel. Which page are you on?

2

MR. WINSTON:  I'm on 2745, the third paragraph.

THE WITNESS:  I see it.

   \* \* \*

79

BY MR. WINSTON:

Q.  Would it be correct to say that Workday has

80

millions of job applications that's on their computer or their servers?

MS. CONNELL:  Objection; vague, calls for speculation, lacks foundation.

THE WITNESS:  I'm sorry.  Can you clarify the question?

BY MR. WINSTON:

Q.  Sure.  When -- do you know the Workday -- well, let me – "The test data sets consisted of thousands of real-world job" -- I'm reading from the document.

A.  Uh-huh.

Q.  "The test data sets consisted of thousands of real-world job requisitions and millions of job applications."

It would be a correct statement to say, then, that Workday has millions of job applications from their customers?

MS. CONNELL:  Objection; misstates the document.  The document speaks for itself.

THE WITNESS:  I would direct you back to as it's described in the document.

Trindel Deposition Transcript at 64:24-65:22, 79:9-17, 79:24-80:21  (March 4, 2025).

87

Q.  Do you see at the next sentence, "Workday performed statistical testing for impermissible bias with respect to candidate gender, race, and disability"?

A.  I see that.

Q.  And it's my understanding you don't know what impermissible bias is.  Is that correct?

MS. CONNELL:  Object.

THE WITNESS:  That's correct.

BY MR. WINSTON:

Q.  And do you know if the testing was performed

88

with respect to -- to age as well?  It doesn't mention age, is why I'm asking.

MS. CONNELL:  I'm going to instruct the witness

not to answer as to the content of the privileged testing that was conducted.

MR. WINSTON: So straight-up "Don't answer"?

MS. CONNELL: Yeah. Instructing her not to answer as to the content of the privileged testing that was done.

* * *

92

BY MR. WINSTON:

Q. Okay. And if you could turn back a couple pages, to 2744. There's a -- there's a – there's a document referenced, "Workday's Continued Diligence to Ethical AI and ML Trust." Is that a document you prepared?

A. That's a Workday blog that I authored, yes.

Q. That you --

A. That I authored, yes.

Q. Okay. And it's referencing -- the sentence above it is "Workday is committed to developing responsible and trustworthy AI, aligning to 4 key principles that reflect our core values."

93

Do you know what the four key principles are?

A. Yes.

Q. Oh. Okay.

A. The first is amplify human potential. The second is positively impact society. The third is champion transparency and fairness. And the fourth is deliver on our commitments to data privacy and security.

Q. And when you reference transparency, can you elaborate on that? What do you want to be transparent about the AI?

MS. CONNELL: Objection; assumes facts, lacks foundation, calls for speculation, vague.

THE WITNESS: For example, **the fact sheets that we're looking a**t, these are provided to customers to provide transparency about how the AI products were built.

BY MR. WINSTON:

Q. And when you say the fact sheet, that's -- that's this?

A. This is, as I understand it --

Q. Okay.

A. -- a version of our candidate skills match fact sheet.

Q. Do you see, under the "Our Lifecycle Approach

4

to Bias in ML," "A key component," in the second

94

paragraph, "of our lifecycle approach is an initial ethics and bias assessment"?

Do you have any knowledge of an instance where the ML tool was changed because of bias?

* * *

94

MR. WINSTON:  2744, the paragraph heading "Our Lifecycle Approach to Bias in ML."

MS. CONNELL:  And I'm sorry.  One more time. The question is?

BY MR. WINSTON:

Q.  Do you know of an instance where the ML tool was changed because of an impermissible bias?

MS. CONNELL:  Same objections.

THE WITNESS:  All I would know about that would be what's contained within this fact sheet.

* * *

98

Q.  What about -- have you ever heard of something called skills miner?

A.  Skills miner?

I'm sorry.  I'm not sure exactly what that is.

Q.  Okay.  I didn't know if you'd heard of it or not.  I saw it referenced in some documents.

What do you understand that skills match does?

MS. CONNELL:  Objection; asked and answered multiple times.

THE WITNESS:  I think the best answer is probably under the heading "How It Works" in the AI fact sheet.

Trindel Deposition Transcript at 87:16-88:9, 92:13-94:4, 94:11-20, 98:1-12 (March 4, 2025).

106

Q.  Do you know if the bias evaluations are ever shared with the customers?

MS. CONNELL:  Objection; lacks foundation, calls for speculation, vague.

THE WITNESS:  I think an example is the fact sheet that we were just looking at for CSM.

BY MR. WINSTON:

Q.  I'll be more specific, more -- you, if you were assessing the candidate skills match for any adverse impact or mitigation bias, if the results were ever

5

shared with the customers.

MS. CONNELL: Objection; assumes facts, calls

107

for speculation, lacks foundation.

THE WITNESS: I'm not aware of any sharing of the candidate skills match testing outside of the fact sheet.

BY MR. WINSTON:

Q. On page 2742 -- back to the other exhibit. I'm sorry.

MS. CONNELL: Exhibit 1? Exhibit 1?

MR. WINSTON: Yeah. Yes. Yes.

THE WITNESS: Yes.

BY MR. WINSTON:

Q. Do you see "How It Was Trained"?

A. Down at the bottom? Yes.

Q. Yeah. And then there's this reference to Workday Skills Cloud ontology. Do you have an understanding of what that is?

A. I have a limited understanding of what it is.

Q. What can you explain?

A. My recollection is that it's a, I can't think of a word other than "ontology," that has relationships between skills. And it's involved with candidate skills match and potentially other products or features that I can't name off the top of my head.

Q. Have you seen documents that discuss Workday's Skills Cloud ontology?

108

A. I may have, but I can't think of an example.

Q. And if you wanted to find out who made -- if you wanted to find out more information about that product or that service or that data set, who would you ask?

A. Someone from our product and technology organization.

Trindel Deposition Transcript at 106:14-108:7  (March 4, 2025).

108

Q. And then it discusses the – Workday's -- that they train using Workday's "proprietary datasets containing over 200 million people profiles and customer data contributions." Do you know where the 200 million people profiles are coming from?

A. I don't at this time. I don't recall any

6

detail about that.

Trindel Deposition Transcript at 108:8-14 (March 4, 2025).

111

Q. Under "Customer Testing," there's a star, and it says "New CRFs." Do you know what that refers to?

A. I could guess, but I'm not entirely sure.

MR. WINSTON: Can she guess?

MS. CONNELL: Also assert that the -- the document speaks for itself. It says "class reporting fields" right here on the document.

MR. WINSTON: Okay. Thank you. It's not a guess.

THE WITNESS: I didn't even see that.

BY MR. WINSTON:

Q. And you don't know if Workday does that in any large way across their data set?

MS. CONNELL: Objection; "vague as to that."

112

MR. WINSTON: Sure.

* * *

112

MR. WINSTON: And then while we're on that, let me ask you, on 2745, where we were talking about, I was asking about whether or not they -- they test for race and disability, and I was asking about age. And I believe that she was instructed not to answer. But I had a different type of question.

Q. Do you know if they test for race and age not independently but together?

MS. CONNELL: I'm going to instruct the witness not to answer, on the basis that your question goes to the content of the testing that Workday performs, and it's privileged.

Trindel Deposition Transcript at 111:12-112:1, 112:11-22  (March 4, 2025).

113

Q. So when we look at it, it says, "Workday performed statistical testing for impermissible bias with respect to candidate gender, race, and disability."

Do you know if it looked at it separately, or was there any combination of the two?

MS. CONNELL: I'm going to instruct the witness not to answer on the basis of attorney-client privilege

7

114

and attorney work product doctrine.  Your question goes to the content of the testing.

BY MR. WINSTON:

Q.  Okay.  Were you, yourself, informed of any disparities as a result of the testing?

MS. CONNELL:  I think you're -- she can't answer that question without going to the content of the testing.  So I'm going to instruct her not to answer that question, on -- for the record, on the basis of attorney-client privilege and attorney work product doctrine.

BY MR. WINSTON:

Q.  Is it your understanding that the candidates -- that the AI makes a score in the candidate skills matching?

MS. CONNELL:  Objection; misstates prior testimony.

THE WITNESS:  I would just point to the fact sheet, under -- well, I'd just point to the fact sheet. I think the information about the product is -- that I'm familiar with is maintained in the fact sheet.

BY MR. WINSTON:

Q.  Are you looking at a specific section?

A.  No, not a specific section, just that the fact sheet describes how the product works, and --

Trindel Deposition Transcript at 113:16-114:22 (March 4, 2025).

116

MR. WINSTON:  I'm sorry.

Q.  You -- in identifying the four AI principles, one of them is championing -- championing transparency and fairness?

A.  Yes.

Trindel Deposition Transcript at 116:1-5 (March 4, 2025).

122

BY MR. WINSTON:

Q.  On the second page, if you turn the page -- or

123

let me just -- hold on.

Restricting ourselves to the content of this document, it says that "While standard legal practices do not anticipate or require a total absence of bias,

8

Workday is confident that its testing and mitigation process is consistent with best practices, legal standards, and our Commitments to Ethical ML." Do you know what ethical ML is?

MS. CONNELL: Objection; lacks foundation, calls for speculation.

THE WITNESS: It's my understanding that in this document, the reference to commitments to ethical ML --

BY MR. WINSTON:

Q. Uh-huh.

A. -- would be referring back to Workday's commitments to ethical --

Q. What page are you on?

A. 2738.

Q. 27?

A. 38.

Q. 38.

Where it says "Workday has committed to 6 key principles that guide how we develop ML," are those listed in this document?

124

A. I believe that those are referring to the link "Workday's Commitments to Ethical AI" --

Q. Okay.

A. -- which, as I recall, was a blog post by --

Q. And that was your blog post?

A. As I recall, that was a blog post by Barbara Cosgrove. I'm just going off the title.

Q. By who?

A. Barbara Cosgrove.

Q. Okay. That was the law firm?

A. Barbara Cosgrove is Workday's chief privacy officer.

Q. I see. Okay.

A. And she published -- as I recall, she published a blog titled that.

Q. But she was a Workday employee?

A. Yes, sir.

Q. Here's something that we -- the next exhibit is 4. Let's see. Where's --

(Discussion off the record.)

Trindel Deposition Transcript at 122:24-124:20 (March 4, 2025).