Lee D. Winston
*Admitted Pro Hac Vice*
lwinston@winstoncooks.com
Roderick T. Cooks
*Admitted Pro Hac Vice*
rcooks@winstoncooks.com
Bethany Neal
*Admitted Pro Hac Vice*
bneal@winstoncooks.com
Winston Cooks, LLC
420 20th Street North, Suite 2200
Birmingham, AL 35203

**Local Counsel:**
Jay Greene, JD, CPA
Greene Estate, Probate, and Elder
Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108

Robert L. Wiggins, Jr.
*Admitted Pro Hac Vice*
rwiggins@wigginschilds.com
Ann K. Wiggins
*Admitted Pro Hac Vice*
awiggins@wigginschilds.com
Samuel Fisher, Jr.
*Admitted Pro Hac Vice*
sf@wigginschilds.com
Jennifer Wiggins-Smith
*Admitted Pro Hac Vice*
jsmith@wigginschilds.com
Nicki Leili Lawsen
*Admitted Pro Hac Vice*
nlawsen@wigginschilds.com
Freddrick Malik Moore
*Admitted Pro Hac Vice*
mmoore@wigginschilds.com
Wiggins, Childs, Pantazis, Fisher &
Goldfarb, LLC
The Kress Building,
301 19th Street North
Birmingham, AL 35203

*Attorneys for the Plaintiff and Proposed Class and Collective Members*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

DEREK L. MOBLEY for and on behalf of
himself and other persons similarly situated,
*Plaintiff,*

v.

WORKDAY, INC.,
*Defendant.*

Case No. 3:23-cv-00770-RFL
**PLAINTIFFS' MOTION TO COMPEL
PRODUCTION OF REQUESTED
DOCUMENTS AND DISCOVERY**
Hearing Date:  May 28, 2026
Time:            9:30 a.m.
Courtroom: Videoconference/In Person per
Court's Direction
Judge: Hon. Laurel Beeler, United States
Magistrate Judge

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS
AND DISCOVERY**

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ...............................................................................2

        A.    WORKDAY'S SERIAL NON-COMPLIANCE .........................................3

III.  LEGAL STANDARD ..........................................................................................3

IV.   ARGUMENT ......................................................................................................3

        A.    WORDAY'S PRIVILEGE LOGS ARE FAICIALLY DEFICIENT AND SHOULD BE STRICKEN ……………………………………………………..…… 3

        B.    DEFENDANT'S BIAS TESTING DATA AND RESULTS ARE NOT PRIVILEGED ……………………………………………………… 4

        C.    THE PYTHON BIAS TESTING SOURCE CODE (Priv. Log ID 489) IS NOT PRIVILEGED ...…………………………………………………….…….6

                1.    Python Source Code Is a Technical Artifact, Not a Communication………………………………………………………………………6

                2.    The Primary Purpose of Bias Testing Code Is Technical, Not Legal ……… 7

                3.    Parking An Attorney On A Datafile Does Not Confer Privilege On Technical Work Product……………………………………..…………………7

                4.    The Regulatory Framework "Curates" the Data And Analysis, Not Attorneys. ………………………………………………………….9

        D.    WORK PRODUCT PROTECTION IS UNAVAILABLE FOR MATERIALS CREATED YEARS BEFORE THIS LITIGATION ………………………..……10

        E.    DATA NOT CLAIMED TO BE PRIVILEGED MUST BE PRODUCED…………………………………………………..………11

        F.    WORKDAY'S CONFIDENTIALITY OBJECTION DOES NOT JUSTIFY WITHHOLDING CUSTOMER APPLICANT DATA ………………………16

                1.    Workday's Ownership of the Aggregated and Statistical Data Precludes Any Customer Confidentiality Interest………………………………….………17

                2.    Workday's Master Subscription Agreement Expressly Authorizes Court-Compelled Production and Forecloses Any Breach Claim…………………18

ii

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

3.    Implied Waiver by Offensive Use…………………………………………..…19

4.    A Private Confidentiality Agreement Is Not a Recognized Privilege and Cannot Alone Justify Withholding Relevant Documents from Discovery....20

5.    Workday Repeatedly Refused To Organize Or Correlate The Documents It Produced With The Discovery Request To Which The Documents Responded…………………………………………………………………..…21

V.    CONCLUSION AND RELIEF REQUESTED ...................................................................23

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

**TABLE OF AUTHORITIES**

*Cases*

*Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court,*
408 F.3d 1142 (9th Cir. 2005) ................................................................................. 3

*Calendar Rsch. LLC v. StubHub, Inc.,*
2019 U.S. Dist. LEXIS 237001 (C.D. Cal. 2019) ............................................... 6

*Cardenas v. Dorel Juvenile Grp., Inc.,*
230 F.R.D. 611 (D. Kan. 2005) ……………………………………………………22

*Centurion Indus., Inc. v. Warren Steurer & Assocs.,*
665 F.2d 323 (10th Cir. 1981) ........................................................……………21

*Chevron Corp. v. Pennzoil Co.,*
974 F.2d 1156 (9th Cir. 1992) .......................................................…………..19

*Does v. Kaiser Found. Health Plan, Inc.,*
2025 U.S. Dist. LEXIS 47482 (N.D. Cal. 2025) ............................................5, 6

*Eureka Fin. Corp. v. Hartford Accident & Indem. Co.,*
136 F.R.D. 179 (E.D. Cal. 1991) ............. …………………………………………..4

*Fed. Open Mkt. Comm. v. Merrill,*
443 U.S. 340 (1979) ..........................................................................................21

*Google, Inc. v. Am. Blind & Wallpaper Factory, Inc.,*
2006 U.S. Dist. LEXIS 97912 (N.D. Cal. Feb. 8, 2006) ……………………………..22

*Greer v. County of San Diego,*
127 F.4th 1216 (9th Cir. 2025) ..........................................................................9

*Iacono v. IBM Corp.,*
2018 U.S. Dist. LEXIS 226184 (C.D. Cal. 2018) .........................……………..6

*In re Grand Jury,*
23 F.4th 1088 (9th Cir. 2021) …………………………………………….......... 3, 7

*In re Grand Jury Investigation,*
974 F.2d 1068 (9th Cir. 1992) ........................................................................ ..3

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

*In re Vioxx Prods. Liab. Litig.,*

501 F. Supp. 2d 789 (E.D. La. 2007) ................................................................ . . .4

*Nat'l W. Life Ins. Co. v. W. Nat'l Life Ins. Co.,*

769 F. Supp. 2d 585 (S.D.N.Y. 2011) ....................................................................11

*Pass & Seymour, Inc. v. Hubbell Inc.,*

255 F.R.D. 331 (N.D.N.Y. 2008) …………………………………………………22

*Residential Construction, LLC v. Ace Prop. & Cas. Ins. Co.,*

2006 U.S. Dist. LEXIS 36943 (D. Nev. June 5, 2006)……………………………….21, 22, 23

*Shuster v. Shuster,*

2017 U.S. Dist. LEXIS 121575 (D.Air. Aug. 16, 2017) ……………………………….21

*Simon v. G.D. Searle & Co.,*

816 F.2d 397 (8th Cir. 1987) ................................................................…..6

*Stirratt v. Uber Techs., Inc.,*

2024 U.S. Dist. LEXIS 69329 (N.D. Cal. 2024) .....................................................5

*Suboh v. Bellsouth Bus. Sys., Inc.,*

2004 U.S. Dist. LEXIS 31422 (N.D. Ga. 2004) ...............................................…5

*United States v. ChevronTexaco Corp.,*

241 F. Supp. 2d 1065 (N.D. Cal. 2002) ...................................................................5

*United States v. Int'l Union of Petroleum & Indus. Workers,*

870 F.2d 1450 (9th Cir. 1989) ...............................................................................19

*United States v. Martin,*

278 F.3d 988 (9th Cir. 2002) ................................................................................3

*United States v. Richey,*

632 F.3d 559 (9th Cir. 2011) …………………………………………………….4, 7, 11

*Upjohn Co. v. United States,*

449 U.S. 383 (1981) .............................................................................3, 4, 5, 6, 8, 10

*Venture Corp. Ltd. v. Barrett,*

2014 U.S. Dist. LEXIS 147643 (N.D. Cal. Oct. 16, 2014)……………………………22, 23

*Visa U.S.A., Inc. v. First Data Corp.,*

2004 WL 1878209 (N.D. Cal. 2004) ......................................................................8

v
**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

**Regulations**

29 C.F.R. § 1607.4(D) …………………………………………………………………9

Cal. Code Regs. tit. 2, § 11008.1 …………………………………………………………9

Cal. Code Regs. tit. 2, §§ 11008.1–11008.4 ..………………………………………………9

N.Y.C. Admin. Code § 20-870(1) ..………………………………………………………..15

**Federal Rules**

Fed. R. Civ. P. 26(b)(1) ..………………………………………………………………..20

Fed. R. Civ. P. 26(b)(3)(A) …………………………………………………………....3, 10

Fed. R. Civ. P. 26(c)(1)(G)…………………………………………………………………20

Fed. R. Civ. P. 34(b)(2)(B)…………………………………………………………………22

Fed. R. Civ. P. 34(b)(2)(E)(i)………………………………………………………………21

**Secondary Authorities**

Ian Goodfellow et al., Deep Learning 98–105 (MIT Press 2016) …………………………14

EEOC, Assessing Adverse Impact in AI Hiring Tools (May 18, 2023) ..………………………14

vi

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that on the date and time indicated above, in Courtroom 15 of the United States District Court for the Northern District of California, before the Honorable Laurel Beeler, United States Magistrate Judge, Plaintiffs Derek L. Mobley, *et al* ("Plaintiffs") will and hereby do move this Court pursuant to Federal Rule of Civil Procedure 37(a)(3)(B) and Civil Local Rules to compel production of requested documents, data and discovery identified below.

Plaintiffs move for two forms of relief. First, to compel Workday to produce all data and documents responsive to the first and second set of requests for production within seven days of the Court's order if not produced before then, together with an accompanying document-by-request index identifying by Bates number every document responsive to each specific request—the organizational disclosure that Rule 34(b)(2)(E) has required from the outset. Second, for an order striking all privilege log entries not facially compliant with the Standing Order and compelling production of such documents within seven days of such order.

This Motion is based on the Memorandum of Points and Authorities below, the declarations and other papers filed or referenced herewith, the complete files and records of this case, and such other matters as the Court may consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiffs are entitled to production of the requested "bias testing data" bias source code, bias testing results and related discovery on three independent grounds. First, the privilege log entries for such data and documents are facially deficient: they contain no dates, no Bates numbers, and no document-level identification, and they describe entire repositories of technical files by category

1

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

alone. Second, the materials themselves are technical and statistical artifacts, not legal communications. Neither attorney-client privilege nor the work product doctrine protects them. Third, to the extent work product is even arguable for some entries, that protection was waived when Workday publicly disclosed the existence and conclusions of its bias testing program through its AI Fact Sheet and its public website, external auditors and executives 'public statements.

Compelling circumstances also support the request for expedited relief. Class certification briefing begins in July 2026. Plaintiffs 'statistical expert requires access to the bias testing data, code, and results to complete the analysis underlying the certification motion. Any further delay directly prejudices the Plaintiffs and the putative class members they represent.

## II.      FACTUAL BACKGROUND

### A.      WORDAY'S SERIAL NON-COMPLIANCE

Plaintiffs 'Requests for Production Nos. 3, 5, 6, 9, 14, 15, and 17 seek, among other things, all bias testing data, code, methodology, results, and communications relating to Workday's AI-based applicant screening tools, including Candidate Skills Match and HiredScore/Spotlight. These requests were served in September 2024 and withheld from production or disclosure in a privilege log on November 18, 2024. Workday responded without identifying any withheld materials in a privilege log.

Workday produced its First Privilege Log in January 2025, its Second Privilege Log on March 13, 2025, and its Court-ordered Third Privilege Log on December 31, 2025 more than six months after the Court's May 2025 order requiring a compliant log. ECF Nos. 130, 131, 232-1. None of those three logs identified PrivLogIDs 488, 489, or 490, or disclosed the withholding of Python bias testing code, JSON data files, or bias testing results in the formats now claimed as privileged. The first time Workday asserted privilege over those three categories was April 6, 2026, in its Fourth Privilege Log.

2

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 37(a)(3)(B), a party may move to compel production when another party "fails to produce documents or fails to answer interrogatories as requested." A party asserting privilege bears the burden of establishing that the privilege applies. *In re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir. 1992). That burden cannot be met by **conclusory log entries; it** requires particularized, document-level showings. *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court,* 408 F.3d 1142, 1147 (9th Cir. 2005). A privilege log that fails to provide dates, document identifiers, or document-level descriptions does not satisfy Rule 26(b)(5) and this Court's Standing Order. *United States v. Martin,* 278 F.3d 988, 1000 (9th Cir. 2002).

Attorney-client privilege protects confidential communications made for the purpose of obtaining or providing legal advice. *Upjohn Co. v. United States,* 449 U.S. 383, 395–96 (1981). It does not protect underlying facts, technical data, or the results of technical processes. *Id.* In the Ninth Circuit, dual-purpose documents are privileged only if their "primary purpose" was legal advice. *In re Grand Jury,* 23 F.4th 1088, 1091–92 (9th Cir. 2021). Work product protection requires that materials were "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3)(A).

## IV.   ARGUMENT

### A.   WORDAY'S PRIVILEGE LOGS ARE FAICIALLY DEFICIENT AND SHOULD BE STRICKEN

A privilege log must "identif[y] each document claimed to be privileged, the nature of the document, the date it was prepared, the author, the persons to whom it was sent, and the general subject matter." *Burlington Northern,* 408 F.3d at 1147. Categorical entries describing entire repositories without dates, individual file identifiers, or document-level descriptions do not satisfy this standard. *United States v. Martin,* 278 F.3d at 1000 (categorical privilege logs are "extremely disfavored"). Entries 488–490 fail on every required element. They contain no date. They contain no

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

Bates number. They contain no document count. They describe entire file categories (all .json files, all .py files, all .xls and .pdf results) without identifying individual documents. They provide no basis on which Plaintiffs or this Court can assess whether any specific document within the described category is actually privileged.

These deficiencies are compounded by the fact that such entries appeared for the first time in the fourth privilege log, more than a year after Workday responded to the underlying requests, and more than six months after the Court-ordered third privilege log. Workday has offered no explanation for why these categories—which include bias testing code dating to 2019—were omitted from all three prior logs. The appropriate remedy for a deficient log that withholds obviously relevant documents without adequate justification is production of the withheld materials. *See Eureka Fin. Corp. v. Hartford Accident & Indem. Co.,* 136 F.R.D. 179, 182 (E.D. Cal. 1991).

### B.     DEFENDANT'S BIAS TESTING DATA AND RESULTS ARE NOT PRIVILEGED

Attorney-client privilege "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Upjohn,* 449 U.S. at 395–96. It "protects only communications; it does not protect disclosure of the underlying facts." *Id.* Bias testing data (PrivLogID 488) and bias testing results (PrivLogID 490) are underlying facts and technical outputs. They are the product of computational processes performed on applicant data. They are not legal communications.

In-house counsel who perform business functions—rather than legal functions—do not transform business documents into privileged communications merely by being present. *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 805 (E.D. La. 2007); *Richey v. Amsouth Bank*, No. 06-0535, 2007 WL 1959254 (S.D. Ala. 2007). The question is whether counsel was acting in a legal or a business capacity.

4

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

Workday's own AI Fact Sheet—produced at Bates WORKDAY_MOB_00002741–46—describes bias testing as a standard component of Workday's "ML Trust Program," its "lifecycle review process," and its product development obligations under NYC Local Law 144 and OFCCP guidance. The Fact Sheet describes the testing as ongoing: Workday "will continue to assess Candidate Skills Match for impermissible bias through continued monitoring and statistical testing at defined intervals." WORKDAY_MOB_00002745. This is regulatory compliance and product governance—not legal advice. Michelle Law's presence as a custodian does not convert Workday's standard bias-testing program into privileged legal communication. *See United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002) (privilege does not apply where in-house counsel performs business or regulatory compliance function rather than legal advisory function).

"[T]he data underlying the statistical analysis is not protected from disclosure by the attorney-client privilege or the work-product doctrine." *Suboh v. Bellsouth Bus. Sys.*, 2004 U.S. Dist. LEXIS 31422, **24-25 (N.D. Ga. 2004). The *underlying* data and facts relevant to calculating the disparate impact of Workday's services are physical facts that exist independently from any attorney-client communication or "work product" about such facts or disparate impact. *Id.* "[T]he protection of the [attorney-client] privilege extends only to communications and not to facts." *Upjohn Co. v. United States*, 449 U.S. 383, 395-396 (1981). "The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Id.* A responding party "may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Id.*[1]

---

[1] *Accord, Does v. Kaiser Found. Health Plan, Inc.*, 2025 U.S. Dist. LEXIS 47482, **7-8, 17-18 (N.D. Cal. 2025) ("The privilege protects only communications and not underlying facts."); *Stirratt v. Uber Techs., Inc.*, 2024 U.S. Dist.

(Continued...)

5

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

For example, RFP No. 9 requests "Workday's **internal data** regarding the impact of AI or ML deployed on applicants of color, and if available, on age, and/or applicants with disabilities." ECF 268-10.  That "internal data regarding the impact of AI or ML deployed on applicants" is merely physical facts about such applicants 'race, age, gender, and disabilities and Workday's "machine learned" ("ML") summary of those underlying facts that is **not** an "attorney-client communication". *Upjohn*, 449 U.S. at 395-396. Workday's "machine learned" summary of such applicant data at issue here — applicant scores, demographic data, recommendation, hiring and promotion outcomes — is not a trade secret of Workday's customers. It is the operational output generated by Workday's own AI and ML tools, retained on Workday's own servers, and owned in significant part by Workday under its customer master subscription agreement's express terms ("MSA"). Workday's invocation of customer confidentiality to block discovery of data that its own contract assigns to Workday is not supported by any recognized legal principle.

### C.    THE PYTHON BIAS TESTING SOURCE CODE (Priv. Log ID 489) IS NOT PRIVILEGED

#### 1.    Python Source Code Is a Technical Artifact, Not a Communication.

A .py file is a plain text document containing a sequence of instructions that tells a computer what calculations to perform. It is written by engineers, not lawyers. Writing Python source code requires training in data science and software development, not legal training. The privilege log for PrivLogID 489 lists Veena Calambur, a data scientist, as a custodian alongside Michelle Law. Ms.

---

LEXIS 69329, *10 (N.D. Cal. 2024) (same). *See also Calendar Research LLC v. Stubhub, Inc.*, 2019 U.S. Dist. LEXIS 237001, *16 (C.D. Cal. 2019) (finding "Plaintiff is entitled to the audit report itself. The audit report appears to be solely a factual code analysis. Those underlying facts do not reflect legal advice, work product or confidential communications."); *Iacono v. IBM*, 2018 U.S. Dist. LEXIS 226184, **22-23 (C.D. Cal. 2018) (ordering production of "the underlying statistical data. . . nationwide"); *Simon v. G. D. Searle & Co.*, 816 F.2d 397, 402-403 (8th Cir. 1987) (holding that underlying "aggregate" data is not privileged — that "individual figures lose their identity when combined to create the aggregate information" and they don't become privileged "when communicated by the legal department to [another] department... simply because they include aggregate information based on the individual . . . figures.") (emphasis added). That is the case here.

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

Calambur or her data science team wrote the code. Ms. Law did not and could not have. Attorney-client privilege protects legal communications, not engineering artifacts. A Python script is no more a communication than a spreadsheet model, a database schema, or an algorithm compiled into executable form. Characterizing it as a "communication" stretches the privilege beyond any recognized boundary.

### 2. The Primary Purpose of Bias Testing Code Is Technical, Not Legal.

Under the Ninth Circuit's primary purpose test, a dual-purpose document is privileged only if its primary purpose was to obtain or provide legal advice. *In re Grand Jury,* 23 F.4th at 1091–92. The primary purpose of Python bias testing code is technical: to execute a statistical computation measuring whether Workday's AI tool produces different selection outcomes across demographic groups. That is data science. The code does not ask a legal question. It does not express a legal opinion. It does not reflect an attorney's mental impressions. It performs arithmetic on a dataset and returns a number.

The Ninth Circuit applied exactly this analysis in *Richey.* There, an attorney retained an appraiser and directed the appraisal process. The court reversed the privilege ruling because the report and supporting data "were not made for the purpose of providing legal advice, but, instead, for the purpose of determining the [technical result]." 632 F.3d at 566–68. The attorney's direction of the work did not change its fundamental character. The same is true here. Engineers wrote Python code to determine a technical result—the demographic selection differential produced by Workday's AI. Counsel's direction of that process did not transform it into a legal communication.

### 3. Parking An Attorney On A Datafile Does Not Confer Privilege On Technical Work Product.

Even accepting Workday's characterization that the code was "created at the direction of counsel," courts in this Circuit have held explicitly that attorney direction or oversight does not

7

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

transform technically-motivated work into a privileged attorney-client communication. *Visa U.S.A.,* 2004 WL 1878209 (documents not privileged where analysis would have been undertaken even without attorney involvement); *Richey,* 632 F.3d at 566–68. The test is not who gave the instruction—it is what the primary purpose of the resulting work was. Instructions from counsel do not make the work they direct privileged. "An instruction to bake the cake is not the cake." A memo directing engineers to write bias testing code is not the code. *Upjohn,* 449 U.S. at 395–96. The code itself —the technical instrument that performed the computation—is not privileged. The presence of in-house counsel Michelle Law as a custodian does not transform JSON data files or spreadsheet outputs into privileged communications. Courts have been clear that attorney routing of technical materials does not create privilege. *United States v. Richey,* 632 F.3d 559, 566–68 (9th Cir. 2011) (reversing privilege over technical appraisal report directed by counsel because primary purpose was technical); *Visa U.S.A., Inc. v. First Data Corp.,* No. C02-01786, 2004 WL 1878209 (N.D. Cal. Aug. 23, 2004) (no privilege where analysis would have been undertaken regardless of attorney involvement). Veena Calambur, the data scientist identified by Dr. Kelly Trindel as the team member closest to Workday's bias testing analyses (Trindel Dep. 43:3–11), who generated these materials. Ms. Calambur is not an attorney. No testimony or evidence from Veena Calambur or any other Workday engineer will reconstruct the actual Python source code. Source code is a precision document: a single character difference can change what the program does. These are not peripheral questions. Allowing Workday to immunize its most important technical evidence from discovery by routing its creation through counsel would, if accepted, allow any company to shield AI bias testing data from discovery in any discrimination case. That result is foreclosed by *Upjohn's* foundational principle that the privilege protects communications, not the underlying facts, and by the Ninth Circuit's instruction that the privilege must "be strictly confined within the narrowest possible limits

8

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

consistent with the logic of its principle." *Greer v. County of San Diego,* 127 F.4th 1216, 1230 (9th Cir. 2025).

> **4.    The Regulatory Framework "Curates" the Data And Analysis, Not Attorneys.**

The bias testing documents withheld in Privilege Log entries 180–197, 272, 280, 286–287, 293, 424–441 and 488-490 are records that the federal Uniform Guidelines On Employee Selection Procedures, 29 C.F.R. § 1607.4(D) ("UGESP") and California FEHA **_required_** to be generated as business-compliance records, not in-house attorney work product. *See* Cal. Code Regs. tit. 2, §§ 11008.1–11008.4 (eff. Oct. 1, 2025).[2] Such data retention and analysis obligations are self-executing under:

- UGESP, 29 C.F.R. § 1607.4(D) — prescribes standard measures of adverse impact;
- FEHA regulations, Cal. Code Regs. tit. 2, §§ 11008.1–11008.4; § 11010 et seq.—prescribes California's standard measures of adverse impact;
- NYC Local Law 144 — independently mandates bias audits for AI hiring tools, with specific methodological requirements and public posting of results;
- OFCCP, 41 C.F.R. Part 60-3 — prescribes standard measures of adverse impact for federal contract compliance.

FEHA's regulatory retention requirements expressly include:
- All data inputs and model parameters.
- Dataset descriptors and training data documentation;
- Selection criteria and decision logic;
- Scoring outputs — i.e., every score assigned to an applicant by the ADS;
- Audit findings and audit correspondence.

---

[2] The FEHA regulations on "bias testing" states that it is "unlawful for an employer or other covered entity to use an automated-decision system or selection criteria . . . that discriminates against . . . a class of applicants or employees on a basis protected by the Act, subject to any available defense." Cal. Code Regs., tit. 2, § 11009(f) (*FEHA Reg. Regarding Automated-Decision Systems*, approved June 27, 2025, effective October 1, 2025). That Section also provides that evidence of anti-bias testing — or the absence of such testing evidence — is relevant to a discrimination claim. Courts and agencies will consider the quality, efficacy, recency, and scope of any testing; the results; and the employer's response to those results. The absence of testing may weigh against the employer. Section 11008.1 makes it unlawful for an employer or covered entity to use an automated decision system (ADS) that results in disparate impact on any FEHA-protected class — including age, race, sex, national origin, religion, and disability. Discriminatory intent is not required; disparate impact alone triggers liability. *See* Cal. Code Regs. tit. 2, § 11008.1.

9

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

Consequently, all of the resulting disparate impact records and calculations at issue in this Motion flow from compliance with those federal and state regulations, not instructions from in-house counsel. The foregoing regulatory obligations *independently prescribe* what data is collected, what gets measured, how it gets measured, and what threshold triggers a finding of unlawful disparate impact. Workday's attorneys did not design the methodology, select the protected categories to analyze, set the statistical threshold, or determine what data to collect and analyze. The regulatory obligation is built directly into Workday's standard operating compliance process — triggered by the code of the mandate itself, not by any attorney memo. The *Upjohn* formulation applies in that instance: privilege protects communications, not facts, and when the facts exist because a regulation requires them to exist, no amount of attorney involvement changes their nature.[3] The attorney, if involved at all, was merely a *conduit* transmitting an external regulatory mandate — not the originating cause of the analysis. That fact negates Workday's attorney-client "curation" argument for all data and calculations performed pursuant to such self-executing regulations. Workday's "attorney curation" argument fails at the threshold under the *independent creation doctrine* because the requested data was compelled independently from counsel and exists regardless of any attorney-client relationship. Workday has not, and cannot, carry its burden of showing that <u>but for</u> the attorney-client relationship, the requested documents and data would not exist.

### D.    WORK PRODUCT PROTECTION IS UNAVAILABLE FOR MATERIALS CREATED YEARS BEFORE THIS LITIGATION

Work product protection requires that materials were "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3)(A). Workday's own Third Privilege Log lists bias testing activities as early as July 2019. ECF No. 232-10, PrivLogIDs 2–5. This action was filed February 9,

---

[3] If the bias testing was part of HiredScore's standard protocol before counsel engaged, or if it operated on a standing compliance schedule, the privilege predicate never existed at all. The attorney saying "run the 80% calculation" adds nothing privileged — it is transmission of a pre-existing legal requirement, not legal advice.

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

2023—nearly four years later. Code written in the ordinary course of product development in 2019 was not prepared in anticipation of litigation that did not exist. *Richey,* 632 F.3d at 567–68 (reversing work product claim where materials were prepared for regulatory, not litigation, purpose).

Workday's own published Ethical AI Principles—authored by Kelly Trindel in December 2022—committed Workday to bias testing as a standard product development practice independent of any litigation obligation. Workday cannot publicly represent that bias testing is a routine ethical commitment while simultaneously claiming in litigation that the testing materials were prepared solely in anticipation of suit. *See National Western Life Ins. Co. v. Western Nat'l Life Ins. Co.,* 769 F. Supp. 2d 585, 590 (S.D.N.Y. 2011) (work product protection unavailable for documents prepared in ordinary course of business).

### E.    DATA NOT CLAIMED TO BE PRIVILEGED MUST BE PRODUCED

Workday's Privilege Logs do not identify any other statistical data or records it contends to be privileged other than its "bias testing data" or  "bias audits." Although the requested data and records at issue have never been limited to those categories, Workday has still not produced the other statistical data or records for which no privilege has been asserted, such as the "training data" on which Plaintiffs 'claims and the Court's findings are substantially based. *See* Order, Doc. 80 at 13–14 (finding that the claims in this case are based on Workday's "algorithmic decision-making tools . . . [that] rely on **biased training data**")[4] *See also* ECF 268-3, Exh. C;  FAC ¶¶ 28, 38–39, 57–60,

---

[4] "The zero percent success rate at passing Workday's initial screening, combined with the FAC's allegations regarding **bias in Workday's training data . . .** plausibly supports an inference that Workday's algorithmic tools **disproportionately reject** applicants based on factors other than qualifications, such as a candidate's race, age, or disability."*Order,* Doc 80 at 14-15.; **"**The sheer number of rejections and the timing of those decisions, coupled with the FAC's allegations that Workday's AI systems rely on **biased training data** (*id.* ¶¶ 38–40, 102–03), support a plausible inference that Workday's screening algorithms were **automatically rejecting** Mobley's applications based on a factor other than his qualifications, such as a protected trait. Furthermore, the causation element is supported by the FAC's cites to academic and other literature about **bias in data models and algorithms**, as well as Amazon's since-abandoned attempt at using "a facially neutral hiring algorithm" that had a disparate impact on female candidates. (*See, e.g.*, FAC ¶¶ 30, 36, 42–48.) *Order,* Doc 80 at 13-14 (citing FAC ¶¶ 30, 36, 38–40, 42–48, 102–03)

11

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

100, 102). Workday concedes that such machine-learned decisionmaking tools are "trained on ... over 200 million people profiles and customer data contributions." ECF 220-1, Exh. A, p. 36 ("AI Fact Sheet" previously sealed) None of such critical data has been produced or listed in a Privilege Log despite having been requested in the Plaintiffs 'first RFPs served in September 2024.

Nor has Workday produced the unprivileged bias testing data underlying the external bias audit that it publicly posted on its Webpage as an advertisement announcing that "Workday commissioned an external auditor to conduct testing . . . for its 'bias audits,'" and that this audit was based on "a random sample of 10 Global Large Customers data over the last 12 months . . . between Sep 2023 to Sep 2024." *See* https://www.workday.com/en-us/legal/responsible-ai-and-bias-mitigation.html.  Despite having never asserted that such bias testing  data given to such **"**external auditor" was in any way confidential or privileged  once it was disclosed in that manner on *at least* three different occasions in 2023, 2024 and 2026, Workday has not produced any of those three iterations of "10 Global Large Customers data" that was the basis for the publicly announced results of those three "external" bias audits.[5] Plaintiffs 'RFP No. 14 specifically required Workday to "[p]roduce any audit documents performed by an *independent auditor* for bias regarding Workday's AI and/or ML.") (emphasis added); *see also* RFP #15 and Interrogatory No. 3.  Workday's Privilege Logs do not include any privilege regarding RFP 14. Rather than comply with that request or claim any confidentiality or privilege in its Privilege Logs for such externally disclosed data and bias audits, Workday initially responded by denying that they existed and only amended that response a year later  on December 19, 2025 *after* the Plaintiffs 'independently discovered such external audits existed. Even then, the supplemental answer first served  on December 19, 2025 merely cited the

---

[5] Workday's external auditor  conducted such bias audits in July 2023,  (Workday_Mob-00003871-3872 and 00002745), September 2024 (https://www.workday.com/en-us/legal/responsible-ai-and-bias- mitigation.html) and March 20, 2026 for the period from September 1, 2025 to February 28, 2026.

12

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

same weblink advertisement that Plaintiffs had already discovered rather than producing the data and audit requested in RFP No. 14 and Interrogatory No. 3. ECF 268, Exh. J.

Workday's non-production of such data and bias audits has continued notwithstanding the Court's most recent Order setting a April 6, 2026 deadline for Workday to produce "all non-privileged, responsive documents . . . and a privilege log for any documents it withholds." ECF No. 280 at 5. Workday's April 6 response to that order consisted of a single sentence from counsel: "We are also confirming our document production is complete." Workday Email, Apr. 6, 2026. No new documents were produced. The requested data and records at issue are by no means limited to "bias testing data." Workday's Privilege Logs do not identify any additional data or records it contends to be privileged other than the three new entries already discussed (PrivLogIDs 488, 489, and 490).

That same pattern of non-production applies to the separate "evaluation data" requested in Plaintiffs 'first RFP No. 3 requesting Workday's "[g]roup membership data for the evaluation data . . . that was used to evaluate bias and demographic disparities for the model(s) in question." ECF124. Here again, Workday misrepresented that no such data existed, stating that "[e]valuation data is not customer applicant data," and "there is no evaluation data for Candidate Skills Match because it is an algorithm," not a "model."

Workday's supplemental response on December 19, 2025 belatedly revealed that CSM is "an algorithmic feature that uses underlying skills-related services including a 'Skills Embedding Model'" that produces the numerical representations that CSM uses *to score* applicant-to-job alignment. Those latest disclosures demonstrate that CSM is not a standalone rule-based algorithm — it is a composite system with a learned ML model at its core. You cannot separate the output of that model from the function CSM performs. Those late-served supplemental disclosures compel production of: (1) **all training, validation, and evaluation data** for the Skills Embedding Model; (2) all **feedback** collected regarding Spotlight and Fetch model performance; and (3) **all bias testing**

13

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

**or evaluation data** conducted on any of these components now that Workday has admitted these things exist, and it's undisputed they remain completely unproduced and unanswered. No bias evaluation data or results have been produced for any of these systems.

Workday's algorithm/model distinction is a litigation invention, not a technical reality. As the sources identified above establish, an "algorithm" in the ML context is the training procedure, while the "model" is the artifact produced. CSM as deployed in production *is* a model — it embeds learned parameters from the Skills Embedding Model into every scoring decision it makes. Workday cannot disclaim model status for CSM while simultaneously admitting that a machine-learning model sits at its core. The distinction Workday draws is not recognized in the technical literature or in any regulatory framework governing AI systems. In standard machine learning terminology, the "algorithm" refers to the optimization procedure used during training — e.g., stochastic gradient descent — while the "model" is the trained artifact: the set of learned weights and parameters that is actually deployed to produce predictions or scores. See, e.g., Ian Goodfellow et al., *Deep Learning* 98–105 (MIT Press 2016). When CSM is invoked to score an applicant, it is not running a training algorithm — it is executing a trained model's learned representations. There is no cognizable technical sense in which a system that (a) encodes learned numeric embeddings, (b) computes similarity metrics between those embeddings, and (c) produces an applicant-specific score is an "algorithm" rather than a deployed model. Workday's own engineers would not use that terminology; neither should this Court. Regulatory guidance reinforces this point. The EEOC's May 2023 technical assistance on AI and Title VII defines "algorithmic decision-making tools" to expressly encompass "machine learning models" and any system that uses mathematical or statistical techniques to generate scores or rankings — precisely the function CSM performs. EEOC, *Assessing Adverse Impact in Software, Algorithms, and Artificial Intelligence Used in Employment Selections* (May 18, 2023). New York City's Local Law 144, which requires independent bias audits of

14

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

"automated employment decision tools," similarly covers any "computational process" used to score, rank, or screen candidates, without regard to whether the vendor labels it a "model" or an "algorithm." N.Y.C. Admin. Code § 20-870(1). These authorities confirm that Workday's internal nomenclature is legally irrelevant: the operative question is function, not label. The point is illustrated by analogy. If a drug manufacturer called its pharmaceutical compound a "chemical process" rather than a "drug" and denied that any efficacy or safety testing data existed, no court would credit that definitional maneuver. The compound's legal character is determined by what it does — its mechanism of action and its effect on patients — not what the manufacturer chooses to call it. So too here. CSM performs applicant scoring by operationalizing a machine-learned embedding space. That function brings it squarely within the scope of Interrogatories 5 and 6, and the bias testing and evaluation data it generated must be produced regardless of the label Workday applies.

For Spotlight and Fetch, Workday's December 19th supplemental response admits that "feedback" is collected but does not answer whether bias evaluations were conducted or what those evaluations showed. This too is an incomplete answer that should be treated as a failure to answer under Rule 37(a)(4). Workday's framing treats the embedding layer as separate and irrelevant, when it is in fact the engine of the entire AI and ML system. Workday's supplemental responses fail to answer the sub-questions for CSM in RFP 5 and 6 *at all* — how feedback was collected, whether models were retrained, how retraining was evaluated, and — most critically — whether bias evaluations were conducted and what their results were. For Spotlight and Fetch, Workday admits feedback is collected regarding model performance but says it is not used for retraining. That is a partial answer to one sub-question. The remaining sub-questions (bias evaluation, evaluation methodology, results) go entirely unanswered even for Spotlight and Fetch.

Workday has also not produced the "component-level data" requested for each element of Workday's overall recruitment, application and screening process. *See* ECF 268, p.1; ECF 268-1, -

15

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

2, - 3, -10. Such unproduced data includes that for "components or aspects of Workday's application, screening or selection process" (RFP 8), "AI tools that assist . . . process[ing] personal information [and] . . . job applications, CVs and resumes." (RFP 12), "AI grading . . . during initial sifting stage" and . . . minimum job requirements" (RFP 13); "AI generated grades to help shortlist and prioritize applications in the recruitment process" (RFP 14); "AI tools to process job applications" (RFP 19); "AI tooling [that] extracts personal information from applications" (RFP #20). See ECF 268-1, -2, -10.

Such component-level data is essential because Ninth Circuit precedent requires Plaintiffs to establish disparate impact of the *intermediate components* of the selection process—not just the overall result. *Stout v. Potter*, 276 F.3d 1118, 1122 (9th Cir. 2002).

The same flaws regarding Workday's evaluation data stated above also apply to its non-production of the data requested in RFP 5 (c, f, h, k-m) and RFP 6 (c, e, l, m, n, o, p).

### F.    WORKDAY'S CONFIDENTIALITY OBJECTION DOES NOT JUSTIFY WITHHOLDING CUSTOMER APPLICANT DATA

Workday concedes it possesses and hosts the customer applicant data at issue. Its confidentiality objection fails as a matter of law: private contracts do not override court-ordered discovery; Workday's own MSA expressly authorizes compelled production and forecloses breach claims arising from it; and Workday owns the aggregated statistical data outright, leaving no customer confidentiality interest to assert. The Court should compel production of all customer applicant data responsive to Plaintiffs' discovery requests, including CSM scores, demographic data, and hiring outcomes, designated under the existing Protective Order's Attorneys' Eyes-Only tier as appropriate.

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

**1.    Workday's Ownership of the Aggregated and Statistical Data Precludes Any Customer Confidentiality Interest.**

For the aggregated and statistical data derived from the operation of Workday's tools — including CSM scores, demographic correlation outputs, and performance metrics across the customer base — the MSA's ownership provisions preclude any claim of customer confidentiality as a ground for withholding production.  Data that Workday owns outright cannot be subject to a customer confidentiality claim. There is no customer whose consent is required, no customer whose contractual rights would be impaired, and no customer who could maintain a claim against Workday for producing data that belongs to Workday.

Section 3.6 of the MSA provides that Workday "owns the aggregated and statistical data derived from the operation of the Service, including, without limitation, the reports processed in the Service and the performance results for the Service." MSA § 3.6. Section 3.1 further provides that "Workday and its licensors own all right, title and interest in and to the Service, Documentation, and other Workday Intellectual Property Rights." MSA § 3.1. [6]

Workday's AI Fact Sheet produced in this case confirms that the outputs generated by CSM's operation include "Candidate Name or ID, Skills Match Score, Skills Match Score Details, Skills Matched, Gender, Race, Stage." Workday Mob 00002744. Those outputs constitute or are derived from the aggregated operation of Workday's platform across its customer base, they are Workday's property under § 3.6, and no MSA non-disclosure provision stands between Workday and its obligation to produce such data and records.

---

[6] The customers' own conduct in this litigation reinforces this conclusion. Multiple customers who received third-party subpoenas responded that the data sought was "in the possession, custody or control of a party to the litigation" — meaning Workday. *See, e.g.*, Kite Pharma, Inc. General Obj. at 3, ¶ 10. By directing Plaintiffs to Workday as the proper source of this data, those customers have affirmatively consented to Workday's production of it and waived any objection based on the MSA's non-disclosure provisions.

17

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

Workday concedes that its" customer data is stored on Workday's servers [and is] referred to internally as customer tenants." Letter, p. 3 (May 2, 2025). Workday's "AI Fact Sheet" states that such Customer data includes "Candidate Name or ID, Skills Match Score, Skills Match Score Details, Skills Matched, Gender, Race, Stage."Workday Mob 00002744 (Trindel Depo. Exhibit #1). The Customers 'consent and waiver to production of such data is also repeated in the next section (§4.2) entitled "Compelled Disclosure," stating "[a] disclosure by one party of Confidential Information of the other party to the extent required by Law shall not be considered a breach of this Agreement." *Id.* at §4.2.

Workday cannot simultaneously assert ownership of this data for commercial purposes — using it to train models, generate performance benchmarks, and publicly market the fairness and accuracy of its AI tools — while claiming in litigation that customer confidentiality prevents production of that same data. That inconsistency is precisely the kind of sword-and-shield conduct that courts in this district do not countenance. A private contractual confidentiality obligation is not a recognized privilege under the Federal Rules and cannot, standing alone, justify withholding relevant documents from court-ordered discovery; the proper mechanism for protecting legitimately sensitive information is a protective order, not unilateral refusal to produce.

**2.      Workday's Master Subscription Agreement Expressly Authorizes Court-Compelled Production and Forecloses Any Breach Claim.**

Workday's contract with customers eliminates its confidentiality objection. The MSA contains two provisions that directly address and authorize the precise situation presented here. Section 4.1 of the MSA authorizes disclosure of customers Confidential Information when "the Receiving Party is ordered to produce Confidential Information of the Disclosing Party by any court of competent jurisdiction" or "to the extent otherwise required by Law." MSA § 4.1. A court order compelling production in this litigation falls squarely and unambiguously within this carve-out.

18

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

Workday drafted and agreed to this language. Having expressly preserved for itself the right to produce customer data in response to court orders, Workday cannot now invoke the same contract as a shield against such production.

Section 4.2, titled "Compelled Disclosure," reinforces the point: "[a] disclosure by one party of Confidential Information of the other party to the extent required by Law shall not be considered a breach of this Agreement." MSA § 4.2; ECF 124, p.3; ECF 170 at 3–4; Order, ECF 175 ¶3. The parties to the MSA — Workday and each of its customers — thus agreed at the outset that court-compelled production would not constitute a breach and would expose Workday to no contractual liability. There is accordingly no contractual barrier to production whatsoever. Workday's confidentiality objection rests on a contract that expressly authorizes the very disclosure it seeks to avoid.

Control under Rule 34 "*need not be actual*"; courts construe it broadly as the legal right to obtain documents upon demand. *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989).

### 3. Implied Waiver by Offensive Use.

A party who affirmatively relies on an otherwise privileged matter in support of its own claims or defenses impliedly waives the privilege with respect to the subject matter of that reliance. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). Workday has done exactly that. It produced the AI Fact Sheet—which describes "statistical testing in accordance with established legal standards" and states that "Workday arrived at definitions of the match scores that appropriately mitigated adverse results"—as an affirmative defense document. WORKDAY_MOB_00002745. Workday's supplemental production and interrogatory responses similarly invoke the bias-testing program as evidence that CSM does not have disparate impact. Workday cannot use its bias-testing conclusions as a sword while withholding the underlying data, code, and results as a shield. *Id.*

19
**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

**4.    A Private Confidentiality Agreement Is Not a Recognized Privilege and Cannot Alone Justify Withholding Relevant Documents from Discovery.**

The Federal Rules of Civil Procedure recognize a defined and limited set of grounds on which a party may withhold otherwise relevant, responsive documents: recognized evidentiary privileges, such as attorney-client privilege and work product protection, and the good-cause showing required for a protective order under Rule 26(c). A private contractual confidentiality agreement between business parties appears nowhere in that list.

Rule 26(b)(1) provides that parties may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The operative limiting term is "privileged" — a term of art that refers to recognized evidentiary privileges, not to contractual promises of confidentiality. A non-disclosure clause in a commercial contract is not a privilege. It does not appear in the Federal Rules of Evidence. It has not been recognized by the Supreme Court or the Ninth Circuit as a basis for withholding documents in discovery. Courts applying Rule 26 have consistently treated the appropriate vehicle for protecting confidential business information in discovery as a protective order under Rule 26(c) — not as a ground for outright withholding. This framework reflects a deliberate policy choice. Rule 26(c) authorizes courts to issue protective orders restricting disclosure of "a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 26(c)(1)(G). Congress crafted that provision precisely because confidential business information is subject to discovery — the question is only the manner and scope of production, not whether production occurs. If private confidentiality agreements could block discovery wholesale, that framework would be superfluous. Workday's position — that its MSA non-disclosure clause permits it to withhold concededly possessed, relevant data — cannot be reconciled with the structure of the Federal Rules.

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

The Tenth Circuit stated the foundational principle clearly in *Centurion Industries, Inc. v. Warren Steurer & Associates*, 665 F.2d 323, 325 (10th Cir. 1981): "'[T]here is no absolute privilege for trade secrets and similar confidential information.'" (quoting *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 362 (1979)). The court held that even genuinely proprietary trade secret software must be produced in response to a valid subpoena upon a showing of relevance and need, with protection afforded through a carefully crafted protective order — not by withholding. *Id.* at 325-26. If trade secrets themselves are subject to compelled discovery with protective order protection as the remedy, a contractual NDA clause plainly cannot fare better.

> **5.    Workday Repeatedly Refused To Organize Or Correlate The Documents It Produced With The Discovery Request To Which The Documents Responded.**

Workday has repeatedly refused to correlate or organize the documents it produced with the discovery request to which the documents respond. Rule 34(b)(2)(E)(i) provides that a party producing documents "must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request." Fed. R. Civ. P. 34(b)(2)(E)(i). Across every set of responses in this case—the November 2024 first-set RFP responses, the December 2025 supplemental interrogatory responses, and the February 2026 second-set RFP responses— Workday has not labeled or organized a single document to correspond to any specific request. Nor has it ever stated it was electing ordinary-course production or provided any request-by-request identification.

A producing party must satisfy one or the other; it cannot simply dump documents on the requesting party without any organizational principle. See *Shuster v. Shuster,* 2017 U.S. Dist. LEXIS 131575, at *7 (D. Ariz. Aug. 16, 2017) (Rule 34(b)(2)(E) exists to prevent the "proverbial unorganized document dump"); *Residential Constructors, LLC v. Ace Prop. & Cas. Ins. Co.,* 2006 U.S. Dist. LEXIS 36943, at *7 (D. Nev. June 5, 2006) (Rule 34 does not authorize production that

21

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

leaves the requesting party to "go fish" through an unindexed mass of documents). A producing party invoking the ordinary-course option bears the burden of demonstrating that documents were in fact produced consistent with that mandate. A bare, unsupported assertion of compliance is insufficient. *Cardenas v. Dorel Juvenile Grp., Inc.,* 230 F.R.D. 611, 618 (D. Kan. 2005); *Venture Corp. Ltd. v. Barrett,* 2014 U.S. Dist. LEXIS 147643, at *5–6 (N.D. Cal. Oct. 16, 2014); *Google, Inc. v. Am. Blind & Wallpaper Factory, Inc.,* 2006 U.S. Dist. LEXIS 97912, at *9–10 (N.D. Cal. Feb. 8, 2006) (same).

At minimum, a party electing ordinary-course production must identify each document's custodian or source, confirm documents are produced in the order maintained, and describe the filing system from which they were recovered. *Pass & Seymour,* 255 F.R.D. at 335; *Residential Constructors,* 2006 U.S. Dist. LEXIS 36943, at *3–4; *Venture Corp.,* 2014 U.S. Dist. LEXIS 147643, at *7–8. None of that has been provided here.

The 2015 amendments to Rule 34 additionally require the responding party to state in its written response, on a request-by-request basis, whether it is producing documents as kept in the ordinary course or organized by request, and to do so with sufficient specificity for the requesting party to assess completeness. Fed. R. Civ. P. 34(b)(2)(B); see also Fed. R. Civ. P. 34 advisory committee's note to 2015 amendment ("The producing party's statement must . . . indicate[] whether documents will be withheld based on objections" so the requesting party can assess the production's completeness). A compliant production—organized by RFP category or accompanied by a Bates-to-request correlation index—would allow Plaintiffs to assess the scope of any privilege claim by comparing what was produced against what was logged.

Given the foregoing authority, Plaintiffs request that Workday be compelled to produce: (1) a written index identifying, for each RFP in the second set, the Bates numbers of all documents Workday contends are responsive; (2) a certification of completeness as to each RFP or, if not complete, the specific basis for any limitation; (3) for each RFP as to which no documents are-

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

produced, a per-request statement to that effect; and (4) confirmation of the manner in which documents were maintained in the ordinary course of business, to the extent Workday invokes Rule 34(b)(2)(E)(i), including custodian, record system, and folder-structure information. This relief tracks what courts have ordered in analogous circumstances. See *Google v. Am. Blind,* 2006 U.S. Dist. LEXIS 97912, at *11–12; Venture Corp., 2014 U.S. Dist. LEXIS 147643, at *8–9; *Residential Constructors,* 2006 U.S. Dist. LEXIS 36943, at *7–8.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Plaintiffs respectfully request that the Court:

1. Set an expedited hearing schedule sufficient to allow resolution of this dispute and production of withheld materials significantly before Plaintiffs 'class certification expert deadline in July 2026;

2. Order that PrivLogIDs 488, 489, and 490 are stricken from the Fourth Privilege Log on the ground that they fail to satisfy the requirements of Federal Rule of Civil Procedure 26(b)(5) and this Court's Standing Order;

3. Find that attorney-client privilege and work product protection do not extend to the bias testing data (.json), bias testing source code (.py), and bias testing results (.xls/.pdf) withheld under PrivLogIDs 488, 489, and 490;

4. Order Workday to produce all materials withheld under PrivLogIDs 488, 489, and 490 within seven (7) days of the Court's order;

5. Order Workday to produce within seven days all documents responsive to the first and second set of requests for production that have not yet been produced ;

6. Order Workday to produce within seven days a document-by-request index identifying by Bates number every document Workday contends is responsive to each specific request in the second set of requests for production, in compliance with Rule 34(b)(2)(E);

7. Deem privilege waived as to entries 488, 489, and 490 for failure to comply with the mandatory requirements of the Court's Standing Order § 2.1, and order the documents produced within seven days; and,

8. Award such further relief as the Court deems just and proper.

**Submitted:    April 20, 2026.**

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

Respectfully submitted,

s/Roderick T. Cooks                                   s/Robert L. Wiggins, Jr.
Lee D. Winston (ASB: 6407O72L)         Robert L. Wiggins, Jr. (ASB: 1754G63R)
*Admitted pro hac vice*                          *Admitted Pro Hac Vice*
lwinston@winstoncooks.com                   rwiggins@wigginschilds.com
Roderick T. Cooks (ASB: 5819O78R)     Ann K. Wiggins (ASB: 7006i61a)
*Admitted Pro Hac Vice*                         *Admitted Pro Hac Vice*
rcooks@winstoncooks.com                       awiggins@wigginschilds.com
Bethany Mae Logan (ASB: 1360X15Z)   Samuel Fisher (ASB: 2675E68S)
*Admitted Pro Hac Vice*                         *Admitted Pro Hac Vice*
bneal@winstoncooks.com                         sf@wgginschilds.com
Winston Cooks, LLC                               Jennifer Wiggins Smith (ASB:9622E53S)
420 20th Street North, Suite 2200           *Admitted Pro Hac Vice*
Birmingham, Alabama 35203                  jsmith@wigginschilds.com
Telephone: (205) 502-0970                     Nicki L. Lawsen (ASB: 2602C00K)
Facsimile: (205) 278-5876                      *Admitted Pro Hac Vice*
                                                            nlawsen@wigginschilds.com
                                                            Freddrick M. Moore (ASB: 7952L20o
                                                            mmoore@wiggins childs.com
                                                            *Admitted Pro Hac Vice*
                                                            Wiggins Childs Pantazis Fisher and
                                                            Goldfarb
                                                            301 North 19th Street
                                                            Birmingham, Alabama 35203
                                                            Telephone: (205) 314-0500
                                                            Facsimile: 205) 254-1500

**Local counsel:**
Jay Greene, JD, CPA
greenattorney@gmail.com
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108
Telephone: (415) 905-0215

24
**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2026. I electronically filed the foregoing document with the United States District Court for the Northern District of California by using the CM/ECF system.  I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Julie Ann Totten       Jtotten@orrick.com, jponce@orrick.com
Erin M. Connell       econnell@orrick.com
Kyla Delgado Grundy  kgrundy@ orrick.com
Alexandria R. Elliott   aelliott@orrick.com

                        *s/Roderick T. Cooks*
                        Of Counsel

25
**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY**