Lee D. Winston
*Admitted Pro Hac Vice*
lwinston@winstoncooks.com
Roderick T. Cooks
*Admitted Pro Hac Vice*
rcooks@winstoncooks.com
Bethany Neal
*Admitted Pro Hac Vice*
bneal@winstoncooks.com
Winston Cooks, LLC
420 20th Street North, Suite 2200
Birmingham, AL 35203

**Local Counsel:**
Jay Greene, JD, CPA
Greene Estate, Probate, and Elder
Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108

Robert L. Wiggins, Jr.
*Admitted Pro Hac Vice*
rwiggins@wigginschilds.com
Ann K. Wiggins
*Admitted Pro Hac Vice*
awiggins@wigginschilds.com
Samuel Fisher, Jr.
*Admitted Pro Hac Vice*
sf@wigginschilds.com
Jennifer Wiggins-Smith
*Admitted Pro Hac Vice*
jsmith@wigginschilds.com
Nicki Leili Lawsen
*Admitted Pro Hac Vice*
nlawsen@wigginschilds.com
Freddrick Malik Moore
*Admitted Pro Hac Vice*
mmoore@wigginschilds.com
Wiggins, Childs, Pantazis, Fisher &
Goldfarb, LLC
The Kress Building,
301 19th Street North
Birmingham, AL 35203

*Attorneys for the Plaintiff and Proposed Class and Collective Members*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEREK L. MOBLEY for and on behalf of himself and other persons similarly situated, *Plaintiff,* <br><br> v. <br><br> WORKDAY, INC., *Defendant.* | Case No. 3:23-cv-00770-RFL <br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY** <br><br> Judge: Hon. Laurel Beeler, United States Magistrate Judge |

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF
REQUESTED DOCUMENTS AND DISCOVERY

**I.    WORKDAY ONLY ASSERTS A PRIVILEGE FOR THE "SUBSET" OF DATA IT HAS "CURATED" FROM ITS "CUSTOMER DATA," NOT THE CUSTOMER DATA ITSELF[1]**

Workday concedes that it "has asserted privilege only over a **subset** of data that was specifically curated" by its in-house attorneys from its "customer data" and that it "is not claiming that all underlying customer data or all source code is privileged." ECF No. 15 at 14-15 (emphasis added). It insists "[o]n the contrary," that it "has not broadly asserted privilege over all customers ' data" or "over the source code underlying CSM, Spotlight, or Fetch." ECF No. 15 at 14-15. As a result, there is no privilege-based reason for withholding *any* such customer data from which such a subset was drawn as a separate   curated reproduction of such "customer data" or Workday's own aggregated or statistical data. Workday should be compelled to produce ***all*** such underlying customer data from which any such curated subset was drawn. The mere existence of such a separate curated subset of the original data does not make such underlying data a privileged attorney-client communication. Whether the curated subset is privileged is a separate stand-alone question.

Workday must be compelled to produce its surviving applicant data and bias testing documents and data because it has destroyed or otherwise done away with its 2023 and 2024 bias audit data in violation of the litigation-hold that attached with or before the filing of Plaintiff Mobley's EEOC Charge in 2021. *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1136

---

[1] Plaintiffs are separately filing a Notice of Errata to correct three citation errors identified in Defendant's Opposition (ECF No. 315, pp. 16-18). Undersigned counsel takes full responsibility for the failure to personally verify each citation before filing and sincerely apologizes to the Court and to opposing counsel for the burden this has caused. None of the substantive arguments in the Motion depend on the withdrawn citations.

1

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF
REQUESTED DOCUMENTS AND DISCOVERY

(N.D. Cal. 2012) (preservation duty arises when a party reasonably anticipates litigation). On July 8, 2025, Workday's counsel belatedly emailed Plaintiffs' lawyers stating "we have learned that Workday no longer has the data it used to conduct its privileged bias testing" and that "the data Plaintiffs seek does not exist anymore." Exh. A-Workday's email July 8, 2025 (Doc. 268-5, at 3; Doc. 232-10); ECF # 317, ¶ 16; *see also* FRCP 37(e). Workday's in-house attorneys' involved in those audits were responsible for assuring such preservation. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Counsel must take affirmative steps to monitor compliance."); Law Decl. ¶¶ 3–4.

## II. WORKDAY HAS NOT PRODUCED ALL OF THE DATA FOR WHICH IT ASSERTS NO PRIVILEGE AND HAS DESTROYED IMPORTANT PARTS OF ITS BIAS DATA

Workday mistakenly represents that it has produced all of the requested documents and data for which it has claimed no privilege. It has not produced its internal applicant data for all of its applicant screening tools from September 24, 2020 forward or *any* of such data for Candidate Skills Match (CSM) or Fetch. It has also not produced : (1)  any of its applicant data or job requisitions for the required period from September 24, 2020 through August 20, 2023 (35 months); (2) only three of its job requisitions have been produced for the eleven-month period from  August 21, 2023 through July 28, 2024; (3) at least eight of nine known job requisitions are missing in the data produced so far, i.e, JR-79034, JR-79370, JR-76656, JR-79650, JR-81087, JR-80525, JR-84574, JR-0090475; and (4) numerous fields of information requested in 2nd RFP #1.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

### III.    PLAINTIFFS' MOTION IS WITHIN THE SCOPE OF THE COURT'S UNDERLYING ORDER

Contrary to Workday's argument that this proceeding is limited to Plaintiffs' second discovery requests served December 2, 2025, its letter brief predicate to this proceeding acknowledges that it is based on Plaintiffs letter which "seeks to compel **the same bias testing data it moved to compel nearly a year ago."** ECF 270, pg.2 (emphasis added, referring to Plaintiffs first set of discovery requests served in September 2024; citing ECF Nos. 124, 130, 133, 141). The Court's Order on that joint letter also acknowledges that same fact— that "[t]he plaintiffs did not waive their ability to seek the discovery", noting that Workday "made the argument that underlying data was privileged in the May 2025 letter brief for the first set of requests for production **and asserts it again here."** ECF No. 280 at 3 (emphasis added, referring to the parties' joint letter on Plaintiffs' first RFPs and Interrogatories served in 2024). *Id.* The Court did not rule on the merits of that dispute but ordered the parties to file the current briefs instead. *Id.*

### 1V.    WORKDAY'S PUBLIC DISCLOSURE OF ITS BIAS TESTING DATA TO FOUR OUTSIDE AUDITORS WAIVES ALL PRIVILEGE FOR SUCH BIAS TESTING

Workday admits that its bias testing data is not privileged because it was disclosed and provided to an "external consultant in 2023" for "bias testing . . . performed on Spotlight . . . , the results of which were posted publicly." ECF No. 315 at 11 n. 4. It also admits that "Workday has not asserted privilege over bias testing . . . performed on Spotlight using an external consultant in 2023 [because] the results . . . were posted publicly." *Id.* at 11 n.4; *see also, id.* at 8 (ECF p. 22) ("Separate from its privileged testing, Workday has also conducted . . . non privileged testing of its product offering, Spotlight . . . in 2023, [when] Workday engaged an external consultant to conduct testing of Spotlight" and such bias testing results were "posted publicly" based on the data

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

Workday furnished to the outside auditor for applicant data from Workday's "10 Global Large Customers'data.") (citing Workday Decl., Ex. D (Interrog. Resp. No. 3)).

Each of those admissions are unambiguous in stating the 2023 bias audit testing — including the underlying data provided to and results received from the outside auditor — is not privileged. Workday disclosed and furnished applicant data to such outside auditor to conduct such bias testing audit. Workday cannot claim, and has not claimed, privilege over such data, audit, and results. *Id.* at 11 n.4. Workday also states that it "has already produced" that same "non-privileged" applicant data to the Plaintiffs for the period from September, 20, 2024 through April 6, 2026, which includes the same time period as the applicant data that it furnished to its outside auditors from 2023-2026 —"namely, data from Workday's use of Spotlight to evaluate candidates for positions at Workday itself," ECF 315 at 10 (citing ECF 317, Grundy Decl., ¶ 9).

Workday also has disclosed and furnished that same form of applicant data to at least three other outside auditors for bias-testing purposes. *Compare* Exhs. B-D *with* ECF 315 at 8 & 11, n. 4. That 2024-2026 disclosure of Workday bias testing data defeats any claim of privilege for the same reason that Workday asserts no privilege for the same form of data it disclosed to the outside auditor for its 2023 bias audit. *Id.* That disclosure included the data Workday furnished to: (1) the February 12, 2024 bias testing audit conducted by Workday's outside auditor based on the applicants data furnished to the outside auditor and publicized on Workday's public website (Exh. B); (2) DLA Piper's Spotlight Bias Audit based on the applicant data that Workday disclosed and furnished to the outside auditor "spanning . . . from June 2024 to May 2025." (Exh. C); (3) the Secretariat Advisors LLC's Spotlight based on the applicant data that Workday disclosed and

4

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

furnished to it for the period from September 1, 2025 to February 28, 2026 (Exh. D). *See also,* Exh. F, Trindell Blogpost.[2]

Those three subsets of bias testing data are not privileged for the same reasons as the non-privileged applicant data from which those subsets are drawn or "curated", namely: (1) the public disclosure to outside auditors and on Workday's public website automatically waives any privilege that might have existed without such disclosure; and (2) Workday admits that it asserts no privilege regarding the subset of bias testing data drawn from the underlying non-privileged dataset. *See* ECF No. 315 at 11 n. 4. The voluntary disclosure of a privileged attorney communication to a third party constitutes waiver of privilege. *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *accord Chevron*, 974 F.2d at 1162-1164.  Workday cannot share its bias-testing program with an outside auditor for purposes of generating a public marketing document and then claim privilege over broader applicant, bias testing data when Plaintiffs seek it through discovery. *See generally*, *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012).

As in *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-1163 (9th Cir. 1992), Plaintiffs seek "to compel disclosure of written materials [to an outside auditor] that supported [the defendant's] belief that its . . . position was reasonable and sound, [but] refuse[d] to supply . . . , claiming that its position was based upon advice from counsel and thus was protected by the attorney-client privilege." *Id.* at 1162. Pennzoil "concede[d] that the district court was correct in ordering disclosure of the documents actually provided to the outside auditor." *Id.* (citing *Weil v.*

---

[2] Plaintiffs request that Workday be compelled to produce Schellman Compliance LLC's ISO 42001 Certification audit which evaluates Workday's entire AI system, including its bias testing and fairness protocols. *See* Exh. E.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF
REQUESTED DOCUMENTS AND DISCOVERY

*Investment/Indicators, Research & Management,* 647 F.2d 18, 24 (9th Cir. 1981) (voluntary disclosure of a privileged attorney communication to a third party constitutes waiver of privilege); 8 J. Wigmore, *Evidence* § 2291 at 554 (McNaughton rev. 1961). That is exactly the case here.

Notwithstanding that Workday concedes that it has not asserted privilege over the 2023 Spotlight bias testing performed by an external consultant. ECF No. 315 at 8, 11 n.4, and despite the further fact that Workday voluntarily transmitted Spotlight applicant data to multiple third-party auditors for the express purpose of generating public bias audits, Workday has produced none of the underlying audit material in this case — not the engagement letters, not the methodologies, not the statistical scripts, not the data analyzed, not the complete results, not the auditor communications. These arguments are internally inconsistent and cannot stand.  That 2023 audit was performed and the results were publicized *well before* Workday's November 18, 2024 sworn denial that any such external audit existed in its answer to Interrogatory No. 3. *See* Exh. G.[3] The same deception occurred again when Workday *denied* the existence of its second bias audit dated February 12, 2024 which was also performed by an external auditor and on the basis of Workday's "10 Global Large Customers" data spanning February 1, 2023 through February 12, 2024 that it publicized *on* its website throughout 2025.  That audit also predates the November 2024 sworn response and was not disclosed in Workday's November 18, 2024 sworn answer to Interrogatory No. 3 which denied that *any* such external bias audit existed.

---

[3] It was not until Workday's December 19, 2025 supplemental response to Interrogatory No. 3 that Workday first admitted that it had "engaged an external consultant to conduct testing of Spotlight," but linked its answer to only the second such bias audit in 2024 that the Plaintiffs had already unearthed on their own eight months earlier.  Workday, however, continued to cover up and not disclose its first external bias audit in 2023.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

Workday has also continued to engage in such subterfuge through today and throughout its current brief. It continues to pretend such data and documents are non-existent despite having been notified that is not true in Plaintiff's letter served April 27, 2026, well before Workday served its current brief on May 4, 2026. *See* Exh. G (requesting "that Workday immediately serve supplemental and verified responses to the discovery requests identified below . . . including its December 2025 supplemental response to Interrogatory No. 3"). That April 27th letter plainly stated that "Workday's existing discovery responses — including its December 2025 supplemental response to Interrogatory No. 3 — are materially inaccurate" because they "omitted TIAA, a customer that used HiredScore Spotlight during the relevant period and for whom Workday directly supplied applicant flow data to a third-party bias auditor." *Id.* p.1. Interrogatory No. 3 asked: "Has Workday's AI been audited for bias and fairness by a third party? . . . If so, what were the results of the audit(s)?" *Id.* (quoting Interrogatory No. 3 served in in September, 2024).[4] Workday's original November 18, 2024 deceptively answered that it had "no non-privileged documents or information responsive to this Interrogatory," and its December 19, 2025 supplemental response a year later continued that deception by not disclosing the 2023 bias audit that it now belatedly admits to have existed all along, and to have waived its privilege when published to the public. ECF No. 315 at 11, n. 4 (ECF, p. 27, Workday's admission that it "has not

---

[4] The interrogatory plainly encompasses all Workday AI tools. The HiredScore Spotlight tool is a Workday AI product: Workday acquired HiredScore, markets Spotlight as part of its Workday Recruiting suite, and represented to this Court and in discovery that CSM, Spotlight, and Fetch are all components of the AI-based applicant screening tools at issue in this case. *See, e.g.,* Workday's Suppl. Resp. to Interrogatory No. 2 (identifying "CSM, Spotlight, and Fetch" as the tools at issue). Workday cannot answer a question about bias audits of "Workday's AI" by disclosing information only about CSM while omitting its HiredScore Spotlight and Fetch — particularly when Workday was simultaneously supplying application data for a third-party LL144 bias audit of Spotlight.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF
REQUESTED DOCUMENTS AND DISCOVERY

asserted privilege over bias testing HiredScore performed on Spotlight using an external consultant *in 2023*, the results of which were posted publicly.") (emphasis added, citing Grundy Decl. D, Supp. Rog. Response No. 3). Workday did not disclose that external 2023 bias audit data or analysis before filing its instant brief on May 4, 2026 (ECF No. 315 at 11, n. 4 (ECF, p. 27)) and it still has not produced any documents or data about such 2023 bias audit as of the May 11, 2026 filing of this Reply. Workday's December 19, 2025 supplemental response to Interrogatory No. 3 only makes reference to its separate 2024 and 2025 external bias audits, disclosing for the first time that "Workday engaged an external consultant to conduct testing of Spotlight. . . [and] that testing is available at this link https://www.workday.com/en-us/legal/responsible-ai-and-bias-mitigation.html." *Id.*[5] Plaintiffs' RFP No. 14 (1st Set) similarly requested "*[a]ny* audit documents performed by an independent auditor for bias regarding Workday's AI and/or ML.

Workday cannot simultaneously assert that its AI hiring tools have been evaluated and found to be fair while withholding the very analyses that would allow those assertions to be tested. Workday has publicly and repeatedly represented that Candidate Skills Match ("CSM") and HiredScore Spotlight have been independently audited, that they have been rigorously tested for bias, and that there is no evidence those tools produce discriminatory outcomes — yet it refuses to produce the underlying data, code, and results on the basis of attorney-client privilege and the work

---

[5] That website link embedded in Workday's supplemental response to Interrogatory No. 3 on December 19, 2025, initially took the reader to the webpage advertisement of Workday's 2024 bias audit (Exh. B at 7), but at some point, shortly after that began showing only the webpage advertisement for Workday's 2026 bias audit for the period between September 1, 2025, through February 28, 2026.  That webpage states: "Date of Testing Completion: March 20, 2026." Exh. D.

8

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF
REQUESTED DOCUMENTS AND DISCOVERY

product doctrine. Having affirmatively placed the existence and conclusions of those evaluations at issue, Workday cannot wield privilege as both a sword and a shield. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-1163 (9th Cir. 1992) (adopting the rule of *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991), that "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield").  Applying that rule, the *Chevron* court rejected Pennzoil's effort to invoke privilege over the very tax-counsel advice on which it claimed its Schedule 13D was "reasonable." *Id.* As the court put it, "Pennzoil cannot invoke the attorney-client privilege to deny Chevron access to the very information that Chevron must refute in order to demonstrate that Pennzoil's Schedule 13D is materially misleading." *Id.*

## V.    WORKDAY'S DATA RELEVANCE ARGUMENT IS CONTRARY TO SUPREME COURT AND CIRCUIT PRECEDENT

Workday misunderstands Title VII when it argues its "bias testing data" is a "secondary and derivative source" for proving disparate impact and that the Plaintiffs should be restricted to what it believes to be "the primary evidence of disparate impact: raw applicant data showing real-world outcomes." ECF 315 at 10 (arguing disparate impact "requires data about real applicants . . . and real hiring outcomes—not Workday's internal audit analysis."); ("The raw applicant data Plaintiffs need . . . is held by Workday's customers, who are the employers making the actual hiring decisions.). ECF 315 at 10. The Supreme Court and this Circuit have rejected the contention that disparate impact must be based on "applicant" data and the end-of-the process hiring decision. *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977); *Connecticut v. Teal*, 457 U.S. 440, 446, (1982); *Stout v. Potter*, 276 F.3d 1118, 1122 (9th Cir. 2002); *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482 (9th Cir. 1983). In *Dothard,* the Court held *"*[t]here is no requirement . . . that a statistical

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants. The application process itself might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." *Dothard*, 433 U.S. at 330.[6] "'When an employer requires such [discriminatory] qualifications, the makeup of the pool of actual applicants does not fairly reflect the pool of individuals affected by the challenged requirement. *Moore*, 708 F.2d at 482.

In *Connecticut v. Teal*, 457 U.S. at 446, the Court similarly held that the data necessary to establish disparate impact is not required to be based on ultimate hiring decision when the plaintiffs "had to participate in a selection process that required, *as the first step*, a passing score on a written examination . . . [which operated] as an absolute condition for [further] *consideration* for promotion.'" Id.. at 443-444, 447-448. The Court held that such a threshold step to the *"opportunity"* to be further considered as a candidate for hiring or promotion violates Title VII if that preliminary component of the selection process has disparate impact regardless of whether the plaintiff that would have been hired at the "bottom-line" hiring or promotion stage of the selection process. *Id.* Under § 703(a)(2) of the Act, "[w[hen . . . a [threshold] barrier has a significant adverse effect on minorities or women, then the applicant has been deprived of an employment *opportunity* 'because of . . . race, color, religion, sex, or national origin." *Id.* at 448 (Court's

---

[6] "'An applicant pool analysis is biased against finding discrimination, if potential applicants know or suspect that the employer is discriminating." *Buchanan v. Tata Consultancy Servs.*, 2017 U.S. Dist. LEXIS 212170 **30-31; 2017 WL 6611653, fn. 15 (N.D. Cal. December 27, 2017) (quoting *Mister v. Illinois Cent. Gulf R. Co.,* 832 F.2d 1427, 1436 (7th Cir. 1987); *id.* at **30-31("[W]here 'there is an allegation that the employer's discriminatory practices infect recruiting . . . applicant flow data cannot be taken at face value.'") (quoting *Castaneda v. Pickard*, 648 F.2d 989, 1003 (5th Cir. 1981)).

10

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF
REQUESTED DOCUMENTS AND DISCOVERY

emphasis). By contrast, only § 703(a)(1) is speaks in terms of practices that "fail or refuse to hire," 42 U. S. C. § 2000e-2(a)(1) rather than the equal "opportunity" to be considered and compete for hiring.  For these reasons, Workday errs in arguing that "[t]he raw applicant data Plaintiffs need . . . [must come from] Workday's customers, who are the employers making the actual hiring decisions." ECF 315 at 10-11.

Workday has not responded to the pending motion's request to compel production of such 'component-level data" at pages 15-16, such as the "components or aspects of Workday's application, screening or selection process" requested in second RFP No. 8 and the "AI grading . . . during initial sifting stage 'and . . . minimum job requirements" stage of such screening process requested in RFP No. 13. ECF No. 10 at 15-16 (citing Plaintiffs' Letter Brief, ECF 268, p.1; ECF 268-1, -2, - 3, -10. Workday says not a word in response to any of such threshold component data sought in Plaintiffs' motion (ECF No. 310 at 15-16).  Such preliminary screening components and data also includes those set forth in the following parts of Plaintiffs' motion:

**RFP No. 12**:" AI tools that assist . . . process[ing] personal information [and] . . . job applications, CVs and resumes." ECF No. 310 at 15-16);

**RFP No. 14:** "AI generated grades to help shortlist and prioritize applications in the recruitment process." *Id*

**RFP No. 19:** "AI tools to process job applications." *Id*

**RFP No. 20:** "AI tooling [that] extracts personal information from applications." *Id*

Such component-level discovery and data is essential to the claims pled in this case because Ninth Circuit held in *Stout v. Potter*, 276 F.3d at 1122, that plaintiffs proof must establish disparate impact of the *intermediate components* of the selection process causing such adverse impact —not just the bottom-line of  employment decisions as a whole without regard  to such components. *Id.*

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

## VI.    WORKDAY HAS POSSESSION, CUSTODY, AND CONTROL OVER CUSTOMER APPLICANT DATA

Workday's possession, custody, or control argument fails on two undisputed facts: Workday physically holds the data on its own servers, and Workday's own contract gives it the legal right to produce that data on order of this Court without breaching any contract. Together, those facts *are* Rule 34 control. *FTC v. Johnso*n, No. 2:10-cv-02203-MMD-GWF, 2013 U.S. Dist. LEXIS 139592, at *16-17 (D. Nev. Sep. 25, 2013)("Control" need not be actual control; courts construe it broadly as "the legal right to obtain documents upon demand." *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989);  [*17] *see also Scott v. Arex, Inc*., 124 F.R.D. 39, 41 (D.Conn. 1989) (party controls document if it has right, authority, or ability to obtain documents on demand)."

Legal authority comes from the MSA Workday drafted. Section 4.1 permits disclosure when "ordered to produce . . . by any court of competent jurisdiction." Section 4.2 ("Compelled Disclosure") immunizes it: "[a] disclosure . . . to the extent required by Law shall not be considered a breach." Section 3.6 vests outright ownership of "the aggregated and statistical data derived from the operation of the Service" in Workday. The customers themselves have identified Workday as the entity in possession, custody or control of the data. See Exh. H, Winston Decl. generally.

Workday had both the actual possession custody and control of the documents and data sought on it's own servers as well as the legal right to obtain the documents/data on demand . *In re Bankers Trust Co.*, 61 F.3d 465, 471 (6th Cir. 1995). Workday cannot disclaim control while affirmatively relying on the same data to defend the case. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

Workday cannot invoke its third-party customer contracts to defeat discovery of applicant data essential to plaintiffs 'Title VII claims. "A court's refusal to enforce . . . a [contract] because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42 (1987). *See also, W. R. Grace & Co.* v. *Rubber Workers*, 461 U.S. 757, 766 (1983) (private contract cannot undo Title VII obligations). "[A] promise is unenforceable if the interest in its enforcement is outweighed … by a public policy harmed by enforcement." *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987). *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 744–45 (1st Cir. 1996), held that "any agreement that materially interferes with" civil rights enforcement is void.

## VII. WORKDAY'S STORED COMMUNICATIONS ACT ARGUMENT FAILS AS A MATTER OF LAW.

Additionally, Workday's invocation of the SCA fares no better than its possession-custody-and-control argument and rests on four legal errors, each independently dispositive. *First*, the SCA's non-disclosure provision protects only the "contents" of a "communication." 18 U.S.C. § 2702(a)(1)–(2). "Contents," when used "with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication." *Id.* § 2510(8). Plaintiffs do not seek the substance of communications between applicants and Workday's customers. Plaintiffs seek Workday's own algorithmic outputs—the scores, rankings, and classifications that CS and HiredScore generate, together with the bias testing data, code, and results that Workday itself created to evaluate those tools. That information is Workday's own work product, derived from but distinct from any underlying applicant

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

communication. *See In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106-1107 (9th Cir. 2014) (record information regarding the characteristics of the message that is generated to facilitate the communication" is not "contents" under the SCA).

*Second*, even if a subset of the requested production might arguably qualify as "contents," the SCA expressly authorizes disclosure with the "lawful consent" of the originator, the addressee, or the subscriber. Id. 2711(3)(b)(ii)). The opt-in plaintiffs in this collective action are the originators of the very applicant communications Workday now invokes the SCA to shield. Each opt-in has executed a consent form authorizing prosecution of these claims and discovery in support of them. Workday cannot in good faith assert privacy protections on behalf of the very individuals who have affirmatively waived those protections by joining this lawsuit.

*Third*, the SCA's RCS protections apply only to providers that offer services "to the public." 18 U.S.C. § 2702(a)(2). Courts have consistently held that enterprise providers offering services exclusively to a defined set of business customers are not "public" providers under the SCA. *See generally Andersen Consulting LLP v. UOP*, 991 F. Supp. 1041, 1043 (N.D. Ill. 1998). Workday markets and sells its recruitment platform exclusively to enterprise customers under negotiated Master Services Agreements; it does not offer that platform to members of the general public. By Workday's own description, its services are confined to its customer relationships. Workday is therefore not a covered RCS provider under § 2702(a)(2), and its reliance on *In re Facebook, Inc.*, 923 F. Supp. 2d 1204 (N.D. Cal. 2012); *Rainsy v. Facebook, Inc.*, 311 F. Supp. 3d 1101 (N.D. Cal. 2018)—both involving public-facing social media platforms—is misplaced.

*Fourth,* Workday conflates compelled production by a party defendant with civil subpoenas served on non-party service providers. The cases Workday cites-*Facebook and Rainey-*

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

both involved third-party subpoenas or 28 U.S.C. 1782 actions to non-party platforms in litigation to which the platforms were strangers. In *Shenwick v. Twitter, Inc.*, 2018 U.S. Dist. Lexis 22676 *9 (N.D. Cal. Feb. 7, 2018) the court made an analogous ruling not allowing discovery to a non-party. Here, Workday is the defendant. The records at issue concern its own algorithmic conduct that is the central instrumentality of liability. The SCA was not enacted to immunize a defendant from producing evidence of its own challenged practices.

Respectfully submitted,

| | |
|---|---|
| */s/Roderick T. Cooks* | *s/Robert L. Wiggins, Jr.* |
| Lee D. Winston (ASB: 6407O72L) | Robert L. Wiggins, Jr. (ASB: 1754G63R) |
| *Admitted pro hac vice* | *Admitted Pro Hac Vice* |
| lwinston@winstoncooks.com | rwiggins@wigginschilds.com |
| Roderick T. Cooks (ASB: 5819O78R) | Ann K. Wiggins (ASB: 7006i61a) |
| *Admitted Pro Hac Vice* | *Admitted Pro Hac Vice* |
| rcooks@winstoncooks.com | awiggins@wigginschilds.com |
| Bethany Mae Logan (ASB: 1360X15Z) | Samuel Fisher (ASB: 2675E68S) |
| *Admitted Pro Hac Vice* | *Admitted Pro Hac Vice* |
| bneal@winstoncooks.com | sf@wgginschilds.com |
| Winston Cooks, LLC | Jennifer Wiggins Smith (ASB:9622E53S) |
| 420 20th Street North, Suite 2200 | *Admitted Pro Hac Vice* |
| Birmingham, Alabama 35203 | jsmith@wigginschilds.com |
| Telephone: (205) 502-0970 | Nicki L. Lawsen (ASB: 2602C00K) |
| Facsimile: (205) 278-5876 | *Admitted Pro Hac Vice* |
| | nlawsen@wigginschilds.com |
| | Freddrick M. Moore (ASB: 7952L20o |
| | mmoore@wiggins childs.com |
| | *Admitted Pro Hac Vice* |
| | Wiggins Childs Pantazis Fisher and Goldfarb |
| | 301 North 19th Street |
| | Birmingham, Alabama 35203 |
| | Telephone: (205) 314-0500 |
| | Facsimile: 205) 254-1500 |

**Local Counsel:**
Jay Greene, JD, CPA
greenattorney@gmail.com
Greene Estate, Probate, and Elder Law Firm

15

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF REQUESTED DOCUMENTS AND DISCOVERY

447 Sutter Street, Suite 435
San Francisco, CA 94108
Telephone: (415) 905-0215

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2026. I electronically filed the foregoing document with the United States District Court for the Northern District of California by using the CM/ECF system.  I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Julie Ann Totten    Jtotten@orrick.com, jponce@orrick.com
Erin M. Connell    econnell@orrick.com
Kyla Delgado Grundy  kgrundy@ orrick.com
Alexandria R. Elliott   aelliott@orrick.com

*s/Roderick T. Cooks*
Of Counsel

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF
REQUESTED DOCUMENTS AND DISCOVERY