United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| DEREK L. MOBLEY, et al., | Case No. 23-cv-00770-RFL (LB) |
| Plaintiffs, | **DISCOVERY ORDER** |
| v. | Re: ECF Nos. 310, 314, 319 |
| WORKDAY, INC., | |
| Defendant. | |

**INTRODUCTION**

The plaintiffs in this employment-discrimination case and putative class action are suing Workday, Inc., for utilizing an AI screening system that is more likely to deny applicants who are African American, suffer from disabilities, or are over forty years old.[1] There are three discovery briefs before the court. First, the court previously ordered Workday to produce a privilege log for the documents withheld from the plaintiffs' second set of requests for production (which included bias-testing code, results, and underlying data) and requested supplemental briefing about the applicability of privilege to the bias-testing data.[2] The plaintiffs filed a motion to compel Workday to produce its bias-testing data and its customers' applicant data (which Workday stores on its

---

[1] Third Am. Compl. – ECF No. 287. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Order – ECF No. 280 at 4.

ORDER – No. 23-cv-00770-RFL (LB)

United States District Court
Northern District of California

servers). The parties dispute whether the bias-testing data is protected by attorney-client privilege and whether Workday has control of its customers' applicant data under Rule 34.

Second, the plaintiffs seek to compel production of Workday's EEO-1 and Office of Federal Contract Compliance Programs (OFCCP) documents responsive to RFP No. 22 and Interrogatories Nos. 23 and 24, with the parties disputing relevance, burden, and waiver.

Third, Workday provided anonymized application and resume data in response to a request for production, and the plaintiffs move to compel Workday to provide deanonymized data.[3]

The court denies the motion to compel production of Workday's bias-testing data and its customers' applicant data. Attorney-client privilege applies to the bias-testing data because Workday's attorneys curated the underlying data and used the results in providing legal advice. The plaintiffs have not shown that Workday has control of its customers' data under Rule 34.

The court orders production of Workday's EEO-1 and OFCCP documents. They are relevant to Workday's knowledge of potential demographic disparities when utilizing the AI tools, and Workday has not shown sufficient burden to warrant denying the discovery.

The court terminates the letter brief addressing deanonymizing applicant data as moot because the plaintiffs admitted in similar discovery requests to third parties that they do not need the data deanonymized.

## STATEMENT

Workday Recruiting is a software product that helps customers manage hiring.[4] Customers who purchase Workday Recruiting have access to Candidate Skills Match, an algorithmic feature that determines the extent to which an applicant's skills match the role to which they applied.[5]

In 2024, Workday acquired HiredScore, allowing Workday to offer additional features to customers, including Spotlight and Fetch. Spotlight is a candidate review tool that integrates with an Applicant Tracking System like Workday Recruiting and allows customers to assess the level

---

[3] Disc. Letter Br. – ECF No. 319.

[4] Moore Decl. – ECF No. 108 at 3 (¶ 7).

[5] Interrog. Resp., Ex. D to Grundy Decl. – ECF No. 317-4 at 6–8.

of match between a candidate's application materials and the job requirements. Customers may also purchase Fetch, a sourcing tool that connects organizations with potential talent by suggesting individuals for open jobs.[6]

Workday's relationship with its customers is governed by Master Subscription Agreements.[7] Workday's universal Master Subscription Agreement states that the "Customer owns all right, title and interest to its Customer Content." [8] Workday and its customers promise to

> use the same degree of care that it uses to protect its own confidential information of like kind (but in no event using less than a reasonable standard of care) not to disclose or use any Confidential Information of the other party (the "Discloser") except as reasonably necessary to perform the Recipient's obligations or to exercise the Recipient's rights under this Agreement or with the Discloser's prior written permission.[9]

The agreement allows Workday to disclose its customers' information "[t]o the extent required by Law" without breaching the agreement if Workday "promptly provides the [customer] with prior notice of such disclosure," but the customer may "seek injunctive relief to enjoin any breach or threatened breach of this clause."[10]

Workday contends that it conducted bias testing of Candidate Skills Match at the direction and under the guidance of its legal counsel for the purpose of rendering legal advice regarding this product.[11] Workday restricts access to its bias testing, including the underlying data, testing code, and results, to the individuals who need it for giving legal advice.[12] In 2023, Workday engaged an external consultant to conduct testing of its product Spotlight using the impact ratios approach described in NYC Local Law 144.[13]

---

[6] *Id.*

[7] Grundy Decl. – ECF No. 317 at 4 (¶ 15).

[8] Master Subscription Agreement, Ex. C to *id.* – ECF No. 317-3 at 2–3 (§ 3(a)).

[9] *Id.* at 3 (§ 4).

[10] *Id.*

[11] Law Decl. – ECF No. 316 at 2–4 (¶¶ 2–10).

[12] *Id.* at 3 (¶¶ 7–8).

[13] Interrog. Resp., Ex. D to Grundy Decl. – ECF No. 317-4 at 5.

ORDER – No. 23-cv-00770-RFL (LB)                3

**GOVERNING LAW**

Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable. Fed. R. Civ. P. 26(b). "Pretrial discovery is ordinarily accorded a broad and liberal treatment." *Peng v. Nw. Mut. Life Ins. Co.*, No. 17-cv-01760-SI, 2017 WL 3007030, at *1 (N.D. Cal. July 14, 2017) (cleaned up and quoting *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993)). Moreover, "the test for relevance is not overly exacting: evidence is relevant if it has 'any tendency to make . . . more or less probable . . . [a] fact [that] is of consequence in determining the action.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2018 WL 340640, at *1 (N.D. Cal. Jan. 9, 2018) (quoting Fed. R. Evid. 401).

The party moving to compel discovery "has the initial burden of establishing that the information sought is relevant to any party's claim or defense and proportional to the needs of the case." *Impinj, Inc. v. NXP USA, Inc.*, No. 19-cv-03161-YGR (AGT), 2022 WL 16586886, at *2 (N.D. Cal. Nov. 1, 2022) (cleaned up). The party resisting discovery bears the burden of showing that the discovery should not be allowed and of supporting its objections with competent evidence. *Lofton v. Verizon Wireless LLC*, 308 F.R.D. 276, 281 (N.D. Cal. 2015). Under Rule 26(b)(2)(C), the court must limit discovery that is "unreasonably cumulative or duplicative," obtainable from a less burdensome source, or where the burden "outweighs its likely benefit."

An eight-part test determines whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (cleaned up).

"[The] party asserting the attorney-client privilege has the burden of establishing the [existence of an attorney-client] relationship and the privileged nature of the communication." *Id.* (cleaned up). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (cleaned up); *see also In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012) ("[W]e construe [the attorney-client privilege] narrowly to serve its purposes." (cleaned up)).

## ANALYSIS

There are three primary discovery disputes before the court. The plaintiffs seek production of Workday's bias-testing data and its customers' applicant data (ECF No. 310), EEO-1 and OFCCP documents responsive to RFP No. 22 and Interrogatories Nos. 23 and 24 (ECF No. 314), and deanonymized applicant data (ECF No. 319).

### 1. ECF No. 310

The plaintiffs contend that the court should compel production of Workday's bias-testing data and its customers' applicant data because (1) none of the requested information is privileged and (2) Workday controls its customer's applicant data. Workday responds that the court should deny the motion because (1) the data the plaintiffs seek is not relevant, (2) the data is protected by attorney-client privilege, and (3) Workday cannot produce its customers' data because it lacks control over it.[14] The parties also dispute whether Workday has produced all non-privileged data.

Workday's relevance argument is unpersuasive. Even assuming that Workday's bias-testing data is not the best evidence of disparate impact, it has at least some probative value.[15] *See Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) ("There is no requirement, however, that a statistical showing of disproportionate impact must always be based on analysis of the

---

[14] The plaintiffs also identified alleged deficiencies with the organization of Workday's productions under Rule 34 and its privilege logs but waived those issues by not responding to Workday's arguments in response. *Narang v. Gerber Life Ins. Co.*, No. 18-CV-04500-LHK, 2018 WL 6728004, at *4 (N.D. Cal. Dec. 21, 2018). Workday argued that the court should deny the plaintiffs' motion outright for exceeding the scope given in the court's previous order. The court declines to do so.

[15] Reply – ECF No. 321 at 10–11.

characteristics of actual applicants."). Regarding the production of non-privileged documents, the dispute is outside the scope of the court's order, and Workday did not directly address the plaintiffs' concerns in its opposition.[16] The court cannot decide the issue on this briefing. The parties can raise the issue in a letter brief if they cannot resolve it themselves.

The remaining issues boil down to whether the bias-testing data is privileged, whether Workday waived that privilege, and whether Workday controls its customers' data.

### 1.1    Attorney-Client Privilege

The bias-testing data is privileged.

The plaintiffs assert that the data is not privileged because (1) attorney-client privilege does not apply to the underlying facts of communications, (2) Workday's counsel was acting in a business capacity, not a legal one, (3) statutes rather than attorney input established the parameters of Workday's bias testing, and (4) Workday waived privilege by relying on the bias testing in its AI Fact Sheet while also refusing to produce the data, failing to retain 2023 and 2024 audit data, and submitting the 2023 HiredScore bias-testing data to an external auditor. Workday responds that the bias-testing data is privileged because (1) it was curated and used by its attorneys to provide legal advice, (2) Workday did not create the data to submit to a regulatory body, (3) the regulations cited by the plaintiffs do not apply to it because (under the plaintiffs' theory) Workday is an agent of its customers and not an employer, and (4) Workday has never used its bias-testing data to support any argument in this case.[17]

The parties agree that the purpose in creating a document determines whether attorney-client privilege applies.[18] Attorney-client privilege also extends to documents prepared by an attorney or at an attorney's request for the purpose of advising a client, if the documents are based on and would tend to reveal the client's confidential communications. *See Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 607–08 (D. Nev. 2005) (attorney's draft affidavits were covered by

---

[16] Opp'n – ECF No. 315 at 14; Reply – ECF No. 321 at 3.

[17] Opp'n – ECF No. 315 at 16–21.

[18] Mot – ECF No. 310 at 14; Opp'n – ECF No. 315 at 16.

United States District Court
Northern District of California

privilege to extent they reflected legal advice); *United States v. Nat'l Ass'n of Realtors*, 242 F.R.D. 491, 496 (N.D. Ill. 2007) (privilege covered in-house counsel's draft of magazine article containing legal advice on antitrust implications of Association's policy that did not appear in published version).

Here, Workday has represented that its attorneys curated the data it used in the bias testing, the overall purpose of the testing was to provide legal advice and not to be used in a business capacity, and it has not submitted the data to a regulatory body.[19] The plaintiffs' assertions that Workday's purpose was business or that the underlying code is technical in nature does not change the result. Workday has shown more than mere direction by its attorneys. Thus, the bias-testing data is privileged.

The cases that the plaintiffs relied on to support the opposite result are distinguishable or support Workday's position. *Upjohn Co. v United States* involved communications between employees and counsel and not the data sets at issue here that were curated by attorneys. 449 U.S. 383 (1981). The court in *Suboh v. Bellsouth Business Systems Inc.*, stated that while data underlying a statistical analysis was not privileged, information about how that "information was to be organized in the report, or any other communications that might reveal the thought processes of counsel for Defendant" was privileged. No. 1:03-CV-0996-CC-CCH, 2004 WL 5550100, at *8–9 (N.D. Ga. Nov. 17, 2004). Consistent with *Suboh*, Workday asserts privilege over its curation of the underlying bias-testing data and its use in advising Workday.

The plaintiffs' arguments on waiver are also unpersuasive. They contend that Workday has waived privilege by using the bias-testing data offensively by relying on an "AI Fact Sheet," which states that Workday performs bias testing.[20] Workday counters that it has never argued that the plaintiffs' claims lack merit because its AI tools are unbiased and that relying on the existence

---

[19] Law Decl. – ECF No. 316 at 2–4 (¶¶ 3–10).

[20] Mot. – ECF No. 310 at 23–25.

United States District Court
Northern District of California

of its testing program is different from relying on its results.[21] Workday's invoking the mere existence of its bias testing outside of litigation is not enough to waive privilege.

The plaintiffs offer no substantive argument to support the bare assertion that Workday's failing to retain 2023 and 2024 audit data should result in compelling the production of the remaining applicant data.[22] The plaintiffs did not respond to Workday's assertion that the regulatory frameworks they cited do not apply to Workday and have waived that argument.[23]

The plaintiffs contend that Workday also waived privilege over its bias-testing data by disclosing it to outside auditors, pointing to admissions by Workday that it (1) provided bias-testing data performed on Spotlight by HiredScore to an external consultant in 2023 and (2) is not asserting privilege over bias-testing data for Spotlight.[24] But that is not the data at issue. Workday's own bias-testing data is what the plaintiffs moved to compel. The problem is that plaintiffs have not shown that a waiver of bias-testing data in one context (here, by disclosing the HiredScore testing data to auditors) warrants a waiver of all bias-testing data.

As discussed at the hearing, there may be some information that is not privileged. Workday represented that it had disclosed underlying data, for example, because it is not claiming privilege. This order addresses only the bias-testing data that Workday is claiming is privileged.

### 1.2    Control Over Customer Data

The plaintiffs seek customer applicant data, asserting that Workday's Master Subscription Agreement allows producing the data under a court order and multiple third-party customers have objected to the plaintiffs' subpoenas because the data was "in the possession, custody, or control of a party to the litigation."[25] Workday contends that it cannot be compelled to produce the customer data because (1) it does not "control" the data as defined in Rule 34 because customers can legally refuse to allow production, (2) the third-party objections the plaintiffs cite are general

---

[21] Opp'n – ECF No. 315 at 21.

[22] Reply – ECF No. 321 at 2–3.

[23] *See* Opp'n – ECF No. 315 at 20–21.

[24] *Id.* at 16 n.4.

[25] Mot. – ECF No. 310 at 22–25, 23 n.6.

and do not authorize Workday to produce the data, (3) the Stored Communications Act bars Workday from producing the data, and (4) the remedy is to seek the data directly from the customers.[26] The plaintiffs reply that (1) they have subpoenaed thirty-five third parties, (2) at least some of them have objected on grounds that the plaintiffs should seek production from Workday, and (3) the Stored Communications Act does not apply here because the plaintiffs do not seek the contents of communications and Workday does not provide public services.[27]

The Federal Rules of Civil Procedure require a party served with a subpoena for records to produce those records that are in its "possession, custody or control." Fed. R. Civ. P. 45(a). Under Rule 34, a party has custody or control of documents if it has actual possession or the legal right to obtain them on demand. *Weston v. Docusign, Inc.*, No. 22-cv-00824-WHO, 2024 WL 3446924, at *2 (N.D. Cal. July 15, 2024). The party seeking production bears the burden of demonstrating control. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, No. 22-md-03047-YGR (PHK), 2024 WL 4125618, at *3 (N.D. Cal. Sep. 6, 2024).

The issue is whether the plaintiffs have met their burden of demonstrating that the provision of the Master Subscription Agreement allowing Workday to produce a customer's data without breaching the contract to the extent required by law constitutes "control" under Rule 34. They have not.

The plaintiffs point to cases stating that a party's "legal right to obtain documents upon demand," but none of the cited cases involve contract provisions allowing production under a court order. *See United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989); *FTC v. Johnson*, No. 2:10–cv–02203–MMD–GWF, 2013 WL 5408272 (D. Nev. Sep. 25, 2013); *Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. Jan. 23, 1989). In the absence of contrary authority, the court cannot say that Workday has a legal right to obtain its customers' data

---

[26] Opp'n – ECF No. 315 at 24–29.

[27] Reply – ECF No. 321 at 15–16.

on demand where the mechanism for production is a court order that the customer can seek an injunction to prevent.[28]

That said, the plaintiffs have subpoenaed this data directly from third parties and have provided responses showing that at least some of them take the positions that the plaintiffs should seek the data from Workday instead.[29] On this record, the court cannot compel production of Workday's customers' data. But given the apparent position of some of the third parties that Workday is the better source of production, the parties should be able to work together to resolve this issue.

**2.   ECF No. 314**

The plaintiffs seek to compel production of Workday's EEO-1 and OFCCP documents responsive to RFP No. 22 and Interrogatories Nos. 23 and 24. The issues are whether the plaintiffs have met their burden of showing that the documents are relevant to their claims and, if so, whether Workday has shown why the documents should not be produced.

The court orders the discovery.

The plaintiffs contend that the EEO-1 and OFCCP documents are relevant to (1) historical patterns of discrimination, (2) Workday's knowledge of demographic disparities in hiring, (3) its monitoring of employment outcomes, (4) the feasibility of disparate-impact analysis, and (4) its own awareness of the need to monitor automated hiring tools.[30] Workday counters that the documents are not relevant because (1) they relate to Workday's hiring practices and (2) the Third Amended Complaint challenges only Workday's role as an agent, not a direct employer.[31] The plaintiffs reply that the documents are relevant to Workday's roles as an agent and direct employer

---

[28] Opp'n – ECF No. 315 at 25–26.

[29] Emails, Exs. B, D. to Winston Decl. – ECF No. 321-8 at 11 (the data "should be obtained (if at all) from your client or through first-party discovery on Workday, not through a non-party like RTX"), 47 (objecting "to the extent that it seeks information that is not in Pfizer's possession, custody, or control, duplicative, publicly available, already in a party's possession, or available from a more convenient, more efficient, less burdensome, or less expensive source than Pfizer").

[30] Disc. Letter Br. – ECF No. 314 at 2–3.

[31] *Id.* at 4.

United States District Court
Northern District of California

and that Workday has admitted that it screens and hires employees based on the same AI tools it uses to screen customer-employer's applicants.[32]

The plaintiffs have met their initial burden on relevance. Workday uses the same AI tools as its customers, and thus, under either their agent or direct-employer theory, Workday's EEO-1 and OFCCP documents are relevant to its knowledge of potential demographic disparities when utilizing AI tools.

Workday asserts that it should not be compelled to produce the EEO-1 and OFCCP documents on grounds of proportionality, the plaintiffs' exceeding the number of allowable interrogatories under Rule 33, and timeliness. These arguments are unpersuasive.

First, Workday contends that the burden in producing the EEO-1 and OFCCP documents is not proportional to their value to the case because the documents are irrelevant and publicly available.[33] But where the court has decided that the documents are relevant, the public availability of the documents alone does not prevent production, which Workday concedes.[34]

Second, Workday asserts that the plaintiffs' interrogatories are improper because they include multiple subparts (representing seventy-eight separate interrogatories) without having requested leave to do so.[35] The plaintiffs respond that Workday waived this argument by not discussing it at meet-and-confers and that the subparts to their interrogatories are not discrete inquiries under Rule 33(a)(1) because they are "logically or factually subsumed within . . . the primary question."[36] *Trevino v. ACB Am., Inc.*, 232 F.R.D. 612, 614 (N.D. Cal. 2006). In the absence of arguments from Workday about how specific subparts are not subsumed within the primary question, the court finds this argument unpersuasive.

---

[32] *Id.* at 5.

[33] *Id.* at 4.

[34] *Id.* at 3–4 ("Workday does not contend that public availability alone defeats an otherwise valid discovery request.").

[35] *Id.* at 5.

[36] *Id.* at 6.

United States District Court
Northern District of California

Finally, Workday argues that the plaintiffs have forfeited their opportunity to request the documents by waiting to bring this motion until eighteen months after Workday served its responses and objections.[37] The plaintiffs respond that (1) Workday waived this argument by not discussing it at meet-and-confers and (2) they moved to compel the production of the EEO-1 data one year ago in May 2025, this court denied the motion because the parties had not met and conferred on the issue, the district court separated and postponed the Title VII class certification schedule until 2026, and the plaintiffs filed this letter following Workday's production of its applicant data in April 2026.[38]

The court does not deny the discovery on timeliness grounds. The data is relevant, and Workday does not represent that the delay has prejudiced it.

### 3. ECF No. 319

The plaintiffs sought production of the names and other application information that applicants submitted in the process of applying for employment with Workday. Workday produced the information with anonymized names using unique identification numbers. The parties filed a letter brief disputing whether Workday should be required to supply the deanonymized information.[39] Since filing the letter brief, the plaintiffs filed third-parties subpoenas to Workday customers seeking the same information while stating that the plaintiffs "do not require applicant names."[40] The plaintiffs have admitted that they do not need applicant names. Thus, the court terminates the letter brief as moot.

---

[37] *Id.* at 5.

[38] Disc. Letter Br. – ECF No. 124; Order – ECF No. 130 at 3; Disc. Letter Br. – ECF No. 314 at 6.

[39] Disc. Letter Br. – ECF No. 319 at 2.

[40] Suppl. – ECF No. 331 at 7.

United States District Court
Northern District of California

**CONCLUSION**

The court denies the motion to compel production of Workday's bias-testing data and its customers' applicant data. The court orders production of Workday's EEO-1 and OFCCP documents. The court terminates the letter brief addressing deanonymizing applicant data as moot. This order resolves ECF Nos. 310, 314, and 319.

**IT IS SO ORDERED.**

Dated: May 28, 2026

_____

LAUREL BEELER
United States Magistrate Judge