Lee D. Winston, Admitted Pro Hac Vice
lwinston@winstoncooks.com
Roderick T. Cooks, Admitted Pro Hac Vice
rcooks@winstoncooks.com
Bethany Mae Logan, Admitted Pro Hac Vice
bneal@winstoncooks.com
WINSTON COOKS, LLC
20th Street North, Suite 2200
Birmingham, AL 35203
Telephone: (205) 502-0970
Facsimile: (205) 278-5876

Local Counsel:
Jay Greene, JD, CPA
GREENE ESTATE, PROBATE, AND
ELDER LAW FIRM
447 Sutter Street, Suite 435
San Francisco, CA 94108

Robert L. Wiggins, Jr., Admitted Pro Hac Vice
rwiggins@wigginschilds.com
Ann K. Wiggins, Admitted Pro Hac Vice
awiggins@wigginschilds.com
Samuel Fisher, Jr, Admitted Pro Hac Vice
sf@wigginschilds.com
Jennifer Wiggins-Smith, Admitted Pro Hac 420 Vice
jsmith@wigginschilds.com
Nicki Leili Lawsen, Admitted Pro Hac Vice
nlawsen@wigginschilds.com
Freddrick M. Moore, Admitted Pro Hac Vice
mmoore@wigginschilds.com
WIGGINS CHILDS PANTAZIS FISHER &
GOLDFARB, LLC
301 North 19th Street
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

Lori Kisch, Admitted Pro Hac Vice
lkisch@wigginschilds.com
Meredith Burrell, Admitted Pro Hac Vice
mburrell@wigginschilds.com
Jennifer M. Swedish, Admitted Pro Hac Vice
jswedish@wigginschilds.com
WIGGINS CHILDS PANTAZIS FISHER &
GOLDFARB, LLC
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

*Attorneys for the Plaintiffs and Proposed Class and Collective Members*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEREK L. MOBLEY, JILL E. HUGHES, SHEILAH JOHNSON-ROCHA, and FAITHLINH ROWE. on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>WORKDAY, INC.,<br><br>*Defendant.* | Case No. 3:23-cv-00770-RFL<br><br>**PLAINTIFFS' FOURTH AMENDED COMPLAINT** |

## NATURE OF COMPLAINT

Plaintiffs Derek L. Mobley ("Mobley"), Jill E. Hughes ("Hughes"), Sheilah Johnson-Rocha ("Johnson-Rocha"), and FaithLinh Rowe ("Rowe") (collectively, "Representative Plaintiffs") bring this action on behalf of themselves and all others similarly situated for injunctive, declaratory, and monetary relief against Defendant Workday, Inc. ("Workday" or "Defendant"). Plaintiffs challenge Defendant's pattern or practice of discrimination on the basis of race—including African American and Asian American applicants—sex (female), age (over 40), and disability, in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 ("ADEA"), the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), and the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940 et seq.

This case arises from Defendant's use of artificial intelligence ("AI"), machine learning ("ML"), and other algorithmic decision-making tools to screen, evaluate, rank, and reject job applicants, including, but not limited to, applicants for jobs and employment opportunities in California. These tools are not passive or ministerial. They function as decision-making systems that materially influence, and in many cases determine, whether an applicant is advanced or rejected for employment opportunities.

Workday provides human resource management and applicant-screening services to medium-sized and large organizations across numerous industries, including professional services, financial services, healthcare, education, government, technology, media, retail, and hospitality. Employers subscribe to Workday's platform to manage hiring workflows, including the intake, processing, scoring, ranking, and disposition of job applications.

At the scale at which Workday operates, its platform serves as a primary gateway to employment. Workday has processed millions of job requisitions and hundreds of millions of applications annually. In May 2023 alone, Workday processed approximately 2.2 million job requisition transactions—representing nearly 22% of all job openings in the United States during that period.

As a result, Workday's system does not merely assist hiring decisions; it structures access to employment opportunities across the national labor market.

Defendant's discriminatory conduct arises from its policy and practice of using automated, algorithm-driven systems—in lieu of individualized human review—to evaluate and screen applicants at scale. These systems are trained on historical data and prior hiring outcomes and are designed to identify patterns and relationships between applicant characteristics and hiring decisions. Once deployed, the system applies those learned relationships to new applicants in order to predict whether they should be advanced or rejected.

Because these systems rely on historical data and statistical modeling, they reproduce and amplify disparities embedded in prior hiring decisions and labor market structures. Bias may enter the system through multiple pathways, including the composition of training data, the selection and weighting of input variables, the design of model objectives, and the evaluation criteria used to assess candidate "fit."

Even where protected characteristics such as race, age, sex, or disability are not explicitly provided to the system, they can be inferred through correlated variables. For example, employment gaps may reflect disability or health conditions, years of experience may serve as a proxy for age, educational background and institutional affiliations may correlate with race, and other application data may reflect gender or caregiving responsibilities. Through these proxy variables, the system is capable of reproducing discriminatory outcomes without explicitly classifying applicants by protected characteristics.

Once deployed, Defendant's system operates uniformly across all applicants. Each applicant is subjected to the same underlying model, scoring mechanisms, and decision-making logic. As a result, any bias embedded in the system manifests systematically, producing consistent disparities in outcomes across protected groups rather than isolated or individualized instances of discrimination.

The discriminatory effects of such systems are measurable at the population level, including through disparities in selection rates, rejection rates, ranking outcomes, and other screening decisions across demographic groups. Because the same system is applied across employers and job postings, these disparities are attributable to Defendant's centralized platform rather than individualized employer discretion.

The experiences of the Representative Plaintiffs illustrate the operation and impact of Defendant's system. Plaintiff Mobley, an African American male over the age of forty with disabilities, applied for numerous positions through Workday's platform and was repeatedly rejected despite being qualified. Plaintiff Hughes, a woman over forty with physical disabilities including cancer and asthma, similarly experienced repeated rejections, including rejections that occurred rapidly and without individualized review. Plaintiff Johnson-Rocha, an African American woman over forty, submitted approximately 2,000 applications through systems utilizing Workday and was consistently rejected, including for positions that were reposted and for which she remained qualified. Plaintiff Rowe, an Asian American woman over the age of forty and a qualified professional, likewise experienced repeated and often immediate rejections through Workday's system.

The uniformity, speed, and consistency of these rejections across different employers, job postings, and time periods are indicative of automated decision-making rather than individualized human review. These experiences are consistent with a centralized system applying standardized criteria and algorithmic decision-making processes across all applicants.

Defendant's system disproportionately excludes applicants who are African American, Asian American, female, over the age of forty, and/or disabled. These disparities are not the result of chance or isolated decision-making, but instead arise from the structure, design, and operation of Defendant's algorithmic screening tools.

As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed classes have been denied employment opportunities, lost wages and career advancement, and suffered

emotional distress. Plaintiffs and class members have also been deterred from applying to positions that utilize Workday's platform due to the futility of repeated rejections generated by Defendant's system.

Defendant's conduct is ongoing, systemic, and unlawful. Plaintiffs seek injunctive relief to halt Defendant's discriminatory practices, declaratory relief to establish their unlawfulness, and monetary damages to compensate Plaintiffs and the proposed classes for the harms they have suffered.

## JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), and (4),2201 and 2202, 42 U.S.C. 2000d-2 and 2000e5(f), and 29 U.S.C. § 621, et seq. Supplemental jurisdiction for the state law claims are invoked pursuant to 28 U.S.C. §1367.

2. This is a suit authorized and instituted pursuant to the Act of Congress known as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., as amended, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., and the ADA Amendments Act of 2008 ("ADAAA").

3. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant Workday, Inc. maintains its principal place of business in Pleasanton, California, within this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

4. Defendant's applicant-screening systems—including its artificial intelligence and machine-learning tools used to evaluate, rank, and reject applicants—are designed, developed, maintained, and controlled from its California headquarters.

## PARTIES

5. Plaintiff Derek L. Mobley is an African American male over the age of forty (40) who suffers from depression and anxiety, conditions that constitute disabilities within the meaning of the

ADAAA. Mobley is a job applicant who has applied for numerous positions through Defendant's platform and has been subjected to Defendant's automated screening system.

6. Plaintiff Jill E. Hughes is a female over the age of forty (40) and an individual with disabilities within the meaning of the ADAAA, including physical impairments such as cancer and asthma. Hughes is a qualified professional who has applied for positions through Defendant's platform and has been subjected to Defendant's automated screening tools, which disproportionately exclude female, disabled, and over-forty applicants. Beginning on or about April 15, 2024, Hughes experienced repeated rejections consistent with the operation of Defendant's algorithmic screening system. Hughes has opted into the age-based collective action. [See Dkt. 103-1].

7. Plaintiff Sheilah Johnson-Rocha is an African American female over the age of forty (40). Johnson-Rocha is a qualified professional who has applied for positions through Defendant's platform and has been subjected to Defendant's automated screening tools, which disproportionately exclude African American, female, and over-forty applicants. On or about September 3, 2024, Johnson-Rocha experienced rejections consistent with the operation of Defendant's system. Johnson-Rocha has opted into the age-based collective action. [See Dkt. 103-1].

8. Plaintiff FaithLinh Rowe is an Asian American female over the age of forty (40) and a qualified HRIS professional with extensive human resources experience. Rowe has applied for multiple positions through Defendant's platform, including positions located in California with Defendant Workday, Inc. itself, and has been subjected to Defendant's automated screening tools, which disproportionately exclude female and over-forty applicants. Rowe has opted into the age-based collective action. [See Dkt. 122-1].

9. Defendant Workday, Inc. acts as an agent of its client-employers by exercising delegated authority over the hiring process, including screening, ranking, and filtering applicants through its platform. Employers rely on the results of Workday's selection procedures in making hiring decisions. In the alternative, Workday functions as an indirect employer because it controls

access to employment opportunities by determining which applicants are advanced or rejected through its system.

**CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII, THE ADEA AND THE ADAAA**

10. On June 3, 2021, Plaintiff Mobley filed a charge of discrimination with the Oakland Field Office of the United States Equal Employment Opportunity Commission ("EEOC"), and on July 19, 2021, he filed an amended charge. On November 22, 2022, the EEOC issued Mobley a Dismissal and Notice of Right to Sue. Mobley timely filed this action within ninety (90) days of receipt of that notice.

11. On May 3, 2024, Plaintiff Jill E. Hughes filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), and on May 13, 2025, the EEOC issued Hughes a Dismissal and Notice of Right to Sue. Hughes timely joined this action within ninety (90) days of receipt of that notice.

12. Hughes has therefore satisfied all administrative prerequisites to suit under Title VII, the ADEA, and the ADAAA.

13. On September 3, 2024, Plaintiff Sheilah Johnson-Rocha filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), and on May 13, 2025, the EEOC issued Johnson-Rocha a Dismissal and Notice of Right to Sue. Johnson-Rocha timely joined this action within ninety (90) days of receipt of that notice.

14. Johnson-Rocha has therefore satisfied all administrative prerequisites to suit under Title VII and the ADEA.

15. On May 9, 2025, Plaintiff FaithLinh Rowe filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed with the California Civil Rights Department ("CRD"), alleging discrimination on the basis of race, sex, and age in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in

Employment Act of 1967. On or about August 13, 2025, the EEOC issued Rowe a Dismissal and Notice of Rights.

16. Rowe has satisfied all administrative prerequisites to suit under federal law and has exhausted her administrative remedies under the California Fair Employment and Housing Act ("FEHA").

## CLASS ACTION ALLEGATIONS

17. The Representative Plaintiffs bring this action individually and on behalf of all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure and seek certification of the following subclasses:

- All African-American applicants or former applicants who from September 24, 2020, to the present were subjected to the challenged discriminatory screening process.

- All female applicants or former applicants who from November 8, 2023, to the present were subjected to the challenged discriminatory screening process.

- All applicants or former applicants over the age of forty (40) who from September 24, 2020, to the present were subjected to the challenged discriminatory screening process.

- All applicants or former applicants who, from September 24, 2020, to the present, have a disability or medical condition affecting mental, cognitive, or physical functioning, and who were evaluated, screened, ranked, or rejected through Defendant's automated assessment tools, including cognitive tests, personality tests, or other algorithmic screening mechanisms.

Representative Plaintiffs in the case at bar challenge systemic discrimination by, and seek class-wide relief against, Workday for its utilization of discriminatory screening tools as part of its employment policies and procedures which constitute a pattern and practice of discrimination on the basis of race, sex, age, and disability with respect to selections. These screening tools have been continuously utilized by the Defendant since at least 2017, and their implementation and use has personally harmed the named Representative Plaintiffs, and the putative class members they seek to represent. Workday's client-customers delegate to it the hiring process, recruitment, and onboarding of employees. Workday then utilizes screening tools, to include Workday branded assessments

and/or tests, to process and interpret an applicant's qualifications and recommend whether the applicant should be accepted or rejected.

Workday's utilization of these screening tools relies upon subjective practices which have caused disparate impact and disparate treatment to applicants who are African-American, women, over the age of forty (40) or and/or disabled. Applicants who are not members of these protected groups and who are similarly situated to the Representative Plaintiffs, have not been subjected to such discriminatory treatment.

**A. Common Questions of Law and Fact**

18. The prosecution of the claims of the Representative Plaintiffs requires adjudication of numerous questions of law and fact common to his individual claims and those of the putative classes he seeks to represent. The common questions of law would include, inter alia: (a) whether the Defendant's screening products cause African-American, women, individuals over the age of forty (40), and/or individuals with a disability to be disproportionately and more likely denied employment; (b) whether the Defendant's doing so cannot be justified as a necessary business practice for evaluating potential employees; and (c) whether the Defendant's screening products have a disparate impact on applicants who are African-American, women, over the age of forty (40), and/or disabled in violation of Title VII of the "Civil Rights Act of 1964," 42 U.S.C. § 2000 et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., and the ADA Amendments Act of 2008 ("ADAAA").

17. The common questions of fact would include, inter alia: (1) whether Workday's administration of its screening products discriminated against the aforementioned applicants because of their race, sex, age, and/or disability with regards to hiring; (2) whether compensatory and punitive damages, injunctive relief, and other equitable remedies for the class are warranted; and (3) whether Workday discriminated against the aforementioned protected groups in other terms and conditions

of employment. The details of the Representative Plaintiffs' claims are encompassed within the claims prosecuted on behalf of the class and set forth in this Complaint.

**B. Typicality**

19. The claims of the Representative Plaintiffs are typical of those of the members of the class. The Representative Plaintiffs and all class members have been and are similarly adversely affected by the systemic discriminatory practices complained of herein. Specifically, the representative claims, like those of the class members, arise out of Defendant's pervasive discriminatory conduct in hiring and other terms and conditions of employment.

20. The relief necessary to remedy the claims of the Representative Plaintiffs is the same relief that is necessary to remedy the claims of the putative class members in this case. The Representative Plaintiffs seek the following relief for individual claims and class claims asserted herein: (1) declaratory judgment that Defendant has engaged in systemic discrimination against African-Americans, women, individuals over the age of forty (40), and/or the disabled; (2) a permanent injunction against such continuing discrimination; (3) injunctive relief which reforms Workday's screening products, policies, practices and procedures so that the Representative Plaintiff and the class members will be able to compete fairly in the future for jobs and enjoy terms and conditions of employment traditionally afforded similarly situated employees outside of the protected categories; (4) backpay, front pay, compensatory damages, and other equitable remedies necessary to make the Plaintiff, and the class, whole from Workday's past discrimination; and, (5) attorneys' fees, costs, and expenses.

**C. Numerosity and Impractability Of Joinder**

21. The class that the Representative Plaintiffs seek to represent is too numerous to make

joinder practicable. The proposed class consists of numerous former, current, and future applicants who have been denied employment due to the discriminatory administration of Workday's screening products. Workday's pattern or practice of discrimination also makes joinder impracticable by making it impractical and inefficient to identify many members of the class prior to the determination of the merits of Workday's class wide liability. Thus, the number of class members is currently indeterminate but is certainly numerous.

**D. Adequacy of Representation**

22. The Representative Plaintiffs will fairly and adequately protect the interests of the class inasmuch as they are broadly representative, as reflected in the preceding paragraphs. There are no conflicts of interest present with the members of the proposed class as each would benefit from the imposition of a remedy for the Defendant's discriminatory employment practices. The Representative Plaintiffs have retained counsel experienced in litigating major class actions in the field of employment discrimination, and who are prepared and able to meet the time and fiscal demands of class action litigation of this size and complexity. The combined interest, experience, and resources of the Representative Plaintiffs and their counsel to litigate competently the individual and class claims of employment discrimination at issue satisfy the adequacy of representation requirement under Fed.R.Civ.P. 23(a)(4).

**E. Efficiency of Class Prosecution of Common Claims**

23. Certification of a class of similarly-situated applicants is the most efficient and economical means of resolving the questions of law and fact that are common to the individual claims of the Representative Plaintiffs and the proposed class. The individual claim of the Representative Plaintiffs require resolution of the common question of whether Defendant has engaged in a systemic pattern of discrimination against African-Americans, women, those over forty (40) and the disabled. The Representative Plaintiffs seek remedies to undo the adverse effects of such discrimination in his own life and career. The Representative Plaintiffs have standing to seek such relief because of the

adverse effect that such discrimination has had on him individually and on the putative classes he seeks to represent, in general. To gain such relief for themselves, as well as for the putative class members, the Representative Plaintiffs will first establish the existence of systemic discrimination as the premise of the relief they seek. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the subclasses affected by the common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Representative Plaintiffs, the classes and the Defendant. The Representative Plaintiffs' individual and class claims are premised upon the traditional bifurcated method of proof and trial for systemic disparate treatment/impact claims of the type at issue in this complaint. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

**F. Certification is Sought Pursuant to Fed.R.Civ. P. 23(b)(2)**

24. Workday has acted on grounds generally applicable to the Representative Plaintiffs and the proposed class by adopting and following systemic practices and procedures that discriminate on the basis of race, sex, age, and/or disability. Workday's screening products are regularly used to discriminate on the basis of race, sex, age, and/or disability. Workday has refused to act on grounds generally applicable to the putative class by: (1) refusing to adopt or follow screening productions and selection procedures which do not systemically discriminate on the basis of race, sex, age, and/or disability. Workday's discriminatory screening products have made appropriate final injunctive relief and declaratory relief with respect to the class as a whole. The injunctive relief and declaratory relief are the predominate reliefs sought because they are both the cumulation of the proof of the Defendant's individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the Representative Plaintiffs and the classes members entitlement to monetary and non-monetary remedies at Stage II of such a trial. Declaratory and injunctive relief flow directly

and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against individuals on the basis of race, sex, age, and/or disability. Such relief is the factual and legal predicate for the Representative Plaintiffs and the class members entitlement to injunctive and equitable remedies caused by such systemic discrimination

**G. Alternatively, Certification is Sought Pursuant to Fed. R.Civ. P. 23(b)(3)**

25. The common issues of fact and law affecting the claims of the Representative Plaintiffs and proposed class members, including, but not limited to, the common issues identified above, predominate over any issues affecting only individual claims. A class action is superior to other available means for the fair and efficient adjudication of the claims of the Representative Plaintiffs and members of the proposed classes. The cost of proving the Defendant's pattern or practice of discrimination makes it impracticable for the named Plaintiffs and members of the proposed class to control the prosecution of their claims individually. The Northern District of California is the most logical forum in which to litigate the claims of the Representative Plaintiffs and the proposed class in this case because the Defendant's home office is here and it engages in or ratifies illegal conduct adversely affecting the Plaintiff here.

**H. Alternatively, Certification is Sought Pursuant to Fed. R. Civ. P. 23(c)(4) for Injunctive and Declaratory Relief**

26. Alternatively, claims for injunctive and declaratory relief for the Injunctive Relief Class are properly certified under Federal Rule of Civil Procedure 23(c)(4) because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

**I. Alternatively, Certification is Sought Pursuant to Fed. R. Civ. P. 23(c)(4) For Class Wide Liability**

27. Alternatively, class wide liability claims are properly certified under Federal Rule of Civil Procedure 23(c)(4) for the Classes because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

**J. Punitive Damages May Alternatively be certified Pursuant to Fed. R. Civ. 23(b)(2)**

28. Punitive damages liability may alternatively be certified under Federal Rule of Civil Procedure 23(b)(2) because such relief focuses on the conduct of Workday and not the individual characteristics of the Plaintiff and are an allowable form of incidental monetary relief.

## CLAIMS OF REPRESENTATIVE PLAINTIFFS

**A. Derek Mobley**

29. Since at least 2017, Plaintiff Mobley has applied for over one hundred (100) positions that utilized Defendant Workday, Inc.'s platform as the gateway for applicant screening and hiring. Each application resulted in rejection.

30. Workday's platform is not a marginal tool—it is a dominant labor-market intermediary. Workday services more than 10,000 organizations, including over half of Fortune 500 companies, and processes a substantial portion of U.S. job applications. As a result, Workday functions as a centralized screening infrastructure governing access to employment opportunities.

31. Mobley's application process followed a uniform, Workday-controlled pathway. He would respond to job postings on third-party platforms such as LinkedIn, Indeed, or Monster, which then redirected him to employer-specific Workday portals.

32. Upon information and belief, these portals—e.g., "@myworkday.com" domains—are standardized interfaces through which Workday collects, structures, and evaluates applicant data using common backend systems.

33. To proceed, Mobley was required to create login credentials, upload his résumé, and submit structured data inputs dictated by Workday's system architecture.

34. Mobley's résumé reflects graduation from Morehouse College, a historically Black college, and extensive work history—information that can function as proxies for protected characteristics such as race and age when processed through data-driven models.

35. Numerous applications required Mobley to complete Workday-branded assessments and/or personality tests as a condition of consideration.

36. Upon information and belief, these assessments constitute standardized components of Workday's screening system and are used across multiple employers without material variation.

37. These assessments are not merely neutral questionnaires. Rather, they are data-collection instruments designed to generate behavioral and psychological profiles that are fed into algorithmic decision-making tools.

38. Upon information and belief, such tools operate as "classification systems" that sort applicants based on predicted suitability, using correlations derived from historical data rather than job-related causation.

39. Mobley suffers from depression and anxiety. The assessments required by Workday are likely to reveal or correlate with such conditions and thus function as disability-related inquiries or medical examinations under the ADA.

40. Individuals with such conditions are more likely to perform worse on these assessments, resulting in systematic exclusion at the screening stage.

41. Mobley's experience reflects a consistent and highly probative pattern of near-immediate rejection following submission of applications through Workday's platform, strongly indicating automated screening rather than individualized review.

42. For example, on or about September 23, 2018, Mobley applied for a Corporate Travel Consultant position with Expedia via the Workday platform. On October 2, 2018, at approximately 2:19 a.m., he received a rejection email.

43. On March 31, 2019, Mobley applied for a Claim Support Representative position with Fiserv via Workday. The following morning, April 1, 2019, at approximately 9:40 a.m., he received a rejection email—less than one day after applying.

44. In June 2019, Mobley applied for a Help Desk Support Technician position with NCR Corporation via Workday and was rejected on June 20, 2019, despite meeting the stated qualifications.

45. On August 31, 2019, Mobley applied for an Associate Customer Care Specialist position with Duke Energy via Workday, completed a required Workday-branded assessment, and was subsequently rejected without explanation.

46. On that same date, August 31, 2019, Mobley applied for a Customer Service Representative position with Unum via Workday and was rejected that same day at approximately 12:52 a.m., reflecting an almost instantaneous automated disposition.

47. On January 29, 2022, at approximately 12:55 a.m., Mobley applied for a Customer Services Specialist position with Unum via Workday. Less than one hour later, at approximately 1:50 a.m., he received a rejection email.

48. On January 9, 2024, Mobley applied for a Customer Support Representative position with ResMed via Workday. On January 11, 2024, at approximately 3:52 a.m., he received a rejection email.

49. Across these and numerous other applications, Mobley was rejected despite meeting or exceeding the stated qualifications for the positions.

50. The timing of these rejections—often occurring within hours or even minutes of submission, including during overnight hours—supports a reasonable inference that Workday's algorithmic decision-making tools automatically screened out Mobley's applications.

51. This pattern is consistent across multiple employers, industries, and years, demonstrating that the decision-making mechanism is centralized within Workday's platform rather than individualized by each employer.

52. Upon information and belief, these tools utilize machine learning models whose behavior depends on trained parameters, scoring thresholds, and data interactions, such that their discriminatory effects manifest in outcomes rather than observable rules.

**B. Jill E. Hughes**

53. Ms. Jill E. Hughes is a white female over the age of forty (40), born on February 4, 1974. Ms. Hughes is a cancer survivor and currently suffers from asthma—serious medical conditions that qualify as disabilities under the ADA and that may affect respiratory function, stamina, and work patterns.

54. Ms. Hughes holds a B.A. from the University of Cincinnati and an M.A. from the University of Chicago and possesses more than twenty-eight (28) years of executive-level experience as a Senior Medical Writer, Project Manager, and Scientific Director. Her experience includes high-level work in the corporate, medical, and media sectors, and she is well-qualified for the positions to which she applied.

55. Since at least December 2023, Ms. Hughes has applied for hundreds of positions through hiring systems powered by Defendant Workday, Inc., which function as the primary gateway for sourcing, recruiting, and applicant screening. These applications include positions with major employers such as 3M, Cigna, Veralto, Stryker, Becton Dickinson, FIS Global, General Electric, Huntington, and Parsons Corporation. Despite meeting or exceeding the stated qualifications for these roles, Ms. Hughes has been rejected in every instance.

56. Upon information and belief, Workday's algorithmic decision-making tools analyze applicant data—including résumé content, employment history, gaps in work, and other indicators—

to predict applicant suitability, including traits such as reliability, productivity, and expected attendance.

57. These same data points—including interruptions in employment, medical-related leave, or patterns consistent with treatment and recovery—are commonly correlated with underlying health conditions such as cancer survivorship and respiratory impairments like asthma.

58. As recognized in the scholarly literature, algorithmic hiring tools can identify and rely upon such proxy indicators of illness or health-related limitations—even where doing so would be unlawful if performed directly—thereby enabling systems to infer the existence of a disability without any explicit inquiry.

59. Because individuals with serious medical conditions, including cancer and asthma, may exhibit distinct work histories, treatment-related gaps, or other behavioral and professional patterns, these systems can disproportionately flag and screen out such applicants based on inferred health status rather than job-related qualifications.

60. The companies listed above sent Ms. Hughes automated rejection notices for positions for which she met or exceeded the posted hiring requirements.

61. In some instances, these automated rejection emails stated that Ms. Hughes “did not meet the minimum requirements for the role,” despite her qualifications, experience, and credentials demonstrating otherwise.

62. These rejections were frequently issued within minutes or a few hours of submission and often occurred outside normal business hours—including times such as 2:40 a.m. on a Sunday or 11:00 p.m. on a weekday—strongly indicating that her applications were screened and rejected by automated systems rather than reviewed by any human decision-maker.

63. This pattern of rapid, uniform rejection across multiple employers is consistent with the operation of Workday’s algorithmic screening tools identifying and acting upon proxy indicators

of disability and health status—including those associated with cancer survivorship and asthma—rather than conducting any individualized assessment of Ms. Hughes' qualifications.

**C. Sheilah Johnson-Rocha**

64 Sheilah Johnson-Rocha is an African-American female. She is over the age of 40. Ms. Johnson-Rocha's date of birth is January 30, 1983.

65, Ms. Johnson-Rocha has three college degrees: (1) an Associates in Arts (Business Administration); Bachelor of Business of Administration; and, a Master of Science-Major in Management. She also possesses various certifications within the pharmaceutical and biotechnology industry. She has worked in the pharmaceutical and biotechnology industries for the past 21 years.

66. Since March 2023, Ms. Johnson-Rocha has submitted approximately 2,000 job applications to various pharmaceutical and biotech companies.

67. A large majority of the companies to which she has applied use Workday's job application platform. Upon information and belief, her qualifications and experience exceeded all criteria in the job requisitions for each of the roles for which she applied, however almost all of her applications were met with an automated rejection notification.

68. Furthermore, many of the jobs for which she applied were not filled and are continuously re-posted. When the jobs are re-posted, she re-applied only to receive an automated rejection email.

69. In some cases, the automated rejection emails stated "You do not meet the minimum requirements for this role" even though she met or exceeded all posted requirements based on her professional resume. Automated rejections were often received within a few hours of applying or were sent at odd times outside of business hours, indicating a human did not review the applications.

**D. Faithlinh Rowe**

70. Plaintiff FaithLinh Rowe is an Asian American female over the age of forty (40). Ms. Rowe was born in 1981 and is a member of protected classes based on race, sex, and age.

71. Ms. Rowe is a highly qualified Human Resources Information Systems ("HRIS") professional with extensive experience in human resources, including HR technology systems, talent management, and enterprise HR operations. Her background includes roles requiring advanced knowledge of HR platforms, data systems, and workforce management tools, making her well-qualified for mid- to senior-level HR and HRIS positions.

72. Beginning as early as 2020 and continuing through 2025, Ms. Rowe applied for numerous positions through hiring systems powered by Defendant Workday, Inc., including positions for which she met or exceeded the stated qualifications. These applications included roles across multiple employers and industries, as well as positions directly with Workday itself.

73. Between 2020 and April 2021, while residing in California, Ms. Rowe applied to at least seven (7) positions associated with Defendant's Pleasanton, California headquarters. Each of these applications was submitted through Defendant's centralized Workday platform and processed through the same automated system:

## FAITHLINH ROWE WORKDAY CANDIDATE PORTAL







74. Ms. Rowe received automated responses and rejections through the Workday platform for these positions. The rejections were issued without any individualized feedback, interview opportunity, or indication that her applications were meaningfully reviewed by a human decisionmaker.

75. Ms. Rowe has also applied for additional positions through Defendant's Workday platform, including positions for which she met or exceeded the stated qualifications, yet experienced a consistent pattern of rejection.

76. On July 15, 2024, Ms. Rowe applied for an Associate Director – HR Technology position at AT&T through the Workday platform. At the time of application, the position had been posted for less than one hour and had only one identified applicant.

77. Immediately upon submitting her application, Ms. Rowe's status was automatically changed to "No longer under consideration," without any interview, follow-up, or individualized review.

78. The near-instantaneous rejection—occurring at the moment of submission—demonstrates that her application was screened out by an automated system rather than a human decisionmaker.

79. Following this rejection, Ms. Rowe contacted Jeff Ellis, Associate Director of Talent Acquisition at AT&T, through LinkedIn to report the issue and request review of her application, but received no response.

80. Ms. Rowe has retained documentary evidence of her applications, including screenshots of the Workday application portal reflecting immediate rejection statuses, as well as communications evidencing her attempts to seek review.

81. Across her applications submitted through Workday systems, Ms. Rowe experienced a consistent pattern of rapid, uniform rejections without explanation, feedback, or any indication of individualized human review.

82. Based on her professional experience working with HRIS platforms, including Workday, Ms. Rowe understands that such immediate and uniform rejections are consistent with automated screening, scoring, or ranking systems applied at or near the point of application submission.

83. Upon information and belief, the automated screening systems that evaluated Ms. Rowe's applications were designed, developed, maintained, and controlled by Defendant from its headquarters in Pleasanton, California.

84. As a result of Defendant's use of these automated screening systems, Ms. Rowe—an Asian American woman over the age of forty—was repeatedly and systematically excluded from employment opportunities despite her qualifications.

85. The uniformity and timing of these rejections are indicative of a centralized, algorithmic screening system operating at scale, rather than individualized hiring decisions.

**HOW ALGORITHMIC DISCRIMINATION WORKS**

86. Workday designs, markets, and deploys algorithmic decision-making tools that power applicant screening systems used by Workday and other employers to accept, rank, or reject job applicants. These systems function as gatekeepers to employment opportunities and operate through automated classification, scoring, and recommendation processes that materially affect hiring outcomes. Defendant

87. Modern employment discrimination increasingly operates through data-driven automation. Employers rely on algorithmic models to process large volumes of applications by extracting, sorting, and evaluating data points such as keywords, prior employment, educational background, and inferred behavioral traits. These processes—commonly referred to as "data mining" and "data analytics"—replace individualized assessment with statistical pattern recognition.

88. However, data-driven systems "learn by example," meaning that the outputs of such systems are necessarily shaped by the data on which they are trained. As leading scholarship recognizes, algorithms built on "inaccurate, biased, or unrepresentative data can…produce outcomes biased along lines of race, sex, or other protected characteristics."

89. For hiring purposes data is mined on the front-end from applications via an Applicant Tracking System ("ATS), which can be located on the company's website or extracted from

applicants on job boards. An applicant tracking system (ATS) is a software application that enables the electronic handling of recruitment and hiring needs. Most job and resume boards (Reed Online, LinkedIn.com, Monster.com, Hotjobs, CareerBuilder, Indeed.com) have partnerships with ATS software providers to provide parsing support and easy data migration from one system to another.

90. In the hiring context, these systems are typically embedded within Applicant Tracking Systems ("ATS"), which collect and process applicant data from employer portals and integrated job boards. These systems parse resumes, extract features, and transform applicants into data profiles that are subsequently scored or ranked through algorithmic models.

91. Contemporary ATS platforms, including those offered by Defendant, function as integrated "platform-as-a-service" ecosystems, allowing third-party tools and machine-learning models to seamlessly interact with applicant data. This architecture enables "omnichannel" recruitment, in which algorithmic decision-making extends across job boards, employer sites, and third-party databases, thereby amplifying the scale and impact of automated screening.

92. These systems rely on machine-learning algorithms that identify statistical relationships within training data to predict applicant suitability. Critically, such systems do not evaluate applicants based on merit in a vacuum; rather, they replicate patterns embedded in historical data.

93. As courts and scholars increasingly recognize, the exclusion of explicit demographic variables (such as race, age, or disability) does not render such systems neutral. Instead, algorithms routinely rely on proxy variables—such as zip code, educational institution, employment gaps, or language usage—that are highly correlated with protected characteristics. As a result, ostensibly neutral systems can reproduce and even amplify discrimination.

94. Indeed, data mining systems may "inherit the prejudices of prior decision makers" or "reflect the widespread biases that persist in society," thereby producing systematically adverse outcomes for protected groups.

95. These risks are not hypothetical. In one widely reported example, Amazon abandoned an automated hiring system after discovering that it systematically penalized female applicants. Although the system did not include gender as an input, it learned to downgrade resumes containing gender-associated indicators and to favor male-dominated career trajectories, demonstrating how biased training data can produce discriminatory outcomes even absent explicit intent.

96. In such systems, the algorithm does not independently assess merit; rather, it identifies statistical patterns within historical data and reproduces them. Where the underlying data reflects historical exclusion or inequality, the resulting model will encode and perpetuate those disparities.

97. Upon information and belief, Defendant's algorithmic decision-making tools operate by learning from and optimizing for employer preferences, including historical hiring decisions. As a result, if an employer's past practices reflect bias—whether explicit or implicit—the algorithm will internalize and replicate those preferences.

98. Upon information and belief, when Defendant's systems detect that certain categories of applicants are less frequently selected or advanced by employer clients, the system correspondingly reduces the likelihood that such applicants will be recommended or surfaced in the future. In this way, Defendant's tools operationalize and scale discriminatory preferences.

99. Algorithmic decision-making systems are not inherently neutral. Rather, they are subject to what scholars describe as "classification bias," whereby automated systems sort individuals in ways that systematically disadvantage protected groups, even in the absence of explicit discriminatory intent.

100. Moreover, the technical literature confirms that fairness in algorithmic systems is inherently constrained: it is often mathematically impossible to satisfy competing definitions of fairness simultaneously, meaning that some groups will inevitably bear disproportionate error rates or adverse outcomes.

101. These dynamics are further compounded by the opacity of algorithmic systems. As scholars have observed, algorithmic decision-making processes are often proprietary and resistant to scrutiny, making it difficult to detect, explain, or remedy discriminatory effects once embedded in the system.

102. Government agencies and regulators have likewise recognized the discriminatory risks posed by algorithmic systems. For example, policymakers have warned that automated decision-making can "reproduce existing patterns of discrimination" and "exacerbate existing inequalities," particularly when relying on historical or proxy data.

103. The absence of adequate safeguards—such as bias testing, transparency mechanisms, or corrective constraints—creates a substantial risk that algorithmic systems will drift over time, amplifying disparities as they continuously retrain on new data. This phenomenon, commonly referred to as "AI drift," can cause systems to deviate from their intended design and produce increasingly discriminatory outcomes.

104. Upon information and belief, Defendant has failed to implement sufficient guardrails to prevent such discriminatory outcomes, including failing to adequately audit, validate, or constrain its algorithmic decision-making systems.

105. This failure reflects, at minimum, deliberate indifference to the foreseeable discriminatory impact of Defendant's technology and, upon information and belief, constitutes a conscious decision to prioritize efficiency and scalability over compliance with federal anti-discrimination laws.

106. The lack of diversity within the technology workforce responsible for designing and training such systems further exacerbates these risks. As experts have noted, homogenous development environments can embed structural bias into data models, leading to discriminatory outputs that disproportionately harm historically marginalized groups.

107. Accordingly, Defendant's algorithmic decision-making tools do not merely reflect neutral technological processes; they function as mechanisms that systematize, scale, and obscure unlawful discrimination in employment.

108. Upon information and belief, Workday determines which candidates to recommend based on the interests demonstrated by its client-employers in certain types of candidates, Workday will offer recommendations that reflect whatever biases employers happen to exhibit.

109. Upon information and belief, if Workday's algorithmic decision-making tools observe that a client-employer disfavors certain candidates who are members of a protected class, it will decrease the rate at which it recommends those candidates. Thus, the recommendation algorithmic decision-making tool caters to the prejudicial preferences of the client-employer.

110. Algorithmic decision-making and data analytics are not, and should not be assumed to be, race neutral, disability neutral, or age neutral. Too often, they reinforce and even exacerbate historical and existing discrimination.

111. For example, a 2019 study found that a clinical algorithm that many hospitals were using to determine which patients need care was biased: Black patients assigned the same level of risk—and thus allocated the same health care resources—were much sicker than white patients. This happened because the algorithm had been trained on historical health care spending data, which reflects a history in which Black patients had less money to spend on their health care than white patients. From this, the algorithm falsely concluded that Black patients were healthier than equally sick white patients.

112. Upon information and belief, Workday's artificial intelligence and machine learning tools are capable of discerning or inferring an applicant's physical and mental health status—even where no such information is expressly provided—by analyzing behavioral, linguistic, and employment-related data collected during the application process.

113. These systems evaluate applicants using natural language processing, speech analysis, and computer-based assessments, measuring features such as response timing, hesitation patterns, communication style, and interaction behaviors, and comparing those inputs against training data derived from prior candidates or incumbent employees.

114. In addition, these tools analyze résumé and application data reflecting employment history—including gaps in work, leaves of absence, tenure patterns, and attendance-related indicators—which are commonly correlated with underlying health conditions such as chronic illness, physical impairments, and mental health disorders.

115. As recognized in the scholarly literature, algorithmic hiring systems may use such information to predict traits like reliability, productivity, or attendance, including by identifying proxies for illness or health-related limitations, even where doing so would be unlawful if performed directly.

116. Because individuals with disabilities or health conditions may exhibit different speech patterns, response speeds, work histories, or behavioral characteristics, these systems can use such proxy variables to identify, infer, or predict the existence of a disability or medical condition without any explicit inquiry.

117. Where, as here, the underlying training data reflects historical bias or underrepresents individuals with disabilities, the resulting models systematically penalize these characteristics, screening out applicants based on inferred health conditions rather than job-related qualifications.

118. In this way, Workday's ostensibly neutral screening tools function as de facto medical examinations or disability-related inquiries, as they are designed to elicit, detect, or act upon information likely to reveal physical or mental impairments—such as illness-related absences, health conditions, or limitations—thereby disproportionately excluding individuals with disabilities in violation of the ADA.

119. The Representative Plaintiffs' repeated near-immediate rejections—often within hours or minutes of submission—are consistent with the operation of these automated screening tools identifying and acting upon such proxy indicators of disability and health status, rather than any individualized assessment of his qualifications.

120. Workday expressly represents that its system can "automatically disposition" candidates and move them through—or exclude them from—the hiring pipeline without human intervention.

121. These tools operate as predictive classification systems that rank applicants based on inferred likelihood of success, using patterns derived from historical workforce data.

122. Upon information and belief, such systems reproduce and amplify historical disparities embedded in training data or reflected through proxy variables.

123. Because protected characteristics can be inferred from non-protected inputs (e.g., education, employment history, geography), algorithmic systems can replicate discrimination without explicitly using protected traits.

124. Workday's integration of tools such as pymetrics further embeds standardized assessment-driven decision-making into its platform.

125. Upon information and belief, these tools are trained on incumbent employee data, thereby reinforcing existing workforce demographics and perpetuating homogeneity.

126. This process "locks in" the status quo by favoring applicants who resemble prior hires, disproportionately disadvantaging African-Americans, older workers, and individuals with disabilities.

127 Workday also facilitates employee referral and recommendation systems that further entrench existing demographic patterns, amplifying disparate impact.

128. These practices constitute facially neutral policies that produce systemic exclusion of protected groups through common mechanisms applied across all client employers.

129. Detecting such discrimination requires examining outputs and disparities across groups, as bias manifests in selection rates, exclusion patterns, and error rates rather than in facial system design.

**A. Agency and Control**

130. Workday operates as more than a passive software vendor. Its platform is the mandatory gateway through which applicants must pass to be considered for employment with client-employers.

131. Employers delegate substantial aspects of their hiring function to Workday, including applicant screening, ranking, and dispositioning.

132. Workday provides ongoing consulting, training, and system optimization services, reflecting a continuous and integrated role in hiring decisions.

133. As a result, Workday acts as an agent of its client-employers and exercises control over access to employment opportunities.

134. Workday's algorithmic screening tools directly interfere with and determine whether applicants—including Mobley and the putative class—can form employment relationships with prospective employers.

**B. Common Policy and Classwide Impact**

135. Plaintiff challenges the use of Workday's common algorithmic screening tools as a uniform employment practice.

136. These tools operate through standardized mechanisms—including résumé parsing, assessments, predictive scoring, and automated dispositioning—applied across all employers using the platform.

137. While implementation details may vary slightly by employer, the core discriminatory mechanisms are common and centrally designed by Workday.

138. The effects of these practices are likewise common: systematic exclusion of African-Americans, women, individuals over 40, and individuals with disabilities at the initial screening stage.

139. The number of individuals affected by these practices is in the thousands, if not tens of thousands.

**C. Claims**

140. Workday's screening tools constitute employment practices that cause a disparate impact on African-American, and female applicants in violation of Title VII, 42 U.S.C. § 2000e-2(k).

141. These practices are not job-related and are not consistent with business necessity.

142. Workday's assessments and screening tools constitute prohibited disability-related inquiries and/or medical examinations under the ADAAA and disparately impact individuals with disabilities.

143. Workday's screening tools also disparately impact applicants over the age of 40 in violation of the ADEA.

**COUNT ONE**
**Intentional Employment Discrimination in**
**Violation of Title VII of the Civil Rights Act of 1964**

144. Plaintiffs recognize that the Court has previously dismissed Count One stated in ¶¶ 86-143 of the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

## COUNT TWO

**Disparate Impact Discrimination on the Basis of Race and Sex in Violation of Title VII of the Civil Rights Act of 1964 and Disability in Violation of the ADAAA of 2008 Class Representatives Derek L. Mobley, Jill E. Hughes, Sheilah Johnson-Rocha, and Faithlih Rowe**

145 Plaintiffs restate and incorporate ¶¶86-143 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count.

146. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis of race or gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September 2024. Such Workday reported data shows that Workday's job application platform and AI screening process has disparate impact against African-Americans at a statistically significant rate greater than what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process is race neutral.

147. That same data for 724,352 applicants for employment with ten of Workday's largest customers also shows that Workday's job application platform and AI screening and selection process has disparate impact against women. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

147. It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

148. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

149. Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

150. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

151. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

152. Since April 29, 2024. HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer -employers.

153. The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024,

including, but not limited to, Plaintiffs Jill E. Hughes Sheliah Johnson-Rocha, Faithlihn Rowe and others.

154. Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater than what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

155. Representative Derek L. Mobley, an African-American male who is diagnosed with anxiety and depression.

156. Representative Plaintiff Mobley's diagnoses are covered by the ADAAA of 2008.

157. He is a cum laude graduate of Morehouse College with a bachelor's degree in finance and is an honors graduate of ITT Technical Institute, holding a Server+ certification.

158. Representative Plaintiff Mobley is a qualified professional who has applied for over one hundred positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on African-American and disabled applicants.

159. For example, Mobley has applied to Fiserv Solutions, LLC, Sedgwick Claims Management Services, Inc., and ResMed, Inc.

160. He was rejected for every position despite meeting the experiential and educational requirements. At least one rejection was received within one hour of his application.

161. Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech.

162. Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted ~2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on African-American applicants.

163. Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

164. She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours.

165. Representative Plaintiff Jill E. Hughes possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director.

166. She is a cancer survivor and suffers from asthma, which are both covered disabilities under the ADAAA of 2008.

167. Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on disabled applicants.

168. Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications: Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

169. She received rejections for all these positions, which often cited unmet minimum

requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours.

170. Plaintiff FaithLinh Rowe is an Asian American female over the age of forty (40). Ms. Rowe was born in 1981 and is a member of protected class based on sex.

171. Ms. Rowe is a highly qualified Human Resources Information Systems ("HRIS") professional with extensive experience in human resources, including HR technology systems, talent management, and enterprise HR operations. Her background includes roles requiring advanced knowledge of HR platforms, data systems, and workforce management tools, making her well-qualified for mid- to senior-level HR and HRIS positions.

172. Beginning as early as 2020 and continuing through 2025, Ms. Rowe applied for numerous positions through hiring systems powered by Defendant Workday, Inc., including

positions for which she met or exceeded the stated qualifications. These applications included roles across multiple employers and industries, as well as positions directly with Workday itself.

173. On July 15, 2024, Ms. Rowe applied for an Associate Director – HR Technology position at AT&T through the Workday platform. At the time of application, the position had been posted for less than one hour and had only one identified applicant.

174. Immediately upon submitting her application, Ms. Rowe's status was automatically changed to "No longer under consideration," without any interview, follow-up, or individualized review.

175. The near-instantaneous rejection—occurring at the moment of submission—demonstrates that her application was screened out by an automated system rather than a human decisionmaker.

176. Following this rejection, Ms. Rowe contacted Jeff Ellis, Associate Director of Talent Acquisition at AT&T, through LinkedIn to report the issue and request review of her application but received no response.

177. Ms. Rowe has retained documentary evidence of her applications, including screenshots of the Workday application portal reflecting immediate rejection statuses, as well as communications evidencing her attempts to seek review.

178. Across her applications submitted through Workday systems, Ms. Rowe experienced a consistent pattern of rapid, uniform rejections without explanation, feedback, or any indication of individualized human review.

179. Based on her professional experience working with HRIS platforms, including Workday, Ms. Rowe understands that such immediate and uniform rejections are consistent with automated screening, scoring, or ranking systems applied at or near the point of application submission.

180. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of race.

181. Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of race. There is no business necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category. Workday's AI screening and selection criteria and process are a pretext for racial discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

182 Workday's employment practices operate as the functional equivalent of a pretext for discrimination.

183. Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

184. Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against the Representative Plaintiffs and the proposed class both within and outside the liability period in this case.

185. As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, the Representative Plaintiffs and the class they seek to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

186. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of Title VII.

187. In the absence of a direct employment relationship, Workday can still be held liable under Title VII for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**COUNT THREE**
**Intentional Discrimination**
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623(a)(1)**

188. Plaintiffs recognize that the Court has previously dismissed Count One of the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

**COUNT FOUR**

**Disparate Impact Discrimination Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623(a)(2) Class Representatives Derek L. Mobley, Jill E. Hughes, Sheilah Johnson-Rocha, and Faithlinh Rowe**

189. Plaintiffs restate and incorporate ¶¶86-143 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count Four.

190. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

191. It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

192. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

193. Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a

comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

194. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

195. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

196. Since April 29, 2024. HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer -employers.

197. The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024, including, but not limited to, Plaintiffs Jille E. Hughes, Sheliah Johnson-Rocha, Faithlinh Rowe, and others.

198. Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater

than what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

199. Representative Derek L. Mobley, an African-American male born in 1974, is over 40 and manages anxiety and depression.

200. He graduated cum laude from Morehouse College in 1995 with a bachelor's degree in finance and is an honors graduate of ITT Technical Institute, holding a Server+ certification.

201. Representative Plaintiff Mobley is a qualified professional who has applied for over one hundred positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

202. For example, Mobley has applied to Fiserv Solutions, LLC, Sedgwick Claims Management Services, Inc., and ResMed, Inc.

203. He was rejected for every position despite meeting the experiential and educational requirements. At least one rejection was received within one hour of his application.

204. Representative Plaintiff Jill E. Hughes is a white female who possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director. She was born in 1974 and is over the age of 40.

205. Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

206. Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications: Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

207. She received rejections for all these positions, which often cited unmet minimum requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours.

208. Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech. She was born in 1983 and is over the age of 40.

209. Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted ~2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

210. Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

211. She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours.

212. Representative Plaintiff Faithlinh Rowe is an Asian-American female with many years of , Human Resource experience. She was born in 1981 and is over the age of 40.

213. Representative Plaintiff Rowe is a qualified professional who has submitted numerous applications Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on applicants over the age of 40.

214. Representative Plaintiff Rowe applied for an Associate Director HR Technology role at AT&T on Jul 15, 2024, and received an immediate rejection, despite meeting the position's qualifications.

215. Likewise, on May 12, 2025, at 1:10 p.m., Representative Plaintiff Rowe applied for a Director, Human Resource Information Systems position with Kyndryl, Inc., by 1:40 p.m. (30 minutes later) she received a rejection email from kyndryl@myworkday.com.

216. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of age.

217. Workday maintains discriminatory policies, patterns, and/or practices that have an adverse impact on employees ages 40 and older in violation of the ADEA and are not, and cannot be, justified by reasonable factors other than age.

218. Employers have delegated hiring decisions to Workday who then, upon information and belief, utilize discriminatory algorithmic decision-making tools that consciously or unconsciously discriminate against applicants on the basis of age.

219. For purposes of the ADEA, Workday is also an agent and/or indirect employer because (1) it has been delegated authority to make hiring decisions by direct employers and (2) it has the ability to interfere with and control access to employment opportunities with direct employers.

220. There is no business necessity justifying the disparate impact these automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools have on individuals in this protected category.

221. Workday's AI screening and selection criteria and process are a pretext for age discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

222. Workday's employment practices operate as the functional equivalent of a pretext for age discrimination. Workday used discriminatory automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools both within and outside the liability period in this case.

223. As a direct result of Workday's discriminatory policies and/or practices as described above, the Representative Plaintiff and the collective he seeks to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

## COUNT FIVE

**Intentional Discrimination**
**42 U.S.C. § 1981**

224. Plaintiffs recognize that the Court has previously dismissed Count Five stated in the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

## COUNT SIX

**Aiding and Abetting Race, Disability, and Age Discrimination**
**Cal. Gov. Code §12940(I)**

225. Plaintiffs recognize that the Court has previously dismissed Count Six stated in the first Amended Complaint and do not include such matters again except for the limited purpose of preserving whatever rights they may have to appeal.

## COUNT SEVEN

**Disparate Impact Discrimination on the**
**Basis of Gender in Violation Title VII of the Civil Rights Act of 1964**
**and California Fair Employment and Housing Act (FEHA)**
**Gov. Code § 12940 et seq.**

226. Plaintiffs restate and incorporate ¶¶86-143 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count Four.

227. Defendant's applicant-screening systems—including its artificial intelligence and machine-learning tools used to evaluate, rank, and reject applicants—are designed, developed, maintained, and controlled from its California headquarters. Workday maintains its headquarters and principal place of business at 6110 Stoneridge Mall Road, Pleasanton, California.

228. Evidence shows that Workday has trained its artificial intelligence procedures to screen and score applicants in a manner that has exhibited "impermissible bias" based on either race, gender, age or disability.

229. Workday trained its AI models and algorithmic tools on the basis of its own proprietary datasets which contain over 200 million people profiles and customer data contributions, and which also leveraged customer-contributed data to form test datasets consisting of thousands of real-world job requisitions and millions of job applications. That same training dataset used to train Workday's AI algorithms and models is common to all of Workday's customers and subscribers worldwide, many of whom are located in California or otherwise serviced by Workday from California.

230. Such algorithmic training and dataset have been designed, developed, operated from Workday's California operations and facilities to simultaneously train and operate those same AI applicant screening services Workday provides to its out-of-state customers and subscribers from California.

231. Workday specifically designed and trained all such AI models, algorithms and application screening process to copy or mimic past patterns of hiring decisions, behaviors and selection criteria. It has done so even though it knew (and admits) that such training process and data process has an inherent susceptibility to carrying forward past impermissible bias into the present and has a significant likelihood that the algorithmic tool's output will contain such impermissible bias based on either race, gender, age or disability.

232. As a result, the discriminatory conduct at issue—including applicant screening, scoring, and rejection—originates in and is carried out from California, causing injury to applicants who are denied employment opportunities, wages, and associated benefits, including backpay.

233. Workday has also failed to implement adequate bias mitigation, auditing, or safeguards as required under California law, including the FEHA, thereby perpetuating systemic disparities through its centralized, California-based hiring infrastructure.

234. For example, between 2020 and April 2021, while residing in California, Plaintiff FaithLinh Rowe applied for at least seven (7) positions tied to or at Defendant's Pleasanton,

California headquarters. Each of these applications was submitted through and processed by Defendant's automated application platform and screening procedure for all Workday customers and Workday itself.

237. Those application records reflect that Plaintiff Rowe's submissions were evaluated and rejected through that same Workday hiring applicant platform for processing applicant data and generating hiring outcomes for all Workday customers and Workday itself.

238. Ms. Rowe also received automated responses and rejections from Workday's platform. Her rejection notices were issued without any individualized feedback, interview opportunity, or indication that her applications were meaningfully reviewed by machine or human decisionmaker.

239. Based on her professional experience working with HRIS platforms, including Workday, Ms. Rowe recognized that this pattern of immediate and uniform rejections are indicative of, and consistent with an automated algorithmic screening, scoring, or ranking system applied at or near the point of applying, rather than individualized non-mechanized screening and decisionmaking.

240. The automated screening systems that evaluated Ms. Rowe's applications were designed, developed, maintained, and controlled by Defendant from its headquarters in Pleasanton, California.

241. The discriminatory conduct alleged herein—including the design, operation, and application of Defendant's automated screening systems—occurred in, was directed from, and is substantially connected to this District.

242. As a result of Defendant's use of these automated screening systems, Ms. Rowe—an Asian American woman over the age of forty—was repeatedly and systematically excluded from employment opportunities despite her qualifications.

243. In addition to Representative Plaintiff FaithLinh Rowe, numerous other individuals applied for Workday jobs located in California using the same Workday-hosted application platform

systems that they also used to apply for jobs with other employers and that operates as the exclusive gateway for employment opportunities in both California and throughout the United States.

244. Other examples of such applicants who applied for jobs in California include, but are not limited to, the following Opt-In In Plaintiffs: Jason Adams, Diana El-Berry, Anthony Fox, Cynthia Monfredi, Katrina Nelson, Roger Mosley, David Stephenson, Denise Russell, Elizabeth Louis, Kenyon Johnston, Michael Street, Tracey Harriott, Theresa Gal, Shanice Love, Leigh-Ann Carnegie, Stephen Duclos, John Erwin, Jr., Felicia Ives, Dionne Joseph, Noah Westwind, Tunde Adedoyin, Steve Hurry, and Christopher Phelan. See, ECF. 220-1.

245. Evidence shows that these applications were processed through Workday's centralized application platform, where recruitment, application screening, AI-driven scoring, and hiring selection decisions are designed, developed, and executed from Workday's headquarters in Pleasanton, California. Workday's algorithmic systems—developed, trained, and governed in California—function as the effective decisionmakers by evaluating applicants, assigning scores, ranking candidates, and effectuating automated rejection decisions.

246. Representative Plaintiff Jill E. Hughes is a white female who possesses a B.A. (Univ. of Cincinnati), M.A. (Univ. of Chicago), 28+ years as Senior Medical Writer, Project Manager, Scientific Director.

247. Representative Plaintiff Hughes is a qualified professional who has applied for hundreds of positions through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on female applicants.

248. Representative Plaintiff Hughes submitted applications to the following companies for which she met the qualifications: Ciena, Intel, Stryker, and Thermo-Fisher Scientific.

249. She received rejections for all these positions, which often cited unmet minimum requirements despite her meeting the position's qualifications, and these rejections were sent at odd hours.

250. Representative Plaintiff Sheilah Johnson-Rocha is an African-American female who possesses three academic degrees (A.A., B.B.A., M.S. in Management), certifications, and 21 years in pharma/biotech.

251. Representative Plaintiff Johnson-Rocha is a qualified professional who has submitted 2,000 job applications through Workday's platform and has been disproportionately affected by its AI/ML products, which have a disparate impact on female applicants.

252. Beginning in December 2023, Representative Plaintiff Johnson-Rocha submitted four separate applications to Thermo-Fisher Scientific for positions for which she met the qualifications.

253. She received rejections for all these positions despite meeting the qualifications, and they were sent at odd hours.

254. Each application was subjected to the same automated screening, evaluation, and dispositioning processes originating from Defendant's California-based operations, and resulted in her rejection.

255. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of gender.

256. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis of gender based on the results for 724,352 applicants for employment with ten of its largest customers for the period ending in September 2024.

257. That data for 724,352 applicants for employment with ten of Workday's largest customers shows that Workday's job application platform and AI screening and selection process has disparate impact against women greater than what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process were gender neutral.

258. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

259. It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

260. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

261. Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

262. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

263. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

264. Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of gender. There is no business necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category.

265. Workday's AI screening and selection criteria and process are a pretext for racial discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use.

266. Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

267. Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against the Representative Plaintiffs and the proposed class both within and outside the liability period in this case.

268. As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, the Representative Plaintiffs and the class they seek to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

269. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of Title VII and California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq.

270. In the absence of a direct employment relationship Workday can still be held liable under Title VII and FEHA for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

## COUNT EIGHT

**Disparate Impact Discrimination on the Basis of Race, Gender, and Age in violation of the California Fair Employment and Housing Act (FEHA)**
Gov. Code § 12940 et seq.

271. Plaintiffs restate and incorporate ¶¶86-143, 227-270 above on the same basis as if those allegations were restated verbatim as part of the allegations of this Count Four.

272. Workday commissioned an external auditor to conduct "bias audits" to determine whether its job application platform and/or its AI screening process and features have disparate impact on the basis of race or gender for 724,352 applicants for employment with ten of its largest customers for the period ending in September 2024.

273. Such Workday-reported data shows that Workday's job application platform and AI screening process has disparate impact against African-Americans at a statistically significant rate greater than what would be expected to occur in the absence of such disparate impact or if Workday's AI-powered screening and selection process is race neutral.

274. That same data for 724,352 applicants for employment with ten of Workday's largest customers also shows that Workday's job application platform and AI screening and selection process has disparate impact against women. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching."

275. Workday has publicly announced that its "AI-powered platform . . . automate[s] the talent acquisition process, enabling more effective candidate, screening, ranking, and matching." It has also publicly announced and advertised that its "AI-powered" products, Platform and services "streamlin[e] and expedit[e] hiring processes through automated notifications ..., all in [customers] flow of work."

276. It does that, in part, by integrating the HiredScore AI-powered recruitment and scoring process into its Workday Recruiting platform to "attract, hire, and retain talent."

277. Workday has also publicly represented that "[b]y integrating HiredScore's advanced AI capabilities with Workday's human capital management system, organizations can automate candidate screening," that "[t]he combination of Workday Talent Management, Workday Skills Cloud, and HiredScore's Talent Orchestration solutions, . . . provide[s] customers with a comprehensive . . . talent acquisition and internal mobility offering" that "better enable[s] recruiters to use data to connect talent to open opportunities," including identifying candidates whose skills and experience most closely match a customer's open jobs."

278. All of HiredScore's AI-powered products and services were fully merged and integrated into Workday Recruiting well before 2024.

279. Workday integrated HiredScore's AI software with Workday's applicant tracking system (ATS), its Workday Recruiting platform and its human capital management (HCM) software used for recruiting, hiring, promoting and retaining its own employees and also use by its customers and subscribers to recruit, hire, promote and retain their employees. To do that, Workday and HiredScore jointly established a pre-acquisition partnership that integrated their HR-related technologies through a "bi-directional" integration with Workday Recruiting that: (1) provides seamless data exchange and process coordination between Workday's and HiredScore's AI systems; and (2) enables recruiters and hiring managers to use HiredScore's AI candidate matching, screening, and rediscovery software within Workday's platform and system.

280. Since April 29, 2024, HiredScore has been an internal department of Workday. Plaintiff Mobley applied for job opportunities that were subject to such integration of HiredScore's AI-powered recruitment and hiring process and products, including his applications for employment opportunities with Uline on June 2, 2024, Cigna on August 21, 2024, G.E. Health Care on July 16, 2024, Cardinal Health Care in October 2024 and other Workday customer-employers.

281. The applications of other Plaintiffs who have opted-in to this case have been similarly processed through that same integrated Workday process both before and since April 2024, including, but not limited to, Plaintiffs Jill E. Hughes, Sheliah Johnson-Rocha, Faithlinh Rowe and others.

282. Workday's job application platform and AI screening and selection features have disparate impact against applicants 40 or more years old at a statistically significant rate of greater than three standard deviations from what would be expected in the absence of such disparate impact or if Workday's AI-powered screening and selection process were age neutral.

283. Representative Plaintiff Rowe is an Asian-American female over the age of 40, with many years of Human Resource experience.

284. Beginning as early as 2020 and continuing through 2025, Representative Plaintiff FaithLinh Rowe applied for numerous positions through hiring systems powered by Defendant Workday, Inc., including positions for which she met or exceeded the stated qualifications.

285. These applications spanned multiple employers and industries and included positions with Workday itself, all of which were submitted through Defendant's centralized platform and processed using its automated screening systems.

286. Between 2020 and April 2021, while residing in California, Ms. Rowe applied to at least seven (7) positions associated with Defendant's Pleasanton, California headquarters.

287. Each application was subjected to the same automated screening, evaluation, and dispositioning processes originating from Defendant's California-based operations and resulted in her rejection.

288. As a result of these practices, Ms. Rowe was disproportionately impacted by Defendant's AI- and machine learning-driven screening tools, which have a disparate impact on female applicants.

289. Representative Plaintiff Rowe applied for an Associate Director HR Technology role at AT&T on Jul 15, 2024, and received an immediate rejection, despite meeting the position's qualifications. Likewise, on May 12, 2025, at 1:10 p.m., Representative Plaintiff Rowe applied for a Director, Human Resource Information Systems position with Kyndryl, Inc., by 1:40 p.m. (30 minutes later) she received a rejection email from kyndryl@myworkday.com.

290. The automated recruitment, hiring, promoting, retaining and otherwise screening and scoring tools utilized by Workday for making selection decisions-to include hiring-discriminate on the basis of race and age.

291. Employers have delegated hiring decisions to Workday who then utilize automated recruitment, hiring, promoting, retaining, screening and scoring tools that consciously or unconsciously discriminate against applicants on the basis of race and age. There is no business necessity justifying the disparate impact these automated screening and scoring tools have on individuals in this protected category.

292. Workday's AI screening and selection criteria and process are a pretext for racial discrimination, as shown by the disparate impact of such practices which have no manifest relationship to the position[s] in question and there are alternative employment practices with less adverse impact and equal or greater utility that Workday and its customers have failed or refused to develop or use. Workday's employment practices operate as the functional equivalent of a pretext for discrimination.

293. Because there are no guardrails to regulate Workday's conduct, the screening tools it utilizes provide a ready mechanism for discrimination.

294. Workday's automated recruitment, hiring, promoting, retaining, screening and scoring tools discriminated against Representative Plaintiff Rowe and the proposed class both within and outside the liability period in this case.

295. As a direct result of Workday's utilization of discriminatory automated recruitment, hiring, promoting, retaining, screening and scoring tools as described above, Representative Plaintiff Rowe and the class she seeks to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

296. Workday has also interfered with the present and future employment prospects of class members that have used its application platform in violation of California Fair Employment and Housing Act (FEHA) Gov. Code § 12940 et seq.

297. In the absence of a direct employment relationship Workday can still be held liable under FEHA for its discriminatory treatment of the class members because it has interfered with their opportunity to gain employment.

**PRAYER FOR RELIEF**

WHEREFORE, the Representative Plaintiff and the Proposed Classes pray for relief as follow:

1. Certification of the case as a class action on behalf the proposed subclasses;

2. Designation of Plaintiff as representative of the subclasses;

3. Designation of Plaintiff's Counsel of record as Class Counsel;

4. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII, the ADEA, the ADAAA, and Cal. Gov. Code §12940(I);

5. A preliminary and permanent injunction against the Company and its officers, agent, successors employees, representatives, and any and all persons acting in correct with them from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

6. An order that the Company institute and carry out policies, practices, and programs that provide equal employment opportunities for all minorities, and that it eradicate the effects of its past and present unlawful employment practices;

7. For back pay, front pay and other monetary relief according to proof (including interest and benefits);

8. For all damages sustained as a result of the Company's conduct according to proof;

9. For compensatory damages, nominal damages, and liquidated damages according to proof;

10. For exemplary damages in an amount commensurate with the Company's ability to pay, to deter future conduct, and to set an example for others;

11. For reasonable attorneys' fees and costs including under to the extent allowable by law;

12. Pre-judgment and post-judgment interest, as provided by law;

13. For such ancillary orders, decrees and such further legal and equitable relief as may be necessary to enjoin and restrain the improper conduct and wrongdoing of Defendant; and

14. For such other and further relief as the Court deems proper.

**JURY TRIAL DEMANDED**

*/s/Roderick T. Cooks*
Lee D. Winston (ASB: 6407O72L)
*Admitted pro hac vice*
lwinston@winstoncooks.com
Roderick T. Cooks (ASB: 5819O78R)
*Admitted Pro Hac Vice*
rcooks@winstoncooks.com
Bethany Mae Logan (ASB: 1360X15Z)
*Admitted Pro Hac Vice*
bneal@winstoncooks.com
Winston Cooks, LLC
420 20th Street North, Suite 2200
Birmingham, Alabama 35203
Telephone: (205) 502-0970
Facsimile: (205) 278-5876

*/s/Robert L. Wiggins, Jr.*
Robert L. Wiggins, Jr. (ASB: 1754G63R)
*Admitted Pro Hac Vice*
rwiggins@wigginschilds.com
Ann K. Wiggins (ASB: 7006i61a)
*Admitted Pro Hac Vice*
awiggins@wigginschilds.com
Samuel Fisher (ASB: 2675E68S)
*Admitted Pro Hac Vice*
sf@wgginschilds.com
Jennifer Wiggins Smith (ASB:9622E53S)
*Admitted Pro Hac Vice*
jsmith@wigginschilds.com
Freddrick M. Moore (ASB: 7952L20o
*Admitted Pro Hac Vice*
mmoore@wiggins childs.com
Wiggins Childs Pantazis Fisher and Goldfarb
301 North 19th Street
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

Lori Kisch, Admitted Pro Hac Vice
lkisch@wigginschilds.com
Meredith Burrell, Admitted Pro Hac Vice
mburrell@wigginschilds.com
Jennifer M. Swedish, Admitted Pro Hac Vice
jswedish@wigginschilds.com
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

**Local Counsel:**
Jay Greene, JD, CPA
greenattorney@gmail.com
Greene Estate, Probate, and Elder Law Firm
447 Sutter Street, Suite 435
San Francisco, CA 94108
Telephone: (415) 905-0215

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2026, I electronically filed the foregoing document with the United States District Court for the Northern District of California by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Julie Ann Totten Jtotten@orrick.com, jponce@orrick.com
Erin M. Connell econnell@orrick.com
Kyla Delgado Grundy kgrundy@ orrick.com
Alexandria R. Elliott (aelliott@orrick.com)

s/*Roderick T. Cooks*
Of Counsel