Lee D. Winston, *Admitted Pro Hac Vice*
lwinston@winstoncooks.com
Roderick T. Cooks, *Admitted Pro Hac Vice*
rcooks@winstoncooks.com
Bethany Mae Logan, *Admitted Pro Hac Vice*
bneal@winstoncooks.com
WINSTON COOKS, LLC
420 20th Street North, Suite 2200
Birmingham, AL 35203
Telephone: (205) 502-0970
Facsimile: (205) 278-5876

**Local Counsel:**
Jay Greene, JD, CPA
GREENE ESTATE, PROBATE, AND ELDER LAW FIRM
447 Sutter Street, Suite 435
San Francisco, CA 94108

Robert L. Wiggins, Jr., *Admitted Pro Hac Vice*
rwiggins@wigginschilds.com
Ann K. Wiggins, *Admitted Pro Hac Vice*
awiggins@wigginschilds.com
Samuel Fisher, Jr, *Admitted Pro Hac Vice*
sf@wigginschilds.com
Jennifer Wiggins-Smith, *Admitted Pro Hac Vice*
jsmith@wigginschilds.com
Nicki Leili Lawsen, *Admitted Pro Hac Vice*
nlawsen@wigginschilds.com
Freddrick M. Moore, *Admitted Pro Hac Vice*
mmoore@wigginschilds.com
WIGGINS CHILDS PANTAZIS FISHER & GOLDFARB, LLC
301 North 19th Street
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

Lori Kisch, *Admitted Pro Hac Vice*
lkisch@wigginschilds.com
Meredith Burrell, *Admitted Pro Hac Vice*
mburrell@wigginschilds.com
Jennifer M. Swedish, *Admitted Pro Hac Vice*
jswedish@wigginschilds.com
WIGGINS CHILDS PANTAZIS FISHER & GOLDFARB
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

*Attorneys for the Plaintiffs and Proposed Class and Collective Members*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**DEREK L. MOBLEY; FAITHLINH ROWE; JILL E. HUGHES; AND SHEILAH JOHNSON-ROCHA,** on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**WORKDAY, INC.**

Defendant.

**Case No. 3:23-cv-00770-RFL-LB**

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Courtroom: 15, 18th Floor

Judge: Hon. Rita F. Lin

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on March 9, 2027, at 10:00 am in Courtroom 15 of this Court, located at 450 Golden Gate Avenue, 18th floor, San Francisco, California, before the Honorable Rita F. Lin, Plaintiffs Derek Mobley, FaithLinh Rowe, Jill E. Hughes, and Sheilah Johnson Rocha, on behalf of themselves and all others similarly situated, will move the Court for an order certifying the case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), (b)(3) and/or (b)(4). This motion is based upon the accompanying memorandum of points and authorities, the Declaration of Meredith Burrell, and the exhibits thereto, including the Declarations of Robert L. Wiggins, Jr., Ann K. Wiggins, and Roderick T. Cooks, and the expert reports of Dr. Will Landecker, Dr. Charles Scherbaum, and Dr. Bernard Siskin, the pleadings and papers on file in this action, and such other matters as may be properly presented to the Court of the time of or after hearing on this matter. Plaintiffs specifically move for the certification of the following class:

All persons within one or more of the four subclasses defined herein who, during the Class Period for each such subclass, have been or will become subject to Workday's AI-based recruitment, screening, rejection, scoring, ranking, shortlisting, or recommendation process and candidate-selection tools, including HiredScore/Spotlight, Fetch, and Candidate Skills Match, and who:

1. were not fetched, surfaced, recommended, shortlisted, or otherwise selected for favorable consideration by one or more of those tools for an employment opportunity;
2. submitted or submit an application for employment that was or is scored, sorted, ranked, screened, matched, recommended, or otherwise processed by one or more of those tools; or

for employment through Workday's AI-based recommendation, ranking, screening, matching, shortlisting, or candidate-selection process.

Subclass Definitions:

The African American subclass within the above class definition represented by Derek Mobley and Sheilah Johnson-Rocha;

The female subclass within the above class definition represented by Jill Hughes, Sheila Johnson-Rocha, and FaithLinh Rowe;

The age subclass within the above class definition represented by FaithLinh Rowe; and

The disability subclass within the above class definition represented by Derek Mobley and Jill Hughes.

Plaintiffs also request the Court appoint Plaintiffs Derek Mobley and Sheilah Johnson-Rocha as class representatives of the African American subclass; appoint Jill E. Hughes, Sheilah Johnson-Rocha, and FaithLinh Rowe as class representatives of the female subclass; appoint FaithLinh Rowe as class representative of the age subclass under the California FEHA; and appoint Derek Mobley and Jill E. Hughes as class representatives for the disability subclass.

Plaintiffs further request that the Court appoint Plaintiffs' current counsel from Winston Cooks and Wiggins, Childs, Pantazis, Fisher & Goldfarb as class counsel.

For the reasons set forth in Plaintiffs' Memorandum of Points and Authorities, Plaintiffs respectfully submit their claims are appropriate for class certification under Rule 23.

TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 4

A. Plaintiffs' Anecdotal Evidence Confirms The Court's Prior Findings ..... 5

B. The Experiences of the Named Plaintiffs and Class Representatives ..... 9

C. Plaintiffs' Experts and Statistical Evidence Further Confirm The Prior Findings ..... 10

1. The Same Models Apply to Every Customer and Every Applicant ..... 12

2. Workday's Bias Analyses Generalize Across All Subscribers And Candidates ..... 15

D. Workday's Algorithmic Screening And Rejection Process Is Common Across All Subscribers And Candidates ..... 16

1. Fetch Searches For, Screens, And Recommends Non-Applicants ..... 16

2. Workday's Application Platform Is The Gateway Through Which All Applications for Employment with Workday Customers Are Funneled and Screened ..... 17

3. Applications Are Parsed, Scored, Graded, Ranked, or Shortlisted By the AI Before Any Human Recruiter Sees It ..... 18

4. Workday's AI Recommends Candidates to Help Its Customers Streamline Their Screening Process By Shortlisting, Grading, and Scoring To Advance Some Applicants And Reject The Rest ..... 19

5. Validity, Business Necessity, and Workday's Bias-Audit Defense Present Common Questions ..... 20

III. PROPOSED CLASS DEFINITIONS ..... 21

IV. LEGAL STANDARDS ..... 22

A. Rule 23 .... 22

B. Substantive Legal Standards .... 22

V. ARGUMENT .... 23

A. The Proposed Classes Satisfy Rule 23(a) .... 23

1. Plaintiffs Allegations Revolve Around Uniform Policies and Practices that Affect All Class Members and Lend Themselves to Common Answers That Will Drive the Resolution of the Litigation .... 23

2. Non-Statistical Proof of Disparate Impact .... 31

3. The Class Representatives and Class Counsel Are Adequate .... 33

4. Workday Has Acted on Grounds that Apply Generally to the Class Such that Injunctive and Declaratory Relief Are Appropriate to the Class as a Whole .... 36

B. Questions of Law and Fact Common to Class Members Predominate Over Questions Affecting Individual Class Members .... 37

1. Plaintiffs' Disparate Impact Claims Under Title VII, the ADA, and the California FEHA Rely on a Common Method of Proof that Will Apply to All Class Members and Predominate over Individual Issues .... 38

2. Damages Are Capable of Determination Using a Classwide Methodology .... 40

3. Certification of the Class is Superior to Other Methods of Adjudication .... 43

C. Issue Certification Under Rule 23(c)(4) Is Appropriate in the Alternative .... 45

VI. CONCLUSION AND REQUEST FOR RELIEF .... 45

TABLE OF AUTHORITIES

**CASES:**

*A.B. v. Haw. State Dep't of Educ.*,
30 F.4th 828 (9th Cir. 2022) ....................................................................................31

*Abdullah v. U.S. Sec. Assocs., Inc.*,
731 F.3d 952 (9th Cir. 2013) ....................................................................................22

*Alliance of Theatrical & Stage Emps.*,
525 F.2d 1354 (9th Cir. 1975) ..................................................................................23

*Amchem. Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..........................................................................................32, 37

*Amgen Inc. v. Connecticut Retirement and Trust Funds*,
568 U.S. 455 (2013)...................................................................................................21

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) 3 ..................................................................................31

*Bolden-Hardge v. Office of the California State Controller*,
63 F.4th 1215 (9th Cir. 2023) ....................................................................................26

*Brown v. Nucor Corp.*,
576 F.3d 149 (4th Cir. 2009) ....................................................................................34

*Brown v. Nucor Corp.*,
785 F.3d 895 (4th Cir. 2015) ....................................................................................34

*Buchanan v. Tata Consultancy Servs.*,
2017 U.S. Dist. LEXIS 212170 (N.D. Cal. Dec. 27, 2017)......................................36

*Campbell v. PricewaterhouseCoopers, LLP*,
253 F.R.D. 586, 594 (E.D. Cal. 2008).......................................................32

*Carter v. CB Richard Ellis, Inc.*,34
122 Cal. App. 4th 1313 (2004) ..................................................................................22

*Chavez v. Tempe Union High Sch. Dist.*
565 F.2d 1087 (9th Cir. 1977) ..................................................................................23

*Chicago Teachers Union Local No. 1 v. Bd. Of Educ. of City of Chicago*,
797 F.3d 426 (7th Cir. 2015) ....................................................................................26

*Craig v. Alabama State Univ.*,
804 F.2d 682 (11th Cir. 1986, 39) ....................................................................30

*Dothard v. Rawlinson*,
433 U.S. 321 (1977) ....................................................................30

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (N.D. Cal. 2012) ....................................16, 32, 35, 36, 37, 38, 39

*Equal Emp. Opportunity Comm'n v. Marquez Bros. Int'l Inc.*,
2017 WL 4123915 (E.D. Cal. Sept. 18, 2017) .......................................... 5, 28

*General Telephone Co. of the Southwest v. Falcon*,
457 U.S. 147 (1982)....................................................................27

*Gonzales v. City of New Braunfels, Tex.*,
176 F.3d 834 (5th Cir. 1999) ....................................................................22

*Griggs v. Duke Power*,
401 U.S. 424 (1971) ....................................................................21, 24

*Gulino v. Bd. of Ed.*,
2013 U.S. Dist. LEXIS 123948 (S.D.N.Y. 2013) ............................................42

*Hamilton v. Wal-Mart Stores, Inc.*
39 F.4th 575 (9th Cir. 2022) ....................................................................42

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ..........................................................32, 36, 42, 43

*Hanon v. Dataproducts Corp.*,
976 F.2d 497, 508 (9th Cir. 1992) ....................................................................3

*Hurtado v. Rainbow Disposal Co.*,
No. 17-01605-JLS-DFM, U.S. Dist. LEXIS 70062 (C.D. Cal. Apr. 22, 2019) ...............31

*Ibarbia v. Regents of Univ. of Cal.*,
191 Cal. App. 3d 1318 (Ca. Ct. App. 1987) ..............................................................26

*In re Valve Antitrust Litig.*,
780 F. Supp. 3d 1110 (W.D. Wash. 2024) .......................................................42, 43

*In re Employment Discrimination Litigation Against the State of Alabama,*

198 F.3d 1305 (11th Cir. 1999) ....................................................................................34

*International Brotherhood of Teamsters v. United States*,
431 U.S. 324 (1977) ....................................................................................30, 38

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ....................................................................................38

*Kaplan v. Int'l Alliance of Theatrical & Stage Emps.*,
525 F.2d 1354 (9th Cir. 1975) ....................................................................................23

*Katz v. Regents of the University of California*,
229 F.3d 831 (9th Cir. 2000) .................................................................................... 22, 26

*Kim v. Allison*,
87 F.4th 994 (9th Cir. 2023) .................................................................................... 32

*Knight v. Hayward Unified School District*,
132 Cal. App. 4th 121 (2005) ....................................................................................22

*Lambert v. Nutraceutical Corp.*,
870 F.3d 1170 (9th Cir. 2017) ....................................................................................39

*Leyva v. Medline Indus.*,
716 F.3d 510, (9th Cir. 2013) ....................................................................................38, 41, 42, 43

*Liu v. Uber Techs.*,
551 F. Supp. 3d 988 (N.D. Cal. 2021) ....................................................................................28

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*
244 F.3d 1152 (9th Cir. 2001) ....................................................................................36

*Lytle v. Nutramax Laboratories, Inc.*,
114 F.4th 1011 (9th Cir. 2024) ....................................................................................36, 39, 40, 41

*Martinez v. Joe's Crab Shack Holdings*,
231 Cal. App. 4th 3625 (2014) ....................................................................................31

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
311 FR.D. 590 (C.D. Cal. 2015) ....................................................................................38

*Mosley v. United States*,
425 F. Supp. 50 (N.D. Cal. 1977) ....................................................................................24

*Noohi v. Johnson & Johnson Consumer Inc.*,

146 F.4th 854 (9th Cir. 2025) ....................22, 39, 40, 41

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
31 F.4th 651 (9th Cir. 2022) ....................22

*Oross v. Kutztown Univ.*,
2024 U.S. Dist. LEXIS 3337, 2024 WL 83506 (E.D. Pa. Jan. 8, 2024) ....................22

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ....................31

*Porter v. Pipefitters Ass'n Local Union 597*,
208 F. Supp. 3d 894 (N.D. Ill. 2016) ....................25

*Pettway v. Am. Cast Iron Pipe Co.*,
576 F.2d 1157 (5th Cir. 1978), cert. denied, 439 U.S. 1115 (1979),
appeal after remand, 681 F.2d 1259 (11th Cir. 1982). appeal after remand,
721 F.2d 315 (11th Cir. 1983), cert. denied sub nom., 467 U.S. 1243 (1984) ....................33

*Rodriguez v. Hayes,*
591 F.3d 1105 (9th Cir. 2010) ....................35

*Ruiz Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016....................36

*Satchell v. FedEx Corp.*,
2005 U.S. Dist. LEXIS 37354 (N.D. Cal. Dec. 14, 2005)....................16

*Sayce v. Forescout Techs., Inc.,*
754 F. Supp. 3d 8780 (N.D. Cal. 2024) ....................43

*Scotch v. Art Institute of California-Orange County, Inc.*, ....................22
173 Cal. App. 4th 986 (2009)22

*Scott v. Family Dollar Stores, Inc.*,
733 F.3d 105 (4th Cir. 2013), class certified on remand,
2016 U.S. Dist. LEXIS 105267 (W.D.N.C. June 24, 2016) ....................34

*Senne v. Kansas City Royals Baseball Corp.*,
934 F.3d 918 (9th Cir. 2019) .................... 38

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ....................21

*Stearns v. Ticketmaster Corp.*,

655 F.3d 1013 (9th Cir. 2011) ....................43

*Stockwell v. City & County of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) ....................22, 26, 27

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442, 136 S. Ct. 1036 (2016).................... 33, 36

*United States v. City of New York*,
847 F. Supp.2d 395 (E.D.N.Y. 2012) .................... 34, 41

*United States v. City & County of San Francisco*,
656 F. Supp. 276 (N.D. Cal. 1987) ....................24

*United States v. Navajo Freight Lines, Inc.*
525 F.2d 1318 (9th Cir. 1975) ....................23

*Wolin v. Jaguar Land Rover North Am.*
617 F.3d 1168 (9th Cir. 2010) ....................42

*Vaquero v. Ashley Furniture Indus., Inc.*,
824 F.3d 1150 (9th Cir. 2016) ....................22

*Villa v. United Site Servs. of Cal., Inc.*,
2012 WL 5503550 (N.D. Cal. Nov. 13, 2012).................... 28

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................3, 27

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010) ....................39

**Statutes**

29 U.S.C. §216(b) ....................27

42 U.S.C. §2000e-2 (k) ....................21

42 U.S.C. §2000e-2 (k)(1)(A) (i) ....................21

42 U.S.C. §1211(b)(6) ....................22

Fed. R. Civ. P. 23 ....................21

Fed. R. Civ. P. 23(a) ....................1

Fed. R. Civ. P. 23(a) (2)....................27

Fed. R. Civ. P. 23(a) (3)....................27

Fed. R. Civ. P. 23(b) (2)....................35

Fed. R. Civ. P. 23(b) (3)....................36, 37, 38, 42, 43

Fed. R. Civ. P. 23(c) (4)....................43

**Other Authorities:**

California Civil Code, §3294(a) ....................35

Cal. Code Regs. tit. 2, § 11008.1(A)–(E) ....................19

Cal. Code Regs., tit. 2, § 11009(f) ....................29

NYC Local Law 144....................19

*Perpetuation of Past Discrimination*, 96 Harv. L. Rev. 828 (1983) ....................24

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Workday did not build a separate algorithm or screening procedure for each of its customers. It built one set — HiredScore Spotlight, Fetch and Candidate Skills Match — trained them on historical hiring data, and deployed them across its customer base to score, rank, and sort the applicants who apply or are screened through them. Derek L. Mobley, FaithLinh Rowe, Jill E. Hughes, and Sheilah Johnson-Rocha, and every member of the class they seek to represent, were evaluated by those same tools.

Whether those tools produce disparate outcomes on the basis of age, race, sex, and disability is therefore a common question with one answer, and that answer will resolve a common question regarding the claims of every class member in one stroke. Plaintiffs 'expert, Dr. Will Landecker, explains why the question is common in terms of being how machine-learning systems work and become properties of Workday's algorithms—not individualized questions that arise anew with each applicant, employer, recruiter, or job opening. Burrell Decl., R1, Report of Will Landecker, Ph.D. ("Landecker Report"), ¶¶ 3, 5, 15, 23-26. The challenged conduct operates through software and machine-learning models developed by a single vendor and applied across the population of applicants subjected to those algorithmic screening. *Id.*, ¶¶ 3, 5, 24, 35.

A machine-learned model's logic is "derived (or trained, or learned, or inferred) from the statistical patterns of historical data" based on "a training dataset of historical hiring decisions." *Id.* ¶ 15. That is what Workday did. Its algorithms "have been trained to recognize and utilize patterns learned from historical employment application data," and for that reason "are capable of internalizing historical biases present in employment applicant data, and perpetuating this bias systemically over the entire population of employers and applicants subject to those algorithms." *Id.* ¶ 3. When a model learns from a history that contains disparities, it "is likely to recreate the same biases and impacts when the model is deployed." *Id.* ¶ 26. The risk is not confined to data that looks discriminatory on its face. Embedding models, like the skill embeddings on which Candidate Skills Match relies, can absorb "stereotyped associations between demographic groups

and occupations…even when the model is trained on seemingly neutral and innocuous training data." *Id.* ¶¶ 28-29.

What a model learns, it applies to everyone. After it's deployed, a screening model "applies its logic uniformly to all applicants subject to it," and "[a]ny bias present in the model . . . manifests systemically, not on an applicant-by-applicant basis." *Id.* ¶ 24. Bias of this kind "exists in the model and software" and "expresses itself over all future applicants." *Id.* ¶ 25.

Whether that systemic bias exists and its magnitude can only be answered through common evidence that examines the population, not the individual. "Detecting the existence and magnitude of such bias requires measuring relevant outcomes for disparate impacts among a sufficient population of applicants." *Id.* ¶ 4. The questions that measurement answers —whether the software produces disparities, how large they are, whether they are meaningful, and what causes them — "apply to the total pool of all job applicants," *id.* at ¶ 37, and "concern systemic properties of the software developed by Workday and used by its customers," *Id.* ¶ 38. Workday measures its own tools in exactly this way. Its bias evaluations of Spotlight and Fetch state that [redacted] *Id.* ¶ 42. Thus, the same aggregated proof can address whether Workday's software produces disparate outcomes, the magnitude of those disparities, whether they are meaningful, and whether they are attributable to the software. Id. ¶¶ 37–42.

Nor do any employer-specific configurations defeat the common question. Employers use Workday's algorithmic selection procedure for different openings, but they do not retrain Workday's models. "Whether Workday's algorithms can be customized and configured by individual employers considering unique job descriptions has no bearing on any central and systemic bias that exists in the algorithms." *Id.* ¶ 5. Put differently, [redacted]" *Id.* ¶ 36. Workday's own documents confirm that recruiters "[redacted]" *Id.* ¶ 34. Differences among employers, jobs,

and applicants therefore do not eliminate the antecedent and common question whether the Workday-developed system itself produces or contributes to disparate outcomes.

Responsibility for that bias, and the capacity to correct it, likewise rest with Workday alone. Building a model that does not reproduce the biases of its training data "requires explicit intervention during the development of the system." *Id.* ¶ 30. Those interventions do not always work; some "hide the bias but do not entirely remove it." *Id.* ¶ 31. For that reason, "[p]roper mitigation of algorithmic bias requires explicit intervention by the developer (Workday), and continual monitoring to verify that interventions are and remain successful." *Id.* ¶ 6. Whatever Workday does, or fails to do, reaches every applicant: "These interventions, whether or not successful, will affect the entire population of employers and applicants subject to those algorithms." *Id.*

These are the hallmarks of a common question. Rule 23(a)(2) requires a contention "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims **in one stroke.**" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis added). Simply put: "Whether that software produces disparate outcomes or impacts, the degree of those disparities, and their causes, are central questions whose resolution will apply to the entire population of applicants subject to Workday's software." Burrell Decl, R1, Landecker Rpt. ¶ 48. The answer will not vary by employer, requisition, or applicant, because the thing being measured, Workday's model, does not vary.

For the same reasons, the Plaintiffs' claims are typical of the class. Typicality asks "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the Plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Plaintiffs are typical because they challenge the same Workday-developed tools, on the same systemic theory, as the absent class members. That conduct is not unique to them. If Workday's algorithms produce or contribute to systemic disparities, that determination is common to the

applicants subjected to it; if it does not, that answer likewise resolves the issue classwide. *See Armstrong v. Davis*, 275 F.3d 849, 868–69 (9th Cir. 2001).

To prevail, Plaintiffs need not show that every applicant applied for the same job, possessed the same qualifications, or encountered the same recruiter to establish the common technical questions presented by Workday's algorithmic selection procedure. That is why the challenged conduct presents questions capable of common resolution.

The statistical comparisons presented by Plaintiffs' statistical and test validation expert, Dr. Charles Scherbaum, exceeded the standard threshold of statistical significance, and most exceeded it by an order of magnitude. Burrell Decl., R2, Report of Charles Scherbaum ("Scherbaum Report") ¶¶ 76-78, 82-85, Tables 14-23.

**Rejection Rate Disparities:** At the first stage of Workday's screening process, the racial disparity in rejection rates between Black and White applicants is 18.356 standard deviations from the result expected if race and rejection outcome were unrelated, an extraordinarily large and statistically significant result. *Id.* ¶ 82, Table 18; *id.* at ¶ 54 ("A result equal to or larger than 1.96 standard deviations is generally considered statistically significant and is evidence of adverse impact."). The disparity between Workday's rejection rate for female and male applications is 15.306 standard deviations from what would be expected if gender and rejection outcomes were unrelated. *Id.* ¶ 83, Table 19.

**Candidate Grading Disparities:** The disparity between Workday's algorithmic grading of Black and White applications across all stages of the screening process is statistically significant at or greater than 17.386 standard deviations from the result expected if race and rejection outcome were unrelated—far exceeding conventional thresholds for statistical significance. *Id.* ¶ 76, Table 14. The disparity between the percentage of female and male applications receiving each combination of Spotlight grades is statistically significant across all three groupings at or greater than 13.980 standard deviations, *Id.* ¶ 77, Table 15.

## II. <u>STATEMENT OF FACTS</u>

The evidence adduced in discovery has confirmed the Court's prior finding that the "specific employment practice" at issue in this case is "Workday's use of algorithmic decision-

making tools to screen applicants." ECF No. 80 at 13 (citing ECF No. 47 ¶ 28). That same evidence also confirms the Court's prior finding that Black applicants" 'success rate at passing Workday's initial screening, combined with the . . . bias in Workday's training data . . . plausibly supports an inference that Workday's algorithmic tools disproportionately ***reject*** applicants based on factors other than qualifications, such as a candidate's race, age, or disability." *Id.* at 15–16 (citing *EEOC v. Marquez Bros. Int'l Inc.*, No. 1:17-cv-0044, 2017 WL 4123915, at *7 (E.D. Cal. Sept. 18, 2017)).

The facts and evidence submitted in support of class certification satisfies the standards of Rule 23 by showing that the challenged algorithmic selection procedures are centralized and apply in common and uniformly across all Workday customers and applicants alike; that its centralized cross-customer aggregation and generalization of bias audits and evaluations similarly apply in common across all customers whose applicants are subject to such algorithmic employment practices; that such practices share the same uniform design and architecture for parsing and scoring job applications and requisitions and shortlisting and recommending candidates for hire based on historical data and hiring decisions; and that the classwide statistical evidence of disparate impact applies uniformly across all Workday customers and applicants alike, as do the common questions presented by Workday's defenses.

### A. Plaintiffs' Anecdotal Evidence Confirms The Court's Prior Findings

Substantial testimony from putative class members and the four named Plaintiffs also confirm Plaintiffs' satisfaction of each element of Rule 23 and Court's prior findings in certifying the age discrimination collective. Thirty-eight putative class members submitted declarations in support of Plaintiffs' Motion for Class Certification. All are over the age of 40,[1] 20 are African

---

[1] Burrell Decl., D5–D42, ¶ 3 (declarations of, in D-number order, Arnold, Barreto, Bouye, Boyd, Bradley, Burks, Carnegie, Comer, Derdiger, Dickson, Duclos, Evans, Flowers, Folsom, Forrest, Gomes, Hamilton, Harrison, Haskins, Johnson, Johnston, Lewis, Love, Mapp, McNerney, Mendoza, Merritt, Monfredi, Murray, Nelson K., Nelson R., Neshewat, Nestler, Perkins, Rich, Schroeder, Shak, and Wallace, cited herein by surname).

American,[2] 27 are women,[3] and 12 identify as individuals with a disability.[4] Their applications through the Workday platform produced a consistent pattern of rejection across different industries, employers, jobs, and years, just like the class representatives. Collectively, the 38 declarants submitted about 1,800 applications through the Workday platform to approximately 133 unique employers [redacted] *See* Burrell Decl., A1. The declarants are characteristic of the early opt-in plaintiffs on whom Workday served discovery in December 2025; [redacted] *See id*, A2.

[redacted]

[2] Burrell Decl., D5, D8–D11, D16, D17, D19, D21, D23–D28, D33, D35, D38, D39, D42, ¶ 3.
[3] Burrell Decl., D5–D7, D9, D11, D13, D14, D16–D18, D20, D23, D24, D26, D27, D29–D36, D39–D42, ¶ 3.
[4] Burrell Decl., D6, D8, D10, D12, D15, D16, D22, D27, D29, D33, D37, D38, ¶ 3.

[redacted]

More than half of the declarants describe receiving Workday-branded rejection emails very soon after the employers confirmed receipt of their applications.[5] Most declarants received rejections within one to two days of applying, while others received rejection notices within hours of their applications being confirmed. Some even received rejection emails at the exact same time that they received emails confirming their applications. Over sixty percent of the declarants received rejection emails at unusual times, including in the middle of the night or on weekends.[6] The timing — the quick turnaround between confirmation and rejection, and the after-hours arrival — suggests that no person meaningfully reviewed those applications.[7]

For example, [redacted]

---

[5] Burrell Decl., D6, D9, D13, D15–D17, D22, D23, D25, D27, D28, D31, D33–D38, D41, D42, ¶ 10; D20, ¶ 9.

[6] Burrell Decl., D7, D9, D12, D13, D15, D17, D21–D23, D25–D28, D30–D36, D39, D41, D42, ¶ 10.

[redacted]

[redacted]

Almost seventy percent of the declarants report that every single application they submitted through the Workday platform was unsuccessful: they do not recall receiving any interviews or offers.[8] The remaining declarants report receiving only one, two, or a "small number" of interviews, and none ultimately received any offers. For example, [redacted]

Many of the declarants convey that they have had greater success when applying for jobs off the Workday platform.[9] They explained that they were more likely to be extended interviews and offers, as well as to be hired into substantive roles, when their applications were reviewed by human beings. For example, [redacted]

---

[8] Burrell Decl., D6–D12, D14, D15, D17–D19, D23, D26, D27, D29–D31, D35–D37, D39–D42, ¶ 9; D20, ¶ 8.

[9] Burrell Decl., D9, D10, D30, D42, ¶ 11; D14, D21, D22, D38, ¶ 12; D32, D33, ¶ 13; D25, ¶ 14.

[redacted]

Finally, not only were the 38 putative class members unsuccessful with the applications they submitted through the Workday platform, but very few were selected by Workday's Fetch AI tool. Thirty-five declarants report that the employers to which they applied through the Workday platform never contacted them to recommend that they apply for another position, suggesting that they were never surfaced or shortlisted by Fetch.[10]

Overall, all 38 putative class members believe that Workday's screening of their applications affected their ability to be considered for the jobs to which they applied on equal footing with other candidates, and that their age, race, gender, and disability could have been factors in that screening.[11]

**B. The Experiences of the Named Plaintiffs and Class Representatives**

Plaintiffs Derek L. Mobley, Jill E. Hughes, Sheilah Johnson-Rocha, and FaithLinh Rowe are four experienced professionals who, over periods spanning as long as nine years, submitted thousands of applications for employment through the online job-application platform operated by Defendant Workday, Inc. Each was rejected, or ignored, with a consistency that did not vary by industry, by employer, by job title, or by year. Burrell Decl., D1, Declaration of Derek L. Mobley ("Mobley Decl."), ¶ 21; D2, Declaration of Jill E. Hughes ("Hughes Decl."), ¶ 21; D3, Declaration

---

[10] Burrell Decl., D6, D8–D12, D16, D17, D19, D23, D26, D28–D30, D35–D37, D39, D41, D42, ¶ 12; D5, D7, D13, D18, D20, D24, D31, D40, ¶ 11; D14, D15, D21, D22, D27, D34, ¶ 13; D32, ¶ 14.

[11] Burrell Decl., D6, D8–D12, D16, D19, D23, D26, D28–D30, D35–D39, D41, D42, ¶ 13; D5, D7, D13, D17, D18, D20, D24, D31, D40, ¶ 12; D14, D15, D21, D22, D27, D33, D34, ¶ 14; D25, D32, ¶ 15.

of Sheilah Johnson-Rocha ("Johnson-Rocha Decl."), ¶ 19; D4, Declaration of FaithLinh Rowe ("Rowe Decl."), ¶ 25.

Each Plaintiff encountered the platform the same way, was required to submit information in the same structured form, was given no means of bypassing the platform to reach a human decisionmaker, and was told nothing about how the platform evaluated what they submitted. *Id.*, Mobley Decl. ¶¶ 15–17, 20; *id.*, Hughes Decl. ¶¶ 15–17, 20; *id.*, Johnson-Rocha Decl. ¶¶ 13, 15, 18; *id.*, Rowe Decl. ¶¶ 18–21, 24. And each received the same near instantaneous rejection notices arriving in seconds, minutes, or hours — frequently overnight or on weekends — without interview, without individualized feedback, and without any opportunity to correct or contest the result. *Id.*, Mobley Decl. ¶¶ 24–25, 27; *id.*, Hughes Decl. ¶¶ 23, 26; *id.*, Johnson-Rocha Decl. ¶¶ 21, 24; *id.*, Rowe Decl. ¶¶ 27, 29–31, 33. Each Plaintiff also testifies that when they applied off the Workday platform and human beings evaluated their qualifications, including through direct recruiter contact and through an internal promotion process, they advanced, interviewed, and were hired. *Id.*, Mobley Decl. ¶¶ 9–11, 30; *id.*, Hughes Decl. ¶¶ 29–30; *id.*, Rowe Decl. ¶ 32.) The variable that changed was the screen, not the applicant.

### C. Plaintiffs' Experts and Statistical Evidence Further Confirm The Prior Findings

The Plaintiffs' experts' reports and documentary evidence similarly corroborate the Court's prior findings that "allegations regarding bias in Workday's training data . . . plausibly supports an inference that Workday's algorithmic tools disproportionately reject applicants based on factors other than qualifications, such as a candidate's race, age, [gender,] or disability . . . sufficient to allege a disparate impact on applicants with Mobley's protected traits." ECF No. 80 at 15. For example, Workday's *Technical Review* for Spotlight and Fetch acknowledges that both algorithms [redacted] Burrell Decl., EX 1, at WORKDAY_MOB_7537; *see also id.*, EX 2, at WORKDAY_MOB_4823 (defining an "A" score as [redacted] *id.*, T1, Deposition of Workday corporate representative David Wachtel (July 8, 2026) ("Workday (Wachtel) Dep.") 191:21–25 ("[redacted]

[redacted]"). Workday also acknowledges that [redacted] *id.*, EX 3 at 4–5; *id.* at 4–5 (stating: [redacted]"); Burrell Decl., R2, Scherbaum Report ¶¶ 2(c), 10-11, 23, 28-31, 87 (c).

Workday's three Bias Evaluations similarly admit [redacted] *Id.*, EX 4, at WORKDAY_MOB_10456; *see also id.*, EX 5, at WORKDAY_MOB_10481 [redacted] Workday also admits that its algorithms are trained to find "[redacted] *Id.*, EX 6, at WORKDAY_MOB_10504. Workday then [redacted]. Workday's Candidate Skills Match (CSM) AI Fact Sheet similarly concedes that "[redacted]

[redacted] Burrell Decl., EX 7, at WORKDAY_MOB_2744; *id.*, R2, Scherbaum Report ¶ 10**.**

The Court's foregoing findings in certifying the ADEA collective are also confirmed by the new statistical and anecdotal evidence presented here**.** Dr. Scherbaum's report shows that Workday's algorithmic rejection of applicants at the outset of the algorithmic selection process is strongly correlated with the race of Black applicants and the gender of female applicants. *See id.*, R2, Scherbaum Report ¶¶ 81-84, Tables 18-21**.** He shows that the difference in the rate of rejection for Black applicants is statistically significant at greater than 18.356 standard deviations from expectation*, id.* ¶ 82, Table 18, that female applicants' rejection rate is greater than their male peers at more than 15 standard deviations (15.306 SD) from expectation, *id.* ¶ 83, Table 19, and that Black female applicants fared even worse than White females at greater than 16 standard deviations (16.441 SD) from expectation, *id.* ¶ 84, Table 20. The odds are one in several trillion that disparities of that magnitude are not associated with the race and gender of the 22,812 rejected Black applicants (77.5%), the 81,826 rejected female applicants (78.2%); and the 10,665 rejected black female (80.9%). *Id.* ¶¶ 83-85, Tables 18-20.

Dr. Scherbaum also demonstrates that of the [redacted] applicants for whom Workday has furnished data and have a grade, [redacted]% were rejected in 24 hours or less. Considering applications rejected in less than 48 hours, [redacted] were rejected in 24 hours or less, and [redacted] were rejected in less than two hours. Among the applications rejected in two hours or less, [redacted] of them were rejected within 5 minutes. *Id.* ¶¶ 66, 68**.** Of those rejected in 48 hours, [redacted] of these rejections occurred in the non-business after-work hours between 6:00pm Pacific Standard Time and 5:59am Pacific Standard Time the next morning. *Id.*

1. <u>The Same Models Apply to Every Customer and Every Applicant</u>

Workday's designated Rule 30(b)(6) deponent, David Wachtell, admits that the HiredScore algorithm and screening process applies in the same way across all customers and applicants for employment. He confirms that "[redacted] Burrell Decl., T1, Workday (Wachtell) Dep. 187:23–188:4; that [redacted]

[redacted] *id.* at 188:22–189:1; [redacted] at *id.* 207:13–15. *See also* Burrell Decl.. EX 2, at WORKDAY_MOB_4824; *id.*, EX 9, at WORKDAY_MOB_6841; *id.*, EX 7, at WORKDAY_MOB_7537. Fetch and CSM also rely on historical data. *See id.*, T1, Workday (Wachtel) Dep._152:23–153:20; *id.*, T3, Deposition of Leslie Blanchard (July 1, 2026) ("Blanchard Dep.") 95:25-96:22; *id.*, EX 8, at WORKDAY_MOB_3869. *See also id.*, R2, Scherbaum Report ¶¶ 10-11, 23-24, 26, 28-31, 34.[12]

Wachtel further [redacted] *id.*, T1, Workday (Wachtel) Dep. 214:8–10; that [redacted]

By operating at scale, Workday's algorithms apply uniform, centralized applicant screening and selection procedures that operate in common across all customer-employers and class members alike. Burell Decl., EX8 at WORKDAY_MOB_3869; *id.* T3, Blanchard Dep. 49:14-51:1; 95:25-96:22; 107:7-108:7; *id.*, R2, Scherbaum Report ¶¶ 2(a), 10-21; 25-26; 19 ("[redacted]

---

[12] Citing Burrell Decl., EX 8, at WORKDAY_MOB_3869; *id.*, EX 2, at WORKDAY_MOB_4823-24; *id.*, EX 10, at WORKDAY_MOB_6061; *id.*, EX 11, at WORKDAY_MOB_6882, 6884, 6892; *id.*, EX 12, at WORKDAY_MOB_7388-89; *id*, EX 1, at WORKDAY_MOB_7537; *id*, EX 13, at WORKDAY MOB_9580; *id*, EX 14, at WORKDAY_MOB_9600.

[13] Wachtel further acknowledged that HiredScore and Spotlight [redacted]

[redacted][14]

Workday has determined that the disparate impact of its screening process can properly be evaluated by aggregating [redacted] without any distinction between them. *See id.*, EX 6, at WORKDAY_MOB_10493; *id.*, EX 4, at WORKDAY_MOB_10444; *id.*, EX 8, at WORKDAY_MOB_3872. Workday admits that it [redacted] *id.* at WORKDAY_MOB_10498. *See also* Burrell Decl., EX 4, at WORKDAY_MOB_10449 [redacted]; *id.*, EX 5, at WORKDAY_MOB_10474 (same).

The results of every Workday-published Bias Audit [redacted] before March 2026 have rested on a cross-employer applicant sample that generalizes across all customers whose applicants are screened by the same algorithm. The July 2, 2023, audit analyzed "a random sample of 10 Global Large Customers," comprising a representative sample of 147,077 applications. *Id.*, EX 20. The February 2024 and September 2024 bias audits recite the identical design and means of analysis. *Id.*, EX 21 at 8; Id., EX 22 at 9. Workday's internal Spotlight Bias Evaluation of April 2025 analyzed [redacted] Burrell Decl., EX 4, at WORKDAY_MOB_10444, and the internal Fetch Bias Evaluation of September 2025 similarly analyzed [redacted] *Id.*, EX 6, at WORKDAY_MOB_10493. Workday's internal Spotlight Bias Evaluation in February

---

[14] See Burrell Decl., EX 8, at WORKDAY_MOB_3876; *id.*, EX 2, at WORKDAY_MOB_4821 & 4824; *id.*, EX 15, at WORKDAY_MOB_6605 & 6609; *id.*, EX 11, at WORKDAY_MOB_6884-85 & 6887 & 6892; *id.*, EX 16, at WORKDAY_MOB_7067; *id.*, EX 17, at WORKDAY_MOB_9388; *id.*, EX 18, at WORKDAY_MOB_9393; *id.*, EX 19, at WORKDAY_MOB_9575; *id.*, EX 13, at WORKDAY_MOB_9580-82; *id.*, EX 14, at WORKDAY_MOB_9598

2026 analyzed [redacted] *Id.*, EX 5, at WORKDAY_MOB_ 10469. Workday also assembled the similar cross-employer sample of 1,449,430 applications that was the basis of the external bias audit that was generalized to TIAA Spotlight. *Id.*, EX 23 at 1. TIAA did not subscribe to or begin using Spotlight until January 28, 2026, and so had no applicant data of its own at the time of that 2025 bias audit. *Id.*

2. <u>Workday's Bias Analyses Generalize Across All Subscribers And Candidates</u>

Workday retained a Labor Economist, Dr. Robert Speakman, to conduct a bias audit and analyze the disparate impact of its Spotlight algorithm based on a single-employer applicant dataset limited to Workday's own applicants that has been generalized to other employers, such as Pfizer, Burrell Decl., EX 24; Moody's, *id.*, EX 25; Guardian Life Insurance, *id.*, EX 26; and The Equitable, *id.*, EX 27, among others. *Id.*, T4, Deposition of Robert Speakman (June 23, 2026) ("Speakman Dep.") at 159:4-170:2. When deposed, Dr. Speakman agreed that his single-employer disparate impact analysis and dataset could be legitimately generalized across employers whose applicants are subject to the same or similar algorithm regardless of whether they part of his dataset or Bias Audit. *Id.* at 102:15-103:21, 105:6-106:15,108:06-19.

> Q. Do you know of anything that varies between one set of applicants and another set of applicants when the same tool, the same algorithm, the same machine learning is applied to those two different — applicants?
> A. . . . [T]he answer's no, I don't know of anything that varies between two users' implementation of — of this tool.

*Id.* at 108:06-19. Dr. Speakman also acknowledges that he's seen no difference in how Spotlight screens or impacts Workday's applicants and its customers 'applicants. *Id.* at 106:13-16. He attests that "sometimes you generalize from one statistical study to a larger field," *id.* at 102:15-17, that the governing standard is whether there is "some reason to believe there's relevance," *id.* at 102:15-103:01, and that generalizing his analysis of Spotlight's disparate impact on Workday's applicants to its impact on other employers' applicants meets that "relevance" standard, *id.* at 104:07-12. In

doing so, he identified two accepted routes, neither of which requires analyzing each employer's own applicant data:

> A. . . . [T]here's two ways I would think about approaching that. The first is . . . if you have their data, you could analyze their data independently . . . . The other way is you would look at the factors surrounding the implementation of the tool to determine whether it was sufficiently similar to the way that this calculation that I have done is specified, and that would be another way of saying it could be applicable . . . .

*Id.* at 105:21-106:12. Despite being given every opportunity to do so, Dr. Speakman provided no reason his single-employer disparate impact analysis does not generalize across all employers and applicants who are subject to the same algorithmic selection procedure. *Id.* at 105:21-107:6.

### D. Workday's Algorithmic Screening And Rejection Process Is Common Across All Subscribers And Candidates

#### 1. <u>Fetch Searches For, Screens, And Recommends Non-Applicants</u>

Workday's Fetch algorithm "[redacted] *See* Burrell Decl., EX 6, at WORKDAY_MOB_10493 & 10496; *id.*, T1, Workday (Wachtel) Dep. 149:10–153:15, 157:24–158:10, 158:18–21; *id.*, EX 1, at WORKDAY_MOB_7540; *id.*, R2, Scherbaum Report ¶¶ 44-45.[15] Workday describes Fetch as [redacted] Burrell Decl., T1, Workday (Wachtel Dep.) 148:15-–159;10; 7539-40; 102:5-18. [redacted]

---

[15] *See also id.*, *Burell Decl.*, EX 1, at WORKDAY_MOB_7539-40 [redacted] .

[redacted]. *Id.*; Burrell Decl., R2, Scherbaum Report ¶¶ 44-45.[16]

In making decisions and recommendations, Fetch's algorithm [redacted] Fetch functions as an algorithmic "tap on the shoulder," selecting and recommending favored shortlists of candidates for recruiter attention. *See e.g., Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012); *Satchell v. FedEx Corp.*, No. C 03-02659 SI, No C 03-02878 SI, U.S. Dist. LEXIS 37354 *28-29 (N.D. Cal. Sept. 27, 2005). Those [redacted] provide Fetch's pre-application candidates a distinct advantage by making them the first to advance to the human recruiter stage of the selection process on a priority basis. *See* Burrell Decl., EX 1, at WORKDAY_MOB_7539. That not only denies the broader population of eligible candidates an equal opportunity to advance, but Fetch does so on grounds that have disparate impact at the pre-application stage of the selection process.

2. Workday's Application Platform Is The Gateway Through Which All Applications for Employment with Workday Customers Are Funneled and Screened

After Fetch's pre-application algorithm is [redacted] *See also* Burrell Decl., EX 28 at 1 ("When you apply for a role through the ICON Careers site, your application is submitted and processed through Workday. . . . All ICON vacancies are published via Workday. When you click 'Apply' on the ICON Careers site, you are redirected to Workday to complete your application. . . . Once submitted, Workday **automatically** creates your candidate **profile** within the system.") (emphasis added); *see also id.*, EX 29 (describing how

---

[16] Burrell Decl., EX 11, at WORKDAY_MOB_6895; *id.*, EX 14, at WORKDAY_MOB_9591.

[17] *See also* Fetch learns [redacted]., EX 1, at WORKDAY_MOB_7539. [redacted] Burrell Decl., T1, Workday (Wachtel) Dep. 152:24–153:20.

Workday processes job applicant information). "[redacted] *Id.*, EX 14, at WORKDAY_MOB_9604.

3. Applications Are Parsed, Scored, Graded, Ranked, or Shortlisted By the AI Before Any Human Recruiter Sees It

Workday's applicant funnel processes each application in the same algorithmic sequence: (1) [redacted] Burrell Decl., T1, Workday (Wachtel) Dep. 129:19–130:19, 132:14–18, 134:17–135:1, 138:5–10, 139:2–140:3; *Burell Decl.*, EX 11, at WORKDAY_MOB_6885 & 6887; *id.*, Ex. 30, at WORKDAY_MOB_7072; *id.*, Ex. 12, at WORKDAY_MOB_7388; *id.*, R2, Scherbaum Report ¶¶ 10-31, 42, 44-45. Each of those centralized algorithmic stages of the selection procedure necessarily occur *before* the recruiter stage of the selection process: "[redacted]" *Id.*, T1, Workday (Wachtel) Dep. 146:17–147:4, 147:15–148:3; *see also id.* at 140:9–11.

Spotlight and CSM function in basically the same way. Both generate a score that Workday bands into "[redacted] *Id.* at 95:22–96:5, 96:24-98:8, 187:3–18; *see Burell Decl.*, EX 1, at WORKDAY_MOB_7537 ("HiredScore Technical Review"); *id.*, EX 8, at WORKDAY_MOB_3868; *id.*, EX 2, at WORKDAY_MOB_4824; *id.*, EX 31, at WORKDAY_MOB_5133-34; *id.*, EX 32, at WORKDAY_MOB_6420-21; *id.*, EX 11, at

---

[18] *See* Burrell Decl, T1, Workday (Wachtel) Dep. 130:11-13 ("[W]hen a company puts together a set of requirements for a job, we need to turn it into something that the technology can understand."); *id.* 134:17–135:1( "When a job requisition is created, . . . Workday parses the information from those job reqs . . . to understand what the customer is looking for in their jobs."); *see also id.* 132:14–18, 138:6–10.

WORKDAY_MOB_6882 & 6884; *id.*, EX 13, at WORKDAY_MOB_9580; *id.*, EX 1, at WORKDAY_MOB_7535-36. These scores are then used to [redacted] See *Id.*, R2, Scherbaum Report ¶¶ 22, 24-26, 31-38, 40-42.[19]

4. <u>Workday's AI Recommends Candidates to Help Its Customers Streamline Their Screening Process By Shortlisting, Grading, and Scoring To Advance Some Applicants And Reject The Rest</u>

Workday's automated application platform uses "AI tools to review job applications, CVs and resumes" to "help shortlist and prioritize applications in the recruitment process," to reject applicants who are not recommended or shortlisted "during [the] initial sifting stages" of the algorithmic screening process. Burell Decl., EX 29, at pp. 5, 13 (Workday Recruitment Privacy Statement). Workday's recruitment and hiring policy identifies the "[p]urpose" of those tools as "[i]dentifying and **shortlisting** prospects and job applicants," *id.* at 13, and acknowledges that "AI grading" is used at the "initial sifting stages" of the process, "for example, where we have particularly high volumes of applicants, [and] it is not possible for every CV/resume or application to be reviewed by a member of the talent acquisition team." *Id.*

For Fetch, "shortlisting" is Workday's term for [redacted] Burrell Decl., T1, Workday (Wachtel) Dep. 149:24–150:2 ("[redacted] *id.* 149:17–23. All three AI tools disadvantage those not recommended or rejected. *See, e.g.*, Burrell Decl., EX 33, at WORKDAY_MOB_3924; *Id.*, EX 32, at WORKDAY_MOB_6420-21; *Id.*, EX 11, at WORKDAY_MOB_6888; *Id.*, EX 30, at WORKDAY_MOB_7072; *Id.*, EX 13, at WORKDAY_MOB_9581 ([redacted] *See also* R2, Scherbaum Report ¶¶ 40-42. The algorithm's

[19] *Burell Decl.*, EX 11, at WORKDAY_MOB_6887; *id.*, EX 18, at WORKDAY_MOB_3724; *id.*, EX 2, at WORKDAY_MOB_4822-4824; *id.*, EX 10, at WORKDAY_MOB_6061 & 6071; *id.*, at WORKDAY_MOB_6616; *id.* EX 11, at WORKDAY_MOB_6888; *id.*. EX 16, at WORKDAY_MOB_7058; *id.*. EX 1, at WORKDAY_MOB_7537; *id.*. EX 13, at WORKDAY_MOB_9581-9582; *id.*. EX 14, at WORKDAY_MOB_9600.

shortlist advances the candidates for priority consideration, rejecting some, and disadvantaging others. In doing so, the algorithm becomes the decisionmaker as to who gets considered or at the very least "*facilitates* human decision making" in the manner defined in FEHA's implementing regulations. Cal. Code Regs. tit. 2, § 11008.1(A)–(E). NYC Local Law 144 similarly defines an AEDT as a "simplified output . . . used to substantially assist or replace discretionary decision-making."

That evidence supports the Court's prior finding that this process "delegate[s] traditional hiring functions, including **rejecting** applicants, to the algorithmic decision-making tools provided by Workday — that Workday's software is not simply implementing in a rote way [the criteria] that employers set forth, but is instead participating in the decision-making process by recommending some candidates to move forward and rejecting others." Order, ECF 128 at 4 (quoting ECF No. 80 at 9). It likewise supports the Court's finding that "these tools created a discriminatory disparity." Id. 128 at 4-5 (citing ECF No. 80 at 15).

5. Validity, Business Necessity, and Workday's Bias-Audit Defense Present Common Questions

Spotlight, Fetch and CSM do "[redacted] Burrell Decl., T1, Workday (Wachtel) Dep. 95:3–7. Nor do they assess "[redacted] *Id.* at 100:17–18, 101:17–103:9. As Wachtell put it: [redacted]" *Id.* at 207:1–5; *see also* Burrell Decl., EX 7, at WORKDAY_MOB_2744 ([redacted]"). Because the tools were "[redacted]

[redacted]" the AI Tools raise issues of job relatedness and validity common to all applicants. Scherbaum ¶ 27.

## III. PROPOSED CLASS DEFINITIONS

Plaintiffs seek certification of the folloiwng classes and subclasses:

All persons within one or more of the four subclasses defined herein who, during the Class Period for each such subclass, have been or will become subject to Workday's AI-based recruitment, screening, rejection, scoring, ranking, shortlisting, or recommendation process and candidate-selection tools, including HiredScore/Spotlight, Fetch, and Candidate Skills Match, and who:

1. were not fetched, surfaced, recommended, shortlisted, or otherwise selected for favorable consideration by one or more of those tools for an employment opportunity;

2. submitted or submit an application for employment that was or is scored, sorted, ranked, screened, matched, recommended, or otherwise processed by one or more of those tools; or

3. intend to seek or apply for employment in the future for positions for which they are likely to be subjected to one or more of those Workday tools and thereby required to compete for employment through Workday's AI-based recommendation, ranking, screening, matching, shortlisting, or candidate-selection process.

<u>Subclass Definitions:</u>

The African-American subclass within the above class definition represented by Derek Mobley and Sheilah Johnson-Rocha;

The female subclass within the above class definition represented by Jill Hughes, Sheila Johnson-Rocha, and FaithLinh Rowe;

The age subclass within the above class definition represented by FaithLinh Rowe; and

The disability subclass within the above class definition represented by Derek Mobley and Jill Hughes.

## IV. LEGAL STANDARDS

### A. Rule 23

Class certification is required where the four prerequisites of Rule 23(a) and at least one of the requirements of Rule 23(b) are satisfied. Fed. R. Civ. P. 23; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997). While certification analysis may "entail some overlap" with the merits, *Dukes*, 564 U.S. at 351, it is firmly settled that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). Once the elements of Rule 23 are met, a district court does not have discretion to deny certification of a class. *See Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

### B. Substantive Legal Standards

The burden-shifting standards applicable to disparate impact claims under Title VII, originally articulated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1970), are codified directly in the statute itself at 42 U.S.C. § 2000e-2(k). A plaintiff must identify a specific employment practice and demonstrate that it causes a disparate impact on the basis of race, color, religion, sex, or national origin; the burden then shifts to the employer to demonstrate that the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Even then, the plaintiff may prevail by showing a less discriminatory alternative practice that would serve the employer's legitimate needs. 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (C). The same standards are applicable to race, sex, and age discrimination claims under the California FEHA. *See Carter v. CB Richard Ellis, Inc.*, 122 Cal. App. 4th 1313, 1321 (2004); *Stockwell v. City & Cty. of San Francisco,* 835 F.3d 1107, 1114 (9th Cir. 2014) (citing *Katz v. Regents of Univ. of Cal*., 229 F.3d 831, 835 (9th Cir. 2000)).

Under the ADA, it is unlawful to use "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the

covered entity, is shown to be job-related for the position in question and consistent with business necessity." 42 U.S.C. § 12112(b)(6). To establish a prima facie case of disparate impact liability under the ADA, "a plaintiff must (1) identify the challenged employment practice or policy, (2) demonstrate that the practice or policy has an adverse impact on the plaintiff with a disability, and (3) demonstrate a causal relationship between the identified practice and the disparate impact." *Oross v. Kutztown Univ.*, No. 21-5032, 2024 U.S. Dist. LEXIS 3337, at *5-6, 2024 WL 83506 (E.D. Pa. Jan. 8, 2024) (citing *Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834, 839 n.26 (5th Cir. 1999)). The substantive standards are similar under FEHA, which recognizes disparate impact as a FEHA disability-discrimination theory. *See Scotch v. Art Inst. of Cal.-Orange Cnty., Inc.*, 173 Cal. App. 4th 986, 1003 (Cal. Ct. App. 2009); *Knight v. Hayward Unified School District*, 132 Cal. App. 4th 121, 128-29 (2005) (FEHA disparate impact standard as requiring proof that a policy or practice bearing no manifest relationship to job requirements had a disproportionate impact on individuals with disabilities).

## V. ARGUMENT

### A. The Proposed Classes Satisfy Rule 23(a)

The four "threshold requirements" on which Rule 23(a) conditions class certification are commonality—a demonstration that the class members share common questions of law or fact—and numerosity, typicality, and adequacy of representation." *Stockwell,* 835 F.3d at 1111; F.R.C.P. 23(a). Those four criteria are satisfied here.

#### 1. Plaintiffs Allegations Revolve Around Uniform Policies and Practices that Affect All Class Members and Lend Themselves to Common Answers That Will Drive the Resolution of the Litigation

The determination of whether a proposed class meets the "common question" requirement "is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 863 (9th Cir. 2025) (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666-67 (9th Cir. 2022)). "The requirement of 'commonality 'means that class members 'claims 'must depend upon

a common contention 'and that the 'common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1153 (9th Cir. 2016) (quoting *Dukes*, 564 U.S. at 350). Rule 23(a)(2) requires only "a single *significant* question of law or fact." *Stockwell,* 749 F.3d at 1111 (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013)). Here, multiple common questions of fact and law satisfy this requirement.

*a. The Rules-Based Logic Deployed By Workday's Algorithmic Screening Is Inherently Discriminatory*

The rules-based logic deployed by Workday's algorithms is inherently discriminatory in basing candidate recruitment and selections on [redacted] that perpetuate past racial, sexual and societal biases and inequities. *See* Section II.C*, supra;* Burrell Decl., R1, Landecker Report ¶¶ 3, 15, 23-29, 47; *id.*, R2, Scherbaum Report ¶¶ 2(c); 10-11, 23, 28-32, 86 (c). Since 1971, the Ninth Circuit has treated perpetuation of past discrimination as an independent basis for Title VII liability, and that basis reaches intermediaries and instrument-builders, not only employers. *Kaplan v. Int'l Alliance of Theatrical & Stage Emps.*, 525 F.2d 1354, 1360 (9th Cir. 1975); *Chavez v. Tempe Union High Sch. Dist.*, 565 F.2d 1087, 1093 & n.8 (9th Cir. 1977); *United States v. Navajo Freight Lines, Inc.*, 525 F.2d 1318, 1323 (9th Cir. 1975). *Kaplan* held an intermediary liable for a prior experience roster it neither administered nor hired under: the roster's "natural consequences" carried other parties 'past exclusion of women into the present, without regard to motive. 525 F.2d at 1360. That is precisely what Workday does when it trains its algorithm and model on historical outcomes that skew current opportunities on the basis of race, gender, age and disabilities. *Id.* [20]

*b. The Analysis of Statistical Disparity is Common to Class Members*

The statistical evidence confirms that the known risk materialized for Black and female applicants, who are disproportionately rejected at the outset of Workday's AI screening stage

[20] *See also Griggs*, 401 U.S. at 429–30; *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir. 1971); *United States v. City & County of San Francisco*, 656 F. Supp. 276 (N.D. Cal. 1987);

with Black females faring the worst. Indeed, the difference in the rate of rejection based on race and gender is statistically significant across both groups, with Black females impacted the worst. For Black applicants, the rejection rate is greater than 18.356 standard deviations from expectation, Burrell Decl., R2, Scherbaum Report ¶ 82, Table 18, female applicants' rejection rate is greater than their male peers at more than 15 standard deviations (15.306 SD) from expectation, *id.* ¶ 83, Table 19, and Black female applicants were rejected more than White females at greater than 16 standard deviations (16.441 SD) from expectation, *id.* ¶ 84, Table 20. These are not the products of one employer's preferences; they are the output of one model, measured across the population it screens. Workday's own AI Fact Sheets [redacted] Burrell Decl., EX 7, at WORKDAY_MOB_2744–45.

Nor is there any serious dispute about where in the process the challenged conduct occurs. Applications submitted through Workday's platform are automatically parsed, scored, ranked, and shortlisted **before** any human recruiter sees anything: [redacted] Burrell Decl., T1, Workday (Wachtel) Dep. 146:17–148:3. This Court has already recognized twice, the plausibility that Workday's tools are "participating in the decision-making process by recommending some candidates to move forward and **rejecting others**." ECF No. 128 at 4 (quoting ECF 80 No. at 9). The discovery record establishes as fact what the Court previously found plausible.

The class members' experience matches the machine's design. The thirty-eight putative class member declarations described above — roughly 1,800 applications [redacted] rapid-fire, off-hours, Workday-branded rejections; almost seventy percent rejected on every

---

*Mosley v. United States*, 425 F. Supp. 50 (N.D. Cal. 1977) (perpetuation of past discrimination through "word-of-mouth solicitation of applicants" and departmental seniority); *Perpetuation of Past Discrimination*, 96 Harv. L. Rev. 828 (1983).

application; and not one offer — are the fingerprint of automated rejection. See Section II.A, *supra*.

Finally, Workday's defenses are as common as Plaintiffs 'claims. Whether each of the models are job-related and justified by business necessity are common questions for the class; so is the adequacy of Workday's bias-audit and mitigation defense — including whether each algorithm was ever or sufficiently evaluated for bias for race, gender, age, or disability. None of these issues turns on what any individual recruiter thought of any individual résumé; each is resolved with the same evidence, in the same way, for every class member.

Workday's operation is at scale; its Rule 30(b)(6) admissions [redacted]; the classwide statistical evidence of disparate impact; the uniform architecture of the parsing, scoring, ranking, and shortlisting process; the evidence of the putative class members; and the common questions presented by Workday's defenses, including whether the products are job-related for purposes of validity and required as a business necessity.

The fact that class members 'job applications are reviewed, evaluated and acted on by individual, disparate Workday customers after the screen by Workday's artificial intelligence does not diminish Workday's role in the evaluation process or undermine commonality. The application of Workday's overarching algorithms to all class members is the common factor that influences the hiring processes that are later carried out by Workday's customers. *See Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894, 906-907 (N.D. Ill. 2016) (holding that the fact individual contractors made final hiring decisions following discriminatory referrals does not defeat a commonality finding against the referring entity). Whether Workday's algorithm was a discriminatory first step "that tainted the entire . . . hiring process" is more efficient to answer one time on behalf of the classes, "rather than over and over again in multiple separate lawsuits." *Id.* (quoting *Chi. Teachers Union Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 436 & n.5 (7th Cir. 2015)).

*c. The Evidence Establishes The Same Basis For Certifying Plaintiffs' FEHA, Title VII And ADAAA Disparate Impact Claims As The Court Found Sufficient To Certify The Same Disparate Impact Claims As A Collective Action Under The ADEA*

Plaintiffs seek class certification of their age-based FEHA disparate impact claims on the same grounds that the Court found sufficient to certify the collective prosecution of their identical age-based disparate impact claims under the ADEA. *Cf.* ECF No. 128. The Ninth Circuit has held that "[t]he requisite prima facie case for a disparate-impact age discrimination claim under California's FEHA is parallel to that under the ADEA." *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1114–15 (9th Cir. 2014) (citing *Katz*, 229 F.3d at 835); *see also Ibarbia v. Regents of Univ. of Cal.*, 191 Cal. App. 3d 1318, 1327-28 (Ca. Ct. App. 1987) (a prima facie case of employment discrimination under FEHA parallels that under Title VII). Moreover, all of the statutes at issue share the same general substantive elements that are subject to the same common proof of disparate impact. *See* Section IV.B, *supra* (identifying substantive legal standards applicable to claims under Title VII, the ADA, and the California FEHA for disability discrimination). Plaintiffs 'trial evidence must "(1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact." *Bolden-Hardge v. Office of the California State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023) (citation omitted). Because the elements are identical, the question whether those elements are susceptible to classwide proof is identical as well.

Plaintiffs must therefore prove the same facts for their FEHA age disparate impact claims in Count Eight as for their parallel ADEA claims. *Compare* ECF No. 393, Complaint, Count Four (ADEA) *with id.* at Count Eight (FEHA). The Court emphasized that overlap again just two months ago in holding that the age disparate impact claims certified as a collective under the ADEA should proceed in common with the "materially similar claims brought under the California Fair Employment and Housing Act," ECF No. 376 at 2, rather than appealed separately, *id.* (citing "the

reasons explained in the order on Workday's Motion to Dismiss and to Strike the Third Amended Complaint" at ECF No. 360).

The Court has already found that susceptibility to common classwide proof in certifying Plaintiffs 'ADEA disparate impact claims as a collective and that susceptibility is no less true for their identical disparate impact claims under FEHA. ECF No. 128. Workday was expressly afforded the opportunity to develop evidence that its AI system "does not operate in a unified way." ECF 128 at 12. The developed record does not undermine the Court's prior determination; it supplies additional common evidence concerning the design, operation, and impact of the challenged products. The Court should adopt its prior commonality determination for the materially similar FEHA claim and find Rule 23(a)(2) and Rule 23(a)(3) satisfied as to Count Eight.

In granting collective certification, the Court did not confine itself to the "similarly situated" inquiry under 29 U.S.C. §216(b). It measured that collective certification against "the more exacting 'commonality 'standard" of Rule 23 and held that standard satisfied on the basis of *Stockwell*, 749 F.3d at 1114–15. *See* ECF 128 at 9 (also citing *Dukes*, 564 U.S. at 350–56 & *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)). The Court held that "[t]he mechanisms behind Workday's AI recommendation system, the effects on applicants who are over 40, and whether those 'effects amount to a disparate impact on account of age, [] will be so for all [collective] members or for none; their claims rise and fall together.'" *Id.* (quoting *Stockwell*, 749 F.3d at 1115).

That holding is a Rule 23(a)(2) holding in substance and in terms. It resolves commonality as to Count Eight because the common question it identifies—whether Workday's AI screening products disparately impact applicants over forty—is the same question Count Eight presents under FEHA. The same holding disposes of typicality. The authority on which the Court relied addresses Rule 23(a)(2) and Rule 23(a)(3) together: ECF No. 128 at 9 (quoting *Dukes*, 564 U.S. at 353, quoting *Falcon*, 457 U.S. at 159 n.15). Nothing distinguishes the named Plaintiffs' injury from the Class's injury from that same AI tool, and the Court has already held that employer-level

variation does not defeat common proof of a unified policy's net impact. ECF No. 128 at 12–13. Typicality requires no more. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)

That anecdotal evidence is even greater than the similar declarations and pleadings that the Court found sufficient to certify the ADEA collective, noting that "[f]requently, plaintiffs satisfy the 'similarly situated 'analysis with 'substantial allegations, supported by declarations or discovery, that the putative class members were together the **victims of a single decision, policy, or plan.**" ECF No. 128 at 5 (emphasis added, citing *Villa v. United Site Servs. of Cal., Inc.,* No. 12-cv-318-LHK, 2012 WL 5503550, at *13 (N.D. Cal. Nov. 13, 2012; *id.* at 6 ("If such similarities exist, the collective may be granted preliminary certification even if there are differences that will ultimately require a degree of individual adjudication.") (citing *Villa, supra* at *14).

Second, the Court found that the named Plaintiff's application rejection rate, "combined with [his] allegations regarding **bias in Workday's training data .** . . plausibly supports an inference that Workday's algorithmic tools disproportionately **reject** applicants based on factors other than qualifications, such as a candidate's race, age, or disability . . . sufficient to allege a disparate impact on applicants with Mobley's protected traits." ECF No. 80 at 14-15 (emphasis added). *See also id* at 15 (finding '[t]he sheer number of rejections and the timing of those decisions, coupled with . . . allegations that Workday's AI systems rely on **biased training data,** support a plausible inference that Workday's screening algorithms were automatically rejecting Mobley's applications based on a factor other than his qualifications, such as a protected trait") (citations omitted); *Liu v. Uber Techs.*, 551 F. Supp. 3d 988, 991–92 (N.D. Cal. 2021) ("[P]lausible allegations stemming from social science research on similar corporate practices can support an inference of causation."); Burrell Decl., R2, Scherbaum Report ¶10; *see also Marquez Bros. Int'l Inc.*, No. 1:17-cv-0044, 2017 U.S. Dist. LEXIS 153339, at *21-22 (holding an inference of discrimination can be properly based on individual anecdotal accounts and the racial homogeneity of the workforce); ECF No. 80 at 9 ("Workday's customers delegated their

traditional hiring functions, **including rejecting applicants**, to the algorithmic decision-making tools provided by Workday." (emphasis added)).

*d. FEHA's Bias-Testing Inference Is a Common Question*

FEHA provides an additional common question because its regulations permit an inference based on whether a covered entity engaged in proactive efforts to identify and mitigate bias from automated decision systems. FEHA claims against an "automated-decision system or selection criteria . . . that discriminates against . . . a class of applicants or employees on a basis protected by the Act" are subject to the following inference of unlawful bias: "Relevant to any such claim or available defense is evidence, or the lack of evidence, of anti-bias testing or similar proactive efforts to avoid unlawful discrimination, including the quality, efficacy, recency, and scope of such effort, the results of such testing or other effort, and the response to the results." Cal. Code Regs., tit. 2, § 11009(f).

Whether Workday undertook those efforts—or failed to do so—is a question about Workday's uniform conduct that can be resolved in one stroke for the class as a whole. There is no evidence, for example, that Workday has sufficiently or completely pursued anti-bias testing or similar proactive efforts to avoid unlawful discrimination based on age for each of its products. *See* Burrell Decl., T5, Workday's Responses to Requests for Admission, Responses 26-31. Plaintifs' entitlement to the resulting inference does not depend upon the circumstances of any individual applicant. Whether Workday's testing and mitigation were absent or inadequate during particular periods or with respect to particular protected groups can therefore be determined from the same Workday evidence for all applicants subjected to the relevant algorithms.

Dr. Landecker's opinions demonstrate why this inquiry is inherently common. *Id.*, R1, Landecker Report ¶¶ 4 & 6. The converse follows as well: whether Workday failed to undertake adequate testing, intervention, or continuing monitoring is a fact concerning Workday's

development and maintenance of the shared algorithms, not a fact that changes from applicant to applicant.

Workday's own practices further demonstrate the common nature of the inquiry. Workday itself evaluates [redacted] *Id.*, R2, Scherbaum Report ¶ 43.[21] Dr. Landecker likewise explains that centralized evaluation can examine outcomes across "race, sex, age, and disability status, and, where the data permits, intersections and combinations of those categories." *Id.*, R1, Landecker Report ¶¶ 39–42.[22]

Thus, FEHA's regulatory inference itself supplies a question capable of common resolution: *Did Workday proactively test its AI tools for unlawful bias and take effective steps to mitigate any bias identified?* The answer depends upon Workday's centralized testing, mitigation, and monitoring—not the qualifications, employer, job, or individual experience of a particular applicant. If Workday failed to take the measures contemplated by FEHA, the resulting inference is common to the Class members subjected to the affected algorithm during the relevant period.

2. <u>Non-Statistical Proof of Disparate Impact</u>

The Supreme Court has held that statistical evidence is not the sole means of proof — that while class claims "have more commonly involved proof of the expected result of a regularly followed discriminatory policy," such "a pattern might [also] be demonstrated by examining the discrete decisions of which it is composed." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324,

---

[21] Burrell Decl., EX 10, at WORKDAY_MOB_6062-63; *Id.*, EX 11, at WORKDAY_MOB_6892.

[22] The evidence concerning whether Workday satisfied that obligation is common as well. Landecker reports that the Spotlight evaluation he reviewed [redacted] Burrell Decl., R1, Landecker Decl. ¶¶ 43–45. There is also evidence which raises a common question of whether Workday failed to undertake the proactive testing and mitigation of racial and gender bias and disparate impact required under FEHA. *Id.* ¶¶ 43–45, at 12.

361 n.46 (1977). "We do not mean to suggest that there are any particular limits on the type of evidence [parties] may use." *Id.*; *see also Craig v. Alabama State Univ.*, 804 F.2d 682, 687, fn. 7 (11th Cir. 1986). Nor are plaintiffs required to limit their evidence to a "showing of disproportionate impact . . . based on analysis of the characteristics of actual applicants." *Dothard v. Rawlinson*, 433 U.S. 321, 330-331(1977). "The plaintiffs in a case such as this are not required to exhaust every possible source of evidence. *Id.*

The Court has already found, for example, that "the causation element is supported by . . . academic and other literature about bias in data models and algorithms, as well as Amazon's since-abandoned attempt at using 'a facially neutral hiring algorithm 'that had a disparate impact on female candidates." ECF No. 80 (citing ECF No. 47 ¶¶ 30, 36, 42–48.). *See Liu*, 551 F. Supp. 3d at 991–92 ("[P]lausible allegations stemming from social science research on similar corporate practices can support an inference of causation.").

*a. Named Plaintiffs' Claims are Typical of the Class Because They are Based on the Same Legal Theory and Their Injuries Are Caused by the Same Workday Employment Practices*

Under Rule 23(a)(3), "representative claims are 'typical 'if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014). Typicality is evaluated by asking whether, as compared to named plaintiffs, '"other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 839 (9th Cir. 2022) (quoting *Hanon*, 976 F.2d at 508). Typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong*, 275 F.3d at 868 (citation omitted). Under the FEHA, typicality is met where class representatives allege the same claims and were injured

by the same conduct as the class. *Martinez v. Joe's Crab Shack Holdings*, 231 Cal. App. 4th 362, 375 (Cal. Ct. App. 2014).

"Plaintiffs 'claims are typical of the proposed class because they focus on the conduct of [Workday] as to the [Class] as a whole and not on conduct specific to any particular Plaintiff." *Hurtado v. Rainbow Disposal Co.*, No. 8:17-cv-01605-JLS, 2019 U.S. Dist. LEXIS 70062, *21 (C.D. Cal. Apr. 22, 2019). Plaintiffs suffered the same harm as did all class members: they applied to positions through Workday's online job-application platform and were denied the opportunity to compete for employment opportunities on equal footing because their applications were systematically deprioritized or rejected by Workday's algorithmic applicant screening products. Moreover, Plaintiffs and class members alike make the same legal arguments to establish Workday's liability for disparate impact employment discrimination.

*b. The Class Consists of At Least Thousands of Job Applicants Whose Applications Were Screened by Workday's AI When They Applied*

Courts readily find classes "numbering in the hundreds to be sufficient to satisfy the numerosity requirement." *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 594 (E.D. Cal. 2008) (collecting cases). *See also Ellis v. Costco Wholesale Corp*., 285 F.R.D. 492, 506 (N.D. Cal. 2012) (noting that "100 or more plaintiffs leads to a presumption of numerosity"). First, numerosity is established by Workday's own applicant flow data for applicants to Workday positions, which consists of [redacted] job applications. That data includes more than [redacted] female applicants, more than [redacted] African American applicants, and more than [redacted] applicants who self-identified as having a disability. Burrell Decl., R2, Scherbaum Report ¶¶ 49, 59, Tables 2,3. According to Workday's own witness, more than 4,775 of Workday's customers use Workday Recruiting, with more than 38 million requisitions opened, more than 356 million applications submitted, and more than 27 million job offers extended through Workday Recruiting in 2024 alone. Moore Decl., ECF No. 108 ¶ 7. The numerosity requirement is established.

3. <u>The Class Representatives and Class Counsel Are Adequate</u>

Rule 23(a)(4) involves resolving two questions "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs

and their counsel prosecute the action vigorously on behalf of the class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quoting *Hanlon*, 150 F.3d at 1020); *see also Amchem Prods.*, 521 at 625 & n.20. Plaintiffs and their counsel meet both requirements.

a. *The Named Plaintiffs Have No Conflict of Interest With the Class*

The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625. No such conflict exists here. None of the Plaintiffs limits her or his requested relief to her or his own applications; each instead seeks declaratory relief, injunctive relief to include cautionary warnings commonly found in other large AI systems when Workday markets their AI as ethical and responsible, changes to Workday's screening practices, and monetary relief for the class as a whole. *Id.*

Plaintiffs 'proposed representation also tracks the specific protected characteristics and subclasses at issue, further eliminating any risk of intra-class conflict. *See Amchem*, 521 U.S. at 625–26 (adequacy requires that "named parties [have] common interests with unnamed members of the class"). Ms. Johnson-Rocha, an African American woman over the age of forty, seeks to represent applicants in the protected groups she shares: African Americans and women. Burrell Decl., D3, Johnson-Rocha Decl. ¶ 37. Ms. Rowe, a woman over the age of forty, seeks to represent women and applicants over forty. *Id.*, D4, Rowe Decl. ¶ 46.) Ms. Hughes, a woman over the age of forty with documented disabilities (a prior cancer diagnosis and asthma), seeks to represent women, and disabled applicants. *Id.*, D2, Hughes Decl. ¶ 39. And Mr. Mobley, an African American man over the age of forty with documented disabilities (depression and anxiety), seeks to represent African Americans, disabled applicants, and applicants over forty. *Id.*, D1, Mobley Decl. ¶ 40. This alignment of interest, not antagonism, is the touchstone of adequacy. *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (adequacy "serves to ensure that the interest of the named representative aligns . . . with the interests of the class").

*b. Proposed Class Counsel is Qualified, Experienced, and Capable*

Rule 23(a)(4) also requires that class counsel be "qualified, experienced, and capable." *See also* Fed. R. Civ. P. 23(g)(1)(A) (directing courts, in appointing class counsel, to consider

counsel's work identifying and investigating the claims, experience in class actions and complex litigation, knowledge of the applicable law, and the resources that counsel will commit to representing the class).

The proposed class counsel include Robert L. Wiggins, Jr., who has practiced employment and civil-rights class litigation for more than five decades, has been licensed in Alabama since 1975, and was counsel for the workers in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016); class counsel for the African-American workers in *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978), in which the former Fifth Circuit ordered and enforced extensive classwide injunctive relief against rule-based employment practices found to perpetuate historical racial segregation from the pre-1964 era and structured the standards for determining backpay on a classwide basis rather than the "quagmire of hypothetical judgments" inherent to individualized determinations of economic loss; class counsel for the employees in *Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009), and 785 F.3d 895 (4th Cir. 2015), in which the Fourth Circuit twice reversed denials of class certification; class counsel for the nationwide class of female employees in *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105 (4th Cir. 2013), class certified on remand, 2016 U.S. Dist. LEXIS 105267 (W.D.N.C. June 24, 2016), in which the Fourth Circuit reversed dismissal of class claims against disparate impact of prior experience criterion that perpetuated past discrimination in job assignments and salaries; and counsel for the plaintiff class in *In re Employment Discrimination Litigation Against the State of Alabama*, *see* Burrell Decl., A3, (R. Wiggins Decl.), ¶¶ 1-10; Ann K. Wiggins, who has practiced class, collective, and employment-discrimination litigation since 1986 and was also class counsel in *Brown v. Nucor Corp*. and counsel for the plaintiff class in *In re Employment Discrimination Litigation Against the State of Alabama, id,* A4 (A. Wiggins Decl.), ¶¶ 1-8; Jennifer Wiggins Smith, an experienced litigator with more than 20 years of experience representing plaintiffs in complex litigation and class actions, *id.*, A3, ¶ 12; Meredith L. Burrell, former Principal Deputy Chief of the Justice Department's Civil Rights Division, Employment Litigation Section, the office charged with systemic Title VII enforcement, including disparate-impact challenges to hiring and promotion practices; Lori B. Kisch, who served 17 years in that Section, most recently as Special Litigation Counsel, and

litigated disparate-impact and pattern-or-practice cases, including *United States v. Pennsylvania State Police*; Jennifer M. Swedish, who served 15 years in that Section, most recently as Deputy Chief, and litigated disparate impact and pattern-or-practice cases, including *United States v. City of New York*; Clare F. Geller, who served in that Section for over 20 years and more than a decade as Deputy Chief of that Section, leading and supervising several disparate impact pattern-or-practice cases, including *United States v. Rhode Island Department of Corrections* (D. R.I.), *id.* A3, ¶¶ 12-16; and Roderick T. Cooks, Lee Winston, and Bethany Neal of Winston Cooks, who filed this case on behalf of Mr. Mobley and the putative classes, briefed and argued the motions to dismiss, and successfully sought conditional certification, *id.* A5. Both firms have committed and will continue to commit the personnel and resources necessary to prosecute the litigation and zealously represent the interests of the Class. *See id.*, A3 ¶¶ 17-19; A5, ¶¶ 16-17.

#### 4. <u>Workday Has Acted on Grounds that Apply Generally to the Class Such that Injunctive and Declaratory Relief Are Appropriate to the Class as a Whole</u>

Class certification under Rule 23(b)(2) is appropriate when (1) "the party opposing the class has acted or refused to act on grounds that apply generally to the class" and (2) "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, certification under Rule 23(b)(2) is appropriate for adjudicating liability, declaratory relief, injunctive relief, and other non-individual relief including punitive damages.[23]

First, the requirement that Workday must have acted on grounds generally applicable to the class as a whole is readily met. As set forth above, Workday's AI products operate in a common manner across every job application with which they interact. Neither the architecture of the artificial intelligence nor the logic it applies to parse a job requisition, parse a resume, or score an applicant vary based on the Workday customer at issue or the job at issue. Workday's conduct --

[23] Punitive damages are recoverable under the California FEHA upon a demonstration of oppression, fraud or malice. *See* California Civil Code § 3294(a).

its participation in the selection process of customers who use the artificial intelligence products – applies generally to all class members.

Second, declaratory and injunctive relief is appropriate to the class as a whole. A declaration that Workday's artificial intelligence products have operated unlawfully, and an injunction to remedy such unlawfulness, would operate to all class members. *See Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (citation omitted)).

The Ninth Circuit has held that certification under 23(b)(2) cannot be denied simply because a class contains some members who may have suffered no injury or may have suffered different injuries as a result of being subjected to the challenged practice. *Rodriguez v. Hayes,* 591 F.3d 1105, 1125 (9th Cir. 2010); *see also Ellis*, 285 F.R.D. at 536. So too here, the possibility that some Class Members may have advanced to human review for some of their job applications does not defeat the propriety of certification under 23(b)(2). Where the subclasses "complain of a [discriminatory practice] that is generally applicable to the class as a whole . . ." and liability turns on Workday's "specific employment practices that [Class Members] contend have classwide discriminatory effects," adjudication of liability and injunctive relief are proper under Rule 23(b)(2). *See id.* at 536-37.

**B. Questions of Law and Fact Common to Class Members Predominate Over Questions Affecting Individual Class Members**

Class certification under Rule 23(b)(3) is appropriate when "questions of law or fact common to class members predominate over any questions affecting only individual members" and class certification is superior to other methods "for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry focuses on whether a proposed class is '"sufficiently cohesive to warrant adjudication by representation.'" *Buchanan v. Tata Consultancy Servs.*, No. 15-cv-01696-YGR, 2017 U.S. Dist. LEXIS 212170 (N.D. Cal. Dec. 27, 2017) (quoting *Hanlon*, 150 F.3d at 1022); *see also Amchem Prods.*, 521 U.S. at 623. The inquiry '"asks whether the common, aggregation-enabling, issues in the case ae more prevalent or

important than the non-common, aggregation-defeating, individual issues.'" *Lytle v. Nutramax Labs, Inc.* 114 F.4th 1011, 1023 (9th Cir. 2024) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). The predominance inquiry is not a counting exercise whereby common issues versus individual issues are tallied and compared. *See Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (predominance is not "a matter of nose-counting" and requires courts to give greater weight to common questions that drive resolution of the litigation than to individualized questions of lesser significance); *Ellis*, 285 F.R.D. at 537–39.

The superiority inquiry balances the four factors enumerated in Rule 23(b)(3): the class members' interests in individually controlling the pursuit of their claims; the extent and nature of similar litigation initiated by class members; the desirability of concentrating the claims in a particular forum; and likely difficulties in managing the litigation. *See* F.R.C.P. 23(b)(3)(a)-(d). *See also Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001); *Hanlon*, 150 F.3d at 1023.

Here, the common issues of law and fact described above are both more prevalent and more important than individualized questions, and class certification a superior method for adjudicating the Plaintiffs claims.

1. <u>Plaintiffs' Disparate Impact Claims Under Title VII, the ADA, and the California FEHA Rely on a Common Method of Proof that Will Apply to All Class Members and Predominate over Individual Issues</u>

Whether Workday's artificial intelligence products caused class members to be denied the opportunity to compete for job opportunities on equal footing is a question that is paradigmatic for certification under Rule 23(b)(3). The predominance of common issues here must be evaluated based on the substantive elements and method of proof for pattern or practice disparate claims under the statutes at issue.

As set forth in Section IV.B, *supra*, proof of liability for disparate impact under each of the relevant statutes requires identification of a specific employment practice that caused a disparate impact, and evaluation of whether the employer can justify use of the specific employment practice as job related and consistent with business necessity. Here, Plaintiffs

challenge *Workday's* role in the hiring process of customers who subscribe to its artificial intelligence recruiting products. Plaintiffs intend to prove that such job applicants are disadvantaged by Workday's products before their job applications undergo human review by Workday's customers (or by Workday hiring managers in the case of applicants to Workday). The Class and Subclasses are defined to include only job applicants whose applications were screened by Workday's artificial intelligence products. In these circumstances, the Court's adjudication of causation and job relatedness will apply to the claims of all Class Members, irrespective of which Workday customer or job requisition to which the Class Member applied.

Because liability for pattern or practice employment discrimination claims does not turn on individual proof, courts in this Circuit have easily recognized that classwide liability predominates over other individual issues. In *Ellis v. Costco*, for example, the district court certified Title VII disparate treatment and disparate impact claims under Rule 23(b)(3) because resolution of the plaintiffs'challenge to the allegedly discriminatory company-wide practices at issue would "resolve significant issues with respect to the class as a whole, and this dwarfs individualized issues as to particular employment decisions." 285 F.R.D. at 538. It was significant to the certification decision in *Ellis* that the claims could be tried using the bifurcated, two-stage approach to liability and damages established by the Supreme Court in *Int*ernationa*l Brotherhood. of Teamsters v. United States*, 431 U.S. 324 (1977). *See Ellis*, 285 F.R.D. at 505. Although *Teamsters* addressed claims of intentional discrimination, *Ellis* approved application of the bifurcated framework to the plaintiffs 'disparate impact discrimination claims as well. *Id.* Indeed, courts have relied on a bifurcated, staged framework to approve Rule 23(b)(3) certification in numerous class-based employment scenarios. *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168–69 (9th Cir. 2014) (affirming certification order that bifurcated individual questions to a damages phase, thereby preserving defendant's opportunity to assert individual defenses); *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 FR.D. 590, 624 (C.D. Cal. 2015) (noting individual damages can be adjudicated in a second phase or assessed by a special master).

The *Teamsters* framework does not treat individualized proof as an obstacle to common adjudication, but rather as the second stage of a case whose first stage is necessarily common.

Thus, while it is true that here, each class member's entitlement to damages may require individualized inquiries to determine the nature and extent of their harm or the applicability of individual defenses, this does not undermine certifiability. In *Senne v. Kansas City Royals Baseball Corp.*, the Ninth Circuit held that a Rule 23(b)(3) class may be certified where "one or more of the central issues in the action are common to the class and can be said to predominate," even if "damages or some affirmative defenses peculiar to some individual class members" must be tried separately. 934 F.3d 918, 937 (9th Cir. 2019), *cert denied*, 592 U.S. 917 (2020). *Senne* emphasized that "[p]redominance in employment cases is rarely defeated on the grounds of differences among employees so long as liability arises from a common practice or policy of an employer." *Id.* at 938 (citation omitted). It also reaffirmed that "the need for individual damages calculations does not, alone, defeat class certification." *Id.* at 943 (citation omitted)*; see also Leyva v. Medline Indus.*, 716 F.3d 510, (9th Cir. 2013) (reversing finding of non-predominance that was based on a "highly individualized" nature of individual damages, noting "we know of no case where [factual determinations of damages to individual class members] has prevented a court from" certifying an otherwise proper class." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *Ellis*, 285 F.R.D. at 539 (certifying the class despite individualized questions with respect to any particular class member's entitlement to relief where proposed trial plan employs *Teamsters* framework).

2. Damages Are Capable of Determination Using a Classwide Methodology

Predominance is further supported where damages can be calculated using a common methodology that applies across class members, as demonstrated by Plaintiffs' expert report outlining such common methodologies that can be applied reliably in this case. *See* Burrell Decl., R3, Report of Bernard R. Siskin Ph.D. ("Siskin Report"). The Ninth Circuit repeatedly has held that class plaintiffs can demonstrate that damages are "susceptible to common proof" by setting forth a "reliable though not-yet executed damages model" as long as the court determines "the model is reliable and, if applied to the proposed class, will be able to calculate damages in a manner common to the class at trial." *See Noohi.*, 146 F.4th at 860-61 (quoting *Lytle,* 114 F.4th at 1019). The Ninth Circuit is equally clear on what is not required: there is no requirement that the evidence

be presented "in an admissible form," *id.*at 1024-25; that "class action plaintiffs actually prove that classwide damages exist," *id.* at 1025; or that plaintiffs have all of the data necessary to perform their damages calculations, *id.* (citing *Lambert v. Nutraceutical Corp.,* 870 F.3d 1170, 1184 (9th Cir. 2017)). Instead, the inquiry centers on "whether [plaintiff] has presented a workable method," and "the likelihood that the model will be capable of generating common answers." *Lytle*, 114 F.4th at 1025, 1032.

The damages model proposed by Plaintiffs 'expert, Dr. Bernard Siskin, is just such a model. It is one model applied across the class, based on a well-established methodology, uses uniform, summary inputs from Workay's customers for relevant job requisitions, and also accounts for individualized determinations for damages. The model adapts a statistical methodology commonly used to compute damages associated with a disparate impact liability finding for a discriminatory test in circumstances where there are more individuals adversely impacted by the discriminatory test than positions and the precise individuals who would have been hired absent discrimination cannot be identified. Burrell Decl., R3, Siskin Report ¶¶ 3, 10. In the context of this litigation in which harmed class members[24] applied to various job requisitions through Workday's platform, the model conceives of a harmed class member failing "Workday's AI tool's screening test" for a requisition if a harmed class member received a rating, grade, or score below the lowest rating, grade, or score of an applicant processed for the job. *Id.* ¶¶ 3, 9, 12. To calculate damages associated with various job requisitions harmed class members applied to, the model relies on common inputs of information from Workday's customers to determine which requisitions resulted in monetary damages for harmed class members (i.e., the requisition has a shortfall of harmed class members who would have continued in the hiring process for that requisition absent their AI screening score, rating, or grade). *Id.* ¶¶ 7, 14. For each such requisition, the model describes step-by-step the common method to compute damages, which can be summed over requisitions to

[24] "Harmed class member" is the term used in the model because the model assumes a liability finding would define who is harmed by the specific employment practice(s) found unlawful.

estimate class-wide damages and the damages for harmed class member for distribution on a pro rata basis. *Id.* ¶¶ 7, 11, 14, 15.

For mitigation, the model contemplates two approaches, either a survey or a sample. *Id.* ¶¶ 18-21. The survey method uses a claims form for harmed class members eligible for damages and obtains the same information from each of them: earnings data and, for periods of unemployment, whether these harmed class members sought work and any evidence of such efforts. *Id.* ¶¶ 19. Alternatively, the model contemplates the use of a probability sample of harmed class members, who would supply similar information. Based on the information, an expert computes a mitigation rate that then is applied to the total class-wide damages estimate. *Id.* ¶¶ 20-21.

The factors that supported the models accepted in *Lytle* and *Noohi*—the expert's qualifications and whether the analytical method is well-established for measuring classwide damages in similar cases—underscore the reliability of Plaintiffs' model. *See Lytle,* 114 F.4th at 1031; *Noohi,* 146 F.4th at 864. Dr. Siskin has spent decades analyzing "data for statistical evidence of discrimination," and has extensive experience developing statistical estimates of classwide damages in employment discrimination cases. Burrell Decl., R3, Siskin Report ¶ 1*,* App. A. The method Dr. Siskin outlines in his report is one, while tailored to the facts of this case, that he himself has executed in systemic employment discrimination cases to establish classwide damages awards. *Id.* ¶ 1 fn.1, and has been accepted by a court, describing it in detail. *See United States v. City of New York*, 847 F. Supp.2d 395, 412, 425 (E.D.N.Y. 2012) (accepting damages model by Dr. Siskin for aggregate pre-mitigation wage backpay based on shortfalls from the liability finding in a discriminatory employment test context).

Dr. Siskin's damages model is a "workable method" that is feasible after common liability questions are determined. *See Levya v. Medline Indus*., Inc, 716 F.3d 510, 514 (9th Cir. 2013) ("Evidence that damages could feasibly and efficiently be calculated once the common liability questions are adjudicated was sufficient to satisfy predominance."). Plaintiffs 'model does not "merely gestur[e] at a model or describe[e] a general method." *Noohi,* 146 F.4th at 864 (quoting *Lytle*, 114 F.4th at 1032). Rather, Plaintiffs 'model lays out data needed for application

to the facts of this case, Burrell Decl., R3, Siskin Report ¶ 9, and there is a path through discovery to obtain the data outlined in the model.

To promote efficiency and feasibility, Plaintiffs' damages model includes the possibility of using a probability sample for analyzing job requisitions as well as for a mitigation percent to apply to the total backpay figure. *Id.* ¶ 5,16,20-21. The procedures in Plaintiffs' model do not implicate the concerns that the Ninth Circuit raised about statistical sampling in a damages phase in *Jimenez* because use of these samples does not deny Workday the opportunity to raise any individualized defenses at the damages phase. *See* 765 F.3d at 1167–68. In this case, the sampling of job requisitions would apply to calculating total back pay, and the "aggregate amount of backpay does not depend on the individual circumstances of any class member," *See United States v. City of New York*, 2011 U.S. Dist. LEXIS 73660, **39-40 (E.D.N.Y. July 8, 2011). Further, nothing in the proposed probability sample procedure for mitigation prevents Workday from raising a failure to mitigate defense or that an award should be reduced further before any back pay is awarded to an individual harmed class member.

In terms of the broader survey mitigation methodology set out in the damages model, in certifying a remedial (damages) class under Rule 23(b)(3), a court found that a "classwide process to collect information from plaintiffs regarding mitigation" represented a common question on a classwide basis that will "achieve economies of time, effort and expense, and promote uniformity of decision." *Gulino v. Bd. of Ed.,* 2013 U.S. Dist. LEXIS 123948 * 23, 33 (S.D.N.Y. 2013*)* (citations omitted).

3. Certification of the Class is Superior to Other Methods of Adjudication

Rule 23(b)(3)'s superiority requirement calls for "a comparative evaluation of alternative mechanisms of dispute resolution" to determine whether class treatment will reduce litigation costs, protect judicial economy, and promote efficiency relative to the realistic alternatives. *Hanlon*, 150 F.3d at 1023; *Wolin v. Jaguar Land Rover North Am.*, 617 F.3d 1168, 1175 (9th Cir. 2010). That comparison resolves decisively in favor of certification here. As set forth above, each Class Member's claim turns on the same predicate question – whether Workday's artificial intelligence recruiting products caused an unlawful disparate impact based on race, sex, disability

or age. Because the class action is the vehicle "most profitably" suited to adjudicate claims that turn on common proof of this kind, it is the superior method here. *In re Valve Antitrust Litig.*, 780 F. Supp. 3d 1110, 1125 (W.D. Wash. 2024).

Evaluation of class members' interest in individually controlling their own litigation weighs heavily in favor of certification. The individual stakes of any single harmed applicant (primarily lost wages and a share of punitive or liquidated damages) are modest for most class members in relation to the cost of litigating a discrimination claim that requires expert statistical proof of algorithmic bias to establish liability at all. Where "the amount of damages suffered by each class member is not large," this factor favors certification because class members have neither the resources nor any realistic prospect of a better outcome by proceeding alone. *Wolin*, 617 F.3d at 1176.

Nor do manageability concerns defeat superiority. The Ninth Circuit has made clear that courts "should not refuse class certification solely on the basis of manageability concerns," treating manageability instead as one component of the broader superiority inquiry. *Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 585 (9th Cir. 2022). To the extent damages vary by class member, that variation does not undermine superiority, because "the need to individually calculate damages does not defeat class certification." *Leyva*, 716 F.3d at 514; *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011).

Finally, no realistic alternative to class treatment exists. Given the complexity and cost of the statistical and technical proof required to demonstrate disparate impact from an AI screening system, resolving that question once on a class-wide basis is manifestly more efficient, economical, and fair than requiring thousands of individual applicants to separately retain experts and relitigate the same threshold question of whether Workday's AI tools discriminate. *In re Valve Antitrust Litig.*, 780 F. Supp. 3d at 1125; *Sayce v. Forescout Techs., Inc.,* 754 F. Supp. 3d 878, 900 (N.D. Cal. 2024). This is precisely the circumstance the Ninth Circuit has described as "paradigmatic," where "[a] fair examination of alternatives can only result in the apodictic conclusion that a class action is the clearly preferred procedure." *Hanlon*, 150 F.3d at 1023. Class treatment should therefore be found superior under Rule 23(b)(3).

### C. Issue Certification Under Rule 23(c)(4) Is Appropriate in the Alternative

Based on all the foregoing facts and evidence, Plaintiffs move alternatively certify the proposed class and subclasses pursuant to Federal Rule of Civil Procedure 23(c)(4).

## VI. CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request the Court to issue an order certifying the Class and Subclasses defined in Plaintiffs' Notice of Motion for Class Certification; appoint named Plaintiffs Derek Mobley, Jill E. Hughs, Sheila Johnson-Rocha, and FaithLinh Rowe as class representatives as set forth above, and appoint Wiggins, Childs, Pantazis, Fisher & Goldfarb and Winston Cooks as class counsel.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 14, 2026, I electronically filed the foregoing document with the United States District Court for the Northern District of California by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF filers and that they will be served by the CM/ECF system:

| | |
|---|---|
| Julie Ann Totten | jtotten@orrick.com |
| Erin M. Connell | econnell@orrick.com |
| Kayla Delgado Grundy | kgrundy@orrick.com |
| Alexandria R. Elliott | aelliott@orrick.com |

*s/ Meredith Burrell*
Of Counsel
Wiggins Childs Pantazis Fisher & Goldfarb
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (205) 314-0500
Facsimile: (205) 254-1500