# R1

# EXPERT REPORT OF WILL LANDECKER, Ph.D.

September 14, 2026

Case No. 3:23-cv-00770-RFL-LB
Mobley et al. v. Workday, Inc.

**TABLE OF CONTENTS**


**I. INTRODUCTION** 1
**II. SUMMARY OF OPINIONS** 2
**III. STATEMENT OF EXPERT QUALIFICATIONS** 2
**IV. DEFINITIONS AND PRINCIPLES OF ALGORITHMS, MACHINE LEARNING, ARTIFICIAL INTELLIGENCE, AND SOFTWARE** 3
**V. GENERAL PRINCIPLES OF MACHINE-LEARNING BIAS** 7
**VI. THE FOURTH AMENDED COMPLAINT PRESENTS QUESTIONS ABOUT SHARED SOFTWARE AND MODELS DEVELOPED BY A SINGLE VENDOR** 9
**VII. THE EVALUATION OF BIAS IN WORKDAY'S SOFTWARE CAN BE PERFORMED BY AN ANALYSIS OF AGGREGATED CUSTOMER DATA** 11
**VIII. CONCLUSIONS** 12
**APPENDIX A: MATERIALS RELIED ON FOR THIS REPORT** 14
**APPENDIX B: CURRICULUM VITAE** 15


## I. INTRODUCTION

1. I have been retained by Plaintiffs in the Mobley, et al. v. Workday, Inc, Case No. 3:23-cv-00770-RFL litigation to provide technical expertise on how AI/ML algorithmic decision-making tools are designed, trained, and evaluated for systemic bias and professional opinions as applied to the Workday algorithms, Candidate Skills Match, Spotlight, and Fetch, in this case.
2. The information I considered in forming these opinions is listed in Appendix A. If additional data or information becomes available to me following the submission of this report, I expect to supplement this report if requested to do so.

## II. SUMMARY OF OPINIONS

3. [redacted]. Such algorithms are capable of internalizing historical biases present in employment applicant data, and perpetuating this bias systemically over the entire population of employers and applicants subject to those algorithms.

4. Detecting the existence and magnitude of such bias requires measuring relevant outcomes for disparate impacts among a sufficient population of applicants.

5. Whether Workday's algorithms can be customized and configured by individual employers considering unique job descriptions has no bearing on any central and systemic bias that exists in the algorithms.

6. Proper mitigation of algorithmic bias requires explicit intervention by the developer (Workday), and continual monitoring to verify that interventions are and remain successful. These interventions, whether or not successful, will affect the entire population of employers and applicants subject to those algorithms.

## III. STATEMENT OF EXPERT QUALIFICATIONS

7. Currently, I am the chief scientist of the Tech Integrity Lab and the owner of Accountable Algorithm, a technical consulting company focusing on responsible artificial intelligence.

8. My relevant areas of expertise include artificial intelligence ("AI"), machine learning ("ML"), algorithms, the evaluation of algorithms and software (including AI and ML), algorithmic decision-making tools, and remediation strategies for algorithms and software. I received my Ph.D. in Computer Science from Portland State University and my B.A. in Mathematics from Reed College. I research and present at conferences and meetings on the

development and evaluation of algorithms. I have published peer-reviewed articles in the areas of machine learning and artificial intelligence.

9. As a data scientist, machine learning engineer, and technical lead at technology companies including Twitter, Lyft, Stripe, and Nextdoor, I developed, evaluated, and advised on software and algorithms (including AI and ML) for over a decade. This work included the design, training, deployment, and evaluation of algorithms, including those used in applicant screening and other regulated contexts. This work also involved analyzing whether algorithms produce systemic disparities for protected classes, as well as how those disparities can be measured and remediated.

10. I am a member of the Institute of Electrical and Electronics Engineers (IEEE) AI Policy Committee as well as the IEEE Working Group on the Standard for the Procurement, Verification and Validation, and Life Cycle Management of Forensic Technologies. I have served as an expert consultant in cases in both state and federal courts. My attached curriculum vitae includes a list of my published articles in Appendix B.

11. I have been compensated for my work on this case by the Plaintiff at my standard expert rate of $500. My compensation is not contingent on the outcome of this case.

## IV. DEFINITIONS AND PRINCIPLES OF ALGORITHMS, MACHINE LEARNING, ARTIFICIAL INTELLIGENCE, AND SOFTWARE

12. An algorithm is a logical process that runs on a computer in order to perform a task[1]. The logic of the algorithm exists in code (instructions written in a computer-legible language) on the computer performing the task. The code contains the instructions that the computer will execute when "running" (meaning, carrying out the logical processes of) the algorithm.

[1] International Organization for Standardization, International Electrotechnical Commission, & Institute of Electrical and Electronics Engineers. *Systems and Software Engineering - Vocabulary*. Standard 24765.

13. *Software* is a program or set of programs running on a computer[2]. In this report, I will use the term to refer to a collection of coordinated algorithms.

14. *Data* refers to a collection of facts, values, or information stored in a manner suitable for human or software interpretation[3]. In this report, I use the word "data" as a general term referring to information or values computed or stored on a computer or storage device, such as an algorithm's inputs (the initial values given to the algorithm), outputs (the final values returned by the algorithm), or intermediate values computed during the algorithm's execution. When software consists of a sequence of algorithms, it is common for one algorithm's output data to serve as another algorithm's input data.

15. A *machine-learned model*[4] is a type of algorithm whose logic is derived (or *trained*, or *learned*, or *inferred*) from the statistical patterns of historical data. The goal of machine learning (ML) is to identify and apply those historical patterns in a way that is useful for future data. The historical data (also called the *training data* or *training dataset*) are typically chosen by a software developer in a way that demonstrates the task that the developer wishes the ML model to perform[5]. For example, if a developer wishes to train an ML model to predict tomorrow's stock prices, they could select historical stock price data in hopes that the model will make profitable trading decisions in the future. Similarly, a developer wanting an ML model that aids hiring decisions could train the model with a training dataset of historical hiring decisions.

16. While some types of algorithms are directly written in legible and comprehensible code by developers, the logic of an ML model is not written explicitly by the developer. Instead, the ML model's logic is encoded in (a potentially enormous number of) parameters and

[2] *Id*.
[3] *Id*.
[4] Sometimes called a *machine-learning model.*
[5] Bishop, *Pattern Recognition and Machine Learning* (Springer, 2006).

operations that are learned from the statistics of the training data. A human may be able to see or read the computer instructions that use the parameters and perform the necessary calculations, but those instructions do not state the model's learned logic as a comprehensible strategy or set of rules. Instead, the model's ability to perform its task emerges from the combined effect of its many learned parameters and operations. As a result, the logic implemented by an ML model is, in general, not intelligible to a human (including trained experts and even the algorithm's developer) merely by inspecting its code or parameters.

17. As an example of the above, consider an algorithm whose task is to determine whether an image contains a face. If the algorithm were written in legible and intelligible code by a human developer, it might contain a clearly articulated strategy such as, "if you see two eyes, a nose, and a mouth, arranged in a particular geometry, then the image contains a face" (with similarly explicit and comprehensible geometric definitions of detecting eyes, noses, and mouths). On the other hand, if the algorithm were an ML model, its code might contain instructions such as, "take the pixel value in the upper left-most corner, and multiply it by 0.7; add this value to the pixel value to its immediate right, multiplied by -0.2; store this intermediate value and multiply the next value to the right by…" and so on. These instructions may technically legible[6], but the strategy is not intelligible or comprehensible by simple examination of the code. And yet the ML model's final output, which is a guess about whether the input image contains a face, may potentially be more accurate than the explicit, intelligible code written by a human developer.

18. Because the logic of an ML model is not typically comprehensible by simply reading its code, a principal way to learn about an ML model is to run the algorithm on appropriately

[6] Some ML model code is not written in a language that was designed to be read by humans, making it both unintelligible and illegible.

chosen inputs and observe its outputs. This is called *testing* or *evaluating* the algorithm[7], and the data used is called the *test data* or *evaluation data*[8]. The model's outputs are then analyzed in some way to answer a question about the model.

19. To perform a proper model evaluation, it is critical that the evaluation data be carefully chosen, and in sufficient quantity, to answer a well-specified question. It is common to ask questions about a model's accuracy (its ability to correctly guess, predict, or infer a value about the input data, such as tomorrow's stock price; whether the candidate was reviewed, accepted, or rejected by the employer; whether the image actually contained a face), its bias (whether the model's outputs result in disparate outcomes or impacts when comparing the input data belonging to different protected classes or groups of people), and many others.

20. [redacted]

21. *Source code* is computer code that developers use to specify the instructions and logic of an algorithm or software. It is written in a language and format that a trained human can read and inspect. How readily a human can understand the logic of source code depends on many factors, including its documentation (such as comments within the code and supplementary reference documents), the organization and architecture of the software, the design patterns chosen by the developer, and the complexity of the underlying algorithm or software. Some source code is therefore much easier to understand than other source code, but in either case its instructions and logic are expressed in a human-readable format.

---

[7] In some contexts, *validating* is used.
[8] In some contexts, *validation data*.
[9] WORKDAY_MOB_00009581
[10] *Id.*
[11] WORKDAY_MOB_00009582
[12] *Id.*
[13] WORKDAY_MOB_00009575

22. The definition of "artificial intelligence" (AI) has changed drastically over time, and is not always consistent from one context to another. I usually use the term synonymously with "machine learning" or "software that contains a machine-learning model." Some use "AI" to mean super-intelligent computer systems[14]; others mean software that interacts with humans using unstructured and "natural" interfaces like written language, videos, or images[15]. In many contexts, AI and ML refer to different aspects of the same software: ML refers to the technical and statistical aspect of an algorithm that was derived from data, and AI refers to the software using ML in a way that allows it to interact with and influence people.

## V. GENERAL PRINCIPLES OF MACHINE-LEARNING BIAS

23. [redacted][16,17,18].

24. Once deployed, such a model (or software that includes such a model, including software that might be called "AI") applies its logic uniformly to all applicants subject to it. Any bias present in the model (such as disparities in selection rates among protected classes, discussed further in Section VII) manifests systemically, not on an applicant-by-applicant basis[19,20].

---

[14] This is also sometimes called "Artificial General Intelligence" (AGI).
[15] This is sometimes called "Generative AI".
[16] Raghavan, Barocas, Kleinberg & Levy, "*Mitigating Bias in Algorithmic Hiring: Evaluating Claims and Practices,*" FAccT (ACM) (2020).
[17] Suresh & Guttag, *"A Framework for Understanding Sources of Harm throughout the Machine Learning Life Cycle,"* Equity and Access in Algorithms, Mechanisms, and Optimization (2021).
[18] WORKDAY_MOB_00006988
[19] Barocas & Selbst, "*Big Data's Disparate Impact*," California Law Review 104 (2016).
[20] Friedman & Nissenbaum, *"Bias in Computer Systems,"* ACM Transactions on Information Systems 14(3) (1996).

25. The origins of such bias can be due to historical biases present in the training data[21,22]. This can lead to bias that exists in the model and software, that expresses itself over all future applicants, and that can be measured using sufficient data[23,24,25].

26. When an ML model is trained to recreate the patterns in historical data that contain biases and disparate impacts, that model is likely to recreate the same biases and impacts when the model is deployed[26,27,28].

27. An *embedding model* is a type of ML model whose goal is to generate mathematical representations of the input data that is useful for some future task. An *embedding* is the mathematical representation that is output by an embedding model[29].

28. Embedding models are capable of internalizing and demonstrating stereotyped associations between demographic groups and occupations, such as the analogy that *man is to computer programmer as woman is to homemaker*[30]. This is true even when the model is trained on seemingly neutral and innocuous training data[31].

29. [redacted]

---

[21] Barocas & Selbst, supra note 19.
[22] Friedman & Nissenbaum, supra note 20.
[23] Barocas & Selbst, supra note 19.
[24] Raghavan et al., supra note 16.
[25] Suresh & Guttag, supra note 17.
[26] Barocas & Selbst, supra note 19.
[27] Bolukbasi et al., *"Man is to Computer Programmer as Woman is to Homemaker? Debiasing Word Embeddings,"* NeurIPS (2016).
[28] NIST Special Publication 1270, *"Towards a Standard for Identifying and Managing Bias in Artificial Intelligence"* (2022).
[29] Bolukbasi et al., supra note 27.
[30] *Id.*
[31] *Id.*
[32] WORKDAY_MOB_00006493

30. Building an ML model that does not recreate the same biases of its training data requires explicit intervention during the development of the system[33,34].

31. Not all anti-bias interventions will successfully yield unbiased models and software. Some interventions have little or no effect, and some hide the bias but do not entirely remove it[35,36]. The common practice in model development is to measure if the intervention was successful after its application, as well as regularly or continuously afterward to determine whether the intervention continues to be successful[37,38].

32. Software that is not machine learned, such as software that is written entirely in source code, is equally capable of producing biased, disparate outcomes across a population of protected classes[39].

## VI. THE FOURTH AMENDED COMPLAINT PRESENTS QUESTIONS ABOUT SHARED SOFTWARE AND MODELS DEVELOPED BY A SINGLE VENDOR

33. The Fourth Amended Complaint states that Workday develops and provides software that is uniformly applied to employers, recruiters, and job applicants who use the Workday software.

34. [redacted]

---

[33] Corbett-Davies, Pierson, Feller, Goel, and Huq, "*Algorithmic Decision Making and the Cost of Fairness,*" Knowledge Discovery and Data Mining (2017)
[34] Institute of Electrical and Electronics Engineers, "*IEEE Standard for Algorithmic Bias Considerations,*" IEEE Standard 7003-2024 (2024)
[35] Gonen and Goldberg, "*Lipstick on a Pig: Debiasing Methods Cover up Systematic Gender Biases in Word Embeddings But do not Remove Them,*" NAACL (2019)
[36] Sariola, Button, Culotta & Mattei, "*The Illusion of Fairness: Auditing Fairness Interventions in Algorithmic Hiring with Audit Studies,*" AAAI (2026).
[37] NIST SP 1270, supra note 28.
[38] IEEE Standard 7003-2024, supra note 34.
[39] Friedman & Nissenbaum, supra note 20.

[redacted].

35. [redacted][40,41].

36. [redacted]

37. From a technical perspective, where software (either configured or customized to the employer, job opening, other entities, or not) screens, reviews, categorizes, ranks, classifies, or scores applications, the following questions apply to the total pool of all job applicants:

a. Whether the software produces, reproduces, causes, or contributes to disparate outcomes or impacts;

b. The magnitude of any such disparities;

c. Whether the magnitude of any such disparities is meaningful; and

d. Whether those disparities are attributable to the software's design, development, implementation, training data, deployment context, or other factors[42,43,44,45,46].

---

40 Raghavan et al., supra note 16.
41 Friedman & Nissenbaum, supra note 20.
42 Bolukbasi et al., supra note 27.
43 NIST SP 1270, supra note 28.
44 Raghavan & Kim, "*Limitations of the 'Four-Fifths Rule' and Statistical Parity Tests for Measuring Fairness,*" 8 Georgetown Law Technology Review (2024).
45 Singh & Joachims, "*Fairness of Exposure in Rankings*," International Conference on Knowledge Discovery & Data Mining (2018).
46 Suresh & Guttag, supra note 17.

38. These questions concern systemic properties of the software developed by Workday and used by its customers[47,48,49].

## VII. THE EVALUATION OF BIAS IN WORKDAY'S SOFTWARE CAN BE PERFORMED BY AN ANALYSIS OF AGGREGATED CUSTOMER DATA

39. Software such as that described in the Fourth Amended Complaint is capable of a centralized evaluation for systemic bias, including statistical analysis comparing the outcomes of demographic groups[50,51].

40. An evaluation of the bias in software includes a comparison and analysis of outcomes of demographic categories such as race, sex, age, and disability status, and, where data permits, intersections and combinations of those categories[52,53,54].

41. In the employment application context, relevant outcomes include applicant selection rates, applicant rejection rates, applicant categorization rates, applicant ranking, and other materially adverse screening results[55,56,57,58].

42. [redacted].

---

[47] Fourth Amended Complaint (hereinafter, "Compl.") at ¶ 4.
[48] Friedman & Nissenbaum, supra note 20.
[49] Raghavan et al., supra note 16.
[50]NIST SP 1270, *supra* note 28.
[51] Raghavan et al., supra note 16.
[52] Barocas & Selbst, supra note 19.
[53]Raghavan & Kim, supra note 44.
[54] Raghavan et al., supra note 16.
[55]Raghavan & Kim, supra note 44.
[56] Raghavan et al., supra note 16.
[57] Singh & Joachims, supra note 45.
[58] Suresh & Guttag, supra note 17.
[59] WORKDAY_MOB_00010440 - WORKDAY_MOB_00010514
[60] WORKDAY_MOB_00010441

43. [redacted]

44. [redacted]

45. [redacted]

## VIII. CONCLUSIONS

46. In my opinion, the software described in the Fourth Amended Complaint is developed by a single vendor, and it is capable of undergoing a bias evaluation[64].

47. [redacted]

48. Whether that software produces disparate outcomes or impacts, the degree of those disparities, and their causes, are central questions whose resolution will apply to the entire population of applicants subject to Workday's software[65].

49. My opinions are based on commonly accepted principles of machine learning, statistics, and bias evaluation[66,67].

---

[61] WORKDAY_MOB_00010449
[62] WORKDAY_MOB_00010474
[63] WORKDAY_MOB_00010493
[64] Compl. at page 3, lines 16 - 19.
[65] Compl. at page 3, lines 25 - 28.
[66] IEEE Standard 7003-2024, supra note 34.
[67]NIST SP 1270, *supra* note 28.

50. My opinions are grounded in the facts and study of algorithms and ML, and the scientific requirements of bias measurement[68,69].

Respectfully submitted,

**Will Landecker, Ph.D.**

[68] Bishop, *supra* note 5.
[69] NIST SP 1270, *supra* note 28.

**APPENDIX A: MATERIALS RELIED ON FOR THIS REPORT**

51. In forming my opinions, I reviewed the following materials, among others:

a. The Fourth Amended Complaint in *Mobley et al. v. Workday, Inc.*;

b. Public descriptions of Workday Inc.'s applicant-screening products;

c. HiredScore's summary of their Workday bias audit;

f. WORKDAY_MOB_00004002

g. WORKDAY_MOB_00006493

h. WORKDAY_MOB_00006988

i. WORKDAY_MOB_00007886

j. WORKDAY_MOB_00009575

k. WORKDAY_MOB_00009581 - WORKDAY_MOB_00009582

l. WORKDAY_MOB_00010440 - WORKDAY_MOB_00010514

**APPENDIX B: CURRICULUM VITAE**

# Will Landecker

will@ti-lab.org

Training, developing, evaluating, deploying, and monitoring algorithms. Helping humans hold technology to high standards.

## Work Experience

**Tech Integrity Lab**
*Chief Scientist*
www.ti-lab.org

Feb 2026 - ongoing

Conduct research, publish articles and educational materials, deliver lectures about measurement, statistics and the development and evaluation of algorithms.

Provide expert assistance in the areas of statistics, algorithms, and their measurements, including machine learning, AI, probabilistic genotyping, facial recognition, biometric identification, generative AI, image recognition, video recognition, and audio recognition.

**Accountable Algorithm**
*Owner*
accountablealgorithm.com

2021 - ongoing

Develop and evaluate algorithms (including machine learning and AI). Measure models and data for a variety of goals including accuracy, bias, transparency, and safety. Remediate models and algorithms. Teach technical teams (engineers, data scientists, analysts) to do the same.

Help executives and cross-functional teams develop policies for AI governance and responsible AI development, deployment, and evaluation.

**Nextdoor**
*Responsible AI Lead and Data Science Tech Lead*

2021 - 2023

Responsible AI Lead, including leading the collection of demographic data and defined metrics used to monitor models and products for disparate impact and bias.

Data Science Tech Lead for the Vitality org, responsible for the analyses and machine-learning projects for a variety of teams: Trust and Safety, Identity, Content Moderation. Oversight of the design, development, evaluation, deployment, and monitoring of the machine-learning models used on these teams.

Co-founder and co-lead of the AI Ethics Committee, a collaboration between the Science and Policy orgs. Established the company's AI Ethics principles and built processes and tools to help model-builders implement these principles.

Founded the Causal Inference Committee, a consulting group within the Data Science org that taught data scientists and machine learning engineers both the scientific principles and engineering approaches to incorporate proper causal inference into the projects that needed it.

**Stripe**, 2021
*Machine Learning Engineer*

Design, implementation, and evaluation of risk models using interpretable machine learning and causal inference.

**Lyft**, 2016 - 2020
*Data Scientist*

Data science and machine learning lead for Safety, Fraud, and Driver Engagement teams. Built, evaluated, and monitored a variety of algorithms and models. Co-lead the Diversity & Inclusion Group's mentorship program.

**Twitter**, 2013 - 2015
*Data Scientist*

Designed, developed, and evaluated machine-learning models using interpretable and privacy-preserving methods. Computer vision and natural language processing.

# Education

**Ph.D. Computer Science**, Portland State University, 2014
Advisor: Melanie Mitchell
Dissertation: *Interpretable machine learning and sparse coding for computer vision.*

My research focused on extracting explanations from trained models, to better understand what was causing them to generate their outputs. My methods allow a model developer or auditor to evaluate a model beyond its accuracy on a static dataset: interpretability allows us to find spurious correlations that were accidentally internalized by a model, identifying failures that would otherwise be undetected.

**B.A. Mathematics**, Reed College, 2006
Senior Thesis: *Hidden Markov Models with Applications to Music*

I researched algorithms that were able to train models on human-generated unstructured data (music) and then generate more data (songs) in styles similar to the data represented during training. This was an early foray into generative AI, before that term existed.

# Publication

D. Popovic, S. Lakhtakia, W. Landecker, and M. Valentine. *Avoid ML failures by asking the right questions*. MIT Sloan Management Review, 65(4), 38–41. 2024.

W. Landecker and Samuel V. Scarpino. *Real-time phenotype prediction from unaligned whole genome sequencing data using deep learning*. Society for Molecular Biology & Evolution — SMBE 2018.

W. Landecker, Rick Chartrand, and Simon DeDeo. *Robust compressed sensing and sparse coding with the difference map*. European Conference on Computer Vision — ECCV 2014.

W. Landecker, Michael D. Thomure, Luís M. A. Bettencourt, Melanie Mitchell, Garrett T. Kenyon, Steven P. Brumby. *Interpreting individual classifications of hierarchical networks.*

Computation Intelligence and Data Mining — CIDM 2013. Special session on Interpretable Systems in Machine Learning.

W. Landecker, Thomas Shrimpton, and Seth Terashima. *Tweakable Blockciphers with Beyond Birthday-Bound Security.* Advances in Cryptology — CRYPTO 2012.

S. P. Brumby, M. Ham, W. Landecker, G. Kenyon, and L. M. A. Bettencourt. *Visualizing classification of natural video sequences using sparse, hierarchical models of cortex*. Nature Precedings, 2011.

S. P. Brumby, G. Kenyon, W. Landecker, C. Rasmussen, S. Swaminarayan, and L. M. A. Bettencourt. *Large-scale functional models of visual cortex for remote sensing*. IEEE Applied Imagery Pattern Recognition Workshop — AIPR 2009.