# R3

# A STATISTICAL METHODOLOGY TO ESTIMATE CLASS-WIDE DAMAGES ASSUMING A FINDING THAT WORKDAY'S ARTIFICAL INTELLIGENCE SCREENING TOOLS HAVE A DISCRIMINATORY DISPARATE IMPACT ON CLASS MEMBER APPLICANTS

**Bernard R. Siskin Ph.D.**
**Managing Director BLDS, LLC**

**September 14, 2026**

# TABLE OF CONTENTS


| | | Page Numbers |
|---|---|---|
| I. | Introduction | 2-3 |
| II. | Summary of Opinions | 3-5 |
| III. | Class-Wide Damage Models | 5-6 |
| | A. Class-Wide Damages: Data Requirements | 5 |
| | B. Class-Wide Damages: Basic Approach | 6-7 |
| | C. Modification of Basic Models for Workday Matter | 7-9 |
| | D. Mitigation Approaches | 9-11 |

# A STATISTICAL METHODOLOGY TO ESTIMATE CLASS-WIDE DAMAGES ASSUMING A FINDING THAT WORKDAY'S ARTIFICAL INTELLIGENCE SCREENING TOOLS HAVE A DISCRIMINATORY DISPARATE IMPACT ON CLASS MEMBER APPLICANTS

**Bernard R. Siskin Ph.D.**

## I. INTRODUCTION

1. I am the Managing Director of BLDS, LLC, a specialty consulting firm. Prior to joining BLDS, I worked at specialty consulting firms, LECG, the Center for Forensic Economic Studies, Inc., and National Economic Research Associates (NERA). Prior to that, I was a tenured faculty member and Chairman of the Department of Statistics at Temple University in Philadelphia. I received my Ph.D. in Statistics with a minor in Econometrics from the Wharton School of the University of Pennsylvania in 1970. I have authored four books on statistical methodology, three book chapters, four research monographs, and numerous papers, including articles on the role of statistics in the analysis of employment discrimination issues. Since receiving my Ph.D., I have specialized in the application of statistics to the analysis of employment practices. I have developed statistical estimates for class-wide damages in multiple cases and was appointed as a neutral party to create a class-wide damage model for a large promotion case. As a statistical expert, I have been retained by numerous governmental and private organizations including, but not limited to, the Third Circuit Task Force on Race and Gender, the Equal Employment Opportunity Commission (EEOC), the Civil Rights Division of the United States Justice Department, the Office of Federal Contract Compliance (OFCCP), the Federal Bureau of Investigation, and various states and municipalities as well as numerous private corporations including many of the Fortune 500 companies. My resume is attached as Appendix A.

I have been asked by Counsel for the Plaintiffs to describe a statistical methodology[1] for estimating class-wide damages assuming that there is a liability finding that Workday's artificial intelligence tools ("AI tools" or "the tools") for screening applications for jobs have a discriminatory disparate impact on certain protected classes. I was provided with summary information about the Candidate Skills Match and Spotlight tools, including a description of the grading, rating, or score output these tools provide. In this model, I assume that the liability finding will determine the class of harmed applicants and relevant shortfalls by protected group, meaning the difference between the percent of class members harmed and the percent of non-class members harmed times the number of class members.

2. While the class of harmed applicants can be determined, and the size of the relevant shortfalls can be determined, we cannot identify which harmed class members would have received the job if Workday's artificial intelligence tools did not have an unlawful disparate impact. In this situation, individual damages cannot be directly computed. Instead, a model based on statistical expectations must be used to determine the overall estimate of damages and the estimated class-wide damages allocated proportionately to all eligible harmed class members.

## II. SUMMARY OF OPINIONS

3. Opinion 1: A statistical methodology is commonly used to compute the damages associated with a situation where a discriminatory test (in this case Workday's artificial intelligence grade, score, or rating) results in harmed individuals and the number of harmed individuals exceeds that relevant shortfall. In this situation, a statistical damages model is the

[1] This report outlines some alternative statistical approaches to estimating class-wide damages. The purpose of this report is to show that reasonable, reliable statistical models estimating class-wide damages exist. A determination of what statistical models are the best would take into account the data available at the time of a liability finding or if additional data is ordered through remedial phase discovery. The proposed statistical class-wide damage approaches delineated below may need to be refined.

standard and only possible approach since there generally are more actual harmed individuals than positions and the precise individuals who would have been hired in the absence of discrimination cannot be identified.[2]

4. Opinion 2: In assessing damages for a single requisition, the usual method is to calculate the damages associated with each harmed class member, determine the average damages per person, multiply that amount by the relevant shortfall, and distribute the resulting damages proportionately among all harmed class members.

5. Opinion 3: When assessing the damages associated with multiple requisitions, all requisitions can be analyzed, or a probability[3] sample of requisitions can be selected and used to assess the damages for the sample and project the results to the full population of requisitions. Given the data constraints in this matter, a probability sample approach should be considered as an option.

6. Opinion 4: To determine damages associated with a requisition, the following data would be needed: Workday grades, ratings, or scores assigned to all applicants who applied for the requisition, and from Workday's customers who posted the requisition (i) the lowest grade, rating, or score of an applicant processed for the job,[4] (ii) the number of applicants hired, and (iii) the economic value of the job(s) or the occupation of the job.

---

[2] In a settlement of a large class finding of racial discrimination in the promotional process covering multiple promotions, I computed the damages using this type of model where the test was applying for the promotion and those not promoted were considered harmed and some applicants applied for the same job for multiple posted openings and for multiple different jobs. In many hiring and promotion matters brought by the Civil Rights Division of the U.S. Department of Justice, I was asked to determine if the test had a disparate impact and estimate the class wide economic damages and used this type of model.

[3] A probability sample is a sample design such that the probability of each member in the population being selected is known. A probability sample will yield an unbiased estimate of the value that would be obtained if the whole population were studied and allows the statistician to determine the accuracy of the sample value in estimating the population values. Thus, a probability sample enables a statistician to make valid and reliable inferences about the population of interest.

[4] If data during liability does not include the assessment results of all applicants that applied to the requisition and instead only class members who applied, Workday's customers would need to report the number of applicants they processed for hire after referral by Workday.

7. Opinion 5: Class-wide damages in this matter could be statistically estimated by applying the damages model above for each requisition being studied for which Workday's AI tools resulted in a relevant shortfall of class members. The damages for that requisition can then be computed using the above model and summed over all such requisitions to estimate class-wide damages, with one modification to the total class damages amount to account for the situation where an applicant applied to so many requisitions that the unadjusted sum would result in a windfall to the applicant and overstate the class-wide damages.

8. Opinion 6: The class-wide damage estimates need to be adjusted for mitigation. However, the specific class members denied the position because of the disparate impact of the Workday AI tools cannot be identified, and hence actual mitigation related to the relevant shortfall cannot be precisely determined. Two alternative approaches are possible to estimate mitigation. One is to survey all harmed class members who based on the class-wide damage computation are eligible for damages. The survey requires harmed class members eligible for damages to supply their earnings data and, if unemployed, whether they sought work and any evidence they may have of such efforts. That information could be used by an expert to compute mitigation for all applicants. An alternative is to select a probability sample of class members who were harmed and assume they are the actual applicants who would have gotten the job. Then determine their earnings and effort in seeking work if unemployed and determine their mitigation. The average sample mitigation percent would then be applied to the total class-wide damage estimate.

## III. CLASS-WIDE DAMAGE MODELS

### A. <u>Class-Wide Damages: Data Requirements</u>

9. To compute the damages associated with a requisition, I would need the

AI screening applicant data for applicants applying to the requisition,[5] and from Workday's customers submitting the requisition, the following summary data (1) the lowest grade, rating, or score of an applicant processed for the job,[6] (2) the number of positions filled, and (3) the economic value of the job(s).[7]

## B. Class-Wide Damages: Basic Approach

10. A statistical methodology is commonly used to compute the damages associated with a situation where a discriminatory test results in a disproportionate number of protected class members failing the test and an applicant must pass the test in order to proceed in the hiring process. In this situation, a statistical damages model is the standard and only possible approach since the shortfall in class members who failed the test are fewer than all class members who failed and hence, the actual class member denied the job cannot be identified. This is similar to the situation in this matter. The usual method is to calculate the damages associated with each class member who failed the test, determine the average damages per person, multiply that amount by the shortfall, and distribute the resulting damages proportionately among all class members who may have suffered economic harm.

11. An overview of such a damages model for a discriminatory test is:

- Step 1: Identify all class members[8] who failed the test and did not opt-out.
- Step 2: Calculate the numerical shortfall of class member test failures.
- Step 3: Compute the hiring rate among test passers plus the relevant shortfall of class members (the number of test passers plus the relevant shortfall in class test passers divided by the number of hires)

[5] It is my understanding that Workday contends that it makes available for its customers, the results for all applications graded by its AI tools.
[6] For applications where a Workday grade or rating is provided.
[7] If Workday's customers will not or cannot supply the job value, wage estimates from the Bureau of Labor Statistics (BLS) surveys or other publicly available private wage data may be used along with the BLS's Employer Costs for Employee Compensation reports, to estimate the value of the job.
[8] In the population or in a probability sample of applicants.

- Step 4: Compute the average value of the job(s). That is, the salary plus value of benefits of the job.

- Step 5: The pool of damages is the result of Step 2 times the result of Step 3 times Step 4.[9]

- Step 6: The pool of damages computed is then allocated proportionately among all class members who failed the test and did not opt out.

- Step 7: The last stage is to reduce the damages to each potential class member due to mitigation.

**C. <u>Modification of Basic Model for Workday Matter</u>**

12. Now let us apply this model to this matter. It is my understanding that Workday's artificial intelligence tools screen applicants' resumes and assign a rating, grade, or score to the applicants.[10] I also understand that Workday contends that it makes available to Workday's customers who use the AI tools, these ratings, grades, or scores. If an applicant is not considered for hire based solely on their Workday's AI tool's rating, grade or scores,[11] the applicant, for purposes of this model, will be considered to have failed Workday's AI screening (this is consistent with the damage model above in terms of a test and who failed the test).

13. Workday evaluates applicants for numerous jobs, and many applicants may have applied for multiple different requisitions, jobs, and to multiple employers.

14. Given the additional data from Workday's customers, we can apply the damage model described above for each requisition being studied. Requisitions for which Workday's assessment

---

[9] Since the computation of damages is limited to the expected hiring shortfall and does not assume that every harmed class member or even the relevant shortfall would be hired but for the disparate impact on the class, it does not overstate the damages.

[10] In some cases, they may not be able to grade and rank an applicant.

[11] If an applicant is assessed and rejected by an AI tool screening, and no rating, grade or score is provided to the Workday customer, for purposes of this model, assuming such applicants would not be considered in the hiring process, that applicant is also categorized as having failed Workday's AI screening test.

resulted in a relevant shortfall of class members failing the Workday "test" can result in damages and will be studied. The damages[12] for that requisition can then be computed using the above model and then summed over all such requisitions to estimate class-wide damages,[13] with one caveat which requires a modification to the total class damages amount. Conceptually the amount of backpay damages awarded to an individual applicant should be calculated to include statistically accounting for an applicant applying and being denied more than one job. However, an applicant's damages, at most, should reflect their being denied one job. However, because we cannot identify which specific job a harmed individual would have received absent discrimination, the individual's damages associated with each requisition they applied for are weighted by the likelihood the applicant would have obtained that job but for the disparate impact of Workday's artificial intelligence assessment. The damages[14] associated with a harmed class member not getting the job are computed. For each harmed class member competing for that job, that amount must be adjusted by the probability that the harmed class member would be the one getting the job (see Step 3 above). When summing up all jobs for which the harmed class member applied, the sum of the probabilities represents the probability they would get a job but for the disparate impact of the Workday's artificial intelligence assessment. Although an individual's total compensable backpay harm can be based only on the loss of at most one job,[15] the sum of probabilities may be greater than one incorrectly indicating the applicant lost more than one job. If it exceeds one, the estimate of damages produces a windfall to the harmed class members and results in overstating the class-wide damages. Accordingly, the total proportional

---

[12] Before considering mitigation.
[13] If conducted on a probability sample basis the results would need to be projected to the full population.
[14] Excluding consideration of mitigation.
[15] Since when they get a job, they would stop seeking work.

damages assigned to any individual across all jobs from which they were harmed is capped at one to eliminate this windfall.

15. The damages for each job studied for which there was a shortfall of harmed class members, can be computed and allocated to all harmed class members and these results summed over all jobs[16] (with the modification that the sum of an individual's aggregated surplus is capped at one) and this would produce a valid statistical estimate of the class-wide damages and the damages for each harmed individual.

16. This statistical modeling of damages could be based on studying all relevant requisitions (those where there are harmed class members) or a probability sample of relevant requisitions. The sample approach would be expected to produce the same estimate of the class damages and is an unbiased estimate of the class damages. The larger the sample used, the more likely the sample estimate would reflect the results one would get from studying all relevant requisitions.[17]

17. The last step is to compute the reduction in class-wide damage due to mitigation.

## D. Mitigation Approaches

18. Step 5 of the damage model methodology gives us damages resulting from the hiring shortfall of harmed class members due to the disparate impact of Workday's AI tools, but not for the specific persons harmed, since they cannot be identified. Since they cannot be identified, the actual mitigation related to the shortfall cannot be precisely determined because not knowing

[16] If based on sample, increase to reflect the estimate of what would be owed if the full population had been studied.
[17] How to design efficiently the probability and to determine a sample size which would produce a desired level of accuracy cannot be done without more detailed information about the population and the data available. From my experience, a sample size of about 500 requisitions may be sufficient. Generally, the size of the population does not impact meaningfully the necessary sample size. For example, if one wants to conduct an election pool and would like the accuracy to be within 3%, approximately the same size sample would be necessary to estimate results of an election in a district, state or in the country.

who the individuals are, we do not know what their earnings are, and what their effort seeking work, if and when they were unemployed, was.

19. Nevertheless, we can compute mitigation for all applicants eligible for damages since presumably all people who would receive damages could be required to supply relevant information concerning their earnings and efforts to seek employment for any periods of unemployment on a claim form.[18] That is, do the mitigation analysis for the full harmed class population eligible for damages. An expert could make the mitigation determinations in terms of earnings and workforce status based on factors established by the court during the remedial phase, which would likely include consideration of W2s and earnings records maintained by the Social Security Administration, as well as information and documentation demonstrating that the individual was seeking work for any periods of unemployment.

20. Alternatively, we can make a valid statistical estimate of the expected degree of mitigation for the damages associated with the jobs by taking a probability sample of harmed class members and assume they are the actual applicants who would have gotten the job and then determine their earnings and labor force status and compute the degree of mitigation for the sample of harmed class members. Finally, the average sample mitigation percent would then be applied to the total class-wide damage estimate.

21. If the sample size is a reasonable size, we could determine the mitigation the way individual mitigation of an individual harmed is commonly done. The applicants in the sample would need to supply evidence of their earnings via producing W2's and releasing their earnings data maintained by the Social Security Administration. If there are periods of not working, the applicant would need to state whether they were seeking work or not. Workday could choose to

[18] I am not a lawyer but from my experience as a damage expert in employment discrimination matters, requiring all individuals receiving damages to supply information about earnings and workforce status is not uncommon.

depose the applicant if they question his work force status. Then based on this information, the expert could compute the mitigation.

22. The statistical methodologies discussed above are presented to show that there are reasonable, reliable statistical methodologies for computing class-wide damages in this case. However, as noted supra, based on additional information about the data produced at the liability stage, as well as additional data that may be available at the remedial stage, I might want to refine my recommendations of the best statistical methodologies for computing class-wide damages. My professional opinion is that a reliable statistical methodology for computing class-wide damages can be developed.

Bernard R. Siskin, Ph.D.
Dated: September 14, 2026

# APPENDIX A

# BLDS, LLC

**Bernard R. Siskin, Ph.D.**
**Director**

BLDS, LLC
105 Forrest Ave, 2nd Floor
Narberth, PA 19072
Main: 215.717.2320
Fax: 215.717.2324
Email: statgroup@bldsllc.com

**SUMMARY**

Bernard Siskin received his B.S. degree in Mathematics from the University of Pittsburgh and a Ph.D. in Statistics from the University of Pennsylvania. For many years, he taught statistics at Temple University and served as Chairman of the Department of Statistics.

Dr. Siskin has specialized in the application of statistics in law, particularly in the area of analyzing data for statistical evidence of discrimination. He has testified for both plaintiffs and defendants in more than 200 cases, many of which were large employment class actions. In addition to discrimination studies, he has conducted statistical studies and has testified in commercial and environmental cases involving statistical issues.

Dr. Siskin has frequently been appointed by federal judges as a neutral expert to aid the court in statistical issues. He was appointed by the Court as Court's Expert to analyze CCC's methodology for determining the value of a lost automobile. In addition, he was the statistical consultant to the Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts.

Dr. Siskin is the author of many articles and textbooks on statistics and quantitative techniques including *Elementary Business Statistics, Encyclopedia of Management* and *Quantitative Techniques for Business Decisions.* He has also written and lectured extensively on the use of statistics in litigation.

He has served as a statistical consultant to the U.S. Department of Justice, the Equal Employment Opportunity Commission, the U.S. Department of Labor, the Federal Bureau of Investigation, the Central Intelligence Agency, the Environmental Protection Agency, the National Aeronautics and Space Administration and Fannie Mae (the Federal National Mortgage Association) and Freddie Mac (the Federal Home Loan Mortgage Corporation), as well as numerous other federal, state and city agencies and Fortune Five Hundred corporations.

# BLDS, LLC

**EDUCATION**
University of Pennsylvania
Ph.D., Statistics (Minor, Econometrics), 1970

University of North Carolina
Graduate Study (Major, Economics; Minor, Statistics), 1966

University of Pittsburgh
B.S., Mathematics (Minor, Economics), 1965

**PRESENT POSITION**
BLDS, LLC, Director, 2011

**TEACHING EXPERIENCE**
Temple University, Adjunct Professor of Law School, 1992 to 2005
Temple University, Tenured Associate Professor of Statistics, 1973 to 1984
Temple University, Chairman-Department of Statistics, 1973 to 1978
Temple University, Assistant Professor of Statistics, 1970 to 1973
Temple University, Instructor of Statistics, 1968 to 1970

**OTHER POSITIONS HELD**
LECG, Director, 2003 to 2011
Center for Forensic Economic Studies, Senior Vice President, 1991 to 2003
National Economic Research Associates, Inc., Senior Vice President, 1989 to 1991
National Economic Research Associates, Inc., Vice President, 1986 to 1989
Center for Forensic Economic Studies, Ltd., President, 1984 to 1986
Center for Forensic Economic Studies, Ltd., Consultant, 1980 to 1984

**PUBLICATIONS**
Books
1. B. Siskin, "Employment Discrimination Litigation: Behavioral, Quantitative, and Legal Perspectives" John Wiley & Sons, Inc. 2005, Chapter 5 *Statistical Issues in Litigation* (with Joseph Trippi).
2. B. Siskin, "Use of Statistical Models to Provide Statistical Evidence of Discrimination in the Treatment of Mortgage Loan Applicants: A Study of One Lending Institution," *Mortgage Lending, Racial Discrimination and Federal Policy*, Urban Institute Press, 1996, J. Georing and R. Wienk, eds.
3. B. Siskin and J. Staller, *What Are The Chances?*, Crown Publishers, 1989.
4. B. Siskin and R. Johnson, *Elementary Statistics: A First Course*, Duxbury Press, 1982.

# BLDS, LLC

**PUBLICATIONS (Continued)**

Books (Continued)

5. B. Siskin and R. Johnson, *Elementary Business Statistics*, Duxbury Press, 1979 2nd Edition, 1985
6. B. Siskin, *Encyclopedia of Management*, McGraw Hill, 1979. (Ed. Les Bechtel).
7. B. Siskin and R. Johnson, *Quantitative Techniques for Business Decisions*, Prentice Hall, 1976.

Articles

1. B. Siskin and D. Griffin, "Litigating Employment Discrimination & Sexual Harassment Claims," *Litigation Handbook Series*, 2002.
2. B. Siskin, H. Carter, V. Lee, G. Page, M. Parker, R.G. Ford, G. Swartzman, S. Kress, S. Singer and D.M. Fry, "The 1986 Apex Houston Oil Spill in Central California: Seabird Mortality and Population Impacts, Injury Assessments, Litigation Process, and Initial Restoration Efforts," *Marine Ornithology*, 2002.
3. B. Siskin, AUtilizing Statistics in Discrimination Cases,@ *Litigation Handbook Series*, 2001.
4. B. Siskin, B. Sullivan, J. Staller, and E. Hull, ADefending and Proving Damages in Employment Discrimination Cases,@ *Litigation Handbook Series*, 2000.
5. B. Siskin, "Litigating Employment Discrimination Cases," *Litigation Handbook Series*, 1998.
6. B. Siskin and D. Kahn, "Litigating Employment Discrimination Cases," *Litigation Handbook Series*, 1997.
7. B. Siskin, R. DuPont, D. Griffin, S. Shiraki, and E. Katze ARandom Workplace Drug Testing. Does It Primarily Identify Casual or Regular Drug Users?,@ *Employment Testing Law & Policy Reporter*, Vol. 4, Number One, 1995.
8. B. Siskin, R. DuPont, D. Griffin, S. Shiraki, and E. Katze "Random Drug Tests at Work: The Probability of Identifying Frequent and Infrequent Users of Illicit Drugs," *Journal of Addictive Diseases*, Vol. 14, Number 3, 1995.
9. B Siskin, J. Staller, B. Sullivan and L. Freifelder, "Litigating Employment Discrimination Cases," *Litigation Course Handbook Series*, 1995.
10. B. Siskin, "Comparing the Role of Statistics In Lending and Employment Cases," *Fair Lending Analysis: A Compendium of Essays on the Use of Statistics*, American Bankers Association, 1995.
11. B. Siskin, "Relationship Between Performance and Banding," *Human Performance*, Vol. 8, No. 3, July 1995.
12. B. Siskin, "Statistical Issues in Litigating Employment Discrimination Claims," *Federal Publications*, 1993.
13. B. Siskin, "Use of Statistical Models to Provide Statistical Evidence of Discrimination in the Treatment of Mortgage Loan Applicants: A Study of One Lending Institution," *Discrimination and Mortgage Lending Research and Enforcement Conference* Department of Housing and Urban Development, May 1993.

# BLDS, LLC

**SPEECHES (Partial List)**

1. Alabama Bar Association
2. American Bar Association
3. American Statistical Association
4. Defense Research Institute
5. Federal Bar Association
6. Harvard University
7. Institute of Industrial Research
8. International Organization of Human Rights Association
9. Law Education Institute
10. Law Enforcement Assistance Administration
11. Michigan Bar Association
12. National Center on Aging
13. Ohio Bar Association
14. Penn State University
15. Pennsylvania Human Relations Commission
16. Practising Law Institute
17. Security Industry Association
18. Women's Law Caucus: National Conference

**STATISTICAL CONSULTANT (Partial List)**

1. Attorney General's Office of the Commonwealth of Pennsylvania, and states of California, Oregon, Massachusetts, Connecticut, Mississippi, Louisiana and New Jersey
2. Board of Higher Education for Massachusetts and Oregon
3. Central Intelligence Agency (CIA)
4. Environmental Protection Agency (EPA)
5. Equal Employment Opportunity Commission (EEOC)
6. Federal Bureau of Investigation (FBI)
7. Freddie Mac (Federal Home Loan Mortgage Corporation)
7. Fannie Mae (Federal National Mortgage Association)
8. Homeland Security
9. International Organization of Human Rights Associations
10. Municipal Court of Philadelphia
11. National Aeronautics and Space Administration (NASA)
12. Office of Federal Contract Compliance, Department of Labor (OFCCP)
13. Pennsylvania Human Relations Commission
14. Security Exchange Commission
15. Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts
16. U.S. Department of Agriculture
17. U.S. Department of Commerce
18. U.S. Department of Labor
19. U. S. Justice Department
20. ADP Auto Source (Assessment of Value of a Lost or Totaled Automobile)
21. Numerous Fortune 500 and other private corporations

# Testimony Listing for Bernard R. Siskin, Ph.D.

| Date | Case Name | Location | Activity | On Behalf Of |
|---|---|---|---|---|
| 2025 | Mitchell v Farmer Ins of WA | Philadelphia, PA | Deposition | Plaintiff |
| 2024 | Memphis v. School District Philadelphia | Philadelphia, PA | Deposition | Plaintiff |
| 2023 | Access Living v. City of Chicago | Philadlephia, PA | Deposition | Plaintiff |
| 2023 | Emergency Group of AZ Prof Corp v. UnitedHealth Gro | Philadelphia, PA | Deposition | Defendant |
| 2023 | Manassa v. NCAA | Philadelphia, PA | Deposition | Plaintiff |
| 2023 | Multiplan UBH | Philadelphia, PA | Deposition | Defendant |
| 2022 | Edmond, et al. v. City of Chiacgo, et al. | Philadelphia, PA | Deposition | Plaintiff |

# APPENDIX B

**DOCUMENTS RELIED UPON**

Plaintiffs' Fourth Amendment Complaint dated filed 07/10/26

Order Granting Preliminary Collective Certification filed 05/16/25

Workday_MOB_00002741.CSM Fact Sheet downloaded 03/20/2023

Workday_MOB_00010213 Spotlight Fact Sheet dated 05/26/2025

Workday_MOB_00004820 Excerpt of HiredScore AI Overview dated 2024

Workday_MOB_00009575 Source Code

Workday_MOB_00006529 Hired Score AI for Recruiting and Talent Mobility