# T4

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

-------------------------------:
DEREK L. MOBLEY for and on :
behalf of himself and other :
persons similarly situated, :
:
Plaintiff, :
: Case No.
vs. : 3:23-cv-00770-RFL
:
WORKDAY, INC., :
:
Defendant. :
-------------------------------:

REMOTE DEPOSITION OF ROBERT SPEAKMAN, PH.D.

DATE: Tuesday, June 23, 2026
TIME: 9:02 a.m.
LOCATION: Remote Proceedings

REPORTED BY: Erick M. Thacker
Reporter, Notary

Job No. 8267389

Q Don't take it -- don't take it as a legal -- I'm asking in your field --

MS. LANDER: It is. You're asking --

BY MR. WIGGINS:

Q Do you know of anything within your field that would make it improper -- and I'm not suggesting it is improper. I'm just asking.

Do you know of anything in your field that would say that Workday customers aren't covered by your analysis?

A That is -- to me, that appears to be 100 percent a legal question. It is not an economics question. It's not a statistics question. I can't -- I can't answer that.

Q Well, sometimes you generalize from one statistical study to a larger field, correct?

A Yes.

Q When do you --

A You --

Q When do you generalize in that -- in that way?

A When you have some reason to believe

there's relevance.

Q Okay. And explain what factors would affect and give you a reason for thinking there's relevance between --

A Okay.

Q -- the data studied and data that's not actually in that study?

A Okay. Suppose I'm looking at unemployment rates in the United States, and in particular, I'm looking at changes in unemployment rates over time. Absent other information, that may be a good -- a good form, a good predictor of unemployment rates and what's happening to unemployment rates, that is, whether they're going up or down within a particular state.

So there are reasons -- if there are reasons to think that you can apply the results of one calculation to another population, but you'd have to go through the reasons you could or could not make that application.

Q Do you know anything that would make

the use of your analysis using Workday data for Workday jobs as the basis for generalizing to the impact of the HiredScore Spotlight tool for other customers, for other employers?

A That's beyond the information and knowledge that I have at this point in time.

Q But you're saying it could be a proper means of generalizing if there was relevance between the HiredScore tool as used with applicants through Workday and the HiredScore tool as used to Workday's customers' applicants?

A Potentially, yes.

Q Did you look into that?

A I don't know how I'd do that. I think we've already established I don't have anybody else's data.

Q Why would you need a customer's data to generalize from Workday's data to whether the same tool would have a similar impact for Workday's customer employers?

A Well, and I should add, I don't have the data to be able to evaluate it, and I don't

have the information necessary to know whether it's relevant.

Q Well, I guess my question is different than that. The --

A Okay.

Q When you're generalizing the way you're describing, do you have to start over and just go get the customer data and do a new study, or can you generalize from -- from the data you do have already?

A No. You would have to know how the other customer is using the tool.

Q How they're using the tool?

A Or -- or you could look at the outcome data. Those are your two options.

Q But would you need new applicant data? Would you need the customer's -- customer employer's applicant data and start over with that dataset, or could you generalize from the dataset based on Workday's use of that same tool?

A Okay. So there -- there's two ways I would think about approaching that. The first

is -- is what you described in your question, which is, if you have their data, you could analyze their data independently and then say -- you arrive at the same conclusions or you don't. It's just a numerical calculation.

The other way is you would look at the factors surrounding the implementation of the tool to determine whether it was sufficiently similar to the way that this calculation that I have done is specified, and that would be another way of saying it could be applicable, depending on the outcome of -- of that study.

Q Do you know of any differences in the way the Workday Spotlight tool is used for an applicant to a company other than Workday?

A No.

Q So -- so, at the moment, you know it's possible. You just don't know -- you just have to study it as to whether --

A Or --

Q -- whether they're --

A Or some --

Q -- applied the same way; is that right?
A Or -- yeah. I'm sorry. I was just going to say, or somebody would have to study it, you being a general you. Somebody would have to study whether --
Q Yeah.
A But other than that, I agree with that, yes.
Q All right. Tell me what you agree with. Make sure we're on the same page.
A Basically that I don't have the information available to be able to analyze it or evaluate it.
Q But it could be done?
A Well, assuming that the data exists, number one certainly could be done. And the other part, somebody would have to look into the details, and that depends upon what data exists, and I think I would leave it at that. If the data exists, it could be done.
Q And do you know of anything about the HiredScore Spotlight algorithm or machine

learning tool --
A No.
Q -- that -- that varies -- no, I'm not finished.
A Okay.
Q Do you know of anything that varies between one set of applicants and another set of applicants that -- when the same tool, the same algorithm, the same machine learning is applied to those two different --
MS. LANDER: Objection to form.
Q -- applicants?
MS. LANDER: Same objection.
A That was a long question. But it basically comes down to, do I know whether there's anything that varies, the first part of your question, and the answer's no, I don't know of anything that varies between two users' implementation of -- of this tool.
Q Okay. Have you ever in your work with the OFCCP and some of the other employers that you identified in your CV that's involving

that, Bob. Objection.

MR. WIGGINS: No, I wanted to clarify what I told him before.

Now, Exhibit 37. This is Guardian Insurance.

(Deposition Exhibit Number 37 was marked for identification.)

MS. LANDER: Same objection as to this exhibit. If this is being used to support your case, it should have been produced in discovery before this deposition.

MR. WIGGINS: That's not an objection to form. You can make that objection later.

MS. LANDER: I'm putting --

MR. WIGGINS: Under the -- under the rules, that type of objection is -- is reserved automatically. You can raise it later. The only thing that you waive here is --

MS. LANDER: I'm going to put my objections --

MR. WIGGINS: -- objection --

MS. LANDER: -- on the --

MR. WIGGINS: -- to form.
MS. LANDER: I'm going to put my objections on the record.
MR. WIGGINS: Well, please keep it to what the rule allows.
MS. LANDER: I'm objecting to the exhibit, not the question.
BY MR. WIGGINS:
Q Have you had a chance to read this, Doctor?
A No. I wasn't asked to read it, and I don't know what the question -- do you want me to read it?
Q Yes.
A Okay. Okay. Yeah, I'm done.
Q Okay. Looking at the paragraph that says -- scroll down. Did you get a chance to read the last paragraph?
A No. That wasn't -- that wasn't on the screen, but let me get it. It's only a sentence, so -- okay.
Q And that says, "Additionally, at

applicable times, Guardian will make public the most recent bias audit results for such AI tools, which may be found here."

If, hypothetically, you click that at the word "here" and you get the next page, that is your analysis, correct?

MS. LANDER: Objection.

MR. TINCHER: Objection.

A I'd have to compare numbers, and it appears that somebody's rewritten the tool audit results.

Q Yeah. We went over earlier the fact that your female-male count was 629 and 814, correct?

A Those are the two numbers I know off the top of my head since we --

Q Yeah.

A -- looked at them earlier. So I would say --

Q But --

A -- those two numbers are the same and -- but I also --

Q Yeah.
A -- said I would have to look at all the other numbers to see.
Q All right. Do you want to take time to do that or --
A If you're going to ask me a question about it, yeah, sure.
Q No. My question, I've already asked you. When -- when -- hypothetically, if you click on that and you get this, the page we're looking at, that is your analysis, is it not?
A If we are only talking about the calculations, those first two numbers on female and male agree with the counts in my calculations.
Q And --
A But if you wanted to say the rest of the numbers are the same, I would have to compare them, and you would have to put them on the screen side by side.
Q But the other information here is the same, too, including the date of the study,

September 1 to February 28, 2026.

That's your time period, correct?

MS. LANDER: Objection to form.

A The completion date on the Workday website is March 20th, 2026, and the period over which there is data from September 1st, 2025 to February 2028 [sic] matches the data that I analyzed.

Q All right. Let's look at Exhibit 23 side by side --

A Okay.

Q -- with this page, Exhibit 37.

MS. LANDER: Page 2.

THE WITNESS: Yeah, it's got to be page 2.

MR. WIGGINS: Page 2.

MS. WIGGINS: Of this, of 23.

MR. WIGGINS: Twenty -- yeah, Exhibit 23, page 2.

THE WITNESS: Can you scroll up to page 1 really quick? Yeah, I'm just going to -- I'm just going to visually walk down. Okay. And now

scroll down to page 2.

MR. TINCHER: The headings in the chart, Bob, they're not identical, just to put that out there, like impact ratio, selection rate.

MR. WIGGINS: I appreciate that, Moses, but that really is coaching the witness. I don't think he needs coaching.

THE WITNESS: The numbers -- other than rounding that's taking place on -- sorry, I'm looking at Exhibit 37 -- except for the rounding that takes place on the impact ratio and the selection rates, which is different. It doesn't change the number. It just rounded it to a different number of decimals. The numbers agree.

And I like the way I specified the title headers, but subject to -- can we make -- can we make Exhibit 37 bigger, so I can read the tool --

MR. WIGGINS: Sure.

THE WITNESS: -- audit results?

MR. WIGGINS: Sure.

THE WITNESS: Yeah, and I've got to see the whole -- all the paragraphs. And I don't -- I don't need Exhibit 23 to read this, so --

MS. LANDER: And can you expand it sideways and make -- there.

THE WITNESS: That's it. Thanks. Okay. So there's some things that agree and some things that do not agree.

So the numbers are the same. I'll agree with that. The numbers in this Table 1 in Guardian -- in Guardian's Table 1 are the same as the numbers on the -- that are posted on the Workday website, which were generated by my study.

The date the bias audit is completed is correct. The time period covered is correct. The stating that it analyzes five job profiles with the highest volume of applications is correct. When it talks about -- when it talks about certain removals that were made were those who did not provide gender information or conflicting information is consistent with the

study I did.

Where it talks about -- and I lost it now, but it talks about multiple employers -- make sure I get the right word. Yeah, it's the third sentence. "This bias audit uses data from multiple employers who used the same vendor's tool and analyzed data." Then it goes on. That part is not correct. So maybe just their description's wrong, but the numbers agree. The headers are different.

As long as you define those terms in the headers appropriately, it's fine. All applications would refer to the applications in that time period in the five highest jobs.

Does it say anywhere that this is restricted to U.S. applicants or -- in New York City? I don't know if I saw that, but -- so I'm not clear that that's correct. But I will agree that the numbers agree.

BY MR. WIGGINS:

Q Well, if the numbers agree with your Exhibit 23, it's because your Exhibit 23 is only

New York City --
A Yeah.
Q -- data, correct?
A I would just phrase it different. I would say my data is only New York City is my understanding.
Q Yeah.
A And the numbers agree, and I -- I agree with that.
Q Yeah. So, whoever did this, wrote this, and the Guardian posted it saying that the bias audit used data from multiple employers who used the same vendor's tool and analytical tool on five jobs and then says somewhere in there about multiple --
A Yeah.
Q Yeah, there it is.
A Third sentence in the third paragraph. Yeah.
Q Yeah. The third sentence about the multiple employers, the basis of this, it's not true for the data that's shown, correct?

A That is -- that is correct. That is -- what you said is correct that what is written there is incorrect --
Q Yeah.
A -- if it's referring to my study.
Q Yeah. Well, we know it's referring to your study because the numbers in Table 1 on Exhibit 37 are the same except for the minor points you made about your data in Exhibit 23, correct?
A If you were making that argument to me, I would believe you.
Q Yeah. And you would believe me because, objectively, that's what the numbers show?
A Because the numbers are the same, right. I mean, it -- it would be a real strange occurrence for them to analyze a separate database and come up with exactly the same numbers.
Q Have you ever done any work that had Guardian data in it?

A Can you -- I'm willing to answer your question, but let's just make it specific to -- same question I asked you earlier. Ever in my lifetime?

Q No, in terms of this study and this contract --

A Yeah.

Q -- and this assignment and engagement. That's the only thing I'm asking you about.

A Fantastic. I just wanted you to clarify that --

Q Yeah.

A -- for your question. The answer's no, I've never looked at Guardian's data, application data or otherwise.

Q And you've never talked to anybody at Guardian about a bias audit, have you?

A No.

Q You never gave them the permission to use your analysis, did you?

A We've said I've never talked to anybody. I don't know if I have to give anybody

permission to use it, but I don't know if I have that right, to be honest.

MR. WIGGINS: All right. Well, let's take a lunch break. Is that all right --

THE WITNESS: Okay.

MR. WIGGINS: -- with everybody?

THE WITNESS: Yeah.

(Whereupon, at 12:34 p.m., a luncheon recess was taken.)

**Mobley, Derek L. v. Workday, Inc.**
**Robert Speakman, Ph.D (#8267389)**

| Page | Line | Change | Reason |
|---|---|---|---|
| 53 | 10 | "Then I would need to put them" to "Then I wouldn't know where to put them" | Clarification |
| 95 | 14 | "you'd be an IOP," to "you'd need an IOP" | Clarification |
| 108 | 16 | "there's anything that varies," to "there's anything that varies or not," | Clarification |
| | 17-19 | "I don't know of anything that varies between two users' implementation of -- of this tool." to "I don't know whether anything varies or if everything varies between two users' implementation of -- of this tool. I don't have any information either way." | Clarification |
| 154 | 8 | "Between 14 and 1,500." to "Between 1,400 and 1,500." | Clarification |
| 163 | 7 | "February 2028" to "February 2026" | Clarification |
| 214 | 12 | "It's data code," to "There's Stata code," | Correction |
| 222 | 14 | "That may say" to "That may or may not say" | Clarification |
| 226 | 2 | "It just stays the same." to "Sometimes it stays the same." | Clarification |

7/23/2026

**Robert B. Speakman, Jr.** **Date**