JULIE A. TOTTEN (STATE BAR NO. 166470)
jatotten@orrick.com
ERIN M. CONNELL (STATE BAR NO. 223355)
econnell@orrick.com
KAYLA DELGADO GRUNDY (STATE BAR NO. 300513)
kgrundy@orrick.com
ALEXANDRIA ELLIOTT (STATE BAR NO. 320293)
aelliott@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

Attorneys for Defendant
WORKDAY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEREK L. MOBLEY, FAITHLINH ROWE, JILL E. HUGHES, AND SHEILAH JOHNSON-ROCHA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

WORKDAY, INC.,

Defendant.

Case No. 3:23-cv-00770-RFL-LB

**DEFENDANT WORKDAY, INC.'S NOTICE OF MOTION AND MOTION FOR DECERTIFICATION OF THE ADEA COLLECTIVE AND MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT**

Judge: Hon. Rita F. Lin
Courtroom: 4, 17th Floor
Date: March 9, 2027
Time: 10:00 a.m.

## NOTICE OF MOTION AND MOTION

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 9, 2027 at 10:00 a.m. or as soon thereafter as may be heard, before the Honorable Rita F. Lin, Courtroom 4, United States District Court, Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102, Defendant Workday, Inc. ("Workday") hereby moves to decertify the preliminarily certified collective under the Age Discrimination in Employment Act ("ADEA") on the grounds that Plaintiffs cannot show they are similarly situated to the opt-in Plaintiffs. This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities and declarations filed herewith, the pleadings and records on file herein, any matters of which the Court may or must take judicial notice, and such other evidence and arguments as may be presented at the hearing.[1]

---

[1] Workday refers to Plaintiffs Derek Mobley, Jill Hughes, Faithlinh Rowe, and Sheilah Johnson-Rocha as the "Named Plaintiffs" and refers to both the Named Plaintiffs and the opt-in Plaintiffs collectively as "Plaintiffs" throughout this Motion.

## TABLE OF CONTENTS


| | | | | Page |
|---|---|---|---|---|
| I. | INTRODUCTION | | | 1 |
| II. | ISSUES TO BE DECIDED | | | 3 |
| III. | RELEVANT FACTUAL BACKGROUND | | | 3 |
| | A. | Workday Sells Software That Helps Employers Manage Their Workforce | | 3 |
| | B. | Workday Develops Its Software Under a Robust Responsible AI Program | | 4 |
| | C. | “Workday Recruiting” Is Software That Customers Control | | 4 |
| | | 1. | Customers Write and Post Their Own Job Requisitions | 5 |
| | | 2. | Customers Often Use Workday Recruiting Without Any Use of AI | 5 |
| | | 3. | Customers Can Only Use CSM to Compare Resumes to Requisitions | 5 |
| | | 4. | Customers Decide How to Disposition Candidates | 7 |
| | D. | Spotlight and Fetch Are Different Products Developed By HiredScore | | 7 |
| | | 1. | Spotlight Measures Alignment Between Requisition and Application | 8 |
| | | 2. | Fetch Helps Recruiters Find Passive Leads; It Does Not Score or Screen | 10 |
| IV. | RELEVANT PROCEDURAL HISTORY | | | 12 |
| | A. | Mobley Initiated This Lawsuit in February 2023 | | 12 |
| | B. | The Court Preliminarily Certified Based on Allegations and Not Evidence | | 12 |
| | C. | Plaintiffs’ Publication Notice Procedure Did Not Limit Opt-In Party Plaintiffs to Individuals Who Are Eligible to Join the Collective | | 13 |
| | D. | Plaintiffs Failed to Deliver On Their Promise to Develop a Record Showing That the More Than 15,154 Party Plaintiffs Are “Similarly Situated” | | 14 |
| V. | RELEVANT LEGAL STANDARDS | | | 16 |
| | A. | Collective Decertification Standard | | 16 |
| | B. | Agency Standard | | 17 |
| | C. | Disparate Impact Standard Under the ADEA | | 17 |
| VI. | THE COURT SHOULD DECERTIFY THE COLLECTIVE | | | 18 |
| | A. | As a Threshold Matter, Plaintiffs Do Not Have Evidence to Show the Bulk of Plaintiffs Fall Within the Preliminarily Certified Collective | | 19 |
| | B. | Plaintiffs Lack Substantial Evidence That They Are Similarly Situated for Purposes of Demonstrating Standing | | 20 |
| | C. | Plaintiffs Lack Substantial Evidence That Workday Acted as an Agent for its Customers as to the Collective Members | | 22 |

**TABLE OF CONTENTS**
(continued)

**Page**


D. Plaintiffs Lack Substantial Evidence Demonstrating That They Are "Similarly Situated" With Respect to the Merits of their Disparate Impact Claim ..... 24

1. Plaintiffs Lack Substantial Evidence That the Collective Was Subject to a Common Policy or Practice ..... 24

2. Plaintiffs Cannot Show They Are Similarly Situated with Respect to Common Resolution of the Issue of a Disparity ..... 26

3. Plaintiffs Lack Substantial Evidence That a Common Policy Caused Any Alleged Disparity ..... 27

E. Workday's Individualized Defenses Require Decertification ..... 31

F. Plaintiffs Who Applied to Workday Must Individually Arbitrate Their Claims and Thus Are Not Similarly Situated to the Rest of the Collective ..... 33

G. Decertification Is Required Because Collective Litigation Is Truly Infeasible ..... 33

VII. CONCLUSION ..... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam v. Kempthorne*,
292 F. App'x 646 (9th Cir. 2008) ........................................ 24

*Apsley v. Boeing Co.*,
722 F. Supp. 2d 1218 (D. Kan. 2010), *aff'd*, 691 F.3d 1184 (10th Cir. 2012) ........ 26

*Bates v. United Parcel Serv., Inc.*,
465 F.3d 1069 (9th Cir. 2006), *on reh'g en banc*, 511 F.3d 974 (9th Cir. 2007) ........ 21

*Beale v. GTE Cal.*,
999 F. Supp. 1312 (C.D. Cal. 1996) ........................................ 26

*Bradley v. T-Mobile US, Inc.*,
2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ........................................ 21

*Braunstein v. Ariz. Dep't of Transp.*,
683 F.3d 1177 (9th Cir. 2012) ........................................ 21

*Butler v. Portland Gen. Elec. Co.*,
748 F. Supp. 783 (D. Or. 1990) ........................................ 26

*Campbell v. City of Los Angeles*,
903 F.3d 1090 (9th Cir. 2018) ........................................ *passim*

*Coe v. Yellow Freight Sys., Inc.*,
646 F.2d 444 (10th Cir. 1981) ........................................ 21

*Cotton v. City of Alameda*,
812 F.2d 1245 (9th Cir. 1987) ........................................ 26

*Doyle v. City of Medford*,
512 F. App'x 680 (9th Cir. 2013) ........................................ 18

*Forsyth v. HP Inc.*,
2020 WL 2524517 (N.D. Cal. May 18, 2020) ........................................ 21

*Gest v. Bradbury*,
443 F.3d 1177 (9th Cir. 2006) ........................................ 20, 21

*Guanzon v. Vixxo Corp.*,
2019 WL 1586873 (D. Ariz. Apr. 12, 2019) ........................................ 25, 31, 33, 34

*Harrington v. Cracker Barrel Old Country Store, Inc.*,
142 F.4th 678 (9th Cir. 2025) ........................................ 33

*Heath v. Google Inc.*,
215 F. Supp. 3d 844 (N.D. Cal. 2016) .......... 24

*Hernandez v. Christensen Bros. Gen. Eng'g, Inc.*,
670 F. Supp. 3d 996 (C.D. Cal. 2023) .......... 25, 31, 33

*Hoffmann-La Roche Inc. v. Sperling*,
493 U.S. 165 (1989) .......... 16

*Jones v. Mukasey*,
565 F. Supp. 2d 68 (D.D.C. 2008) .......... 21

*Katz v. Regents of the University of California*,
229 F.3d 831 (9th Cir. 2000) .......... 28

*King v. Stanislaus Consol. Fire Prot. Dist.*,
985 F. Supp. 1228 (E.D. Cal. 1997) .......... 21

*Lusardi v. Xerox Corp.*,
118 F.R.D. 351 (D.N.J. 1987) .......... 31, 33

*Meacham v. Knolls Atomic Power Lab'y*,
554 U.S. 84 (2008) .......... 24

*Melendez v. Ill. Bell Tel. Co.*,
79 F.3d 661 (7th Cir. 1996) .......... 21

*Moore v. Hughes Helicopters, Inc.*,
708 F.2d 475 (9th Cir. 1983) .......... 18, 26

*Morgan v. Family Dollar Stores, Inc.*,
551 F.3d 1233 (11th Cir. 2008) .......... 17

*Palmer v. United States*,
794 F.2d 534 (9th Cir. 1986) .......... 26

*Phillips v. Cnty. of Riverside*,
2022 WL 2162822 (C.D. Cal. Apr. 7, 2022) .......... 25

*Pittmon v. CACI Int'l, Inc.*,
2023 WL 8168834 (C.D. Cal. Oct. 26, 2023) .......... 25, 34

*Pottenger v. Potlatch Corp.*,
329 F.3d 740 (9th Cir. 2003) .......... 21, 26

*Renati v. Wal-Mart Stores, Inc.*,
2019 WL 5536206 (N.D. Cal. Oct. 25, 2019) .......... 21

*Rose v. Wells Fargo & Co.*,
902 F.2d 1417 (9th Cir. 1990) .......... *passim*

*Shutt v. Sandoz Crop Prot. Corp.*, 944 F.2d 1431 (9th Cir. 1991) .......... 26

*Smith v. City of Jackson*, 544 U.S. 228 (2005) .......... 18, 24, 31

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015) .......... 27, 28

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) .......... 26

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977 (1988) .......... 26, 27

*Weeks v. Matrix Absence Mgmt. Inc.*, 2022 WL 17104261 (D. Ariz. Nov. 22, 2022) .......... 25, 31, 33

*In re Wells Fargo Mortgage Discrimination Litigation*, 794 F. Supp. 3d 662 (N.D. Cal. 2025) .......... 28

**Statutes & Regulations**

29 C.F.R. § 1625.7(d) .......... 18

29 C.F.R. § 1625.7(e)(1) .......... 31

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (FLSA) .......... 13

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Court preliminarily certified Plaintiffs' disparate impact claim under the ADEA for purposes of sending out notice of the lawsuit to individuals who fell within the Court's collective definition and providing them an opportunity to opt in as party plaintiffs. ECF No. 128. That ruling rested on the lenient first-step standard that governs preliminary certification, loosely akin to a plausibility standard, primarily based on the allegations in the operative complaint. That stage is over. The Court left no doubt about what this stage would require. It repeatedly confirmed that it would be Plaintiffs' burden to come forward with evidence to prove their right to proceed collectively. They never delivered. Eighteen months after preliminary certification, Plaintiffs have a heavier burden: they must prove, by substantial evidence, that the 15,000+ opt-in Plaintiffs are similarly situated in ways that are material to their claims. They cannot.

***First***, Plaintiffs cannot show that ***any*** of them are even eligible to be a member of the Court-defined collective. To be eligible, each Plaintiff must show that: (1) they were "scored, sorted, ranked, or screened" by Workday's AI features, (2) any such result was not a "recommendation to hire," and (3) any such result was communicated to a prospective employer ***or*** the Plaintiff was automatically rejected by Workday. *See* ECF No. 128 at 17-18. They have no evidence—let alone substantial evidence—to make that required showing. As to the overwhelming majority of the 15,000+ Plaintiffs, there is no evidence that any of them was scored, sorted, ranked, or screened by Workday's AI features at all. And even for the small number who applied to Workday itself and were graded, that grade alone does not satisfy the Court's criteria. Because the opt-in Plaintiffs have no evidence they are even eligible for membership in the very collective they seek to maintain, the collective must be decertified and their claims dismissed.

***Second***, Plaintiffs cannot show they are similarly situated as to Article III standing, confirming standing cannot be resolved collectively. Plaintiffs have no evidence that any of them suffered any injury, and certainly not one that is traceable to Workday. Nor can they show collective standing sufficient to seek injunctive relief. Eighteen months after preliminary certification, standing remains an inherently individualized inquiry for each of the 15,000+ opt-in Plaintiffs.

Plaintiffs' speculation that Workday's AI features might have harmed them, or may harm them in the future, and that the alleged harms are redressable here cannot substitute for proof.

***Third***, Plaintiffs cannot show they are "similarly situated" on the issue on which their entire theory of liability depends: that they applied to employers that delegated an employment function to Workday. They did not. Customers confirm that Workday does not make or participate in their advancement and rejection decisions. Instead, recruiters and hiring managers exercise independent judgment in deciding which candidates to reject, move forward, and ultimately hire. Customers, and individual recruiters within each customer, may or may not have access to scores or grades. If they have access, they use scores or grades differently or ignore them altogether. Proving agency would therefore require, at a minimum, a customer-by-customer—or, more accurately, a job-by-job—inquiry into whether any particular employer (or individual recruiter or hiring manager within each employer) delegated decision-making to Workday, and if so, to what extent. No common answer exists, confirming Plaintiffs are not "similarly situated" on this threshold issue of agency liability.

***Fourth***, Plaintiffs do not have substantial evidence showing they were subject to a common policy or practice, which is required to avoid decertification. Preliminary certification rested on Plaintiffs' allegation that a uniform policy could be traced to Workday's AI features, rendering the claims susceptible to common proof. The record refutes that notion. The features—CSM, Spotlight, and Fetch—are distinct from one another and function differently across customers, requisitions, and time. Customers decide whether to enable these three features, and for which jobs. They decide which settings to configure, and whether anyone can see any score, grade, or surfaced candidate. In addition, the features have changed over time, so there is no evidence that they operate in a unified way. There is no single "practice" to challenge—only countless customer-specific configurations and individualized determinations about whether and how these software features were used—confirming Plaintiffs were not subject to a common practice.

***Fifth***, Plaintiffs do not have substantial evidence of a disparity caused by Workday's AI-powered software features, let alone common evidence, and therefore they are not "similarly situated" with respect to the last two elements of their disparate impact claim. As evidenced by

their motion for class certification, Plaintiffs' expert did not analyze any disparity based on age, because the limited data Plaintiffs obtained in discovery does not contain age data. And there is no reason to believe such data will ever exist. Moreover, because each output is an input-dependent signal generated by comparing a specific application to a specific customer-written job requisition, determining whether any feature caused a disparate impact in scores, grades, or surfacing of candidates between applicants who are over and under the age of 40 requires individualized, applicant-, customer-, and requisition-specific analyses. Indeed, Plaintiffs report the exact same experience (including repeat rejections) from employers that never used any challenged features.

***Sixth***, Workday's defenses turn on individualized facts. CSM, Spotlight, and Fetch are distinct features that operate differently based on the customer's job requisitions, configuration, and use. Accordingly, whether an outcome is based on a reasonable factor other than age can only be assessed at the job level. Workday cannot fairly present its defense for thousands of jobs and applicants through generalized proof. Denying Workday the ability to present this individualized evidence—which is part of any liability determination—would violate due process.

***Finally***, collective resolution is truly infeasible. Every material issue must be answered plaintiff-by-plaintiff, customer-by-customer, and requisition-by-requisition. There is no feasible way to try more than 15,000 claims in one trial consistent with substantive law and due process.

## II. ISSUES TO BE DECIDED

Whether, based on the record evidence, the Court should decertify the collective and dismiss the opt-in Plaintiffs because Plaintiffs do not have substantial evidence demonstrating they are "similarly situated" for purposes of collective certification and resolution of their ADEA claims.

## III. RELEVANT FACTUAL BACKGROUND[2]

### A. Workday Sells Software That Helps Employers Manage Their Workforce

Workday develops and licenses enterprise software. Wachtel Decl. ¶¶ 6, 8. More than 11,500 organizations use Workday's software to manage business functions such as human

[2] The factual background in Section III is substantively identical to the corresponding fact sections in Workday's concurrently filed Opposition to Class Certification. Because the two briefs address overlapping issues arising from a common factual record, the same background is necessary to each filing, and Workday has repeated it here so that this Motion may be read on its own terms.

resources, payroll, and procurement. *Id.* ¶ 8. Each customer chooses which products to license, whether and how to deploy their configurable features, and who can access them. *Id.* ¶¶ 8, 10.

**B. <u>Workday Develops Its Software Under a Robust Responsible AI Program</u>**

Workday maintains a robust Responsible Artificial Intelligence ("RAI") program through which it seeks to develop ethical AI features that enhance, rather than supplant, consequential human decision-making. Trindel Decl. ¶ 11. Senior executives oversee the program through an RAI Advisory Board, and a dedicated team, including data scientists, builds, maintains, and enforces the program. *Id.* ¶ 14. Workday's RAI guidelines require each new AI tool be subjected to an RAI risk evaluation before becoming generally available. *Id.* ¶ 15. Additionally, Workday confirms in written documentation that the outputs of AI features intended to support hiring are suggestive, not definitive, and human review by customers is important. *Id.* Workday voluntarily obtained ISO 42001 accreditation and a National Institute of Standards and Technology AI Risk Management Framework attestation for its RAI program. *Id.* ¶ 17, Exs. A-B. Consistent with its role as a vendor, Workday conducts fairness testing of its high-risk AI features. *Id.* ¶¶ 22-24, Exs. E-G. Workday also encourages customers to conduct their own testing, based on their own jobs and data. *Id.*

**C. <u>"Workday Recruiting" Is Software That Customers Control</u>**

Workday Recruiting is software that customers license to manage their hiring processes, from requisition management and job postings through candidate management, interviews, offers, and onboarding. Wachtel Decl. ¶ 11. Workday provides the scaffolding; however, each customer builds its own hiring process by deciding which functions to use and how. *Id.* ¶¶ 11, 13, 15, Ex. B; Invisors Decl. ¶¶ 4-5; Grundy Decl. ¶ 50, Ex. 42 (customer configures software "to meet its business and legal needs"). Customers integrated Workday into their hiring process to open more than 39 million requisitions and extend more than 33 million offers in 2025 alone. Wachtel Decl. ¶ 12.

Workday does not operate its software for customers. *See* Wachtel Decl. ¶¶ 57-58; Itzhak Decl. ¶ 7; Biogen Decl. ¶¶ 15-16; Grundy Decl., App. A. Although Workday personnel may assist with a customer's initial setup, customers can change their configurations, and Workday does not track changes. Wachtel Decl. ¶¶ 14, 16, 55; Stein Decl. ¶ 5. Workday does not post jobs, search for candidates, consult with customers about ideal candidate qualifications, or make advancement

decisions. *See* Wachtel Decl. ¶¶ 9, 17, 57; Itzhak Decl. ¶¶ 7, 12; Grundy Decl., App. A.

**1. <u>Customers Write and Post Their Own Job Requisitions</u>**

Customers write their own job requisitions, including the preferred and required qualifications (if any), and decide where to post them. Wachtel Decl. ¶¶ 17-18. Customers configure and manage their own career websites and decide what content to display and what information to request from candidates. *Id.* ¶¶ 17, 19. Applicant data belongs to the customer and is not accessible to Workday or other Workday customers. *Id.* ¶¶ 14, 17, 56.

**2. <u>Customers Often Use Workday Recruiting Without Any Use of AI</u>**

Customers decide which Workday features or third-party integrations to use in their hiring process, and most involve no AI. *Id.* ¶¶ 11, 20, 33; Stein Decl. ¶ 6. "Rating and ranking," for example, rates candidates using criteria and weights the customer selects—for example, scoring a Ph.D. higher than a bachelor's degree or preferring candidates in Atlanta over Chicago—and then tallies each score per the customer's instructions. Wachtel Decl. ¶¶ 20-24, Ex. B; Stein Decl. ¶ 8. Through "knock out questions," customers can disqualify candidates based on their answers. Wachtel Decl. ¶ 25, Ex. B; Ochsner Decl. ¶¶ 4-7. Both can result in quick rejections, but neither involves AI, and neither has utility until configured by the customer. Wachtel Decl. ¶¶ 20-25. Customers may also use third-party assessments, which Workday does not offer. *Id.* ¶¶ 16, 26. When a customer chooses to use one, the customer selects the provider and determines how to act on the results. *Id.*; Grundy Decl. ¶ 49, Ex. 41 (customer using HireVue Assessments and pre-screening scores).

**3. <u>Customers Can Only Use CSM to Compare Resumes to Requisitions</u>**

Of the 5,075 customers that purchased Workday Recruiting between September 2020 and September 2025, [redacted]. Wachtel Decl. ¶¶ 12, 39. Even fewer ever saw or used those scores. *Id.* ¶¶ 38, 40; Stein Decl. ¶¶ 6-7; Grundy Decl., App. B.

***Functionality***. Recruiters can use CSM to assess how the skills on an applicant's resume overlap with the customer's requisition, including a strong, good, fair, or low match (or "pending" or "unable to score"). Wachtel Decl. ¶¶ 41, 43; Lafferty Rep. ¶¶ 70, 88. CSM does not evaluate whether an applicant has a skill; it compares only the text on the application with the text on the

job requisition, Wachtel Decl. ¶¶ 41-42, applying weights based on the customer's designation of the skill as required, optional, or inferred. *Id.* ¶ 44; Lafferty Rep. ¶¶ 71, 85. CSM measures skills—not education, experience, or other qualifications. Wachtel Decl. ¶ 42. To account for differences in terminology, skills in resumes and requisitions are matched to Workday's Skills Ontology, which functions as a dictionary: it treats "project coordination" and "project management" as related skills, and "natural language processing" and "NLP" as the same. *Id.* ¶ 41; Lafferty Rep. ¶¶ 72, 82.

***Outputs.*** Recruiters can see which skills were matched by CSM and which were not, and decide how much weight to give the result, if any. Wachtel Decl. ¶ 43. Candidates do not know their CSM score. *Id.* No action is tied to a CSM result: a "low" score does not trigger a rejection, and a "strong" score does not trigger an interview or offer. *Id.*; Lafferty Rep. ¶¶ 88-89, 153 (based on review of source code, "[redacted]). No score carries over: each application is scored anew, and no customer sees the score a candidate received on another requisition. Wachtel Decl. ¶¶ 45-46; Lafferty Rep. ¶¶ 86-87.

***Changes.*** CSM has changed during the class period. Wachtel Decl. ¶ 47. Workday regularly updates the Skills Ontology and has changed CSM's algorithms as a matter of course, so the same candidate may receive different results under different versions of CSM, even for the same requisition. *Id.*; Lafferty Rep. ¶¶ 72-73, 90-92, 189-190.

***Training.*** CSM is not trained on historical hiring data or hiring decisions. Wachtel Decl. ¶¶ 42, 48; Lafferty Rep. ¶¶ 73, 77, 183.[3]

***Customer Use***. Customers must take affirmative steps to enable and use CSM. Wachtel Decl. ¶ 37, Ex. B. Enabling scoring and displaying results are distinct steps; a customer can activate scoring without making scores visible. *Id.* ¶¶ 37, 40; Accenture Decl. ¶ 11 (two separate configuration steps are required before a recruiter can see a CSM score). Customers also can show scores to only select recruiters, and for some jobs, business units, or locations, and not others. Wachtel Decl. ¶ 40; Stein Decl. ¶¶ 5-6. These variations are not theoretical. For example, Thermo

---

[redacted]

Fisher enabled CSM but never configured its interface to display scores. Thermo Fisher Decl. ¶ 11; *see also* Grundy Decl., App. B. Target made CSM results available only to some recruiters, for some jobs, during just a 12-week pilot. Target Decl. ¶¶ 7-10. Corewell has displayed CSM results since January 2025 but directs recruiters to treat them as one data point among many. Corewell Decl. ¶ 11. Others may see CSM scores and not rely on them. Huron Decl. ¶ 16. Workday does not know which recruiters at any customer can see scores, or whether any recruiter relies on them. Wachtel Decl. ¶¶ 14, 38, 40.

#### 4. <u>Customers Decide How to Disposition Candidates</u>

Customers decide how to review and disposition candidates, and approaches differ. *Id.* ¶¶ 28-29; *see, e.g.*, Ochsner Decl. ¶ 7 (using work authorization as a knockout question); Grundy Decl., App. B. Some review candidates in the order they applied, others reject anyone who lacks key qualifications, others interview standouts only, and still others prioritize referrals. Wachtel Decl. ¶ 28. Workday does not prescribe or encourage any method. *Id.* ¶ 29. Approaches vary even among recruiters at the same customer. *See, e.g.*, Back Decl. ¶ 5. At Workday, recruiters may start with the oldest or newest applications, or filter by location and visa eligibility, or take a posting down when they have enough applications. *See, e.g.*, *id.* ¶ 7; Sarmiento Decl. ¶ 10; Cabral Decl. ¶¶ 5, 6; Accarino Decl. ¶¶ 6, 8. Even the same recruiter may review candidates differently depending on the role. *See, e.g.,* Bacon Decl. ¶ 4. The customer also controls whether and how to notify rejected candidates, including the message and its timing. Wachtel Decl. ¶ 30; Stein Decl. ¶ 9. Some customers set delays, which can cause emails to arrive at odd hours: with a one-day delay, a candidate rejected at 2 PM Pacific may receive the email at midnight Pacific the next day—3 AM in New York. Wachtel Decl. ¶ 31; Sarmiento Decl. ¶ 18. Neither the timing of a rejection email, nor the "@myworkday.com" domain, says anything about whether AI played a role. Wachtel Decl. ¶¶ 31-32; *see, e.g.*, Huron Decl. ¶ 15; Cox Decl. ¶ 16. Notifications are made consistent with the customer's practice; Workday is not involved. Wachtel Decl. ¶ 32; Stein Decl. ¶ 9.

### D. <u>Spotlight and Fetch Are Different Products Developed By HiredScore</u>

HiredScore—an Israel-based company founded in 2013—designed, developed, trained, and tested Spotlight and Fetch in Israel. Itzhak Decl. ¶¶ 4-5. HiredScore licensed Spotlight and Fetch

to its own customers for years before Workday acquired HiredScore in 2024, and did not design, develop, or train either feature. *Id.* ¶ 6; Wachtel Decl. ¶ 49; Lafferty Rep. ¶¶ 69, 95, 167-70. Both features run on the HiredScore platform, separate from Workday Recruiting. Itzhak Decl. ¶ 6; Wachtel Decl. ¶ 50. Not all Spotlight and Fetch customers use Workday Recruiting. Wachtel Decl. ¶ 53; Itzhak Decl. ¶ 15. The features can be used with other applicant tracking systems, including Oracle Recruiting Cloud, Taleo, iCIMS, Avature, and/or SAP SuccessFactors. *Id.*; *see, e.g.*, Grundy Decl. ¶¶ 49, 51, Exs. 41 (Oracle); 43 (Success Factors and Avature). HiredScore does not author requisitions, post jobs, set qualifications, decide whom to interview, or make any hiring decisions. Itzhak Decl. ¶¶ 7, 12; Lafferty Rep. ¶¶ 150-52, 154-56.

**1. <u>Spotlight Measures Alignment Between Requisition and Application</u>**

***Functionality.*** Spotlight measures how closely an applicant's stated qualifications overlap with the requirements the customer includes in a job requisition. Itzhak Decl. ¶¶ 19, 21, 35-36. Where CSM compares skills alone, Spotlight compares a broader set of qualifications, such as years of experience, degree, certifications, and work authorization. *Id.* ¶ 21.

Each step of Spotlight's workflow depends on customer inputs. *Id.*; Lafferty Rep. ¶¶ 97-102. First, the customer's requisition and the candidate's application are converted or "parsed" into structured records of the qualifications they state. Itzhak Decl. ¶¶ 21-22; Lafferty Rep. ¶¶ 97-99. Next, the application is compared to the basic qualifications the customer defined: [redacted] Itzhak Decl. ¶ 23; Lafferty Rep. ¶ 111. The customer sets the qualifications; Spotlight only applies them. Itzhak Decl. ¶ 23; Lafferty Rep. ¶¶ 102, 162. Spotlight thus functions differently for every requisition: a sales manager requisition produces grades based on the qualifications the customer set for that role, a nursing requisition on entirely different ones, and even two similar requisitions at the same customer can produce different grades for the same candidate based on different requirements for the job. Itzhak Decl. ¶ 24; Lafferty Rep. ¶¶ 100-101, 140. [redacted]

[redacted].

***Outputs***. Because a grade measures how closely an application aligns with a requisition's requirements, the same applicant can receive an A for one requisition and a C for another. *Id.* ¶ 36; Lafferty Rep. ¶¶ 101, 147. For example, CANDIDATE-3-1356834 applied for two roles at Workday on the same day: Customer Success Manager and a Machine Learning Engineer. He was graded an "A" on the former and a "C" on the latter. Saad Rep. ¶ 65, Table 11. Grades do not follow the candidate: new applications—even to the same employer—receive a new grade based on the new requisition, and no customer ever sees a grade from another customer. Itzhak Decl. ¶ 38. Candidates do not know what grade they received, if any. *Id.* ¶ 19. Grades are informational: recruiters can consider or ignore them, and recruiters can and do advance candidates graded C or D and decline candidates graded A or B. *Id.* ¶ 20; Lafferty Rep. ¶¶ 109, 113-15, 154; *see* Sarmiento Decl. ¶¶ 21, 25; Disney Decl. ¶¶ 11-12.

***Changes***. Spotlight has changed over time, and customers use different versions that can produce different grades for the same candidate and role. Itzhak Decl. ¶¶ 26-27; Lafferty Rep. ¶¶ 93, 110-12, 116-17. [redacted] Customers also choose between three Spotlight versions: Professional, Blue Collar, and Campus Recruiting. Itzhak Decl. ¶ 29. Each operates differently. *Id.*

***Training***. [redacted]

[redacted]

***Customer Use***. Customers use Spotlight differently. *Id.* ¶ 30. Some do not use it for high-volume or entry-level roles, others do not use it for senior roles, and customers using Workday as their ATS cannot use it for confidential roles. *Id.* ¶ 31; Sarmiento Decl. ¶ 20. Customers can also let candidates opt out of grading entirely. Itzhak Decl. ¶ 31; Ochsner Decl. Ex. A. Customers decide which employees see grades, if anyone, so the same grade can be used, ignored, or never seen at all. Itzhak Decl. ¶ 32. Customers decide which candidate information recruiters see, from name and location to education and experience. *Id.* ¶ 33; Grundy Decl. ¶ 48, Ex. 40 (contract with configuration of user interface). And customer-authored prescreening questions can influence a candidate's grade regardless of the model's logic. Itzhak Decl. ¶ 34. Workday cannot tell whether a recruiter ever saw a grade or relied on it. *Id.* ¶ 37.

Customers' actual practices bear this out. As just one of many examples, Disney started using HiredScore in 2018 on a non-Workday platform and provided it to only 25 recruiters. Disney Decl. ¶ 8. In 2022, Disney began using Spotlight for professional jobs and internships but not for executive, creative, or mass-hiring roles. *Id.* ¶ 9. It routinely advances applicants graded C or D, particularly in technology and specialized roles, and never shares grades with hiring teams. *Id.* ¶¶ 11-12. As another example, a Zelis recruiter testified in a separate action that, despite having HiredScore grades available to her, she "never used" a HiredScore grade. RJN, Ex. C. ***There is no evidence that any customer has based a hiring decision on a Spotlight grade alone.*** To the contrary, recruiters—including Workday's own recruiters in its capacity as a customer—regularly advance candidates graded C or D and decline candidates graded A or B. *See, e.g.*, Bacon Decl. ¶ 8; Accarino Decl. ¶ 12; Sarmiento Decl. ¶ 25; RJN, Ex. A.

### 2. <u>Fetch Helps Recruiters Find Passive Leads; It Does Not Score or Screen</u>

***Functionality***. Fetch is a distinct HiredScore feature with a narrow purpose: helping

recruiters search for passive candidates—people who have ***not*** applied to a role, but whose information is already in the customer's own database, such as past applicants or internal employees. Itzhak Decl. ¶¶ 39-40; Lafferty Rep. ¶¶ 118, 170, 174. Fetch surfaces people whose previously-submitted materials match the basic qualifications of the customer's requisition, subject to the filters and rules the customer configured. Itzhak Decl. ¶ 41; Lafferty Rep. ¶¶ 126, 129, 163. Critically, Fetch generates no visible score or grade at all. Itzhak Decl. ¶ 41; Lafferty Rep. ¶¶ 130, 155.

***Outputs***. Fetch does not advance anyone, schedule interviews, extend offers, or even add candidates to the applicant pool; it only shows the recruiter people who might be worth inviting to apply. Itzhak Decl. ¶ 44; Lafferty Rep. ¶¶ 119, 130-32, 155-56. The recruiter decides whether to invite, dismiss, or save any lead, or to ignore Fetch altogether—and invited candidates decide independently whether to apply. Itzhak Decl. ¶ 48; Lafferty Rep. ¶ 132. Anyone who does apply is processed exactly like every other applicant and receives no preferential treatment or head start, because Fetch can be used only on requisitions already open to all applicants. Itzhak Decl. ¶¶ 49-50. Passive candidates do not know whether Fetch surfaced them. *Id.* ¶ 43.

***Changes***. Fetch has changed over time. Itzhak Decl. ¶ 45; Lafferty Rep. ¶¶ 133, 189.

***Training***. Like Spotlight, [redacted]

***Customer Use***. Customers control how to use Fetch. Whether it surfaces a passive candidate depends on the requisition the customer wrote, the qualifications it defined, and the rules it configured—the same person can be surfaced for one requisition and not another. Itzhak Decl. ¶¶ 41-43, 46. Customers decide who can be surfaced—for example, by requiring candidates to opt in, excluding people with disposition codes such as "not eligible for rehire," or limiting surfacing by geography or application date. *Id.* ¶ 46. Customers also decide how many leads recruiters see and what information appears with them. *Id.* ¶ 47. Purchasing Fetch does not mean any recruiter used it for any given job: recruiters may use it for some roles, but not others; many ignore it entirely;

and those who use it may invite all, some, or none of the people it surfaces. *Id.* ¶¶ 40, 44, 48.

## IV. RELEVANT PROCEDURAL HISTORY

### A. Mobley Initiated This Lawsuit in February 2023

Mobley filed his complaint nearly four years ago. ECF No. 1. After two rounds of motions to dismiss, the Court dismissed Plaintiffs' disparate treatment claims. ECF No. 80. The only ADEA claim remaining is Plaintiffs' disparate impact claim. *Id.* Although Workday addresses Plaintiffs' disparate impact claim for purposes of this Motion, Workday maintains its position that the ADEA does not authorize a disparate impact claim for applicants. *See* ECF Nos. 80, 237, 253, 259, 286.

### B. The Court Preliminarily Certified Based on Allegations and Not Evidence

Two years after filing this lawsuit, Mobley moved to preliminarily certify an ADEA collective consisting of: "[a]ll individuals aged 40 and over who, from September 24, 2020, through the present [] applied for job opportunities using Workday, Inc.'s job application platform and were denied employment recommendations." ECF No. 106 at 14. Workday opposed. ECF No. 107.

On May 16, 2025, the Court granted preliminary certification under the lenient first-step standard that is "loosely akin to a plausibility standard." ECF No. 128 at 6 (quoting *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109 (9th Cir. 2018)). The Court found that Plaintiffs ***plausibly alleged*** a uniform policy applicable to all collective members, thus demonstrating—for purposes of facilitating notice—that Plaintiffs' prima facie claim may be susceptible to common proof.[4] *Id.* at 8-9. Specifically, the Court relied on allegations about Workday's AI features, the effects on applicants over 40, and whether those effects amount to a disparate impact will be the same for all collective members. *Id.* at 9. As such, the Court preliminarily certified a more limited collective than Plaintiffs proposed, consisting only of: "[a]ll individuals aged 40 and over who, from September 24, 2020, through the present, [] applied for job opportunities using Workday, Inc.'s job application platform and were denied employment recommendations." *Id.* at 17. According to the Court, "denied employment recommendations" means that: (1) the individual's application was scored, sorted, ranked, or screened by Workday's AI; (2) the result of the AI scoring, sorting,

---

[4] Contrary to Plaintiffs' contention in their Motion for Class Certification, the Court categorically did not apply the Rule 23 commonality standard in granting preliminary certification; rather, the Court made clear that the standard it applied comes from *Campbell*. ECF No. 128.

ranking, or screening was not a recommendation to hire; and (3) that result was communicated to the prospective employer, or the result was an automatic rejection by Workday. ECF No. 128 at 17-18; *id.* at 19 (rejecting Workday's concerns about the potential size of the collective for notice purposes as it "ignores the qualifiers in the definition of the collective that will limit its scope").

In granting preliminary certification, the Court acknowledged that under *Campbell*'s two-step framework, Workday would have the opportunity to later move for decertification on the grounds that Plaintiffs "fail[] to satisfy the 'similarly situated' requirement in light of the evidence produced to that point." *Id.* at 6. According to *Campbell*, a motion for decertification "resemble[s] a motion for partial summary judgment" where the Court must "take a more exacting look at the plaintiffs' allegations and the record." *Id.* at 6, 8. At stage two, after notice of a plausible collective action is disseminated, the Court "eliminat[es] those whose promise is not borne out by the record." *Id.* at 7-8 (quoting *Campbell*, 903 F.3d at 1110). Although Workday proceeds with this motion under the decertification standard articulated in *Campbell*, Workday does not concede *Campbell*'s standard is consistent with the language and requirements of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and reserves all rights to challenge this standard on appeal.

### C. <u>Plaintiffs' Publication Notice Procedure Did Not Limit Opt-In Party Plaintiffs to Individuals Who Are Eligible to Join the Collective</u>

After the Court preliminarily certified the collective, the Parties negotiated a notice and opt-in procedure. Though the Court preferred targeted notice, there was no practical way to identify whom to notify because the relevant data resides with Workday's customers, and Plaintiffs had not obtained it in discovery. *See* ECF No. 128 at 18; Grundy Decl. Ex. 29, 5:5-7:8.

The Parties therefore had no choice but to proceed with publication notice. *Id.*; *see also* ECF No. 149 at 1. The Parties and the Court then discussed how to determine whether each individual seeking to opt in actually falls within the collective definition. *See* ECF Nos. 160, 170, 180. Recognizing that Named Plaintiffs must affirmatively establish that every opt-in Plaintiff meets the eligibility criteria at stage two, the parties evaluated potential screening procedures, such as pre- and/or post-opt-in eligibility questionnaires and retaining a third-party administrator to verify opt-in forms against Workday's AI customer list. *Id.* Indeed, the Court has repeatedly confirmed that it

is Plaintiffs' burden at decertification to show that the party plaintiffs were "denied employment recommendations" by Workday's AI features. *See* ECF No. 154 ("It will be Plaintiffs' burden at final certification stage to show that the Plaintiffs in the collective were not recommended for hire by Workday's AI features"); ECF Nos. 166 at 2; 175 at 5 (same).

After Plaintiffs rejected a process to screen potential opt-ins before they joined, the parties agreed to a procedure that did not require an eligibility form before opting in but contemplated a post-opt-in eligibility process. *See* ECF No. 186 ¶¶ 3, 7. The Court blessed the plan, remarking that it would not "play a gatekeeping role with respect to an individual's ability to opt-in to this action" but that "individuals who fail to make use of the eligibility process will [likely] be dismissed at the decertification stage because they are ineligible and/or because the parties lack sufficient information to determine their eligibility." *Id.* ¶ 7. At the eleventh hour, Plaintiffs reversed course. They insisted that a post-opt-in form and administrator were unnecessary because Plaintiffs themselves could prove each opt-in's eligibility using their own documents (*e.g.*, applications, emails) and discovery. ECF No. 193 at 3-5 ("individuals are able to establish they applied through Workday's platform to one or more employers who used the challenged AI features . . . by exercising their right to conduct discovery as parties to the case, such as serving subpoenas for documents and depositions on the employers to whom they applied"). The Court took Plaintiffs at their word, agreeing that they may meet this burden at decertification through traditional discovery devices. ECF No. 195. Plaintiffs thus made a deliberate choice to forgo a structured eligibility process in exchange for the promise that they would do the work themselves.

Public notice ran from January 6, 2026 through March 7, 2026. ECF No. 211. Because Plaintiffs abandoned any eligibility forms, every individual who submitted a consent form became, and remains, a party plaintiff on their ADEA claim—regardless of whether they ever applied to an employer that used a challenged feature. The result is a collective of Plaintiffs' own making: over 15,154 Plaintiffs who now seek to try their individual ADEA claims collectively.

**D. <u>Plaintiffs Failed to Deliver On Their Promise to Develop a Record Showing That the More Than 15,154 Party Plaintiffs Are "Similarly Situated"</u>**

Despite assuring the Court they could substantiate each opt-in Plaintiff's eligibility using

their own data and traditional discovery devices, they have utterly failed to do so.

***First***, Plaintiffs have not obtained or produced evidence demonstrating that any of them falls within the definition of the collective and is thus eligible for inclusion.[5] Despite the Court's admonition to move forward with discovery, Plaintiffs made little progress by March 2026: only 109 of the original 195 opt-in Plaintiffs had responded to Workday's discovery, served months earlier on December 16, 2025. ECF No. 279. Plaintiffs had produced no documents, and the responses they did serve were untimely, unverified, and replete with boilerplate objections. *Id.* On March 23, 2026, Workday moved to compel complete and compliant responses. *Id.* Rather than respond to the outstanding discovery, Plaintiffs sought a protective order asking the Court to limit individualized discovery, despite their burden on decertification to put forward substantial evidence that they are "similarly situated." ECF No. 292-1. On April 7, 2026, the Court rejected Plaintiffs' efforts to curtail discovery, holding that Workday could conduct full discovery on a sample of 425 opt-in Plaintiffs and separately might be entitled to additional information from all opt-in Plaintiffs following further meet-and-confer efforts. ECF No. 296.

Consistent with the Court's recognition that the parties could use traditional discovery to obtain opt-in eligibility information and the parties' meet and confer efforts to date, Workday served discovery on all 15,000+ opt-in Plaintiffs on April 15, 2026. Grundy Decl. ¶ 57. Workday sought information about the jobs to which each had applied and the resumes submitted with those applications. *Id.* Workday explained, once again, that it did not have possession, custody, or control of this data (which belongs to its customers) and that the opt-in Plaintiffs are the only parties to this lawsuit that are in possession of that information. *Id.* ¶ 58. Rather than respond substantively by the May 15, 2026 deadline, Plaintiffs served only objections, prompting Workday to move to compel. ECF No. 344-1. The Court granted the motion on June 29, 2026. ECF No. 368. Rather than comply

[5] There is some evidence that a small subset of Plaintiffs ([redacted] of the 15,000+) were 40 or older and applied [redacted] were "scored" by Spotlight, and that those scores were technically available to recruiters if they chose to review them. Grundy Decl. ¶ 53. But that does not make them collective members. They must also show their score was "not a recommendation to hire." ECF No. 128 at 18. But Plaintiffs have refused to adopt a definition of "not a recommendation to hire." Grundy Decl. ¶ 55; ECF Nos. 149, 180. More critically, there is no evidence that any Workday recruiter actually looked at or considered those scores (whether to Plaintiff's benefit or detriment) when dispositioning their applications, further confirming they lack eligibility.

with the Court's order, Plaintiffs sought relief from it. ECF No. 396. On July 23, 2026, the Court denied that challenge and upheld the order. ECF No. 402. On September 4, 2026, Workday asked the Court to impose a deadline for the opt-in Plaintiffs' discovery responses. ECF No. 414. Days later, the Court ordered Plaintiffs to make their initial production by September 21, 2026, with rolling productions every two weeks thereafter until November 30, 2026. ECF No. 415.

To date, Plaintiffs have not produced ***any*** evidence that any of Workday's AI features scored, sorted, screened, or ranked any of their applications to its customers. Those Plaintiffs who have sat for deposition confirmed they do not know whether any employer used Workday's AI features when reviewing their applications, or what grade they received. Grundy Decl. ¶ 5, App. D. Nor is there any evidence that any Workday customer considered—let alone relied upon—any score or grade of any Plaintiff in connection with any job to which they applied. *Id.* ¶ 4, App. C. And while [redacted] of the opt-in Plaintiffs applied for roles at Workday when they were 40 or older, there is no evidence any received a "recommendation not to hire" or that a Spotlight grade influenced their candidacy. *Id.* ¶ 53. All [redacted] also agreed to arbitrate their claims. Sarmiento Decl. ¶¶ 19, 34, Exhibit A.

***Second***, aside from their abject refusal to timely respond to discovery, Plaintiffs also have failed to obtain data from any of Workday's customers—the very discovery they told the Court they would pursue through discovery devices such as subpoenas.[6] As the parties and the Court have repeatedly acknowledged throughout this case, determining whether any of the Plaintiffs are eligible for inclusion in the preliminarily certified collective requires substantial third-party discovery. Despite Workday producing the customer list on October 7, 2025, ECF No. 235, Workday understands Plaintiffs have not obtained any customer applicant data. Grundy Decl. ¶ 79.

## V. <u>RELEVANT LEGAL STANDARDS</u>

### A. <u>Collective Decertification Standard</u>

The ADEA permits a plaintiff to sue on behalf of themselves and others similarly situated. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Collective members are "similarly

---

[6] The only applicant data produced in this case is [redacted] Sarmiento Decl. ¶ 19.

situated" only "to the extent they share a similar issue of law or fact material to the disposition of their . . . claims." *Campbell*, 903 F.3d at 1117. Not just any similarity will do. Plaintiffs must share "a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* at 1115.

The Ninth Circuit utilizes a two-step process, which Workday does not agree is the correct standard, but that it applies for purposes of this Motion. *See id.* at 1108-09. At step one, a plaintiff need only show they "have at least facially satisfied the 'similarly situated' requirement." *Id.* at 1100. This is not an exacting standard. *Id.* Step two is different. At step two, defendants may move to decertify on the ground that the plaintiff's "status as 'similarly situated' was not borne out by the fully developed record." *Id.* At that stage, "the plaintiff bears a heavier burden." *Id.* at 1117-18 (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)). According to *Campbell*, they must prove, by substantial evidence, that they "satisfy the 'similarly situated' requirement in light of the evidence produced to that point." *Id.* at 1109. Where decertification overlaps with the merits, the inquiry is effectively a partial motion for summary judgment. *Id.* at 1117-18. Allegations and preliminary showings no longer suffice. *Id.*

Even if a plaintiff survives that scrutiny, a district court retains discretion to decertify "where conditions make the collective mechanism truly infeasible." *Id.* at 1117 & n.21 (leaving district courts free to apply a modified version of the ad hoc test, or any other test that "gives full effect to" the Ninth Circuit's understanding of section 216(b)).

### B. <u>Agency Standard</u>

An agent may be held liable as an employer when the employer has delegated to it "functions traditionally exercised by an employer" like "hiring." ECF No. 80 at 5, 9. Workday maintains its position that the ADEA does not reach third-party vendors but addresses the Court's articulated standard for purposes of this Motion. ECF Nos. 50, 61, 80.

### C. <u>Disparate Impact Standard Under the ADEA</u>

A disparate impact claim "challenges employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423-24 (9th Cir. 1990) (citations omitted). The "requirements

of a disparate impact prima facie case . . . are in some respects more exacting than those of a disparate treatment case" because a plaintiff must "prove the discriminatory impact at issue." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 481-82 (9th Cir. 1983) (citation omitted). To establish a prima facie case of disparate impact under the ADEA, a plaintiff must: "(1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation." *Rose*, 902 F.2d at 1424. Even if a plaintiff makes a *prima facie* showing, the employer may overcome that showing with evidence that its actions were based on a "reasonable factor[] other than age" or "RFOA." *Doyle v. City of Medford*, 512 F. App'x 680, 681 (9th Cir. 2013). The RFOA defense "assumes that a non-age factor is at work." *Id.* (citing 29 C.F.R. § 1625.7(d)); *see also Smith v. City of Jackson*, 544 U.S. 228, 243 (2005) (recognizing that "[u]nlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement"). Critically, under this framework, the RFOA showing goes to liability, not damages. *Smith*, 544 U.S. at 239 (the RFOA provision "plays its principal role by precluding liability if the adverse impact was attributable to a nonage factor that was 'reasonable'").

## VI. THE COURT SHOULD DECERTIFY THE COLLECTIVE

The Court has multiple bases on which to decertify the collective. Plaintiffs have no evidence—let alone substantial evidence—as to any of the relevant questions material to the resolution of their claims, including: (1) whether Plaintiffs fall within the collective definition, (2) whether Plaintiffs have standing, (3) whether Workday was an "agent" of its customers with respect to the positions at issue, (4) whether Plaintiffs were subject to a common policy or practice, (5) whether Workday's AI features caused a disparate impact, (6) whether the challenged practices are based on an RFOA, and (7) whether Plaintiffs who applied to Workday are bound to individually arbitrate their claims. For these reasons, they do not meet their burden of demonstrating they are "similarly situated." Further, the collective must be decertified for the additional and independent reason that the collective mechanism for adjudicating Plaintiffs' claims is truly infeasible.

### A. As a Threshold Matter, Plaintiffs Do Not Have Evidence to Show the Bulk of Plaintiffs Fall Within the Preliminarily Certified Collective

The Court's preliminary certification order is straightforward. Applying the lenient plausibility standard, the Court found the preliminary collective "alike in the central way that matters: they were allegedly required to compete on unequal footing due to Workday's discriminatory AI recommendations." ECF No. 128 at 2. The collective is therefore limited to "individuals aged 40 and over who, from September 24, 2020, through the present, [] applied for job opportunities using Workday, Inc.'s job application platform and were denied employment recommendations." *Id.* at 17. To have been "denied" an "employment recommendation," each party plaintiff must show "that (i) the individual's application was scored, sorted, ranked, or screened by Workday's AI; (ii) the result of the AI scoring, sorting, ranking, or screening was not a recommendation to hire; and (iii) that result was communicated to the prospective employer, or the result was an automatic rejection by Workday." *Id.* at 17-18. That showing is a threshold, material issue on which this broad collective stands or falls.

With discovery materials available to aid the Court's analysis, the "similarly situated" inquiry is more searching than at the preliminary certification stage. In recognition of this, the Court repeatedly has instructed Plaintiffs that each must demonstrate eligibility for inclusion in the collective at decertification. *See* ECF Nos. 154, 162, 166, 175. They cannot clear even this threshold. Plaintiffs do not know whether any employer to which they applied—to the extent they can recall that employer—used Workday's AI features to review their applications. Grundy Decl. ¶ 5, App. D. Plaintiffs' class certification record is no better. At most, it shows that 38 declarants and 114 early opt-in Plaintiffs (which are not mutually exclusive) in the "age candidate class" applied for jobs at companies appearing on Workday's AI customer list. ECF Nos. 418, 419-01, 419-02. But presence on Workday's AI customer list is not proof that any customer used Workday's AI features for the jobs to which they applied. *See, e.g.*, Thermo Fisher Decl. ¶¶ 10-12 (enabling CSM scores but not making them visible); Grundy Decl. ¶ 2, App. A. Plaintiffs have no evidence that any of these customers used AI to review their applications, or that any Plaintiff was "scored, sorted, ranked or screened by Workday's AI." *See id.* It follows that they cannot offer any evidence

that "the result . . . was not a recommendation to hire," that the "result was communicated to the prospective employer," or that the "result was an automatic rejection by Workday."[7] ECF No. 128 at 18. Despite years to gather this necessary evidence, it remains entirely unknown whether any Plaintiffs are eligible for inclusion in the preliminarily certified collective, which is the obvious first step in determining whether collective treatment is appropriate on the developed record.

To the extent Plaintiffs contend these problems are somehow merits issues and not threshold issues on decertification, Plaintiffs are wrong. Since granting preliminary certification 18 months ago, the Court has recognized that if the "parties lack sufficient information to determine [Plaintiffs'] eligibility" to be in the collective, it is "likely" they will "be dismissed at the decertification stage because they are ineligible and/or because the parties lack sufficient information to determine their eligibility." ECF No. 186 at 3. The decertification stage is now. Plaintiffs traded a structured eligibility process for a promise to prove eligibility through discovery, and then failed to do so. They cannot now ask the Court or Workday to fill the gap, and there is no basis to further delay this four-year litigation. The absence of any record on who belongs in the collective is a problem of Plaintiffs' own making, and their foot-dragging is powerful evidence that Plaintiffs have no way of answering the question on behalf of this monumental collective. Because Plaintiffs have no evidence that they share this critical factual similarity, the time has come for the Court to decertify the collective. *See Campbell*, 903 F.3d at 1115.

### B. <u>Plaintiffs Lack Substantial Evidence That They Are Similarly Situated for Purposes of Demonstrating Standing</u>

Plaintiffs also are not similarly situated as to Article III standing. Indeed, Plaintiffs lack evidence that ***any*** of them: (1) suffered an injury-in-fact, (2) that is fairly traceable to Workday's challenged conduct, and (3) that is likely, not merely speculative, to be redressed by a favorable decision. *See Gest v. Bradbury*, 443 F.3d 1177, 1181-82 (9th Cir. 2006).

To start, Plaintiffs have no evidence that any opt-in Plaintiff suffered an injury, or that any alleged injury is somehow traceable to Workday. The evidence shows that only [redacted] Plaintiffs were

[7] Plaintiffs' suggestion that the 35 Plaintiffs who were not contacted by the employers to which they applied were never surfaced or shortlisted by Fetch, ECF No. 418 at 20, is rank speculation and should be disregarded.

ever scored by Workday's AI features at all, and there is no evidence any grade influenced whether they advanced in the hiring process. That deficiency is fatal, for traceability is the very foundation on which preliminary certification rested. Plaintiffs must demonstrate they are similarly situated as to whether each of them was "subject to the particular employment practice with the alleged disparate impact." *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749-50 (9th Cir. 2003) (affirming summary judgment for employer on ADEA disparate impact claim where, *inter alia*, the plaintiff could not show that his termination was the result of the challenged employment practice); *see also Renati v. Wal-Mart Stores, Inc.*, 2019 WL 5536206, at *9 (N.D. Cal. Oct. 25, 2019) (dismissing disparate impact claims for lack of standing where the plaintiffs challenged policies that did not cause their alleged injury); *Forsyth v. HP Inc.*, 2020 WL 2524517, at *10, *12-13 (N.D. Cal. May 18, 2020) (dismissing discriminatory termination claims under the ADEA for lack of standing to the extent the plaintiffs asserted claims against entities that did not employ them and thus could not have terminated them).

For these same reasons, Plaintiffs cannot demonstrate they are similarly situated as to redressability, meaning a favorable decision would provide a common remedy. *Gest*, 443 F.3d at 1181. Even as to injunctive relief, the Court has found that Plaintiffs need to show "that they were denied the right to compete on equal footing against other candidates due to the allegedly discriminatory nature of Workday's AI recommendation system, and that they intend to apply for jobs in the future through Workday's platform." ECF No. 128 at 16. Although Workday respectfully maintains that Plaintiffs also need evidence that they were qualified—collectively—for the positions sought, *see, e.g.*, *Bradley v. T-Mobile US, Inc.*, 2020 WL 1233924, at *10 (N.D. Cal. Mar. 13, 2020)[8], even using the Court's standard, Plaintiffs cannot meet it. *See supra* § VI.A. Moreover, as the Court already has acknowledged, and case law confirms, to have standing for damages, Plaintiffs ***do*** need to show they are qualified for the positions sought, which they cannot

---

[8] Ninth Circuit and out-of-circuit authority confirms that applicants must be qualified to have standing, even for injunctive relief. *E.g.*, *Bates v. United Parcel Serv., Inc.*, 465 F.3d 1069, 1078 (9th Cir. 2006), *on reh'g en banc*, 511 F.3d 974 (9th Cir. 2007); *King v. Stanislaus Consol. Fire Prot. Dist.*, 985 F. Supp. 1228, 1234 (E.D. Cal. 1997); *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996); *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 451 (10th Cir. 1981) (to establish standing, Title VII plaintiffs must show that "they were qualified for the positions that they sought"); *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008) (same).

do for any of them, let alone on a collective basis. ECF No. 128 at 17 (recognizing that "[t]o be sure, an applicant's qualifications could affect their standing to seek damages" (citing *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1186-87 (9th Cir. 2012))).

Allegations sufficed at step one. They do not at step two. Now, 18 months after preliminary certification, Plaintiffs offer no evidence from which the Court could collectively resolve whether Workday's AI features caused an age-based disparity in hiring and have no plan for belatedly obtaining it. They therefore cannot show they are similarly situated as to whether any one of them suffered an injury traceable to, and redressable by, Workday.

### C. <u>Plaintiffs Lack Substantial Evidence That Workday Acted as an Agent for its Customers as to the Collective Members</u>

Plaintiffs' claims hinge on an unproven threshold predicate: that Workday acted as the "agent" of customers by delegating traditional hiring functions to Workday. ECF No. 80 at 5-11; ECF No. 391 ¶¶ 9, 130-134, 219. Because liability turns on Workday's status as an "agent," continued collective treatment is appropriate only if Plaintiffs can show they are similarly situated in ways that are material to the collective resolution of that issue. They cannot.

Although the Court found Plaintiffs adequately ***alleged*** that Workday acts as an agent of its customers, ECF No. 80 at 11, Plaintiffs bear a heavier burden on decertification. *Campbell*, 903 F.3d at 1117-18. Importantly, the Court's order granting preliminary certification limited the scope of the collective to ***exclude*** individuals who were "scored, sorted, ranked, or screened based only on criteria that were specifically selected by the customer alone," even if the criteria were "effectuated through Workday." ECF No. 128 at 12. At the decertification stage, the ***evidence*** confirms that is exactly what Workday's AI features do, as ***the criteria for scores and grades come from the customers' job requisitions***. *See* Lafferty Rep. ¶¶ 17-18, 152; Itzhak Decl. ¶¶ 19, 21-25, 40-43; Wachtel Decl. ¶¶ 41-44.

The report of Plaintiffs' expert, Dr. Charles Scherbaum, confirms that Plaintiffs cannot produce substantial evidence that they are "similarly situated" with respect to this material issue. Dr. Scherbaum examined only Workday's [redacted] ECF No. 419-82 ¶¶ 46-47; Grundy Decl., Ex. 25, 22:6-20, 187:15-188:9. But if the only way to

analyze for disparate impact is to analyze the customer's use of the software feature, as Dr. Scherbaum did based on [redacted], that undercuts any alleged claim of agency liability based on the software's features because outcomes are tied to the customer's "use" of the features. Moreover, Dr. Scherbaum admitted that he does not know if any Workday recruiter or hiring manager used any Spotlight grade to make an employment decision, including advancing or rejecting candidates. Grundy Decl., Ex. 25, 24:2-28:4. And because he did not analyze any outputs from CSM or Fetch, Plaintiffs have no basis whatsoever to argue agency in the context of those two features. *Id.* at 35:7-14, 189:8-190:17, 191:18-193:11, 222:10-223:23.

Moreover, the customer declarations that Workday submits in support of this Motion show that Workday's customers ***do not*** (uniformly or otherwise) delegate employment functions to Workday. Customers affirmatively disavow delegating any employment decision-making—let alone their hiring function—to Workday, and their actual practices confirm that each customer retains and exercises its own hiring judgment. *See* Biogen Decl. ¶¶ 15-16; Grundy Decl., Apps. A, B. To give just a few examples from the customer declarations, when Target piloted Workday's CSM feature from October 30, 2024 to January 22, 2025, Target itself chose to limit the pilot to jobs managed by approximately eight of its own recruiters. Target Decl. ¶¶ 7, 10-11. During that period, Target made 106 offers of employment for the job requisitions that were part of the pilot. *Id.* ¶ 11. Of those offers, only 10 went to candidates scored "Strong." *Id.* Another 56 candidates were scored "Good," 21 were scored "Fair," and 9 were scored "Low." *Id.* The remainder were not scored at all. *Id.* Similarly, Disney's recruiters use Spotlight as one tool in their own initial review of applicants. Disney Decl. ¶ 10. Spotlight grades applicants based on the skills and experiences listed on their resumes, but Disney does not auto-reject applicants at all, including those graded C or D. *Id.* ¶ 11. In fact, Disney has made offers to candidates who scored C or D. *Id.*

The customers' declarations confirm they do not consider the output from Workday's software features in the same way (if at all), and that they make their own decisions about whom to advance or reject. Each customer—indeed, each recruiter—decides whether, when, and how to use Workday's software features. The customer posts the job, defines the criteria, receives and reviews the applications, and decides who to reject, advance and ultimately hire. Wachtel Decl.

¶ 58; *see also* Grundy Decl., Apps. A-B. Plaintiffs have ***no*** evidence to the contrary, which necessarily would be highly individualized as to each of the 15,000+ Plaintiffs in any event.

### D. Plaintiffs Lack Substantial Evidence Demonstrating That They Are "Similarly Situated" With Respect to the Merits of their Disparate Impact Claim

To avoid decertification, Plaintiffs also must show they are similarly situated as to the substantive elements of their ADEA claim. *Campbell*, 903 F.3d at 1114. This requires substantial evidence that they share a factual or legal similarity as to the specific employment practice they challenge, the disparate impact of that practice, and causation. *See Rose*, 902 F.2d at 1424; *see also Heath v. Google Inc.*, 215 F. Supp. 3d 844, 857 (N.D. Cal. 2016) (recognizing that a plaintiff cannot demonstrate they are similarly situated to members of an overbroad collective that includes individuals who cannot establish an element of the prima facie case). Plaintiffs cannot meet their evidentiary burdens necessary to proceed as a collective.

#### 1. Plaintiffs Lack Substantial Evidence That the Collective Was Subject to a Common Policy or Practice

At the first prong, Plaintiffs must identify a specific employment practice that allegedly caused the adverse impact. *Smith*, 544 U.S. at 241 (rejecting ADEA disparate impact claim where the plaintiff failed to identify "any specific test, requirement, or practice" within a general pay plan "that has an adverse impact on older workers"). Pointing to a generalized policy will not do. *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 100-01 (2008) (recognizing that "[i]dentifying a specific practice is not a trivial burden" and "[t]he aim of this requirement . . . is to avoid the 'result [of] employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances'" (quoting *Smith*, 544 U.S. at 241)). Instead, Plaintiffs must "isolate and identify the specific employment practice responsible for the disparate impact." *Adam v. Kempthorne*, 292 F. App'x 646, 652 (9th Cir. 2008). Plaintiffs cannot do so here.

Plaintiffs cannot show that any AI feature operates as a uniform employment practice as to any two applicants, let alone as to the collective as a whole. Plaintiffs challenge CSM, Spotlight, and Fetch as one practice based on the theory that they operate the same across all customers and

applicants. But these are: (1) separate features, (2) that perform different functions, (3) that have had different versions over time, (4) that are configured differently by each customer, and (5) that are used differently by each customer, including at the recruiter level. *See supra* §§ III.C-D; Lafferty Rep. ¶¶ 17, 20, 134-46, 164-65, 189-90. Plaintiffs only have evidence that shows, at most, that certain Plaintiffs applied for jobs at companies that appear on Workday's AI customer list. ECF No. 418 at 5-6. But there is no evidence that a customer actually used Workday's AI features to evaluate a ***Plaintiff's*** application—let alone the results.

On these facts, *Campbell* forecloses maintaining this action on a collective basis. In *Campbell*, the district court certified an off-the-clock collective where the plaintiffs alleged that the employer maintained an unwritten, Department-wide policy discouraging the reporting of overtime. 903 F.3d at 1120. The Ninth Circuit found that evidence of the existence of this Department-wide policy was "essential to the viability of the collective action" because it was "the sole justification advanced for a Department-wide collective." *Id.* But because the plaintiffs did not put forward any evidence that was "probative of an unwritten overtime policy of that breadth," the court affirmed decertification. *Id.* Post-*Campbell*, district courts have routinely decertified collective actions where the plaintiffs could not put forward sufficient evidence of a uniform practice to demonstrate the collective members were similarly situated. *E.g.*, *Pittmon v. CACI Int'l, Inc.*, 2023 WL 8168834, at *10 (C.D. Cal. Oct. 26, 2023) (decertifying collective where the plaintiffs did not have sufficient evidence of a uniform practice for denying overtime); *Phillips v. Cnty. of Riverside*, 2022 WL 2162822, at *4 (C.D. Cal. Apr. 7, 2022) (same); *Guanzon v. Vixxo Corp.*, 2019 WL 1586873, at *6-7 (D. Ariz. Apr. 12, 2019) (decertifying collective where the plaintiffs were not similarly situated as to one element of the employer's exemption defense, which went to the heart of the merits issue to be decided at trial); *Weeks v. Matrix Absence Mgmt. Inc.*, 2022 WL 17104261, at *2-3 (D. Ariz. Nov. 22, 2022) (same); *see also Hernandez v. Christensen Bros. Gen. Eng'g, Inc.*, 670 F. Supp. 3d 996, 1017-18 (C.D. Cal. 2023) (denying certification at *Campbell*'s second stage analysis where the plaintiffs failed to establish any uniform practices on which their class and collective claims depended). So too here. Plaintiffs cannot put forward evidence of a uniform practice or policy to support their claims. Accordingly, decertification is

required.

### 2. <u>Plaintiffs Cannot Show They Are Similarly Situated with Respect to Common Resolution of the Issue of a Disparity</u>

To establish a disparity, a plaintiff "must not merely prove circumstances raising an inference of discriminatory impact; he must prove the discriminatory impact at issue." *Palmer v. United States*, 794 F.2d 534, 536 (9th Cir. 1986) (quoting *Moore*, 708 F.2d at 482). Because a disparate impact claim focuses on "the consequences of employer action, statistical evidence usually provides the only rational means of determining whether a facially neutral employment practice had a discriminatory impact." *Cotton v. City of Alameda*, 812 F.2d 1245, 1247 (9th Cir. 1987); *see also Pottenger*, 329 F.3d at 749 (a disparate impact claim fails where the proffered statistics do not support a disparate impact analysis). When large numbers are involved, courts ***also*** consider practical significance, which typically is shown using impact ratios or the EEOC's "80 percent" or "4/5ths rule." *E.g.*, *Apsley v. Boeing Co.*, 722 F. Supp. 2d 1218, 1246-47 (D. Kan. 2010) (statistical significance does not equate to practical significance and in cases with "a great deal of data, even small differences may be highly statistically significant"), *aff'd*, 691 F.3d 1184 (10th Cir. 2012). On the other side of the coin, statistical data that is small or incomplete may have little probative value. *Shutt v. Sandoz Crop Prot. Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991) (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 996-97 (1988)). A statistical analysis also fails where it relies on an incorrect comparison pool. *E.g.*, *Beale v. GTE Cal.*, 999 F. Supp. 1312, 1323-24 (C.D. Cal. 1996) (rejecting statistical data that relied on an improper comparator pool); *Butler v. Portland Gen. Elec. Co.*, 748 F. Supp. 783, 790 (D. Or. 1990) (recognizing "[c]ase law indicates that the proper method for assessing statistics in discrimination cases is to examine the entire applicant pool" (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989))).

A disparate impact analysis is necessarily comparative. At minimum, Plaintiffs must show an alleged disparity between applicants who were 40 or older when they applied and those under 40. Plaintiffs have no such evidence and no viable way of getting it. Although their FEHA age discrimination claim is at issue in their Motion for Class Certification, their expert, Dr. Scherbaum, did not even attempt an age analysis. ECF No. 419-82 ¶ 57. He conceded he could not, because he

has no applicant ages or dates of birth. Grundy Decl., Ex. 25, 202:24-203:11. He claims he will review that data if it becomes available, but there is no reason to believe it ever will. ECF No. 419-82 ¶ 57. Employers are not required to collect applicant age data, and most (including Workday, the only entity whose applicant data has been produced) do not. *See* Sarmiento Decl. ¶ 44(b). And the only age data analysis that does exist cuts against Plaintiffs. When Workday's expert, Dr. Ali Saad, analyzed the [redacted] Plaintiffs who applied to [redacted] and have known dates of birth and applied for jobs when aged 40 or older, he found that older applicants had a statistically significantly ***higher*** selection rate than younger applicants. Saad Rep. ¶ 101. Nor can the promise of proxy data save Plaintiffs' claims. Dr. Scherbaum suggested that other information, such as the year of an applicant's first job, might serve as a proxy for age, but claimed he could not perform that analysis on [redacted] applicant data. Grundy Decl., Ex. 25, 36:3-12. Dr. Saad tested Dr. Scherbaum's idea against the opt-in Plaintiffs' actual ages by analyzing their ages against years of experience plus 22 for college graduates. Saad Rep. ¶¶ 16(l), 99-100. He confirmed the "proxy" was inaccurate almost half (45 percent) of the time. *Id.* Alternative "proxies" fared no better. *Id.* Accordingly, there is no reason to believe there will be accurate "proxy" data going forward.

Plaintiffs thus do not have—and will never have—substantial evidence that they are similarly situated with respect to any alleged disparity caused by Workday's AI software features. Because they cannot satisfy their burden of putting forward evidence that their claims can be advanced collectively to resolution on this issue, the collective must be decertified.

#### 3. **<u>Plaintiffs Lack Substantial Evidence That a Common Policy Caused Any Alleged Disparity</u>**

In addition to proving a disparity, Plaintiffs must demonstrate the neutral practice ***caused*** the disparity. *E.g.*, *Rose*, 902 F.2d at 1424 (plaintiffs must prove causation, "that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group" (quoting *Watson*, 487 U.S. at 994)). Plaintiffs cannot show they are similarly situated with respect to the material issue of causation.

Disparate impact carries a "robust causality requirement." *Tex. Dep't of Hous. & Cmty. Affs.*

*v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015) (applying federal disparate impact discrimination framework to Fair Housing Act claim). This requirement "protects defendants from being held liable for . . . disparities they did not create." *Id.* As such, the Ninth Circuit and district courts within the circuit enforce the causation requirement rigorously. For example, in *Rose*, the court affirmed summary judgment in favor of the employer on a disparate impact claim brought under the ADEA where it found the plaintiffs "failed to prove that practice ***caused*** the termination of older . . . employees because of their age." 902 F.2d at 1425 (emphasis added). Likewise, in *Katz v. Regents of the University of California*, the court affirmed dismissal even though an early retirement incentive offered only to members of one retirement plan (average age 55), but not another (average age 60), excluded 27 percent of employees aged 60 or older. 229 F.3d 831, 833, 836 (9th Cir. 2000). The disparity was not enough to show causation because eligibility turned on plan membership, not age. *Id.* Thus, there was no direct nexus between the challenged policy and the employees' age. *Id.* And in *In re Wells Fargo Mortgage Discrimination Litigation*, the court found that the plaintiffs failed to proffer evidence of causation because, even though there was evidence of a statistical disparity, they only pointed to the fact that all applicants used the same applicant system, and did not demonstrate any connection between the two or explain how the system might have caused the disparities on the basis of suspect factors. 794 F. Supp. 3d 662, 670 (N.D. Cal. 2025).

Here, Plaintiffs have no evidence—let alone common evidence—that Workday's AI features caused any disparity. Plaintiffs have produced declarations reflecting they have applied to approximately 600 employers who use Workday's software in some way. Grundy Decl. ¶¶ 60-63. Of those, only 112 have ever enabled any of the challenged features. *Id.* ¶ 62. And even as to those 112 employers, there is no evidence any customer actually used those features at all, or used the features for a particular requisition to which any declarant applied, or that the feature had any influence on an employment decision. Meanwhile, Plaintiffs' own declarations describe the same outcome—rejection or no response—for the hundreds of employers that ***never used*** CSM, Spotlight, or Fetch. *See, e.g.*, ECF No. 419-38 ¶¶ 6, 9 (160 applications to 90 employers; rejected or no response for nearly all); ECF No. 419-40 ¶¶ 6, 9 (140 applications to 120 employers; no

interview or offer); ECF No. 419-20 ¶¶ 6, 9 (115 applications to 70 employers; same). Where the declarants experienced the exact same outcome at the 80 percent of employers that never ran one of the challenged features, the features cannot be what caused it. And because use of Workday's AI features varies between customers, and even recruiter to recruiter, the only way to determine whether any feature ***caused*** any applicant's rejection is an individualized, recruiter-by-recruiter, requisition-by-requisition, plaintiff-by-plaintiff inquiry.

Moreover, Plaintiffs' class certification declarants' theories do not withstand scrutiny. For example, Johnson applied to 11 jobs at Cushman & Wakefield. Cushman & Wakefield Decl. ¶ 11. She was rejected each time. *Id.* While she blames AI, Cushman & Wakefield does not use AI. *Id.* ¶ 12. The disconnect is not unique. Murray and Nelson blame AI for their five rejections from UPS, yet UPS does not use AI in hiring. UPS Decl. ¶¶ 10, 16, 19. Johnston, Nelson, Neshewat, and Bradley each fault AI for their rejections from Cox, but a human decisionmaker dispositioned each of them. Cox Decl. ¶¶ 17-20. Indeed, Cox never enabled Spotlight or Fetch or displayed CSM scores, so no decision could have rested on AI. *Id.* ¶¶ 11, 17-20. Love, Duclos, Murray, Monfredi, and Nelson blame AI for their rejections from Workday, but the recruiters who dispositioned them tell a different story. Recruiters rejected declarants for reasons unrelated to any grade, including that "other candidates were a better fit," Back Decl. ¶¶ 13-14 (Love), and "other applicants were more qualified," Bacon Decl. ¶¶ 10, 13-14 (Duclos). Murray, Monfredi, and Nelson applied before Workday began using Spotlight in 2025 and were never graded. Accarino Decl. ¶¶ 10, 14; Cabral Decl. ¶¶ 10, 12. Plaintiffs' only basis for suspecting AI—an overnight email—reflects only that Workday's system sends rejection notices at midnight the day after a decision, timing that "has nothing to do" with whether AI was used. Accarino Decl. ¶¶ 9, 16; *see also* Sarmiento Decl. ¶ 18; Accenture Decl. ¶ 12. If Plaintiffs' anecdotal method collapses on the available evidence, it cannot establish causation at hundreds of employers about which Plaintiffs have no record. Answering "why was I disfavored" for any declarant requires an individualized inquiry.

The expert evidence further confirms that causation cannot be resolved with common proof. Plaintiffs' own expert helps prove it. Dr. Scherbaum never tested the one thing that matters: whether

Workday's AI features score the same qualifications differently by age.[9] Instead, and confusingly, he claims he used Spotlight grades—which by design measure the match between a requisition and a resume—to explain differences in Spotlight grades. Grundy Decl. Ex. 25, 162:13-163:6. This circular reasoning sheds no light whatsoever on whether the AI-powered software caused any disparities. Saad Rep. ¶ 79. Dr. Scherbaum himself conceded he did not know whether any score differences he found reflected bias, or instead simply reflected differences in qualifications. Grundy Decl., Ex. 25, 294:12-295:2; 157:24-158:6. And the variation in the data in fact suggests that differences in grades are driven by the employer's requisition and the qualifications each applicant chose to include, not age. Saad Rep. ¶¶ 19, 55-68. Moreover, recruiters regularly advance applicants graded C and D. *Id.* ¶¶ 6, 61, 97; *see also, e.g.*, Back Decl. ¶ 9; Bacon Decl. ¶ 8; Accarino Decl. ¶ 12; Disney Decl. ¶ 11; Target Decl. ¶ 11 (CSM). Thus, determining whether a grade caused any applicant's rejection would require requisition-by-requisition study that also accounts for the individual practices of the recruiter and hiring manager involved, along with an individualized review of each applicant's qualifications. Saad Rep. ¶¶ 5, 16(b), (l), (n), (o), 79, 106, 110, 124. That is the antithesis of a question capable of collective resolution.

Finally, Plaintiffs' proffered expert opinion about what machine learning ***could do*** is not evidence of what Workday's AI features ***actually do***. Dr. Landecker's limited opinion, offered in support of Plaintiffs' Motion for Class Certification, that algorithms trained on historical employment data are "capable of internalizing historical biases present in employment applicant data, and perpetuating this bias systemically" does nothing to advance Plaintiffs' claims on a uniform basis. *See* ECF No. 419-81 ¶ 3; *see also* Lafferty Rep. ¶¶ 22, 191-95. Dr. Landecker never examined Workday's AI features, never reviewed their source code, never saw the training data, and never analyzed any applicant data. Grundy Decl., Ex. 27, 19:4-20:14, 30:5-21, 31:12-16. And he could not even testify as to how many algorithms or models each feature contains. Grundy Decl., Ex. 27, 19:4-20:14, 30:5-21, 31:12-32:12, 35:19-36:21, 39:23-41:2, 96:13-22. The same is true for

[9] Although Dr. Scherbaum's "adverse impact" analyses primarily focus on grades, to the extent Plaintiffs claim they have substantial evidence to collectively resolve the question of whether Workday's use of Spotlight caused a disparate impact in ***hiring*** based on age, Plaintiffs are wrong. The only analyses Dr. Scherbaum conducted as to "offers" were intersectional analyses that do not align with the preliminarily certified collective and did not consider age at all.

Dr. Scherbaum. Despite opining that Workday's AI-powered software features are "highly standardized with common features," he did not study them. Scherbaum Rep. ¶ 2a; Grundy Decl., Ex. 25, 19:22-21:3; 130:15-132:9, 174:11-21, 180:8-184:24. Further supporting the individualized nature of Plaintiffs' claims is Dr. Landecker's admission that if outcomes differed by requisition, aggregating disparities across requisitions would be inappropriate. Grundy Decl., Ex. 27, 212:25-214:4. Because each applicant's results must be considered in light of the role's requirements, their qualifications, and the recruiter's independent judgment, there is no way to determine causation absent individualized inquiries, confirming the issue of causation is not susceptible to a common answer, and the collective must be decertified.

### E. Workday's Individualized Defenses Require Decertification

Workday's defenses also are not susceptible to common proof. They require showing the challenged practice is based on an RFOA. *Smith*, 544 U.S. at 242-43.

To demonstrate an RFOA, an employer must show the challenged practice is "objectively reasonable when viewed from the position of a prudent employer mindful of its responsibilities under the ADEA under like circumstances" which "must be decided on the basis of all the particular facts and circumstances surrounding each individual situation." 29 C.F.R. § 1625.7(e)(1). Thus, whether use of CSM, Spotlight, or Fetch is based on a reasonable, non-age factor requires a job-by-job analysis that considers the job requisition, the resumes and the manner in which the employer used the output of the challenged feature. This type of individualized analysis warrants decertification. *See, e.g.*, *Guanzon*, 2019 WL 1586873, at *6-7 (decertifying collective where plaintiffs could not show they were similarly situated with respect to the employer's exemption defense); *Weeks*, 2022 WL 17104261, at *2-3 (same); *see also Hernandez*, 670 F. Supp. 3d at 1018 (denying certification at step two in part because "the relevant defenses raise individualized issues"); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 371-72 (D.N.J. 1987) ("[B]ecause Congress has included certain defenses within the statutory scheme of the ADEA, it is contrary to due process to prevent their utilization by a defendant in the liability phase of the trial.").

Workday's expert confirms the need for a job-by-job analysis. Dr. Dunleavy explains that Spotlight grades "are not created in a vacuum and do not exist outside of a specific job requisition."

Dunleavy Rep. at 8. Each grade reflects how closely an applicant's resume matches the unique requirements that the customer itself defines in the requisition, and the model weights those inputs differently depending on what the customer designates as "required" versus "preferred" and on the profession at issue. *Id.* As Dr. Dunleavy puts it, if comparing Spotlight to a traditional multiple choice employment test, the job requisition created by the customer supplies the content; that is, education and experience are like the test questions. The applicant's chosen resume supplies the answers. And Spotlight is simply a scoring guide used by the test administrator (the customer) to assign right and wrong answers and grades. *Id.* A grade for an entry-level sales development representative and a grade for a Vice President of Strategy & Operations measure dramatically different experience and education. *Id.* at 15-17. Moreover, grades do not determine outcomes. Recruiters and hiring managers retain final authority to advance, reject, or hire candidates for requisition-specific reasons regardless of grade. *See, e.g.*, Wachtel Decl. ¶ 43; Itzhak Decl. ¶¶ 20, 44; Grundy Decl., Apps. A-B. Whether the use of a feature was based on an RFOA therefore cannot be assessed in the abstract; rather, it depends on the requirements the customer set for that job, the applicant pool for that job, and how the feature was actually used for that job.

Dr. Dunleavy further explains that aggregating outcomes across requisitions is inconsistent with accepted methodology and commits a classic aggregation fallacy that can "disguise and distort" any disparity, either manufacturing an apparent disparity or obscuring a real one. Dunleavy Rep. at 17; *see generally id.* Op. 2 and Op. 5. The accepted approach requires analyzing each requisition separately, or rigorously testing whether results are consistent across requisitions before combining them. *See generally id.* at Op. 2. Dr. Scherbaum has himself applied that approach in other cases, admitting that "each requisition may represent a distinct selection opportunity" such that "different adverse impact analyses would be required." *Id.* at 26-27 (quoting Scherbaum). The record confirms why aggregation fails here: 351 of the 3,780 offers that Dr. Scherbaum analyzed came from requisitions with only one graded candidate (where a grade could not possibly have disadvantaged anyone), *id.* at 35, and hundreds of candidates received offers without any Spotlight grade at all, *id.* at 32-33. If the existence of a disparity, its cause, and the reasonableness of the practice all vary by requisition, Workday's RFOA defense must proceed job-by-job. *See generally*

*id.* at Op. 6.[10] Because Workday's RFOA defense goes to liability and is inherently individualized, allowing the case to proceed collectively would effectively deny Workday the ability to defend itself and violate due process. *See, e.g.*, *Guanzon*, 2019 WL 1586873, at *6-7; *Weeks*, 2022 WL 17104261, at *2-3; *Hernandez*, 670 F. Supp. 3d at 1018; *Lusardi*, 118 F.R.D. at 371-72.

### F. Plaintiffs Who Applied to Workday Must Individually Arbitrate Their Claims and Thus Are Not Similarly Situated to the Rest of the Collective

Every Plaintiff who applied for jobs at Workday agreed to resolve their claims through individual arbitration, rather than proceed collectively in court. Sarmiento Decl. ¶ 34, Ex. A. Because [redacted], it is likely that other Plaintiffs who applied to Workday's customers agreed to arbitrate their claims individually as well. But whether, and to what extent, each such Plaintiff is bound to arbitration cannot be answered on a collective basis. It turns on individualized questions, including the scope of the agreements, their enforceability, which state law applies, and whether any Plaintiff raises any individual defenses. No representative or collective-wide evidence can resolve those questions; each must be resolved individually based on each Plaintiff's circumstances, as the Ninth Circuit has recognized. *Harrington v. Cracker Barrel Old Country Store, Inc.*, 142 F.4th 678, 684 (9th Cir. 2025) ("Issues regarding the applicability and enforceability of arbitration agreements are often fact intensive and individualized."). Differing and individualized circumstances regarding arbitration agreements constitute yet another reason the 15,000+ members of the collective do not share "a similar issue of law or fact material to the disposition of their . . . claims." *Campbell*, 903 F.3d at 1117. Proceeding collectively would either require dozens of mini-trials on arbitrability of claims or deprive Workday of its right to enforce the agreements. Neither is consistent with collective treatment. *See Lusardi*, 118 F.R.D. at 371-72.

### G. Decertification Is Required Because Collective Litigation Is Truly Infeasible

Even if Plaintiffs could overcome these deficiencies (they cannot), decertification is

---

[10] Workday acknowledges that the RFOA defense under the ADEA is governed by a different standard than the defense that governs Plaintiffs' disparate impact claims under Title VII and the Americans with Disabilities Act (*i.e.*, "job related and consistent with business necessity"). Under either standard, however, the evidence confirms that Workday's defenses are job- and context-specific, and not susceptible to common proof.

required because there is no feasible way to try their 15,000+ individual ADEA claims together consistent with substantive law and due process. Discovery confirms that every material issue turns on individualized facts, and any joint trial would devolve into thousands of mini-trials.

The Ninth Circuit expressly preserved district courts' discretion to decertify "where conditions make the collective mechanism truly infeasible." *Campbell*, 903 F.3d at 1116-17. As the court recognized, "[a] 'collective' action in which, as a practical matter, no material dispute truly could be heard on a collective basis would hardly be consistent with the FLSA's remedial purpose." *Id.* at 1115-16. Nor does deference to Plaintiffs' choice of procedure change the analysis, as "this deference isn't a blank check—there still must be a showing that the [opt-in] plaintiffs are similarly situated in material respects." *Guanzon*, 2019 WL 1586873, at *6. Mere procedural preference cannot make a collective trial feasible when the record shows it is not. Courts have exercised this discretion since *Campbell*. In *Pittmon*, the court decertified a collective of 316 party plaintiffs because trial would require each to prove they worked unpaid overtime, why they did so, and whether the employer knew or should have known—requiring testimony from each plaintiff's supervisors—and would entitle the employer to present plaintiff-specific evidence of its investigation into underreporting. *Pittmon*, 2023 WL 8168834, at *11. "[S]uch mini-trials would be unmanageable from the point of view of the judicial system and the parties." *Id.* Likewise, in *Guanzon*, the court noted decertification was appropriate because "the multitude of individualized inquiries required at any trial . . . defeat the purpose of collective treatment." *Guanzon*, 2019 WL 1586873, at *7 n.13.

This case is far less manageable. While *Pittmon* involved individualized inquiries within a single employer, here, they multiply across hundreds of independent customers with entirely distinct hiring practices. For every Plaintiff, the factfinder must determine: (1) which customer they applied to; (2) whether they applied to a role at age 40 or older; (3) whether that customer used a challenged AI feature for that requisition; (4) whether the feature actually scored, sorted, ranked, or screened the application; (5) what result it produced; (6) whether that result reached the customer or produced an automatic rejection; and (7) whether the customer's own recruiters, requirements, and judgment drove the outcome. Workday is entitled to contest each of these questions—and its

RFOA defense—job-by-job. No common proof can answer these questions, and no manageable trial plan can resolve them without stripping Workday of its defense rights in violation of the ADEA, its implementing regulations, and Workday's constitutional right to due process. The collective mechanism is truly infeasible, and decertification is required.

## VII. **CONCLUSION**

For the reasons discussed above, Workday respectfully requests an order decertifying the preliminarily certified collective and dismissing all opt-in Plaintiffs without prejudice.

Dated: November 10, 2026

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: *\/s/ Erin Connell*

Erin M. Connell
Julie A. Totten
Kayla Delgado Grundy
Alexandria Elliott
Attorneys for Defendant
WORKDAY, INC.